**IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRIS BROWN; ALLEN MAYVILLE; PRIME PROTECTION STL, LLC D/B/A PRIME PROTECTION STL TACTICAL BOUTIQUE; NATIONAL RIFLE ASSOCIATION OF AMERICA; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; and AMERICAN SUPPRESSOR ASSOCIATION, | : : : : : : : : | No. |
| *Plaintiffs*, | : : | |
| v. | : : | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | : : : : : : : : | |
| *Defendants*. | : : | |

Plaintiffs Chris Brown, Allen Mayville, Prime Protection STL, LLC d/b/a Prime Protection STL Tactical Boutique ("Prime Protection"), National Rifle Association of America ("NRA"), Firearms Policy Coalition, Inc. ("FPC"), Second Amendment Foundation ("SAF"), and American Suppressor Association ("ASA," and together with NRA, FPC, and SAF, "Organizational Plaintiffs"), through undersigned counsel, bring this Complaint against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Daniel P. Driscoll, in his official capacity as Acting Director of the ATF, the United States Department of Justice ("DOJ"), and Pamela J. Bondi, in her official capacity as Attorney General of the United States, and allege as follows:

## INTRODUCTION

1.    The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801–5872), established a $200 tax (when adopted, approximately $5000 in today's dollars) on, among other things, the making and transfer of certain classes of firearms, as well as a comprehensive registration regime meant to facilitate enforcement of the tax. The NFA and its implementing regulations require an individual seeking to make, transfer, or receive those firearms to provide information such as name, home address, photograph, date of birth, demographic information, fingerprints, and a detailed description of the firearms, including their quantity and physical location. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Congress passed the NFA explicitly premised on its enumerated power to "lay and collect Taxes," U.S. CONST. art. I, § 8, cl. 1, and the Supreme Court upheld provisions of the NFA on that basis, holding that the NFA was "only a taxing measure" and that the registration provisions were "obviously supportable as in aid of a revenue purpose," *see Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Indeed, the Court has described the NFA as "an interrelated statutory system *for the taxation* of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968) (emphasis added). That constitutional basis, however, has recently been eliminated with respect to the making, transferring, and receiving of several items which are defined as "firearms" by the NFA, including suppressors, short-barreled rifles, and short-barreled shotguns, thus making the NFA's restrictions on those items unconstitutional as applied to those arms. Although the Eighth Circuit suggested in the early 1990s that the NFA's regulatory regime could be sustained under the Commerce Clause, *see United States v. Pearson*, 8 F.3d 631, 633 (8th Cir. 1993), it reversed course after *United States v. Lopez*, 514 U.S. 549 (1995), reinvigorated the limits on the Commerce Clause, and "h[e]ld" that the NFA's registration requirements "cannot be

sustained under the [C]ommerce [C]lause," *United States v. Hall*, 171 F.3d 1133, 1140 (8th Cir. 1999).

2.      The One Big Beautiful Bill Act ("BBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025), signed into law by the President on July 4, 2025, eliminated the making and transfer taxes on suppressors, short-barreled rifles, short-barreled shotguns, and NFA-defined "any other weapons," while leaving the registration requirements intact. In other words, individuals no longer have to pay taxes for making and transferring most firearms under the NFA, but the firearms are still required to be registered and are subject to the "web of regulation" that was designed to "aid[ ] enforcement" of the NFA's (now-extinct) tax. *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972). This regulatory regime no longer comports with Congress's constitutionally enumerated powers. While the NFA's regulations may have been permissible in support of the statute's taxes on making and transferring firearms, that justification no longer remains for items whose making and transfer are no longer taxed. To the extent that the NFA imposes requirements on making, transferring, receiving, possessing, or otherwise using untaxed firearms, it cannot be justified as an exercise of any other Article I power. Accordingly, the NFA is unconstitutional as to the untaxed firearms.

3.      Wholly apart from the NFA's constitutional infirmity in the above respect, the NFA's remaining restrictions constitute an unconstitutional regulatory scheme as pertains to suppressors and short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment right to keep and bear arms presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment applies to it, and the government bears the burden of proving, at the minimum, that there is a historical tradition of regulating arms to support the challenged regulatory

3

scheme. Because suppressors and short-barreled rifles are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

4.    Plaintiffs are individuals and entities that are subject to (or have members who are subject to) the NFA's regulatory requirements pertaining to untaxed firearms. Plaintiffs seek a judgment declaring that the NFA is unconstitutional with respect to the untaxed firearms it purports to regulate and enjoining enforcement of the unconstitutional provisions and any related regulations. Additionally, Plaintiffs seek a judgment declaring that the NFA is unconstitutional with respect to suppressors and short-barreled rifles under the Second Amendment to the United States Constitution and enjoining enforcement of the unconstitutional provisions and any related regulations.

## JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States.

6.    Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

7.    This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. §§ 2202, 2412.

8.    The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this suit because it challenges the NFA only with respect to untaxed items. Furthermore, and accordingly, it seeks not to restrain the collection or assessment of any tax but instead to restrain information-gathering and other requirements that previously were meant to support the now-defunct tax regime. The suit

therefore is not brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a); *see also CIC Servs., LLC v. IRS*, 593 U.S. 209, 211 (2021).

9.     Venue is proper in this Court because Defendants are officers, agencies, and departments of the United States, no real property is involved in this action, and Plaintiff Chris Brown resides in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

10.     Plaintiff Chris Brown is a citizen of the United States and a resident of St. Louis, Missouri, within this district. Brown is over the age of 21 and is eligible to purchase and possess firearms under state and federal law. Brown is a firearms owner, a member of the Organizational Plaintiffs, a member of his local Friends of the NRA Board, the former Shooting Sports Chairman for the Greater St. Louis Area Council of the Boy Scouts of America (2017–2025), and a supporter of the Second Amendment right to keep and bear arms.

11.     Plaintiff Allen Mayville (together with Brown, "Individual Plaintiffs") is a citizen of the United States and a resident of Omaha, Nebraska. Mayville is over the age of 21 and is eligible to purchase and possess firearms under state and federal law. Mayville is a firearms owner, a member of Organizational Plaintiffs, and a supporter of the Second Amendment right to keep and bear arms.

12.     Individual Plaintiffs value their personal privacy and do not want the federal government to obtain identifying information about their personally owned firearms, including information such as their names, home addresses, photographs, dates of birth, demographic information, fingerprints, and a detailed description of their firearms, including their quantity and physical locations. Federal law, however, currently requires that Individual Plaintiffs provide all of this intrusive personally identifying information to the federal government for them legally to

5

make, transfer, or receive items defined and regulated as "firearms" under the NFA through its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Individual Plaintiffs object to this burdensome registration requirement, which forces them to provide information to the federal government similar to that obtained from an individual arrested and charged with a crime.

13.     Complying with the NFA's byzantine registration requirements as a precondition to lawfully making, transferring, or receiving the covered firearms imposes a significant regulatory burden on firearm owners such as Individual Plaintiffs. For example, to register a firearm regulated by the NFA, Individual Plaintiffs must spend time completing the application forms issued by the ATF and then wait for the ATF to issue an approval determination, enter their registration information, and authorize their possession of the firearm. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022), https://perma.cc/RZ5B-5Q5Y; BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION OF FIREARM (2023), https://perma.cc/963W-KTYE.

14.     Collecting the information required by these forms and completing them can take significant time, and Individual Plaintiffs must then wait what could be months for the ATF to enter their registration information and issue an approval determination. *See Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://perma.cc/PB94-674A (last updated June 10, 2025). Indeed, it took nearly ten months from 2016 to 2017 for ATF to approve Brown's first suppressor purchase, and it took over nine months from 2023 to 2024 for ATF to approve Mayville's first suppressor purchase. The ATF itself has acknowledged the burdens that the NFA's registration regime imposes on lawful firearms owners, publicly stating that "registering

6

firearms . . . under the NFA will impose a time burden." Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6563 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478, 479).

15.     To comply with the NFA's requirements, Individual Plaintiffs must also incur costs arising from providing their fingerprints and photographs with each NFA registration application. Individual Plaintiffs have in fact incurred these time and monetary costs in the past from registering suppressors with the ATF.

16.     Given the BBB's reduction of the NFA's excise tax for the majority of covered firearms to $0, Individual Plaintiffs plan to take a number of actions with respect to NFA-covered firearms.

17.     Brown wants to transfer a Yankee Hill Machine Co. rifle suppressor that he lawfully owns because it no longer suits his needs, but he does not do so because of the provisions challenged in this case. He has had multiple opportunities in the recent past to sell this suppressor, but his would-be buyers declined to purchase it because of the need to go through the burdensome NFA registration process. In particular, he wants to transfer the suppressor locally to a friend of his who is a Missouri resident without complying with the NFA's transfer provisions. If it were not a violation of federal law to do so, Brown would transfer his suppressor as a transferor in a private transfer without complying with the NFA's transfer provisions, which prohibit him from transferring a suppressor—and the transferee from receiving and possessing a suppressor—in the same manner as any other handgun, rifle, or shotgun.

18.     Brown wishes to acquire a short-barreled rifle. He would acquire a short-barreled rifle within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Were Brown to purchase and possess

7

a short-barreled rifle without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Brown will not purchase his desired short-barreled rifle unless and until it would not be a violation of federal law for him to do so without complying with the NFA.

19.     Mayville already owns two suppressors but has been deterred from acquiring another because of the challenged NFA provisions. Mayville now wishes to acquire another suppressor—a BANISH 30 suppressor—to use with a firearm he owns that was reconfigured from a hunting rifle to a long-range competition shooting rifle to reduce the firearm's noise and increase its accuracy. He would acquire the suppressor within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Were Mayville to acquire a suppressor without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Mayville will not purchase his desired suppressor unless and until it would not be a violation of federal law for him to do so without complying with the NFA.

20.     Plaintiff Prime Protection STL, LLC d/b/a Prime Protection STL Tactical Boutique is an entity formed under the laws of the state of Missouri with its principal place of business in Bridgeton, Missouri. It is a Black-owned federally licensed firearms store in St. Louis County with a primarily Black customer base. Prime Protection was created to serve all people by introducing and furthering proper firearm knowledge and education. Prime Protection sells a wide variety of handguns, rifles, shotguns, firearms components, and firearms accessories. In addition to being a licensed firearms dealer under the Gun Control Act, Prime Protection is licensed to sell NFA items under the NFA. Despite being licensed to do so and offering them for sale, however, Prime Protection has not sold any NFA items because customers—and especially members of the Black

8

community—do not wish to comply with the NFA's intrusive requirements. If it were not a violation of federal law to do so, Prime Protection would sell suppressors, short-barreled rifles, and short-barreled shotguns without complying with the challenged NFA provisions.

21.     Plaintiff National Rifle Association of America is a nonprofit corporation founded in 1871. NRA is America's oldest civil rights organization and America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. NRA has millions of members across the nation, including in states in the Eighth Circuit. NRA brings this action on behalf of its members across the Nation, including Individual Plaintiffs and Prime Protection, who are adversely and directly harmed by Defendants' enforcement of the NFA.

22.     Plaintiff Firearms Policy Coalition, Inc. is a nonprofit membership organization incorporated under the laws of Delaware with its principal place of business in Clark County, Nevada, with members across the country. FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms and protect the means by which individuals may exercise the right to carry and use firearms. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf of its members, including Individual Plaintiffs and Prime Protection, who are adversely and directly harmed by Defendants' enforcement of the NFA.

23.     Plaintiff Second Amendment Foundation is a nonprofit educational foundation incorporated in 1974. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and

legal-action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. SAF brings this action on behalf of its members throughout the country, including Individual Plaintiffs and Prime Protection, who are adversely and directly harmed by Defendants' enforcement of the NFA.

24.     Plaintiff American Suppressor Association was formed in 2011 with the purpose of securing pro-suppressor reform nationwide. ASA has lobbied in 35 U.S. states and territories, fought to ease the archaic restrictions on suppressors in the District of Columbia, testified before dozens of legislative bodies, hosted countless suppressor demonstrations for legislators, policymakers, media, and the public, and funded research proving the efficacy of suppressors. ASA brings this action on behalf of its members, including Individual Plaintiffs and Prime Protection, who are adversely and directly harmed by Defendants' enforcement of the NFA.

25.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives is a component of the DOJ and is headquartered at 99 New York Avenue Northeast, Washington, DC 20226. The ATF is delegated authority to enforce federal firearm laws, including the NFA's taxation and registration provisions. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a). The ATF receives and processes NFA-related registration applications, issues approval determinations on those applications, and maintains the National Firearms Registration and Transfer Record, the central registry of all NFA-regulated firearms that "are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a).

26.     Defendant Daniel P. Driscoll is the Acting Director of the ATF and is responsible for overseeing the Agency's enforcement of the NFA's taxation and registration provisions. *See* 28 C.F.R. § 0.130(a)(1)–(3); 28 U.S.C. § 510. Acting Director Driscoll is being sued in his official capacity.

27.     Defendant Department of Justice is headquartered at 950 Pennsylvania Avenue Northwest, Washington, DC 20530. The DOJ is the executive department with authority to enforce federal laws, including the NFA's taxation and registration provisions.

28.     Defendant Pamela J. Bondi is the United States Attorney General. She oversees the DOJ. 28 U.S.C. §§ 501, 503. She is vested with authority to enforce federal firearms laws, including the provisions of the NFA at issue in this case. *See* 26 U.S.C. § 7801(a)(2). Attorney General Bondi is being sued in her official capacity.

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

### I.     The National Firearms Act.

29.     The NFA imposed a $200 excise tax on the making and transfer of what it defines as "firearms." *See* 26 U.S.C. §§ 5811, 5821, 5841. The maker or transferor must pay the tax. *See id.* §§ 5811(b), 5821(b).

30.     The NFA also creates a burdensome registration scheme that a maker, transferor, or transferee must comply with to lawfully make, transfer, or receive the firearm. *See id.* §§ 5812, 5822, 5841, 5861; 27 C.F.R. §§ 479.62, 479.84. Before making or transferring a firearm, the maker or transferor is required to provide to the ATF extensive, intrusive personally identifying information such as the maker or transferee's name, home address, photograph, date of birth, demographic information, and fingerprints, along with a detailed description of the firearms in question, including their quantity and physical location, to be entered into a central registry, the National Firearms Registration and Transfer Record. *See* 26 U.S.C. §§ 5812, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

31.     Among other items, the NFA's definition of "firearm" applies to suppressors, short-barreled rifles, short-barreled shotguns, and "any other weapon."[1] *See* 26 U.S.C. § 5845(a).

32.     The NFA imposes severe penalties on any person who transfers, receives, or even possesses a covered firearm that is unregistered or untaxed according to its requirements, including imprisonment up to 10 years and fines up to $250,000 for individuals and $500,000 for organizations. 26 U.S.C. §§ 5861 (unlawful acts), 5871 (penalties); 18 U.S.C. § 3571(b)(3), (c)(3) (fines). Indeed, as the Fifth Circuit has explained, the NFA's provisions "have teeth" and carry "severe consequences." *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023).

33.     Moreover, "[a]ny firearm involved in any violation" of the NFA "shall be subject to seizure and forfeiture." 26 U.S.C. § 5872(a).

34.     The NFA applies to all covered firearms regardless of whether they traveled in interstate commerce; the NFA contains no interstate commerce "jurisdictional hook." Consequently, the NFA applies equally to a firearm an individual makes in that person's home and a firearm made by a national company and shipped to a customer across state lines. The lack of an interstate commerce jurisdictional hook in the NFA makes it markedly different than other federal firearm statutes. For instance, the Gun Control Act of 1968—contained in Title 18 of the United States Code—explicitly regulates "interstate commerce." *See*, *e.g.*, 18 U.S.C. §§ 921(a)(2),

---

[1] The NFA defines "any other weapon" as "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition." 26 U.S.C. § 5845(e).

922(a)(1), (k), (n). And it contains specific Congressional findings about the relationship between the firearms industry and interstate commerce in that context. *Id.* § 922(q)(1).

35.    Congress passed the NFA in 1934 specifically premised on its enumerated power to "lay and collect Taxes." U.S. CONST. art. I, § 8, cl. 1.

36.    Attorney General Homer Cummings, the initial lead spokesman for the bill, explained that Congress has "no inherent police powers to go into certain localities and deal with local crime," but that "[i]t is only when we can reach those things under . . . the power of taxation, that we can act." *National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong., 2d Sess. 8 (1934) (statement of Homer Cummings, Att'y Gen. of the United States) [hereinafter *National Firearms Act Hearings*]. Attorney General Cummings further explained that "[i]f [Congress] made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say '[w]e will tax the machine gun' . . . you are easily within the law." *Id.* at 19. Assistant Attorney General Joseph Keenan explained during the same hearing that the proposed law "follows the theory of taxation all the way through," and that the reason the Attorney General's office did not propose a bill that simply banned these weapons was that Congress does not have "the power to do that under the Constitution of the United States." *Id.* at 86, 100 (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States). And in responding to objections from an industry witness, a Representative explained that "[i]f you take away the tax feature entirely, this bill goes out of the picture." *Id.* at 157 (statement of Rep. Samuel B. Hill).

37.    The Supreme Court upheld the NFA's occupational tax on dealers against constitutional challenge in 1937, holding that the NFA was "only a taxing measure," and thus

lawful pursuant to Congress's taxing power, and that the registration provisions were "obviously supportable as in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513.

38.     In 1968, Congress expanded the scope of the NFA. Originally, the NFA only regulated the transfer of covered firearms. But in the National Firearms Act Amendments of 1968, Pub. L. No. 90-618, § 5822, 82 Stat. 1213, 1228 (codified at 26 U.S.C. § 5812(1), (6)), Congress also subjected persons who "[m]ake" their own covered firearms to the NFA's tax and regulatory scheme. *Id.* Thus, Congress extended the NFA tax to activities that could be undertaken alone, with no plausible relation to commerce of any kind, much less interstate commerce.

**II.     The One Big Beautiful Bill Act.**

39.     Congress passed the One Big Beautiful Bill Act on July 3, 2025, and the President signed it into law on July 4, 2025.

40.     The BBB eliminates the NFA's $200 making and transfer tax on all NFA firearms except for machineguns and "destructive devices." BBB § 70436.

41.     The elimination of the tax will apply to "calendar quarters beginning more than 90 days after the date of the enactment of this Act," or, in other words, the elimination will be effective as of January 1, 2026. *Id.* § 70436(d).

**III.     The Second Amendment and NFA-Covered Firearms.**

42.     The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, the law-abiding citizens of this Nation have a fundamental, guaranteed right to keep and bear arms for defense of self and family and for all other lawful pursuits.

43.     In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an

14

individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

44.     The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Supreme Court has defined "arms" under the Second Amendment broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id.*

45.     Despite this constitutional guarantee, Congress has enacted, and Defendants enforce, an unconstitutional regulation of suppressors and short-barreled rifles.

**A.     Suppressors Are Second Amendment–Protected Arms.**

46.     A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve the experience and use of firearms. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, make firearms training safer and more effective, increase the accuracy and ease of use of firearms by reducing felt recoil and shot flinch, and improve the effectiveness of firearms for self-defense and defense of the home. Contrary to representations in movies and television, suppressors do not reduce all sound from a gunshot and are rarely used by criminals.

47.     While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46

15

CUMB. L. REV. 35, 36 (2016) [hereinafter *Firearm Sound Moderators*]; *see also* AMERICAN SUPPRESSOR ASSOCIATION, *The American Suppressor Association (ASA)* (YouTube, Nov. 26, 2014), https://bit.ly/45aP0qe (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard" easily. *Firearm Sound Moderators*, at 36; *see also United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers" as "the same thing"). Indeed, suppressed firearms are still quite loud.

48.     The NFA's regulation of suppressors implicates the Second Amendment's plain text. By regulating suppressors, the NFA effectively regulates suppressed firearms, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms.

49.     The government agrees that suppressors are protected by the text of the Second Amendment. *See* Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [hereinafter Gov't *Peterson* Br.] ("In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors."); *see also id.* at 2–5.

50.     Therefore, by forcing Plaintiffs (and their members) to comply with the NFA to possess suppressors, Defendants have burdened the right to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. amend. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

51.     Defendants cannot demonstrate any such thing. *Heller* and *Bruen* have provided the sole historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of restricting the use of dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48. To be banned, a firearm must be "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original). And if a firearm cannot be banned, because it is not *both* dangerous *and* unusual, it can be regulated only if there is a historical tradition of doing so. Suppressors are neither dangerous nor unusual. Arms that are in common use, like those equipped with suppressors, cannot be unusual. And suppressors, which increase the safety of a firearm and have been deemed necessary to the safest use of a firearm, cannot be dangerous. Nor is there a historical tradition that supports the NFA's comprehensive registration scheme for protected arms.

52.     Suppressors do not meet the Supreme Court's threshold for banning or regulating arms, so the NFA's registration scheme as to suppressors must be held unconstitutional.

### i.     Suppressors are in Common Use.

53.     Suppressors have been broadly permitted and commonly used for over one hundred years. In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7. Several years later, Maxim explained that he invented the device to reduce sound disturbance caused by firearms. HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER 2–4 (1915), https://perma.cc/WY37-3YE2 [hereinafter MAXIM]. Even President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012), https://perma.cc/3G38-C5XQ.

54.     The common use of suppressors has continued into the modern day. Millions of suppressors are owned by Americans, in steadily increasing numbers. As of May 2021, Americans had registered nearly 2.7 million suppressors with the ATF. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021, at 16 (2021), https://perma.cc/4WAF-QGPQ [hereinafter ATF STATISTICAL UPDATE 2021]. As of May 2024, ATF reported over 3.5 million registered suppressors. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: STATISTICAL UPDATE 2024, at 12 (2024), https://perma.cc/DJC5-VBJZ [hereinafter ATF STATISTICAL UPDATE 2024]. And more recent ATF data indicates that by the end of 2024 there were approximately 4.5 million registered suppressors. *See* NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY 7 (2025), https://perma.cc/HV5A-7APV.

55.     Suppressors are widely permitted throughout the United States. Forty-two states permit their citizens to possess and use suppressors. And the NFA allows individuals to make, transfer, or receive suppressors subject to its onerous, invasive registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

**ii.  Suppressors Have Many Lawful, Safe, and Common Uses.**

56.     Suppressors have many common, legal uses. Firearm suppressors are commonly used for lawful purposes and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

57.     First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery, the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise, the Centers for Disease Control and Prevention, and the Academy of Doctors of Audiology have all recommended the use

of suppressors for hearing protection. *See Suppressors for Hearing Preservation*, Am. Acad. Otolaryngology-Head & Neck Surgery (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ; Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, Nat'l Hearing Conservation Ass'n (Mar. 16, 2017), https://perma.cc/RB6V-V7JV; Lilia Chen & Scott E. Brueck, Nat'l Inst. for Occupational Safety & Health, Ctrs. for Disease Control & Prevention, HHE Rep. No. 2011-0069-3140, Noise and Lead Exposures at an Outdoor Firing Range – California 5 (2011), https://perma.cc/8C62-Z42R; Scott E. Brueck et al., Nat'l Inst. for Occupational Safety & Health, Ctrs. for Disease Control & Prevention, HHE Rep. No. 2013-0124-3208, Measurement of Exposure to Impulsive Noise at Indoor & Outdoor Firing Ranges During Tactical Training Exercises 14 (2014), https://perma.cc/UQF7-DH5Q; Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC. Because suppressors are the most effective hearing protection, police departments routinely purchase them to "[r]educ[e] potential hearing loss of officers and the public during shooting events." Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, Police1 (May 15, 2024), https://perma.cc/MD4N-8S79. As the Law Enforcement Management Institute of Texas concluded, "[t]o help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors." James B. Abbott, Tex. Off. Att'y Gen., Use of Firearm Suppressors by Law Enforcement to Prevent Hearing Loss 9 (2024), https://perma.cc/FF96-5Q9J. Likewise, "[i]n 2017 the U.S. Marines began using suppressors on service weapons" to reduce gunshot-related hearing loss. *Military-Grade Protection*, Hearing Health Found., https://perma.cc/U369-7C2N (last visited July 16, 2025).

58.     This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level] limit recommended by [OSHA] and [NIOSH]." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, Audiology Today, Mar.–Apr. 2011, at 38, 40, https://perma.cc/QS93-AVV8. Consequently, "it is not surprising that recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127–130 decibels. David Kopel, *The Hearing Protection Act and 'Silencers'*, Volokh Conspiracy (June 19, 2017), https://perma.cc/C5FU-T6U8. An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, Wash. Post (Mar. 20, 2017), https://perma.cc/9M7S-NFYH.

59.     Second, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors do not silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. Maxim, at 2–4.

60.     Third, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *See Do Suppressors Reduce Recoil?*, Silencer Shop (Apr. 2, 2024), https://perma.cc/9H6M-A8LU. Further, using suppressors in conjunction with earmuffs or ear plugs (or in place of earmuffs or ear plugs, in instances where traditional hearing protection is not commonly used, such as self-defense or hunting) increases a firearm user's ability to hear

commands and warnings, which improves the safe use of firearms at ranges and elsewhere. *See Firearm Sound Moderators*, at 34.

61.    Fourth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. If an individual must use a firearm for self-defense, suppressors reduce recoil and shot flinch, improving the accuracy of a shot. The individual may not have earmuffs or ear plugs at his or her disposal. Accordingly, a suppressor already affixed to the barrel of the firearm allows the individual to exercise self-defense or defense of the home while dramatically reducing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noise or signals, which may aid in coordinating self-defense activities or contacting law enforcement.

62.    The government agrees that suppressors "have several benefits to persons in exercising their Second Amendment rights" and "facilitate the constitutional right to keep and bear arms," including "limit[ing] the noise caused by firearms," "improv[ing] accuracy and aid[ing] in target re-acquisition by reducing recoil and muzzle rise," and "aid[ing] in target shooting." Gov't *Peterson* Br. at 4–5.

63.    Although not relevant to the constitutional inquiry, by contrast, suppressors are almost never used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007). One study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.* And that number includes prosecutions for mere possession of the silencer itself "where no other crime was committed." *Id.* In 2017, ATF Associate Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." RONALD TURK, BUREAU OF

ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS 6–7 (2017), https://perma.cc/H52G-BJCT.

64.     The fact that suppressors are very rarely used for criminal purposes makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren. BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE 8 (2011), https://perma.cc/NAZ3-VL46. Accordingly, criminals who shoot suppressed weapons can still be easily heard. Suppressors can reduce or prevent hearing damage but do not silence criminal activity.

65.     The government also agrees that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov't *Peterson* Br. at 7.

66.     Although the transferring of suppressors has been regulated under the NFA's onerous licensing scheme since 1934, the legislative history of the NFA does not demonstrate that Congress viewed suppressors as a dangerous or unusual weapon. The inclusion of all suppressors appears to be an accident. The original draft of the bill only regulated suppressors for firearms that were "capable of being concealed on the person." Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons' to Tax*, 25 WYO. L. REV. 149, 173 (2025) [hereinafter *The Power to Tax*]. This made sense because concealed weapons themselves were included in the draft bill at that point in the drafting process. *Id.* Yet, without explanation, a future draft of the NFA that *removed* traditional handguns from its scope nevertheless *expanded* the class of covered suppressors from those suited for concealable weapons to all suppressors. *Id.*

22

67.    The NFA's regulatory scheme as pertains to suppressors, therefore, is a regulation of keeping and bearing arms that are commonly possessed and used for lawful purposes, including hearing protection, public courtesy, firearm accuracy and training, and self-defense in the home.

**B.    Short-Barreled Rifles Are Second Amendment–Protected Arms.**

68.    Short-barreled rifles plainly are arms under the plain text of the Second Amendment. More, they are not dangerous and unusual weapons. The Constitution therefore guarantees the right of peaceable citizens to possess and use them.

69.    First, for dangerousness, there is nothing about a short-barreled rifle that makes it more dangerous than other protected arms. A short-barreled rifle is simply an intermediate-size firearm that is more accurate, although less portable, than a handgun. A short-barreled rifle is also more portable, although generally less accurate, than a rifle with a longer barrel. Nor is there anything inherently dangerous about short-barreled rifles, *i.e.*, rifles with barrels under 16 inches in length. *See The Power to Tax*, at 181; Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 WYO. L. REV. 111, 141 (2025) [hereinafter *The Tradition of Short-Barreled Rifle Use*].

70.    Again, although irrelevant to this Court's constitutional inquiry, statistical surveys demonstrate that short-barreled rifles are rarely used by criminals. *See The Tradition of Short-Barreled Rifle Use*, at 141. For example, a survey conducted by the National Institute for Justice found that only seven of the 157 firearm criminals that they interviewed had used a short-barreled rifle. JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 95 tbl. 4.6 (expanded ed. 1986). That number is lower than pistols, sawed-off shotguns, regular shotguns, and regular rifles. *Id.*

71.     The legislative history of the NFA itself demonstrates that Congress did not even view short-barreled rifles as particularly dangerous. *See The Tradition of Short-Barreled Rifle Use*, at 130–36. The bill that became the NFA did not originally restrict possession of short-barreled rifles. But without any mention of the barrel length of rifles in the statute, Representative Harold Knutson of Minnesota was concerned that the category of "any other firearm capable of being concealed on the person" could be interpreted to include some hunting rifles. *National Firearms Act Hearings*, 73d Cong., 2d Sess. 13 (statement of Rep. Harold Knutson). His constituents would not stand for a steep tax on popular hunting rifles. *Id.* Thus, Knutson suggested taxing short-barreled rifles in addition to short-barreled shotguns because doing so would imply that long-barreled rifles were not covered. *See The Power to Tax*, at 169. The ban on short-barreled rifles was thus a historical accident and not a necessary measure to keep arms away from criminals. Indeed, "no one mentioned a short-barreled rifle having any criminal use" during the Senate hearings after the tax on short-barrel rifles was added to the bill. *Id.* at 170.

72.     Second, regarding unusualness, short-barreled rifles are in common use in the United States. As of May 2021, there were 532,725 short-barreled rifles registered with the ATF. *See* ATF STATISTICAL UPDATE 2021, at 16. As of May 2024, the ATF reported that number had increased to 870,286. *See* ATF STATISTICAL UPDATE 2024, at 12. Given a similar pattern of growth in registrations, there are likely now close to or over a million short-barreled rifles registered with the ATF.

73.     To be sure, the Supreme Court in 1939 rejected a Second Amendment challenge to the inclusion of short-barreled *shotguns* in the NFA on the grounds that those firearms were not protected arms. *See United States v. Miller*, 307 U.S. 174, 178 (1939). But *Miller* does not foreclose

a Second Amendment challenge to the NFA's application to short-barreled *rifles*, as short-barreled rifles are distinct from short-barreled shotguns.

74.     There is no constitutionally relevant difference between what the government unconstitutionally regulates as "short-barreled rifles" and other rifles that all agree are protected arms. Just like other rifles, short-barreled rifles are popular and commonly possessed for lawful purposes such as self-defense, proficiency training, hunting, competition, and collecting, and they are lawful to possess and use in the vast majority of states now and historically.

75.     The NFA's regulatory scheme as pertains to short-barreled rifles, therefore, is a regulation of keeping and bearing arms that are neither dangerous nor unusual.

**C.     There is No Historical Tradition Supporting the NFA's Comprehensive Regulatory Scheme for Protected Arms.**

76.     Because suppressors and short-barreled rifles are not dangerous and unusual weapons, they are protected by the Second Amendment. And there is no historical tradition that would support the NFA's all-encompassing registration scheme for suppressors, short-barreled rifles, or any other protected arm.

77.     Defendants bear the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id.* at 29.

78.     Defendants will be unable to carry their burden because there is no historical tradition of requiring the registration of protected arms at all, much less punishing the failure to do so with hefty criminal penalties. *See The Tradition of Short-Barreled Rifle Use*, at 140–47.

79.     There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by

25

Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors and short-barreled rifles, commercial suppressor and short-barreled rifle sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t). What registration does do is allow a government to track who has arms and, therefore, registration can facilitate efforts by a government to disarm the populace. *See generally* STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013). It is thus unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

80.     Accordingly, because suppressors and short-barreled rifles are neither dangerous nor unusual, and there is no historical tradition of requiring the registration of protected arms, the NFA's registration scheme as pertains to suppressors and short-barreled rifles is unconstitutional under the Second Amendment.

## COUNT ONE
### Violation of the U.S. Constitution
### The NFA's Regulation of Untaxed Firearms Exceeds Congress's Authority

81.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though set forth fully herein.

82.     The NFA's registration and related requirements on untaxed firearms exceed Congress's enumerated powers and are thus unconstitutional.

83.     Congress passed the NFA explicitly premised on, and the Supreme Court upheld the NFA as an exercise of, Congress's taxing power. *Sonzinsky*, 300 U.S. at 513–14.

84.     As a result of BBB § 70436, nearly all of the firearms covered by the NFA—except for machineguns and "destructive devices"—are now untaxed, yet the comprehensive registration scheme to make, transfer, receive, or possess those firearms remains in effect.

85.     Individual Plaintiffs, Prime Protection, and the members of Organizational Plaintiffs are injured by the NFA's unconstitutional requirements.

86.     Plaintiffs are entitled to a declaration that the NFA's requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA, and any regulations implementing them, exceed Congress's enumerated powers and are thus unconstitutional, both facially and/or as applied to Individual Plaintiffs, Prime Protection, and Organizational Plaintiffs' members. *See*, *e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

87.     Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing the NFA's registration requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA and any regulations implementing those registration requirements. *See*, *e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

## COUNT TWO
### Violation of the U.S. Constitution
### The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment

88.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count above as though set forth fully herein.

89.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

90.     "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

91.     The Supreme Court has stated the test for addressing Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

92.     By regulating suppressors and short-barreled rifles, the NFA regulates the use of bearable arms in common use by Americans for lawful purposes. Suppressors and short-barreled rifles are neither dangerous nor unusual and their possession is protected by the Second Amendment. There is no historical tradition that would justify the NFA's comprehensive registration scheme for protected arms.

93.     Defendants therefore violate the Second Amendment right to keep and bear arms by forcing law-abiding Americans, including Individual Plaintiffs, Prime Protection and its customers, and members of Organizational Plaintiffs, under pain of felony violation, to comply

with the challenged provisions of the NFA to make, transfer, receive, possess, or otherwise use suppressors and short-barreled rifles.

94.    Defendants' enforcement of the NFA forces Individual Plaintiffs, Prime Protection, and Organizational Plaintiffs' members either to comply with the unconstitutional registration scheme—thereby being burdened in exercising their rights under the Second Amendment to the United States Constitution—or be subjected to criminal prosecution.

95.    Therefore, as a direct and proximate result of the above infringement and impermissible burden on Second Amendment rights, Individual Plaintiffs, Prime Protection, and Organizational Plaintiffs' members have suffered—and continue to suffer—from an unlawful and irreparable deprivation of the fundamental constitutional right to keep and bear arms.

96.    Plaintiffs are entitled to a declaration that the NFA's requirements with respect to the making, transferring, receiving, possessing, or otherwise using suppressors and short-barreled rifles, along with the regulations that implement them, violate the Second Amendment and are thus unconstitutional both facially and/or as applied to Individual Plaintiffs, Prime Protection, and Organizational Plaintiffs' members. *See*, *e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

97.    Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the NFA and related regulations that pertain to untaxed suppressors and short-barreled rifles. *See*, *e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

     a.     Declare that the NFA's requirements relating to making, transferring, receiving, possessing, or otherwise using untaxed firearms exceed Congress's enumerated powers, both facially and as-applied;

     b.     Declare that any regulations promulgated, in whole or in part, under such requirements are unlawful;

     c.     Declare that such requirements and any regulations implementing them violate the Second Amendment with respect to suppressors and short-barreled rifles, both facially and as-applied;

     d.     Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of the NFA with respect to violations in any way predicated on failure to comply with the NFA's unconstitutional provisions pertaining to making, transferring, receiving, possessing, or using untaxed firearms or, in the alternative, untaxed suppressors and short-barreled rifles;

     e.     Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of all regulations promulgated to effectuate the challenged NFA requirements, including, but not limited to, 27 C.F.R. §§ 479.62 and 479.84;

     f.     Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

     g.     Award Plaintiffs such other legal and equitable relief as is just and appropriate and as necessary to effectuate the Court's judgment.

Dated: August 1, 2025                    Respectfully Submitted,


                                         /s/ David H. Thompson
                                         David H. Thompson*
                                         Peter A. Patterson*
                                         Nicholas A. Varone*
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Avenue, N.W.
                                         Washington, DC 20036
                                         Tel: (202) 220-9600
                                         dthompson@cooperkirk.com
                                         ppatterson@cooperkirk.com
                                         nvarone@cooperkirk.com

                                         *Applications for *pro hac vice* admission
                                         forthcoming

                                         *Attorneys for Plaintiffs*