**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRIS BROWN; ALLEN MAYVILLE; PRIME PROTECTION STL, LLC D/B/A PRIME PROTECTION STL TACTICAL BOUTIQUE; NATIONAL RIFLE ASSOCIATION OF AMERICA; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; and AMERICAN SUPPRESSOR ASSOCIATION, | : : : : : : : : | |
| *Plaintiffs*, | : : | No. 4:25-cv-1162 |
| v. | : : | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | : : : : : : : : | |
| *Defendants*. | : : | |

**APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW
ENFORCEMENT TO PREVENT HEARING LOSS (2024), https://perma.cc/FF96-
5Q9J ............................................................................................................... APPX.001

SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS.
FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208,
MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR
FIRING RANGES DURING TACTICAL TRAINING EXERCISES (2014),
https://perma.cc/UQF7-DH5Q.............................................................................. APPX.017

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE
IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021 (2021),
https://perma.cc/4WAF-QGPQ............................................................................. APPX.049

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE
UNITED STATES: STATISTICAL UPDATE 2024 (2024), https://perma.cc/DJC5-
VBJZ ............................................................................................................... APPX.077

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014,
FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022),
https://perma.cc/RZ5B-5Q5Y .............................................................................. APPX.096

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014,
FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION
OF FIREARM (2023), https://perma.cc/963W-KTYE ............................................ APPX.109

LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. for OCCUPATIONAL SAFETY & HEALTH,
CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140,
NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA
(2011), https://perma.cc/8C62-Z42R ................................................................. APPX.122

*Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS &
EXPLOSIVES, https://perma.cc/XNZ7-UZUR (last updated Sep. 19, 2025)......... APPX.154

*Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024),
https://perma.cc/9H6M-A8LU.............................................................................. APPX.156

William English, *2021 National Firearms Survey: Updated Analysis Including Types
of Firearms Owned,* GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022),
https://perma.cc/XMB6-GBC9 ............................................................................ APPX.168

BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM
NOISE (2011), https://perma.cc/NAZ3-VL46 ...................................................... APPX.214

Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc, *United States v. Peterson*,
No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 ........................................ APPX.227

Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017),
https://perma.cc/9M7S-NFYH.............................................................................. APPX.242

i

David Kopel, *The Hearing Protection Act and 'Silencers'*, VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8 ...................................................... APPX.248

Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC ...................................................... APPX.253

HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER (1915), https://perma.cc/WY37-3YE2 .............................................................................. APPX.254

*Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N ............................................................................... APPX.279

MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT, NAT'L SHOOTING SPORTS FOUND. (July 14, 2022), https://perma.cc/GT6M-C97D ....... APPX.283

NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY (2025), https://perma.cc/HV5A-7APV................................................................................ APPX.364

Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79 ........ APPX.394

Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7 .............................................................................. APPX.396

Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012), https://perma.cc/3G38-C5XQ ..................................................... APPX.400

Ron Spomer, *Short Rifle Barrel Performance Advantages*, RON SPOMER OUTDOORS, https://perma.cc/3PXD-4F4P (last visited Oct. 22, 2025) ................................... APPX.403

Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/RB6V-V7JV ............................................................................. APPX.412

Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, Mar.–Apr. 2011, https://perma.cc/QS93-AVV8 ................ APPX.422

*Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ ....................... APPX.437

RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS (2017), https://perma.cc/H52G-BJCT ............................................................................... APPX.441

*Why SBRs Are Becoming Popular for Home Defense*, SUMMERLIN ARMORY (Feb. 4, 2025), https://perma.cc/Z2XN-SJHF..................................................... APPX.452

JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008) ................................................................................................................. APPX.453

Dated: November 14, 2025                        Respectfully submitted,

                                           /s/ David H. Thompson
                                         David H. Thompson*
                                         Peter A. Patterson*
                                         Nicholas A. Varone*
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Ave., N.W.
                                         Washington, DC 20036
                                         Tel: (202) 220-9600
                                         Fax: (202) 220-9601
                                         dthompson@cooperkirk.com
                                         ppatterson@cooperkirk.com
                                         nvarone@cooperkirk.com

                                         *Admitted *pro hac vice*

                     *Attorneys for Plaintiffs*

# The Bill Blackwood
# Law Enforcement Management Institute of Texas

═══════════════

### Use of Firearm Suppressors by Law Enforcement
### to Prevent Hearing Loss

═══════════════

### A Leadership White Paper
### Submitted in Partial Fulfillment
### Required for Graduation from the
### Leadership Command College

═══════════════

### By
### James B. Abbott

### Office of the Attorney General
### Austin, Texas
### September 2024

# ABSTRACT

A major occupational health issue for law enforcement officers is noise-induced hearing loss (NIHL). All peace officers will be exposed to loud noises such as alarms, sirens, explosions, and gunshots throughout their career and studies show that the longer an officer serves, the more their hearing will diminish. Most law enforcement agencies provide their officers with hearing protection devices (HPD) to reduce the effects of loud noises in controlled environments. However, it is unreasonable to expect officers to deploy earmuffs when responding to an active shooter event. There is a more effective option that these agencies are neglecting to use. A firearm sound suppressor, also called a "silencer," is a tool that is placed on the muzzle of a firearm and is used to suppress the blast when the weapon is fired, thus preventing hearing loss. Suppressors are a more reasonable option for police officers to use when training or when responding to a crisis event because it is already attached to the weapon and ready for use. Firearm sound suppressors are not only important for an officer's health, but they also have multiple safety benefits. There is also the question as to whether an agency is liable regarding hearing loss compensation claims due to a failure to provide appropriate safety devices to officers or compensation claims by citizens who are exposed to gunfire by law enforcement. Noise-induced hearing loss, a disability that afflicts so many peace officers, can be prevented with the use of these simple devices. Because it is a reasonable option, law enforcement agencies should utilize firearm sound suppressors to help prevent permanent hearing loss to law enforcement officers.

# TABLE OF CONTENTS

Page

Abstract

Introduction ............................................................................................ 1

Position.................................................................................................... 3

Counter Arguments ................................................................................ 6

Recommendation..................................................................................... 9

References ............................................................................................... 12

# INTRODUCTION

When it comes to peace officers' safety and health, hearing protection is not the first thing that comes to mind. However, it is a major concern for the officers themselves and citizens who are exposed to police gunfire.  According to Johnson Law Offices, (2022), one-third of police officers have noise-induced hearing loss (NIHL), which is more than double the prevalence of the general population.  Based on a study that was published in 2015, "The mean duration of service was 14.75 ± 9.39 years and the prevalence of NIHL in this study population was a staggering 34.2 percent" (Win et al., 2015).   When discussing hearing protection, most people think of earmuffs and/or earplugs as being sufficient for officers when firing weapons.  Even wearing both earmuffs along with earplugs does not prevent hearing loss. A study conducted by Bell and Albino in 2014 found that "even with double ear protection, hearing loss still occurred in about 75 percent of cases".  That is because earmuffs and ear plugs fail to protect one's hearing from concussive damage, which is caused by the concussive force generated by a firearm that has been fired.  This is the sound that is transmitted directly through the bones in a person's skull into the inner ear causing hearing loss through bone conduction.  Firing weapons inside a closed environment, which officers must sometimes do when performing close-quarters combat, amplifies the level of noise and increases the level of concussive damage to the ear substantially.  Some law enforcement agencies use indoor ranges for firearms training which can cause even greater damage to an officer's hearing if multiple weapons are being fired at the same time and for an extended period.

Another option to protect the hearing of law enforcement officers when using firearms is the use of a firearm sound suppressor.  Sound suppressors, commonly known as "silencers", have been around for more than one hundred years and are designed specifically to reduce the noise level and concussive pressure of a gunshot. A firearm sound suppressor is a device that is attached to the muzzle of a firearm that can reduce the noise level of a gunshot nearly 1000 times (Wipfler, 2023). A gunshot, also known as a muzzle blast, is described as the noise and gas pressure that is made by the expansion of gas accelerating a bullet at supersonic speed out of a barrel (Nielson, 2015).  Firearm sound suppressors are designed to reduce the effects of muzzle blasts by decreasing the velocity of rapidly expanding gas and absorbing or canceling out sound waves (Nielson, 2015).

When contemplating the use of firearm sound suppressors, it shouldn't be a difficult decision based on face value, considering the amount of hearing protection a firearm sound suppressor can provide for a law enforcement officer.  However, there are certain obstacles that law enforcement administrators must take into consideration when thinking about purchasing sound suppressors for their officers. There are some tactical disadvantages to using a sound suppressor that must also be considered.  Cost is always a factor, normally the main factor, when considering the purchase of equipment. Thought must also be given to how the public will perceive the use of firearm sound suppressors by law enforcement. Despite these considerations, all weighed against the safety and health of peace officers, law enforcement agencies should utilize firearm sound suppressors to help prevent permanent hearing loss to law enforcement officers.

## POSITION

Noise-induced hearing loss is a leading disability among law enforcement officers, but it doesn't have to be.  Firearm sound suppressors are an excellent tool that can be used to reduce the number of law enforcement officers suffering from hearing loss and tinnitus, a constant ringing in the ear(s) that can be caused by an injury to the ear(s).  Noise from a firearm is characterized by having a very high pressure level of very short duration, which is considered "impulse noise" (Nakashima & Farinaccio, 2015).  The volume of sound is measured in decibels (dB). Impulse sound over 140 dB can cause permanent hearing damage (Bell & Albino, 2014).  For comparison, a whisper is approximately 30 dB, the normal speech volume level is about 60 dB, and the volume of an alarm clock is approximately 80 dB (Bell & Albino, 2014).  The Occupational Safety and Health Administration states that the threshold for hearing safe impulse noise is 140 dB (Nielsen, 2015). In terms of concussive damage, regular protection doesn't stop this transmission and the skull only dampens between 40 dB and 60 dB (Bell & Albino, 2014). Firearm sound suppressors can potentially reduce the noise from a muzzle blast by up to 30dB (Kopel, 2017).  A study that was published by the National Library of Medicine, comparing muzzle suppression with ear-level hearing protection in firearm use, stated: "Modern muzzle-level suppression is vastly superior to ear-level protection and the only available form of suppression capable of making certain sporting arms safe for hearing" (Branch, 2011). Firearms generally have a noise volume of 140 dB or higher (Bell & Albino, 2014).  An AR-15 has a noise volume of around 168 dB, so every shot is past the threshold of permanent hearing loss and simply wearing earmuffs and/or earplugs will

not be enough to protect a person's hearing (Nielsen, 2015).  If an officer must fire their rifle in the line of duty, where hearing protection is not readily available, a well-made firearm sound suppressor for that weapon will lower the dB level of the rifle below 140 dB, making it a primary-hearing safety device.

Some law enforcement agencies are using firearm sound suppressors for multiple reasons, but many of them are still limiting the use of suppressors and not affording all their law enforcement personnel the benefit of these safety devices.  One agency, the Spokane, Washington Police Department, decided to equip all their AR-15 rifles with a firearm sound suppressor to protect the hearing of  their officers and bystanders who may be exposed to police gunfire (Washington, 2017).  The department also wanted to reduce worker's compensation claims and lawsuits from bystanders exposed to police gunfire (Washington, 2017). Bell & Albino also stated that in 2011, the New York Police Department forced the retirement of police officers who had  hearing deficiencies and wore hearing aids (2014).  At the time of the article, the New York Police Department had a policy to eliminate applicants who cannot pass a hearing test.  The department had tenured police officers wearing hearing aids that were purchased for them by the department, but shortly after they received the hearing aids, they were medically retired (Bell & Albino, 2014).  Younger officers who wore hearing aids were instructed not to wear them while on duty (Bell & Albino, 2014). The officers who continue to work without their hearing aids say they are less equipped to perform their assigned duties (Bell & Albino, 2014). A spokesperson for the department indicated hearing aids are incompatible with police work and that officers who wear them might not hear a command (Bell & Albino, 2014).  Two of the

New York police officers who were forced to medically retire filed complaints with the federal Equal Employment Opportunity Commission stating the policy forbidding the use of hearing aids is discriminatory toward those with hearing loss, which is a medical disability (Goldstein, 2011). Law enforcement agencies that allow the use of or provide firearm sound suppressors to their peace officers have the potential to prevent such suits because they, in good faith, provided all the safety equipment they could to diminish the effects of loud impulse noises peace officers are exposed to when firing weapons in the field and during training.

Law enforcement tactical teams that already utilize firearm sound suppressors are not using them just for their level of noise reduction. Firearm sound suppressors provide other operational benefits beyond noise suppression, such as their ability to allow teams to communicate better on operations. Suppressors allow operators the ability to work without wearing earmuffs, which helps ensure they will hear critical communications and preserve situational awareness. This also limits the opposition's ability to track where a team member's gunfire is coming from if their weapon is not suppressed. Suppressed firearms will also help to prevent disorientation and deafness among team members caused by firing non-suppressed weapons in an enclosed environment like a room inside a building (Nielson, 2015). Firearm sound suppressors are designed to capture the burning gasses within their baffles. This significantly reduces the light emitted from the muzzle when a weapon is fired. This feature not only prevents temporary blindness from the muzzle blast to an operator working in a low light condition, but it is also a vital tool that is required when using night vision technology. Night vision devices (NVD), also called night vision goggles

(NVG), use internal electronics to collect ambient light in a dark environment and convert it to ambient light. Without a suppressor, the muzzle flash of a firearm will cause an NVD to be temporarily disabled, preventing the user from seeing.  Also, the opposition will not be able to track the muzzle flash of a team member if they are using a weapon that is suppressed. Hostile gunfire can be easily identified and tracked if all team members are using firearm  sound suppressors.  Suppressors also significantly reduce the amount of ground debris that is normally dislodged and scattered in the air when a person is shooting from a prone position with a firearm that is not suppressed.  This can give away a shooter's position, plus it may blind the shooter temporarily.  Another benefit that is useful for anyone using a firearm sound suppressor is the reduction of recoil.  The added weight of the suppressor, combined with the gases being captured, creates less recoil, and allows the shooter to recover faster after each shot, improving the shooter's accuracy on their first and follow-up shots (Wipfler, 2023).  A U.S. Marine Corps study indicated units that were universally equipped with firearm sound suppressors significantly improved their combat efficiency (Wipfler, 2023)

## COUNTER ARGUMENTS

Cost for anything is always a mitigating factor when agency leaders are solicited for funding.  The cost to purchase a substantial number of firearm sound suppressors is costly, but not compared to the cost of lawsuits, back pay, and the forced medical retirement of peace officers due to permanent hearing damage. Not to mention the staggering cost of payouts to citizens who are exposed to police shootings (LaPedis, 2016). Many different suppressors are being manufactured with

costs varying between $200 and $1200 depending on how they are made and what they are made with. There are fixed suppressors that are permanently attached to a barrel and there are pricier detachable suppressors that can be removed from the barrel at will.  Detachable suppressors require a special muzzle device that allows them to be quickly attached to a barrel and they generally cost between $100-$200. The cost to purchase suppressors will no doubt be substantial, but far less when compared to a settlement.  It's just a drop in the bucket compared to the $1.3 million combined income of an average law enforcement officer with a 25-year career (Wipfler, 2023).  The U.S. Military faces similar issues when confronted with debilitating hearing loss by service members and veterans.  According to Bell & Albino (2014), 60 percent of veterans returning from Iraq and Afghanistan are suffering from hearing loss, which amounted to $1.1 billion in disability payments in 2011.  In 2018, thousands of military personnel and veterans began filing lawsuits against the company, 3M, because the defective earplugs they provided to service members did not protect their hearing from loud noises they were exposed to on the battlefield and during training exercises.  The service members suit eventually became the largest mass tort case in United States history due to the length of time it took to litigate.  In 2023, 3M agreed to settle the lawsuits for $6.01 billion (Gaines, 2023).  Advocates against the removal of suppressors, also called "silencers", from the National Firearms Act argue that they do what they are called, which is render a firearm near to or completely silent. The same advocates also believe silencers are so effective that police will not be able to track and intercept an active shooter because they will not be able to hear the shots nor will gunfire detection devices that are being used in

multiple major U.S. cities. They also maintain that suitable hearing protection such as earmuffs is sufficient for firing weapons without silencers. The truth is higher caliber weapons that are shot with a suppressor are still loud, but the true benefit of a suppressor is how they can lower the risk of concussive damage to a person's hearing compared to only wearing earmuffs. This argument also has no bearing on peace officers responding to priority calls without the ability to retrieve their earmuffs and engage a perpetrator with their duty rifle, which has no suppressor.

Firearm sound suppressors do have operational disadvantages one being increased blow-back on the shooter when using a suppressed semi-auto loading rifle like an AR15, which is a widely accepted rifle for use in law enforcement. Because firearm sound suppressors are designed to capture expanding gases, they will cause back pressure in the barrel. This blowback causes the internal parts of the rifle to wear faster which creates reliability issues and gas particles tend to be pushed back into the shooter's face. Suppressors, unlike other weapon furniture, normally cannot be installed and used right away without first making some adjustments to the rifle itself (replacing parts) or purchasing suppressors specifically designed to reduce blowback. Either way, this can be mitigated. Another disadvantage is a decrease in accuracy. Barrels flex when a weapon is fired and anytime something is added to the barrel of a rifle it is going to alter the trajectory of the bullet based on the "barrel harmonics." This could make the point of impact worse or make it better. One thing that can be done if this happens is to ensure the suppressor is aligned properly with the rifle threads. Find ammunition that is more suitable for the rifle/suppressor setup, resight the scope, and finally, thread adaptors can be used to line up the suppressor

correctly (Maddox, 2022).  A disadvantage that has a simple fix is the suppressor getting hot when shooting.  The more a weapon is shot the hotter it gets, to the point it could cause serious burns to the operator.  Suppressor sleeves that are made of different materials can be used to cover the suppressor like an oven mitt to prevent injuries when the suppressor is being used.  Suppressors also add cumbersome length and weight to a weapon; however, the weapon can be modified to accommodate both.  Suppressors have proven that they can help to reduce officer and agency liability, the same as any other piece of safety equipment that law enforcement agencies provide for their peace officers. More importantly, they will help prevent permanent hearing loss for law enforcement professionals.

## RECOMMENDATION

To help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors.  Hearing protection devices work well for sound reduction but the real issue relating to peace officer hearing loss is the concussive damage to officer's ears caused by gunfire, even while wearing hearing protection devices.  It speaks volumes when stated that modern muzzle-level suppression is vastly superior to ear-level protection (Branch, 2011).  Ideal hearing protection for peace officers would be the combination of HPDs along with the use of firearm sound suppressors.  However, peace officers cannot simply wear HPDs for their entire shift and it is unreasonable to expect officers to grab their HPDs when arriving at a shot's fired call.  Officers firing their AR-15s without HPDs will endure severe hearing trauma along with any civilians who are near officers engaged in gunfire. Bystander lawsuits against law enforcement agencies for exposure to police

gunfire, along with disability compensation and forced retirement of peace officers due to hearing loss, could be costly.  The 3rd largest number of occupational disease claims filed are worker's compensation claims for hearing loss (Jlo, 2023).  In comparison, the initial cost to purchase firearm sound suppressors can be a fraction of the potential cost of settlements and payouts.  Additionally, the benefits afforded peace officers from firearm sound suppressors far out way their disadvantages. Firearm sound suppressors allow officers in the field to have better face-to-face communication and hear clear and concise radio communications which ultimately means improved situational awareness. Suppressors save officers' night vision, both with the naked eye and with night vision technology, when working in low light conditions and it decreases the opposition's ability to see where officer gunfire is coming from so as not to give away their position (Wipfler, 2023).  More importantly, suppressors improve shooter accuracy due to reduced recoil and allow for faster follow-up shots.  Suppressor issues such as increased back pressure, altered trajectory, and unwieldy handling can be mitigated with the right suppressor/rifle setup.  When considering rifle suppressors, law enforcement agencies should conduct research and testing of different rifles with different gas systems (direct impingement (DI)/gas piston), different barrel lengths along with different manufactured rifle suppressors to find the best fit and noise level reduction for their officers.  Rifle and firearm sound suppressor manufacturers and distributors will normally provide samples of their products to agencies for testing at no cost. Departments can start informational outreach programs to apprise citizens of the benefits gained from the use of suppressors by police officers just as the Spokane

Police Department did after they began issuing suppressors with each of their rifles (Washington, 2017).  Communicating to the public that firearm sound suppressors are safety devices that are used to preserve the health and well-being of officers and citizens alike will reduce fear and mitigate the idea by some citizens that the use of suppressors by police is just another step towards militarization.  It is time for law enforcement agencies to start taking officer hearing loss seriously and realize that firearm sound suppressors are the next step to preventing permanent hearing loss for law enforcement professionals.

# REFERENCES

Branch, M. P. (2011, June). *Comparison of muzzle suppression and ear level hearing protection in firearm use.* Pubmed. 44(6):950-3. https://pubmed.ncbi.nlm.nih.gov/21493334/

Bell, S., & Albino, S. A. (2014). Concussive force: The silent variable in hearing loss. *Law Enforcement Technology, 41*(6), 46-47.

Gaines, Mari. (2023). *3M earplug lawsuit settled: Everything you need to now.* Forbes Advisor. https://www.forbes.com/advisor/legal/product-liability/3m-earplug- lawsuit/

Goldstein, J. (2011, June 20). *Ban on hearing aids is forcing out veteran New York City police officers.* The New York Times. https://www.nytimes.com/2011/06/20/nyregion/ny-enforces-ban-on-police-officers-using-hearing-aids.html#:~:text=Ban%20on%20Hearing%20Aids%20Is%20Forcing%20Out%20Veteran%20New%20York%20City%20Police%20Officers,-Share%20full%20article&text=The%20New%20York%20Police%20Departent's,not%20be%20hired%20as%20officers

Gulley, T. (2023a, March 23). *Facts about silencers (and yes, they're legal).* Firearms Legal Protection. https://firearmslegal.com/facts-about-silencers/

Jlo. (2023, September 27). *Police officers are 19% more likely to have hearing loss - Hearing loss advocates.* Johnson Law Offices. https://www.johnsonlawoffices.net/police-officers-are-19-more-likely-to-have-hearing-loss/

Kopel, D. (2017, June 19). *The Hearing protection act and 'silencers' - The Washington Post.* The Washington Post. https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/06/19/the-hearing-protection-act-and-silencers/

LaPedis, R. (2020, September 28). *How can suppressors pay for themselves?* Police1. https://www.police1.com/police-products/firearms/accessories/articles/how- can-suppressors-pay-for-themselves-BZ7heHbOZN7M2AjF/

Lobarinas E, Scott R, Spankovich C, Le Prell CG; (n.d.). *Differential effects of suppressors on hazardous sound pressure levels generated by AR-15 rifles: Considerations for recreational shooters, law enforcement, and the military.* International journal of audiology. National Library of Medicine. https://pubmed.ncbi.nlm.nih.gov/26821935/

Nakashima, A. & Farinaccio, R. (2015). Review of weapon noise measurement and damage risk criteria: Considerations for auditory protection and performance. *Military Medicine*, *180*(4), 402.

Nielsen, E. Firearm sound suppressors. Tactical response. *Suppl. Digital Special*, *13*, 24-27. Retrieved from https://ezproxy.shsu.edu/login?url=https://www.proquest.com/magazines/firearm-sound-suppressors/docview/1807489691/se-2

Maddox, B. (2022, August 11). *How suppressors affect accuracy*. Silencer Central. https://www.silencercentral.com/blog/how-suppressors-affect-accuracy/

Saunders, G., & Griest, S. (2009). Hearing loss in veterans and the need for hearing loss prevention programs. *Noise & Health, 1*(42),14 21. doi:https://doi.org/10.4103/1463-1741.45308

Staff, T. (2023, January 26). *Firearms expert calls arguments against gun silencers "flawed'*. The Crime Report. https://thecrimereport.org/2017/07/11/silencers- arent-goldenbut-they-help/

Washington, S. (2017, October). *Spokane police to use suppressors to protect hearing.* America's 1st Freedom. https://www.americas1stfreedom.org/content/suppressor-use-on-the-rise-for-law-enforcement/

Win, K. N., Balalla, N. B., Lwin, M. Z., & Lai, A. (2015). Noise-induced hearing loss in the police force. *Safety and health at work. PubMed, 6*(2), 134–138. https://doi.org/10.1016/j.shaw.2015.01.002

Wipfler III, E. J. (2023, July 5). *Sound arguments for the purchase and use of firearm suppressors - A physician's perspective and recommendations.* ACEP. https://www.acep.org/talem/newsroom/july-2023/Sound-arguments-for-the-purchase-and-use-of-firearm-suppressors#:~:text=Suppressors%20are%20an%20effective%20preventive,ke

# Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges during Tactical Training Exercises

Scott E. Brueck, MS, CIH
Chuck A. Kardous, MS, PE
Aalok Oza, MPH
William J. Murphy, PhD



**Health**Hazard
Evaluation Program

Report No. 2013-0124-3208
June 2014



U.S. Department of Health and Human Services
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health



APPX.017

# Contents

**Highlights**..................................................i

**Abbreviations** ..................................... iii

**Introduction** ......................................... 1

**Methods** .............................................. 1

**Background on Impulse Noise and Damage Risk Criteria** .........................4

**Results and Discussion** ........................ 5

**Conclusions** ........................................ 14

**Recommendations**............................. 14

**Appendix A: Methods**....................... 16

**Appendix B: Tables**............................18

**References** .......................................... 21

**Acknowledgements**............................ 25

The employer is required to post a copy of this report for 30 days at or near the workplace(s) of affected employees. The employer must take steps to ensure that the posted report is not altered, defaced, or covered by other material.

The cover photo is a close-up image of sorbent tubes, which are used by the HHE Program to measure airborne exposures. This photo is an artistic representation that may not be related to this Health Hazard Evaluation. Photo by NIOSH.

# Highlights of this Evaluation

The Health Hazard Evaluation Program received a request from a federal agency in Tennessee. The requestors were concerned about firearms instructors' exposures to high intensity impulsive noise during tactical training exercises.

## What We Did

- We measured instructors' impulsive noise exposures when training with several different firearms and weapons systems.

- We calculated the number of gunfire exposures that would be permitted per day without incurring a significant risk of hearing loss.

## What We Found

- During most training exercises, instructors were exposed to peak sound pressure levels greater than 150 decibels. NIOSH recommends a ceiling limit of 140 decibels for peak sound pressure levels.

- Peak sound pressure levels for the Dillon M134D minigun, 12-gauge shotgun, and full-load flash bang grenade were sometimes greater than 170 decibels.

- Instructors could exceed the number of gunfire exposures permitted per day.

## What the Employer Can Do

- Install noise controls at the outdoor and indoor ranges.

- Use noise suppressors on firearms, if feasible.

- Use the most protective criterion to limit the number of daily gunfire exposures

- Require use of dual hearing protection during all live fire training exercises.

- Fit test employees for the hearing protection they use.

## What Employees Can Do

- Wear dual hearing protection during all live fire training exercises.

> We measured firearms instructors' exposures to impulsive noise during live fire training exercises. When using firearms and flash bang grenades, instructors were exposed to impulsive noise levels greater than 150 decibels, which is above the NIOSH ceiling limit. Exposures were greater than recommended by some damage risk criteria. We recommended using dual hearing protection during all live fire training exercises and installing additional noise controls.

**This page left intentionally blank**

# Abbreviations

| | |
|---|---|
| AHAAH | Auditory Hazard Assessment Algorithms for Humans |
| ARU | Auditory risk units |
| ANE | Allowable number of exposures |
| CHABA | Committee on Hearing, Bioacoustics, and Biomechanics |
| CFR | Code of Federal Regulations |
| dBA | Decibels, A-weighted |
| Hz | Hertz |
| LeqA8hr | A-weighted 8-hour equivalent sound level |
| msec | Milliseconds |
| NIMS | NIOSH Impulsive-noise Measurement System |
| NIOSH | National Institute for Occupational Safety and Health |
| OSHA | Occupational Safety and Health Administration |
| U.S. DOD | U.S. Department of Defense |

**This page left intentionally blank**

Health Hazard Evaluation Report 2013-0124-3208

APPX.022

# Introduction

The Health Hazard Evaluation (HHE) Program received a request from the safety and health manager of a federal agency concerning firearms instructors' exposures to high intensity impulsive noise during weapons qualifications and tactical training exercises. The firearms instructors train the agency's security personnel. The safety and health manager asked the National Institute for Occupational Safety and Health (NIOSH) to characterize impulsive noise generated by several different weapon systems. The weapons were used during employee tactical training and firearms qualification exercises at indoor and outdoor firing ranges at the agency's security training complex. The agency was particularly interested in knowing peak sound pressure levels, B–duration of the impulse noise waveform, and how much weapons fire instructors could be exposed to per day.

Two NIOSH HHE Program industrial hygienists and a NIOSH research engineer visited the security training complex in June 2013. During the site visit we met with agency safety and health staff, union representatives, and firearms instructors to discuss the HHE request. We observed workplace conditions and work activities, and informally spoke with firearms instructors. We measured impulsive noise generated by several different weapons at three outdoor firing ranges, one indoor firing range, the live fire "shoothouse" facility, the tactical training facility, and the virtual training facility during tactical training exercises.

At the end of our visit, we met with employee and employer representatives. We summarized our activities, and shared preliminary observations and recommendations. In July 2013, we sent a letter to employer and employee representatives. The letter summarized our preliminary results and showed the peak sound pressure levels, the B–duration of the impulse waveform, and the allowable number of rounds of weapons fire that instructors can be exposed to per day when wearing dual hearing protection.

# Methods

## Impulsive Noise Measurement System

We measured impulsive noise during live firing exercises using the NIOSH Impulsive-Noise Measurement System (NIMS) and software platform. The system was designed to acquire, characterize, and analyze impulsive noise generated by weapons fire [NIOSH 2013a]. The measurement system acquired data and used a graphical interface to display the time domain waveform, one-third octave band frequency spectra, peak sound pressure level, equivalent average sound level, kurtosis, time duration, number of impulses, and temporal spacing between impulses. The system calculates potential risk to hearing based on the United States Department of Defense (U.S. DOD) MIL-STD-1474D, A-weighted 8-hour equivalent sound level (LeqA8hr) equal energy criterion, and the Auditory Hazard Assessment Algorithms for Humans (AHAAH). Additional details about NIMS and calculations using damage risk criteria are provided in Appendix A.

For each tactical training exercise we placed two or three stationary microphones on tripods within 3–4 feet of the instructor or representative instructor positions (Figure 1). We positioned the microphones at a height matching instructors' ear level (standing, sitting, or kneeling). We checked the calibration of each microphone prior to measurements. For impulsive noise measurements of the Dillon M134D Aero minigun, we placed the microphones behind the turret on the top of a modified special weapons and tactics (SWAT) vehicle at the kneeling instructor's ear level. Using the NIMS, we took several impulse noise measurements for each type of weapon or weapon system at each location to capture a representative sample of impulsive noise exposures (Figure 2). Table 1 summarizes the locations of weapons or weapons systems at each location where NIOSH took impulsive noise measurements.



Figure 1. NIOSH investigator positioning and calibrating a one-eighth inch microphone for impulsive noise measurements. Photo by HHE requestor.



Figure 2. NIOSH investigator acquiring and analyzing impulsive noise data on laptop computer using NIOSH Impulsive Measurement System. Photo by HHE requestor.

Table 1. Weapons used at each location during NIOSH impulse noise measurements

| Location | Firearms or weapons system |
|---|---|
| Range 1 | M240 machine gun; M249 machine gun; M4 rifle |
| Range 2 | Dillon M134D Aero minigun with and without noise barrier |
| Range 3 | M240 machine gun; M249 machine gun |
| Indoor range | M4 rifle; 9 mm pistol |
| Shoothouse | M4 rifle; 870 shotgun; flash bang (full-load and reduced load); Sledgehammer on door; Battering ram on door |
| Virtual training facility | M249 machine gun |

Because of the rate of fire for some of the automatic weapons systems, one to dozens of impulsive noise exposures (i.e., gunshots) occurred during each "trigger pull." The elapsed time for each trigger pull was approximately 1 second or less. To account for this sometimes rapid succession of gunfire impulses, we considered each trigger pull as an impulse noise exposure analogous to one round of gunfire or one impulsive noise exposure event. We combined the separate gunfire impulses per trigger pull and calculated damage risk and the allowable number of exposures (ANE) for each weapons system and each training exercise. The ANE is equivalent to the allowable number of rounds calculated for single shot weapons.

Instructors wore Moldex Pura-Fit insert ear plugs and Peltor Model MT15H69FB ear muffs. We calculated ANE assuming use of dual hearing protection with an effective attenuation of 34 decibels (dB). This is the attenuation given to this combination of earplugs and earmuffs by U.S. DOD MIL-STD-1474D.

# Background on Impulse Noise and Damage Risk Criteria

Impulsive noise is considered to be more damaging to hearing than continuous sounds [Dunn et al. 1991; Starck et al. 2003]. Unprotected exposure to high intensity impulsive noise can cause acute acoustic trauma, resulting in symptoms such as ringing in the ears (tinnitus) and temporary hearing impairment [Salmivalli 1967; Mrena et al. 2002]. Permanent hearing loss may also occur from exposure to high intensity impulsive sounds that exceed a critical sound pressure level by causing direct mechanical damage to the inner ear [Ward et al. 1961; Luz and Hodge 1971].

Although military agencies in the United States and Europe have studied the effects of exposure to impulsive noise from weapons [Ylikoski 1994; Dancer et al. 1998], these studies lacked the data needed to quantify the relationship between impulsive noise and auditory damage. As a consequence, experts in the occupational, military, and scientific communities have not developed a consensus on the extent of hearing loss risk from exposures to impulsive noise.

In 1968, the Committee on Hearing, Bioacoustics, and Biomechanics (CHABA) of the U.S. National Research Council proposed a damage-risk criterion for exposure to impulsive noise [CHABA 1968]. The CHABA criterion was developed on the basis of measurements that could be made using available instruments at the time. The U.S. DOD criterion, MIL-STD-1474D, was based on the 1968 CHABA criterion. This standard provided a method to calculate an allowable number of impulsive noise exposures without a significant risk of hearing loss. The allowable number of impulse noise exposures varies with the use of single or double hearing protection, peak sound levels, and the B-duration of the impulse waveform [U.S. DOD 1997]. B-duration refers to the length of time that pressure fluctuations in the noise wave are within 20 dB of the peak sound pressure level. The U.S. DOD criterion does not account for the characteristics of impulsive noise such as the spectral or temporal content, or for combined exposure to continuous and impulse noise. Additionally, it does not incorporate the effectiveness of hearing protectors or the protection provided by the nonlinear acoustical reflex and the peak clipping that occurs in the middle ear [CHABA 1992]. The standard does not require hearing protection for impulses with peak pressure levels less than 140 dB.

The French Committee for Weapons Noises advocates the use of the LeqA8hr for impulsive noise exposure [DTAT 1983; Dancer et al. 1995]. It recommends a limit for unprotected ears of 85 decibels, A-weighted (dBA) for an 8-hour, A-weighted, equivalent level. Most current noise instruments are capable of measuring LeqA8hr. The criterion integrates continuous and impulsive noise and allows for the assessment of exposure to multiple impulses regardless of whether the impulse happened in the free-field or a reverberant environment. It also allows

for measuring the effectiveness of hearing protectors. However, some studies have shown that the LeqA8hr method may underestimate the actual protection efficiency of certain hearing protectors by 5 to 20 dB [Dancer et al. 1995]. A NIOSH report on the LeqA8hr and other damage risk criteria highlighted the advantages of using LeqA8hr to characterize exposure to impulse noise [NIOSH 2012].

The AHAAH damage risk criterion is based on an ear model developed by the U.S. Army Research Laboratory. The AHAAH model simulates the behavior of the middle and inner ear in response to high intensity impulse noise and calculates Auditory Risk Units (ARU). The AHAAH model recommends a daily dose maximum of 500 ARUs [Price and Kalb 1991]. Doses greater than 500 ARUs are predicted to produce permanent hearing loss. Other researchers recommend reducing this limit to 200 ARUs for daily or near daily occupational exposures [Fedele et al. 2013]. The model takes into account protective nonlinearities of the middle and inner ear and explains why some short impulses can cause more hearing damage than longer impulses, even when the longer impulses contain more acoustic energy than the short impulses. The model incorporates "warned" and "unwarned" conditions for calculating ARUs. The "warned" condition occurs when an individual anticipates intense noise exposures. In contrast, the "unwarned" condition occurs when an individual does not know or expect intense noise exposure. The model also incorporates use of hearing protectors for calculating ARUs.

Regulations established by the Occupational Safety and Health Administration (OSHA) and NIOSH recommendations state that no exposure to impulsive sound should be permitted if the peak sound pressure level exceeds 140 dB [OSHA 1992; NIOSH 1998]. The European Union directive 86/188, the International Organization for Standardization in ISO 1999:2013, and the American National Standards Institute ANSI S3.44-1996 also state that no exposure should be permitted above peak sound levels in excess of 140 dB [ECD 1986; ISO 1990; ANSI 1996].

The agency currently uses the U.S. DOD MIL-STD-1474D damage risk criterion to determine the allowable number of gunshot exposures per day. The U.S. DOD has proposed a revised design limit criterion for noise, MIL-STD-1474E, that uses a variant of the equivalent A-weighted sound level based on the first 100 milliseconds (msec) of an impulse (LeqA$_{100msec}$) and the AHAAH model.

# Results and Discussion

In this evaluation, we assessed firing range instructors' exposures to high-intensity impulsive noise from gunfire and weapons systems during tactical training exercises. Tables B1, B2, and B3 in Appendix B show detailed results of our noise measurements and ANE for impulsive noise from each firearm or weapons system based on the three damage risk criteria with hearing protection.

Peak impulsive noise levels during shooting of the Dillon M134D Aero minigun at outdoor range 2 reached a maximum of 171.4 dB at the instructor's position next to the shooter.

Figure 3 shows the acoustic waveform and rapid succession of 42 gunfire impulses that occurred in less than 1 second during firing of the Dillon M134D. One-third octave band measurements show that the highest noise levels occurred at frequencies of 50, 63, 100, and 160 hertz (Hz). The highest peak bands correspond to the fundamental frequency and harmonics of the firing rate of the weapon. A single impulse peaks at higher frequencies, near the 1000 Hz band.



Figure 3. Screen capture of impulsive noise waveform and one-third octave band noise frequency results from NIMS display of one trigger pull from the M134D Dillon Aero minigun showing 42 gunfire noise impulses.

Depending on the damage risk criterion, the ANE (i.e. trigger pulls) for the Dillon M134D per day ranged from 5 using the AHAAH model to 276 using the U.S.DOD criterion (with dual hearing protection). To reduce instructors' noise exposures from the Dillon M134D, agency personnel positioned a wooden barrier between the gun muzzle and the shooter and instructor (Figure 4). With the barrier in place, the maximum peak sound pressure level was 160.7 dB, a decrease of about 10 dB. The ANE with the barrier in place increased to 37 based on AHAAH criterion and to 17,131 based on the U.S. DOD criterion. Additional acoustical treatment of the current barrier design could further increase attenuation of peak sound pressure levels.



Figure 4. Firing range instructor kneeling between microphones and behind a noise barrier on top of modified SWAT vehicle during firing of Dillon 134D Aero Minigun. Photo by HHE requestor.

At outdoor ranges 1 and 3, three shooters in a prone position fired their weapons simultaneously. One or two instructors usually stood 4–6 feet behind the firing line between the shooters (Figure 5) or sat next to the shooters. An additional instructor stood about 10 feet behind the shooters. Maximum peak levels at the instructor 1 position (nearest the shooters) during shooting of the M4, M240, and M249 ranged from 159–164 dB. The M249 had slightly lower peak sound pressure levels. The ANE for instructor 1 ranged from 19 using the AHAAH criterion to 412 using the U.S. DOD criterion (with dual hearing protection). Because instructor 2 stood farther away from the shooters, maximum peak sound pressure levels were less, ranging from 149–151 dB. ANE for instructor 2 was 154 using the AHAAH criterion, and > 40,000 using the U.S. DOD criterion.



Figure 5. Two instructors standing between shooters at the outdoor range. Photo by HHE requestor.

At the outdoor ranges each set of shooters usually had 16 trigger presses per live fire exercise with each weapon. Figure 6 shows the impulsive noise waveform pattern for two separate trigger presses of an M240. The impulsive noise waveform for each trigger press had seven distinct noise peaks, corresponding to seven gunshots, occurring in a timespan of approximately 0.75 seconds. The same pattern was repeated one-half a second later. Peak impulse noise levels ranged from 2000 to 3000 pascals (160–164 dB). Noise levels at all frequencies higher than 100 Hz were above 120 dB. However, at 1250 and 1600 Hz noise levels were 130–135 dB. Acoustical treatment of the underside of the corrugated metal roof and the wall behind the shooters might reduce some of reverberant noise during shooting.

Based on the AHAAH criterion, instructor 1 would exceed ANE after observing only two sets of shooters (assuming 16 trigger presses per set of shooters), but could observe about 25

sets of shooters before ANE was exceeded using the U.S. DOD criterion. At the instructor 2 position, an instructor would exceed the ANE after observing 9 sets of shooters based on the AHAAH criterion, but would not exceed the U.S. DOD criterion during a workday because the ANE was greater than 40,000.



Figure 6. Screen capture of impulsive noise waveform and one-third octave band noise frequency measurement results from NIMS display showing two trigger pulls of M240 rifle.

At the indoor range, shooters used M4 rifles and 9 mm pistols at distances of 50 yards, 25 yards, and 5 yards from range targets (Figure 7). During our evaluation, 14 shooters fired weapons simultaneously at the 50-yard and 25-yard positions. However, the number of shooters can vary from ten to twenty. Shooters fire weapons from standing, kneeling, and prone positions. On a typical day, each shooter fires 75 rounds from the M4 rifle and 50 rounds from the 9 mm pistol. For the 50-yard and 25-yard exercises, instructors stood about 6 feet behind the firing line and shooters. Maximum peak sound pressure levels at the instructor position were approximately 152 dB for the M4 rifle and 146 dB for the 9 mm pistol. Maximum peak levels increased to about 160 dB for 5-yard training exercises. This increase in peak levels is most likely because the instructors stand within an arm's length distance from the shooter for the 5-yard exercises. Additionally, instructors were exposed to more reverberant noise because the shooters were relatively close to the walls and ceiling of the nearby bullet trap.



Figure 7. Live fire exercises using M4 rifle from kneeling position at 50 yard position. Note the NIMS microphone at the instructor position behind the firing line. Photo by HHE requestor.

Using the U.S. DOD criterion, the ANE was 40,000 for most of the training exercises at the indoor range, except for an ANE of 6,651 for shooting the 9 mm pistol at the 5-yard position. Using the AHAAH criterion, the minimum ANE was 91 for live fire exercises at the 25- and 5-yard positions. At the 50-yard position the instructor's minimum ANE was 149 for the M4 rifle and 476 for the 9 mm pistol. The indoor range had concrete floors and did not have acoustical treatment on the walls and ceiling. Installing acoustical treatment could reduce some of the reverberation from gunfire but may not have a substantial impact on the ANE for instructors because of their close proximity to the shooters. However, at the 50-yard position it may be possible to install three-sided enclosures behind the firing line for instructors to stand in during shooting.

Live fire training exercises in the shoothouse simulated tactical scenarios in rooms of various sizes and configurations inside a building (Figure 8). Shooters used M4 rifles and Remington model 870 12-gauge shotguns. Additionally, full-load and reduced load flash bang grenades were used for some exercises. Peak sound pressure levels during shooting of the M4 rifle reached about 163 dB when fired in a doorway, but were about 3 dB less when fired in a walkway or hallway. The 12-gauge shotgun reached peak levels of about 172 dB when fired in a doorway and about 155 dB when fired in a hallway. Using the AHAAH criterion, the minimum ANE for the M4 rifle was 5 and for the shotgun was 95. Using the U.S. DOD criterion, the ANE was more than 11,000 for the M4 rifle and more than 2,500 for the shotgun.



Figure 8. Two shooters firing M4 rifles in the shoothouse, with an instructor standing in the doorway. Photo by HHE requestor.

The full-load flash bang grenades generated peak sound pressure levels ranging from 158–172 dB. Figure 9 provides an example of the impulse noise waveform and octave band noise frequency from a full-load flash bang grenade. The wave form was characterized by a very large initial impulse followed by several reverberant impulses of rapidly diminishing energy over the next 0.5 second. Full-load flash bang grenades generated higher peak sound pressure levels than reduced load flash bang grenades discharged at the same location. However, even reduced load flash bang grenades generated peak levels of 151.1–168.8 dB. The highest peak levels occurred when the flash bang devices were exploded in doorways. Peak sound levels were lower when the grenades were exploded in the middle of the room and in the walkway. These differences in peak levels are most likely related to greater reverberation of the explosion shockwave because of the close proximity of the wall and door frame. The minimum ANE for the flash bang grenades ranged from 47 using the AHAAH criterion to 551 using the U.S. DOD criterion.



Figure 9. Screen capture of impulsive noise waveform and one-third octave band noise frequency measurement results from NIMS display of a full-load flash bang grenade.

Our results showed that the AHAAH model was the most conservative criterion (most protective against hearing loss) and the U.S. DOD MIL-STD-1474D (currently used by the agency) was the least protective. Results for the LeqA8hr criterion fell between the other criteria. We calculated damage risk estimates for instructors using dual hearing protection and assumed a combined attenuation for earplugs and earmuffs of at least 34 dB, as prescribed by the damage risk criteria in U.S. DOD. On the basis of the U.S. DOD criterion and use of dual hearing protection, instructors would not likely exceed the calculated ANE during any of the live fire exercises. However, on the basis of the AHAAH criterion, instructors would likely exceed the ANE for live fire exercises using the Dillon M134D (with or without the barrier), and for the weapons used at the outdoor ranges and shoothouse. Using the equal energy criterion, instructors would exceed the ANE at the Dillon M134D if the barrier were not used. If ANE were calculated using single hearing protection instead of dual protection, instructors would exceed ANE for nearly all of the weapons and live fire exercises, except for exercises in the virtual training facility.

We observed a few instances at the outdoor ranges of instructors only using single hearing protection. We also observed that not all insert hearing protection appeared to be deeply inserted into the ear canal, as recommended by hearing protector manufacturers. Additionally, employees can appear to have hearing protection properly inserted, but the hearing protectors still may not fit effectively. Lack of proper insertion can substantially reduce the ability of the hearing protectors to attenuate noise. NIOSH has developed a hearing protector fit test system [Murphy 2014] to help ensure proper selection and fit. Methods and systems for fit testing of hearing protection are available from several manufacturers.

Recent NIOSH research on hearing protectors for impulsive noise exposures has shown that the combination of ear plugs and muffs worn by instructors can attenuate noise levels by 36–49 dB, if properly fitted and worn [Murphy et al. 2012; NIOSH 2013b]. If this attenuation was achieved, noise levels at the ear of firearms' instructors could be reduced to below the impulse noise exposure limit of 140 dB established by OSHA, and recommended by NIOSH, ANSI, ISO, and the EU. Greater noise attenuation of hearing protection should also increase the calculated ANE. Although NIOSH research has shown that hearing protectors are capable of attenuating more noise than the attenuation levels used for damage risk criteria calculations in this report, these higher levels of noise attenuation cannot be assumed and hearing protector attenuation should be verified through fit testing. Sound can also be transmitted to the inner ear through the skull (bone-conduction), bypassing the hearing protector entirely and effectively limiting the attenuation to about 41 dB.

# Conclusions

Firearms instructors were exposed to impulsive noise levels greater than 150 dB for most of the weapons and weapons systems used during indoor and outdoor live fire training exercises. Thus, instructors were exposed above the occupational exposure limit of 140 dB. The Dillon M134D and flash bang grenades generated peak levels greater than 170 dB. Calculation of ANE for live fire exercises using the U.S. DOD currently used by the agency showed that instructors wearing dual hearing protection would not exceed the ANE permitted on a typical day. In contrast, calculations using the AHAAH criterion showed that instructors would likely exceed the ANE permitted for most of the weapons or weapon systems used. The U.S. DOD has proposed a revised standard that incorporates a variant of the LeqA8 criterion and the AHAAH damage risk model.

# Recommendations

On the basis of our findings, we recommend the actions listed below. We encourage the agency to use a labor–management health and safety committee or a working group to discuss our recommendations and develop an action plan. Those involved in the work can best set priorities and assess the feasibility of our recommendations.

Our recommendations are based on an approach known as the hierarchy of controls. This approach groups actions by their likely effectiveness in reducing or removing hazards. In most cases, the preferred approach is to eliminate hazardous materials or processes and install engineering controls to reduce exposure or shield employees. Until such controls are in place, or if they are not effective or feasible, administrative measures and personal protective equipment may be needed.

## Engineering Controls

Engineering controls reduce employees' exposures by removing the hazard from the process or by placing a barrier between the hazard and the employee. Engineering controls protect employees effectively without placing primary responsibility of implementation on the employee.

1. If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure levels.

2. Continue to use the noise barrier for all exercises with the Dillon M134D.

3. Install acoustical materials and panels to the canopy and walls at the outdoor firing ranges and to the barrier used for exercises using the Dillon M134D.

# Administrative Controls

The term administrative controls refers to employer-dictated work practices and policies to reduce or prevent hazardous exposures. Their effectiveness depends on employer commitment and employee acceptance. Regular monitoring and reinforcement are necessary to ensure that policies and procedures are followed consistently.

1. Use the LeqA8hr or the AHAAH model to determine the amount of gunfire instructors can be exposed to per day.

# Personal Protective Equipment

Personal protective equipment is the least effective means for controlling hazardous exposures. Proper use of personal protective equipment requires a comprehensive program and a high level of employee involvement and commitment. The right personal protective equipment must be chosen for each hazard. Supporting programs such as training, change-out schedules, and medical assessment may be needed. Personal protective equipment should not be the sole method for controlling hazardous exposures. Rather, personal protective equipment should be used until effective engineering and administrative controls are in place.

1. Require instructors to use dual hearing protection for all live fire training exercises.

2. Perform hearing protector fit testing to determine the noise attenuation of the hearing protectors used by instructors.

# Appendix A: Methods

For measurements using the NIMS system, we connected four 1/8-inch condenser pressure microphones (GRAS model 40DD) and four 1/4-inch preamplifiers (GRAS model 26AC) to two 2–channel power modules (GRAS model 12AA) using LEMO® cables. The outputs from the two–channel power modules were connected to a National Instruments (model NI–4432) universal serial bus data acquisition board using BNC coaxial cables. The data acquisition board operated at a sampling rate of 102.4 kilohertz. The data acquisition board was connected to a laptop using a USB 2.0 cable. The NIMS program operated using the National Instruments LabVIEW Runtime 2011 64 bit (for Windows 7 or higher) software and National Instruments DAQMX 93.5 device drivers, and the Microsoft.Net or Visual C redistributable package. We calibrated each microphone using a Brüel and Kjær model 4228 piston–phone calibrator.

We calculated damage risk and maximum ANE to gunfire using three different damage risk criteria. The NIOSH artificial head fixture was not available at the time of the site visit to measure attenuation of actual hearing protectors used by instructors. Therefore, for damage risk calculations, we used previously measured values for the single and double hearing protectors that instructors used [Garinther and Hodge 1971; NIOSH 2013b].

## U.S. Department of Defense Criterion MIL-STD-1474D

We calculated the allowable number of impulsive noise exposures per day using the following equation [U.S. DOD 1997]:

$N1 = 10^X$  where,
$X = 1/5\ [177 - L + 6.64\ \log_{10} 200/T]$
$N2 = 20 \times N1$

$N1$ = allowable number of impulse exposures/day (single protection),
$N2$ = allowable number of impulse exposures/day (double protection),
$L$ = measured peak sound pressure level, in dB,
$T$ = measured B–duration in milliseconds (msec), if B > 200 msec, use B = 200 msec.

To calculate the allowable number of exposures per day for the shooters and instructors wearing hearing protection, we divided $N2$ by the number of impulses in each exposure.

### MIL-STD-1474D Definitions and Assumptions

A. A single exposure consists of either
 1. a single impulse for non-repetitive systems (systems producing not more than one impulse per second, e.g., single shot rifle or shotgun, or
 2. a burst for repetitive systems (systems normally producing more than one impulse per second, e.g., automatic weapons. For repetitive systems such as the Dillon Aero M134D and M240/M249 belt–fired machine guns, the B–duration is calculated by multiplying the average B–duration of every impulse in a "gunfire burst" by the number of impulses in the first 200 millisecond of that burst, as specified in section 5.4.2 of MIL-STD-1474D.
B. The maximum permissible number of exposures per day provided in Table 4–I of MIL-STD-1474D (40,000) was used when the calculated allowable number of rounds exceeded those shown in the table.

## A-weighted 8-hour Sound Equivalent Level (LeqA8hr) [DTAT 1983; Dancer et al. 1995]

Following measurements of gunfire noise exposures, the NIMS provided LeqA8hr values for single or multiple shot exposures. Because instructors wore hearing protectors, we reduced the LeqA8hr by 29 dBA for single protection or 34 dBA for double protection [Garinther and Hodge 1971]. More recent NIOSH research indicates that greater hearing protector reductions are possible, ranging from 26–39 dB for single protection and 36–49 dB for double protection [NIOSH 2003; 2013b]. However, for this report, we used the 29 dB and 34 dB values because they represent a more protective measure of instructors' potential risk.

We calculated the allowable number of impulsive noise exposures per day on the basis of the LeqA8hr criterion by using the following formula:

Allowable number of exposures = $10^{[85-(LeqA8hr \text{ with Hearing Protection Device [HPD]})/10]}$

Where, LeqA8hr with HPD = LeqA8hr value from NIMS – 34 dBA of attenuation for dual hearing protection (or 29 dB for attenuation of single protection)

## Ear Modeling Method – Auditory Hazard Assessment Algorithms for Humans (AHAAH) [Price and Kalb 1991; Price 2007]

The AHAAH ear modeling technique is based on an ear model that explains the behavior of the middle and inner ear in response to high intensity impulse noise [Price and Kalb 1991]. Following gunfire measurements, the NIMS provided ARU values calculated on the basis of dual hearing protection and "warned" noise exposure conditions because instructors anticipated high impulse gunfire. We calculated the allowable number of impulsive noise exposures per day by dividing the model maximum allowable ARU (i.e., 200) by the number of impulses per exposure.

# Appendix B: Tables

Table B1. Peak sound pressure levels, damage risk, and allowable number of exposures at outdoor ranges 1, 2, and 3

| Weapon/Location | Peak level (dB) | Number of impulse exposures per trigger pull or impulsive event | U.S. DOD criterion MIL-STD-1474D | | Equal energy criterion LeqA8hr | | AHAAH Auditory Risk Units | |
|---|---|---|---|---|---|---|---|---|
| | | | B-Duration (msec) | Allowable number of exposures | LeqA8hr w/ HPD (dB) | Allowable number of exposures | ARU w/ HPD | Allowable number of exposures |
| Dillon M134D/Range 2 | 168.0–171.4 | 15–45 | 8–15 | 276–1,498 | 63.0–69.9 | 32–158 | 11.3–36.9 | 5–17 |
| Dillon M134D (with barricade)/Range 2 | 157.8–160.7 | 28–52 | 16–20 | 17,131–40,000 | 53.8–59.4 | 363–1,318 | 1.4–5.4 | 37–144 |
| M240/Range 1 (Instructor 1) | 158.7–163.9 | 6–16 | 82–94 | 412–2,542 | 58.8–65.4 | 89–417 | 2.2–10.3 | 19–91 |
| M240/Range 1 (Instructor 2) | 147.0–150.7 | 6–16 | 92–110 | 40,000 | 52.4–56.9 | 645–1,819 | 0.4–1.3 | 154–571 |
| M249/Range 1 (Instructor 1) | 157.0–159.0 | 7–13 | 50–60 | 2,772–17,619 | 53.0–58.6 | 436–1,585 | 0.4–1.8 | 113–526 |
| M249/Range 1 (Instructor 2) | 147.0–149.2 | 7–13 | 66–75 | 40,000 | 50.7–56.3 | 741–2,692 | 0.3–1.0 | 208–625 |
| M4/Range 1 (Instructor 1) | 158.6–164.2 | 1–3 | 56–100 | 1,509–23,727 | 53.1–59.0 | 398–1,549 | 0.5–2.1 | 95–417 |
| M4/Range 1 (Instructor 2) | 147.3–149.0 | 1–3 | 64–115 | 40,000 | 41.9–48.5 | 4,467–20,417 | 0.1–0.2 | 1,111–2,857 |
| M240/Range 3 (Instructor 1) | 163.6–164.4 | 14–15 | 26–44 | 554–1,467 | 62.5–64.1 | 123–178 | 5.1–6.2 | 32–39 |
| M240/Range 3 (Instructor 2) | 148.2–149.8 | 14–15 | 35–70 | 40,000 | 51.0–52.0 | 1,995–2,512 | 0.3–0.4 | 500–645 |
| M249/Range 3 (Instructor 1) | 156.8–159.0 | 8–13 | 22–46 | 12,693–26,556 | 53.0–58.6 | 436–1,585 | 0.4–1.8 | 113–526 |
| M249/Range 3 (Instructor 2) | 147.2–149.0 | 8–13 | 34–65 | 40,000 | 50.7–56.3 | 741–2,692 | 0.3–1.0 | 208–625 |

Table B2. Peak sound pressure levels, damage risk, and allowable number of exposures at the indoor range

| Weapon/Location | Peak level (dB SPL) | Number of impulse exposures per trigger pull or impulsive event | U.S. DOD criterion MIL–STD–1474D | | Equal energy criterion LeqA8hr | | AHAAH Auditory Risk Units | |
|---|---|---|---|---|---|---|---|---|
| | | | B-Duration (msec) | Allowable number of exposures | LeqA8hr w/ HPD (dB) | Allowable number of exposures | ARU w/ HPD | Allowable number of exposures |
| M4 rifle – 50 yards, Instructor 1 | 150.4–150.5 | 8–18 | > 200 | 40,000 | 47.5–51.8 | 2,089–5,623 | 0.4–1.2 | 167–455 |
| M4 rifle – 50 yards, Instructor 2 | 150.4–151.6 | 8–18 | > 200 | 40,000 | 48.2–52.7 | 1,698–4,677 | 0.5–1.3 | 149–385 |
| M4 rifle – 50 yards, Instructor 3 | 147.9–150.9 | 8–18 | > 200 | 40,000 | 47.7–51.6 | 2,188–5,370 | 0.4–1.1 | 182–465 |
| 9 mm pistol – 50 yards, Instructor 1 | 144.6–146.2 | 10–18 | > 200 | 40,000 | 43.2–45.6 | 8,710–15,135 | 0.2–0.4 | 541–1,000 |
| 9 mm pistol – 50 yards, Instructor 2 | 142.9–144.8 | 10–18 | > 200 | 40,000 | 43.0–45.7 | 8,511–15,849 | 0.2–0.3 | 588–1,111 |
| 9 mm pistol – 50 yards, Instructor 3 | 141.3–143.4 | 10–18 | > 200 | 40,000 | 42.9–46.8 | 6,607–16,218 | 0.2–0.4 | 476–1,176 |
| M4 rifle – 25 yards, Instructor 1 | 149.4–149.5 | 28 | > 200 | 40,000 | 53.8 | 1,318 | 1.7–1.8 | 111–116 |
| M4 rifle – 25 yards, Instructor 2 | 150.2–151.6 | 28 | > 200 | 40,000 | 53.2–55.0 | 1,000–1,514 | 1.5–2.2 | 91–131 |
| M4 rifle – 25 yards, Instructor 3 | 150.8–152.0 | 28 | > 200 | 40,000 | 54.2–54.6 | 1,096–1,202 | 1.9–2.1 | 95–106 |
| M4 – 5 yards, Instructor 1 | 144.3 | 2 | > 200 | 40,000 | 45.2 | 9,550 | 0.3 | 800 |
| M4 – 5 yards, Instructor 2 | 160.1 | 2 | > 200 | 40,000 | 49.8 | 3,311 | 0.8 | 256 |
| 9 mm Pistol – 5 yards, Instructor 1 | 159.7 | 6 | > 200 | 9,613 | 54.6 | 1,096 | 2.2 | 91 |
| 9 mm Pistol – 5 yards, Instructor 2 | 160.5 | 6 | > 200 | 6,651 | 54.2 | 1,202 | 1.9 | 104 |

Table B3. Peak sound pressure levels, damage risk, and allowable number of exposures at the shoothouse

| Weapon/Location | Peak level (dB SPL) | Number of impulse exposures per trigger pull or impulsive event | U.S. DOD criterion MIL–STD–1474D | | Equal energy criterion LeqA8hr | | AHAAH Auditory Risk Units | |
|---|---|---|---|---|---|---|---|---|
| | | | B-Duration (msec) | Allowable number of exposures | LeqA8hr w/ HPD (dB) | Allowable number of exposures | ARU w/ HPD | Allowable number of exposures |
| M4 rifle, Doorway | 159.8–162.7 | 1–12 | 100–120 | 11,524–28,553 | 54.2–56.9 | 646–1,202 | 1.8–3.6 | 55–111 |
| M4 rifle, Walkway | 153.3–156 | 1–12 | 148–150 | 40,000 | 50.0–52.7 | 1,698–3,162 | 0.6–1.4 | 146–323 |
| M4 rifle, Hallway | 159.4 | 2 | 125 | 40,000 | 51.5 | 2,239 | 1.2 | 174 |
| Shotgun 870, Doorway | 166.9–171.8 | 1 | 30–62 | 2,724–9,920 | 55.1–55.2 | 955–977 | 1.6–2.1 | 95–127 |
| Shotgun 870, Walkway | 150.5–154.7 | 1 | 172–185 | 40,000 | 42.0–45.9 | 8,128–19,953 | 0.1–0.4 | 540–1,818 |
| Flash Bang (reduced load), Doorway | 163.8 | 1 | 125 | 16,297 | 50.2 | 3,020 | 0.5 | 392 |
| Flash Bang (reduced load), Walkway | 151.1 | 1 | 180 | 40,000 | 42.5 | 17,783 | 0.1 | 1,667 |
| Flash Bang (reduced load), Midroom | 157.7–162.9 | 1 | 154–200 | 13,213 | 50.7–53.5 | 692–2,692 | 1.4–4.3 | 47–145 |
| Flash Bang (full load), Doorway | 171.8 | 1 | 100 | 551 | 53.5 | 1,413 | 0.4 | 571 |
| Flash Bang (full load), Walkway | 157.8 | 1 | 170 | 40,000 | 43.0 | 15,849 | 0.1 | 1667 |
| Flash Bang (full load), Midroom | 168.4 | 1 | 96 | 2,782 | 57.0 | 631 | 3.3 | 60 |
| Sledgehammer | 137.9–140.4 | 1 | 84–125 | 40,000 | 66.8 | 50,000 | <0.01 | 20,000 |
| M249, Virtual training facility | 127.7 | 1 | 180 | 40,000 | 51.4 | 50,000 | 1.9 | 6,667 |

Health Hazard Evaluation Report 2013-0124-3208
APPX.042

# References

ANSI [1996]. Determination of occupational noise exposure and estimation of noise–induced hearing impairment, American National Standards Institute. American National Standard ANSI S3.44–1996. Acoustical Society of America, Melville, New York.

CFR. Code of Federal Regulations. Washington, DC: U.S. Government Printing Office, Office of the Federal Register.

CHABA [1968]. Proposed damage risk criterion for impulse noise (Gunfire). Committee on Hearing, Bioacoustics, and Biomechanics. National Research Council, Washington, D.C.

CHABA [1992]. Hazardous exposure to impulse noise. Committee on Hearing, Bioacoustics, and Biomechanics. National Research Council, Washington, D.C.

Dancer A, Plessiet D, Vaillant T [1995]. Damage risk criteria for weapons noises. CD nl 241/CT/DTB/1995. Etablissement Technique de Bourges, Bourges, France.

DTAT [1983]. Recommendations on evaluating the possible harmful effects of noise on hearing. AT–83/27/28. Direction Technique des Armements Terrestres. Etablissement Technique de Bourges, Bourges, France.

Dunn DE, Davis RR, Merry CJ, Franks JR [1991]. Hearing loss in the chinchilla from impact and continuous noise exposure. J Acoust Soc Am *90*(4):1979–1985.

ECD [1986]. Protection of workers from risks related to exposure to noise at work. European Council Directive 86/188/EEC. Brussels, Belgium.

Fedele PD, Binseel MS, Kalb JT, Price GR [2013]. Using the auditory hazard assessment algorithm for humans (AHAAH) with hearing protection software, release MIL–STD–1474E. ARL-TR–6748, U.S. Army Research Laboratory, Aberdeen Proving Ground, MD.

Garinther GR, Hodge DC [1971]. Small rocket noise: hazards to hearing. Advanced LAW Program, Report No. HEL–TM–7–71. Army Material Command, Human Engineering Lab. Aberdeen Proving Ground, Maryland.

ISO [1990]. Acoustics—determination of occupational noise exposure and estimation of noise–induced hearing impairment. International Standards Organization, International Standard ISO 1999:2013. International Organization for Standardization, Geneva, Switzerland.

Luz G, Hodge R [1971]. The recovery from impulse noise-induced TTS in monkeys and men: a descriptive model. J Acoust Soc Am *49*(6):1770–1777.

Mrena R, Savolainen S, Kuokkanen JT, Ylikoski J [2002]. Characteristics of tinnitus induced by acute acoustic trauma: a long–term follow–up. Audiol Neurootol *7*(2):122–130.

Murphy WJ, Flamme GA, Meinke DK, Sondergaard J, Finan DS, Lankford JE, Khan A, Stewart M [2012]. Measurement of impulse peak insertion loss for four hearing protection devices in field conditions. Int J Aud *51*:S31–S42.

Murphy WJ [2014]. Comparing personal attenuation ratings for hearing protector fit-test systems. CAOHC Update *25*(3).

NIOSH [1998]. Criteria for a recommended standard—occupational noise exposure (revised criteria 1998). Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 98-126.

NIOSH [2003]. Health hazard evaluation report: Fort Collins Police Services, Fort Collins, CO. By Tubbs R, Murphy W. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, NIOSH HHE Report No. 2002-0131-2898.

NIOSH [2012]. In–depth survey report: a case for using A–weighted equivalent energy as a damage risk criterion. By Murphy WJ, Kardous CA. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, EPHB–350-11a, 1-32, 2012.

NIOSH [2013a]. Engineering report: development and validation testing of an impulse noise meter. By Kardous CA. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, EPHB–349-11a, 1-31, 2013.

NIOSH [2013b]. In–depth survey report: comparison of two acoustic test fixtures for measurement of impulse peak insertion loss. By Khan A, Fackler CJ, Murphy WJ. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, EPHB–350-13a, 1-40, 2013.

OSHA [1992]. Occupational noise exposure 29 CFR 1910.95. U.S. Government Printing Office, Office of the Federal Register. Occupational Safety and Health Administration, Washington, D.C.

Price GR, Kalb JT [1991]. Insights into hazard from intense impulses from a mathematical model of the ear. J Acoust Soc Am *90*(1):219–227.

Price GR [2007]. Validation of the auditory hazard assessment algorithm for the human with impulse noise data. J Acoust Soc Am *122*(5):2786–2802.

Salmivalli A [1967]. Acoustic trauma in regular army personnel—clinical audiologic study. Acta Otolaryngol *222*(Suppl):1–85.

Starck J, Toppila E, Pyykko I [2003]. Impulse noise and risk criteria. Noise Health *5*(20):63–73.

U.S. DOD [1997]. MIL-STD-1474D Design criteria standard noise limits. U.S. Department of Defense, Washington, D.C.

Ward WD, Fleer RE, Glorig A [1961]. Characteristics of hearing losses produced by gunfire and steady noise. J Aud Res *1*:325–356.

Ylikoski ME [1994]. Prolonged exposure to gunfire noise among professional soldiers. Scand J Work Environ Health *20*(2):87–92.

Keywords: North American Industry Classification System 928110 (National Security), noise, impulse noise, impulsive noise, peak noise, damage risk criteria, firearms, weapons, guns, gunfire, hearing loss

The Health Hazard Evaluation Program investigates possible health hazards in the workplace under the authority of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 669(a)(6)). The Health Hazard Evaluation Program also provides, upon request, technical assistance to federal, state, and local agencies to investigate occupational health hazards and to prevent occupational disease or injury. Regulations guiding the Program can be found in Title 42, Code of Federal Regulations, Part 85; Requests for Health Hazard Evaluations (42 CFR Part 85).

# Disclaimer

The recommendations in this report are made on the basis of the findings at the workplace evaluated and may not be applicable to other workplaces.

Mention of any company or product in this report does not constitute endorsement by NIOSH.

Citations to Web sites external to NIOSH do not constitute NIOSH endorsement of the sponsoring organizations or their programs or products. NIOSH is not responsible for the content of these Web sites. All Web addresses referenced in this document were accessible as of the publication date.

# Acknowledgments

Desktop Publisher: Shawna Watts
Editor: Ellen Galloway
Logistics: Donnie Booher

# Availability of Report

Copies of this report have been sent to the employer, employees, and union at the facility. The state and local health department and the Occupational Safety and Health Administration Regional Office have also received a copy. This report is not copyrighted and may be freely reproduced.

This report is available at http://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf.

> **Recommended citation for this report:**
> NIOSH [2014]. Health hazard evaluation report: measurement of exposure to impulsive noise at indoor and outdoor firing ranges during tactical training exercises. By Brueck SE, Kardous CA, Oza A, Murphy WJ. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, NIOSH HHE Report No. 2013-0124-3208.

**Delivering on the Nation's promise:**
**Safety and health at work for all people through research and prevention**

**To receive NIOSH documents or more information about occupational safety and health topics, please contact NIOSH:**

Telephone: 1–800–CDC–INFO (1–800–232–4636)

TTY: 1–888–232–6348

CDC INFO: www.cdc.gov/info

or visit the NIOSH Web site at www.cdc.gov/niosh

For a monthly update on news at NIOSH, subscribe to NIOSH eNews by visiting www.cdc.gov/niosh/eNews.

**SAFER • HEALTHIER • PEOPLE™**



Alcohol, Tobacco, Firearms and Explosives

# Firearms Commerce in the United States

## ANNUAL STATISTICAL UPDATE 2021

## Exhibit 1: Firearms Manufactured (1986 – 2019)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |
| 2010 | 2,258,450 | 558,927 | 1,830,556 | 743,378 | 67,929 | 5,459,240 |
| 2011 | 2,598,133 | 572,857 | 2,318,088 | 862,401 | 190,407 | 6,541,886 |
| 2012 | 3,487,883 | 667,357 | 3,168,206 | 949,010 | 306,154 | 8,578,610 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.

## Exhibit 1: Firearms Manufactured (1986 – 2019) — continued

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2013 | 4,441,726 | 725,282 | 3,979,570 | 1,203,072 | 495,142 | 10,844,792 |
| 2014 | 3,633,454 | 744,047 | 3,379,549 | 935,411 | 358,165 | 9,050,626 |
| 2015 | 3,557,199 | 885,259 | 3,691,799 | 777,273 | 447,131 | 9,358,661 |
| 2016 | 4,720,075 | 856,291 | 4,239,335 | 848,617 | 833,123 | 11,497,441 |
| 2017 | 3,691,010 | 720,917 | 2,504,092 | 653,139 | 758,634 | 8,327,792 |
| 2018 | 3,881,158 | 664,835 | 2,880,536 | 536,126 | 1,089,973 | 9,052,628 |
| 2019 | 3,046,013 | 580,601 | 1,957,667 | 480,735 | 946,929 | 7,011,945 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.

## Exhibit 1a: Firearms Manufactured (1986-2019)



## Exhibit 2: Firearms Manufacturers' Exports (1986 – 2019)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |
| 2010 | 80,041 | 25,286 | 76,518 | 43,361 | 16,771 | 241,977 |
| 2011 | 121,035 | 23,221 | 79,256 | 54,878 | 18,498 | 296,888 |
| 2012 | 128,313 | 19,643 | 81,355 | 42,858 | 15,385 | 287,554 |
| 2013 | 167,653 | 21,236 | 131,718 | 49,766 | 22,748 | 393,121 |
| 2014 | 126,316 | 25,521 | 207,934 | 60,377 | 784 | 420,932 |
| 2015 | 140,787 | 22,666 | 159,707 | 18,797 | 1,499 | 343,456 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

## Exhibit 2: Firearms Manufacturers' Exports (1986 – 2019) — continued

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2016 | 172,408 | 24,587 | 147,044 | 24,668 | 8,111 | 376,818 |
| 2017 | 275,424 | 21,676 | 158,871 | 29,997 | 2,332 | 488,300 |
| 2018 | 333,266 | 21,498 | 165,573 | 27,774 | 6,126 | 554,237 |
| 2019 | 138,683 | 14,778 | 136,241 | 22,319 | 5,461 | 317,482 |

Source:  ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

## Exhibit 2a: Firearms Manufacturers' Exports (1986-2019)



### Exhibit 3: Firearms Imports (1986 – 2020)

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |
| 2011 | 529,056 | 998,072 | 1,725,276 | 3,252,404 |
| 2012 | 973,465 | 1,243,924 | 2,627,201 | 4,844,590 |
| 2013 | 936,235 | 1,507,776 | 3,095,528 | 5,539,539 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

### Exhibit 3: Firearms Imports (1986 – 2020) — continued

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 2014 | 648,339 | 791,892 | 2,185,037 | 3,625,268 |
| 2015 | 644,293 | 815,817 | 2,470,101 | 3,930,211 |
| 2016 | 736,482 | 729,452 | 3,671,837 | 5,137,771 |
| 2017 | 632,105 | 572,309 | 3,287,842 | 4,492,256 |
| 2018 | 713,931 | 652,031 | 2,939,889 | 4,305,851 |
| 2019 | 743,252 | 648,703 | 2,594,708 | 3,986,663 |
| 2020 | 1,924,937 | 875,159 | 4,031,280 | 6,831,376 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

### Exhibit 3a: Firearms Imports (1986-2020)



## Exhibit 4: Importation Applications (1986 – 2020)

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 1986 | 7,728 | 9,434 | 2,631 | 19,793 |
| 1987 | 7,833 | 8,059 | 2,130 | 18,022 |
| 1988 | 7,711 | 7,680 | 2,122 | 17,513 |
| 1989 | 7,950 | 8,293 | 2,194 | 18,437 |
| 1990 | 8,292 | 8,696 | 2,260 | 19,248 |
| 1991 | 8,098 | 10,973 | 2,412 | 21,483 |
| 1992 | 7,960 | 9,222 | 2,623 | 19,805 |
| 1993 | 7,591 | 6,282 | 2,585 | 16,458 |
| 1994 | 6,704 | 4,570 | 3,024 | 14,298 |
| 1995 | 5,267 | 2,834 | 2,548 | 10,649 |
| 1996 | 6,340 | 2,792 | 2,395 | 11,527 |
| 1997 | 8,288 | 2,069 | 1,395 | 11,752 |
| 1998 | 8,767 | 2,715 | 1,536 | 13,019 |
| 1999 | 9,505 | 2,235 | 1,036 | 12,776 |
| 2000 | 7,834 | 2,885 | 1,416 | 12,135 |
| 2001 | 9,639 | 3,984 | 1,569 | 15,192 |
| 2002 | 9,646 | 6,321 | 3,199 | 19,166 |
| 2003 | 8,160 | 2,264 | 2,081 | 12,505 |
| 2004 | 7,539 | 1,392 | 1,819 | 10,750 |
| 2005 | 7,539 | 1,320 | 1,746 | 10,605 |
| 2006 | 8,537 | 1,180 | 1,505 | 11,222 |
| 2007 | 8,004 | 1,081 | 1,236 | 10,321 |
| 2008 | 7,610 | 718 | 980 | 9,308 |
| 2009 | 7,967 | 504 | 970 | 9,441 |
| 2010 | 7,367 | 823 | 1,088 | 9,278 |
| 2011 | 7,647 | 641 | 959 | 9,247 |
| 2012 | 8,408 | 420 | 895 | 9,723 |
| 2013 | 9,964 | 319 | 597 | 10,880 |

Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

* Depicts ATF Form 6 Part II (5330.3C)

## Exhibit 4: Importation Applications (1986 – 2020) — continued

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 2014 | 8,529 | 255 | 429 | 9,213 |
| 2015 | 6,078 | 318 | 897 | 7,293 |
| 2016 | 6,154 | 220 | 814 | 7,188 |
| 2017 | 5,859 | 309 | 685 | 6,853 |
| 2018 | 6,631 | 289 | 670 | 7,590 |
| 2019 | 7,040 | 380 | 711 | 8,131 |
| 2020 | 7,243 | 180 | 583 | 8,006 |

Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

* Depicts ATF Form 6 Part II (5330.3C)

## Exhibit 4a: Importation Application (1986-2020)



## Exhibit 5: Firearms Imported into the United States by Country 2020

| Country | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Turkey | 415,180 | 29,450 | 1,045,621 | 1,490,251 |
| Austria | 1,279,123 | 5,632 | 30 | 1,284,785 |
| Brazil | 849,700 | 120,864 | 46,066 | 1,016,630 |
| Croatia | 521,932 | 0 | 0 | 521,932 |
| Sweden | 45 | 1,680 | 430,062 | 431,787 |
| Italy | 146,565 | 48,705 | 175,818 | 371,088 |
| Germany | 274,799 | 73,118 | 2,374 | 350,291 |
| Czech Republic | 247,491 | 28,418 | 34 | 275,943 |
| Canada | 3,050 | 232,395 | 982 | 236,427 |
| China | 0 | 12,000 | 205,462 | 217,462 |
| Philippines | 113,399 | 3,818 | 0 | 117,217 |
| Japan | 0 | 78,249 | 620 | 78,869 |
| Spain | 960 | 57,506 | 515 | 58,981 |
| Israel | 41,357 | 7,839 | 7,697 | 56,893 |
| Serbia | 22,703 | 24,096 | 0 | 46,799 |
| Finland | 8 | 46,506 | 32 | 46,546 |
| Romania | 22,145 | 15,911 | 0 | 38,056 |
| Portugal | 0 | 34,576 | 72 | 34,648 |
| Argentina | 29,030 | 0 | 0 | 29,030 |
| Belgium | 14,120 | 9,533 | 212 | 23,865 |
| Switzerland | 17943 | 3,390 | 35 | 21,368 |
| Bulgaria | 6,937 | 13,733 | 1 | 20,671 |
| United Kingdom | 65 | 11,937 | 8492 | 20,494 |
| Poland | 10,286 | 8,291 | 0 | 18,577 |
| Slovenia | 4,902 | 0 | 0 | 4,902 |

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

### Exhibit 5: Firearms Imported into the United States by Country 2020 — continued

| Country | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Montenegro | 3,639 | 0 | 0 | 3,639 |
| Taiwan | 0 | 3,140 | 0 | 3,140 |
| Slovakia | 2,987 | 0 | 0 | 2,987 |
| Georgia | 608 | 1,500 | 0 | 2,108 |
| Hungary | 1,154 | 875 | 0 | 2,029 |
| Russia | 0 | 1,595 | 0 | 1,595 |
| France | 1,042 | 321 | 62 | 1,425 |
| Other [2] | 110 | 81 | 750 | 941 |
| **Total** | **4,031,280** | **875,159** | **1,924,937** | **6,831,376** |

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

### Exhibit 5a: Imported Firearms Type 2020



Shotguns 28%
Handguns 59%
Rifles 13%

### Exhibit 6: National Firearms Act
### Tax Revenues and Related Activities (1984 – 2020)

| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer & Making Tax Paid | Enforcement Support [3] | |
|---|---|---|---|---|
| | | | Certifications | Records Checks |
| 1984 | $596,000 | $666,000 | 1,196 | 2,771 |
| 1985 | $606,000 | $594,000 | 921 | 3,682 |
| 1986 | $667,000 | $1,372,000 | 690 | 3,376 |
| 1987 | $869,000 | $1,576,000 | 575 | 4,135 |
| 1988 | $2,095,000 | $1,481,000 | 701 | 3,738 |
| 1989 | $1,560,000 | $1,527,000 | 1,196 | 6,128 |
| 1990 | $1,442,000 | $1,308,000 | 666 | 7,981 |
| 1991 | $1,556,000 | $1,210,000 | 764 | 7,857 |
| 1992 | $1,499,000 | $1,237,000 | 1,257 | 8,582 |
| 1993 | $1,493,000 | $1,264,000 | 1,024 | 7,230 |
| 1994 | $1,444,000 | $1,596,000 | 586 | 6,283 |
| 1995 | $1,007,000 | $1,311,000 | 882 | 5,677 |
| 1996 | $1,143,000 | $1,402,000 | 529 | 5,215 |
| 1997 | $1,284,000 | $1,630,000 | 488 | 4,395 |
| 1998 | $1,299,000 | $1,969,000 | 353 | 3,824 |
| 1999 | $1,330,000 | $2,422,000 | 345 | 3,994 |
| 2000 | $1,399,000 | $2,301,000 | 144 | 2,159 |
| 2001 | $1,456,000 | $2,800,000 | 402 | 5,156 |
| 2002 | $1,492,000 | $1,510,000 | 441 | 6,381 |
| 2003 | $1,758,000 | $2,699,000 | 401 | 6,597 |
| 2004 | $1,640,000 | $3,052,000 | 435 | 6,191 |
| 2005 | $1,659,000 | $2,810,000 | 447 | 6,218 |
| 2006 | $1,709,000 | $3,951,000 | 327 | 6,331 |
| 2007 | $1,815,000 | $4,890,000 | 530 | 7,468 |
| 2008 | $1,950,000 | $5,742,000 | 375 | 5,872 |
| 2009 | $2,125,000 | $7,971,000 | 418 | 5,736 |
| 2010 | $2,530,000 | $7,184,000 | 267 | 5,883 |
| 2011 | $2,952,000 | $9,576,000 | 287 | 6,313 |
| 2012 | $3,628,000 | $12,814,000 | 390 | 7,103 |
| 2013 | $4,294,000 | $18,182,000 | 501 | 7,138 |
| 2014 | $4,837,000 | $22,678,000 | 367 | 6,172 |

### Exhibit 6: National Firearms Act
### Tax Revenues and Related Activities (1984 – 2020) — continued

| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer & Making Tax Paid | Enforcement Support [3] | |
| | | | Certifications | Records Checks |
|---|---|---|---|---|
| 2015 | $5,417,000 | $32,462,000 | 338 | 5,650 |
| 2016 | $6,018,000 | $62,596,000 | 397 | 6,547 |
| 2017 | $6,371,000 | $22,972,000 | 469 | 6,749 |
| 2018 | $6,753,000 | $33,371,000 | 537 | 6,130 |
| 2019 | $7,014,000 | $37,285,000 | 447 | 5,426 |
| 2020 | $7,982,000 | $51,677,000 | 456 | 4,520 |

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1997 - 2000 were based on calendar year data.

[2] Special occupational tax revenues for FY 1990 - 1996 include collections made during the fiscal year for prior tax years. Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax.

[3] ATF searches the NFRTR in support of criminal investigations and regulatory inspections in order to determine whether persons are legally in possession of NFA weapons and whether transfers are made lawfully.

Data from 2000-2010 for Certifications and Records Checks was corrected in the 2012 update.

### Exhibit 7: National Firearms Act Firearms Processed by Form Type (1990 - 2020)

| Calendar Year [1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer [2] (ATF Form 5) | Exported (ATF Form 9) | Total [3] |
|---|---|---|---|---|---|---|---|
| 1990 | 399 | 66,084 | 23,149 | 7,024 | 54,959 | 21,725 | 173,340 |
| 1991 | 524 | 80,619 | 19,507 | 5,395 | 44,146 | 40,387 | 190,578 |
| 1992 | 351 | 107,313 | 26,352 | 6,541 | 45,390 | 22,120 | 208,067 |
| 1993 | 310 | 70,342 | 22,071 | 7,388 | 60,193 | 24,041 | 184,345 |
| 1994 | 1,076 | 97,665 | 27,950 | 7,600 | 67,580 | 34,242 | 236,113 |
| 1995 | 1,226 | 95,061 | 18,593 | 8,263 | 60,055 | 31,258 | 214,456 |
| 1996 | 1,174 | 103,511 | 16,931 | 6,418 | 72,395 | 40,439 | 240,868 |
| 1997 | 855 | 110,423 | 18,371 | 7,873 | 70,690 | 36,284 | 244,496 |
| 1998 | 1,093 | 141,101 | 27,921 | 10,181 | 93,135 | 40,221 | 313,652 |
| 1999 | 1,071 | 137,373 | 28,288 | 11,768 | 95,554 | 28,128 | 302,182 |
| 2000 | 1,334 | 141,763 | 23,335 | 11,246 | 96,234 | 28,672 | 302,584 |
| 2001 | 2,522 | 145,112 | 25,745 | 10,799 | 101,955 | 25,759 | 311,892 |
| 2002 | 1,173 | 162,321 | 25,042 | 10,686 | 92,986 | 47,597 | 339,805 |
| 2003 | 1,003 | 156,620 | 21,936 | 13,501 | 107,108 | 43,668 | 343,836 |
| 2004 | 980 | 83,483 | 20,026 | 14,635 | 54,675 | 19,425 | 193,224 |
| 2005 | 1,902 | 65,865 | 26,603 | 14,606 | 26,210 | 20,951 | 156,137 |
| 2006 | 2,610 | 188,134 | 51,290 | 20,534 | 100,458 | 42,175 | 405,201 |
| 2007 | 3,553 | 296,267 | 51,217 | 22,260 | 194,794 | 76,467 | 644,558 |
| 2008 | 4,583 | 424,743 | 71,404 | 26,917 | 183,271 | 206,411 | 917,329 |
| 2009 | 5,345 | 371,920 | 56,947 | 31,551 | 201,267 | 163,951 | 830,981 |
| 2010 | 5,169 | 296,375 | 58,875 | 33,059 | 189,449 | 136,335 | 719,262 |
| 2011 | 5,477 | 530,953 | 107,066 | 33,816 | 147,341 | 311,214 | 1,135,867 |
| 2012 | 7,886 | 484,928 | 149,762 | 52,490 | 170,561 | 219,700 | 1,085,327 |
| 2013 | 9,347 | 477,567 | 206,389 | 57,294 | 110,637 | 224,515 | 1,085,749 |
| 2014 | 22,380 | 591,388 | 262,342 | 107,921 | 138,204 | 248,109 | 1,370,344 |
| 2015 | 32,558 | 583,499 | 365,791 | 130,017 | 127,945 | 306,037 | 1,545,847 |
| 2016 | 49,985 | 1,066,812 | 571,840 | 133,911 | 152,264 | 555,397 | 2,530,209 |
| 2017 | 40,444 | 497,329 | 344,197 | 184,312 | 180,850 | 224,389 | 1,471,521 |
| 2018 | 21,580 | 545,700 | 355,114 | 128,324 | 169,258 | 318,387 | 1,538,363 |
| 2019 | 28,006 | 844,378 | 361,754 | 170,182 | 234,486 | 402,626 | 2,041,432 |
| 2020 | 40,790 | 884,656 | 610,002 | 246,806 | 266,600 | 360,731 | 2,409,585 |

## Exhibit 7: National Firearms Act Firearms Processed by Form Type (1990 - 2020)

| Calendar Year [1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer [2] (ATF Form 5) | Exported (ATF Form 9) | Total [3] |
|---|---|---|---|---|---|---|---|

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Data from 1990 - 1996 represent fiscal year.

[2] Firearms may be transferred to the U.S., State or local governments without the payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[3] Totals do not include ATF Form  5320.20 or ATF Form 10 because these do not relate to commercial transactions.

### Exhibit 7a: National Firearms Act Firearms Processed by Form Type (1990-2020)



### Exhibit 7b: National Firearms Act Firearms Processed by Fiscal Year (2002-2020)



## Exhibit 8: National Firearms Act Registered Weapons by State (May 2021)

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,352 | 82,978 | 34,702 | 64,506 | 8,830 | 2,552 | 194,920 |
| Alaska | 345 | 6,256 | 1,802 | 15,192 | 3,108 | 1,534 | 28,237 |
| Arkansas | 703 | 83,161 | 5,689 | 38,058 | 5,076 | 1,294 | 133,981 |
| Arizona | 2,647 | 123,286 | 19,032 | 85,353 | 25,203 | 3,170 | 258,691 |
| California | 4,752 | 324,948 | 29,112 | 17,271 | 15,520 | 14,757 | 406,360 |
| Colorado | 1,154 | 57,926 | 7,666 | 67,008 | 13,509 | 2,119 | 149,382 |
| Connecticut | 1,034 | 14,610 | 35,235 | 18,648 | 4,212 | 1,135 | 74,874 |
| District of Columbia | 69 | 62,757 | 7,872 | 1,024 | 1,426 | 1,167 | 74,315 |
| Delaware | 52 | 3,876 | 537 | 411 | 565 | 651 | 6,092 |
| Florida | 4,100 | 230,917 | 47,117 | 175,156 | 50,848 | 10,587 | 518,725 |
| Georgia | 2,269 | 96,486 | 42,545 | 129,566 | 21,232 | 12,026 | 304,124 |
| Hawaii | 34 | 8,234 | 441 | 403 | 93 | 75 | 9,280 |
| Iowa | 919 | 19,353 | 7,228 | 22,529 | 2,937 | 1,212 | 54,178 |
| Idaho | 667 | 23,674 | 5,299 | 40,755 | 5,376 | 654 | 76,425 |
| Illinois | 1,075 | 103,440 | 30,576 | 3,297 | 4,622 | 1,739 | 144,749 |
| Indiana | 1,862 | 50,885 | 21,137 | 63,249 | 10,872 | 9,541 | 157,546 |
| Kansas | 823 | 26,035 | 3,986 | 31,811 | 5,924 | 1,271 | 69,850 |
| Kentucky | 1,212 | 36,615 | 18,128 | 44,040 | 6,717 | 2,121 | 108,833 |
| Louisiana | 713 | 60,863 | 7,206 | 72,042 | 9,212 | 2,025 | 152,061 |
| Massachusetts | 969 | 19,571 | 7,070 | 10,409 | 6,079 | 1,040 | 45,138 |
| Maryland | 1,137 | 61,460 | 29,854 | 32,275 | 7,633 | 3,898 | 136,257 |
| Maine | 600 | 3,789 | 5,109 | 8,285 | 3,057 | 556 | 21,396 |
| Michigan | 1,284 | 30,928 | 17,464 | 49,324 | 9,120 | 1,715 | 109,835 |
| Minnesota | 2,825 | 61,232 | 8,779 | 48,154 | 7,681 | 1,154 | 129,825 |
| Missouri | 1,574 | 37,631 | 11,167 | 49,754 | 10,230 | 2,995 | 113,351 |
| Mississippi | 564 | 32,211 | 4,906 | 36,545 | 5,354 | 1,132 | 80,712 |
| Montana | 467 | 4,999 | 2,531 | 25,409 | 2,612 | 660 | 36,678 |

## Exhibit 8: National Firearms Act Registered Weapons by State (May 2021) – continued

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| North Carolina | 1,158 | 107,333 | 15,875 | 76,759 | 17,478 | 3,563 | 222,166 |
| North Dakota | 215 | 3,726 | 1,670 | 23,042 | 2,003 | 319 | 30,975 |
| Nebraska | 816 | 9,780 | 2,403 | 25,879 | 3,472 | 911 | 43,261 |
| New Hampshire | 534 | 5,834 | 20,817 | 36,954 | 7,613 | 681 | 72,433 |
| New Jersey | 534 | 47,080 | 44,422 | 3,889 | 3,775 | 2,528 | 102,228 |
| New Mexico | 404 | 93,029 | 4,233 | 19,873 | 4,590 | 839 | 122,968 |
| Nevada | 1,264 | 50,124 | 14,577 | 37,880 | 12,662 | 2,500 | 119,007 |
| New York | 1,848 | 54,148 | 13,554 | 7,406 | 7,622 | 7,613 | 92,191 |
| Ohio | 2,312 | 92,909 | 22,979 | 68,736 | 15,158 | 6,567 | 208,661 |
| Oklahoma | 1,253 | 19,174 | 9,776 | 62,404 | 8,738 | 2,023 | 103,368 |
| Oregon | 1,683 | 28,654 | 6,740 | 49,193 | 9,483 | 1,717 | 97,474 |
| Pennsylvania | 2,482 | 205,854 | 21,169 | 83,563 | 21,215 | 13,884 | 348,167 |
| Rhode Island | 46 | 3,663 | 630 | 96 | 338 | 114 | 4,887 |
| South Carolina | 733 | 44,017 | 10,997 | 50,422 | 9,088 | 3,948 | 119,205 |
| South Dakota | 388 | 4,559 | 2,176 | 55,666 | 1,612 | 265 | 64,666 |
| Tennessee | 1,803 | 54,554 | 14,683 | 60,573 | 13,350 | 6,573 | 151,536 |
| Texas | 7,517 | 332,208 | 46,318 | 529,150 | 81,000 | 10,362 | 1,006,555 |
| Utah | 578 | 19,648 | 7,745 | 79,557 | 9,212 | 1,668 | 118,408 |
| Virginia | 3,094 | 250,986 | 43,877 | 90,454 | 26,361 | 8,935 | 423,707 |
| Vermont | 238 | 3,106 | 1,465 | 3,528 | 904 | 210 | 9,451 |
| Washington | 1,981 | 62,633 | 4,673 | 78,279 | 16,919 | 1,049 | 165,534 |
| Wisconsin | 853 | 36,053 | 8,391 | 40,596 | 8,070 | 1,467 | 95,430 |
| West Virginia | 465 | 25,315 | 7,359 | 13,696 | 2,913 | 1,215 | 50,963 |
| Wyoming | 337 | 120,688 | 2,019 | 16,681 | 2,089 | 433 | 142,247 |
| Other US Territories | 6 | 323 | 408 | 20 | 12 | 103 | 872 |
| **Total** | **67,744** | **3,343,519** | **741,146** | **2,664,774** | **532,725** | **162,267** | **7,512,175** |

## Exhibit 8: National Firearms Act Registered Weapons by State
### (May 2021) – continued

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|-------|----------------------|------------------------|----------------|--------------|--------------------------|----------------------------|-------|

*Source:* ATF National Firearms Registration and Transfer Record (NFRTR).

[1] The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2] Destructive device generally is defined as (a) any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3] Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

[4] Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5] Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6] Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

### Exhibit 9: National Firearms Act
### Special Occupational Taxpayers by State
### Tax Year 2020

| State | Importers | Manufacturers | Dealers | Total |
|-------|-----------|---------------|---------|-------|
| Alabama | 26 | 118 | 272 | 416 |
| Alaska | 1 | 33 | 112 | 146 |
| Arizona | 30 | 407 | 276 | 713 |
| Arkansas | 15 | 132 | 168 | 315 |
| California | 14 | 122 | 86 | 222 |
| Colorado | 6 | 157 | 343 | 506 |
| Connecticut | 3 | 88 | 114 | 205 |
| Delaware | 0 | 0 | 3 | 3 |
| District of Columbia | 1 | 0 | 0 | 1 |
| Florida | 66 | 462 | 595 | 1123 |
| Georgia | 13 | 203 | 380 | 596 |
| Hawaii | 0 | 0 | 1 | 1 |
| Idaho | 2 | 130 | 155 | 287 |
| Illinois | 11 | 96 | 37 | 144 |
| Indiana | 6 | 103 | 310 | 419 |
| Iowa | 1 | 65 | 226 | 292 |
| Kansas | 4 | 80 | 268 | 352 |
| Kentucky | 18 | 95 | 254 | 367 |
| Louisiana | 2 | 85 | 220 | 307 |
| Maine | 3 | 48 | 95 | 146 |
| Maryland | 8 | 77 | 152 | 237 |
| Massachusetts | 5 | 118 | 27 | 150 |
| Michigan | 12 | 134 | 300 | 446 |
| Minnesota | 13 | 109 | 228 | 350 |
| Mississippi | 11 | 77 | 172 | 260 |
| Missouri | 15 | 147 | 255 | 417 |
| Montana | 4 | 72 | 148 | 224 |
| Nebraska | 0 | 33 | 132 | 165 |
| Nevada | 12 | 173 | 135 | 320 |
| New Hampshire | 6 | 101 | 121 | 228 |
| New Jersey | 1 | 7 | 21 | 29 |

**Source:** ATF's National Firearms Act Special Occupational Tax Database (NSOT).

**Numbers represent locations of qualified premises.**

### Exhibit 9: National Firearms Act
### Special Occupational Taxpayers by State
### Tax Year 2020 — continued

| State | Importers | Manufacturers | Dealers | Total |
|---|---|---|---|---|
| New Mexico | 10 | 70 | 133 | 213 |
| New York | 4 | 91 | 19 | 114 |
| North Carolina | 2 | 231 | 407 | 640 |
| North Dakota | 1 | 14 | 119 | 134 |
| Ohio | 6 | 239 | 379 | 624 |
| Oklahoma | 1 | 138 | 211 | 350 |
| Oregon | 1 | 110 | 210 | 321 |
| Pennsylvania | 17 | 210 | 457 | 684 |
| Rhode Island | 1 | 0 | 1 | 2 |
| South Carolina | 10 | 109 | 236 | 355 |
| South Dakota | 0 | 31 | 131 | 162 |
| Tennessee | 6 | 131 | 321 | 458 |
| Texas | 39 | 748 | 1035 | 1822 |
| Utah | 5 | 148 | 151 | 304 |
| Vermont | 4 | 26 | 71 | 101 |
| Virginia | 45 | 197 | 363 | 605 |
| Washington | 5 | 140 | 176 | 321 |
| West Virginia | 7 | 43 | 140 | 190 |
| Wisconsin | 1 | 115 | 252 | 368 |
| Wyoming | 2 | 47 | 119 | 168 |
| **Total** | **476** | **6,310** | **10,537** | **17,323** |

Source: ATF's National Firearms Act Special Occupational Tax Database (NSOT).

Numbers represent locations of qualified premises.

## Exhibit 10: Federal Firearms Licensees Total (1975-2020)

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | | Destructive Device | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Ammunition | Firearms | Importer | Dealer | Manufacturer | Importer | |
| 1975 | 146,429 | 2,813 | 5,211 | 6,668 | 364 | 403 | 9 | 23 | 7 | 161,927 |
| 1976 | 150,767 | 2,882 | 4,036 | 7,181 | 397 | 403 | 4 | 19 | 8 | 165,697 |
| 1977 | 157,463 | 2,943 | 4,446 | 7,761 | 408 | 419 | 6 | 28 | 10 | 173,484 |
| 1978 | 152,681 | 3,113 | 4,629 | 7,735 | 422 | 417 | 6 | 35 | 14 | 169,052 |
| 1979 | 153,861 | 3,388 | 4,975 | 8,055 | 459 | 426 | 7 | 33 | 12 | 171,216 |
| 1980 | 155,690 | 3,608 | 5,481 | 8,856 | 496 | 430 | 7 | 40 | 11 | 174,619 |
| 1981 | 168,301 | 4,308 | 6,490 | 10,067 | 540 | 519 | 7 | 44 | 20 | 190,296 |
| 1982 | 184,840 | 5,002 | 8,602 | 12,033 | 675 | 676 | 12 | 54 | 24 | 211,918 |
| 1983 | 200,342 | 5,388 | 9,859 | 13,318 | 788 | 795 | 16 | 71 | 36 | 230,613 |
| 1984 | 195,847 | 5,140 | 8,643 | 11,270 | 710 | 704 | 15 | 74 | 40 | 222,443 |
| 1985 | 219,366 | 6,207 | 9,599 | 11,818 | 778 | 881 | 15 | 85 | 45 | 248,794 |
| 1986 | 235,393 | 6,998 | 10,639 | 12,095 | 843 | 1,035 | 16 | 95 | 52 | 267,166 |
| 1987 | 230,888 | 7,316 | 11,094 | 10,613 | 852 | 1,084 | 16 | 101 | 58 | 262,022 |
| 1988 | 239,637 | 8,261 | 12,638 | 10,169 | 926 | 1,123 | 18 | 112 | 69 | 272,953 |
| 1989 | 231,442 | 8,626 | 13,536 | 8,345 | 922 | 989 | 21 | 110 | 72 | 264,063 |
| 1990 | 235,684 | 9,029 | 14,287 | 7,945 | 978 | 946 | 20 | 117 | 73 | 269,079 |
| 1991 | 241,706 | 9,625 | 15,143 | 7,470 | 1,059 | 901 | 17 | 120 | 75 | 276,116 |
| 1992 | 248,155 | 10,452 | 15,820 | 7,412 | 1,165 | 894 | 15 | 127 | 77 | 284,117 |
| 1993 | 246,984 | 10,958 | 16,635 | 6,947 | 1,256 | 924 | 15 | 128 | 78 | 283,925 |
| 1994 | 213,734 | 10,872 | 17,690 | 6,068 | 1,302 | 963 | 12 | 122 | 70 | 250,833 |
| 1995 | 158,240 | 10,155 | 16,354 | 4,459 | 1,242 | 842 | 14 | 118 | 71 | 191,495 |
| 1996 | 105,398 | 9,974 | 14,966 | 3,144 | 1,327 | 786 | 12 | 117 | 70 | 135,794 |
| 1997 | 79,285 | 9,956 | 13,512 | 2,451 | 1,414 | 733 | 13 | 118 | 72 | 107,554 |
| 1998 | 75,619 | 10,176 | 14,875 | 2,374 | 1,546 | 741 | 12 | 125 | 68 | 105,536 |
| 1999 | 71,290 | 10,035 | 17,763 | 2,247 | 1,639 | 755 | 11 | 127 | 75 | 103,942 |
| 2000 | 67,479 | 9,737 | 21,100 | 2,112 | 1,773 | 748 | 12 | 125 | 71 | 103,157 |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS). Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 10: Federal Firearms Licensees Total (1975-2020) — continued

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of Ammunition | Manufacturer of Firearms | Importer | Destructive Device Dealer | Destructive Device Manufacturer | Destructive Device Importer | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 63,845 | 9,199 | 25,145 | 1,950 | 1,841 | 730 | 14 | 117 | 72 | 102,913 |
| 2002 | 59,829 | 8,770 | 30,157 | 1,763 | 1,941 | 735 | 16 | 126 | 74 | 103,411 |
| 2003 | 57,492 | 8,521 | 33,406 | 1,693 | 2,046 | 719 | 16 | 130 | 82 | 104,105 |
| 2004 | 56,103 | 8,180 | 37,206 | 1,625 | 2,144 | 720 | 16 | 136 | 84 | 106,214 |
| 2005 | 53,833 | 7,809 | 40,073 | 1,502 | 2,272 | 696 | 15 | 145 | 87 | 106,432 |
| 2006 | 51,462 | 7,386 | 43,650 | 1,431 | 2,411 | 690 | 17 | 170 | 99 | 107,316 |
| 2007 | 49,221 | 6,966 | 47,690 | 1,399 | 2,668 | 686 | 23 | 174 | 106 | 108,933 |
| 2008 | 48,261 | 6,687 | 52,597 | 1,420 | 2,959 | 688 | 29 | 189 | 113 | 112,943 |
| 2009 | 47,509 | 6,675 | 55,046 | 1,511 | 3,543 | 735 | 34 | 215 | 127 | 115,395 |
| 2010 | 47,664 | 6,895 | 56,680 | 1,759 | 4,293 | 768 | 40 | 243 | 145 | 118,487 |
| 2011 | 48,676 | 7,075 | 59,227 | 1,895 | 5,441 | 811 | 42 | 259 | 161 | 123,587 |
| 2012 | 50,848 | 7,426 | 61,885 | 2,044 | 7,423 | 848 | 52 | 261 | 169 | 130,956 |
| 2013 | 54,026 | 7,810 | 64,449 | 2,353 | 9,094 | 998 | 57 | 273 | 184 | 139,244 |
| 2014 | 55,431 | 8,132 | 63,301 | 2,596 | 9,970 | 1,133 | 66 | 287 | 200 | 141,116 |
| 2015 | 56,181 | 8,152 | 60,652 | 2,603 | 10,498 | 1,152 | 66 | 315 | 221 | 139,840 |
| 2016 | 56,754 | 8,076 | 57,345 | 2,481 | 11,083 | 1,105 | 71 | 332 | 217 | 137,464 |
| 2017 | 56,638 | 7,871 | 55,588 | 2,259 | 11,946 | 1,110 | 78 | 357 | 234 | 136,081 |
| 2018 | 55,891 | 7,639 | 54,136 | 2,119 | 12,564 | 1,127 | 98 | 378 | 239 | 134,191 |
| 2019 | 53,924 | 7,341 | 52,446 | 1,910 | 13,044 | 1,109 | 129 | 391 | 252 | 130,546 |
| 2020 | 52,799 | 7,141 | 52,865 | 1,797 | 14,054 | 1,127 | 128 | 425 | 269 | 130,605 |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).  Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

### Exhibit 11: Federal Firearms Licensees by State 2020

| State | FFL Population |
|---|---|
| Alabama | 2,114 |
| Alaska | 833 |
| Arizona | 3,385 |
| Arkansas | 1,871 |
| California | 8,461 |
| Colorado | 2,945 |
| Connecticut | 1,743 |
| Delaware | 316 |
| District of Columbia | 34 |
| Florida | 6,988 |
| Georgia | 3,478 |
| Hawaii | 223 |
| Idaho | 1,506 |
| Illinois | 4,506 |
| Indiana | 2,730 |
| Iowa | 1,994 |
| Kansas | 1,773 |
| Kentucky | 2,225 |
| Louisiana | 1,937 |
| Maine | 880 |
| Maryland | 2,837 |
| Massachusetts | 3,960 |
| Michigan | 3,856 |
| Minnesota | 2,434 |
| Mississippi | 1,433 |
| Missouri | 4,242 |
| Montana | 1,499 |
| Nebraska | 1,098 |

### Exhibit 11: Federal Firearms Licensees by State 2020 — continued

| State | FFL Population |
|---|---|
| Nevada | 1,318 |
| New Hampshire | 1,174 |
| New Jersey | 473 |
| New Mexico | 1,022 |
| New York | 3,784 |
| North Carolina | 4,430 |
| North Dakota | 698 |
| Ohio | 4,454 |
| Oklahoma | 2,197 |
| Oregon | 2,148 |
| Pennsylvania | 6,136 |
| Rhode Island | 565 |
| South Carolina | 2,102 |
| South Dakota | 758 |
| Tennessee | 3,103 |
| Texas | 10,635 |
| Utah | 1,493 |
| Vermont | 548 |
| Virginia | 3,962 |
| Washington | 3,109 |
| West Virginia | 1,347 |
| Wisconsin | 2,848 |
| Wyoming | 878 |
| Other Territories | 122 |
| **Total** | **130,605** |

## Exhibit 12: Actions on Federal Firearms License Applications (1975 - 2020)

| | Original Application | | | |
|---|---|---|---|---|
| Fiscal Year | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 1975 | 29,183 | 150 | 1,651 | ... |
| 1976 | 29,511 | 209 | 2,077 | ... |
| 1977 | 32,560 | 216 | 1,645 | ... |
| 1978 | 29,531 | 151 | 1,015 | 414 |
| 1979 | 32,678 | 124 | 432 | 433 |
| 1980 | 36,052 | 96 | 601 | 661 |
| 1981 | 41,798 | 85 | 742 | 329 |
| 1982 | 44,745 | 52 | 580 | 370 |
| 1983 | 49,669 | 151 | 916 | 649 |
| 1984 | 39,321 | 98 | 706 | 833 |
| 1985 | 37,385 | 103 | 666 | 598 |
| 1986 | 42,842 | 299 | 698 | 452 |
| 1987 | 36,835 | 121 | 874 | 458 |
| 1988 | 32,724 | 30 | 506 | 315 |
| 1989 | 34,318 | 34 | 561 | 360 |
| 1990 | 34,336 | 46 | 893 | 404 |
| 1991 | 34,567 | 37 | 1,059 | 685 |
| 1992 | 37,085 | 57 | 1,337 | 611 |
| 1993 | 41,545 | 343 | 6,030 | 1,844 |
| 1994 | 25,393 | 136 | 4,480 | 3,917 |
| 1995 | 7,777 | 49 | 1,046 | 1,180 |
| 1996 | 8,461 | 58 | 1,061 | 629 |
| 1997 | 7,039 | 24 | 692 | 366 |
| 1998 | 7,090 | 19 | 621 | 352 |
| 1999 | 8,581 | 23 | 48 | 298 |
| 2000 | 10,698 | 6 | 447 | 91 |
| 2001 | 11,161 | 3 | 403 | 114 |
| 2002 | 16,100 | 13 | 468 | 175 |
| 2003 | 13,884 | 30 | 729 | 289 |
| 2004 | 12,953 | 18 | 572 | 235 |
| 2005 | 13,326 | 33 | 943 | 300 |
| 2006 | 13,757 | 35 | 898 | 234 |

## Exhibit 12: Actions on Federal Firearms License Applications (1975 - 2020) — continued

| Original Application | | | | |
|---|---|---|---|---|
| Fiscal Year | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 2007 | 14,123 | 32 | 953 | 402 |
| 2008 | 15,434 | 21 | 1,030 | 291 |
| 2009 | 16,105 | 20 | 1,415 | 724 |
| 2010 | 16,930 | 32 | 1,467 | 380 |
| 2011 | 19,923 | 22 | 1,744 | 369 |
| 2012 | 20,977 | 28 | 2,252 | 358 |
| 2013 | 23,242 | 30 | 2,901 | 385 |
| 2014 | 17,816 | 27 | 2,192 | 444 |
| 2015 | 15,219 | 34 | 1,953 | 387 |
| 2016 | 15,853 | 16 | 2,165 | 307 |
| 2017 | 14,546 | 17 | 2,038 | 366 |
| 2018 | 14,054 | 17 | 1,913 | 377 |
| 2019 | 12,966 | 9 | 1,993 | 382 |
| 2020 | 13,429 | 11 | 2,387 | 319 |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

[1] An application can be withdrawn by an applicant at any time prior to the issuance of a license.

[2] If ATF cannot locate an applicant during an attempted application inspection or cannot obtain needed verification data, then the application will be abandoned.

## Exhibit 13: Federal Firearms Licensees and Compliance Inspections
## (FY 1975 – 2020)

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities* | Percent Ins pected |
|---|---|---|---|---|---|
| 1975 | 10,944 | 161,927 | 6.7% | 156,716 | 7.0% |
| 1976 | 15,171 | 165,697 | 9.1% | 161,661 | 9.4% |
| 1977 | 19,741 | 173,484 | 11.3% | 169,038 | 11.7% |
| 1978 | 22,130 | 169,052 | 13.1% | 164,423 | 13.5% |
| 1979 | 14,744 | 171,216 | 8.6% | 166,241 | 8.9% |
| 1980 | 11,515 | 174,619 | 6.5% | 169,138 | 6.8% |
| 1981 | 11,035 | 190,296 | 5.7% | 183,806 | 6.0% |
| 1982 | 1,829 | 211,918 | 0.8% | 203,316 | 0.9% |
| 1983 | 2,662 | 230,613 | 1.1% | 220,754 | 1.2% |
| 1984 | 8,861 | 222,443 | 3.9% | 213,800 | 4.1% |
| 1985 | 9,527 | 248,794 | 3.8% | 239,195 | 4.0% |
| 1986 | 8,605 | 267,166 | 3.2% | 256,527 | 3.4% |
| 1987 | 8,049 | 262,022 | 3.1% | 250,928 | 3.2% |
| 1988 | 9,283 | 272,953 | 3.4% | 260,315 | 3.6% |
| 1989 | 7,142 | 264,063 | 2.7% | 250,527 | 2.9% |
| 1990 | 8,471 | 269,079 | 3.1% | 254,792 | 3.3% |
| 1991 | 8,258 | 276,116 | 3.0% | 260,973 | 3.2% |
| 1992 | 16,328 | 284,117 | 5.7% | 268,297 | 6.1% |
| 1993 | 22,330 | 283,925 | 7.9% | 267,290 | 8.4% |
| 1994 | 20,067 | 250,833 | 8.0% | 233,143 | 8.6% |
| 1995 | 13,141 | 191,495 | 7.0% | 171,577 | 7.7% |
| 1996 | 10,051 | 135,794 | 7.4% | 120,828 | 8.3% |
| 1997 | 5,925 | 107,554 | 5.5% | 94,042 | 6.3% |
| 1998 | 5,043 | 105,536 | 4.8% | 90,661 | 5.6% |
| 1999 | 9,004 | 103,942 | 8.7% | 86,179 | 10.4% |
| 2000 | 3,640 | 103,157 | 3.5% | 82,558 | 4.4% |
| 2001 | 3,677 | 102,913 | 3.6% | 77,768 | 4.7% |

## Exhibit 13: Federal Firearms Licensees and Compliance Inspections (FY 1975 – 2020) — continued

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities* | Percent Ins pected |
|---|---|---|---|---|---|
| 2002 | 5,467 | 103,411 | 5.2% | 73,254 | 7.5% |
| 2003 | 5,170 | 104,105 | 4.9% | 70,699 | 7.3% |
| 2004 | 4,509 | 106,214 | 4.2% | 69,008 | 6.5% |
| 2005 | 5,189 | 106,432 | 4.9% | 66,359 | 7.8% |
| 2006 | 7,294 | 107,316 | 6.8% | 63,666 | 11.5% |
| 2007 | 10,141 | 108,933 | 9.3% | 61,243 | 16.6% |
| 2008 | 11,100 | 112,943 | 9.8% | 60,346 | 18.4% |
| 2009 | 11,375 | 115,395 | 9.9% | 60,349 | 18.8% |
| 2010 | 10,538 | 118,487 | 8.9% | 61,807 | 17.0% |
| 2011 | 13,159 | 123,587 | 10.6% | 64,360 | 20.4% |
| 2012 | 11,420 | 130,956 | 8.7% | 69,071 | 16.5% |
| 2013 | 10,516 | 139,244 | 7.6% | 74,795 | 14.1% |
| 2014 | 10,437 | 141,116 | 7.4% | 77,815 | 13.4% |
| 2015 | 8,696 | 139,840 | 6.3% | 79,188 | 11.0% |
| 2016 | 9,790 | 137,464 | 7.1% | 80,119 | 12.2% |
| 2017 | 11,009 | 136,081 | 8.1% | 80,493 | 13.7% |
| 2018 | 10,323 | 134,191 | 7.7% | 80,055 | 12.9% |
| 2019 | 13,079 | 130,546 | 10.0% | 78,100 | 16.7% |
| 2020 | 5,827 | 130,605 | 4.5% | 77,740 | 7.5% |

Source: ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

*Does not include Collector of Curio and Relics (Type 03).



**U.S. Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives**
99 New York Ave., NE, Washington, DC 20226

**www.atf.gov**



**Alcohol, Tobacco, Firearms and Explosives**

# Firearms Commerce in the United States

## STATISTICAL UPDATE 2024

## Exhibit 1: Total Firearms Manufactured (2013 – 2023)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2013 | 4,441,726 | 725,282 | 3,979,570 | 1,203,072 | 495,142 | 10,844,792 |
| 2014 | 3,633,454 | 744,047 | 3,379,549 | 935,411 | 358,165 | 9,050,626 |
| 2015 | 3,557,199 | 885,259 | 3,691,799 | 777,273 | 447,131 | 9,358,661 |
| 2016 | 4,720,075 | 856,291 | 4,239,335 | 848,617 | 833,123 | 11,497,441 |
| 2017 | 3,691,010 | 720,917 | 2,504,092 | 653,139 | 758,634 | 8,327,792 |
| 2018 | 3,881,158 | 664,835 | 2,880,536 | 536,126 | 1,089,973 | 9,052,628 |
| 2019 | 3,046,013 | 580,601 | 1,957,667 | 480,735 | 946,929 | 7,011,945 |
| 2020 | 5,509,183 | 993,078 | 2,760,392 | 476,682 | 1,324,743 | 11,064,078 |
| 2021 | 6,751,919 | 1,159,918 | 3,934,374 | 675,426 | 1,283,282 | 13,806,940 |
| 2022 | 6,150,667 | 830,786 | 3,577,951 | 662,350 | 2,171,255 | 13,395,031 |
| 2023 | 3,939,517 | 805,054 | 3,119,376 | 602,782 | 1,305,530 | 9,772,259 |

## Exhibit 1a: Total Firearms Manufactured (2013 – 2023)



Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms' categories defined on the ATF Form 5300.11 Annual Firearms  Manufacturing and Exportation Report (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and  receivers).

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2023 data was due to ATF by April 1, 2024, but not published until January 2025.

Data for years prior to 2013 can be found in earlier editions of this report. **https://www.atf.gov/resource-center/data-statistics**.

## Exhibit 2: Firearms Manufacturers' Exports (2013 – 2023)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 2013 | 167,653 | 21,236 | 131,718 | 49,766 | 22,748 | 393,121 |
| 2014 | 126,316 | 25,521 | 207,934 | 60,377 | 784 | 420,932 |
| 2015 | 140,787 | 22,666 | 159,707 | 18,797 | 1,499 | 343,456 |
| 2016 | 172,408 | 24,587 | 147,044 | 24,668 | 8,111 | 376,818 |
| 2017 | 275,424 | 21,676 | 158,871 | 29,997 | 2,332 | 488,300 |
| 2018 | 333,266 | 21,498 | 165,573 | 27,774 | 6,126 | 554,237 |
| 2019 | 138,683 | 14,778 | 136,241 | 22,319 | 5,461 | 317,482 |
| 2020 | 382,758 | 19,264 | 99,454 | 17,874 | 9,788 | 529,138 |
| 2021 | 237,194 | 25,367 | 160,294 | 27,487 | 8,342 | 460,705 |
| 2022 | 337,680 | 24,691 | 217,976 | 43,312 | 5,504 | 631,185 |
| 2023 | 217,691 | 12,112 | 198,768 | 45,067 | 5,395 | 479,033 |

## Exhibit 2a: Firearms Manufacturers' Exports (2013 – 2023)



Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1] Miscellaneous firearms are any firearms not specifically categorized in any of the firearms' categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers).

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act. For example, calendar year 2023 data was due to ATF by April 1, 2024, but not published until January 2025.

Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics.

### Exhibit 3: Firearms Imports (2013 – 2023)

| Calendar Year | Handguns | Rifles | Shotguns | Total |
|---|---|---|---|---|
| 2013 | 3,095,528 | 1,507,776 | 936,235 | 5,539,539 |
| 2014 | 2,185,037 | 791,892 | 648,339 | 3,625,268 |
| 2015 | 2,470,101 | 815,817 | 644,293 | 3,930,211 |
| 2016 | 3,671,837 | 729,452 | 736,482 | 5,137,771 |
| 2017 | 3,287,842 | 572,309 | 632,105 | 4,492,256 |
| 2018 | 2,939,889 | 652,031 | 713,931 | 4,305,851 |
| 2019 | 2,594,708 | 648,703 | 743,252 | 3,986,663 |
| 2020 | 4,031,280 | 875,159 | 1,924,937 | 6,831,376 |
| 2021 | 5,263,341 | 1,240,125 | 2,816,380 | 9,319,846 |
| 2022 | 4,478,978 | 1,187,666 | 1,403,917 | 7,070,561 |
| 2023 | 3,788,194 | 1,162,442 | 982,574 | 5,933,210 |

### Exhibit 3a: Firearms Imports (2013 – 2023)



**Source: ATF and United States International Trade Commission.**

**Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics.**

## Exhibit 4:  Importation Applications (2013 – 2023)

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 2013 | 9,964 | 319 | 597 | 10,880 |
| 2014 | 8,529 | 255 | 429 | 9,213 |
| 2015 | 6,078 | 318 | 897 | 7,293 |
| 2016 | 6,154 | 220 | 814 | 7,188 |
| 2017 | 5,859 | 309 | 685 | 6,853 |
| 2018 | 6,631 | 289 | 670 | 7,590 |
| 2019 | 7,040 | 380 | 711 | 8,131 |
| 2020 | 7,243 | 180 | 583 | 8,006 |
| 2021 | 10,592 | 324 | 462 | 11,378 |
| 2022 | 10,524 | 337 | 462 | 11,323 |
| 2023 | 10,849 | 272 | 596 | 11,717 |

## Exhibit 4a: Importation Applications (2013 – 2023)



Source: ATF's Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

* Depicts ATF Form 6 Part II (5330.3C)

Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics

## Exhibit 5: Firearms Imported into the United States by Country

| Fiscal Year 2021 | | | | |
|---|---|---|---|---|
| Country | Handguns | Rifles | Shotguns | Total Firearms |
| Turkey | 646,810 | 48,693 | 2,039,085 | 2,734,588 |
| Austria | 1,688,941 | 4,311 | 10 | 1,693,262 |
| Brazil | 925,789 | 215,940 | 50,677 | 1,192,406 |
| Croatia | 652,040 | 0 | 0 | 652,040 |
| Italy | 221,906 | 47,111 | 295,348 | 564,365 |
| Germany | 416,748 | 141,244 | 2,035 | 560,027 |
| China[1] | 0 | 17,801 | 416,666 | 434,467 |
| Canada | 62 | 324,146 | 1,879 | 326,087 |
| Czechia | 250,076 | 26,938 | 9 | 277,023 |
| Philippines | 198,544 | 0 | 0 | 198,544 |
| Spain | 656 | 87,957 | 1,539 | 90,152 |
| Israel | 71,301 | 13,581 | 0 | 84,882 |
| Japan | 0 | 79,781 | 502 | 80,283 |
| Finland | 181 | 58,893 | 24 | 59,098 |
| Portugal | 0 | 55,030 | 1,333 | 56,363 |
| Serbia | 18,850 | 34,246 | 0 | 53,096 |
| Argentina | 51,867 | 0 | 0 | 51,867 |
| Romania | 24,288 | 23,022 | 0 | 47,310 |
| Belgium | 24,809 | 12,509 | 12 | 37,330 |
| Switzerland | 28,170 | 2,548 | 42 | 30,760 |
| Poland | 15,232 | 14,858 | 0 | 30,090 |
| United Kingdom | 4 | 13,238 | 6,863 | 20,105 |
| Slovenia | 18,757 | 0 | 0 | 18,757 |
| Bulgaria | 2,058 | 10,008 | 0 | 12,066 |
| France | 2,709 | 686 | 83 | 3,478 |
| Montenegro | 1,988 | 0 | 0 | 1,988 |
| Russia | 0 | 1,908 | 0 | 1,908 |
| Sweden | 18 | 1,623 | 168 | 1,809 |
| Taiwan | 27 | 1,604 | 0 | 1,631 |
| Hungary | 171 | 1,330 | 0 | 1,501 |
| Bosnia-Herzegovina | 1,047 | 0 | 0 | 1,047 |
| Other[2] | 292 | 1,119 | 105 | 1,516 |
| Total | 5,263,341 | 1,240,125 | 2,816,380 | 9,319,846 |

Source: ATF's Firearms and Explosives Import System (FEIS)

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China; however, sporting shotguns are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of the Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia, Sudan, Syria, Unita (Angola), and Vietnam may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, and Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

## Exhibit 6: Firearms Imported into the United States by Country

| Fiscal Year 2022 | | | | |
|---|---|---|---|---|
| Country | Handguns | Rifles | Shotguns | Total Firearms |
| Turkey | 486,513 | 77,226 | 952,646 | 1,516,385 |
| Austria | 1,471,950 | 10,594 | 93 | 1,482,637 |
| Brazil | 753,431 | 157,490 | 44,762 | 955,683 |
| Germany | 491,465 | 109,591 | 1,751 | 602,807 |
| Italy | 150,188 | 42,251 | 295,368 | 487,807 |
| Croatia | 476,957 | 6,100 | 0 | 483,057 |
| Canada | 29,423 | 309,929 | 1,219 | 340,571 |
| Czechia | 228,788 | 32,682 | 2 | 261,472 |
| Philippines | 160,782 | 4,800 | 0 | 165,582 |
| Spain | 205 | 113,097 | 2,402 | 115,704 |
| Japan | 0 | 91,509 | 1,273 | 92,782 |
| China[1] | 0 | 0 | 93,601 | 93,601 |
| Finland | 100 | 71,345 | 0 | 71,445 |
| Israel | 52,083 | 11,346 | 0 | 63,429 |
| Serbia | 12,600 | 46,546 | 0 | 59,146 |
| Romania | 42,300 | 6,997 | 0 | 49,297 |
| Argentina | 47,586 | 0 | 0 | 47,586 |
| Portugal | 0 | 42,945 | 100 | 43,045 |
| Belgium | 22,917 | 12,706 | 97 | 35,720 |
| Poland | 10,678 | 17,077 | 0 | 27,755 |
| United Kingdom | 4,487 | 12,745 | 7,563 | 24,795 |
| Slovenia | 11,134 | 10 | 0 | 11,144 |
| Switzerland | 8477 | 5,011 | 0 | 10,488 |
| France | 3,607 | 2,283 | 138 | 6,028 |
| Bulgaria | 4,869 | 0 | 0 | 4,869 |
| Pakistan | 2,950 | 0 | 650 | 3,600 |
| Slovakia | 3,555 | 0 | 0 | 3,555 |
| India | 477 | 30 | 1,196 | 1,703 |
| Bosnia-Herzegovina | 1,162 | 120 | 36 | 1,318 |
| Sweden | 14 | 1,154 | 4 | 1,172 |
| Taiwan | 173 | 0 | 960 | 1,133 |
| Other[2] | 107 | 2,082 | 56 | 2,245 |
| Total | 4,478,978 | 1,187,666 | 1,403,917 | 7,070,561 |

Source: ATF's Firearms and Explosives Import System (FEIS)

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China; however, sporting shotguns are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of the Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia, Sudan, Syria, Unita (Angola), and Vietnam may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had  been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, and Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

## Exhibit 7: Firearms Imported into the United States by Country

| Fiscal Year 2023 | | | | |
|---|---|---|---|---|
| Country | Handguns | Rifles | Shotguns | Total Firearms |
| Turkey | 439,825 | 139,316 | 662,761 | 1,241,902 |
| Austria | 1,215,002 | 9,770 | 35 | 1,224,807 |
| Brazil | 765,712 | 192,382 | 58,798 | 1,016,892 |
| Germany | 481,182 | 66,917 | 1,677 | 549,776 |
| Italy | 143,800 | 38,248 | 223,163 | 405,211 |
| Croatia | 328,510 | 17,570 | 0 | 346,080 |
| Canada | 15,332 | 177,905 | 2,563 | 195,800 |
| Czechia | 110,777 | 63,069 | 0 | 173,846 |
| Spain | 802 | 140,201 | 1,601 | 142,604 |
| Philippines | 105,199 | 980 | 0 | 106,179 |
| Japan | 0 | 85,133 | 1,353 | 86,486 |
| Portugal | 0 | 59,489 | 43 | 59,532 |
| Finland | 84 | 76,174 | 0 | 76,258 |
| Belgium | 58,031 | 12,929 | 592 | 71,552 |
| Israel | 33,108 | 9,974 | 0 | 43,082 |
| Romania | 24,560 | 8,001 | 0 | 32,561 |
| Serbia | 5,057 | 22,098 | 0 | 27,155 |
| United Kingdom | 9,876 | 10,061 | 4,979 | 24,916 |
| China[1] | 0 | 0 | 24,761 | 24,761 |
| Argentina | 19,852 | 0 | 0 | 19,852 |
| Poland | 5,967 | 12,381 | 1 | 18,349 |
| Switzerland | 9,230 | 3,850 | 41 | 13,121 |
| Bulgaria | 2,872 | 9,616 | 0 | 12,488 |
| Slovenia | 6,545 | 1 | 0 | 6,546 |
| France | 3,629 | 1,176 | 146 | 4,951 |
| Slovakia | 2,044 | 4 | 0 | 2,048 |
| Hungary | 338 | 1,667 | 0 | 2,005 |
| Sweden | 32 | 1,780 | 3 | 1,815 |
| Other[2] | 828 | 1,750 | 57 | 2,635 |
| Total | 3,788,194 | 1,162,442 | 982,574 | 5,933,210 |

Source: ATF's Firearms and Explosives Import System (FEIS)

[1] On May 26, 1994, the United States instituted a firearms imports embargo against China; however, sporting shotguns are exempt from the embargo.

[2] Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of the Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia, Sudan, Syria, Unita (Angola), and Vietnam may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, and Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).

### Exhibit 8: National Firearms Act Tax Revenues (2013 – 2023)

| Fiscal Year | Occupational Tax Paid | Transfer & Making Tax Paid |
| --- | --- | --- |
| 2013 | $4,300,000 | $18,200,000 |
| 2014 | $4,800,000 | $22,700,000 |
| 2015 | $5,400,000 | $32,500,000 |
| 2016 | $6,000,000 | $62,600,000 |
| 2017 | $6,400,000 | $23,000,000 |
| 2018 | $6,800,000 | $33,400,000 |
| 2019 | $7,000,000 | $37,300,000 |
| 2020 | $8,000,000 | $51,700,000 |
| 2021 | $9,200,000 | $78,600,000 |
| 2022 | $9,600,000 | $91,500,000 |
| 2023 | $10,100,000 | $96,000,000 |

### Exhibit 8a: National Firearms Act Tax Revenues (2013 – 2023)



**Source:** ATF's Financial Management Division associated with applications in the National Firearms Registration and Transfer Record (NFRTR) and NFA Special Occupational Tax (NSOT) database.

Special occupational tax revenues include collections made during the fiscal year for prior tax years. Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax. Data is rounded for consistency.

Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics.

## Exhibit 9: National Firearms Act Firearms Processed by Form Type (2013 – 2023)

| Calendar Year | Application to Make and Register a Firearm | Notice of Firearms Manufactured and Imported | Application for Tax Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer | Application for Tax Paid Transfer and Registration of Firearm | Application for Tax Exempt Transfer and Registration of Firearm[1] | Application and Permit for Permanent Exportation of Firearms | Total [2] |
|---|---|---|---|---|---|---|---|
| | ATF Form 1 | ATF Form 2 | ATF Form 3 | ATF Form 4 | ATF Form 5 | ATF Form 9 | |
| 2013 | 9,347 | 477,567 | 206,389 | 57,294 | 110,637 | 224,515 | 1,085,749 |
| 2014 | 22,380 | 591,388 | 262,342 | 107,921 | 138,204 | 248,109 | 1,370,344 |
| 2015 | 32,558 | 583,499 | 365,791 | 130,017 | 127,945 | 306,037 | 1,545,847 |
| 2016 | 49,985 | 1,066,812 | 571,840 | 133,911 | 152,264 | 555,397 | 2,530,209 |
| 2017 | 40,444 | 497,329 | 344,197 | 184,312 | 180,850 | 224,389 | 1,471,521 |
| 2018 | 21,580 | 545,700 | 355,114 | 128,324 | 169,258 | 318,387 | 1,538,363 |
| 2019 | 28,006 | 844,378 | 361,754 | 170,182 | 234,486 | 402,626 | 2,041,432 |
| 2020 | 40,790 | 884,656 | 610,002 | 246,806 | 266,600 | 360,731 | 2,409,585 |
| 2021 | 53,051 | 1,035,332 | 870,535 | 199,565 | 194,644 | 360,311 | 2,713,438 |
| 2022 | 48,718 | 1,142,946 | 919,419 | 347,944 | 200,795 | 367,480 | 3,027,302 |
| 2023 | 284,533 | 1,072,755 | 872,406 | 471,239 | 214,956 | 617,644 | 3,533,533 |

## Exhibit 9a: National Firearms Act Firearms Processed by Form Type (2013 – 2023)



Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Firearms may be transferred to U.S., State, or local governments without payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[2] Totals do not include ATF Form 5320.20 or ATF Form 10 because these do not relate to commercial transactions.

Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics.

Exhibit 9b: National Firearms Act Firearms Processed by Calendar Year (2013 – 2023)[3]



Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1] Firearms may be transferred to U.S., state, or local governments without payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[2] Totals do not include ATF Form 5320.20 or ATF Form 10 because these do not relate to commercial transactions.

[3] Exhibit 7b in the 2021 statistical update was incorrectly titled and should have been titled "National Firearms Act Forms Processed by Fiscal Year."

Data for years prior to 2013 can be found in earlier editions of this report. https://www.atf.gov/resource-center/data-statistics.

## Exhibit 10: National Firearms Act Registered Weapons by State
### (data as of May 2024)

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|-------|------|------|------|------|------|------|------|
| Alabama | 1,541 | 84,135 | 40,734 | 80,740 | 14,667 | 2,524 | 224,341 |
| Alaska | 328 | 6,842 | 1,779 | 20,733 | 4,843 | 1,572 | 36,097 |
| Arkansas | 14,681 | 118,385 | 18,204 | 114,447 | 40,002 | 3,254 | 308,973 |
| Arizona | 693 | 42,225 | 5,541 | 48,735 | 7,738 | 1,283 | 106,215 |
| California | 5,106 | 334,883 | 26,335 | 18,484 | 19,201 | 14,962 | 418,971 |
| Colorado | 1,384 | 59,732 | 7,467 | 102,190 | 23,732 | 2,274 | 196,779 |
| Connecticut | 1,123 | 13,136 | 40,642 | 25,736 | 11,637 | 1,023 | 93,297 |
| Delaware | 84 | 4,464 | 646 | 1,161 | 885 | 648 | 7,888 |
| District of Columbia | 133 | 70,092 | 26,469 | 1,166 | 2,050 | 1,164 | 101,074 |
| Florida | 4,975 | 240,273 | 46,811 | 245,647 | 83,657 | 10,446 | 631,809 |
| Georgia | 2,550 | 99,631 | 50,188 | 177,211 | 36,866 | 11,354 | 377,800 |
| Hawaii | 34 | 8,456 | 500 | 458 | 121 | 74 | 9,643 |
| Idaho | 666 | 24,759 | 4,703 | 57,564 | 9,018 | 818 | 97,528 |
| Illinois | 1,158 | 99,007 | 27,925 | 3,865 | 5,815 | 1,652 | 139,422 |
| Indiana | 1,884 | 82,764 | 23,342 | 87,431 | 18,672 | 12,187 | 226,280 |
| Iowa | 901 | 21,605 | 5,289 | 36,555 | 6,738 | 1,318 | 72,406 |
| Kansas | 776 | 25,170 | 4,044 | 41,916 | 9,105 | 1,276 | 82,287 |
| Kentucky | 1,266 | 36,904 | 18,639 | 61,327 | 10,967 | 2,084 | 131,187 |
| Louisiana | 856 | 57,305 | 6,839 | 69,362 | 13,314 | 2,385 | 150,061 |
| Massachusetts | 595 | 3,789 | 4,137 | 14,675 | 4,979 | 592 | 28,767 |
| Maine | 1,108 | 65,154 | 27,114 | 44,640 | 12,471 | 3,871 | 154,358 |
| Maryland | 1,239 | 19,025 | 5,796 | 12,928 | 7,982 | 1,075 | 48,045 |
| Michigan | 1,373 | 33,667 | 17,982 | 75,823 | 19,161 | 1,987 | 149,993 |
| Minnesota | 2,819 | 61,543 | 7,453 | 52,096 | 12,867 | 1,022 | 137,800 |
| Mississippi | 564 | 38,386 | 4,835 | 45,471 | 7,680 | 1,087 | 98,023 |
| Missouri | 1,537 | 39,918 | 10,310 | 67,149 | 15,651 | 2,903 | 137,468 |
| Montana | 475 | 6,072 | 2,523 | 41,768 | 4,594 | 694 | 56,126 |
| Nebraska | 836 | 10,030 | 2,339 | 35,044 | 5,494 | 704 | 54,447 |
| Nevada | 1,020 | 44,393 | 14,900 | 50,939 | 18,806 | 2,233 | 132,291 |
| New Hampshire | 535 | 6,205 | 20,328 | 44,093 | 12,307 | 739 | 84,207 |
| New Jersey | 579 | 47,151 | 52,312 | 6,363 | 5,794 | 3,238 | 115,437 |
| New Mexico | 428 | 82,011 | 3,967 | 27,310 | 7,178 | 788 | 121,682 |
| New York | 1,827 | 55,582 | 9,381 | 9,430 | 8,842 | 7,903 | 92,965 |
| North Carolina | 1,302 | 86,650 | 15,663 | 112,666 | 32,250 | 3,831 | 252,362 |
| North Dakota | 237 | 3,830 | 1,694 | 31,058 | 2,965 | 338 | 40,122 |

## Exhibit 10: National Firearms Act Registered Weapons by State
### (data as of May 2024)

**Continued**

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| Ohio | 2,352 | 92,845 | 22,627 | 94,121 | 27,121 | 6,692 | 245,758 |
| Oklahoma | 1,250 | 24,738 | 7,818 | 73,160 | 13,985 | 2,080 | 123,031 |
| Oregon | 1,666 | 28,163 | 5,863 | 72,664 | 17,113 | 1,671 | 127,140 |
| Pennsylvania | 2,478 | 99,299 | 21,604 | 117,806 | 40,285 | 14,002 | 295,474 |
| Rhode Island | 47 | 3,613 | 593 | 100 | 443 | 99 | 4,895 |
| South Carolina | 816 | 48,974 | 17,215 | 63,066 | 15,267 | 3,970 | 149,308 |
| South Dakota | 377 | 4,540 | 2,371 | 108,859 | 2,398 | 262 | 118,807 |
| Tennessee | 6,489 | 52,447 | 12,274 | 92,541 | 23,299 | 5,707 | 192,757 |
| Texas | 6,309 | 348,794 | 50,170 | 599,133 | 122,052 | 10,274 | 1,136,732 |
| Utah | 646 | 30,172 | 16,798 | 110,367 | 15,041 | 1,740 | 174,764 |
| Vermont | 267 | 2,973 | 1,127 | 5,389 | 1,615 | 196 | 11,567 |
| Virginia | 4,623 | 267,149 | 46,392 | 114,167 | 38,304 | 8,947 | 479,582 |
| Washington | 2,467 | 60,481 | 4,292 | 112,630 | 32,745 | 1,024 | 213,639 |
| West Virginia | 459 | 27,495 | 7,461 | 21,403 | 5,408 | 1,282 | 63,508 |
| Wisconsin | 907 | 33,721 | 7,494 | 60,632 | 13,889 | 1,488 | 118,131 |
| Wyoming | 383 | 53,969 | 2,028 | 24,404 | 3,272 | 443 | 84,499 |
| **Total** | 88,149 | 3,212,547 | 782,958 | 3,536,623 | 870,286 | 165,180 | 8,655,743 |

Source: ATF National Firearms Registration and Transfer Record (NFRTR) based on state descriptors.

[1] The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2] Destructive device generally is defined as (a) any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3] Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

[4] Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5] Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6] Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

## Exhibit 11: National Firearms Act Special Occupational Taxpayers (Tax Year 2023)

| State | Importer | Manufacturer | Dealer | Total |
|---|---|---|---|---|
| Alabama | 9 | 142 | 161 | 312 |
| Alaska | 0 | 37 | 49 | 86 |
| Arkansas | 3 | 107 | 123 | 233 |
| Arizona | 20 | 481 | 271 | 772 |
| California | 5 | 93 | 81 | 179 |
| Colorado | 6 | 211 | 229 | 446 |
| Connecticut | 3 | 78 | 66 | 147 |
| Delaware | 0 | 1 | 4 | 5 |
| District of Columbia | 0 | 0 | 0 | 0 |
| Florida | 51 | 547 | 556 | 1,154 |
| Georgia | 14 | 236 | 284 | 534 |
| Hawaii | 1 | 1 | 0 | 2 |
| Idaho | 5 | 167 | 115 | 287 |
| Illinois | 4 | 96 | 27 | 127 |
| Indiana | 2 | 129 | 180 | 311 |
| Iowa | 2 | 84 | 100 | 186 |
| Kansas | 4 | 88 | 133 | 225 |
| Kentucky | 6 | 99 | 148 | 253 |
| Louisiana | 1 | 89 | 164 | 254 |
| Massachusetts | 4 | 127 | 26 | 157 |
| Maine | 3 | 47 | 44 | 94 |
| Maryland | 5 | 76 | 118 | 199 |
| Michigan | 5 | 155 | 230 | 390 |
| Minnesota | 3 | 95 | 113 | 211 |
| Mississippi | 2 | 76 | 120 | 198 |
| Missouri | 10 | 163 | 206 | 379 |
| Montana | 1 | 69 | 106 | 176 |
| Nebraska | 0 | 43 | 93 | 136 |
| Nevada | 20 | 154 | 89 | 263 |
| New Hampshire | 6 | 93 | 62 | 161 |
| New Jersey | 0 | 7 | 17 | 24 |
| New Mexico | 2 | 75 | 69 | 146 |
| New York | 4 | 99 | 26 | 129 |
| North Carolina | 5 | 283 | 326 | 614 |
| North Dakota | 2 | 26 | 65 | 93 |

## Exhibit 11: National Firearms Act Special Occupational Taxpayers (Tax Year 2023)

**Continued**

| State | Importer | Manufacturer | Dealer | Total |
|---|---|---|---|---|
| Ohio | 7 | 264 | 267 | 538 |
| Oklahoma | 1 | 139 | 159 | 299 |
| Oregon | 0 | 107 | 163 | 270 |
| Pennsylvania | 17 | 266 | 327 | 610 |
| Rhode Island | 0 | 0 | 3 | 3 |
| South Carolina | 7 | 131 | 142 | 280 |
| South Dakota | 0 | 46 | 67 | 113 |
| Tennessee | 4 | 188 | 235 | 427 |
| Texas | 21 | 929 | 971 | 1,921 |
| Utah | 8 | 184 | 127 | 319 |
| Vermont | 4 | 24 | 19 | 47 |
| Virginia | 24 | 185 | 245 | 454 |
| Washington | 7 | 169 | 135 | 311 |
| West Virginia | 2 | 44 | 79 | 125 |
| Wisconsin | 4 | 143 | 147 | 294 |
| Wyoming | 2 | 53 | 73 | 128 |
| **Total** | **316** | **7,146** | **7,560** | **15,022** |

## Exhibit 11a: National Firearms Act Special Occupational Taxpayers (Tax Year 2023)



**Source:** ATF's National Firearms Act Special Occupational Tax (NSOT) database.

**Data may include multiple locations per taxpayer.**

## Exhibit 12: Federal Firearms Licensees Total (2013 – 2023)

| Fiscal Year | Dealer Type 01 | Pawnbroker Type 02 | Collector Type 03 | Manufacturer of Ammunition Type 06 | Firearms Type 07 | Importer Type 08 | Dealer Type 09 | Manufacturer of Destructive Devices Type 10 | Importer Type 11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 54,026 | 7,810 | 64,449 | 2,353 | 9,094 | 998 | 57 | 273 | 184 | 139,244 |
| 2014 | 55,431 | 8,132 | 63,301 | 2,596 | 9,970 | 1,133 | 66 | 287 | 200 | 141,116 |
| 2015 | 56,181 | 8,152 | 60,652 | 2,603 | 10,498 | 1,152 | 66 | 315 | 221 | 139,840 |
| 2016 | 56,754 | 8,076 | 57,345 | 2,481 | 11,083 | 1,105 | 71 | 332 | 217 | 137,464 |
| 2017 | 56,638 | 7,871 | 55,588 | 2,259 | 11,946 | 1,110 | 78 | 357 | 234 | 136,081 |
| 2018 | 55,891 | 7,639 | 54,136 | 2,119 | 12,564 | 1,127 | 98 | 378 | 239 | 134,191 |
| 2019 | 53,924 | 7,341 | 52,446 | 1,910 | 13,044 | 1,109 | 129 | 391 | 252 | 130,546 |
| 2020 | 52,799 | 7,141 | 52,865 | 1,797 | 14,054 | 1,127 | 128 | 425 | 269 | 130,605 |
| 2021 | 52,993 | 6,981 | 53,475 | 2,111 | 16,730 | 1,632 | 141 | 462 | 284 | 134,809 |
| 2022 | 52,173 | 6,666 | 52,608 | 2,123 | 18,517 | 1,809 | 141 | 475 | 299 | 134,811 |
| 2023 | 50,309 | 6,417 | 50,805 | 2,086 | 20,003 | 1,851 | 147 | 476 | 289 | 132,383 |

## Exhibit 12a: Federal Firearms Licensees Total (2013 – 2023)



Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

Data is based on active federal firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 13: Federal Firearms Licensees by State

| State | 2021 | 2022 | 2023 |
|-------|------|------|------|
| Alabama | 2,180 | 2,159 | 2,073 |
| Alaska | 827 | 810 | 758 |
| Arizona | 3,629 | 3,679 | 3,619 |
| Arkansas | 1,884 | 1,878 | 1,871 |
| California | 9,128 | 9,561 | 9,815 |
| Colorado | 3,067 | 3,042 | 3,023 |
| Connecticut | 1,780 | 1,763 | 1,716 |
| Delaware | 323 | 321 | 309 |
| District of Columbia | 35 | 31 | 24 |
| Florida | 7,364 | 7,504 | 7,429 |
| Georgia | 3,649 | 3,703 | 3,601 |
| Hawaii | 232 | 231 | 219 |
| Idaho | 1,593 | 1,647 | 1,672 |
| Illinois | 4,432 | 4,266 | 4,337 |
| Indiana | 2,741 | 2,716 | 2,650 |
| Iowa | 2,048 | 2,025 | 1,968 |
| Kansas | 1,817 | 1,786 | 1,729 |
| Kentucky | 2,246 | 2,213 | 2,168 |
| Louisiana | 1,931 | 1,887 | 1,800 |
| Maine | 914 | 919 | 884 |
| Maryland | 2,891 | 2,903 | 2,773 |
| Massachusetts | 3,975 | 3,963 | 3,884 |
| Michigan | 3,921 | 3,887 | 3,761 |
| Minnesota | 2,436 | 2,379 | 2,319 |
| Mississippi | 1,461 | 1,456 | 1,383 |
| Missouri | 4,181 | 4,035 | 3,873 |

| State | 2021 | 2022 | 2023 |
|-------|------|------|------|
| Montana | 1,500 | 1,503 | 1,478 |
| Nebraska | 1,102 | 1,113 | 1,075 |
| Nevada | 1,353 | 1,334 | 1,311 |
| New Hampshire | 1,200 | 1,201 | 1,187 |
| New Jersey | 470 | 491 | 511 |
| New Mexico | 1,052 | 1,010 | 993 |
| New York | 3,922 | 3,905 | 3,739 |
| North Carolina | 4,611 | 4,661 | 4,621 |
| North Dakota | 718 | 707 | 695 |
| Ohio | 4,575 | 4,413 | 4,234 |
| Oklahoma | 2,251 | 2,195 | 2,112 |
| Oregon | 2,181 | 2,123 | 2,046 |
| Pennsylvania | 6,288 | 6,332 | 6,199 |
| Rhode Island | 566 | 559 | 565 |
| South Carolina | 2,226 | 2,235 | 2,247 |
| South Dakota | 784 | 800 | 793 |
| Tennessee | 3,186 | 3,197 | 3,205 |
| Texas | 11,301 | 11,378 | 11,109 |
| Utah | 1,634 | 1,688 | 1,700 |
| Vermont | 551 | 541 | 529 |
| Virginia | 4,137 | 4,078 | 3,980 |
| Washington | 3,279 | 3,316 | 3,228 |
| West Virginia | 1,362 | 1,363 | 1,318 |
| Wisconsin | 2,837 | 2,846 | 2,802 |
| Wyoming | 913 | 934 | 927 |
| Other Territories | 125 | 124 | 121 |
| **Totals** | **134,809** | **134,811** | **132,383** |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

Data is based on active federal firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 14: Actions on Federal Firearms License Applications (2013 – 2023)

| Fiscal Year | Original Application | | | |
|---|---|---|---|---|
| | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 2013 | 23,242 | 30 | 2,901 | 385 |
| 2014 | 17,816 | 27 | 2,192 | 444 |
| 2015 | 15,219 | 34 | 1,953 | 387 |
| 2016 | 15,853 | 16 | 2,165 | 307 |
| 2017 | 14,546 | 17 | 2,038 | 366 |
| 2018 | 14,054 | 17 | 1,913 | 377 |
| 2019 | 12,966 | 9 | 1,993 | 382 |
| 2020 | 13,429 | 11 | 2,387 | 319 |
| 2021 | 13,197 | 8 | 4,868 | 236 |
| 2022 | 11,610 | 30 | 3,542 | 444 |
| 2023 | 10,624 | 26 | 2,715 | 263 |

## Exhibit 14a: Actions on Federal Firearms License Applications (2013 – 2023)



## Exhibit 15: Federal Firearms Licensees and Compliance Inspections

Exhibit 15 has been removed from this statistical update. ATF published similar data in the National Firearms Commerce and Trafficking Assessment (Volume I) and currently publishes monthly compliance inspection data at https://www.atf.gov/firearms/firearms-compliance-inspection-results.

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).

[1] An application can be withdrawn by an applicant at any time prior to the issuance of a license.

[2] If ATF cannot locate an applicant during an attempted application inspection or cannot obtain needed verification data, then the application will be abandoned.



**U.S. Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives**
99 New York Ave., NE, Washington, DC 20226

OMB No. 1140-0011 (12/31/2025)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application to Make and Register a Firearm

**ATF Control Number**

**To:** Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 5015, Portland, OR 97208-5015, National Firearms Act Division (NFA)
*(Submit in duplicate. Please do not staple documents. See instructions attached.)*

As required by Sections 5821(b), 5822, and 5841 of the National Firearms Act, Title 26 U.S.C., Chapter 53, the undersigned hereby submits application to make and register the firearm described below.

1. Type of Application *(check one)*

2. Application is made by: ☐ Corporation ☐ Individual ☐ Other Legal Entity ☐ Trust ☐ Government Entity

3a. Trade Name *(If any)*

☐ a. Tax Paid. Submit your tax payment of $200 with the application. The tax may be paid by credit or debit card, check, or money order. Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act Stamp. *(See instruction 2.C and 3)*

3b. Applicant's Full Legal Name and Full Mailing Address *(Type or print below) (See instruction 2.D)*

3d. County/Parish

3e. Telephone Number

3f. E-mail Address

☐ b. Tax Exempt. Firearm is being made on behalf of the United States, or any department, independent establishment, or agency thereof. or Tax Exempt. Firearm is being made by or on behalf of any State or possession of the United States, or any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

3c. If P.O. Box is Shown Above, Street Address Must be Given Here

☐ c. Tax Exempt. Firearm is not subject to the making tax pursuant to Title 26 U.S.C. §§ 7801, 7805. To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the firearm to be registered.

4. Description of Firearm *(Complete items a through k) (See instruction 2.J)*

| a. Name and Address of Original Manufacturer and/or Importer of Firearm *(If any)* | b. Type of Firearm to be Made *(See definition 2.K)* *(If a destructive device, complete item 4.J)* | c. Caliber or Gauge *(Specify one)* | d. Model *(As marked on firearm)* |
|---|---|---|---|
| | | | e. Barrel Length |
| | | | f. Overall Length |
| | | | g. Serial Number |

h. Additional Description *(Indicate required Maker's Markings to include Maker's name as registered, City and State as each will appear on firearm)*

i. Specify Why You Intend To Make Firearm *(Use additional sheet if necessary)*

j. Type of Destructive Device *(Check one box)*: ☐ Firearm ☐ Explosives *(If the Explosives box is checked, complete item 5 and see instruction 2.M)*

If an Explosive Type Destructive Device, Please provide additional description: _____

k. Is This Firearm Being Reactivated? ☐ Yes ☐ No *(See definition 1.K)*

5. Applicant's Federal Firearms License *(If any)* or Explosives License or Permit Number For Notification Purposes, per Regulation 479.62, Please Provide 15-Digit Number

6. Special *(Occupational)* Tax Status *(SOT) (If applicable) (See definitions)*

a. Employer Identification Number

b. Class

**Under Penalties of Perjury, I declare** that I have examined this application, including accompanying documents, and to the best of my knowledge and belief it is true, accurate and complete and the making and possession of the firearm described above would not constitute a violation of Title 18, U.S.C., Chapter 44, Title 26, U.S.C., Chapter 53; or any provisions of State or local law.

| 7. Signature of Applicant | 8. Name and Title of Authorized Official | 9. Date |
|---|---|---|
| | | |

**The space below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By authority of the Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, this Application has been Examined and the Applicant's Making and Registration of the Firearm described above is:

☐ Approved *(With the following conditions, if any)*

☐ Disapproved *(For the following reasons)*

Authorized ATF Official

Date

Previous Editions Are Obsolete

ATF Copy

ATF Form 1 (5320.1)
Revised December 2022

**MAKER'S CERTIFICATION** *(not completed by a GOVERNMENT ENTITY)*

**10.   Law Enforcement Notification** *(See instruction 2.H)*

Each applicant is to provide notification of the proposed making and possession of the firearm described on this Form 1 by providing a copy of the completed form to the Chief Law Enforcement Officer *(CLEO)* in the agency identified below:

| | |
|---|---|
| Agency or Department Name | Name and Title of Official |

Address *(Street address or P.O. Box, City, State and ZIP Code)* to which sent *(Mailed or delivered)*

| **Information for the Chief Law Enforcement Officer** | 12.   Photograph |
|---|---|

This form provides notification of the applicant's intent to make and register a NFA firearm.  No action is required by the CLEO.  However, should the CLEO have information that may disqualify this person from making or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**Maker's Questions** *(Complete only when the maker is an individual)*

Answer the following questions by checking or marking either the "yes" or "no" box to the right of the questions.

11.  Answer questions 11.a. through 11.m.  Answer questions 13, 15, 16 and 17 if applicable.  For any  "Yes" answer the applicant shall provide details on a separate sheet.  *(See instruction 7.C and definitions)*

|   | | Yes | No |
|---|---|---|---|
| a. | Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 11.c through 11.l, or a person described in question 11.m who does not fall under an exception? | | |
| b. | Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | |
| c. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1.N)* | | |
| d. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1.N)* | | |
| e. | Are you a fugitive from justice? *(See definition 1.T)* | | |
| f. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | |
| g. | Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1.O and 1.P)* | | |
| h. | Have you been  discharged from the Armed Forces under **dishonorable** conditions? | | |
| i. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1.Q)* | | |
| j. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1.R)* | | |
| k. | Have you ever renounced your United States citizenship? | | |
| l. | Are you an alien illegally or unlawfully in the United States? | | |

**Affix a 2" x 2" Photograph Here**
**No Stapling.  Please Tape**
**Sides of Photo to the Application.**

1. Photo must have been taken within the last year.

2. Photo must have been taken in full face view without a hat or head covering that obscures the hair or hairline.

3. On back of photograph print full name, last 4 of SSN.

m.1.  Are you an alien who has been admitted to the United States under a nonimmigrant visa?   ☐ Yes   ☐ No

m.2.  If "Yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application   ☐ Yes   ☐ No   ☐ N/A

13.  If you are an alien, record your U.S.-Issued Alien or Admission number *(AR#, USCIS#, or I94#)*:

14.  Have you been issued a Unique Personal Identification Number *(UPIN)? (See instruction 2.F)* ☐ Yes   ☐ No   If Yes please list _____

15.  Social Security Number: *(See instruction 2.F)*                    Date of Birth:

| 16a.  Ethnicity | ☐ Hispanic or Latino | 16b.  Race | ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ White |
|---|---|---|---|---|---|
| | ☐ Not Hispanic or Latino | | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

17a.  Country of Citizenship:  *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1.S)*

☐ United States of America *(U.S.A.)*   ☐ Other Country/Countries *(Specify)*: _____

| 17b.  State of Birth | 17c. Country of Birth |
|---|---|

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF, a completed copy of this form will be directed to the CLEO shown in item 10, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.D(2) and 2.D(3) for the items to be completed depending on the type of applicant.**

| | |
|---|---|
| Signature of Maker | Date |

ATF Copy

ATF Form 1 (5320.1)
Revised December 2022

18.  Number of Responsible Persons *(see definitions)* associated with the applicant trust or legal entity _____

19.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(if there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s))*.  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 1 application for each Responsible Person.

Full Name | Full Name
--- | ---
_____ | _____
_____ | _____
_____ | _____

**20.  Method of Payment** *(Check one) (See instruction 2.I) (if paying by credit/debit card, complete the sections below)*

☐ Check *(Enclosed)*   ☐ Cashier's Check or Money Order *(Enclosed)*   ☐ Visa   ☐ Mastercard   ☐ American Express   ☐ Discover   ☐ Diners Club

| Credit/Debit Card Number *(No dashes)* | Name as Printed on the Credit/Debit Card | Expiration Date *(Month & year)* |
|---|---|---|

| Credit/Debit Card Billing Address: | Address: | | |
|---|---|---|---|
| | City: | State: | ZIP Code: |

| | Tax Amount: $ |
|---|---|

I Authorize ATF to Charge my Credit/Debit Card the Above Amount.

_____        _____
Signature of Cardholder                                  Date

Your credit/debit card will be charged the above stated amount upon receipt of your application.  The charge will be reflected on your credit/debit card statement.  In the event your application is NOT approved, the above amount will be credited to the credit/debit card noted above.

### Important Information for Currently Registered Firearms

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 3b, the executor should contact the NFA Division, Bureau of ATF, 244 Needy Road, Martinsburg, WV 25405 or contact via email at NFAFAX@ATF.gov for additional assistance.

**Interstate Movement:**  If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320.20 can be used to request this permission.

**Change of Description or Address:**  The registrant shall notify the National Firearms Act Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm in item 4, or any change to the address of the registrant.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF Officer upon request.

### Paperwork Reduction Act Notice

This form is in accordance with the Paperwork Reduction Act of 1995.  The information you provide is used to establish that the applicant's making and possession of the firearm would be in conformance with Federal, State, and local law.  The data is used as proof of lawful registration of a firearm to the manufacturer.  The furnishing of this information is mandatory *(26 U.S.C. § 5822)*.

The estimated average burden associated with this collection of information is 4.0 hours per respondent or recordkeeper, depending on individual circumstances.  Comments concerning the accuracy of this burden estimate and suggestion for reducing this burden should be addressed to Reports Management Officer,  Resource Management Staff, Contract and Forms Section, Bureau of Alcohol, Tobacco, Firearms and Explosives, 99 New York Avenue NE. Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

ATF Form 1 (5320.1)
Revised December 2022

ATF Copy



**Privacy Act Information**

1. **Authority.**  Solicitation of this information is made pursuant to the National Firearms Act *(26 U.S.C. §§ 5821 and 5822)*.  Disclosure of this information by the applicant is mandatory for any person *(other than a manufacturer qualified under the National Firearms Act)* making a firearm as defined in the National Firearms Act.

2. **Purpose.**  To verify payment of the tax imposed by 26 U.S.C. § 5821; to determine that the making would not be in violation of law; and to effect registration of the firearm.

3. **Routine Uses.**  The information will be used by ATF to make the determinations set forth in  paragraph 2.  In addition, to effect registration of the firearm, information as to the identification of the firearm, date of registration, and the identification and address of person entitled to possess the  firearm will be entered into the National Firearms Registration and Transfer Record.  No information obtained from an application, registration, or records required to be submitted by an individual in order to comply with any provision of the National Firearms Act or regulation issued thereunder, shall, except in connection with prosecution or other action for furnishing false information, be used, directly or indirectly, as evidence against that person in any criminal proceeding with respect to a violation of  law occurring prior to or concurrently with the filing of the application.  The information from this application may only be disclosed to Federal authorities for purposes of prosecution for violation of the National Firearms Act.

4. **Effects of not Supplying Information Requested.**  Failure to supply complete information will delay processing and may cause denial of the application.

**Definitions/Instructions**

1. Definitions.

   A. **National Firearms Act (NFA)**.  Title 26, United States Code, Chapter 53.  The implementing regulations are found in Title 27, Code of Federal Regulations, Part 479.

   B. **Gun Control Act (GCA)**.  Title 18, United States Code, Chapter 44.  The implementing regulations are found in Title 27, Code of Federal Regulations, Part 478.

   C. **Firearm**.  The term "firearm" means:  (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length;  (3) a rifle having  a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length;  (5) any other weapon, as defined in 26 U.S.C. § 5845(e); (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition; and (8) a destructive device,as defined in 26 U.S.C. § 5845 (f).

   D. **Person**.  A partnership, company, association, trust, corporation, including each Responsible Person associated with such an entity; an estate; or an individual.

   **Qualified**- As related to a dealer, manufacturer and/or importer, qualified means the person licensed under the GCA as a dealer, importer, or manufacturer also pays the Special *(Occupational)* Tax *(SOT)*, which qualifies that person to also engage in the business of dealing, importing, or manufacturing NFA firearms.

Section A
   E. **Responsible Person**.  In case of an unlicensed entity, including any trust, partnership, association, company *(including any Limited Liability Company (LLC))*, or corporation, any individual who possesses, directly, or indirectly, the power or authority to direct the management and policies of the trust or entity to receive, possess, ship, transport, deliver, transfer or otherwise dispose of a firearm for, or on behalf of, the trust or legal entity.
Section B
Trust: Those persons with the power or authority to direct the management and policies of the trust includes any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under  State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of the trust.  Examples of who may be considered a Responsible Person include settlors/grantors, trustees, partners, members, officers, directors, board members, or owners.  An example of who may be excluded from this definition of Responsible Person is the beneficiary of a trust, if the beneficiary does not have the capability to  exercise the enumerated powers or authorities.

   F. **Employer Identification Number (EIN)**.  Required of taxpayer filing Special *(Occupational)* Tax returns under 27 CFR § 479.35.

   G. **Special  (Occupational)  Tax**.  Required by the NFA to be paid by a Federal firearms licensee engaged in the business of manufacturing *(Class 2)*, importing *(Class 1)*, or dealing *(Class 3)* in NFA firearms.

   H. **Federal Firearms License**.  A license issued under the provisions of the GCA to manufacture, import or deal in firearms.

   I. **ATF Officer**.  An officer or employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) authorized to perform any function relating to the administration of the NFA.

   J. **Make**.  The term "make", and the various derivatives of such word, shall include manufacturing *(other than by one qualified to engage in such business under the NFA)*, putting together, altering, any combination of these, or otherwise producing a firearm.

   K. **Reactivation**.  The restoration of a registered unserviceable NFA firearm to a functional condition.  This action incurs the making tax liability.

   L. **Unserviceable Firearm**.  One which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to firing condition.  An acceptable method of rendering most firearms unserviceable is to fusion weld the chamber closed and fusion weld the barrel solidly to the frame.

   M. **Maker**.  A person applying to make an NFA firearm.

   N. **Prohibited Person.**  Generally, 18 U.S.C. § 922 (g) prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who: has been convicted of a misdemeanor or crime of domestic violence; has been convicted of a felony, or any other crime, punishable by imprisonment for a term exceeding one year *(this does not include State misdemeanors punishable by imprisonment of two years or less)*; is a fugitive from justice, is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated as a mental defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions, has renounced his or her U.S. citizenship; is an alien illegally in the United States or an alien admitted to the United States under a nonimmigrant visa; or is subject to certain restraining orders.  Furthermore, Section 922(n) prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony in any Federal, State or local court, or any other crime, punishable by imprisonment for a term exceeding one year.  An information is a formal accusation of a crime verified by a prosecutor.

**EXCEPTION:**  A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who had been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if: (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights (the right to vote, sit on a jury, and hold public office) taken away and later restored AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms.  Persons subject to this exception should mark "no" in the applicable box.

ATF Form 1 (5320.1)
Revised December 2022

O. **Adjudicated As a Mental Defective.** A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) is a danger to himself or to others; or (2) lacks the mental capacity to contract or manage his own affairs. This term shall include; (1) a finding of insanity by a court in a criminal case; and (2) those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility.

P. **Committed to a Mental Institution**. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

**EXCEPTION NICS** Improvement Amendments Act of 2007: A person who has been adjudicated as a mental defective or committed to a mental institution in a State proceeding is not prohibited by the adjudication or commitment if the person has been granted relief by the adjudicating/ committing State pursuant to a qualifying mental health relief from disabilities program. Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of the Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication/ commitment; or (d) the adjudication or commitment, respectively is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code; or (e) the person was granted relief from the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities program. Persons who fall within one of the above exceptions should mark "No" in the applicable box. This exception to an adjudication or commitment by a Federal department or agency does not apply to any person who was adjudicated to be not guilty by reason of insanity, or based on a lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

Q. **Restraining Order.** Under 18 U.S.C. § 922, firearms may not be sold to or received by persons subject to a court order that; (A) was issued after a hearing which the person received actual notice of and had an opportunity to participate in; (B) restrains such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. An "intimate partner" of a person is; the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or has cohabitated with the person.

R. **Misdemeanor Crime of Domestic Violence.** A Federal, State, local, Tribal offense that is a misdemeanor under Federal, State, or Tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person cohabitating with, or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim (as defined in 18 U.S.C. § 921(a)(37)). The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon (e.g., assault and battery), if the offense is committed by one of the defined parties. *(See Exception in the definition of "Prohibited Person").* A person who has been convicted of a misdemeanor crime of domestic violence also is not prohibited unless; (1) the person was represented by a lawyer or gave up the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a jury, or gave up the right to a jury trial. Persons subject to this exception should mark "no" in the applicable box.

S. **Alien Admitted to the United States Under a Nonimmigrant Visa.** An alien admitted to the United States under a nonimmigrant visa includes, among others, persons visiting the United States temporarily for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain temporary foreign workers. These aliens must answer "Yes" to question 11.d.1 and provide the additional documentation required under question 11.d.2. Permanent resident aliens and aliens legally admitted to the United States pursuant to either the Visa Waiver Program or to regulations otherwise exempting them from visa requirements may answer "No" to this question and are not required to submit the additional documentation under 11.d.2. An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving, or possessing a firearm if the alien; (1) is in possession of a hunting license or permit lawfully issued by the Federal Government, a State, or local government, or an Indian tribe federally recognized by the Bureau of Indian Affairs, which is valid and unexpired; (2) was admitted to the United States for lawful hunting or sporting purposes; (3) is an official representative of a foreign government who is accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; (4) is an official representative of a foreign government who is en route to or from another country to which that alien is accredited; (5) is an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; (6) is a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business; (7) has received a waiver from the prohibition from the Attorney General of the United States.

T. **Fugitives from Justice.** Any person who has fled from any State to avoid prosecution for a felony or a misdemeanor, or any person who leaves the State to avoid giving testimony in any criminal proceeding. The term also includes any person who knows that misdemeanor or felony charges are pending against such person and who leaves the State of prosecution.

2. **Preparation of Application and Payment of Tax.**

A. **Authority.** As provided by 26 U.S.C. § 5822, any person *(other than a qualified manufacturer of firearms (see paragraph b))* seeking to make a firearm must submit, in duplicate, a separate application on this form for each firearm. The applicant maker must furnish all the information called for, except as noted by instructions within, on this application form. Please note that the form now contains a 3rd (CLEO) copy of the form for use in compliance with instruction 2g and item 10 of the form.

B. **Registration by Qualified Manufacturer.** A person who has a Federal firearms license to manufacture firearms *(Type 07 or 10)* and who has paid Special *(Occupational)* Tax to manufacture NFA firearms is exempt from the making tax and filing of the ATF Form 1 application. Such qualified manufacturer must report and register each NFA firearm manufactured by filing ATF Form 2, Notice of Firearms Manufactured or Imported, as required by 27 CFR § 479.103.

C. **Payment/Exemption from Payment of Tax.** As provided in 26 U.S.C. § 5821, there is a tax on each firearm made. The reactivation of a registered unserviceable firearm is also subject to the making tax under this provision.

Title 26 U.S.C. §§ 5852 and 5853 exempts the making tax when an NFA firearm may be made without payment of the tax when made by, or on behalf of the United States or any State or political subdivision thereof. Documentation that the firearm is being made for a government entity, such as a United States contract or a State or local government agency purchase order, must accompany the application.

Title 26 U.S.C. §§ 7801, 7805 authorizes the Attorney General to exempt tax under the National Firearms Act in limited circumstances. This exemption applies when the Attorney General authorizes a tax exemption to inivduals for the making of specific NFA firearms by ruling, regulation, or other notice. Documentation must be provided that the firearm listed on the ATF Form 1 falls within the parameters of the Attorney General authorization.

ATF Form 1 (5320.1)
Revised December 2022

D. **Completion of Form** *(Note: Type 03 licensee must follow individual instructions)*

(1) The applicant shall provide the applicant's full legal name to include middle and mailing address in item 3b. If a post office box address is used, the physical address shall be entered in item 3c. If the applicant is a trust or legal entity, show only the complete name of the trust or legal entity and do not include any individual names *(such as  names of trustees  or corporate officials)*. The address shall be the location within the particular State where the firearm will be maintained for a trust or legal entity. In the case of two or more locations for a legal entity, the address shown shall be the principal place of business within the particular State *(or principal office, in the case of a corporation)*.

(2) If the applicant is an individual, the entire Form 1 shall be completed except for items 18 and 19. In addition, the applicant must include his or her fingerprints on FBI Form FD-258 and his or her photographs *(see instruction 2g)*.

(3) If the applicant meets the definition of a Responsible Person for a legal entity (see definition 1.e.), see 2.d.5. for Responsible Person Requirements. Individuals must complete items 11-17 and sign the Certification Statement.

(4) Documentation of entity existence: (a) If the applicant is other than an individual, the applicant must attach documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust with any trust schedules, attachments, exhibits, and enclosures. (b) If the applicant entity has had an application approved as a maker or transferee within the preceding 24 months of the date of filing this application, and there has been no change to the documentation evidencing the existence and validity of the entity previously provided, the entity may provide a certification that the information has not been changed since the prior approval and shall identify the application for which the documentation had been submitted by form number, serial number, and date approved.

**Note**: An entity licensed under the Gun Control Act *(GCA)* that does not pay the Special *(Occupational*) Tax *(SOT)* must submit documentation of entity existence as required in the above paragraph 27 CFR § 479.63(b) (2)(ii).

(5) If the applicant is other  than an individual, each Responsible Person (see definition 1e) for the trust or legal entity must include a completed ATF Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, with the submitted Form 1.

**Note**: Each Responsible Person of an entity licensed under the Gun Control Act *(GCA)* that does not pay the Special *(Occupational)* Tax *(SOT)* must submit ATF Form 5320.23 with the application as instructed in the above paragraph 27 CFR § 479.63(b)(2)(ii).

(6) Item 18  (Method of Payment) is obscured on the ATF copy 2 (Registrant) and the CLEO copy.  In addition, item 4g (serial number) is obscured on the CLEO copy.  These fields do not require completion on these copies.

E. **Photograph and Fingerprints and Photograph**. An individual applicant or Responsible Persons of a legal entity applicant must  (1) attach to item 15 of the ATF Form 1, a 2 inch by 2 inch photograph of the frontal view of the transferee taken within 1 year prior to the date of the application and  (2) submit two properly completed FBI Forms FD-258 *(Fingerprint Card with blue lines)* with the application.  The fingerprints must be clear for accurate classification and taken by someone properly equipped to take them.

**Note**: Each Responsible Person of an entity licensed under the Gun Control Act *(GCA)* that does not pay the Special *(Occupational) Tax (SOT)* must submit fingerprints and photographs with the application as instructed in the above paragraph 27 CFR § 479.63(b)(2)(iii)(iv).

F. **Social Security and UPIN**.  The Social Security number and UPIN are not required.  However, this information assists with the efficient completion of the NICS background check.  Please be aware that refusal to provide this information may result in a delay in the NICS background check process.

G. **Signatures**.  All signatures required on ATF Form 1 must be original in ink on both copies.  **Exceptions**: In the case of eforms on where a variance has been granted a Digital/Electronic signature may be used.

(1) if the applicant is an individual, the applicant shall sign the form;

(2) if the applicant is a trust or legal entity, a responsible person of the trust or legal entity shall sign the form;

(3) if the applicant is a Federal firearms licensee, a responsible person of the Federal firearms licensee shall sign the form; or

(4) if the applicant is a government entity, a person who has a authority to sign for the entity shall sign the form.

H. **Law Enforcement Notification**.  The applicant must provide a copy of the Form 1 to the Chief Law Enforcement Officer (CLEO) who has jurisdiction over the area of the applicant's shown in item 3b of the Form 1.  In addition, if the applicant is other than an individual, a copy of the Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, for each Responsible Person must be provided to their respective Chief Law Enforcement Officer.  The Chief Law Enforcement Officer is considered to be the Chief of Police; the Sheriff; the Head of the State Police; or a State or local district attorney or prosecutor.

I. **Remittance**.  If the application is subject to the $200 making tax, please complete item 20 of the ATF Form 1.  Please note that you may pay the tax by credit/debit card, check, or money order.  The check or money order is to be made payable to ATF.  Do not send cash.

J **Photocopies, Computer Generated Versions or Download Version**. The form may be copied or downloaded *(for example, from the ATF website (www.atf.gov))*.  The form does not have to be printed front to back.

K. **Description of Firearm and Markings**.  (1) Item 4a.  If you are modifying an existing firearm, enter the name and location of the original manufacturer.  If  you are creating the firearm, enter the Maker's name, city and State.  (2) Item 4b.  The types of NFA firearms are listed in the definitions; (3) Item 4c.  Specify one caliber or gauge. If there is another designation, indicate the designation in item 4h. (4) Item 4d.  Show the model designation (if known).  (5) Item 4e and 4f.  Specify one barrel length and overall length in items 4e and 4f as applicable.  Note: if the firearm has a folding or collapsible stock, the overall measurement is to be made with the stock extended. (6) Item 4g.  Do not alter or modify the serial number of an existing firearm .  Enter the existing serial number or, if a new firearm, one you create.  (7) Markings: The maker is required to mark the firearm with the Maker's name, City and State as shown in item 3b.  All markings are to be in compliance with 27 CFR §§ 478.92 and 479.102.  Do not alter or modify the serial number of an existing firearm. Enter the existing serial number, or if a new firearm, one you create.  The Maker may not duplicate any serial number placed by the Maker on any other firearm.  See 27 CFR § 479.102.

L. **State or Local Permit**.  If a State or local permit or license is required before the making of the firearm, a copy of the permit or license must be submitted with the application.  If the applicant is a trust or legal entity, when the State of residence or any Responsible Person requires a State or local permit or license, a copy of the permit or license must be submitted with Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire.

M. **Compliance with explosives laws (18 U.S.C. Chapter 40) and regulations (27 CFR Part 555)**.  If the application is for a Destructive Device utilizing explosive materials, check the Explosives box in item 4.j and include the type(s) of explosives to be used.  If the applicant is other than a government agency, item 5 must be completed with an explosives license or permit number issued to the applicant.  If the applicant is other than an individual, such as a legal entity, and does not have an explosives license or permit, then a Responsible Person for the applicant must have a license or permit and enter the information in item 5.  To comply with the explosives laws and regulations, any member of a legal entity must also be identified as a Responsible Person or Employee Possessor on the explosives licenser or permit.  A trust cannot be issued an explosives license or permit.

ATF Form 1 (5320.1)
Revised December 2022

N. **Submission.** The Maker shall submit 2 complete forms *(ATF copy and registrant copy)* with original signatures to the NFA Division at the address on the face of the form. The applicant shall direct a 3rd complete copy of the form to the Chief Local Law Enforcement Officer *(CLEO)* as provided in instruction 2g and item 10.

3. **Approval of Application**. Upon approval of an application, the NFA Division will affix the NFA tax stamp *(if any)* to the application, cancel it, and return the approved copy to the Maker. The approval of the application effectuates registration of the firearm to the Maker; however, the firearm must not be made until the applicant has been approved.

4. **Withdrawal of Application**. The Maker may withdraw the application prior to approval by the submission of a signed, written request to the Chief, NFA Division either by mail to National Firearms Act Division, National Service Center, 244 Needy Road, Martinsburg, WV 25405 or by emailing a signed copy to nfafax@atf.gov. The NFA Division will arrange for a refund of any tax paid.

5. **Cancellation of Approved Application**. An approved application may be cancelled only if the firearm had not been made or modified. The Maker must return the approved application with original tax stamp affixed with a written request for cancellation, citing the need and that the making of the firearm did not take place. The NFA Division will arrange for a refund of any tax paid.

6. **Disapproval of Application**. If the application is disapproved, the NFA Division will note the reason for disapproval on the application and return one copy to the Maker. The NFA Division will arrange for a refund of any tax paid.

7. **Reason for Disapproval**. 26 U.S.C. § 5822 provides that applications shall be denied if the making or possession of the firearm would place the Maker in violation of law.

   a. **Violation of Law.** Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

   b. **Machineguns.** 18 U.S.C. § 922 (o) provides that a machinegun may be made only for government use or export. An application will be denied unless the making meets these criteria.

   c. **Persons Prohibited from Making a Firearm**. The application will be disapproved if the Maker is a person prohibited from possessing a firearm. For information regarding persons prohibited from possessing a firearm, refer to definitions 1n through 1t.

8. **Inquiries**. Information relating to the NFA and other firearms laws is available at the ATF Internet website at www.atf.gov. Any inquiry relating to the status of  an application to transfer an NFA firearm or about procedures in general should be directed to the NFA Division at (304) 616-4500 or emailed to NFA@ATF.GOV. Please be aware that any dissemination by ATF of information relating to the application to register an NFA firearm must conform with the restrictions in 26 U.S.C. § 6103.

9. **Penalties.** Any person who violates or fails to comply with any of the requirements of the NFA shall, upon conviction, be fined not more than $10,000 or be imprisoned for not more than 10 years, or both. Any firearm involved in a violation of the NFA shall be subject to seizure and forfeiture. It is unlawful for any person to make or cause the making of a false entry on any application or record required by the NFA knowing such entry to be false.

10. **Compliance with the Gun Control Act**. Person must also comply with all relevant portions of the GCA.

ATF Form 1 (5320.1)
Revised December 2022

OMB No. 1140-0011 (12/31/2025)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application to Make and Register a Firearm

---

**ATF Control Number**

**To:** Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 5015, Portland, OR 97208-5015, National Firearms Act Division (NFA)

*(Submit in duplicate. Please do not staple documents. See instructions attached.)*

As required by Sections 5821(b), 5822, and 5841 of the National Firearms Act, Title 26 U.S.C., Chapter 53, the undersigned hereby submits application to make and register the firearm described below.

1. Type of Application *(check one)*

2. Application is made by: ☐ Corporation ☐ Individual ☐ Other Legal Entity ☐ Trust ☐ Government Entity

3a. Trade Name *(If any)*

☐ a. **Tax Paid.** Submit your tax payment of $200 with the application. The tax may be paid by credit or debit card, check, or money order. Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act Stamp. *(See instruction 2.C and 3)*

3b. Applicant's Full Legal Name and Full Mailing Address *(Type or print below) (See instruction 2.D)*

3d. County/Parish

3e. Telephone Number

3f. E-mail Address

☐ b. **Tax Exempt.** Firearm is being made on behalf of the United States, or any department, independent establishment, or agency thereof.

or

**Tax Exempt.** Firearm is being made by or on behalf of any State or possession of the United tates, or any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

3c. If P.O. Box is Shown Above, Street Address Must be Given Here

☐ c. **Tax Exempt.** Firearm is not subject to the making tax pursuant to Title 26 U.S.C. §§ 7801, 7805. To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the firearm to be registered.

4. Description of Firearm *(Complete items a through k) (See instruction 2.J)*

| a. Name and Address of Original Manufacturer and/or Importer of Firearm *(If any)* | b. Type of Firearm to be Made *(See definition 2.K)* *(If a destructive device, complete item 4.J)* | c. Caliber or Gauge *(Specify one)* | d. Model *(As marked on firearm)* |
| | | | e. Barrel Length |
| | | | f. Overall Length |
| | | | g. Serial Number |

h. Additional Description *(Indicate required Maker's Markings to include Maker's name as registered, City and State as each will appear on firearm)*

i. Specify Why You Intend To Make Firearm *(Use additional sheet if necessary)*

j. Type of Destructive Device *(Check one box)*: ☐ Firearm ☐ Explosives *(If the Explosives box is checked, complete item 5 and see instruction 2.M)*

If an Explosive Type Destructive Device, Please provide additional description:

k. Is This Firearm Being Reactivated? ☐ Yes ☐ No *(See definition 1.K)*

5. Applicant's Federal Firearms License *(if any)* or Explosives License or Permit Number For Notification Purposes, per Regulation 479.62, Please Provide 15-Digit Number

6. Special *(Occupational)* Tax Status *(SOT) (If applicable) (See definitions)*

| a. Employer Identification Number | b. Class |

**Under Penalties of Perjury, I declare** that I have examined this application, including accompanying documents, and to the best of my knowledge and belief it is true, accurate and complete and the making and possession of the firearm described above would not constitute a violation of Title 18, U.S.C., Chapter 44, Title 26, U.S.C., Chapter 53; or any provisions of State or local law.

| 7. Signature of Applicant | 8. Name and Title of Authorized Official | 9. Date |

**The space below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By authority of the Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, this Application has been Examined and the Applicant's Making and Registration of the Firearm described above is:

☐ Approved *(With the following conditions, if any)*

☐ Disapproved *(For the following reasons)*

Authorized ATF Official

Date

Previous Editions Are Obsolete

ATF Copy 2 - To Be Returned To Registrant

ATF Form 1 (5320.1)
Revised December 2022

**MAKER'S CERTIFICATION** *(not completed by a GOVERNMENT ENTITY)*

**10.  Law Enforcement Notification** *(See instruction 2.H)*

Each applicant is to provide notification of the proposed making and possession of the firearm described on this Form 1 by providing a copy of the completed form to the Chief Law Enforcement Officer *(CLEO)* in the agency identified below:

_____     _____
Agency or Department Name                                                      Name and Title of Official

_____
Address *(Street address or P.O. Box, City, State and ZIP Code)* to which sent *(Mailed or delivered)*

| **Information for the Chief Law Enforcement Officer** | 12.  Photograph |
|---|---|

This form provides notification of the applicant's intent to make and register an NFA firearm.  No action is required by the CLEO. However, should the CLEO have information that may disqualify this person from making or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**Maker's Questions**  *(Complete only when the maker is an individual)*

Answer the following questions by checking or marking either the "yes" or "no" box to the right of the questions.

11.  Answer questions 11.a. through 11.m.  Answer questions 13, 15, 16 and 17 if applicable.  For any  "Yes" answer the applicant shall provide details on a separate sheet.  *(See instruction 7.C and definitions)*

|  | | Yes | No |
|---|---|---|---|
| a. | Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 11.c through 11.l, or a person described in question 11.m who does not fall under an exception? | | |
| b. | Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | |
| c. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1.N)* | | |
| d. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1.N)* | | |
| e. | Are you a fugitive from justice? *(See definition 1.T)* | | |
| f. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | |
| g. | Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1.O and 1.P)* | | |
| h. | Have you been  discharged from the Armed Forces under **dishonorable** conditions? | | |
| i. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1.Q)* | | |
| j. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1.R)* | | |
| k. | Have you ever renounced your United States citizenship? | | |
| l. | Are you an alien illegally or unlawfully in the United States? | | |

**Affix a 2" x 2" Photograph Here No Stapling.  Please Tape Sides of Photo to the Application.**

1.  Photo must have been taken within the last year.

2.  Photo must have been taken in full face view without a hat or head covering that obscures the hair or hairline.

3.  On back of photograph print full name, last 4 of SSN.

m.1.  Are you an alien who has been admitted to the United States under a nonimmigrant visa?  ☐ Yes   ☐ No

m.2.  If "Yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application   ☐ Yes  ☐ No  ☐ N/A

13.  If you are an alien, record your U.S.-Issued Alien or Admission number *(AR#, USCIS#, or I94#)*: _____

14.  Have you been issued a Unique Personal Identification Number *(UPIN)*? *(See instruction 2.F)*  ☐ Yes  ☐ No  If Yes please list _____

15.  Social Security Number: *(See instruction 2.F)*                                    Date of Birth:

| 16a.  Ethnicity | ☐ Hispanic or Latino | 16b.  Race | ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ White |
|---|---|---|---|---|---|
| | ☐ Not Hispanic or Latino | | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

17a.  Country of Citizenship:  *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1.S)*

☐ United States of America *(U.S.A.)*   ☐ Other Country/Countries *(Specify)*: _____

| 17b.  State of Birth | 17c. Country of Birth |
|---|---|

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF, a completed copy of this form will be directed to the CLEO shown in item 10, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.D(2) and 2.D(3) for the items to be completed depending on the type of applicant.**

_____     _____
Signature of Maker                                                                     Date

ATF Form 1 (5320.1)
Revised December 2022

18.  Number of Responsible Persons *(see definitions)* associated with the applicant trust or legal entity _____

19.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(if there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s)).*  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 1 application for each Responsible Person.

Full Name

_____

_____

_____

Full Name

_____

_____

_____

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 3b, the executor should contact the NFA Division, Bureau of ATF, 244 Needy Road, Martinsburg, WV 25405 or contact via email at NFAFAX@ATF.gov for additional assistance.

**Interstate Movement:**  If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320.20 can be used to request this permission.

**Change of Description or Address:**  The registrant shall notify the National Firearms Act Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm in item 4, or any change to the address of the registrant.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF Officer upon request.

**Paperwork Reduction Act Notice**

This form is in accordance with the Paperwork Reduction Act of 1995.  The information you provide is used to establish that the applicant's making and possession of the firearm would be in conformance with Federal, State, and local law.  The data is used as proof of lawful registration of a firearm to the manufacturer.  The furnishing of  this information is mandatory *(26 U.S.C. § 5822)*.

The estimated average burden associated with this collection of information is 4.0 hours per respondent or recordkeeper, depending on individual circumstances.  Comments concerning the accuracy of this burden estimate and suggestion for reducing this burden should be addressed to Reports Management Officer, Resource Management Staff, Contract and Forms Section, Bureau of  Alcohol, Tobacco, Firearms and Explosives, 99 New York Avenue NE. Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

OMB No. 1140-0011 (12/31/2025)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application to Make and Register a Firearm

**ATF Control Number**

**To:** Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 5015, Portland, OR 97208-5015, National Firearms Act Division (NFA)
*(Submit in duplicate. Please do not staple documents. See instructions attached.)*

As required by Sections 5821(b), 5822, and 5841 of the National Firearms Act, Title 26 U.S.C., Chapter 53, the undersigned hereby submits application to make and register the firearm described below.

1. Type of Application *(check one)*

2. Application is made by: ☐ Corporation  ☐ Individual
☐ Other Legal Entity  ☐ Trust  ☐ Government Entity

3a. Trade Name *(If any)*

a. Tax Paid. Submit your tax payment of $200 with the application. The tax may be paid by credit or debit card, check, or money order. Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act Stamp. *(See instruction 2.C and 3)*

3b. Applicant's Full Legal Name and Full Mailing Address *(Type or print below) (See instruction 2.D)*

3d. County/Parish

3e. Telephone Number

3f. E-mail Address

b. Tax Exempt. Firearm is being made on behalf of the United States, or any department, independent establishment, or agency thereof.

or

Tax Exempt. Firearm is being made by or on behalf of any State or possession of the United tates, or any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

3c. If P.O. Box is Shown Above, Street Address Must be Given Here

c. Tax Exempt. Firearm is not subject to the making tax pursuant to Title 26 U.S.C. §§ 7801, 7805. To confirm the application qualifies for tax-free registration, ATF may require additional supporting documentation, such as photographs of the firearm to be registered.

4. Description of Firearm *(Complete items a through k) (See instruction 2.J)*

| a. Name and Address of Original Manufacturer and/or Importer of Firearm *(If any)* | b. Type of Firearm to be Made *(See definition 2.K) (If a destructive device, complete item 4.J)* | c. Caliber or Gauge *(Specify one)* | d. Model *(As marked on firearm)* | | |
|---|---|---|---|---|---|
| | | | e. Barrel Length | | f. Overall Length |

h. Additional Description *(Indicate required Maker's Markings to include Maker's name as registered, City and State as each will appear on firearm)*

i. Specify Why You Intend To Make Firearm *(Use additional sheet if necessary)*

j. Type of Destructive Device *(Check one box):* ☐ Firearm  ☐ Explosives *(If the Explosives box is checked, complete item 5 and see instruction 2.M)*

If an Explosive Type Destructive Device, Please provide additional description:

k. Is This Firearm Being Reactivated? ☐ Yes  ☐ No  *(See definition 1.K)*

5. Applicant's Federal Firearms License *(If any)* or Explosives License or Permit Number For Notification Purposes, per Regulation 479.62, Please Provide 15-Digit Number

6. Special *(Occupational)* Tax Status (SOT) *(If applicable) (See definitions)*

| a. Employer Identification Number | b. Class |
|---|---|

**Under Penalties of Perjury, I declare** that I have examined this application, including accompanying documents, and to the best of my knowledge and belief it is true, accurate and complete and the making and possession of the firearm described above would not constitute a violation of Title 18, U.S.C., Chapter 44, Title 26, U.S.C., Chapter 53; or any provisions of State or local law.

| 7. Signature of Applicant | 8. Name and Title of Authorized Official | 9. Date |
|---|---|---|

Previous Editions Are Obsolete

ATF Form 1 (5320.1)
Revised December 2022

CLEO Copy

**MAKER'S CERTIFICATION** *(not completed by a GOVERNMENT ENTITY)*

**10.   Law Enforcement Notification**  *(See instruction 2.H)*

Each applicant is to provide notification of the proposed making and possession of the firearm described on this Form 1 by providing a copy of the completed form to the Chief Law Enforcement Officer *(CLEO)* in the agency identified below:

_____   _____
Agency or Department Name                                                                 Name and Title of Official

_____
Address *(Street address or P.O. Box, City, State and ZIP Code)* to which sent *(Mailed or delivered)*

**Information for the Chief Law Enforcement Officer**

This form provides notification of the applicant's intent to make and register a NFA firearm.  No action is required by the CLEO.  However, should the CLEO have information that may disqualify this person from making or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**Maker's Questions** *(Complete only when the maker is an individual)*

Answer the following questions by checking or marking either the "yes" or "no" box to the right of the questions.

11.  Answer questions 11.a. through 11.m.  Answer questions 13, 15, 16 and 17 if applicable.  For any  "Yes" answer the applicant shall provide details on a separate sheet.  *(See instruction 7.C and definitions)*

|  |  | Yes | No |
|---|---|---|---|
| a. | Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 11.c through 11.l, or a person described in question 11.m who does not fall under an exception? | | |
| b. | Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felony or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | |
| c. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1.N)* | | |
| d. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1.N)* | | |
| e. | Are you a fugitive from justice? *(See definition 1.T)* | | |
| f. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | |
| g. | Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1.O and 1.P)* | | |
| h. | Have you been  discharged from the Armed Forces under **dishonorable** conditions? | | |
| i. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1.Q)* | | |
| j. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1.R)* | | |
| k. | Have you ever renounced your United States citizenship? | | |
| l. | Are you an alien illegally or unlawfully in the United States? | | |

m.1. Are you an alien who has been admitted to the United States under a nonimmigrant visa?    ☐ Yes    ☐ No

m.2. If "Yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application    ☐ Yes   ☐ No   ☐ N/A

13.  If you are an alien, record your U.S.-Issued Alien or Admission number *(AR#, USCIS#, or I94#)*: _____

14.  Have you been issued a Unique Personal Identification Number *(UPIN)? (See instruction 2.F)*   ☐ Yes   ☐ No   If Yes please list _____

Date of Birth: _____

| 16a. Ethnicity | ☐ Hispanic or Latino | 16b. Race | ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ White |
|---|---|---|---|---|---|
| | ☐ Not Hispanic or Latino | | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

17a. Country of Citizenship:  *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1.S)*

☐ United States of America *(U.S.A.)*    ☐ Other Country/Countries *(Specify)*:  _____

| 17b. State of Birth | 17c.Country of Birth |
|---|---|

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF, a completed copy of this form will be directed to the CLEO shown in item 10, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.D(2) and 2.D(3) for the items to be completed depending on the type of applicant.**

_____   _____
Signature of Maker                                                                 Date

ATF Form 1 (5320.1)
Revised December 2022

18.  Number of Responsible Persons *(see definitions)* associated with the applicant trust or legal entity _____

19.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(if there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s))*.  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 1 application for each Responsible Person.

Full Name                                                                        Full Name

_____          _____

_____          _____

_____          _____

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 3b, the executor should contact the NFA Division, Bureau of ATF, 244 Needy Road, Martinsburg, WV 25405 or contact via email at NFAX@ATF.gov for additional assistance.

**Interstate Movement:**  If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320.20 can be used to request this permission.

**Change of Description or Address:**  The registrant shall notify the National  Firearms Act Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm in item 4, or any change to the address of the registrant.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF Officer upon request.

**Paperwork Reduction Act Notice**

This form is in accordance with the Paperwork Reduction Act of 1995.  The information you provide is used to establish that the applicant's making and possession of the firearm would be in conformance with Federal, State, and local law.  The data is used as proof of lawful registration of a firearm to the manufacturer.  The furnishing of  this information is mandatory *(26 U.S.C. § 5822)*.

The estimated average burden associated with this collection of information is 4.0 hours per respondent or recordkeeper, depending on individual circumstances.  Comments concerning the accuracy of this burden estimate and suggestion for reducing this burden should be addressed to Reports Management Officer, Resource Management Staff, Contract and Forms Section, Bureau of Alcohol, Tobacco, Firearms and Explosives, 99 New York Avenue NE. Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

ATF Form 1 (5320.1)
Revised December 2022

OMB No. 1140-0014 (10/31/2026)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application for Tax Paid Transfer and Registration of Firearm

---

**ATF Control Number**

**SUBMIT in DUPLICATE to:**   National Firearms Act Division
Bureau of Alcohol, Tobacco, Firearms and Explosives,  P.O. Box 5015, Portland, OR  97208-5015

| | |
|---|---|
| 1. Type of Transfer *(Check one)*<br><br>☐ $5  ☐ $200<br><br>Submit the appropriate tax payment with the application. The tax may be paid by credit or debit card, check, or money order.  Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act stamp. (See instructions 2b, 2j and 3) | 2a. Transferee's Full Legal Name and Address  *(Include trade name, if any) (See instruction 2d)*<br><br>☐ Corporation    ☐ Other Legal Entity<br>☐ Individual      ☐ Trust<br><br>2b.  County/Parish |

| 3a.  Transferor's Full Legal Name and Address *(Include trade name, if any)*  *(Executors:  see instruction 2l)* | 3b.  E-mail address | 3c.  Transferor's Telephone *(Area code and number)* |
|---|---|---|
| | 3d.  If Applicable:  Decedent's Name, Address, and Date of Death | |
| | 3e.  Number, Street, City, State and ZIP Code of Residence *(or firearms business premises) (if different from Item 3a.)* | |

The above-named and undersigned transferor hereby makes application as required by Section 5812 of the National Firearms Act to transfer and register the firearm described below to the transferee.

4.  Description of Firearm  *(Complete items a through h) (See instruction 2n)*

| a.  Name and Address of Maker Manufacturer and/or Importer of Firearm | b.  Type of Firearm *(See definitions 1c)* | c.  Caliber or Gauge | d.  Model |
|---|---|---|---|
| | | | e.  Barrel Length:    f.  Overall Length: |
| | | | g.  Serial Number |

h.  Additional Description or Data Appearing on Firearm  *(Attach additional sheet if necessary)*

| 5.  Transferee's Federal Firearms License *(if any)* or Explosives License or Permit Number *(Give complete 15-digit number)  (See instruction 2c)* | 6.  Transferee's Special (Occupational) Tax Status  *(If any)* |
|---|---|

| First 6 digits | 2 digits | 2 digits | 5 digits | a.  Employer Identification Number | b.  Class |
|---|---|---|---|---|---|
| | | | | | |

| 7.  Transferor's Federal Firearms License  *(If any)* | 8.  Transferor's Special (Occupational) Tax Status  *(If any)* |
|---|---|

| First 6 digits | 2 digits | 2 digits | 5 digits | a.  Employer Identification Number | b.  Class |
|---|---|---|---|---|---|
| | | | | | |

**Under Penalties of Perjury, I Declare** that I have examined this application, and to the best of my knowledge and belief it is true, correct and complete, and that the transfer of the described firearm to the transferee and receipt and possession of it by the transferee are not prohibited by the provisions of Title 18, United States Code, Chapter 44; Title 26, United States Code, Chapter 53; or any provisions of State or local law.

| 9.  Signature of Transferor *(Or authorized official)* | 10.  Name and Title of Authorized Official *(Print or type)* | 11.  Date |
|---|---|---|

**The Space Below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

| By Authority of The Director, This Application Has Been Examined, and the Transfer and Registration of the Firearm Described Herein and the Interstate Movement of that Firearm, When Applicable, to the Transferee are: | Stamp Denomination |
|---|---|

☐  Approved *(With the following conditions, if any)*          ☐  Disapproved *(For the following reasons)*

| Signature of Authorized ATF Official | Date |
|---|---|

Previous Editions Are Obsolete

ATF Copy

ATF Form 4 (5320. 4)
Revised October 2023

Transferee Notification

**12. Law Enforcement Notification** *(See instruction 2f)*

The transferee is to provide notification of the proposed acquisition and possession of the firearm described on this Form 4 by providing a copy of the completed form to the chief law enforcement officer in the agency identified below:

| | |
|---|---|
| Agency or Department Name | Name and Title of Official |

Address *(Street address or P.O. Box, City, State and ZIP Code to which sent (mailed or delivered))*

### Information for the Chief Law Enforcement Officer

This form provides notification of the transferee's intent to acquire and possess a National Firearms Act (NFA) firearm. No action on your part is required. However, should you have information that may disqualify this person from acquiring or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**13. Transferee Necessity Statement** *(See instruction 2e)*

I, _____, have a reasonable necessity to possess the machinegun, short-barreled rifle,
*(Name and Title of Transferee)*

short-barreled shotgun, or destructive device described on this application for the following reason(s) _____

_____
and my possession of the device or weapon would be consistent with public safety (18 U.S.C. § 922(b) (4) and 27 CFR § 478.98).

**Transferee Questions** *(Complete only when transferee is an individual)*

14. Answer questions 14.a. through 14.m. Answer questions 16, 17, 18, 19 and 20, if applicable. For any "Yes" answer the transferee shall provide details on a separate sheet. *(See instruction 7b and definitions)*

| | | Yes | No |
|---|---|---|---|
| a. | Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 14.c through 14.l. or a person described in question 14.m. who does not fall under an exception? | | |
| b. | Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felon or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | |
| c. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1m)* | | |
| d. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1m)* | | |
| e. | Are you a fugitive from justice? *(See definition 1s)* | | |
| f. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | |
| g. | On or after the age of 16, have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1n and 1o)* | | |
| h. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | | |
| i. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1p)* | | |
| j. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1q)* | | |
| k. | Have you ever renounced your United States citizenship? | | |
| l. | Are you an alien illegally or unlawfully in the United States? | | |
| m.1. | Are you an alien who has been admitted to the United States under a nonimmigrant visa? | | |
| m.2. | If "yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application | | ☐ N/A |

**15. Photograph**

Affix a 2" x 2" Photograph here.
**No Stapling. Tape Sides of Photo to the Application.**

1. Photo must have been taken within the last year.

2. Photo must have been taken in full face view without a hat or head covering that obscures the hair or hairline.

3. On back of photograph print full name, last 4 of SSN.

16. If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or 194#):

17. Have you been issued a Unique Personal Identification Number *(UPIN)*? *(See instruction 2h)*  ☐ Yes  ☐ No  If yes please list _____

18. Social Security Number: *(See instruction 2h)* _____  Date of Birth:

| 19a. Ethnicity | ☐ Hispanic or Latino | 19b. Race | ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ White |
|---|---|---|---|---|---|
| | ☐ Not Hispanic or Latino | | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

20a. Country of Citizenship: *(Check/List more than one, if applicable. Nationals of the United States may check U.S.A.) (See definition 1r)*
☐ United States of America  ☐ Other Country/Countries *(Specify)*: _____

ATF Form 4 (5320. 4)
Revised October 2023

20b. State of Birth                  20c.Country of Birth

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF,  a completed copy of this form will be directed to the chief law enforcement officer *(CLEO)* shown in item 12, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.d(2) and 2.d(3) for the items to be completed depending on the type of transferee.**

Signature of Transferee                           Date

21.  Number of Responsible Persons *(see definitions)* associated with the transferee trust or legal entity

22.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(If there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s)).*  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 4 application for each Responsible Person.

Full Name                                             Full Name

**23.  Method of Payment** *(Check one) (See instruction 2j) (If paying by credit/debit card, complete the section below)*

☐ Check *(Enclosed)*    ☐ Cashier's Check or Money Order *(Enclosed)*    ☐ Visa    ☐ Mastercard    ☐ American Express    ☐ Discover    ☐ Diners Club

| Credit/Debit Card Number *(No dashes)* | Name as Printed on the Credit/Debit Card | Expiration Date *(Month & year)* |
|---|---|---|
| Credit/Debit Card Billing Address: | Address: | |
| | City:      State:      Zip Code: | |
| | | Tax Amount: $ |

I Authorize ATF to Charge my Credit/Debit Card the Tax Amount.

Signature of Cardholder                           Date

Your credit/debit card will be charged the above stated amount upon receipt of the application.  The charge will be reflected on your credit/debit card statement. In the event your application is NOT approved, the above amount will be credited to the credit/debit card noted above.

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 2a, the executor should contact the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405.

**Change of Address:**  Unless currently licensed under the Gun Control Act, the registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the address in item 2a.

**Change of Description:**  The registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm*(s)* in item 4.

**Interstate Movement:**  If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320. 20 can be used to request this permission.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF officer upon request.


ATF Form 4 (5320. 4)
Revised October 2023

## Paperwork Reduction Act Notice

This form meets the clearance requirements of the Paperwork Reduction Act of 1995. The information you provide is used in applying to transfer serviceable firearms taxpaid. Data is used to identify transferor, transferee, and firearm, and to ensure legality for transfer under Federal, State and local laws. The furnishing of this information is mandatory (26 U.S.C. § 5812).

The estimated average burden associated with this collection of information is 3.78 hours per respondent or recordkeeper, depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestion for reducing this burden should be addressed to Reports Management Officer, Information Technology Coordination Staff, Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

## Privacy Act Information

The following information is provided pursuant to Section 3 of the Privacy Act of 1974 (5 U.S.C. § 552(e)(3)):

1. **Authority.**  Solicitation of this information is made pursuant to the National Firearms Act (26 U.S.C. § 5812).  Disclosure of this information by the applicant is mandatory for transfer of an NFA firearm, unless the transfer is otherwise exempt from tax.

2. **Purpose.**  To ensure payment of the tax imposed by 26 U.S.C. § 5811; to ensure that the transfer would not be in violation of law; and to effect registration of the firearm.

3. **Routine Uses.**  The information will be used by ATF to make the determinations set forth in  paragraph 2.  In addition, to effect registration of the firearm, information as to the identification of the firearm, date of registration, and the identification and address of person entitled to possess the firearm will be entered into the National Firearms Registration and Transfer Record.  No information obtained from an application, registration, or records required to be submitted by an individual in order to comply with any provision of the National Firearms Act or regulation issued thereunder, shall, except in connection with prosecution or other action for furnishing information, be used, directly or indirectly, as evidence against that person in any criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application.  The information from this application may only be disclosed to Federal authorities for purposes of prosecution for violation of the National Firearms Act.

4. **Effects of not Supplying Information Requested.**  Failure to supply complete information will delay processing and may cause denial of the application.

## Definitions/Instructions

1. **Definitions**

   a. **National Firearms Act  (NFA).**  Title 26, United States Code, Chapter 53.  The implementing regulations are found in Title 27, Code of Federal Regulations, Part 479.

   b. **Gun Control Act  (GCA).**  Title 18, United States Code, Chapter 44.  The implementing regulations are found in Title 27, Code of Federal Regulations, Part 478.

   c. **Firearm.**  The term "firearm" means:  (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon as defined in 26 U.S.C. § 5845(e); (6) a machinegun; (7) a muffler or silencer for any firearm  whether or not such firearm is included within this definition; and (8) a destructive device.

   d. **Person.**  A partnership, company, association, trust, corporation, including each responsible person associated with such an entity; an  estate; or an individual.

   Section A.

   e. **Responsible Person.**  In the case of an unlicensed entity, including any trust, partnership, association, company (including any Limited Liability Company (LLC)), or corporation, any individual who possesses, directly or indirectly, the power or authority to direct the management and policies of the trust or entity to receive, possess, ship, transport, deliver, transfer or otherwise dispose of a firearm for, or on behalf of, the trust or legal entity.

   Section B.

   Trust: Those persons with the power or authority to direct the management and policies of the trust includes any person who has the capability to  exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of the trust.  Examples of who may be considered a responsible person include settlors/grantors, trustees, partners, members, officers, directors, board members, or owners.  An example of who may be excluded from this definition of responsible person is the beneficiary of a trust, if the beneficiary does not have the capability to exercise the enumerated powers or authorities.

   f. **Employer Identification Number  (EIN).**  Required of taxpayer filing special (occupational) tax returns under 27 CFR  § 479.35.

   g. **Special (Occupational) Tax.**  Required by the NFA to be paid by a Federal firearms licensee engaged in the business of manufacturing (Class 2), importing (Class 1), or dealing (Class 3) in NFA firearms.

   h. **Federal Firearms License.**  A license issued under the provisions of the GCA to manufacture, import or deal in firearms.

   i. **ATF Officer.**  An officer or employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) authorized to perform any function relating to the administration of the NFA.

   j. **Transfer.**  Selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of a firearm.

   k. **Transferor.**  The person selling or otherwise disposing of a firearm; including applying to transfer a firearm.

   l. **Transferee.**  The person acquiring the firearm.

   m. **Prohibited Person.**  Generally, 18 U.S.C. § 922(g) prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who:  has been convicted of a misdemeanor crime of domestic violence; has been convicted of a felony, or any other crime, punishable by imprisonment for a term exceeding one year *(this does not include State misdemeanors punishable by imprisonment of two years or less)*; is a fugitive from justice; is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated as a mental defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions; has renounced his or her U.S. citizenship; is an alien illegally in the United States or an alien admitted to the United States under a nonimmigrant visa; or is subject to certain restraining orders.  Furthermore, Section 922(n)  prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony in any Federal, State or local court, or any other crime punishable by imprisonment for a term exceeding one year.  An information is a formal accusation of a crime verified by a prosecutor.

ATF Copy

ATF Form 4 (5320. 4)
Revised October 2023

**EXCEPTION:** A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who has been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if: (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights *(the right to vote, sit on a jury, and hold public office)* taken away and later restored AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms.  Persons subject to this exception should mark "no" in the applicable box.

n.  **Adjudicated as a Mental Defective.**  A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) is a danger to himself or to others; or (2) lacks the mental capacity to contract or manage his own affairs.  This term shall include: (1) a finding of insanity by a court in a criminal case; and (2) those persons found incompetent to stand trial or found not guilty by reason of mental responsibility.

o.  **Committed to a Mental Institution.**  A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily.  The term includes commitment for mental defectiveness or mental illness.  It also includes commitments for other reasons, such as for drug use.  The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

**EXCEPTION NICS** Improvement Amendments Act of 2007:  A person who has been adjudicated as a mental defective or committed to a mental institution in a state proceeding is not prohibited by the adjudication or commitment if the person has been granted relief by the adjudicating/committing state pursuant to a qualifying mental health relief from disabilities program.  Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of the Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication/commitment; or (d) the adjudication or commitment respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudication as a mental defective consistent with 922(g)(4) of title 18, United States code; or (e)  the person was granted relief from the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities program.  Persons who fall within one of the above exceptions should mark "no" in the applicable box.  This exception to an adjudication or commitment by a Federal department or agency does not apply to any person who was adjudicated to be not guilty by reason of insanity, or based on a lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

p.  **Restraining Order.**  Under 18 U.S.C. § 922, firearms may not be sold to or received by persons subject to a court order that:  (A) was issued after a hearing which the person received actual notice of and had an opportunity to participate in; (B) restrains such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. An "intimate partner" of a person is:  the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or has cohabitated with the person.

q.  **Misdemeanor Crime of Domestic Violence:**  A Federal, State, local, tribal offense that  is a misdemeanor under the Federal, State, or tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person cohabitating with, or has cohabitated

with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim (as defined in 18 U.S.C. § 921(a)(37)).  The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon *(e.g., assault and battery)*, if the offense is committed by one of the defined parties. *(See Exception in the definition of  "Prohibited Person").*  A person who has been convicted of a misdemeanor crime of  domestic violence also is not prohibited unless: (1) the person was represented by a lawyer or gave up the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a jury, or gave up the right to a jury trial.  Persons subject to this exception should mark "no" in the applicable box.

r.  **Alien Admitted to the United States Under a Nonimmigrant Visa.**  An alien admitted to the United States under a nonimmigrant visa includes, among others, persons visiting the United States temporarily for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain temporary foreign workers.  These aliens must answer "yes" to question 16.d.1 and provide the additional documentation required under question 16.d.2.  Permanent resident aliens and aliens legally admitted to the United States pursuant either the Visa Waiver Program or to regulations otherwise exempting them from visa requirements may answer "no" to this question and are not required to submit the additional documentation under 16.d.2.  An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving, or possessing a firearm if the alien:  (1) is in possession of a  hunting license or permit lawfully issued by the Federal Government, a State, or local government, or  an Indian tribe federally recognized by the Bureau of Indian Affairs, which is valid and unexpired; (2) was admitted to the United States for lawful hunting or sporting purposes; (3) is  an official representative of a foreign government who is accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; (4) is an official representative of a foreign government who is enroute to or from another country to which that alien is accredited; (5) is an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; (6) is a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business; (7) has received a waiver from the prohibition from the Attorney General of the United States.

s.  **Fugitives from Justice.**  Any person who has fled from any State to avoid prosecution for a felony or a misdemeanor, or any person who leaves the State to avoid giving testimony in any criminal proceeding.  The term also includes any person who knows that misdemeanor or felony charges are pending against such person and who leaves the State of prosecution.

2.  **Preparation of Application**

a.  **Authority.**  As provided by 26 U.S.C. §§ 5811 and 5812, any person seeking to transfer a firearm must submit, in duplicate, a separate application on this form for each firearm.  The transferor must furnish all the information called for, except as noted by instructions within, on this application form.  Please note that the form now contains a 3rd (CLEO) copy of the form for use in compliance with instruction 2f and item 12 of the form.

b.  **Transfer Tax Rates.**  The transfer tax is $200.00 except when the firearm is an 'any other weapon' where the tax rate is $5.00.

c.  **Federal Firearms Licensees.**  If the transferor or transferee is a Federal Firearms licensee (FFL) under the GCA, the licensee's complete name, trade name (if any), and address shall be entered in items 2a or 3a of this form, respectively.  The complete license number for each shall be entered in items 5 and 7 of the form and if the licensee is a special (occupational) taxpayer under the NFA, the licensee's employer identification number (EIN) shall be entered in item 6 and 8 of the form, along with the class of special tax paid.  **IMPORTANT NOTE:** The business structure of the license shall be described consistently.  For example, if the transferor is a sole proprietor, item 3a shall reflect the FFL information for the sole proprietor business and item 7 shall reflect the FFL number for that sole proprietor business.  Item 8 will reflect the EIN for the sole proprietor business.  If the special tax is paid as a corporation, then it is not valid to file for the transaction.  Similarly, a corporation name shown in item 3a with the FFL number and EIN of a sole proprietor will not be valid for the transaction.

**IMPORTANT NOTE:** The business structure of the licensee shall be described consistently. For example, if the transferor is a sole proprietor, then item 3a shall reflect the FFL information for the sole proprietor business and item 7 shall reflect the FFL number for that sole proprietor business. Item 8 will reflect the EIN for the sole proprietor business. If the special tax is paid as a corporation, then it is not valid for the transaction. Similarly, a corporation name shown in item 3a with the FFL number and EIN of a sole proprietor will not be valid for the transaction.

d. **Completion of Form**

(1)  The transferor shall provide the transferee's full legal name to include middle and physical address (no Post Office boxes) in item 2aIf the transferee is a trust or legal entity, show only the complete name of the trust or legal entity and do not include any individual names (such as names of trustees or corporate officials). The address shall be the location within the particular state where the firearm will be maintained for a trust or legal entity. In the case of two or more locations for a legal entity, the address shown shall be the principal place of business within the particular state (or principal office, in the case of a corporation).

(2)  If the transferee is an individual, the entire Form 4 shall be completed except for items 21 and 22. In addition, the transferee must include his or her fingerprints on FBI Form FD-258 and his or her photos (see instruction 2g).

(3)  If the transferee is other than an individual, e.g., a trust or legal entity such as a corporation, the transferee shall not complete items 14, 15, 16, 17, 18, 19 and 20. All other items must be completed including the signing of the Transferee Certification statement by the transferee. See 2.d.5. for Responsible Person Requirements

(4)  Documentation of entity existence:

(a)  If the transferee is other than an individual, the transferee must attach documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust with any trust schedules, attachments, exhibits, and enclosures.

(b)  If the transferee entity has had an application approved as a maker or transferee within the preceding 24 months of the date of filing this application, and there has been no change to the documentation evidencing the existence and validity of the entity previously provided, the entity may provide a certification that the information has not been changed since the prior approval and shall identify the application for which the documentation had been submitted by form number, serial number, and date approved.

(5)  If the transferee is other than an individual, each responsible person of the trust or legal entity (see definition 1e) must have completed a completed ATF Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, with the submitted Form 4.

**NOTE:** Each Responsible Person of an entity licensed under the Gun Control Act (GCA) that does not pay the Special (Occupational) Tax (SOT) must submit ATF Form 5320.23 with the application as instructed in the above paragraph 27CFR 479.63 (b)(2)(ii).

(6)  Item 22 (Method of Payment) is obscured on the ATF Copy 2 (Registrant) and the CLEO copy. In addition, item 4g (serial number) is obscured on the CLEO copy. These fields do not require completion on these copies.

e. **Transferee Necessity Statement.** Item 13  must be completed by the transferee if:

(1)  the firearm to be transferred is a machinegun, short-barreled rifle, short-barreled shotgun, or destructive device;

(2)  the transferor is licensed under the GCA to deal in such device or fire arm; and

(3)  the transferee is **not** licensed under the GCA to deal in such device or firearm.

f. **Law Enforcement Notification.** The transferee must provide a copy of the Form 4 to the chief law enforcement officer (CLEO) who has jurisdiction over the area of the transferee's address shown in item 2a of the Form 4. In addition, if the transferee is other than an individual, a copy of the Form 5320.23, National Firearms Act (NFA) Responsible Person Question naire, completed by each responsible person must be provided to their respective chief law enforcement officer. The chief law enforcement officer is considered to be the Chief of Police; the Sheriff; the Head of State Police, or a State or local district attorney or prosecutor.

g. **Photographs and Fingerprints.** An individual transferee, except if licensed as a manufacturer, importer, or dealer under the GCA, must (1) attach to item 15 of the ATF Form 4, except for the CLEO copy a 2 inch x 2 inch photograph of the frontal view of the transferee taken within 1 year prior to the date of the application and (2) submit two properly completed FBI Forms FD-258 *(Fingerprint Card with blue lines)* with the application. The fingerprints must be clear for accurate classification and taken by someone properly equipped to take them.

h. **Social Security and UPIN.** The Social Security number and UPIN are not required. However, this information assists with the efficient completion of the NICS background check. Please be aware that refusal to provide this informatin may result in a delay in the NICS backgrount check process.

i. **Signatures.** All signatures required on ATF Form 4 must be original in ink on both copies. **Exceptions:** In the case of eforms or where a variance has been granted a Digital/Electronic signature may be used.

(1)  if the transferee is an individual, the applicant shall sign the form;

(2)  if the transferee is the estate of a decedent where the firearm is being transferred to other than a beneficiary, the executor or administrator of the estate shall sign the form;

(3)  if the transferee is a trust or legal entity, a responsible person of the trust or legal entity shall sign the form; or

(4)  if the transferee is a Federal firearms licensee, a responsible person of the Federal firearms licensee or such other employee of the Federal firearms licensee as authorized by a responsible person shall sign the form.

j. **Remittance.** The applicant shall complete item 22. Please note that you may pay by credit/debit card, check, or money order. The check or money order is to be made payable to ATF. **Do not send cash.**

k. **Photocopies, Computer Generated Versions, or Downloaded Version.** The form may be copied or downloaded *(for example, from the ATF website (www.atf.gov))*. The form does not have to be printed front to back.

l. **Estates, Trusts, and Other Transfers by Operation of Law.** When a firearm is being transferred tax exempt from an estate by bequest or intestate succession (See 27 CFR § 479.90a), or by other operation of law to a beneficiary or other authorized recipient, ATF Form 5 is used to effect the transfer otherwise, Form 4 is used. See ATF Form 5 for additional information.

m. **Submission.** The transferor shall submit 2 forms (ATF Copy 1 and Copy 2 (Registrant)) to the NFA Division at the address on the face of the form. All items on the form are to be completed except as noted in the instructions and any attachment included with the submission. The applicant shall direct the 3rd copy (CLEO) complete copy of the form to the chief law enforcement officer as provided in instruction 2f and item 12.

n. **Description of Firearm and Markings.** (1) Item 4a. please provide the name and address of the maker, manufacturer or importer of the firearm. If there are additional makers, manufacturers, or importers, include this information in item 4h or on a separate sheet of paper. (2) Item  4b. the types of NFA firearm are listed in instruction 1c. (3) Item 4c. specify one caliber or gauge. If there are additional calibers associated with the description of the firearm, include this information in item 4h or on a separate piece of paper. (4) Item 4d. show the model designation *(if any)*(5) Item 4e. and 4f. specify the barrel and overall lengths as applicable. If there are additional barrel and overall lengths associated

with the description of the firearm, include this information in item 4h. or
on a separate sheet of paper. (6) Item 4g. enter the serial number of
the firearm as it appears on the firearm. (7) If there are differences
between the description of the firearm on the form in comparison to the
physical description of the firearm or in the markings on the firearm,
including the serial number, contact the NFA Division in regard to these
differences.

o.   **State or Local Permit.**  If a State or local permit or license is required
for the transferee prior to acquisition of the firearm, a copy of the permit
must be included with the application.  If the transferee is a trust or legal
entity, when the State of residence for any responsible person requires a
State or local permit or license, a copy of the permit or license must be
submitted with Form 5320.23, National Firearms Act *(NFA)* Responsible
Person Questionnaire.

3.   **Approval of Application.**  Upon approval of an application, the NFA Division
will return the approved copy to the transferor for delivery with the firearm to the
transferee.  Since the approval of the application effectuates registration of the
firearm to the transferee, the physical transfer of the firearm  must be
completed immediately; however, the transferor must not transfer the firearm
until the application has been approved and received.  If the physical transfer
of the firearm cannot be completed immediately, the transferor must contact
the NFA Division with the specifics.

4.   **Withdrawal of Application.**  The application may be withdrawn prior to approval by the
submission of a signed, written request to the Chief, NFA Division either by mail to 244
Needy Road, Martinsburg, WV 25405 or by emailing a signed copy to nfafax@atf.gov.

5.   **Cancellation of Approved Application.**  The transferor may cancel an approved
application only if the physical transfer of the firearm has not been completed.  The
transferor must return the approved application with the original tax stamp affixed
with a written request for cancellation, citing the need and that the physical transfer
of the firearm did not take place.  The request shall be directed to the Chief, NFA
Division, 244 Needy Road, Martinsburg, WV.  25405.  The NFA Division will
arrange for a refund of the tax paid.

6.   **Disapproval of Application.**  If the application is disapproved, the NFA Division
will note the reason for disapproval on the application and return one copy of the ATF
Form 4 to the transferor.

7.   **Reasons for Disapproval.**  26 U.S.C. § 5812 provides that applications shall be
denied if the transfer, receipt, or possession of the firearm would place the transferee
in violation of law.

a.   **Violation of Law.**  Applications shall  be denied if the receipt or possession
of the firearm would place the person receiving or possessing the firearm in
violation of law.

b.   **Persons Prohibited from Receiving a Firearm.**  The application will be
disapproved if the transferee is a person prohibited from receiving a firearm.
For information regarding persons prohibited from receiving a firearm, refer
to definitions 1m through 1r.

8.   **Status Inquiries and Questions.**  Information relating to the NFA and other firearms
laws is available at the ATF Internet website at **www.atf.gov**.  Any inquiry relating to
the status of an application to transfer an NFA firearm or about procedures in general
should be directed to the NFA Division at (304) 616-4500 or emailed to
nfa@atf.gov.  Please be aware that any dissemination by ATF of information relating
to the application to register an NFA firearm must conform with the restrictions in
26 U.S.C. § 6103.

9.   **Penalties.**  Any person who violates or fails to comply with any of the
requirements of the NFA shall, upon conviction, be fined not more than $10,000
or be imprisoned  for not more than 10 years, or both.  Any firearm involved in
a violation of the NFA shall be subject to seizure and forfeiture.  It is unlawful
for any person to make or cause the making of a false entry on any application
or record required by the NFA knowing such entry to be false.

10.  **Compliance with the Gun Control Act**.  Persons must also comply with all
relevant portions of the GCA.

OMB No. 1140-0014 (10/31/2026)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Application for Tax Paid Transfer and Registration of Firearm

---

**ATF Control Number**

**SUBMIT in DUPLICATE to:**    **National Firearms Act Division**
**Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 5015, Portland, OR 97208-5015**

| 1. Type of Transfer *(Check one)* | 2a. Transferee's Full Legal Name and Address *(Include trade name, if any) (See instruction 2d)* |
|---|---|

1. Type of Transfer *(Check one)*

☐ $5    ☐ $200

Submit the appropriate tax payment with the application. The tax may be paid by credit or debit card, check, or money order. Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act stamp. *(See instructions 2b, 2j and 3)*

2a. Transferee's Full Legal Name and Address *(Include trade name, if any) (See instruction 2d)*

☐ Corporation    ☐ Other Legal Entity

☐ Individual    ☐ Trust

**2b.** County/Parish

3a. Transferor's Full Legal Name and Address *(Include trade name, if any) (Executors: see instruction 2l)*

3b. E-mail address

3c. Transferor's Telephone *(Area code and number)*

3d. If Applicable: Decedent's Name, Address, and Date of Death

3e. Number, Street, City, State and ZIP Code of Residence *(or firearms business premises) (if different from Item 3a.)*

The above-named and undersigned transferor hereby makes application as required by Section 5812 of the National Firearms Act to transfer and register the firearm described below to the transferee.

4. Description of Firearm *(Complete items a through h) (See instruction 2n)*

| a. Name and Address of Maker Manufacturer and/or Importer of Firearm | b. Type of Firearm *(See definitions 1c)* | c. Caliber or Gauge | d. Model |
|---|---|---|---|
| | | | e. Barrel Length:    f. Overall Length: |
| | | | g. Serial Number |

h. Additional Description or Data Appearing on Firearm *(Attach additional sheet if necessary)*

| 5. Transferee's Federal Firearms License *(if any)* or Explosives License or Permit Number *(Give complete 15-digit number) (See instruction 2c)* | 6. Transferee's Special (Occupational) Tax Status *(If any)* |
|---|---|

| First 6 digits | 2 digits | 2 digits | 5 digits |
|---|---|---|---|
| | | | |

6. Transferee's Special (Occupational) Tax Status *(If any)*

| a. Employer Identification Number | b. Class |
|---|---|

| 7. Transferor's Federal Firearms License *(If any)* | 8. Transferor's Special (Occupational) Tax Status *(If any)* |
|---|---|

| First 6 digits | 2 digits | 2 digits | 5 digits |
|---|---|---|---|
| | | | |

| a. Employer Identification Number | b. Class |
|---|---|

**Under Penalties of Perjury, I Declare** that I have examined this application, and to the best of my knowledge and belief it is true, correct and complete, and that the transfer of the described firearm to the transferee and receipt and possession of it by the transferee are not prohibited by the provisions of Title 18, United States Code, Chapter 44; Title 26, United States Code, Chapter 53; or any provisions of State or local law.

| 9. Signature of Transferor *(Or authorized official)* | 10. Name and Title of Authorized Official *(Print or type)* | 11. Date |
|---|---|---|

---

**The Space Below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By Authority of The Director, This Application Has Been Examined, and the Transfer and Registration of the Firearm Described Herein and the Interstate Movement of that Firearm, When Applicable, to the Transferee are:

Stamp Denomination

☐ Approved *(With the following conditions, if any)*      ☐ Disapproved *(For the following reasons)*

Signature of Authorized ATF Official

Date

Previous Editions Are Obsolete

ATF Form 4 (5320. 4)
Revised October 2023

**Transferee Certification**

12.  Law Enforcement Notification *(See instruction 2f)*

The transferee is to provide notification of the proposed acquisition and possession of the firearm described on this Form 4 by providing a copy of the completed form to the chief law enforcement officer in the agency identified below:

_____

Agency or Department Name                                                    Name and Title of Official

_____

Address *(Street address or P.O. Box, City, State and ZIP Code* to which sent *(mailed or delivered))*

**Information for the Chief Law Enforcement Officer**

This form provides notification of the transferee's intent to acquire and possess a National Firearms Act (NFA) firearm.  No action on your part is required.  However, should you have information that may disqualify this person from acquiring or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**13.  Transferee Necessity Statement** *(See instruction 2e)*

I, _____, have a reasonable necessity to possess the machinegun, short-barreled rifle,

*(Name and Title of Transferee)*

short-barreled shotgun, or destructive device described on this application for the following reason(s)  _____

_____

and my possession of the device or weapon would be consistent with public safety (18 U.S.C. § 922(b) (4) and 27 CFR § 478.98).

**Transferee Questions** *(Complete only when transferee is an individual)*

14.  Answer questions 14.a. through 14.m.  Answer questions 16, 17, 18, 19 and 20, if applicable.  For any  "Yes"  answer the transferee shall provide details on a separate sheet. *(See instruction 7b and definitions)*

| | Yes | No |
|---|---|---|
| a.  Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 14.c through 14.l. or a person described in question 14.m. who does not fall under an exception? | | |
| b.  Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felon or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | |
| c.  Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1m)* | | |
| d.  Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1m)* | | |
| e.  Are you a fugitive from justice? *(See definition 1s)* | | |
| f.  Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or  any other controlled substance?  **Warning:  The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | |
| g.  On or after the age of 16, have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1n and 1o)* | | |
| h.  Have you been  discharged from the Armed Forces under **dishonorable** conditions? | | |
| i.  Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1p)* | | |
| j.  Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1q)* | | |
| k.    Have you ever renounced your United States citizenship? | | |
| l.    Are you an alien illegally or unlawfully in the United States? | | |
| m.1.  Are you an alien who has been admitted to the United States under a nonimmigrant visa? | | |
| m.2.  If "yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application | | |

15.  Photograph

**Affix a 2" x 2" Photograph here. No Stapling.  Tape Sides of Photo to the Application.**

1.  Photo must have been taken within the last year.

2.  Photo must have been taken in full face view without a hat or head covering that obscures the hair or hairline.

3.  On back of photograph print full name, last 4 of SSN.

☐ N/A

16.  If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or 194#): _____

17.  Have you been issued a Unique Personal Identification Number *(UPIN)?* *(See instruction 2h)*   ☐ Yes   ☐ No   If yes please list _____

Date of Birth: _____

19a.  Ethnicity   ☐ Hispanic or Latino     19b.  Race   ☐ American Indian or Alaska Native   ☐ Black or African American   ☐ White

☐ Not Hispanic or Latino   ☐ Asian   ☐ Native Hawaiian or Other Pacific Islander

20a.  Country of Citizenship:  *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1r)*

☐ United States of America     ☐ Other Country/Countries *(Specify):* _____

ATF Form 4 (5320. 4)
Revised October 2023

| 20b. State of Birth | 20c. Country of Birth |
|---|---|

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF,  a completed copy of this form will be directed to the chief law enforcement officer *(CLEO)* shown in item 12, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.d(2) and 2.d(3) for the items to be completed depending on the type of transferee.**

_____

Signature of Transferee                                                    Date

21.  Number of Responsible Persons *(see definitions)* associated with the transferee trust or legal entity

22.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(If there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s))*.  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 4 application for each Responsible Person.

Full Name                                                                         Full Name

_____

_____

_____

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 2a, the executor should contact the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405.

**Change of Address:**  Unless currently licensed under the Gun Control Act, the registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the address in item 2a.

**Change of Description:** The registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm*(s)* in item 4.

**Interstate Movement:** If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320. 20 can be used to request this permission.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF officer upon request.

OMB No. 1140-0014 (10/31/2026)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application for Tax Paid Transfer and Registration of Firearm

| **ATF Control Number** |
|---|

**SUBMIT in DUPLICATE to:**    National Firearms Act Division
Bureau of Alcohol, Tobacco, Firearms and Explosives,  P.O. Box 5015, Portland, OR  97208-5015

**1. Type of Transfer** *(Check one)*

☐ $5    ☐ $200

Submit the appropriate tax payment with the application. The tax may be paid by credit or debit card, check, or money order.  Please complete item 20. Upon approval of the application, we will affix and cancel the required National Firearms Act stamp. *(See instructions 2b, 2j and 3)*

**2a.  Transferee's Full Legal Name and Address** *(Include trade name, if any) (See instruction 2d)*

☐ Corporation    ☐ Other Legal Entity
☐ Individual    ☐ Trust

**2b.  County/Parish**

**3a.  Transferor's Full Legal Name and Address** *(Include trade name, if any)*
*(Executors:  see instruction 2l)*

**3b.  E-mail address**

**3c.  Transferor's Telephone** *(Area code and number)*

**3d.  If Applicable:  Decedent's Name, Address, and Date of Death**

**3e.  Number, Street, City, State and ZIP Code of Residence** *(or firearms business premises) (if different from Item 3a.)*

The above-named and undersigned transferor hereby makes application as required by Section 5812 of the National Firearms Act to transfer and register the firearm described below to the transferee.

**4.  Description of Firearm** *(Complete items a through h) (See instruction 2n)*

| a.  Name and Address of Maker Manufacturer and/or Importer of Firearm | b.  Type of Firearm *(See definitions 1c)* | c.  Caliber or Gauge | d.  Model |
|---|---|---|---|
| | | | e.  Barrel Length:    f.  Overall Length: |

h.  Additional Description or Data Appearing on Firearm *(Attach additional sheet if necessary)*

**5.  Transferee's Federal Firearms License** *(if any)* or Explosives License or Permit Number
*(Give complete 15-digit number) (See instruction 2c)*

| First 6 digits | 2 digits | 2 digits | 5 digits |
|---|---|---|---|
| | | | |

**6.  Transferee's Special (Occupational) Tax Status** *(If any)*

| a.  Employer Identification Number | b.  Class |
|---|---|
| | |

**7.  Transferor's Federal Firearms License** *(If any)*

| First 6 digits | 2 digits | 2 digits | 5 digits |
|---|---|---|---|
| | | | |

**8.  Transferor's Special (Occupational) Tax Status** *(If any)*

| a.  Employer Identification Number | b.  Class |
|---|---|
| | |

**Under Penalties of Perjury, I Declare** that I have examined this application, and to the best of my knowledge and belief it is true, correct and complete, and that the transfer of the described firearm to the transferee and receipt and possession of it by the transferee are not prohibited by the provisions of Title 18, United States Code, Chapter 44; Title 26, United States Code, Chapter 53; or any provisions of State or local law.

| 9.  Signature of Transferor *(Or authorized official)* | 10.  Name and Title of Authorized Official *(Print or type)* | 11.  Date |
|---|---|---|
| | | |

CLEO Copy

APPX.119

ATF Form 4 (5320. 4)
Revised October 2023

#: 355

**Transferee Identification**

12. Law Enforcement Notification *(See instruction 2f)*

The transferee is to provide notification of the proposed acquisition and possession of the firearm described on this Form 4 by providing a copy of the completed form to the chief law enforcement officer in the agency identified below:

_____

Agency or Department Name                                   Name and Title of Official

_____

Address *(Street address or P.O. Box, City, State and ZIP Code* to which sent *(mailed or delivered))*

**Information for the Chief Law Enforcement Officer**

This form provides notification of the transferee's intent to acquire and possess a National Firearms Act (NFA) firearm.  No action on your part is required.  However, should you have information that may disqualify this person from acquiring or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA@atf.gov.

**13.  Transferee Necessity Statement** *(See instruction 2e)*

I,_____ , have a reasonable necessity to possess the machinegun, short-barreled rifle,

*(Name and Title of Transferee)*

short-barreled shotgun, or destructive device described on this application for the following reason(s) _____

_____

and my possession of the device or weapon would be consistent with public safety (18 U.S.C. § 922(b) (4) and 27 CFR § 478.98).

**Transferee Questions** *(Complete only when transferee is an individual)*

14.  Answer questions 14.a. through 14.m.  Answer questions 16, 17, 18, 19 and 20, if applicable.  For any  "Yes"  answer the transferee shall provide details on a separate sheet. *(See instruction 7b and definitions)*

|  | | Yes | No | |
|---|---|---|---|---|
| a. | Do you intend to make any firearm listed on this form for sale or other disposition to any person described in questions 14.c through 14.l. or a person described in question 14.m. who does not fall under an exception? | | | |
| b. | Do you intend to sell or otherwise dispose of any firearm listed on this form in furtherance of any felon or other offense punishable by imprisonment for a term of more than one year, a Federal crime of terrorism, or a drug trafficking offense? | | | |
| c. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1m)* | | | |
| d. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1m)* | | | |
| e. | Are you a fugitive from justice? *(See definition 1s)* | | | |
| f. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or  any other controlled substance?  **Warning:  The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** | | | |
| g. | On or after the age of 16, have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1n and 1o)* | | | |
| h. | Have you been  discharged from the Armed Forces under **dishonorable** conditions? | | | |
| i. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1p)* | | | |
| j. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1q)* | | | |
| k. | Have you ever renounced your United States citizenship? | | | |
| l. | Are you an alien illegally or unlawfully in the United States? | | | |
| m.1. | Are you an alien who has been admitted to the United States under a nonimmigrant visa? | | | |
| m.2. | If "yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application | | | ☐ N/A |

16.  If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or 194#): _____

17.  Have you been issued a Unique Personal Identification Number *(UPIN)? (See instruction 2h)*   ☐ Yes   ☐ No   If yes please list _____

Date of Birth:

| 19a. Ethnicity | ☐ Hispanic or Latino | 19b. Race | ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ White |
|---|---|---|---|---|---|
| | ☐ Not Hispanic or Latino | | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

20a. Country of Citizenship: *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1r)*

☐ United States of America      ☐ Other Country/Countries *(Specify)*: _____

ATF Form 4 (5320. 4)
Revised October 2023

20b. State of Birth | 20c. Country of Birth

**CERTIFICATION:  Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF,  a completed copy of this form will be directed to the chief law enforcement officer** *(CLEO)* **shown in item 12, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE:  See instructions 2.d(2) and 2.d(3) for the items to be completed depending on the type of transferee.**

_____     _____
Signature of Transferee                                                                   Date

21.  Number of Responsible Persons *(see definitions)* associated with the transferee trust or legal entity_____

22.  Provide the full name *(printed or typed)* below for each Responsible Person associated with the applicant trust or legal entity *(If there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s)).*  Please note that a completed Form 5320.23, National Firearms Act *(NFA)* Responsible Person Questionnaire, must be submitted with the Form 4 application for each Responsible Person.

Full Name | Full Name

_____     _____

_____     _____

_____     _____

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:**  For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 2a, the executor should contact the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405.

**Change of Address:**  Unless currently licensed under the Gun Control Act, the registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the address in item 2a.

**Change of Description:**  The registrant shall notify the NFA Division, National Service Center, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm*(s)* in item 4.

**Interstate Movement:**  If the firearm identified in item 4 is a **machinegun**, **short-barreled rifle**, **short-barreled shotgun**, or **destructive device**, the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.  ATF Form 5320. 20 can be used to request this permission.

**Restrictions on Possession:**  Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:**  If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:**  A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF officer upon request.

ATF Form 4 (5320. 4)
Revised October 2023





# Noise and Lead Exposures at an Outdoor Firing Range — California

*Lilia Chen, MS, CIH*

*Scott E. Brueck, MS, CIH*

Health Hazard Evaluation Report
HETA 2011-0069-3140
September 2011

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention



National Institute for Occupational Safety and Health



The employer shall post a copy of this report for a period of 30 calendar days at or near the workplace(s) of affected employees. The employer shall take steps to insure that the posted determinations are not altered, defaced, or covered by other material during such period. [37 FR 23640, November 7, 1972, as amended at 45 FR 2653, January 14, 1980].

# CONTENTS

## REPORT

Abbreviations ..................................................................ii

Highlights of the NIOSH Health Hazard Evaluation............ iii

Summary ........................................................................ iv

Introduction ..................................................................1

Assessment ..................................................................2

Results and Discussion ...................................................3

Conclusions ..................................................................12

Recommendations...........................................................12

References ..................................................................14

## APPENDIX A

Occupational Exposure Limits and Health Effects.............18

## APPENDIX B

Methods..........................................................................23

## ACKNOWLEDGMENTS

Acknowledgments and Availability of Report....................25

# ABBREVIATIONS

| | |
|---|---|
| μg/100 cm² | Micrograms per 100 square centimeters |
| μg/dL | Micrograms per deciliter |
| μg/m³ | Micrograms per cubic meter |
| AIHA | American Industrial Hygiene Association |
| ACGIH® | American Conference of Governmental Industrial Hygienists |
| AL | Action level |
| BLL | Blood lead level |
| CFR | Code of Federal Regulations |
| dB | Decibel |
| dBA | Decibel, A-scale |
| dBC | Decibel, C-scale |
| Hz | Hertz |
| m³ | Cubic meter |
| mg/m³ | Milligrams per cubic meter |
| MDC | Minimum detectable concentration |
| MQC | Minimum quantifiable concentration |
| min | Minute |
| MSDS | Material safety data sheet |
| NAICS | North American Industry Classification System |
| NIHL | Noise-induced hearing loss |
| NIOSH | National Institute for Occupational Safety and Health |
| NRR | Noise reduction rating |
| OEL | Occupational exposure limit |
| OSHA | Occupational Safety and Health Administration |
| PBZ | Personal breathing zone |
| PEL | Permissible exposure limit |
| PPE | Personal protective equipment |
| REL | Recommended exposure limit |
| SLM | Sound level meter |
| TLV® | Threshold limit value |
| TWA | Time-weighted average |
| WEEL™ | Workplace environmental exposure level |

# HIGHLIGHTS OF THE NIOSH HEALTH HAZARD EVALUATION

The National Institute for Occupational Safety and Health (NIOSH) received a technical assistance request from a federal government agency in California. Although no health symptoms or hearing loss were reported, the requestor was concerned about exposures to noise and lead among firing range instructors at an outdoor firing range.

## What NIOSH Did

- We evaluated noise and lead exposures in April 2011.
- We took personal measurements for noise and lead.
- We took surface wipe samples and hand wipe samples for lead.
- We measured sound levels at different frequencies during live fire training.

## What NIOSH Found

- Employee exposures to noise were above the NIOSH recommended exposure limit.
- Peak noise levels were above 160 decibels during gunfire.
- Employee exposure to lead did not exceed occupational exposure limits.
- We found lead on surfaces.
- Students appeared to have good hand washing practices.

## What Managers Can Do

- Establish a hearing conservation program that includes annual audiograms for instructors.
- Require instructors and students to wear dual hearing protection during weapon fire, and provide training to ensure proper use. Dual hearing protection includes ear plugs and earmuffs.
- Consider supplying non-lead bullets and primers for classes.
- Require students and instructors to wash hands before eating, drinking, or using tobacco products.
- Notify employees and students that picnic tables have lead on them. Tell employees about the potential for getting lead from the table into their food or from their hands into their mouth. Managers should share this information with the firing range owner.

## What Employees Can Do

- Wear dual hearing protection during weapon fire. Dual hearing protection includes ear plugs and earmuffs.
- Continue to use good hygiene practices. Wash your hands before eating, drinking, or using tobacco products.

# SUMMARY

On February 25, 2011, NIOSH received a technical assistance request from a federal government agency to assess exposures to noise and lead of firing range instructors at an outdoor firing range in California. On April 11–12, 2011, NIOSH investigators evaluated employee exposures to noise and lead during a 3-day basic firearms course.

Eight students and five instructors contributed 14 personal noise dosimetry measurements over 2 days. During live fire training, we measured sound levels and octave band noise frequency levels with a type 1 SLM. We took 16 PBZ air samples and six surface wipe samples for lead. We also used a colorimetric wipe test to test for lead on hands.

Noise monitoring results indicated that all participants' TWA noise exposures exceeded the NIOSH REL, some exceeded the OSHA AL, but none exceeded the OSHA PEL. However, noise dosimeter microphones and electronic circuitry do not adequately capture peak noise levels above the maximum range of the instrument, therefore, personal TWA noise measurements from gunfire noise using dosimeters should be interpreted cautiously. These measurements can underrepresent noise exposure and hearing loss risk from gunfire noise. Sound level meter measurements revealed that peak noise levels during gunfire were greater than 160 dB.

None of the lead PBZ air sampling results exceeded applicable OELs. Results varied from Day 1 to Day 2, which was likely due to the meteorological conditions. Under different meteorological conditions and employee proximity to the gun smoke source, exposures may be higher. Lead was found on the outdoor picnic table surface where we observed employees eating lunch. Employees appeared to have good hand hygiene as no lead was found on the hand wipes after washing.

Because of the high noise levels in firing ranges, double hearing protection is necessary. The noise levels generated by the firearms warrant a hearing conservation program, which should meet the requirements of the OSHA hearing conservation standard [29 CFR 1910.95]. Firing range instructors should have yearly audiometric evaluations to measure hearing levels and identify hearing loss. Reviewers of audiograms should be aware of potentiating and synergistic effects of ototoxins such as lead and solvents. To reduce lead exposures, use of non-lead bullets and non-lead primers should be considered as it becomes economically feasible. Good personal hygiene should continue to be encouraged to reduce the potential for lead ingestion.

**Personal noise measurements taken during a basic firearms course at an outdoor firing range exceeded the NIOSH REL. Personal lead air measurements did not exceed applicable OELs, but lead was found in air samples and on a picnic table where employees ate lunch. Employees should wear double hearing protection and participate in a hearing conservation program.**

**Keywords:** NAICS 922190 (Other Justice, Public Order, and Safety Activities), firearms, lead, noise, impulse noise, impulsive noise, hearing loss, shotguns, rifles, outdoor firing range, ototoxins, ototoxicity

# INTRODUCTION

On February 25, 2011, NIOSH received a technical assistance request from a federal government agency to assess exposures to noise and lead among firing range instructors at an outdoor firing range in California. No employees had reported hearing loss or health concerns to management. On April 11–12, 2011, NIOSH investigators evaluated employee exposures to noise and lead during a 3-day basic firearms training course.

Firing range instructors teach 1- to 3-day basic and refresher firearm courses to other federal government employees who carry a firearm for their job. They instruct courses approximately five times a year at a rented public outdoor firing range that is closed to the public on the days the course is taught. The basic firearms course we evaluated included classroom and field practice components, with about 6 hours per day of field practice. Students completed qualifying exams on the last day of the course. The class had three to five instructors and eight students. Three instructors were always present on the firing range with the eight students. Most of the class was taught at a straight lane outdoor range where students fired at paper targets, with earth backing behind the targets. Students spread out approximately 4 feet apart in a line about 15 yards away from the targets. During live fire exercises, instructors stood about 2–3 feet behind students. Students used shotguns (12 gauge) and two types of rifles (.30-06 or .45-70) (Figure 1). Students did not use revolvers (.44 caliber) in this course, but in some other courses revolvers are also used. During the qualifying exams, students used parts of the skeet range and clay courses. The instructors selected ammunition for the course. Shotguns used rifled lead slugs. Rifles used bullets with partial or full copper metal jacket over lead. All the primers contained lead. The number of rounds fired in a typical training day varied depending on the class size and experience. Towards the end of the course, the instructors taught students how to clean the firearms.



Figure 1. Firearms used for training (from left to right: 12-gauge shotgun, .30-06 rifle, and .45-70 rifle).

The instructors brought all equipment, ammunition, PPE, and teaching materials to the firing range. They did not store any of their property at the range. All instructors and students wore safety glasses and earmuffs. During our evaluation, students wore 3M (St. Paul, Minnesota) Peltor® Tactical™ 6-S with an NRR of 19 dB, and instructors wore Peltor® PowerCom Plus™ with an NRR of 25 dB during live fire. The agency had no blood lead monitoring program and no hearing conservation program although a draft hearing conservation program written by the agency safety specialist had been submitted to management. We obtained MSDSs for the chemicals used for cleaning the firearms.

APPX.128

# ASSESSMENT

We held an opening meeting on April 11, 2011, with employer and employee representatives. On April 11 and 12, 2011, we interviewed several instructors; observed classroom and field activities; measured outdoor temperature, wind direction, and velocity; and sampled for noise and lead.

Eight students and five instructors contributed 14 personal noise dosimetry measurements over 2 days. Students and instructors wore integrating noise dosimeters on Day 1 of sampling. However, only instructors wore dosimeters on Day 2 of sampling. We measured area noise levels and performed octave band frequency spectrum analysis (measurement of noise levels in different frequencies) with two SLM and real-time frequency analyzers. The SLMs were mounted on tripods at a height of approximately 5 feet to represent the ear position of a standing shooter. We placed the tripods with SLMs on each end of the firing line approximately 4 to 6 feet from the student (Figure 2). Because of safety concerns and risk of interfering with students and instructors, we were not able to place SLMs closer during live fire training sessions. However, during some of the qualifying exams, we handheld the SLMs approximately 1 to 2 feet from the instructor's ear.



Figure 2. Sound level meter at firing line during firearm training exercises.

We took 16 personal breathing zone air samples and six surface wipe samples for lead. Surfaces tested included areas that people frequently touched, such as the trigger and forend of the firearm, doorknobs, and restroom water faucet handles. We also used a colorimetric wipe test to test for lead on hands.

More information on OELs and health effects for noise and lead can be found in Appendix A. More information on sampling methodology for noise and lead can be found in Appendix B.

# RESULTS AND DISCUSSION

## Noise

Results from the personal dosimetry measurements are provided in Table 1. Results indicated that all participants' TWA noise exposures exceeded the NIOSH REL, some exceeded the OSHA AL, but none exceeded the OSHA PEL. Noise dosimeter microphones and electronic circuitry do not adequately capture peak noise levels above the maximum range of the instrument and "clip" noise levels at approximately 145 dB. Previous research on the use of dosimeters for gunfire measurements concluded that these electroacoustic limitations produce errors in calculating TWA noise levels from impulsive noise environments [Kardous et al. 2003; Kardous and Willson 2004]. Therefore, personal TWA noise measurements from gunfire noise collected with dosimeters should be interpreted cautiously and considered to underrepresent noise exposure and hearing loss risk from gunfire noise.

Table 1. Personal noise dosimetry results*

| Job title | Duration | OSHA AL | | | OSHA PEL | | | NIOSH REL | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | TWA† | TWA 8-hr‡ | Dose§ | TWA† | TWA 8-hr‡ | Dose§ | TWA† | TWA 8-hr‡ | Dose§ |
| | (h:mm) | (dBA) | (dBA) | (%) | (dBA) | (dBA) | (%) | (dBA) | (dBA) | (%) |
| Student | 5:00 | *89* | *85* | *50* | 89 | 85 | 50 | *100* | *97* | *1598* |
| Student | 4:54 | 87 | 84 | 44 | 87 | 84 | 44 | *99* | *96* | *1269* |
| Student | 4:59 | 88 | 84 | 44 | 87 | 84 | 44 | *98* | *96* | *1269* |
| Student | 5:04 | 86 | 82 | 33 | 86 | 82 | 33 | *97* | *95* | *1007* |
| Student | 4:52 | 86 | 83 | 38 | 86 | 82 | 33 | *98* | *95* | *1007* |
| Student | 4:57 | 84 | 80 | 25 | 84 | 80 | 25 | *95* | *93* | *634* |
| Instructor | 4:59 | *89* | *85* | *50* | 88 | 84 | 44 | *98* | *96* | *1269* |
| Instructor | 4:53 | *89* | *86* | *57* | 88 | 85 | 50 | *96* | *94* | *799* |
| Instructor | 4:55 | 82 | 78 | 19 | 82 | 78 | 19 | *93* | *91* | *400* |
| Instructor | 5:37 | *88* | *85* | *50* | 87 | 85 | 50 | *97* | *96* | *1269* |
| Instructor | 4:59 | 86 | 83 | 38 | 86 | 83 | 38 | *97* | *95* | *1007* |
| Instructor | 5:42 | 84 | 82 | 33 | 84 | 81 | 29 | *95* | *94* | *799* |
| Instructor | 6:30 | 83 | 82 | 33 | 82 | 80 | 25 | *95* | *94* | *799* |
| Instructor | 6:34 | 78 | 75 | 13 | 78 | 74 | 11 | *90* | *88* | *200* |
| Exposure Limits | | 85 | 50 | | 90 | 100 | | 85 | 100 | |

\* Exposures at or exceeding exposure limits are highlighted in bold and italicized font.
† TWA noise exposures for the duration of the noise monitoring period
‡ Projected 8-hour TWA assuming that noise exposures beyond the measured duration were below 80 dBA
§ Dose is based on TWA 8-hour noise exposure.

# RESULTS AND DISCUSSION (CONTINUED)

One-third octave band noise frequency measurements collected when students were shooting .45-70 rifles are shown in Figure 3. These measurements showed that the highest sound pressure levels (125 dB) occurred at 500 Hz, and were greater than 110 dB across all the one-third octave bands from 125 Hz to 20,000 Hz. Measurements taken during shooting of the 12-gauge shotgun and the .30-06 rifle had similar results. Octave band measurements provide information about the frequency distribution of noise. Because the energy from noise is usually widely distributed over many frequencies, the frequency range is broken into a smaller range of frequencies (called bandwidths), the most common being the octave band (defined as a frequency band where the upper band frequency is twice the lower band-edge frequency).



Figure 3. One-third octave band noise frequency levels of four rifles (.45-70) being fired over a 90-second period during a basic firearms training course.

Octave band analysis allows for determination of the dominant noise frequencies and can be useful for identifying potential engineering controls. For example, if low frequency noise is dominant (i.e., the highest octave-band sound levels occur in frequencies of 500 Hz or less), noise is likely generated by vibration, and noise controls that reduce or isolate the vibration from tools or equipment might decrease noise levels. If high frequency noise is dominant (i.e., the highest octave band sound levels occur in frequencies of 2,000 Hz or greater), noise enclosures, barriers, or sound absorption systems are typically the most effective approach [Driscoll and Royster 2003]. One of the

# RESULTS AND DISCUSSION (CONTINUED)

primary sources of noise generated during gunfire is the muzzle blast during firing, which generates high noise across the mid to high frequency range. The only potentially effective noise control method to reduce students' or instructors' noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel. However, some states do not permit civilians to use suppressors on firearms.

Peak sound levels ranged from 154.6 dB to 163.1 dB during shooting exercises. Peak levels for the 12-gauge shotgun and .30-06 rifles were slightly higher than for the .45-70 rifle (Table 2). During training exercises, students typically fire a series of shots in succession followed by several minutes without shooting for instruction. An example of peak sound levels during 1 minute of shooting a .30-06 rifle is shown in Figure 4. Eight peaks greater than 160 dB and several others greater than 150 dB can be seen during this time period.

Table 2. Peak sound level range for firearms

| Firearm | Peak Sound Level Range (dB) | Ammunition Weight (Grains) |
|---|---|---|
| 12-Gauge Shotgun | 154.6 – 162.7 | 438 |
| .45-70 Rifle | 155.2 – 159.9 | 350 |
| .30-06 Rifle | 158.7 – 163.1 | 173 |



Figure 4. Peak sound levels during one minute of shooting .30-06 rifles in a training exercise.

# RESULTS AND DISCUSSION
## (CONTINUED)

Research has shown that repeated exposure to impulse noise can result in permanent NIHL [Patterson and Hamernik 1992; Pekkarinen et al. 1993; Chan et al. 2001]. Noise produced by impulsive noise, such as gunfire, has sufficient intensity to permanently damage unprotected ears in a very short period of time; damage can occur in minutes rather than the days or years typical of industrial noise exposure. The OSHA PEL and NIOSH REL state that exposure to impulse noise should not exceed 140 dB. However, peak impulse is not the sole factor in hearing damage. Other factors such as duration of the impulse and frequency of exposure also have an effect on hearing loss.

Because of the high noise levels in firing ranges, double hearing protection is necessary to protect hearing. Research has reported that double hearing protection can provide the additional noise reduction needed in high noise level environments [Berger 1983]. However, proper insertion of hearing protection is critically important to ensure proper noise attenuation. NIOSH has previously identified poor insertion of formable hearing protection into the ear canals [NIOSH 2005].

To estimate hearing protector attenuation NIOSH recommends using subject fit data based on the American National Standards Institute's standard S12.6-1997 [ANSI 1997]. However, if no subject fit data are available, NIOSH recommends adjusting the hearing protectors' ratings by subtracting 25% from the manufacturer's labeled NRR for earmuffs and subtracting 50% from the manufacturer's labeled NRR for formable earplugs. An additional 5 to 10 dB of attenuation can be added for use of dual hearing protection [NIOSH 1998]. Figure 5 shows the range of estimated noise attenuation that could be achieved for properly fitted and worn ear plugs and earmuffs, using NIOSH noise attenuation calculations for unweighted or dBC noise exposure levels. For dBA noise exposure levels, an additional 7 dB should be subtracted from the derated NRR.

On the basis of hearing protection worn by instructors and students during the training class (instructors: Peltor® PowerCon Plus™ with an NRR of 25 dB; students: Peltor® Tactical™ 6-S with an NRR of 19 dB), the estimated hearing protector attenuation using the NIOSH hearing protector derating formula is 19 dB for instructors and 14 dB for students. If instructors and students wore earmuffs with an NRR of 33 dB along with properly inserted ear plugs, their estimated attenuation for dual

# RESULTS AND DISCUSSION
## (CONTINUED)

protection using the NIOSH hearing protector derating formula would increase to 30–35 dB. In tests of hearing protection using an acoustic mannequin, NIOSH found that in some instances double hearing protection actually provided more peak noise attenuation than the NIOSH hearing protector derating formula calculates [NIOSH 2003, 2005].



Figure 5. Range of estimated noise attenuation (dB) for combination of properly fitted and worn insert type ear plugs and earmuffs, based on NIOSH noise attenuation calculations for unweighted or dBC noise levels.

In 2002, NIOSH proposed a simplified formula to reduce the risk of exposure to impulse noise in terms of the number of gunshot impulses to which a person can be exposed per day [NIOSH 2002]:

$$N = 10^{((140 - PI)/10)}$$

where N is the number of gunshot exposures permitted, and PI is the peak impulse level in dB under hearing protection. PI is determined by subtracting the noise attenuation for hearing protection from the peak noise exposure level for a gunfire impulse.

Figure 6 shows the number of gunshot exposures permitted on the basis of peak noise levels under hearing protection. For example, if the peak noise level under hearing protection is 120 dB, applying this formula yields N=100 gunshots. The NIOSH proposed formula is a conservative estimate and does not take into account the duration of the impulse, its spectral content, or its energy.

APPX.134

# RESULTS AND DISCUSSION
## (CONTINUED)



*Peak sound level under hearing protection is calculated by subtracting the estimated noise attenuation for  hearing protection from the peak noise exposure level for a gunfire impulse.

Figure 6. Number of gunshot exposures permitted using NIOSH recommendations [NIOSH 2002], based on peak sound levels (dB) under hearing protection.

## Lead

We collected 16 PBZ area air samples on students and instructors for lead. None of our results exceeded applicable OELs. These results are listed in Table 3. Results from Day 1 were very low with only one quantifiable PBZ air sample. Results from Day 2 were higher than Day 1, with the highest lead exposure found on an instructor at 15 µg/m³. The concentration differences between Day 1 and Day 2 were most likely due to the meteorological conditions. On Day 1, the wind moved gun smoke down the course and away from the employees. On Day 2, the wind was mild and moved gun smoke up the course towards the employees. On Day 2, it is possible that students' exposures would have been even higher than the instructors' because of their closer proximity to the smoke sources. Past studies looking at lead exposure to outdoor firearm instructors found that despite "natural ventilation" at outdoor firing ranges, PBZ levels exceeded OSHA, NIOSH, and ACGIH

# Results and Discussion
## (continued)

OELs of 50 μg/m³ as an 8-hour TWA [Goldberg et al. 1991; Tripathi et al. 1991; Mancuso et al. 2008]. Studies have also shown that jacketed or non-lead bullets can reduce lead concentrations [NIOSH 1986; Tripathi et al. 1991; NIOSH 1995] in air and on surfaces. Although we did not find air lead levels that exceeded the OELs, it is possible that airborne lead levels could be higher during certain meteorological conditions, and care should be taken to minimize lead exposures.

Table 3. PBZ air sampling results for lead*

| Day | Type | Sampling Time (min) | Sample Volume (m³) | 8-hr TWA* Concentration (μg/m³) |
|---|---|---|---|---|
| 1 | Student | 307 | 0.61 | 1.02 |
| 1 | Student | 302 | 0.59 | [0.82] |
| 1 | Student | 300 | 0.59 | [0.75] |
| 1 | Student | 306 | 0.60 | [0.70] |
| 1 | Student | 303 | 0.60 | [0.57] |
| 1 | Student | 307 | 0.61 | [0.51] |
| 1 | Student | 267 | 0.53 | [0.44] |
| 1 | Student | 304 | 0.60 | [0.49] |
| 1 | Instructor | 305 | 0.60 | ND |
| 1 | Instructor | 300 | 0.59 | ND |
| 2 | Instructor | 370 | 0.72 | 15 |
| 2 | Instructor | 364 | 0.70 | 4.3 |
| 2 | Instructor | 313 | 0.61 | 1.5 |
| 2 | Instructor | 359 | 0.70 | 1.2 |
| 2 | Instructor | 315 | 0.62 | [0.66] |
| 2 | Instructor | 297 | 0.58 | ND |
| MDC† | | | | 0.32 |
| MQC† | | | | 1.3 |
| NIOSH REL (8-hr TWA) | | | | 50 |
| OSHA PEL (8-hr TWA) | | | | 50 |
| ACGIH TLV (8-hr TWA) | | | | 50 |

Values in brackets indicate levels between the MDC and MQC.

*Concentrations were calculated to reflect an 8-hour TWA by assuming no lead exposure beyond the measured duration.

†Based on an air volume of 0.62 m³.

# RESULTS AND DISCUSSION
### (CONTINUED)

The highest levels of surface contamination for lead were found on the firearms, which was expected (Table 4). Lead levels were much lower on surfaces where frequent contact occurs, such as door and sink handles. Lead was found on the outdoor picnic table surface where we observed employees eating lunch, so care should be taken to prevent lead from transferring from the table surface to food or hands to mouth.

Table 4. Lead surface wipe sampling results

| Location | Concentration ($\mu$g/100 cm$^2$) |
|---|---|
| Rifle forend* | 1.0 |
| Shotgun stock* | 0.68 |
| Rifle stock* | 0.10 |
| Picnic table | 0.08 |
| Men's restroom sink handles* | 0.03 |
| Door handle into classroom* | 0.02 |

* Approximated 100 cm$^2$ surface area

All students showed a positive result for lead on their hands immediately after returning from the range after live firearms practice. After hand washing, no positive result was observed on the hand wipes (Figure 7). We also asked one instructor to use the wipes after returning from the range and washing hands. The instructor's hand wipe results showed a negative result. Aside from an occasional demonstration, the instructors did not usually handle firearms. These results indicate that students had good hand hygiene.



Figure 7. The left wipe, taken from a student who had just returned from the shooting range and had not yet washed hands, is positive for lead. The right wipe, taken after the student had washed hands, is negative for lead.

# RESULTS AND DISCUSSION (CONTINUED)

## Ototoxins

Ototoxins are chemicals that can cause hearing damage when absorbed into the body. Studies have shown that exposure to some chemicals, such as lead and some solvents, can cause hearing loss [Sliwinska-Kowalska et al. 2004; Hwang et al. 2009]. The mechanism of loss is not well understood, but it is hypothesized that ototoxins entering the blood stream damage inner ear structures, causing nerve damage and/or oxidative stress [Henderson et al 2006; Johnson and Morata 2010]. Some chemicals may not cause hearing loss alone, but can exacerbate hearing loss caused by noise (potentiation). Some chemicals may cause a synergistic effect, where the combined effect of the two exposures is greater than either alone. It is difficult to distinguish whether hearing loss is caused by ototoxicants or excessive noise, as both losses appear similar on pure tone audiograms and have many other similar characteristics (e.g., bilateral loss, loss starting in the high frequencies).

Solvents are used to clean firearms after use. Although none of the ingredients listed on the MSDS that were given to us had been observed as ototoxicants, users should be aware that moderate exposures (below or around the OEL) to solvents such as toluene [Morata et al. 1993; Chang et al. 2006], xylene, and mixtures of solvents [Sliwinska-Kowalska et al. 2004; Fuente et al. 2009] have been shown to be associated with hearing loss [Sliwinska-Kowalska et al. 2007].

The ACGIH states that, "In settings where there may be exposures to noise and to carbon monoxide, lead, manganese styrene, toluene, or xylene, periodic audiograms are advised and should be carefully reviewed" [ACGIH 2011]. The U.S. Army recommends annual audiometric monitoring when workers are exposed to air concentrations that are at or exceed 50% of the most stringent OEL criteria for a variety of ototoxicants including solvents and lead [U.S. Army 2009]. The highest lead PBZ air concentration (15 mg/m³) did not exceed 50% of the NIOSH REL, but because meteorological factors may cause variations in worker exposure, it is possible that exposure on a different day could be higher. We were also told that some instructors shot recreationally, which would contribute to their overall lead and noise exposures. Reviewers of employees' audiometric tests should be aware of possible additive, potentiating, or synergistic effects between noise exposure, solvents, and lead when evaluating audiograms.

# CONCLUSIONS

Personal noise measurements taken during a basic firearms course exceeded the NIOSH REL, some exceeded the OSHA AL, but none exceeded the OSHA PEL. Peak sound levels exceeded 160 dB. Because of the high noise levels in shooting ranges, the use of double hearing protection is necessary. The noise levels generated by the firearms warrant a hearing conservation program, and firing range instructors should have yearly audiometric evaluations. Personal lead air measurements did not exceed applicable OELs, but lead was observed in the air and on some surfaces. Meteorological conditions and employee proximity to the gun smoke may greatly affect exposures. Reviewers of audiograms should be aware of potentiating and synergistic effects of ototoxins. To reduce lead exposures, use of non-lead bullets and non-lead primers as they become economically feasible should be considered. Good personal hygiene should be encouraged to reduce lead ingestion potential.

# RECOMMENDATIONS

On the basis of our findings, we recommend the actions listed below to create a more healthful workplace. Our recommendations are based on the hierarchy of controls approach (refer to Appendix A: Occupational Exposure Limits and Health Effects). This approach groups actions by their likely effectiveness in reducing or removing hazards. In most cases, the preferred approach is to eliminate hazardous materials or processes and install engineering controls to reduce exposure or shield employees. Until such controls are in place, or if they are not effective or feasible, administrative measures and/or personal protective equipment may be needed. PPE is the least effective means for controlling employee exposures. Proper use of PPE requires a comprehensive program, and calls for a high level of employee involvement and commitment to be effective.

1. The noise levels generated by the firearms warrant a hearing conservation program. At a minimum, the program should meet the requirements of the OSHA hearing conservation standard [29 CFR 1910.95]. Another source for designing an effective hearing loss prevention program is the NIOSH occupational noise criteria document [NIOSH 1998].

2. Firing range instructors should have yearly audiometric evaluations to measure hearing levels and identify hearing loss. Reviewers of audiograms should be aware of potentiating and synergistic effects of ototoxins, such as lead and solvents, on hearing loss.

# Recommendations
(CONTINUED)

3. Instructors and students should wear dual hearing protection (ear plugs and earmuffs) during weapons fire. For maximum protection, select earmuffs and ear plugs that provide a high level of noise attenuation. Because of the critical importance of proper use and fit, train students and instructors how to properly wear hearing protection. Encourage the use of dual hearing protection during recreational shooting.

4. Consider using non-lead bullets and non-lead primers as they become economically feasible.

5. Employees should follow safe work practices identified by the firing range and employer. They should continue good personal hygiene practices including hand washing before eating, drinking, smoking, and leaving the range.

6. Assume that picnic tables are contaminated with lead, and take precautions to prevent transfer of lead from surface to food or hands to mouth (e.g., cover the table with a disposable tablecloth before eating). This information should be shared with the range owner.

# REFERENCES

ACGIH [2011]. 2011 TLVs® and BEIs®: threshold limit values for chemical substances and physical agents and biological exposure indices. Cincinnati, OH: American Conference of Governmental Industrial Hygienists.

ANSI [1997]. American national standard: methods for measuring the real-ear attenuation of hearing protectors. New York: American National Standards Institute, Inc. ANSI S12.6-1997.

Berger EH [1983]. Laboratory attenuation of earmuffs and earplugs both singly and in combination. Am Ind Hyg Assoc J *44*(5):321–329.

CFR. Code of Federal Regulations. Washington, DC: U.S. Government Printing Office, Office of the Federal Register.

Chan PC, Ho KH, Kan KK, Stuhmiller JH, Mayorga MA [2001]. Evaluation of impulse noise criteria using human volunteer data. J Acoust Soc Amer *110*(4):1967–1975.

Chang SJ, Chen CJ, Lien CH, Sung FC [2006]. Hearing loss in workers exposed to toluene and noise. Environ Health Perspect *114*(8):1283–1286.

Driscoll DP, Royster LH [2003]. Noise control engineering. In: Berger EH, Royster LH, Royster JD, Driscoll DP, Layne M. eds, The noise manual, 5th ed. Akron, OH: American Industrial Hygiene Association, pp. 279–378; [Reference: Table 9.5, pp. 298–300].

Fuente A, Slade MD, Taylor T, Morata TC, Keith RW, Sparer J, Rabinowitz PM [2009]. Peripheral and central auditory dysfunction induced by occupational exposure to organic solvents. J Occup Environ Med *51*(10):1202–1211.

Goldberg RL, Hicks AM, O'Leary LM, London S [1991]. Lead exposures at uncovered outdoor firing ranges. J Occup Med *33*(6):718–719.

Henderson D, Bielefeld EC, Harris KC, Hu BH [2006]. The role of oxidative stress in noise-induced hearing loss. Ear Hear 27(1):1–19.

Hwang YH, Chiang HY, Yen-Jean MC, Wang JD [2009]. The association between low levels of lead in blood and occupational noise-induced hearing loss in steel workers. Sci Total Environ *408*(1):43–49.

# REFERENCES (CONTINUED)

Johnson A, Morata TC [2010]. Occupational exposure to chemicals and hearing impairment. In: The Nordic expert group for criteria documentation of health risks from chemicals. Kjell Torén, ed. Gothenburg, Sweden. pp. 14–19.

Kardous CA, Willson RD, Hayden CS, Szlapa P, Murphy WJ, Reeves ER [2003]. Noise exposure assessment and abatement strategies at an indoor firing range. App Occ Environ Hyg *18*(8):629–636.

Kardous CA, Willson RD [2004]. Limitations of using dosimeters in impulse noise environments. J Occup Environ Hyg *1*(7):456–462.

Mancuso JD, McCoy J, Pelka B, Kahn PJ, Gaydos JC [2008]. The challenge of controlling lead and silica exposures from firing ranges in a special operations force. Military Med *173*(2):182–186.

Morata TC, Dunn DE, Kretschmer LW, Lemasters GK, Keith RW [1993]. Effects of occupational exposure to organic solvents and noise on hearing. Scand J Work Environ Health *19*(4):245–254.

NIOSH [1986]. Hazard evaluation and technical assistance report: Federal reserve bank, Cincinnati, OH. By Lee S. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, HETA Report No. 86–0269–1812.

NIOSH [1995]. Hazard evaluation and technical assistance report: Colorado state patrol training academy, Golden, Colorado. By Lee S and Boudreau Y. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, HETA Report No. 95–0290–9221.

NIOSH [1998]. Criteria for a recommended standard: occupational noise exposure (revised criteria 1998). Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 98-126.

# References
(CONTINUED)

NIOSH [2002]. Comments of the National Institute for Occupational Safety and Health on the Occupational Safety and Health Administration ANPR Hearing Conservation Program for Construction Workers 29 CFR Part 1926 Docket No. H–011G. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.

NIOSH [2003]. Hazard evaluation and technical assistance report: Fort Collins Police Services, Fort Collins, CO. By Tubbs R, Murphy W. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, NIOSH HETA Report No. 2002–0131–2898.

NIOSH [2005]. Hazard evaluation and technical assistance report: Immigration and naturalization service, National Firearms Unit, Altoona, PA. By Harney J, King B, Tubbs R, Crouch K, Hayden C, Kardous C, Khan A, Mickelsen L, Willson R. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, HETA Report No. 2000-0191-2960.

Patterson J, Hamernik R [1992]. An experimental basis for the estimation of auditory system following exposures to impulse noise. In: Noise-induced hearing loss. Dancer A, Henderson D, Salvi R, Hamernik R, eds. Philadelphia, PA: BC Decker, pp. 336–348.

Pekkarinen J, Iki M, Starck J, Pyykko I [1993]. Hearing loss risk from exposure to shooting impulses in workers exposed to occupational noise. Br J Aud 27(3):175–182.

Sliwinska-Kowalska M, Zamyslowska-Szmytke E, Szymczak W, Kotylo P, Fiszer M, Wesolowski W, Pawlaczyk-Luszczynska M, Bak M, Gajda-Szadkowska A [2004]. Effects of coexposure to noise and mixture of organic solvents on hearing in dockyard workers. J Occup Environ Med 46(1):30–38.

Sliwinska-Kowalska M, Prasher D, Rodrigues CA, Zamys owska-Szmytke E, Campo P, Henderson D, Lund SP, Johnson AC, Schäper M, Odkvist L, Starck J, Toppila E, Schneider E, Möller C, Fuente A, Gopal KV [2007]. Ototoxicity of organic solvents - from scientific evidence to health policy. Int J Occup Med Environ Hlth 20(2):215–22.

APPX.143

# REFERENCES
### (CONTINUED)

Tripathi RK, Sheretz PC, Llewellyn GS, Armstrong CW [1991]. Lead exposure in outdoor firearm instructors. Am J Pub Hlth *81*(6):753–755.

U.S. Army [2009] Just the facts...Occupational ototoxins (ear poisons) and hearing loss. Hearing Conservation and Industrial Hygiene and Medical Safety Management [http://www.nmcphc.med.navy.mil/downloads/occmed/toolbox/occupationalototoxinfactsheet-chppm.pdf]. Date accessed: July 2011.

APPX.144

# APPENDIX A: OCCUPATIONAL EXPOSURE LIMITS AND HEALTH EFFECTS

In evaluating the hazards posed by workplace exposures, NIOSH investigators use both mandatory (legally enforceable) and recommended OELs for chemical, physical, and biological agents as a guide for making recommendations. OELs have been developed by federal agencies and safety and health organizations to prevent the occurrence of adverse health effects from workplace exposures. Generally, OELs suggest levels of exposure that most employees may be exposed to for up to 10 hours per day, 40 hours per week, for a working lifetime, without experiencing adverse health effects. However, not all employees will be protected from adverse health effects even if their exposures are maintained below these levels. A small percentage may experience adverse health effects because of individual susceptibility, a preexisting medical condition, and/or a hypersensitivity (allergy). In addition, some hazardous substances may act in combination with other workplace exposures, the general environment, or with medications or personal habits of the employee to produce adverse health effects even if the occupational exposures are controlled at the level set by the exposure limit. Also, some substances can be absorbed by direct contact with the skin and mucous membranes in addition to being inhaled, which contributes to the individual's overall exposure.

Most OELs are expressed as a TWA exposure. A TWA refers to the average exposure during a normal 8- to 10-hour workday. In the United States, OELs have been established by federal agencies, professional organizations, state and local governments, and other entities. Some OELs are legally enforceable limits, while others are recommendations. The U.S. Department of Labor OSHA PELs (29 CFR 1910 [general industry]; 29 CFR 1926 [construction industry]; and 29 CFR 1917 [maritime industry]) are legal limits enforceable in workplaces covered under the Occupational Safety and Health Act of 1970. NIOSH RELs are recommendations based on a critical review of the scientific and technical information available on a given hazard and the adequacy of methods to identify and control the hazard. NIOSH RELs can be found in the NIOSH Pocket Guide to Chemical Hazards [NIOSH 2010]. NIOSH also recommends different types of risk management practices (e.g., engineering controls, safe work practices, employee education/training, personal protective equipment, and exposure and medical monitoring) to minimize the risk of exposure and adverse health effects from these hazards. Other OELs that are commonly used and cited in the United States include the TLVs recommended by ACGIH, a professional organization, and the WEELs recommended by the AIHA, another professional organization. The TLVs and WEELs are developed by committee members of these associations from a review of the published, peer-reviewed literature. They are not consensus standards. ACGIH TLVs are considered voluntary exposure guidelines for use by industrial hygienists and others trained in this discipline "to assist in the control of health hazards" [ACGIH 2011]. WEELs have been established for some chemicals "when no other legal or authoritative limits exist" [AIHA 2011].

Outside the United States, OELs have been established by various agencies and organizations and include both legal and recommended limits. The Institut für Arbeitsschutz der Deutschen Gesetzlichen Unfallversicherung (IFA, Institute for Occupational Safety and Health of the German Social Accident Insurance) maintains a database of international OELs from European Union member states, Canada (Québec), Japan, Switzerland, and the United States. The database, available at http://www.dguv.de/ifa/en/gestis/limit_values/index.jsp, contains international limits for over 1,500 hazardous substances and is updated periodically.

NIOSH investigators encourage the use of the traditional hierarchy of controls approach to eliminate or minimize identified workplace hazards. This includes, in order of preference, the use of (1) substitution or elimination of the hazardous agent, (2) engineering controls (e.g., local exhaust ventilation, process enclosure, dilution ventilation), (3) administrative controls (e.g., limiting time of exposure, employee training, work practice changes, medical surveillance), and (4) personal protective equipment (e.g., respiratory protection, gloves, eye protection, hearing protection).

# APPENDIX A: OCCUPATIONAL EXPOSURE LIMITS AND HEALTH EFFECTS (CONTINUED)

Below we provide the OELs and surface contamination limits for the compounds we measured, as well as a discussion of the potential health effects from exposure to these compounds.

## Lead

Lead is ubiquitous in U.S. urban environments due to the widespread use of lead compounds in industry, gasoline, and paints during the past century. Exposure to lead occurs via inhalation of dust and fume and via ingestion through contact with lead-contaminated hands, food, cigarettes, and clothing. Absorbed lead accumulates in the body in the soft tissues and bones. Lead is stored in bones for decades, and may cause health effects long after exposure as it is slowly released in the body.

Symptoms of chronic lead poisoning include headache, joint and muscle aches, weakness, fatigue, irritability, depression, constipation, anorexia, and abdominal discomfort [Moline and Landrigan 2005]. Overexposure to lead may also result in kidney damage, anemia, high blood pressure, infertility and reduced sex drive in both sexes, and impotence. In most cases, an individual's BLL is a good indication of recent exposure to lead, with a half-life (the time interval it takes for the quantity in the body to be reduced by half its initial value) of 1–2 months [Lauwerys and Hoet 2001; Moline and Landrigan 2005; NCEH 2005]. Elevated zinc protoporphyrin levels have also been used as an indicator of chronic lead intoxication, however, other factors, such as iron deficiency, can cause an elevated zinc protoporphyrin level, so the BLL is a more specific test for evaluating occupational lead exposure.

Under the OSHA general industry lead standard (29 CFR 1910.1025), the PEL for airborne exposure to lead is 50 µg/m³ for an 8-hour TWA. The standard requires lowering the PEL for shifts exceeding 8 hours, medical monitoring for employees exposed to airborne lead at or above the AL of 30 µg/m³ (8-hour TWA), medical removal of employees whose average BLL is 50 µg/dL or greater, and economic protection for medically removed workers. Medically removed workers cannot return to jobs involving lead exposure until their BLL is below 40 µg/dL. NIOSH has an REL for lead of 50 µg/m³ averaged over an 8-hour work shift [NIOSH 2010]. ACGIH has a TLV for lead of 50 µg/m³ (8-hour TWA), with worker BLLs to be controlled to or below 30 µg/dL, and designation of lead as an animal carcinogen [ACGIH 2011].

The NIOSH REL is consistent with the OSHA PEL, which is intended to maintain worker BLLs below 40 µg/dL. This is also intended to prevent overt symptoms of lead poisoning, but is not sufficient to protect workers from more subtle adverse health effects like hypertension, renal dysfunction, and reproductive and cognitive effects [Schwartz and Stewart 2007; Schwartz and Hu 2007; Brown-Williams et al. 2009]. Adverse effects on the adult reproductive, cardiovascular, and hematologic systems, and on the development of children of exposed workers, can occur at BLLs as low as 10 µg/dL [Sussell 1998]. Recommendations from the March 2007 edition of Environmental Health Perspectives' Mini-Monograph on adult lead exposure and from the Association of Occupational and Environmental Clinics include advising workers and shooters that BLLs should be kept below 10 µg/dL [CSTE 2009].

In homes with a family member occupationally exposed to lead, care must be taken to prevent "take home" of lead, that is, lead carried into the home on clothing, skin, hair, and in vehicles. High BLLs in resident children and elevated concentrations of lead in the house dust have been found in the homes of workers employed in industries associated with high lead exposure [Grandjean and Bach 1986]. Particular effort should be made to ensure that children of persons who work in areas of high lead exposure receive a BLL test. The current CDC screening guidelines for children use 10 µg/dL as a "level of concern" in order to intervene and prevent long-term cognitive deficits [CDC 2005].

# APPENDIX A: OCCUPATIONAL EXPOSURE LIMITS AND HEALTH EFFECTS (CONTINUED)

Lead-contaminated surface dust represents a potential source of lead exposure, particularly for young children. This may occur either by direct hand-to-mouth contact, or indirectly from hand-to-mouth contact with contaminated clothing, cigarettes, or food. Previous studies have found a significant correlation between resident children's BLLs and house dust lead levels [Farfel and Chisholm 1990]. In the workplace, generally there is little or no correlation between surface lead levels and employee exposures because ingestion exposures are highly dependent on personal hygiene practices and available facilities for maintaining personal hygiene. No current federal standard provides a permissible limit for lead contamination of surfaces in occupational settings.

## Noise

Noise-induced hearing loss is an irreversible, sensorineural condition that progresses with exposure. Although hearing ability declines with age (presbycusis), noise exposure produces more hearing loss than that resulting from aging alone. This NIHL is caused by damage to nerve cells of the inner ear (cochlea) and, unlike some conductive hearing disorders, cannot be treated medically [Berger et al. 2003]. In most cases, NIHL develops slowly and usually occurs before it is noticed. Hearing loss is often severe enough to permanently affect a person's ability to hear and understand speech. For example, people with hearing loss may not be able to distinguish words such as "fish" from "fist." [Suter 1978].

The dBA is the preferred unit for measuring sound levels to assess employee noise exposures. The dBA noise scale is weighted to approximate the sensory response of human ears to sound frequencies near the hearing threshold. Because the dBA scale is logarithmic, increases of 3 dBA, 10 dBA, and 20 dBA represent a doubling, tenfold increase, and hundredfold increase of sound energy, respectively. Noise exposures expressed in dBA cannot be averaged by taking the arithmetic mean.

The OSHA noise standard [29 CFR 1910.95] specifies a PEL of 90 dBA as an 8-hour TWA. The OSHA PEL is calculated using a 5 dB exchange rate. This means that a person may be exposed to noise levels of 95 dBA for no more than 4 hours, 100 dBA for 2 hours, 105 dBA for 1 hour, etc. An employee's daily noise dose, on the basis of duration and intensity of noise exposure, can be calculated according to the formula:

Dose = 100 X (C1/T1 + C2/T2 + ... + Cn/Tn),

where Cn indicates the total time of exposure at a specific noise level, and Tn indicates the reference duration for that level as given in Table G-16a of the OSHA noise regulation. Doses greater than 100% exceed the OSHA PEL.

When noise exposures exceed the PEL of 90 dBA, OSHA requires that employees wear hearing protection and that an employer implement feasible engineering or administrative controls to reduce noise exposures. The OSHA noise standard also requires an employer to implement a hearing conservation program when 8-hour TWA noise exposures exceed the AL 85 dBA. The program must include noise monitoring, employee notification, observation, audiometric testing, hearing protectors, training, and record keeping.

NIOSH [NIOSH 1998] and ACGIH [ACGIH 2011] recommend an exposure limit of 85 dBA as an 8-hour TWA. A more conservative 3 dB exchange rate is used in calculating these exposure limits. Using NIOSH criteria, an employee can be exposed to 85 dBA for 8 hours, but to no more than 88 dBA for 4 hours, 91 dBA for 2 hours, 94 dBA for 1 hour, etc. According to the NIOSH REL, 12-hour exposures must be 83.2 dBA or less.

# APPENDIX A: OCCUPATIONAL EXPOSURE LIMITS AND HEALTH EFFECTS (CONTINUED)

Audiometric evaluations of employees' hearing thresholds must be conducted in quiet locations, preferably in a sound-attenuating booth, by presenting pure tones of varying frequencies at threshold levels (i.e., the level of a sound that the person can just barely hear). Zero dB hearing level represents the hearing level of an average, young individual with good hearing. OSHA requires hearing thresholds to be measured at test frequencies of 500, 1,000, 2,000, 3,000, 4,000, and 6,000 Hz. Individual employee's annual audiograms are compared to their baseline audiogram to determine if a standard threshold shift has occurred. OSHA states that a standard threshold shift has occurred if the average threshold values at 2,000, 3,000, and 4,000 Hz have increased by 10 dB or more in either ear when comparing the annual audiogram to the baseline audiogram [29 CFR 1910.95]. The NIOSH-recommended hearing threshold shift criterion is a 15-dB shift at any frequency in either ear from 500–6,000 Hz measured twice in succession [NIOSH 1998]. Both of these hearing threshold shift criteria require at least two audiometric tests.

The audiogram profile is a plot of the hearing test frequencies (x-axis) versus the hearing threshold levels (y-axis). For many employees, the audiogram profile tends to slope downward toward the high frequencies with an improvement at the audiogram's highest frequencies, forming a "notch" [Suter 2002]. A notch in the audiogram of an employee with otherwise normal hearing may indicate the early onset of hearing loss. The notch from occupational noise can occur between 3,000 and 6,000 Hz [ACOM 1989; Osguthorpe and Klein 2001]. However, it is generally accepted that a notch at 4,000 Hz indicates occupational hearing loss [Prince et al. 1997]. An individual may have notches at different frequencies in one or both ears [Suter 2002]. For this evaluation, a notch is defined as the frequency where the hearing level is preceded by an improvement of at least 10 dB and followed by an improvement of at least 5 dB.

## References

ACOM [1989]. Occupational noise-induced hearing loss. ACOM Noise and Hearing Conservation Committee. J Occup Med *31*(12):996.

ACGIH [2011]. 2011 TLVs® and BEIs®: threshold limit values for chemical substances and physical agents and biological exposure indices. Cincinnati, OH: American Conference of Governmental Industrial Hygienists.

AIHA [2011]. AIHA 2011 Emergency response planning guidelines (ERPG) & workplace environmental exposure levels (WEEL) handbook. Fairfax, VA: American Industrial Hygiene Association.

Berger EH, Royster LH, Royster JD, Driscoll DP, Layne M, eds. [2003]. The noise manual. 5th rev. ed. Fairfax, VA: American Industrial Hygiene Association.

Brown-Williams H, Lichterman J, Kosnett M [2009]. Indecent exposure: lead puts workers and families at risk. Health Research in Action, University of California, Berkeley. Perspectives *4*(1)1–9.

CDC [2005]. Preventing Lead Poisoning in Young Children. Atlanta: CDC; 2005. [http://www.cdc.gov/nceh/lead/publications/prevleadpoisoning.pdf]. Date accessed: September 2011.

CFR. Code of Federal Regulations. Washington, DC: U.S. Government Printing Office, Office of the Federal Register.

CSTE [2009]. Public health reporting and national notification for elevated blood lead levels. CSTE position statement 09-OH-02. Atlanta: CSTE 2009 [http://www.cste.org/ps2009/09-OH-02.pdf]. Date accessed: September 2011.

APPX.148

# APPENDIX A: OCCUPATIONAL EXPOSURE LIMITS AND HEALTH EFFECTS (CONTINUED)

Farfel MR, Chisholm JJ [1990]. Health and environmental outcomes of traditional and modified practices for abatement of residential lead–based paint. Am J Pub Health 80(10):1240–1245.

Grandjean P, Bach E [1986]. Indirect exposures: the significance of bystanders at work and at home. Am Ind Hyg Assoc J 47(12):819–824.

Lauwerys RR, Hoet P [2001]. Chapter 2. Biological monitoring of exposure to inorganic and organometallic substances. In: Industrial chemical exposure: guidelines for biological monitoring. 3rd ed. Boca Raton, FL: CRC Press, LLC, pp. 21–180.

Moline JM, Landrigan PJ [2005]. Lead. Chapter 39.8. In: Textbook of clinical occupational and environmental medicine, Rosenstock L, Cullen MR, Brodkin CA, and Redlich CA, eds., 2nd ed. Philadelphia, PA: Elsevier Saunders, pp. 967–979.

NCEH [2005]. Third national report on human exposure to environmental chemicals. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. National Center for Environmental Health Publication number 05–0570.

NIOSH [1998]. Criteria for a recommended standard: occupational noise exposure (revised criteria 1998). Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 98-126.

NIOSH [2010]. NIOSH pocket guide to chemical hazards. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2010-168c. [http://www.cdc.gov/niosh/npg/]. Date accessed: September 2011.

Osguthorpe JD, Klein AJ [2001]. Occupational hearing conservation. Clin Audiol 24(2):403–414.

Prince M, Stayner L, Smith R, Gilbert S [1997]. A re-examination of risk estimates from the NIOSH Occupational Noise and Hearing Survey (ONHS). J Acous Soc Am 101(2):950–963.

Schwartz BS, Hu H [2007]. Adult lead exposure: time for change. Environ Health Perspect 115(3):451–454.

Schwartz BS, Stewart WF [2007]. Lead and cognitive function in adults: A question and answers approach to a review of the evidence for cause, treatment, and prevention. Int Rev Psychiatry 19(6):671–692.

Sussell A [1998]. Protecting workers exposed to lead-based paint hazards: a report to congress. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 98–112.

Suter AH [1978]. The ability of mildly hearing-impaired individuals to discriminate speech in noise. Washington, DC: U.S. Environmental Protection Agency, Joint EPA/USAF study, EPA 550/9-78-100, AMRL-TR-78-4.

Suter AH [2002]. Hearing conservation manual. 4th ed. Milwaukee, WI: Council for Accreditation in Occupational Hearing Conservation.

# APPENDIX B: METHODS

## Noise Dosimetry

Noise dosimeters (Larson Davis, Provo, Utah, Spark™ models 706RC or 705P) were attached to the wearer's belt, and a small remote microphone was fastened to the wearer's shirt at a point midway between the ear and outside of the shoulder. A windscreen provided by the dosimeter manufacturer was placed over the microphone to reduce or eliminate artifact noise, which can occur if objects bump against an unprotected microphone. The dosimeters were set up to collect data using different settings to allow comparison of noise measurement results with the three different noise exposure limits referenced in this health hazard evaluation, the OSHA PEL and AL and the NIOSH REL (Table B1). During noise dosimetry measurements, noise levels below the threshold level are not integrated by the dosimeter for accumulation of dose and calculation of TWA noise level.

The dosimeters averaged noise levels every second. At the end of the sampling period, the dosimeter was removed and paused to stop data collection. The noise measurement information stored in the dosimeters was downloaded to a computer for interpretation with Larson Davis Blaze® software. The dosimeters were calibrated before and after the measurement periods according to the manufacturer's instructions.

Table B1. Dosimeter settings

| Parameters | OSHA AL | OSHA PEL | NIOSH REL |
|---|---|---|---|
| Response | Slow | Slow | Slow |
| Exchange rate | 5 | 5 | 3 |
| Criterion level | 90 | 90 | 85 |
| Threshold | 80 | 90 | 80 |
| Upper limit | 115 | 115 | 115 |

Area noise levels and octave band noise frequency analysis (measurement of noise in different frequencies) were measured with System 824 SLM and real-time frequency analyzers (Larson-Davis, Provo, Utah). The SLMs were equipped with 0.25-inch random incidence Type 1 microphones; the instruments measured noise levels between 16 and 170 dBA. Sound level and octave band frequency spectrum measurements were collected at a sample rate of 51,200 times per second and averaged eight times per second. The SLMs were calibrated before and after the measurement periods according to the manufacturer's instructions. SLMs were either handheld or mounted on a tripod at a height of approximately 5 feet.

## Lead in Air

Air samples for lead were collected on 37-millimeter diameter, 0.8-micron pore-size mixed cellulose ester filters using SKC Air Check® 2000 air sampling pumps (SKC Inc., Eighty Four, Pennsylvania) calibrated at a flow rate of 2 liters per minute. The inlet port of the sampling pump was connected to the sampling media with Tygon® tubing. For PBZ samples, the sampling media were attached to the employee's lapel

# APPENDIX B: METHODS (CONTINUED)

within the breathing zone, roughly defined as an area in front of the shoulders with a radius of 6 to 9 inches. Samples were analyzed by inductively coupled plasma according to NIOSH Method 7303 [NIOSH 2011].

## Lead on Surfaces

We collected six surface wipe samples for lead. Surface samples were collected with premoistened Palintest® dust wipes (Palintest USA, Erlanger, Kentucky). The collection procedure was as follows: (1) identify the area to be sampled, (2) put on a pair of disposable nitrile gloves, (3) place the wipe flat on surface as defined by the 10 centimeter by 10 centimeter disposable template and wipe surface using three to four horizontal S-strokes, side-to-side so that entire surface is covered, (4) wipe the area with three to four vertical S-strokes, (5) wipe the area with three to four diagonal S-strokes, and (6) place the wipe in a sterile container. A new template and a pair of disposable gloves were used for each wipe sample. The wipe samples were digested and analyzed by inductively coupled argon plasma according to NIOSH Method 9102 [NIOSH 2011].

## Lead on Hands

Hand wipe samples were collected and analyzed with a commercially available dust wipe (Full Disclosure® Instant Wipes, SKC Inc., Eighty Four, Pennsylvania) conforming to the American Society for Testing and Materials Standard E 1792 (Specifications for Wipe Sampling Materials for Lead in Surface Wipes). After collection, each wipe was sprayed with a 5% leaching solution of acetic acid to solubilize lead and lead compounds into lead ions. The wipe was then sprayed with a chilled solution of sodium rhodizonate, a chemical that reacts colorimetrically to the presence of lead by changing from yellow to red. The visual limit of identification for the method is approximately 17–20 micrograms per sample.

## Reference

NIOSH [2011]. NIOSH manual of analytical methods (NMAM®), 4th ed. Schlecht PC, O'Connor PF, eds. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication 94–113 (August, 1994); 1st Supplement Publication 96–135, 2nd Supplement Publication 98–119; 3rd Supplement 2003-154. http://www.cdc.gov/niosh/nmam/. Date accessed: September 2011.

# ACKNOWLEDGMENTS AND AVAILABILITY OF REPORT

The Hazard Evaluations and Technical Assistance Branch (HETAB) of the National Institute for Occupational Safety and Health (NIOSH) conducts field investigations of possible health hazards in the workplace. These investigations are conducted under the authority of Section 20(a)(6) of the Occupational Safety and Health Act of 1970, 29 U.S.C. 669(a)(6) which authorizes the Secretary of Health and Human Services, following a written request from any employer or authorized representative of employees, to determine whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found. HETAB also provides, upon request, technical and consultative assistance to federal, state, and local agencies; labor; industry; and other groups or individuals to control occupational health hazards and to prevent related trauma and disease.

Mention of any company or product does not constitute endorsement by NIOSH. In addition, citations to websites external to NIOSH do not constitute NIOSH endorsement of the sponsoring organizations or their programs or products. Furthermore, NIOSH is not responsible for the content of these websites. All Web addresses referenced in this document were accessible as of the publication date.

This report was prepared by Lilia Chen and Scott E. Brueck of HETAB, Division of Surveillance, Hazard Evaluations and Field Studies. Health communication assistance was provided by Stefanie Evans. Editorial assistance was provided by Ellen Galloway. Desktop publishing was performed by Robin Smith and Greg Hartle.

Copies of this report have been sent to employee and management representatives, the state health department, and the Occupational Safety and Health Administration Regional Office. This report is not copyrighted and may be freely reproduced. The report may be viewed and printed at http://www.cdc.gov/niosh/hhe/. Copies may be purchased from the National Technical Information Service at 5825 Port Royal Road, Springfield, Virginia 22161.

**Below is a recommended citation for this report:**
NIOSH [2011]. Health hazard evaluation report: evaluating noise and lead exposures at an outdoor firing range – California. By Chen L, Brueck SE. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, NIOSH HETA No. 2011-0069-3140.



*National Institute for Occupational Safety and Health*

## Delivering on the Nation's promise: Safety and health at work for all people through research and prevention.

To receive NIOSH documents or information about occupational safety and health topics, contact NIOSH at:

**1-800-CDC-INFO** (1-800-232-4636)

TTY: 1-888-232-6348

E-mail: cdcinfo@cdc.gov

or visit the NIOSH web site at: **www.cdc.gov/niosh.**

For a monthly update on news at NIOSH, subscribe to NIOSH eNews by visiting **www.cdc.gov/niosh/eNews.**

**SAFER • HEALTHIER • PEOPLE™**

# Current Processing Times

**Average Processing Times for Applications Processed During August 2025**

Statistical information on average processing times of applications that are filled out correctly and completely.

| | ATF Form | Processing Office | <u>Paper</u> | <u>eForms</u> |
|---|---|---|---|---|
| **Form 1** | <u>Application to Make and Register a Firearm</u> | NFA Division | 28 days | 8 days |
| **Form 2** | <u>Notice of Firearms Manufactured or Imported</u> | NFA Division | 6 days | 1 day |
| **Form 3** | <u>Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer (SOT)</u> | NFA Division | 6 days | 1 day |
| **Form 4 Trust** | <u>Application for Tax Paid Transfer and Registration of Firearm</u> | NFA Division | 45 days | 23 days |
| **Form 4 Individual** | <u>Application for Tax Paid Transfer and Registration of Firearm</u> | NFA Division | 35 days | 10 days |
| **Form 5** | <u>Application for Tax-Exempt Transfer and Registration of Firearm</u> | NFA Division | 12 days | 2 days |
| **Form 6** | <u>Application and Permit for Importation of Firearms, Ammunition and Implements of War</u> | Imports Branch | 16 days | 16 days |
| **Form 6 NIA** | <u>Application/Permit for Temporary Importation of Firearms and Ammunition by Nonimmigrant Aliens</u> | Imports Branch | 21 days | - |
| **Form 7** | <u>Application for Federal Firearms License (FFL)</u> | FFLC | 60 days | - |
| **Form 9** | <u>Application and Permit for Permanent Exportation</u> | NFA Division | 6 days | 2 days |
| **Form 10** | <u>Application for Registration of Firearms Acquired by Certain Governmental Entities</u> | NFA Division | 7 days | 7 days |
| **Form 3311.4** | <u>Application for Alternate Means of Identification of Firearm(s) (Marking Variance)</u> | FATD | 30 days | - |
| **Form 5320.20** | <u>Application to Transport Interstate or to Temporarily Export Certain National Firearms Act (NFA) Firearms</u> | NFA Division | 45 days | - |
| **Form 5400.13/ 5400.16** | <u>Application for Explosives License or Permit (FEL/FEP)</u> | FELC | 3 months | - |
| **Form 5400.28** | <u>Employee Possessor Questionnaire (EPQ)</u> | FELC | 3 months | - |

| | |
|---|---|
| Total number of NFA applications received during this reporting period | 97,223 |
| Total number of Form 4 silencer applications received during the reporting period above | 48,327 |
| Total number of NFA applications processed during this reporting period | 105,457 |
| Total number of Form 4 applications processed during this reporting period | 58,287 |
| Total number of Silencer Form 4 applications processed during the reporting period above | 55,194 |
| Total number of actionable NFA applications (excludes applications submitted pursuant to ATF Final Rule 2021R-08F) | 16,907 |
| Median processing times for individual eForm 4 applications during this reporting period | 4 days |

*Last Reviewed September 19, 2025*

SILENCER SHOP    SILENCER SHOP

Free Shipping Always. **Free Tax Stamps & Gift Cards While They Last. Move Fast!**

Home / Blog / Do Suppressors Reduce Recoil?

## DO SUPPRESSORS REDUCE RECOIL?

April 2, 2024

<u>General</u>

# Do Suppressors Reduce Recoil?

# Do Suppressors Reduce Recoil?

When most people think about suppressors, they think of sound reduction. But beyond making shooting quieter, suppressors also drastically reduce recoil, helping you shoot smoother, stay on target, and recover faster between shots.

<u>Suppressors work by</u> controlling the gas pressure that follows each bullet out of the barrel, preventing the sharp "kick" shooters feel after every round. Let's break down how and why that works.

## HOW SUPPRESSORS REDUCE RECOIL

Recoil happens because of Newton's Third Law of Motion: every action has an equal and opposite reaction. When gunpowder ignites, expanding gases push the bullet forward and push the firearm backward into your shoulder or hands.

A suppressor changes that dynamic by:

- Capturing expanding gases within internal baffles.

- Allowing gases to cool and expand slowly, reducing the explosive jet that causes "kick."

APPX.156

- Extending barrel length, increasing dwell time and redirecting energy away from the shooter.

This gas management dramatically reduces both rearward recoil and muzzle rise, improving control, comfort, and follow-up accuracy.





# TABLE OF CONTENTS

- <u>Suppressor vs Muzzle Brake</u>

- <u>Negatives of Recoil</u>

- Best Suppressors for Recoil Reduction

- Conclusion

# SUPPRESSOR VS MUZZLE BRAKE FOR RECOIL REDUCTION

While both reduce recoil, they do it differently:

| Feature | Suppressor | Muzzle Brake |
|---|---|---|
| Primary Function | Reduces sound & recoil | Reduces recoil only |
| Noise Level | Quiet | Louder |
| Gas Direction | Contained and slowed | Redirected sideways |
| Best Use | Hunting, tactical, orindoor ranges | Precision rifles or open-range competition |

**Summary:**

- Muzzle brakes excel at pure recoil reduction but are extremely loud.

- Suppressors reduce recoil and noise, providing a balanced, more comfortable shooting experience.

If your priority is recoil reduction with sound suppression, the suppressor wins hands down.

# DO SUPPRESSORS IMPROVE ACCURACY?

Yes, suppressors often improve accuracy by:

- Reducing shooter flinch caused by recoil or blast.

- Minimizing barrel whip through added forward weight.

- Decreasing muzzle rise, keeping your optic on target for faster follow-up.

However, there can be a minor point of impact (POI) shift when installing a suppressor. This is normal and consistent once zeroed, and rarely affects accuracy negatively.

# HOW MUCH RECOIL DOES A SUPPRESSOR REDUCE?

On average, a suppressor can reduce recoil between 20% and 40%, depending on caliber, ammunition type, and suppressor design.

**Examples:**

- A .308 rifle with a quality titanium suppressor may see a 35% reduction in felt recoil.

- A 9mm handgun may experience 20–25% less muzzle rise.

- Larger magnum rifles can feel like shooting a smaller caliber with a good brake-equipped suppressor.

Key takeaway: recoil reduction varies, but even at its minimum, it makes shooting smoother, faster, and more enjoyable.

# BEST SUPPRESSORS FOR RECOIL REDUCTION

Some suppressors are purpose-built to tame recoil and muzzle climb. Here are Silencer Shop's top picks, with your current product links retained:

## SILENCERCO SCYTHE TI

Lightweight titanium build with an integrated single-port anchor brake that disperses gases laterally. Perfect for .30-cal and hunting setups.

Shop SilencerCo Scythe-Ti





## SILENCERCO OMEGA 300

A benchmark in recoil control and durability. Multi-port anchor brake design makes it ideal for .308 and 6.5 Creedmoor rifles.

Shop SilencerCo Omega 300





## DEAD AIR E-BRAKE

Compatible with Nomad, Sandman, and Wolfman models. This omnidirectional brake accessory nearly eliminates muzzle rise.

- Shop Dead Air Nomad

- Shop Dead Air Sandman S

- Shop Dead Air Wolfman

- Dead Air E-Brake





# DANIEL DEFENSE SOUNDGUARD

Uses tunable muzzle ports to direct gases outward and eliminate recoil while maintaining precision. Excellent for hunters and tactical shooters alike.

- Shop Daniel Defense SoundGuard SG-30

- Shop Daniel Defense SoundGuard SG-556





# FAQ: SUPPRESSORS AND RECOIL REDUCTION

## Q1: DO SUPPRESSORS REALLY REDUCE RECOIL?

A: Yes. Most shooters experience 20–40% less recoil, depending on the caliber and silencer design.

## Q2: DOES A SUPPRESSOR REDUCE ACCURACY?

A: No. It usually improves consistency once the firearm is zeroed with the suppressor attached.

## Q3: DO SUPPRESSORS REDUCE MUZZLE RISE?

A: Yes. By containing gas expansion, suppressors dramatically cut muzzle flip, especially noticeable in semi-autos.

## Q4: ARE SUPPRESSORS BETTER THAN MUZZLE BRAKES?

A: Suppressors reduce both sound and recoil. Muzzle brakes only handle recoil and are much louder.

## Q5: HOW DOES A SUPPRESSOR REDUCE RECOIL PHYSICALLY?

A: The baffle stack traps and cools combustion gases, spreading energy over a longer duration to minimize backward thrust.

---

 by **Chase S.**     **0 comments**

## Comments

### Leave your comment

Your email address will not be published

Comment

Your name

Your e-mail

**POST COMMENT**

---

🎖🎖 **#1 IN THE NFA INDUSTRY**

4.9 out of 5 Google Ratings
99.5% Application Accuracy

🔇🔇 **NO TRANSFER FEES**

Never pay a transfer fee, when you order with silencershop.com

🫶🫶 **COMMUNITY SUPPORT**

Proceeds of each NFA item go directly to your selected local gun shop.

**SIGN UP FOR EXCLUSIVE DEALS & OFFERS!**

Enter your email                                                    SIGN UP

---

## WE'RE HERE TO HELP!

512-931-4556

Phone hours:
Mon - Fri: 9:00 AM to 6:00 PM CT
Saturday: 9:00 AM to 4:00 PM CT
Store hours:
Mon - Fri 9:00 AM to 6:00 PM CT

ORDER STATUS

**MY ACCOUNT**

**RESOURCES**

**COMPANY**

**SUPPORT**





**SILENCER OWNERSHIP SIMPLIFIED**

17414 FM 1431, Leander, TX 78641

© 2025 Silencer Shop

# 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned

William English, PhD

Georgetown University

Expanded Report: May 13, 2022

## Abstract

This report summarizes the findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date. This online survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners who were, in turn, asked in-depth questions about their ownership and their use of firearms, including defensive uses of firearms.

Consistent with other recent survey research, the survey finds an overall rate of adult firearm ownership of 31.9%, suggesting that in excess of 81.4 million Americans aged 18 and over own firearms. The survey further finds that approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and it estimates that guns are used defensively by firearms owners in approximately 1.67 million incidents per year. Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and in most defensive incidents (81.9%) no shot was fired. Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property. About one out of ten (9.1%) defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.

A majority of gun owners (56.2%) indicate that they carry a handgun for self-defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency. We estimate that approximately 20.7 million gun owners (26.3%) carry a handgun in public under a "concealed carry" regime; and 34.9% of gun owners report that there have been instances in which they had wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

The average gun owner owns about 5 firearms, and handguns are the most common type of firearm owned. 48.0% of gun owners – about 39 million individuals – have

1

Electronic copy available at: https://ssrn.com/abstract=4109494

owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and 30.2% of gun owners – about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). Demographically, gun owners are diverse. 42.2% are female and 57.8% are male. Approximately 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms. In total, Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

# 1    Introduction

This report summarizes the main findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date.

Before this survey, the most authoritative resource for estimating details of gun ownership in the U.S. has been the "Comprehensive National Survey on Firearms Ownership and Use" conducted by Cook and Ludwig in 1994 (Cook and Ludwig, 1996), and the most authoritative resource for estimating defensive gun use in the U.S. has been the "National Self-Defense Survey" conducted by Kleck and Gertz in 1993 (Kleck and Gertz, 1995, 1998). While valuable resources, they are both now a quarter century old, and no surveys of similar scope and depth have documented firearms ownership and use in more recent years.

Hepburn et al. (2007) conducted a more limited survey to ascertain the "gun stock" in 2004, a version of which was repeated in 2015 (Azrael et al., 2017). However, as they explain in introducing their latter survey, data sources on firearms ownership and use remain scarce:

> Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the number of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms

Electronic copy available at: https://ssrn.com/abstract=4206007

in civilian hands are derived from two national surveys dedicated to producing detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994, the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007).

Miller, Zhang, and Azrael conducted an expanded survey in 2021 of 5,932 gun owners with a focus on characterizing the demographics of those who acquired firearms for the first time during the COVID-19 Pandemic, based on a sub-sample of 447 individuals who fit this criterion (Miller et al., 2022). This team also described their survey as a "2021 National Firearms Survey," and it is helpful to clarify that their survey was distinct from the survey reported here.

Richer survey data on firearms ownership and use has been collected by industry associations such as the National Shooting Sports Foundation (NSSF).[1] However, these surveys generally aim at assessing industry trends and market segmentation and are not necessarily designed to be nationally representative. In 2017, the Pew Research Center conducted one of the most recent and detailed surveys of the demographics of gun ownership (Brown, 2017).[2] Although it did not ask detailed questions concerning defensive use of firearms and the types of firearms owned, this recent Pew survey serves as a helpful benchmark for corroborating the general ownership estimates of the present survey.

Advances in survey research technologies make it possible to reach large, representative respondent populations today at a much lower cost than a quarter century ago. One of the limitations of the Cook and Ludwig survey, which sought to be nationally representative, was that the survey sample was relatively small, with about 2,500 respondents of whom only about 600, or (24.6%), owned a firearm when the survey was administered. As the investigators noted in their report, some sub-questions were not sufficiently well powered to make confident inferences, particularly concerning the defensive use of firearms. Similarly, Kleck and Gertz's survey was limited to 4,977 respondents, and the more recent surveys by Pew, Hepburn, and Azrael are all based on less than 4,000 respondents.

---

[1] See https://www.nssf.org/research/

[2] See Pew Research Center, June 2017, "America's Complex Relationship With Guns" https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2017/06/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

Electronic copy available at: https://ssrn.com/abstract=4209697

Today, professional survey firms like Centiment[3] cultivate large pools of survey respondents, enabling representative sampling, and have techniques that encourage high response and completion rates while also ensuring the integrity of responses.[4]  The online survey summarized here was presented to a nationally representative sample (excluding residents of Vermont who had already responded to a pilot version of this survey) of 54,244 individuals aged 18 or over who completed an initial questionnaire that included an indirect question indicating whether they owned a firearm (respondents were presented with a list of items commonly owned for outdoor recreational purposes, including firearms, and were asked to select all items that they own).

This question identified 16,708 individuals as gun owners, who were then transferred to the main survey, which then asked detailed questions about their ownership and use of firearms.  Given the length and detail of the survey, there was a slight amount of attrition, as 7.5%, or 1,258 individuals, did not make it through all questions to the end of the survey. However, 92.5% of the responding firearms owners (15,450) did proceed through all of the survey questions.

This survey thus contains what we believe is the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States.  This survey was approved by Georgetown University's Institutional Review Board. Of note, this survey was conducted just after a period of widespread social unrest across the U.S. and a contentious presidential election, which background check data suggests led to record gun sales (approximately 39.7 million in 2020, up 40% from the prior year).[5]  It is thus a comprehensive and timely assessment of the state of firearms ownership and use in the United States.  Finally, the extraordinarily large size of this sample enables us to make well-powered, statistically informative inferences within individual states, which considerably extends the value of this data.

The initial sample of respondents achieved excellent demographic representation across

---

[3]See https://www.centiment.co/

[4]See https://help.centiment.co/how-we-safeguard-your-data

[5]See McIntyre, Douglas A."Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January" https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/

Electronic copy available at: https://ssrn.com/abstract=4209637

all 49 states and DC, excluding Vermont (see Appendix A and B). For the purpose of estimating firearms ownership rates for the general U.S. population we employed raked weighting on gender, income, age, race, and state of residence. Note that there was a brief period in the first two days after the soft launch of the survey that comprehensive demographic data was not collected from those respondents who did not indicate firearms ownership, and thus did not proceed to the main survey (approximately 300 respondents). Although the survey company, Centiment, maintained demographic data on these panel respondents, it was determined that this data was not as comprehensive as the data collected by the survey, at which point the demographic questions were moved to the front of the survey, and asked of all respondents, including those who did not indicate firearms ownership. For the purpose of calculating statistics on national firearms ownership rates, we exclude the entire sample of both firearms owners and non-firearms owners from these first two days (410 respondents), leaving us with 53,834 respondents after this date for whom we have comprehensive demographic data. Firearms-owning respondents from the first two days are included in subsequent analysis of firearms owners, and we do possess comprehensive demographic information for these individuals.

Appendix B contains tables reporting the demographic sampling rates and the Census demographics used for raked weighting of the national survey. Note that the overall effect of weights is minimal given the high representativeness of the initial sample. For the purposes of analyzing responses within the sub-sample of firearms owners, we do not employ weighting schemes, in part because the "true" demographics of gun ownership are not knowable from an authoritative source analogous to the U.S. Census Bureau. However, as a robustness exercise, using weights based on estimates derived from the larger survey response rates yields results that are substantially identical for the analysis of responses from firearms owners.

One of the challenges in asking questions about firearms is eliciting truthful responses from firearms owners who may be hesitant to reveal information about practices that are associated with public controversy. The "tendency to respond to questions in a socially acceptable direction" when answering surveys is often referred to as "social desirability bias" (Spector, 2004), and there is evidence that it can influence survey responses to questions regarding firearms. For example, when Rafferty et al. (1995) conducted a telephone survey

Electronic copy available at: https://ssrn.com/abstract=4209697

of Michigan residents who had purchased a hunting license or registered a handgun, only
87.3 percent of the handgun registrants and 89.7 percent of hunting license holders reported
having a gun in their household. Similarly, Ludwig et al. (1998) have documented a large
gender gap in reporting of firearms ownership, finding that "in telephone surveys, the rate
of household gun ownership reported by husbands exceeded wives' reports by an average
of 12 percentage points." Asking questions via an anonymous survey instrument on the
internet is likely to cause less concern or worry than traditional phone-based questionnaires
with a live person on the other end or during face-to-face interviews, which is how the
General Social Survey – one of the most prominent national surveys that regularly asks
about firearm ownership – is conducted.[6] Even when presented in the more impersonal
setting of a computer interface, however, a survey must be worded thoughtfully so as to
assure anonymity, and not give respondents reason to worry about answering truthfully.

This survey employs five common devices to encourage more truthful responses. First,
it uses an indirect "teaser" question to pre-screen respondents in order to select those who
own firearms. The initial question prompt presents the survey as concerned with "recre-
ational opportunities and related public policies" and asks respondents if they own any of
the following items, presented in a random order: Bicycle, Canoe or Kayak, Firearm, Rock
Climbing Equipment, None of the Above. Only those who select "Firearm" are then pre-
sented the full survey. We also ask demographic questions at the outset, which allows us
to assess the representativeness of the sample, including those who do not indicate firearms
ownership. Second, the survey was carefully phrased so as to not suggest animus towards gun
owners or ignorance of firearms-related terminology. Third, the survey assures respondents
of anonymity. Fourth, in order to ensure that respondents are reading the survey questions
carefully, and then responding with considered answers thereto, a "disqualifying" question
(sometimes referred to as a "screening" question) was embedded a little over half of the way
through the survey instructing respondents to select a particular answer for that question,
which only those who read the question in its entirety would understand. Anyone registering
an incorrect answer to this question was disqualified from the survey and their responses to

---

[6]For a description of the methods of the General Social Survey see: `https://www.nsf.gov/pubs/2007/`
`nsf0748/nsf0748_3.pdf`

Electronic copy available at: https://ssrn.com/abstract=4209697

any of the survey questions were neither considered nor tallied.

Finally, while responses were required for basic demographic questions, if questions of a sensitive nature were left blank, the software would first call attention to the blank response and prompt the respondent to enter a response. However, if a respondent persisted in not responding and again tried to progress, rather than kick them out of the survey, they would be allowed to progress to the next section in the interest of obtaining the maximum amount of information that they were willing to share. Respondents were not made aware of this possibility in advance, and in practice such "opting out" of a particular question was seldom done (less than 1% of responses for the average question). This is the reason that small variations are sometimes observed in the total number of respondents for certain questions.

A pilot version of this survey was first fielded in Vermont as part of a research project aimed at documenting firearms ownership and firearms use rates in that specific state. The Vermont survey served as a proof of concept for the national version, demonstrating that this survey is a viable instrument for eliciting responses from firearms owners with both high response rates and low disqualification rates. The results of the Vermont survey are presented separately in Appendix A of this report and closely mirror national results.

This report focuses on providing descriptive statistics of answers to the major questions asked in the survey. Future research will examine responses, and relationships between them, in more detail. The report proceeds as follows: the next (second) section summarizes national firearms ownership estimates and demographics; the third section examines defensive uses of firearms; the fourth section examines question regarding carrying for self-defense; the fifth section summarizes ownership statistics, and the sixth section concludes.

# 2    Gun Ownership Demographics

- About a third of adults in the U.S. report owning a firearm, totaling about 81.4 million adult gun owners.

- 57.8% of gun owners are male, 42.2% are female.

- 25.4% of Blacks own firearms.

Electronic copy available at: https://ssrn.com/abstract=4209697

- 28.3% of Hispanics own firearms.

- 19.4% of Asians own firearms.

- 34.3% of Whites own firearms.

With raked weighting employed for gender, state, income, race, and age we find that 32.5% of US adults age 21 and over own a firearm (95% Confidence Interval, 32.1 - 32.9%). Expanding the sample population to include those age 18-20, who are restricted in some states from purchasing firearms, 31.9% of US adults age 18 and over own firearms (95% Confidence Interval, 31.5% - 32.3%). This is slightly above, but consistent with, the most recent in-depth survey of firearms ownership conducted by Pew in 2017 before the Covid-19 pandemic, which found that 30% of adults in America own a firearm (Brown, 2017). It is also consistent with recent Gallup polling in 2020 and 2021, which found that 32% and 31% of adults personally own a firearm (Gallup, 2021).

As a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership, we can also compare ownership rates of other items reported by respondents for this question. We find 52% of respondents indicating owning a bicycle, which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014.[7]

The distribution of gun owners surveyed by state is illustrated in Figure 1, and ranges from 1,287 in California and 1,264 in Texas to 26 in Washington, DC and 24 in North Dakota.

Table 1 shows the proportion of the population in each state estimated to own a firearm. Massachusetts, Hawaii, Rhode Island, and New Jersey have the lowest rates of ownership with less than 20% of the adult population owning firearms, while Kentucky, Montana, West Virginia, and Idaho have the highest rates of ownership with more than 45% of the adult population owning firearms.

With regard to the demographics of gun ownership, we find that 57.8% of gun owners are male and 42.2% are female, the average age of gun owners is 46-50 years old, and the average annual household income is $80,000-$90,000. Approximately 18% of gun owners do not identify as White (alone). Overall, approximately 10.6% of gun owners identify as Black,

---

[7]See https://www.pewresearch.org/fact-tank/2015/04/16/car-bike-or-motorcycle-depends-on-where-you-live/

Electronic copy available at: https://ssrn.com/abstract=4209697



Figure 1: Distribution of Firearms Owners Surveyed

3.6% identify as Asian, 1.6% identify as American Indian, .2% identify as Pacific Islander, 82.0% identify as White, and 2.0% identify as Other. When analyzed within racial groups, we find that 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms.

According to the latest (2019) census estimates, there are approximately 255,200,373 individuals age 18 and over in the U.S., which implies that there are about 81.4 million adult gun owners.[8] Note that this figure does not include those under the age of 18 who may use or possess firearms for purposes such as hunting or shooting sports.

In sum, firearms ownership is widespread, and firearms owners are diverse.

# 3  Defensive Use of Firearms

- 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a gun in self-defense.

- In most cases (81.9%) the gun is not fired.

- Gun owners engage in approximately 1.67 million defensive uses of firearms per year.

- The majority of defensive gun uses take place outside of the home (74.8%).

---

[8]Census date is available at `https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-syasexn.xlsx`

Electronic copy available at: https://ssrn.com/abstract=4209697

| State | Proportion of adult population estimated to own firearms | 95% Confidence Interval |
|---|---|---|
| Alabama | 39.6% | 35.2% − 44.1% |
| Alaska | 33.4% | 25.7% − 42.1% |
| Arizona | 32.0% | 28.8% − 35.4% |
| Arkansas | 36.6% | 31.1% − 42.5% |
| California | 25.5% | 24.0% − 27.0% |
| Colorado | 33.6% | 29.8% − 37.7% |
| Connecticut | 20.2% | 16.8% − 24.1% |
| Delaware | 24.7% | 18.9% − 31.6% |
| District of Columbia | 23.9% | 15.6% − 34.9% |
| Florida | 30.3% | 28.5% − 32.2% |
| Georgia | 37.1% | 34.5% − 39.9% |
| Hawaii | 16.4% | 10.6% − 24.5% |
| Idaho | 54.5% | 45.5% − 63.1% |
| Illinois | 26.5% | 24.3% − 28.9% |
| Indiana | 40.3% | 36.6% − 44.1% |
| Iowa | 33.2% | 28.1% − 38.8% |
| Kansas | 42.8% | 37.4% − 48.3% |
| Kentucky | 46.7% | 42.6% − 50.8% |
| Louisiana | 32.8% | 28.0% − 38.0% |
| Maine | 35.9% | 29.7% − 42.6% |
| Maryland | 21.7% | 18.5% − 25.2% |
| Massachusetts | 15.8% | 13.4% − 18.6% |
| Michigan | 34.7% | 32.0% − 37.5% |
| Minnesota | 32.5% | 28.4% − 36.8% |
| Mississippi | 39.5% | 33.5% − 45.8% |
| Missouri | 39.7% | 36.2% − 43.4% |
| Montana | 48.4% | 38.7% − 58.3% |
| Nebraska | 37.2% | 29.8% − 45.2% |
| Nevada | 38.0% | 32.8% − 43.4% |
| New Hampshire | 24.1% | 18.4% − 30.9% |
| New Jersey | 19.3% | 16.9% − 22.0% |
| New Mexico | 33.8% | 25.9% − 42.7% |
| New York | 22.7% | 21.3% − 24.2% |
| North Carolina | 37.3% | 34.5% − 40.2% |
| North Dakota | 42.6% | 29.9% − 56.4% |
| Ohio | 33.7% | 31.1% − 36.4% |
| Oklahoma | 40.5% | 36.2% − 45.0% |
| Oregon | 38.3% | 32.7% − 44.2% |
| Pennsylvania | 30.3% | 28.1% − 32.6% |
| Rhode Island | 16.9% | 11.4% − 24.2% |
| South Carolina | 40.7% | 36.5% − 45.1% |
| South Dakota | 39.2% | 32.4% − 46.4% |
| Tennessee | 43.0% | 39.5% − 46.6% |
| Texas | 36.0% | 34.1% − 38.0% |
| Utah | 42.8% | 36.1% − 49.8% |
| Virginia | 30.6% | 27.6% − 33.7% |
| Washington | 32.8% | 29.3% − 36.4% |
| West Virginia | 53.0% | 45.6% − 60.2% |
| Wisconsin | 33.3% | 29.9% − 36.9% |
| Wyoming | 42.7% | 34.5% − 51.2% |

Table 1: Proportion of the population estimated to own a firearm in each state.

- About half of defensive gun uses involve more than one assailant (51.2%).

- Handguns are the firearm most commonly used in defensive incidents (65.9%), followed

10

Electronic copy available at: https://ssrn.com/abstract=4209697

by shotguns (21.0%) and rifles (13.1%).

Defensive use of firearms was assessed through a series of questions that asked for increasingly detailed information from those who indicated that they had used a firearm in self-defense.

First, all gun owners were asked, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard." About a third (31.1%) answered in the affirmative, and they were then asked how many times they defended themselves with a firearm (from "once" to "five or more times"). As Figure 2 shows, a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion.



Figure 2: Defensive Gun Use: 31.1% of firearms owners have defended themselves of their property with a gun, and a majority have done so more than once.

Both men and women report having used firearms in self-defense at high rates, with 33.8% of male gun owners indicating they have defensively used a gun, and 27.3% of female gun owners indicating they have defensively used a gun. Table 2 further breaks down reports of

Electronic copy available at: https://ssrn.com/abstract=4209697

defensive use of firearms by categories of race and ethnic ancestry, illustrating that defensive gun use rates are higher in some minority groups.

| Demographic Group | Proportion of Gun Owners Who Used Gun Defensively | 95% Confidence Interval |
|---|---|---|
| White | 29.7% | 29.0% − 30.5% |
| Black | 44.3% | 41.2% − 47.5% |
| Asian | 26.0% | 21.7% − 30.9% |
| Native American | 47.7% | 42.7% − 52.7% |
| Pacific Islander | 37.1% | 26.0% − 49.7% |
| Other Ethnic Ancestry | 36.2% | 30.3% − 42.7% |
| Hispanic (any ancestry) | 39.3% | 36.0% − 42.8% |
| Male | 33.8% | 32.8% − 34.8% |
| Female | 27.3% | 26.2% − 28.4% |

Table 2: Demographics of defensive gun use.

Given that 31.1% of firearms owners have used a firearm in self-defense, this implies that approximately 25.3 million adult Americans have defended themselves with a firearm. Answers to the frequency question suggest that these gun owners have been involved in a total of approximately 50 million defensive incidents. Assuming that defensive uses of firearms are distributed roughly equally across years, this suggests at least 1.67 million defensive uses of firearms per year in which firearms owners have defended themselves or their property through the discharge, display, or mention of a firearm (excluding military service, police work, or work as a security guard).[9]

---

[9]This is calculated by taking the total number of defensive incidents represented by the survey responses (50 million) and dividing by the number of adult years of the average respondent, which is 30. According to U.S. Census data, the average age of U.S. adults (i.e. the average age of those in the set of everyone 18 years or older) is 48, which also matches our survey data. Thus, the average respondent of the survey has 30 years of adult experience (48 years - 18 years = 30 adult years), over which the defensive incidents captured in this survey are reported.

Note that this estimate is inherently conservative for two reasons. First, it assumes that gun owners possessed firearms, or had access to firearms, from the age of 18. In so far as firearms were only first ac-

12

Electronic copy available at: https://ssrn.com/abstract=4209607



Figure 3: How Guns are Employed in Self-defense: In most defensive incidents no shots are fired.

Gun owner respondents were asked to answer detailed questions regarding each defensive

quired/accessed by some respondents in later years, this would reduce the number of adult firearms owning years represented by the survey responses and result in a higher estimate of the number of defensive incidents per year. Second, this figure only captures defensive gun uses by those currently indicating firearms ownership. According to Kleck and Gertz (1995), only 59.5% of respondents who reported a defensive gun use personally owed a gun (p.187). This would suggest that the true number of defensive gun uses, if those who do not personally own firearms are included in the estimate, could be substantially higher - perhaps as high as 2.8 million per year.

This approach is also robust to critiques that have been made by Hemenway (1996) and others who argue that defensive gun use estimates from surveys can be exaggerated due to recollection bias when respondents are asked to recount incidents within a limited time period. The intuition behind these critiques is that if respondents are asked, for example, if they used a gun defensively within the last year, there is a possibility that people will respond affirmatively if they used a gun in self-defense in recent memory, even if that incident wasn't strictly within the last 12 months. This could lead to inflated "per year" estimates of defensive gun uses, which would only be further magnified when extrapolated out to total defensive gun uses over many years. However, the approach of this survey is not vulnerable to this critique because the survey asks about defensive gun use at any time, not simply those within the last year or some other short time horizon. We thus do not engage in the exercise of extrapolating out estimates from potentially biased measures of comparatively rare events in a restricted window of time. Rather our approach asks questions about defensive gun use in the manner that is most methodologically sound for eliciting unbiased estimates.

Finally, note that our overall approach assumes that children are not employing firearms for self-defense

Electronic copy available at: https://ssrn.com/abstract=4209697

incident that they reported. As Figure 3 shows, in the vast majority of defensive gun uses (81.9%), the gun was not fired. Rather, displaying a firearm or threatening to use a firearm (through, for example, a verbal threat) was sufficient. This suggests that firearms have a powerful deterrent effect on crime, which, in most cases, does not depend on a gun actually being fired or an aggressor being injured.

Figure 4 shows where defensive gun uses occurred. Approximately a quarter (25.2%) of defensive incidents took place within the gun owner's home, and approximately half (53.9%) occurred outside their home but on their property. About one out of ten (9.1%) of defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.



Figure 4: The Location of Defensive Incidents: Most take place outside the home.

For each incident, respondents were asked to indicate what sort of firearm was used. Figure 5 show the distribution of types of firearms employed in defensive incidents. Handguns were the most commonly used firearm for self-defense, used in nearly two-thirds (65.9%) of defensive incidents, followed by shotguns (21.0%) and rifles (13.1%).

Respondents were also asked to indicate how many assailants were involved in each de-

---

with any meaningful frequency. However, for the purpose of sensitivity analysis, if we lower the age used for calculating defensive incident frequency to assume that children as young as 12 years old are commonly possessing and using firearms for self-defense (and no non-firearms owning adults used firearms for self-defense), this would still imply 1.39 million defensive uses of firearms per year (48 years - 12 years = 36 years over which 50 million defensive incidents took place).

Electronic copy available at: https://ssrn.com/abstract=4209697



What sort of firearm did you use during this incident? (%)

Figure 5: Type of Gun Used for Defense: Handguns are the most common type of firearm used in defensive encounters, followed by shotguns and rifles.

fensive incident. As Figure 6 illustrates, about half of defensive encounters (51.2%) involved more than one assailant. Presumably, part of the value of using a firearm in self-defense is that it serves as a force multiplier against more powerful or more numerous assailants. Survey responses confirm that encountering multiple assailants is not an infrequent occurrence in defensive incidents. 30.8% of defensive incidents involved two assailants, and 20.4% involved three or more, while slightly less than half (48.8%) involved a single assailant.

Finally, after respondents answered these detailed questions about each defensive incident, which all flowed from their initial affirmative answer to the question, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed?", all gun owners were asked, "Separate from any incident in which you directly used a gun to defend yourself, has the presence of a gun ever deterred any criminal conduct against you, your family, or your property?" This question was meant to capture incidents that did not involve active self-defense, but for which individuals believed that the presence of a firearm helped deter predatory behavior. For example, a situation in which a combative customer calmed down after noticing that shop owner had a handgun on his or her hip, or a situation in which a trespasser cooperatively left a property when questioned by a landowner who had a rifle slung over his or her shoulder, or a situation in which a friend showed up with a firearm

15

APPX.182

Electronic copy available at: https://ssrn.com/abstract=4209697



Figure 6: Distribution of the Number of Assailants Involved in a Defensive Incident: Multiple assailants are common.

to help diffuse a dangerous situation, could fall into this category. Respondents answering in the affirmative could indicate how many times such deterrence occurred, from once to five or more occasions. As Figure 7 illustrates, separate from the self-defense incidents summarized earlier, 31.8% of gun owners reported that the mere presence of a gun has deterred criminal conduct, and 40.2% of these individuals indicated that this has happened on more than one occasion. Extrapolated to the population at large, this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime.

# 4    Carry Outside of the Home

- A majority of gun owners (56.2%) indicate that there are some circumstances for which they carry a handgun for self-defense.

- Approximately 26.3% of gun owners, or 20.7 million individuals, carry handguns for defensive purposes under a "concealed carry" regime.

- About a third of gun owners (34.9%) have wanted to carry a handgun for self-defense

Electronic copy available at: https://ssrn.com/abstract=4291697



Figure 7: Frequency with which Firearms Deter Crime: 31.8% of firearms owners report that the presence of a firearm has deterred criminal conduct against them, often on more than one occasion.

in a particular situation but local rules prohibited them from doing so.

As Figure 8 illustrates, a majority of gun owners (56.2%), or about 45.8 million, indicate that there are some circumstances in which they carry a handgun for self-defense (which can include situations in which no permit is required to carry, such as on their own property); and about 35% of gun owners report carrying a handgun with some frequency (indicating that they carry "Sometimes," "Often," or "Always or almost always."). Moreover, as Figure 9 summarizes, 34.9% of gun owners report that there have been instances in which they wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

Assessing the number of people who carry a concealed handgun in public is complicated due, in part, to the proliferation of so-called "constitutional carry" or "permitless carry" states in recent years. These states - about 18 at the time this survey was conducted - generally allow adults in good legal standing (often restricted to those age 21 and older) to

17

Electronic copy available at: https://ssrn.com/abstract=4209697



Figure 8: Frequency of Defensive Carry: Carrying a handgun for self-defense is common.



Figure 9: Prohibition of Carry: About a third of gun owners have wanted to carry a handgun for self-defense in a particular situation but local rules prohibited them from doing so.

carry a concealed weapon without a permit. Most of these states previously had a permitting process for concealed carry and required permits to be renewed at regular intervals in order to remain valid. Under constitutional carry, law abiding adults in these states are permitted to carry concealed without an official "permit." However, most of these states continue to issue permits to residents who desire them because such permits can be useful for reciprocal carry benefits in other states. For example, a person acquiring a Utah carry permit would be entitled to carry a handgun in a number of other states such as neighboring Colorado and

Electronic copy available at: https://ssrn.com/abstract=4209697

Nevada.[10] Thus, while basically all gun owners age 21 and over are "permitted" to carry a handgun for self-defense in constitutional carry states, many individuals may also possess a "permit," even though it is redundant for in-state carry.

Unsurprisingly, when asked "Do you have a concealed carry permit?" gun owning residents of many constitutional carry states respond in the affirmative at high rates. Also complicating this question about concealed carry permits is the fact that many states refer to such permits by different names, the fact that the right to carry a handgun can be conferred in certain circumstances by hunting or fishing licenses in some states,[11] and the existence of other related permits, some of which do not license concealed carry (e.g. standard pistol permits in North Carolina or New York, eligibility certificates in Connecticut) and some of which do (most License To Carry permits required for handgun ownership in Massachusetts, state pistol permits in Connecticut, and LEOSA permits available to current and retired law enforcement officers nationwide). Finally, it is also possible for individuals to obtain concealed carry permits in states other than the one in which they reside.

In order to provide a robust but conservative estimate of those who actually carry in public, we code as "public carriers" those individuals who indicated both that they have a concealed carry permit and that they carry a handgun for self-defense at least "sometimes." We also restrict analysis and population estimates to those age 21 and over given that most states restrict those under 21 from carrying concealed in public.

Using this simple definition, we find that 26.3% of gun owners are "public carriers," which translates to approximately 20.7 million individuals who carry handguns in public under a concealed carry regime. Note that this could include current and former law enforcement officers who may be represented in the survey. However, the number of active law enforcement officers in the U.S. is well under a million (approximately 700,000 in 2019).[12]

---

[10] See https://bci.utah.gov/concealed-firearm/reciprocity-with-other-states/

[11] For example, a number of states such as California, Georgia, and Oregon allow those with a hunting or fishing license to carry concealed while engaged in hunting or fishing or while going to or returning from an expedition. See: https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/cfl2016.pdf, https://law.justia.com/codes/georgia/2010/title-16/chapter-11/article-4/part-3/16-11-126/, https://codes.findlaw.com/or/title-16-crimes-and-punishments/or-rev-st-sect-166-260.html

[12] See https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-74

Electronic copy available at: https://ssrn.com/abstract=4209697

# 5    Types of Firearms and Magazines Owned

- 82.7% of gun owners report owning a handgun, 68.8% report owning a rifle, and 58.4% report owning a shotgun.

- The average gun owner owns about 5 firearms. The median gun owner owns 3.

- 29.0% of gun owners own only one firearm.

- 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.

- 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.

- Overall, Americans own in excess of 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

## 5.1    Rifles, Shotguns, and Handguns

Respondents were asked to indicate the number of rifles, shotguns, and handguns that they owned. 82.7% of gun owners report owning a handgun (95% CI 82.0% - 83.3%), 68.8% reported owning a rifle (95% CI 68.1% - 69.6%), and 58.4% report owning a shotgun (95% CI 57.6% - 59.2%). Note that using survey weights based on in-survey demographics of firearms ownership has no substantive effect on these estimates: Handgun, 83.7% (82.9% - 84.4%), Rifle, 68.6% (67.7% - 69.6%), Shotgun 58.6% (57.6% - 59.6%).

Approximately 99.8% of respondents indicated owning fewer than 100 firearms of each type, and approximately 97.2% indicated owning fewer than 10 firearms of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 firearms in any category in the analysis that examines average numbers of guns owned. Also, 1.5% of respondents entered zero for each category of firearms ownership. While ostensibly inconsistent with having earlier indicated ownership of a firearm, there are a number of plausible explanations for this discrepancy including a reluctance to

20

Electronic copy available at: https://ssrn.com/abstract=4209687



Percentage of gun owners reporting ownership of at least one firearm in the indicated category.

Figure 10: Percent of gun owners who own each type of firearm.

provide this level of detailed information, having use of a firearm in one's household which one does not personally own, or owning a firearm that technically does not fall into one of these three categories. We exclude these response in analyzing ownership rates below. However, including them has no significant effect on estimates.

On average, gun owners owned 5.1 firearms, consisting of 1.8 rifles, 1.2 shotguns, and 2.1 handguns. Figure 11 plots histograms of the number of firearms owned by respondents. Unsurprisingly, these are skewed right, indicating that most gun owners own a small number of guns, while a smaller portion of gun owners own a large number of guns. The median gun owner owned 3 firearms. 29.0% of firearms owners owned only one firearm.[13] Among those who only own one firearm, handguns are the most commonly owned type of gun (64.7%), followed by rifles (22.5%) and shotguns (13.3%).

Overall, these estimates imply that Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

_____

[13]An earlier draft had estimated that 21.9% of gun owners owned only one firearm, but the denominator for that calculation mistakenly included respondents who did not provide an answer to this question. The estimate of 29.0% properly incorporates all information provided by respondents.

Electronic copy available at: https://ssrn.com/abstract=4209697



(a) Histogram of number of rifles owned      (b) Histogram of number of shotguns owned

(c) Histogram of number of handguns owned      (d) Histogram of total number of guns owned

Figure 11: Histograms showing the distributions of gun ownership.

## 5.2 Magazine Ownership

The survey asked respondents whether they have ever owned a magazine that holds more than 10 rounds. Those who answered in the affirmative were then asked to indicate the purposes for which they owned such magazines and to estimate how many magazines of different types they owned.

48.0% of gun owners (95% CI 47.2%-48.7%) responded yes to the question, "Have you ever owned a handgun or rifle magazine that holds more than 10 rounds? (You can count magazines that you may keep in another state if there are local restrictions against ownership.)" indicating that they had owned such magazines. Note that, again, using survey

Electronic copy available at: https://ssrn.com/abstract=4209697

weights based on in-survey demographics of firearms ownership has no substantive effect on this estimate (47.4%, CI 46.5%-48.4%). This suggests that approximately 39 million adults in the U.S. have owned magazines that hold more than 10 rounds.



Percentage indicating each factor was a reason for ownership.

Figure 12: Purposes indicated for owning 11+ capacity magazines.

Figure 12 shows the percentage of respondents who indicated that they owned magazines that can hold more than 10 rounds for the following purposes: defense outside the home (41.7%), home defense (62.4%), competitive shooting sports (27.2%), recreational target shooting (64.3%), hunting (47.0%), and other (3.9%). Note that respondents could choose multiple purposes for which they owned such magazines. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

Respondents who indicated that they had owned magazines that can hold more than 10 rounds were also asked to estimate the number of pistol and rifle magazines they owned of particular sizes. Numerical responses were unbounded. Approximately 99.8% of respondents indicated owning fewer than 100 magazines of each type, and approximately 96.5% indicated owning fewer than 10 magazines of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 magazines

Electronic copy available at: https://ssrn.com/abstract=4209697

in a category.



Average number of handgun magazines owned by capacity.

Figure 13: About how many handgun magazines of each type would you estimate you have owned?

Figure 13 shows the average number of handgun magazines of each type reported by respondents in this section: 10 rounds or less (3.1 magazines), 11-15 rounds (2.5 magazines), more than 15 rounds (4.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 10 handgun magazines, and more than two-thirds of these magazines hold more than 10 rounds. Note that the question asked whether respondents have ever owned such magazines and how many such magazines they have owned, so these estimates should be interpreted as an upper bound on current ownership given that some magazines may have been resold. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 269 million handgun magazines that hold over 10 rounds.

Figure 14 shows the average number of rifle magazines of each type reported by respondents in this section: 10 rounds or less (2.4 magazines), 11-15 rounds (1.8 magazines), over 15 rounds (5.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 9.6 rifle magazines, and about three-quarters of these magazines hold more than 10 rounds. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 273 million rifle magazines that

Electronic copy available at: https://ssrn.com/abstract=4209697

hold over 10 rounds.



Average number of rifle magazines owned by capacity.

Figure 14: About how many rifle magazines of each type would you estimate you have owned?

These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds. Finally, note that these questions about the types of magazines owned were only asked of those who indicated that they had owned a magazine that holds more than 10 rounds, and thus we do not know how many magazines up to 10 rounds are owned by the 52.0% of gun owners who are not in this category.

Table 3 shows the breakdown of ownership of magazines that hold over 10 rounds across different demographic segments.

Table 4 shows the percentage of gun owners in each state who indicated that they have owned magazines that hold more than 10 rounds. Note that this question explicitly instructed respondents that "You can count magazines that you may keep in another state if there are local restrictions against ownership." This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such magazines. It's also possible that those answering in the affirmative possess magazines that were grandfathered in because they were acquired before such bans or that some respondents have gotten rid of magazines that they owned in the past.

Another dynamic that likely contributes to such differences in ownership rates derives

Electronic copy available at: https://ssrn.com/abstract=4209697

| Demographic Group | Proportion Owned 11+ Mags | 95% Confidence Interval |
|---|---|---|
| White | 47.0% | 46.1% – 47.8% |
| Black | 55.2% | 52.2% – 58.2% |
| Asian | 50.0% | 44.8 – 55.2% |
| Native American | 52.6% | 47.7% – 57.4% |
| Pacific Islander | 59.1% | 47.4% – 69.9% |
| Other Ethnic Ancestry | 59.6% | 53.3% – 65.6% |
| Hispanic (any ancestry) | 61.6% | 58.3% – 64.7% |
| Male | 57.7% | 56.7% – 58.7% |
| Female | 34.1% | 33.0% – 35.3% |

Table 3: Demographics of ownership of magazines that hold more than 10 rounds.

from the fact that in states with low rates of firearms ownership, such as DC and Hawaii, those few individuals who do own guns are presumably more likely to be gun enthusiasts. Indeed, analysis of the survey data reveals that states with higher rates of firearms ownership are associated with slightly lower rates of ownership of magazines that own over 10 rounds, and this difference is statistically significant (coef = -0.36, p=.03).

Given that such a large percentage of gun owners indicated that they owned magazines that hold over ten rounds for defensive purposes, we further analyze the potential value of these magazines for defense. Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired.

As part of the self-defense section of the survey, respondents were invited to answer an open response question that asked: "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes

Electronic copy available at: https://ssrn.com/abstract=4209697

| State | Owned 11+ cap. mags | 95% Confidence Interval |
|---|---|---|
| Alabama | 48.1% | 42.7% − 53.6% |
| Alaska | 52.7% | 39.6% − 65.4% |
| Arizona | 47.5% | 42.3% − 52.8% |
| Arkansas | 50.7% | 44.1% − 57.3% |
| California | 53.8% | 51.0% − 56.5% |
| Colorado | 51.4% | 45.3% − 57.4% |
| Connecticut | 42.6% | 34.4% − 51.3% |
| Delaware | 50.6% | 39.8% − 61.5% |
| District of Columbia | 69.2% | 49.5% − 83.8% |
| Florida | 46.9% | 43.9% − 49.8% |
| Georgia | 52.4% | 48.7% − 56.2% |
| Hawaii | 59.3% | 40.3% − 75.8% |
| Idaho | 45.4% | 36.7% − 54.4% |
| Illinois | 51.5% | 47.3% − 55.6% |
| Indiana | 46.5% | 41.8% − 51.2% |
| Iowa | 35.4% | 28.0% − 43.6% |
| Kansas | 42.2% | 35.4% − 49.4% |
| Kentucky | 43.7% | 38.5% − 49.0% |
| Louisiana | 47.4% | 41.1% − 53.8% |
| Maine | 37.9% | 28.7% − 48.0% |
| Maryland | 50.8% | 43.7% − 57.8% |
| Massachusetts | 53.3% | 45.7% − 60.8% |
| Michigan | 37.1% | 33.2% − 41.1% |
| Minnesota | 39.8% | 34.0% − 46.0% |
| Mississippi | 44.6% | 37.3% − 52.2% |
| Missouri | 50.6% | 45.8% − 55.5% |
| Montana | 52.6% | 39.8% − 65.1% |
| Nebraska | 45.5% | 35.9% − 55.3% |
| Nevada | 61.0% | 52.8% − 68.5% |
| New Hampshire | 43.9% | 31.6% − 56.9% |
| New Jersey | 52.2% | 46.5% − 57.8% |
| New Mexico | 49.2% | 36.9% − 61.5% |
| New York | 54.9% | 51.8% − 58.0% |
| North Carolina | 43.9% | 39.9% − 47.9% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 42.0% | 38.4% − 45.7% |
| Oklahoma | 47.5% | 41.7% − 53.4% |
| Oregon | 49.8% | 42.9% − 56.6% |
| Pennsylvania | 39.6% | 36.0% − 43.2% |
| Rhode Island | 55.3% | 39.5% − 70.1% |
| South Carolina | 42.8% | 37.7% − 48.0% |
| South Dakota | 50.0% | 40.2% − 59.8% |
| Tennessee | 44.1% | 39.5% − 48.7% |
| Texas | 54.1% | 51.3% − 56.8% |
| Utah | 46.8% | 38.2% − 55.6% |
| Virginia | 47.5% | 42.7% − 52.4% |
| Washington | 53.1% | 47.8% − 58.4% |
| West Virginia | 44.8% | 37.7% − 52.1% |
| Wisconsin | 33.6% | 28.5% − 39.0% |
| Wyoming | 63.0% | 51.4% − 73.3% |

Table 4: Percent of gun owners who have indicated that they have ever owned magazines that hold over 10 rounds by state. Note that this includes magazines that an owner holds in other states if there are local ownership restrictions.

Electronic copy available at: https://ssrn.com/abstract=4209697

to have a firearm with a magazine capacity in excess of 10 rounds?  If so, please briefly describe that situation."  Approximately 550 respondents gave a affirmative response with most sketching out details of the encounter.  Examples of these responses (reported verbatim) include:

- I got jumped by multiple people in a carjacking in front of our apartments with my wife and children.

- Yes. I was robbed on a street 1 time by a group of about 6 people that at least 1 was armed and I wasn't.  It took about 6 hours of emergency surgery to gat my bones in face jaws and skull back in place form being beaten in the head face kicked all over.  Damn near killed me.

- Yes, a man broke into our apartment, high.  He was approx 6'4, 300 pounds & threw a friend of ours around the living room like a rag doll.  Beat her repeatedly.

- Yes. The first incident I mentioned.  Three men attempted to rob me outside my home, with the intention of entering my home thereafter.  My wife and child were inside the home at the time.  That was in California with a magazine that only held 7 shots.  I am a great shot, prior military and other firearms training, but I hate to only have 7 shots with three people.  In such a situation, very well trained people, pumped up with adrenalin can and do miss their target.  Thank you.

- Yes, absolutely.  I am mobility challenged and was walking my dog one day.  Three men ambushed me from behind, but luckily my dog chased them away.  My dog actually bit one of the men.

- On the farm, we have had mountain lions killing our calves so a larger animal could require more rounds

- When two people attacked my company's warehouse

- Yes, I was alone with my son and 3 large men were trying to break in, I was unable to reload, thank goodness they realized and left.

Electronic copy available at: https://ssrn.com/abstract=4209607

- I was charged by a bear. It was very scary in the moment I panicked and rattled over multiple shots. Most missed but some hit home and eventually stopped him.

- Yes. I went in but into a store and 4 thugs approached me telling me to give them money. I produced my handgun at my side and they left. If this had been a shooting with multiple bad guys with guns a 15 round magazine is best.

- When I was a teenager 4 guys did a home invasion at our house. I could easily see needing a 20 to 30 round clip would be necessary.. we didnt have weapons and my mom and dad were hurt pretty bad. Dad was stabbed 4 times and they had a gun too. Thats when I decided when I was on my own that I would have protection.

- About 20 coyotes attacked some of my livestock. It took two 30 round magazines to repel the animals and then only after killing 10 of them.

- Yes. I was surrounded by would-be assailants in a perking lot. I was able to escape unharmed, but if they had rushed me, I would most certainly had to lay down a rapid field of fire, alternately in various directions. In that scenario, I probably would have missed the targets and needed multiple, rapid follow-up shots to hit or at least dissuade the attackers from pressing forward. Only a firearm with 10 or more round magazine would offer that kind of defensive capability.

- Had several people trespass on my property doing something illegal and when I called the police said it would be a while before they could come out so when I asked the people to leave they threatened to kill me but after they seen that I was open carry the left if the situation went a different way I dont know if I would have been about to protect myself with as many of them as there was

- The time when there were 4 people in my home and I was fearful of being hurt and my concern was do I have enough rounds to protect myself what if I missed if I had to fire the weapon .

- Yes. Been stalked by a pack of coyotes while hiking with my children

Electronic copy available at: https://ssrn.com/abstract=4209697

- Yes when I had more than one person trying to break into my car. I live out in the country so I do not have time to wait for police to get to me I have to act fast and protect myself and my family.

- Yes, I ran into a situation where there were numerous criminals breaking the law and rioting at a public venue during an annual festival event. They were blocking my self and my friends, two of which were females, from leaving the area as well as preventing the police from reaching us. I was very glad that I had multiple magazines that had more then a 10 round capacity.

- 2 men broke into my home while I was sleeping. I woke up and heard them breaking stuff downstairs. I grabbed my gun and ran down stairs and confronted them. I pointed my gun at them and told them to get out. They ran off.

- I was stopped at a red light. Car in front of me backed up and the car behind me pulled up to my bumper. Both drivers got out and approached both sides of my car. Light turned green. I gassed it pushing the car in front of me out of the way. They had bats to break my windows. Would've robbed me I think. Was under a overpass.

- Twice it was people attempting to break into my home I was alone age 64 and 4 burly men thought no one was home as I had been napping. They learned quickly this old lady was not without protection. They saw the gun and quickly left. I called 911 and they were apprended they had been robbing homes for 6 weeks in the area. Those home who had guns they left and went elsewhere. Another time people a group wanted a big party came to the wrong road half were drunk or stoned. I had small children. There was finally someone sober enough to see I had a gun and that I meant business it was the middle of the night and they wanted to party but had the wrong road. The sane person got them to all leave and they never came back. We had no phone at that time. The third time was a cougar attacking my livestock. It ran off but had killed 4 goats. We called the game warden they had a special hunt and killed it as we had been the 4th place hit it had killed livestock. We have had cougar on our property in our yard 3 times since once my son shot one stalking him and his dog the other time

Electronic copy available at: https://ssrn.com/abstract=4209607

it ran off before he could get his gun ready.

- yes, but not at home, we were camping in prescott arizona and several men came up and wanted to harass and steal from our family. We all felt very threatened and if another couple of people had not shown up with their guns the people would have over ran us and my family would have been hurt.

- It could have helped during a robbery at my residence where 4 intruders entered my home

- I was a small business owner before I became disabled. I would often carry large amounts of cash. On more than 1 occasion I was faced with pulling my weapon or lose my cash

- I was walking a long distance through Philadelphia to get to a restaurant and was approached by 3 men who demanded to know why I thought I could go through their neighborhood. I told them I did not want any trouble and tried to continue walking but one stood in my way and asked if I actually thought I was going to leave without answering them. I began to wonder if I was going to be robbed or assaulted when they first approached and at this point it seemed like they would prevent me from leaving. I lifted my shirt and placed my hand on a pistol I was legally able to conceal carry and said yes I would be leaving. They backed away from me but continued to yell things at me as I left the area. I never pulled the gun out, but them knowing I had it and may use it to stop them was enough to escape unharmed. Having less than 10 rounds against 3 attackers, especially if they were also armed, would have put me at a disadvantage if I was unable to accurately hit my targets initially and they continued to Pursue me.

- Yes, I was in Illinois, which does not honor Indiana concealed carry. I had to leave my firearm at home. This was truly the only time in my life I felt I needed to actually use a firearm, but almost was killed. 4 men (3 with guns displayed and 1 with a knife in his hand) were walking up to me fast in a parking lot screaming stop and give me everything you have. The parking lot was near empty, and dark outside. I was able

Electronic copy available at: https://ssrn.com/abstract=4209697

to unlock my car while running, start the car and speed off. Just as I got in the car, I had just enough time to lock the door before the 3 men pointed there guns at the car and the other was stabbing the window with a knife. They intended to rob and kill me. I couple rounds were fired as I sped off. I would have needed minimally 10 rounds if I had discharged given their distancing. I almost died because of Illinois law and my street smarts and luck was the only thing that saved me

- Yes An incident occurred when a man was drunk and crashed his car in front of me while I was carrying my 2 small children. A large group of his friends tried to get the drunk away before the police arrived. A fight started with them punching my elderly dad and threatened my elderly mother with violence.

- I was confronted then attacked by a group of about 12 teens when I was a teenager. They kicked me and caused a sever head injury and fractured ribs. I was defenseless. Being able to brandish a weapon with the capacity to take on a group of that size would have deterred their next step of physically assaulting me

- The two large males that attempted to break into my home. Much larger than myself. A 9mm would take several shots to slow down either and/or both.

- Yes. I am a 5'2" disabled female. I was stalked by a homeless drug addict. He was detained 4-5 times due to red behavior because he was high on methamphetamine. This person could have potentially done great harm to me. Meth addicts don't always go down easy. Sometimes it takes numerous rounds to get them down.

- My brother and I were robbed at gun point when ione of the men got in the car with me after my brother got out of the car. The man had already told my brother that he wanted his money and that there were other people watching across the parking lot in case he had any problems with us. So when my brother got out, that man got in with a gun and stuck it right into my right side. He told me not to look at him and to give him all my money. With the other men standing in different positions in the parking lot my brother could have tried to shoot them (or at them) to try and scare them off

Electronic copy available at: https://ssrn.com/abstract=4209697

and if he could have had a larger capacity magazine he could have been able to fire more rounds at them to keep them away while we tried to get help from someone.

Finally, it is worth noting that, although a majority of these scenarios involve the prospect of defending against criminal aggression, a number involve defending against animals. The pilot survey in Vermont similarly documented a number of incidents involving animals (see Appendix A). This is a phenomenon that has been largely neglected in the scholarly literature examining the value of firearms for self-defense, and it would be helpful for future research to evaluate the frequency with which firearms are employed in defense against animal threats.

## 5.3   Ownership of AR-15 and similarly styled rifles

All gun owners were asked, "Have you ever owned an AR-15 or similarly styled rifle? You can include any rifles of this style that have been modified or moved to be compliant with local law." 30.2% of gun owners, about 24.6 million people, indicated that they have owned an AR-15 or similarly styled rifle. Using survey weights based on in-survey demographics of firearms ownership has no effect on this estimate. Respondents were then asked to indicate how many of such rifles they have owned. Approximately 99.7% indicated owning under 100 and 98.4% under 10. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we disregard the 0.3% that indicate owning over 100 in calculating average ownership numbers. Among those who indicate having owned AR-15 and similarly styled rifles, they indicate having owned an average of 1.8, with the median owner having owned 1. This suggest that up to 44 million AR-15 styled rifles have been owned by U.S. gun owners. Note, again, that this estimate is based on a question that asks whether someone has ever owned such a rifle, so this estimate should be interpreted as an upper bound on current ownership given that some rifles may have been resold.

Figure 15 shows the percentage of respondents who indicated that they owned AR-15 styled rifles for the following purposes: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). Note that respondents could choose multiple purposes for which

Electronic copy available at: https://ssrn.com/abstract=4206697



Figure 15: Purposes indicated for owning AR-15 styled rifles.

they owned such firearms. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

| Demographic Group | Proportion Owned AR-15 Styled Rifle | 95% Confidence Interval |
|---|---|---|
| White | 29.6% | 28.9% − 30.4% |
| Black | 34.0% | 31.0% − 37.1% |
| Asian | 29.2% | 24.6% − 34.2% |
| Native American | 35.4% | 30.8% − 40.3% |
| Pacific Islander | 48.4% | 36.3% − 60.7% |
| Other Ethnic Ancestry | 34.6% | 28.8% − 41.1% |
| Hispanic (any ancestry) | 38.3% | 35.0% − 41.8% |
| Male | 36.4% | 35.5% − 37.4% |
| Female | 21.3% | 20.3% − 22.3% |

Table 5: Demographics of ownership of AR-15 styled rifles.

Table 5 shows the breakdown of ownership of AR-15 styled rifles across different demographic segments. As this table demonstrates, AR-15 styled rifles are commonly owned at

Electronic copy available at: https://ssrn.com/abstract=4209697

high rates across many different demographic groups.

Table 6 shows the percentage of gun owners in each state who indicated that they have owned AR-15 styled rifles. Note that this question explicitly instructed respondents that "You can include any rifles of this style that have been modified or moved to be compliant with local law." Thus, as with magazines, these answers can include firearms that are kept in other states, as well as firearms that were grandfathered in or modified to be compliant with local law, or respondents who have since sold or disposed of such guns. This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such firearms.

# 6   Conclusion

This report summarizes the main findings of the most comprehensive survey of firearms ownership and use conducted in the United States to date. While many of its estimates corroborate prior survey research in this area, it also provides unique insights that are relevant to timely public policy debates, particularly regarding the defensive use of firearms and the ownership and use of AR-15 styled rifles and magazines that hold over 10 rounds.

This survey finds firearms ownership rates slightly above those documented before the Covid-19 pandemic, which is consistent with other recent scholarly research finding a large surge in firearms purchases during the pandemic, particularly among first time buyers (Crifasi et al., 2021; Miller et al., 2022).

In sum, about 31.9% of U.S. adults, or 81.4 million Americans, own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns. About 24.6 million individuals have owned a up to 44 million AR-15 and similarly styled rifles, and 39 million individuals have owned up to 542 million magazines that hold over 10 rounds. Approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and guns are used defensively by firearms owners in approximately 1.67 million incidents per year. A majority of gun owners (56.2%) indicate that they carry a handgun for self- defense in at least some cir- cumstances, and about 35% of gun owners report carrying a handgun with some frequency.

Electronic copy available at: https://ssrn.com/abstract=4206637

| State | Owned AR-15 Style Rifle | 95% Confidence Interval |
|---|---|---|
| Alabama | 28.9% | 24.1% − 34.3% |
| Alaska | 37.0% | 24.4% − 51.6% |
| Arizona | 28.8% | 24.2% − 34.0% |
| Arkansas | 35.0% | 28.7% − 41.8% |
| California | 37.5% | 34.8% − 40.2% |
| Colorado | 33.3% | 27.7% − 39.5% |
| Connecticut | 21.8% | 15.3% − 30.2% |
| Delaware | 20.3% | 12.6% − 30.9% |
| District of Columbia | 30.0% | 14.1% − 52.7% |
| Florida | 28.1% | 25.5% − 30.9% |
| Georgia | 31.4% | 27.9% − 35.1% |
| Hawaii | 34.6% | 19.1% − 54.3% |
| Idaho | 31.0% | 23.3% − 40.0% |
| Illinois | 32.6% | 28.7% − 36.7% |
| Indiana | 30.8% | 26.5% − 35.5% |
| Iowa | 27.1% | 20.4% − 35.1% |
| Kansas | 28.4% | 22.4% − 35.4% |
| Kentucky | 29.9% | 25.2% − 35.1% |
| Louisiana | 27.5% | 22.0% − 33.7% |
| Maine | 22.0% | 14.6% − 31.6% |
| Maryland | 29.9% | 23.7% − 36.9% |
| Massachusetts | 33.8% | 26.9% − 41.4% |
| Michigan | 24.9% | 21.5% − 28.6% |
| Minnesota | 20.7% | 16.1% − 26.3% |
| Mississippi | 30.4% | 23.8% − 38.0% |
| Missouri | 28.0% | 23.8% − 32.7% |
| Montana | 26.8% | 16.8% − 39.8% |
| Nebraska | 22.4% | 15.3% − 31.8% |
| Nevada | 42.4% | 34.6% − 50.6% |
| New Hampshire | 23.2% | 14.0% − 36.0% |
| New Jersey | 30.7% | 25.7% − 36.2% |
| New Mexico | 29.5% | 19.4% − 42.1% |
| New York | 37.8% | 34.8% − 41.0% |
| North Carolina | 25.6% | 22.2% − 29.4% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 25.9% | 22.7% − 29.4% |
| Oklahoma | 29.3% | 24.1% − 35.0% |
| Oregon | 25.6% | 20.0% − 32.2% |
| Pennsylvania | 24.4% | 21.3% − 27.8% |
| Rhode Island | 29.7% | 17.3% − 46.1% |
| South Carolina | 25.3% | 21.0% − 30.2% |
| South Dakota | 35.8% | 26.8% − 45.9% |
| Tennessee | 28.9% | 24.8% − 33.3% |
| Texas | 36.0% | 33.3% − 38.7% |
| Utah | 24.8% | 17.9% − 33.2% |
| Virginia | 26.0% | 21.9% − 30.6% |
| Washington | 35.3% | 30.3% − 40.6% |
| West Virginia | 27.4% | 21.3% − 34.5% |
| Wisconsin | 19.7% | 15.6% − 24.6% |
| Wyoming | 36.1% | 25.9% − 47.8% |

Table 6: Percent of gun owners who have indicated that they have ever owned an AR-15 styled rifle by state. Note that this includes rifles that an owner holds in other locations if there are local ownership restrictions and rifles modified to be compliant with local laws.

Electronic copy available at: https://ssrn.com/abstract=4209697

Finally, the demographics of firearms ownership and defensive use are diverse, with different demographic groups commonly owning and using firearms at substantial rates.

Electronic copy available at: https://ssrn.com/abstract=4209697

# References

Deborah Azrael, Lisa Hepburn, David Hemenway, and Matthew Miller. The stock and flow of us firearms: results from the 2015 national firearms survey. *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5):38–57, 2017.

Anna Brown. *America's Complex Relationship With Guns: An In-depth Look at the Attitudes and Experiences of US Adults.* Pew Research Center, 2017.

Philip J Cook and Jens Ludwig. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Police Foundation Washington, DC, 1996.

Cassandra K Crifasi, Julie A Ward, Emma E McGinty, Daniel W Webster, and Colleen L Barry. Gun purchasing behaviours during the initial phase of the covid-19 pandemic, march to mid-july 2020. *International review of psychiatry*, 33(7):593–597, 2021.

Gallup. *In Depth: Topics, Guns.* https://news.gallup.com/poll/1645/guns.aspx , https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx, 2021.

David Hemenway. Survey research and self-defense gun use: an explanation of extreme overestimates. *J. Crim. L. & Criminology*, 87:1430, 1996.

Lisa Hepburn, Matthew Miller, Deborah Azrael, and David Hemenway. The us gun stock: results from the 2004 national firearms survey. *Injury prevention*, 13(1):15–19, 2007.

Gary Kleck and Marc Gertz. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J. Crim. L. & Criminology*, 86:150, 1995.

Gary Kleck and Marc Gertz. Carrying guns for protection: results from the national self-defense survey. *Journal of Research in Crime and Delinquency*, 35(2):193–224, 1998.

Jens Ludwig, Philip J Cook, and Tom W Smith. The gender gap in reporting household gun ownership. *American Journal of Public Health*, 88(11):1715–1718, 1998.

Matthew Miller, Wilson Zhang, and Deborah Azrael. Firearm purchasing during the covid-19 pandemic: results from the 2021 national firearms survey. *Annals of internal medicine*, 175(2):219–225, 2022.

Electronic copy available at: https://ssrn.com/abstract=4209597

Ann P Rafferty, John C Thrush, Patricia K Smith, and Harry B McGee. Validity of a household gun question in a telephone survey. *Public Health Reports*, 110(3):282, 1995.

Paul Spector. Social desirability bias. *The SAGE encyclopedia of social science research methods*, 2004.

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix A: Vermont Pilot Survey

An initial version of this survey was fielded in Vermont. We report below the top line results from the Vermont survey, which closely mirror the results of the national survey.

In sum, 572 Vermont residents were surveyed, of which 163 indicated owning firearms. The survey sample represented the demographics of Vermont well on all dimensions except gender, as women were over represented and comprised 65.2% of respondents. Thus, weights were employed for gender.

With weighting employed, we find that 30% of Vermont residents own a firearm. Given that the adult population of Vermont is approximately 486,000, this suggest that there are over 145,600 firearms owners in Vermont. 42.1% of Vermont firearms owners are estimated to be female and 57.9% male.

As Figure 16 illustrates, almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property (not counting incidents that were due to military service, police work, or work as a security guard). In nearly half of these defensive gun uses (45.9%), respondents reported facing multiple assailants. 85.8% of all incidents were resolved without the firearm owner having to fire a shot (e.g. by simply showing a firearm or verbally threatening to use it).



Figure 16: Proportion of gun owners in Vermont who have use a firearm in self-defense and number of assailants involved.

Electronic copy available at: https://ssrn.com/abstract=4209697

Sample of Vermont responses to open ended question prompt of "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?":

- in the first incident it was five to one. I was outnumbered. three rounds per person if needed

- The time I was assaulted by 10 individuals.

- Yes. We have bear that frequently come to our home. They've attempted to get into my truck, they have come onto our porch thru the dog door (XL size) they have been in our chicken coops and in our garage. They have damaged many items, destroyed gas grills and threatened my dogs and children. Sometimes a warning shot isn't enough. And if, God forbid, the bear turned and started to attack us multiple bullets would be needed to stop him.

- About 6 individuals broke into my house one night. I locked myself in my room and they tried to break my door down. I threatened them with use of deadly force, but they kept trying. One of them was outside and broke my bedroom window and I aimed my shotgun at him and he ran off. I threatened again with the sound of charging my shotgun that they knew I wasn't bluffing and they all fled. Had they entered with the intent to kill my family and I, then we would have been out numbered. If there was an exchange of gun fire, I wouldn't want to have the restriction of reloading within the time I needed to protect my family and myself. Outgun the enemy or the enemy will surely outgun you. Limiting everyone's right to weapons is not the answer, and clearly this attempt to ban high capacity magazines is just the catalyst to a government gun grab for easier totalitarian control of the population.

- Yes, i had two run ins with a mountain lion.

- We had a home invasion two times in a month

- Yes. We live in VT. Every time I fired my gun in defense of my property it was to deter bears from damaging my property. It takes more than 1 shot to scare a bear. If

41

Electronic copy available at: https://ssrn.com/abstract=4209697

it charges you or your family it'll definitely take a bunch of shots to stop the bear.

- Yes.  Just because there are 10 rounds in a magazine does not mean all will be on target during a self defense incident.  In 2012 while I was in college in Connecticut, I got jumped by 4 people in Hartford ct.  I had nothing on me to defend myself.  The men all threatened me with knives and handguns.  I wish I was able to carry a firearm at that point.

42
APPX.209

Electronic copy available at: https://ssrn.com/abstract=4209597

# Appendix B: Sampling Proportions With and Without Weights for National Survey

| Gender | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Male | 49.32% | 49.23% |
| Female | 50.68% | 50.77% |

| Age Range | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| 18-20 | 7.89% | 5.04% |
| 21-25 | 8.11% | 8.58% |
| 26-30 | 7.30% | 9.24% |
| 31-35 | 11.67% | 8.67% |
| 36-40 | 12.66% | 8.44% |
| 41-45 | 8.49% | 7.70% |
| 46-50 | 6.46% | 8.09% |
| 51-55 | 6.37% | 8.13% |
| 56-60 | 7.39% | 8.52% |
| 61-65 | 7.67% | 7.87% |
| 66-70 | 8.03% | 6.59% |
| 71-75 | 5.07% | 5.13% |
| 76-80 | 1.94% | 3.50% |
| Over 80 | 0.93% | 4.49% |

Electronic copy available at: https://ssrn.com/abstract=4209697

| Annual Household Income | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Less than $10,000 | 8.87% | 3.40% |
| $10,000-20,000 | 8.95% | 4.89% |
| $20,000-30,000 | 9.69% | 6.26% |
| $30,000-40,000 | 8.78% | 7.06% |
| $40,000-50,000 | 7.44% | 7.21% |
| $50,000-60,000 | 7.72% | 6.96% |
| $60,000-70,000 | 6.00% | 6.96% |
| $70,000-80,000 | 6.37% | 6.37% |
| $80,000-90,000 | 4.51% | 5.76% |
| $90,000-100,000 | 5.89% | 5.76% |
| $100,000-150,000 | 17.67% | 19.11% |
| Over $150,000 | 8.12% | 20.23% |

Electronic copy available at: https://ssrn.com/abstract=4209697

| State of Residence | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Alabama | 1.83% | 1.52% |
| Alaska | 0.39% | 0.22% |
| Arizona | 2.10% | 2.16% |
| Arkansas | 1.10% | 0.91% |
| California | 9.75% | 11.95% |
| Colorado | 1.59% | 1.75% |
| Connecticut | 1.23% | 1.09% |
| Delaware | 0.56% | 0.30% |
| District of Columbia | 0.27% | 0.21% |
| Florida | 7.29% | 6.51% |
| Georgia | 3.67% | 3.24% |
| Hawaii | 0.36% | 0.44% |
| Idaho | 0.44% | 0.56% |
| Illinois | 4.14% | 3.87% |
| Indiana | 2.13% | 2.05% |
| Iowa | 0.91% | 0.96% |
| Kansas | 0.92% | 0.89% |
| Kentucky | 1.61% | 1.36% |
| Louisiana | 1.23% | 1.41% |
| Maine | 0.51% | 0.41% |
| Maryland | 1.67% | 1.87% |
| Massachusetts | 1.88% | 2.13% |
| Michigan | 3.21% | 3.05% |
| Minnesota | 1.36% | 1.73% |
| Mississippi | 0.83% | 0.90% |
| Missouri | 1.93% | 1.86% |
| Montana | 0.25% | 0.33% |
| Nebraska | 0.53% | 0.59% |
| Nevada | 0.90% | 0.94% |
| New Hampshire | 0.40% | 0.42% |
| New Jersey | 2.97% | 2.81% |
| New Mexico | 0.36% | 0.64% |
| New York | 8.09% | 6.11% |
| North Carolina | 3.18% | 3.16% |
| North Dakota | 0.13% | 0.24% |
| Ohio | 4.13% | 3.57% |
| Oklahoma | 1.32% | 1.20% |
| Oregon | 1.05% | 1.28% |
| Pennsylvania | 4.30% | 3.93% |
| Rhode Island | 0.33% | 0.33% |
| South Carolina | 1.68% | 1.55% |
| South Dakota | 0.48% | 0.27% |
| Tennessee | 2.18% | 2.09% |
| Texas | 6.91% | 8.81% |
| Utah | 0.56% | 0.99% |
| Virginia | 2.43% | 2.61% |
| Washington | 2.03% | 2.33% |
| West Virginia | 0.71% | 0.54% |
| Wisconsin | 1.83% | 1.78% |
| Wyoming | 0.32% | 0.17% |

45

APPX.212

Electronic copy available at: https://ssrn.com/abstract=4209697

| Race | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| White | 81.26% | 76.30% |
| Black | 9.85% | 13.40% |
| Asian | 3.98% | 5.90% |
| Native American | 2.19% | 1.30% |
| Pacific Islander | 0.49% | 0.20% |
| Other | 2.22% | 2.90% |

Electronic copy available at: https://ssrn.com/abstract=4209697



**BETTER HEARING INSTITUTE**

Your Guide To

# PREVENTION OF HEARING LOSS FROM NOISE





# CONTENTS

| | |
|---|---|
| Introduction | 3 |
| Noise-induced hearing loss | 3 |
| Tinnitus and noise exposure | 4 |
| How do we hear and the impact of noise | 5 |
| Noise "ages" hearing | 6 |
| What are the symptoms of NIHL? | 7 |
| Preventing noise-induced hearing loss | 7 |
|     Noise thermometer | 8 |
|     Hearing loss prevention devices summary | 9 |
|     Occupations at risk for hearing loss | 11 |
| Conclusions | 11 |
| References | 12 |

# Prevention of Hearing Loss from Noise Exposure

*Brian J. Fligor, Sc.D.*

*Children's Hospital Boston, Harvard Medical School, Boston, MA*

## Introduction

Noise is one of the most common causes of hearing loss, and one of the most common occupational illnesses in the United States. A single shot from a large caliber firearm, experienced at close range, may permanently damage your hearing in an instant. Repeated exposures to loud machinery may, over an extended period of time, present serious risks to human hearing. According to the National Institute on Deafness and Other Communication Disorders (NIDCD):

- 10 million Americans have already suffered irreversible hearing damage from noise
- 30 to 50 million more are exposed to dangerous noise levels each day.

Why has this problem become so widespread? Unfortunately, the effects of noise are often underestimated because the damage takes place so gradually, loud noises have become so common in our culture, and (although traumatizing to the parts of the body responsible for hearing) there are no externally-visible physical changes (like bleeding). As a result, people have traditionally not appreciated the serious impact of noise-induced hearing loss (NIHL) on their daily living until they're frustrated by a permanent communication problem or ongoing ringing in their ears. Perhaps a bit too late, they then become passionate about "hearing conservation" in order to save the hearing they still possess. Doesn't it make more sense, though, to emphasize "HEARING LOSS PREVENTION", while you still have good hearing sensitivity? This document will summarize how excessive noise can damage the hearing system, factors that influence this damage, and actions that you can take to prevent hearing loss.



## Noise-induced hearing loss

Every day, we enjoy sounds: from nature sounds, to music, to a good conversation with a friend or loved one. Stop for a moment and think of your *favorite* sound. Is it the rain, or ocean waves, or a child's laughter? Now, imagine permanently losing the ability to hear your favorite sound… slowly. That would be tragic. When an individual is exposed at work or at home to harmful sounds – sounds that are too loud for too long a time - sensitive structures of the inner ear can be damaged, causing noise-induced hearing loss (NIHL). NIHL is a hearing disorder characterized by a gradual, progressive loss of high frequency hearing sensitivity over time, as a result of exposure to excessive

Noise-induced hearing loss

noise levels. The Figure below illustrates this typical progression, in which the pattern of NIHL usually shows a "notch" that is most often seen at or near 4000 Hz. In later stages, the hearing loss may spread to frequencies that are more critical to understanding human speech *(in the range of 500-3000 Hz)*. NIHL usually occurs in both ears. However, the hearing loss may not necessarily occur equally between the left and right ears when the exposure conditions favor one side of the head. A common example of "asymmetric" NIHL is from shooting a rifle or shotgun (a right-handed shooter often has poorer hearing in the left ear, which is closer to the muzzle than the right ear). It is even possible to see a hearing loss in only one ear, as can happen in acoustic trauma, when a loud blast affects the ear nearest the explosion.



*Progression of hearing loss following exposure to loud noise (95 dBA, averaged across the work day. Data show hearing loss for white males at ages 20, 30, 40, 50 and 60 years with 0 – 40 years of exposure, respectively). (ANSI 3.44-1996)*

# Tinnitus and noise exposure

Another condition that is often part of NIHL is tinnitus (pronounced "TIN-i-tus" or "tin-EYE-tus"). This is a condition described as the perception of sound (often buzzing, ringing, or hissing) in the absence of any external stimulus (that is, there is no sound others hear but the tinnitus sufferer does). This essentially takes away the opportunity for the person to experience quiet, and can be very distressing.



Some 30 million adults suffer from persistent tinnitus (it can also affect children). For some people the problem is severe enough that it impacts their everyday life. Tinnitus affects people differently. The most common areas in which tinnitus has a direct influence are:

Tinnitus and noise exposure

- **Thoughts and emotions.** Some are annoyed, bothered, depressed, anxious or angry about their tinnitus. They think and focus on their tinnitus often.
- **Hearing.** In some, the sound of the tinnitus competes with or masks speech or environmental sound perception.
- **Sleep.** Many tinnitus sufferers report that their tinnitus interferes with them getting to sleep. It can also make it more difficult to get back to sleep when they wake up in the middle of the night.
- **Concentration.** Some tinnitus sufferers report that they have difficulty focusing on a task because of their tinnitus. This might include reading a book or the newspaper.

For more information on tinnitus and treatment:

- See the Better Hearing Institute's Your Guide to Tinnitus
- Visit the American Tinnitus Association website at www.ata.org.

# How do we hear and the impact of noise?

While earlier we have explained the mechanisms of hearing, it would be useful to review these principles in terms of how noise can lead to permanent hearing damage. Our hearing system is designed to detect and process sounds over a remarkably wide range of levels. One can appreciate that early humans with better hearing could hear a predator or enemy trying to sneak up on them and "get the jump on them" and so have the greatest opportunity to survive and have offspring with good hearing. Modern industrialization, with combustion engines, pneumatic pumps, and repetitive loud machine noise wouldn't have existed early in human development, and so the ear would not have been tuned to develop to be able to tolerate these very recent high sound levels.

Acoustic signals enter the auditory system through the outer ear, funneled by the pinna (the external part of the ear that we can see) and external ear canal. This funneling causes a "resonance" (like that created when you blow across the top of a glass bottle) which boosts energy in high frequencies, about 2000 Hertz (heard as a high pitch). The energy then reaches the eardrum and is transmitted through the middle ear by vibrating three tiny bones, called the ossicles. The eardrum and ossicles amplify the vibrations and carry them to the inner ear (specifically, the "cochlea"), which is a fluid-filled chamber locked inside the skull. These vibrations through the middle ear can be dampened when loud sounds cause a contraction of two tiny muscles attached to the middle ear bones, but this action is not fast enough to offer protection from sudden bangs and cannot be sustained during long exposures.

Inside the cochlea are very specialized sensory cells, called "hair cells" which



Anatomy of the Ear

Ossicles:
Stapes
Incus
Malleus
Temporal bone
Semicircular ducts
Vestibular nerve
Cochlear nerve
Cochlea
Auricle
Earlobe
Auditory canal
Eardrum
Tympanic cavity
Auditory tube
Outer ear
Middle ear
Inner ear

are responsible for our remarkable ability to detect very soft sound and tolerate reasonably loud sound. We are born with a full complement of cells (about 17,000); if these cells are damaged, they are *not replaced* with new cells. So, when a hair cell dies, it is gone for good. Vibration from the middle ear to the inner ear causes motion in the inner ear fluid. This motion stimulates the top portion of the hair cells, which results in chemical changes that produce nerve impulses. These nerve impulses are carried along the hearing nerve to the brain, where they are interpreted as sound. The brain uses the incoming nerve impulses in an elegant interpretation of *which, when* and *how many* hair cells are stimulated. The hearing sensitivity of young children, with no hearing damage, allows them to detect very soft sounds across a range of approximately 8-9 octaves.

# Noise "ages" hearing

Noise damages hearing in a manner not dissimilar to the effects of aging. In some ways, age-related hearing loss (presbycusis) is "lifetime wear and tear" on hearing. Noise serves to speed up the "wear and tear" process. When the hearing system is exposed to excessive noise, mechanical and metabolic changes can occur from this stress. Scientific research, based on studies of industrial workers, as well as lab studies of humans and animals, have investigated the effects of noise on hearing. This work has determined that, after excessive noise has stimulated cells in the inner ear, chemical processes occur that can exceed the cells' tolerance, damaging their structure and function.



When sound is sufficient to cause hearing loss, most often there is a temporary loss of hearing sensitivity, known as temporary threshold shift (TTS). You likely have experienced this after attending a loud concert or working with loud tools or machinery. If the ear is given time to rest (typically 16 to 48 hours of relative quiet) the TTS recovers back to baseline hearing. With repeated occurrence, this TTS does not recover, and instead becomes a permanent threshold shift. How quickly this happens varies from one person to the next, and depends on how high was the offending sound exposure.

Loud explosions (that peak for a few milliseconds at levels greater than 130-140 dB) may cause immediate hearing loss (this is called "acoustic trauma"). More often, however, hearing loss is caused by repeated exposure to noise above 85 dBA over long periods. The risk of noise-induced hearing loss depends on both the intensity and duration of the exposure. As intensity increases, the length of time for which the exposure is "safe" decreases. As a result, someone exposed to 85dBA (often produced by gas-engine lawn mowers) for 8 hours may be equally at risk for noise exposure after using a chain saw (producing 110dBA) for only a few minutes.

For typical long term exposure to high level sound that results in permanent hearing loss, a cascade of chemical events occurs when the cell is metabolically "overloaded" and the cell undergoes a process known as "apoptosis." The cell that is damaged beyond its ability to recover literally fragments and the pieces of the cell are ejected into the fluid of the cochlea. Cells around the now missing hair cell serve as "scar tissue" to maintain the structural integrity of the system, but these supporting cells do not contribute to the active process of hearing. This damage results in sensorineural hearing loss and, often, tinnitus.

# What are the symptoms of NIHL?

NIHL develops gradually so that people may lose a significant amount of hearing before becoming aware of its presence. During the early stages, sufferers often report having to turn up the volume on the TV or have difficulty understanding speech in groups or in the presence of background noise. As the hearing loss worsens, it becomes difficult to understand normal conversation even in quiet, one-on-one situations. The individual may not be aware of the high frequency hearing loss, but it can be detected with a hearing test. In fact, early identification is important in order to recognize the presence of NIHL and then take steps to prevent further hearing loss.

Some of the warning signs of the presence of, or exposure to, hazardous levels of noise are as follows:

- You can't hear someone talking three feet away
- You have a feeling of "fullness" in your ears after leaving a noisy area
- You hear ringing or buzzing (tinnitus) in your ears immediately after exposure to noise
- You suddenly have difficulty understanding speech after exposure to noise; you can hear people talking but you have difficulty understanding them.

# Preventing noise-induced hearing loss

NIHL is almost entirely preventable. Although hearing normally declines with age, the average, healthy, non-noise-exposed person can have essentially normal hearing at least up to age 60. Individuals vary in their susceptibility to hearing loss. While research has shown some trends, there currently is no reliable way to identify which particular individuals may be most susceptible to NIHL. To protect themselves when exposed to hazardous noise, everyone should take these precautions:

- Know which noises can cause damage (those above 85 decibels), including jet engines, lawn mowers, motorcycles, chainsaws, powerboats, and personal listening devices (like MP3 players). If you have to raise your voice to shout over the noise to be heard by someone within an arm's length away, the noise is probably in this range. More formal noise measurements can be made (and are required in most industries), to determine risks from noise exposures. The noise thermometer below shows you the relative risk associated with certain noisy environments.



- If possible, try to reduce noise at the source. Sometimes, replacing mufflers, keeping equipment in good maintenance, or placing the machine inside an enclosure can shield a person from the risks of NIHL. When purchasing new tools and yard equipment, consider their noise outputs before buying units with ineffective mufflers.

- Personal listening devices (like MP3 players with earphones) can also present risks to hearing if used at too high a volume for too long. Consider using earphones that block out background noise to help you moderate your listening level, and give yourself listening breaks if you do choose to listen loud. Some devices exist on the market which limit the volume that can be output by the MP3 player, virtually making them kid-proof.

- Wear hearing protection devices (HPDs) such as earplugs or earmuffs, when involved in loud activities (at work or when involved in noisy recreational activities). When properly selected and used, HPDs can be powerful tools for preventing NIHL. HPDs are required by law to be labeled with a

Noise Reduction Rating (NRR) that is based on performance obtained under ideal laboratory conditions. Usually, people obtain far less protection than the labeled rating because they don't wear the devices correctly or neglect to wear them during the entire period of the noise exposure. It must be emphasized that the best hearing protector is not the one with the highest NRR, but the one that people will consistently wear whenever exposed to loud noise. There is no single protector that will fit everyone, be universally comfortable, and be appropriate in every environment. What follows are some typical HPD options, as well as some special-purpose options, that you may consider.



## Hearing Loss Prevention Devices Summary

Here are some common hearing loss prevention devices.



**Disposable plugs** are placed inside the ear canal to block out noise. They are commonly made of expandable foam. One size fits most everyone. They roll up into a thin cylinder for insertion. Once they're inside your ear canal, they expand to form a good seal. Keep the plugs as clean as possible by inserting them with clean hands. Always inspect them before reinsertion. If they are damaged or dirty, throw them away.

**Sound isolating earphones** with universal-fit ear tips. These earphones provide considerable sound isolation to most people, therefore the volume on MP3 players may be set lower. Noise cancelling headphones are also available which do a great job of cancelling steady state noise such as on an airplane. These devices require little maintenance. The ear tips may be cleaned as needed; if they become brittle simply replace.





**Reusable plugs** are preformed to fit the ear. They are usually made of a flexible rubber or silicon. They may be flanged or cone-shaped and are often joined by a cord so that they're not easily lost. Reusable plugs can be worn safely for months, depending on the type. They should be replaced as soon as they become hard, torn, or deformed. Inspect and clean them often with warm soapy water. Rinse well. Store them in the case supplied by the manufacturer.

**Earmuff stereo headphones.** The soft plastic cushions, filled with foam or liquid, should form a good seal against noise. If you wear glasses with wide temples, you may want to choose another type of protector. If you're exposed to very loud noise, you can wear earmuffs and plugs together. Wipe the cushions clean with a damp rag when they become soiled. Check the cushions often, and replace them if they're stiff, worn, cut, or torn. Do not modify your muffs in any way.





Preventing noise-induced hearing loss



**Special purpose headsets.** When communication is required with hearing protection, special-purpose earmuffs may help you understand speech from co-workers or those transmitting signals to you by radio. Advances in active noise reduction may be effective in reducing low frequency noises that can interfere with speech. Care of special-purpose earmuffs also requires that the internal electronics are maintained.



**Musicians Earplugs™** are sleeves that fit in the ear canal and a removable filter to change between different levels of attenuation: 9 dB, 15 dB, or 25 dB. Musicians and music enthusiasts may prefer to use a type of earplug that is designed to match the ear's natural response, making sound quieter but not distorted. Filters in these Musicians Earplugs™ use a diaphragm that reduces noise levels relatively equally across all frequencies. These filters can be placed in pre-formed or custom-made earplugs. While these earplugs may be washed with water and mild soap, the filter should never be exposed to water. Remove the filter before such washing. Molds should be replaced when discolored, cracked, or obviously hardened. Never use alcohol or solvents to clean the sleeves.



**Custom in-ear monitor**, made of a silicone material. The benefit is a consistently comfortable fit and excellent sound isolation. Musicians can also use custom in-ear monitors to hear themselves rather than through the floor "wedge" loudspeaker monitors. This results in lower levels on stage and if the earpiece is tightly sealed to the ear without venting, it **can** serve as a hearing protection device. Used inappropriately, however, it can be turned up to dangerous levels. A variation for the normal consumer can be obtained from hearing health professionals for listening to MP3 players; the devices can be made of silicone or acrylic (although silicone seals in the ear better and most often provides better sound isolation). Keep the sound ports that fit in the ear canal clear of earwax and use a "wax loop" tool to remove wax. Do not get these wet and do not use alcohol or solvents to clean the earpieces. Wipe them with a tissue and store them in a cool, dry place between use. Consider using a desiccant (moisture absorber) container if you sweat a lot.

## Occupations at risk for hearing loss

If you're exposed to hazardous noise on the job, your employer may already be providing annual hearing tests to identify any change in hearing that might indicate under-protection from the noise. Occupations particularly at risk for hearing loss due to exposure to noise are as follows:

- ✓ Firefighters
- ✓ Police officers
- ✓ Factory workers
- ✓ Miners
- ✓ Farmers
- ✓ Construction workers
- ✓ Military personnel
- ✓ Heavy industry workers
- ✓ Musicians
- ✓ Entertainment industry professionals
- ✓ Office staff in crowded buildings



## Conclusions

- If you are aware of some of the symptoms of NIHL (like ringing ears or muffled speech), seek a hearing test from a qualified hearing health professional. Although noise exposures are hazardous, other medical causes for hearing loss should be ruled out by a qualified health care provider, using data from your hearing test and your history.

- Be alert to hazardous noise. Since prevention is so critical, make sure that your family (especially children), friends, and colleagues are aware of the hazards of noise. Although animal research with drug therapies and the physiology of the hearing system may eventually lead to the development of treatment strategies to reduce NIHL, the most fundamental recommendation is the best. ***One-third of permanent hearing loss is preventable with proper hearing loss prevention strategies.***

## PROTECT THE HEARING THAT YOU HAVE NOW!



# References

ANSI (1996). American National Standard: Determination of occupational noise exposure and estimation of noise-induced hearing impairment. New York: American National Standards Institute, Inc., ANSI S3.44-1996.

National Institutes of Health (1990). Noise and Hearing Loss. NIH Consensus Development Conference Consensus Statement 1990, Jan 22-24; 8 (1).

National Institute for Occupational Safety and Health (1998). Revised Criteria for a recommended standard - Occupational noise exposure, U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication 98-126.

National Institute on Deafness and Other Communication Disorders (1999). Noise-Induced Hearing Loss. NIH Pub. No. 97-4233.

Occupational Safety and Health Administration (1983). Occupational Noise Exposure Standard. 29 CFR Chapter XVII, Part 1910.95.

NIDCD, Statistics and Epidemiology of Hearing Loss. http://www.nidcd.nih.gov/health/statistics/quick.htm accessed December 1, 2009.

Kopke RD, Jackson RL, Coleman JK, Liu J, Bielefeld EC, and Balough BJ. (2007) NAC for noise: from bench top to the clinic. *Hearing Research* 226(1-2): 114-25.

Yost W. (1994) *Fundamentals of Hearing: An Introduction* (3rd ed.). San Diego: Academic Press, Inc.

**Photos courtesy of, and used with permission:**

Sight and hearing www.soundandhearing.org: Noise Thermometer

Etymotic Research: Musician ear plugs, noise canceling earbuds

Sensaphonics: in-ear monitor

Tinnitus photo: Auricle Ink Publishers, Inc, Sedona, AZ.



**COMPLIMENTS OF:**



WWW.BETTERHEARING.ORG

1444 I STREET, NW   |   SUITE 700   |   WASHINGTON, DC 20005   |   202-449-1100



*©2011 Better Hearing Institute. BHI does not endorse products or services.*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

No. 24-30043

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GEORGE PETERSON,

Defendant - Appellant

———————

Appeal From The United States District Court
For The Eastern District Of Louisiana

Honorable Jay C. Zainey, District Judge
Criminal Docket No. 22-231, Section "A"

———————

GOVERNMENT'S SUPPLEMENTAL RESPONSE TO
DEFENDANT-APPELLANT'S PETITION FOR REHEARING EN BANC

———————

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF LOUISIANA

KEVIN G. BOITMANN
Assistant U.S. Attorney, Chief of Appeals
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
(504) 680-3109
Attorney for the United States of America

May 23, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES........................................................ iii

INTRODUCTION ....................................................................1

ARGUMENT............................................................................2

    I.    Regulations on firearm suppressors burden the right protected by the Second Amendment...........................................................2

    II.   The National Firearms Act's restrictions on suppressor possession comply with the Second Amendment............................5

CONCLUSION......................................................................11

CERTIFICATE OF SERVICE AND ECF COMPLIANCE.............................12

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. 165 (1871)..........................................................3

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..........................8

*District of Columbia v. Heller*, 554 U.S. 570 (2008). ..................................3, 6

*Hill v. Colorado,* 530 U.S. 703 (2000) ............................................................3

*Luis v. United States*, 578 U.S. 5 (2016)..........................................................2

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983) .................................................................................2

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) .................................................3

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)........... 5, 6, 9, 10

*United States v. Miller*, 307 U.S. 174 (1939) ...............................................3, 7

*United States v. Peterson*, 127 F.4th 941 (5th Cir. 2025)..................................1

*United States v. Rahimi*, 602 U.S. 680 (2024)........................................ passim

## Statutes

18 U.S.C. § 922(t)........................................................................................10

26 U.S.C. § 5811 ..........................................................................................5

26 U.S.C. § 5812(a) ......................................................................................5

26 U.S.C. § 5841 ......................................................................................1, 5

## Other Authorities

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024)...........................................................6

*The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467 (2024).........6

iii

### INTRODUCTION

George Peterson entered a conditional guilty plea to possession of an unregistered suppressor, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.[1]  A panel of this Court affirmed, holding that the registration requirement does not violate the Second Amendment because suppressors are not "arms" protected by the Second Amendment.  *United States v. Peterson*, 127 F.4th 941 (5th Cir. 2025).  Peterson petitioned for rehearing en banc, and the United States opposed, arguing that the panel's decision was consistent with Supreme Court precedent and the decisions of other circuits.

As part of its broader evaluation of its litigating positions in Second Amendment cases, *see* Executive Order 14206, *Protecting Second Amendment Rights*, the United States has re-evaluated its position in this case.  In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors.  As a result, restrictions on the possession of suppressors burden the right to bear arms, and a ban on the possession of suppressors or other similar accessories would be unconstitutional.  The government's earlier argument to the contrary was incorrect.  But the National

---

[1] The indictment used the statutory term "silencer," but this filing uses the term "suppressor" both to be consistent with the panel opinion and because the term "silencer" is inaccurate.  Suppressors modestly reduce the decibel level of the firearms to which they attach; they do not "silence" them.

Firearms Act's registration and taxation requirement is constitutional because it imposes a modest burden on a firearm accessory that is consistent with this Nation's historical tradition because suppressors are specially adaptable to criminal misuse. For this reason, the panel correctly affirmed Peterson's conviction. Accordingly, although rehearing en banc is unwarranted, the Court should grant panel rehearing to correct the panel opinion's analysis. *See* Fifth Circuit Rule 40, I.O.P. (stating that "[a] petition for rehearing en banc is treated as a petition for rehearing by the panel if no petition is filed" and that "[t]he panel may grant rehearing without action by the full court").

## <u>ARGUMENT</u>

**I. Regulations on firearm suppressors burden the right protected by the Second Amendment.**

The Second Amendment protects the "right to keep and bear Arms." <u>U.S. Const. amend. II</u>. Regardless of whether suppressors themselves constitute "arms," restrictions on suppressors burden the right to "keep and bear Arms" and so must be closely scrutinized to ensure compliance with the Second Amendment. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, <u>578 U.S. 5, 26-27</u> (2016) (Thomas, J., concurring in judgment). In the First Amendment context, for example, a tax on ink and paper burdens the freedom of the press. *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, <u>460 U.S. 575, 582</u> (1983). As Justice

2

Scalia observed, "[t]here comes a point . . . at which the regulation of action intimately and unavoidably connected with traditional speech is a regulation of speech itself." *Hill v. Colorado,* 530 U.S. 703, 745 (2000) (Scalia, J., dissenting).

So too, in the Second Amendment context, "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Although none of these activities literally involves the "keep[ing]" of "arms," each activity is a fundamental component of the right protected by the Second Amendment. *See United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition . . . ." (quotation omitted)). The right to bear arms similarly "implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *District of Columbia v. Heller*, 554 U.S. 570, 618 (2008) (quoting Thomas Cooley, *Treatise on Constitutional Limitations* 271 (1868)). And the right extends to firearm accessories that are useful to the exercise of the right. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

3

Suppressors have several benefits to persons in exercising their Second Amendment rights. Most importantly, suppressors limit the noise caused by firearms, reducing a firearm's audible muzzle blast by up to 30 decibels.[2] This noise reduction helps shooters avoid permanent hearing damage and facilitates communication with others when engaging in both civilian self-defense and public defense. Indeed, because of the hearing-related benefits of suppressors, the U.S. Marine Corps began issuing them to infantry units in 2020.[3] Suppressors appear to improve accuracy and aid in target re-acquisition by reducing recoil and muzzle rise.[4] And suppressors aid in target shooting—an activity protected by the Second Amendment—by reducing noise pollution and providing additional hearing protection beyond personal protective equipment. All these practical benefits demonstrate that suppressors facilitate the constitutional right to keep and bear

---

[2] Michael Stewart et al., Nat'l Hearing Conservation Ass'n, *NHCA Position Statement: Recreational Firearm Noise* 5 (March 16, 2017), https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf.

[3] Marines.mil, *Marine Corps Begins Widespread Fielding of Suppressors*, https://www.marines.mil/News/News-Display/Article/2459549/marine-corps-begins-widespread-fielding-of-suppressors/.

[4] *See* Savage Arms, *How Suppressors Work To Reduce Noise and Recoil*, https://savagearms.com/blog/post/how-suppressors-work-to-reduce-noise-and-recoil; Congressional Sportsmen's Foundation, *Firearm Suppressors*, https://congressionalsportsmen.org/policy/firearm-suppressors/.

4

arms.  Accordingly, restrictions on suppressors impose a burden on using firearms that implicates the Second Amendment.

## II.  The National Firearms Act's restrictions on suppressor possession comply with the Second Amendment.

Although the National Firearms Act's restrictions on suppressor possession implicate the right to bear arms, the modest burden they impose does not violate the Second Amendment.  Under the Act, every suppressor must be registered to its possessor in the National Firearms Registration and Transfer Record.  26 U.S.C. § 5841.  As a condition of registration, the Bureau of Alcohol, Tobacco, Firearms and Explosives confirms that the transferee is eligible to possess the device under federal, state, and local law.  *See* 26 U.S.C. §§ 5812(a), 5822.  And the person acquiring the suppressor must pay a $200 tax.  26 U.S.C. § 5811.  Although a total ban on suppressors or other similar accessories would be unconstitutional, the Act's modest regulations pass muster.

When the government regulates the right to keep and bear arms, it bears the burden of showing that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation."  *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).  That is a rigorous test, not a "regulatory blank check."  *Id.* at 30.  "Why and how the regulation burdens the right are central to this inquiry."  *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

Even if the government can identify a specific historical analogue for a statute, the statute must comply with the broader "principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. The founding generation distinguished between a valid regulation and an impermissible "infringement" of the right to keep and bear arms. *See* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 382-387 (2025). A restriction could amount to an unconstitutional infringement if (among other reasons) it served an illegitimate purpose, burdened the right more severely than necessary to serve a valid purpose, or broadly negated the right. *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1489 (2024).

Our Nation's regulatory tradition shows that the Second Amendment does not guarantee an "unlimited" right "to keep and carry any weapon whatsoever." *Heller*, 554 U.S. at 626. For example, American legislatures have long "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47 (citation omitted); *see Heller*, 554 U.S. at 627.

Particularly relevant here, American legislatures have also traditionally imposed special taxes on arms that are especially susceptible to criminal misuse. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 227 (2024). For instance, many 19th-century

6

legislatures taxed weapons such as dueling pistols, sword canes, Bowie knives, Arkansas toothpicks, and dirks. *See id.* at 293-328 (collecting statutes).

The National Firearms Act's restrictions on suppressors are "'relevantly similar'" to those historical laws in "why" they burden the right to bear arms. *Rahimi*, 602 U.S. at 698 (citation omitted). Suppressors are susceptible to criminal misuse, not because they purportedly "silence" a firearm—they do not—but because they make it harder for law enforcement to identify or detect the source and direction of gunfire, such as in drive-by or mass shootings or assassination attempts.[5] This is not to say that suppressors are widely used for criminal purposes—their beneficial use is overwhelming in relation to their criminal use—but they do present a niche case for criminal use. For example, Christopher Dorner in 2013 used suppressed weapons to murder two people in a populated area and later to shoot at police officers without revealing his position.[6] DeWayne Craddock used a suppressor during a mass shooting at a Virginia Beach Municipal

---

[5] *See* Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, KRON4 (June 1, 2019), https://www.kron4.com/news/national/did-gunmans-silencer-make-a-difference-in-the-carnage/ (quoting former ATF agent's observation that "a suppressor will distort the sound in such a way that it would not immediately be recognizable as gunfire").

[6] The Police Foundation, *Police Under Attack: Southern California Law Enforcement Response to the Attacks by Christopher Dorner* 14, 20, 35-36, https://www.policinginstitute.org/wp-content/uploads/2015/07/Police-Under-Attack.pdf.

7

Center.[7] And Luigi Mangione is alleged to have used a suppressor in the killing of an insurance executive on a busy New York City street.[8]  Thus, while suppressors are beneficial to the exercise of Second Amendment rights, they are also specially adaptable to criminal misuse beyond the mere fact that all weapons (and thus all accessories) can be used in the commission of a crime—a fact that was accounted for in the policy choice made by the People when they adopted the Second Amendment.[9]

The Act's restrictions on suppressors also resemble historical laws in "how" they burden the right to bear arms. *Rahimi*, 602 U.S. at 698.  The Act imposes only a minor burden on the right of armed self-defense.  It regulates a nonessential firearm accessory, so the burden on the Second Amendment is less severe than a

---

[7] Wilt Johnson & Bill Hutchinson, *Suspected Virginia Beach Shooter Used Legally-Bought Gun Suppressor*, ABC News (June 4, 2019), https://abcnews.go.com/US/suspected-virginia-beach-gunman-resigned-personal-reasons-massacre/story?id=63449625.

[8] *See* U.S. Dep't of Justice, Press Release, *Luigi Mangione Charged with the Stalking and Murder of UnitedHealthcare CEO Brian Thompson and Use of a Silencer in a Crime of Violence* (Dec. 19, 2024), https://www.justice.gov/archives/opa/pr/luigi-mangione-charged-stalking-and-murder-unitedhealthcare-ceo-brian-thompson-and-use.

[9] Because ordinary firearms, unlike suppressors, are not peculiarly susceptible of criminal misuse, registration laws or taxes targeting such firearms likely would not serve or be proportionate to any legitimate public-safety purpose. *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("requir[ing] registration of individual guns" generally does not serve any legitimate purpose and is usually "aimed at deterring gun ownership").  In addition, a law regulating or taxing the firearm itself would impose a more severe burden on the right to keep and bear arms than regulations on useful but non-essential accessories such as suppressors.

8

taxation or registration requirement applicable to weapons or essential components themselves. And the Act does not ban suppressor possession; rather, it requires only registration, payment of a modest tax, and a background check. Those burdens are comparable to the burdens imposed by historical laws taxing weapons that pose a special danger of misuse.

The Supreme Court has determined that other similarly modest burdens are consistent with the Second Amendment. For example, in invaliding a New York law requiring a "special need" to obtain a firearm-carry license, *Bruen* made clear that it was not calling into question the constitutionality of the "shall-issue" licensing regimes in 43 states, which issued permits based on the general desire for self-defense. *Bruen*, 597 U.S. at 38 n.9. The Court explained that these schemes, "which often require applicants to undergo a background check or pass a firearms safety course," are permissible so long as "lengthy wait times" or "exorbitant fees" do not "deny ordinary citizens their right to public carry." *Id.* at 38 n.9.

The National Firearms Act's $200 transfer tax for suppressors is neither "exorbitant," nor does it deny ordinary citizens the ability to possess and use a suppressor—much less a firearm. The $200 fee is generally less than the cost of a suppressor itself, which can range from $350 to $1,500.[10] And the fee is not

---

[10] *See* Silencer Central, *How Much Does a Suppressor Cost?*, https://www.silencercentral.com/blog/how-much-does-a-suppressor-cost/.

9

disproportionate to the licensing fees charged by shall-issue states, which ranged from around $10 to $140 in 2017.[11]  The Act's requirements are no more burdensome than a variety of other constitutional regulations, such as the requirements that a firearm purchaser obtain a background check, *see* <ins>18 U.S.C. § 922(t)</ins>; or that a person licensed to carry a firearm undergo safety training and pay a reasonable fee, *see Bruen*, <ins>597 U.S. at 13</ins>, <ins>38</ins> nn.1, 9.

As discussed above, history and tradition permit Congress to impose modest regulations on suppressors.  The National Firearms Act does not prohibit possession of suppressors. It requires only registration, a background check, and a $200 tax that is not indexed to inflation.

The Act's restrictions on suppressors are also consistent with the broader "principles that underpin [the Nation's] regulatory tradition." *Rahimi*, <ins>602 U.S. at 692</ins>.  The restrictions serve the legitimate purpose of regulating nonessential firearm components that are particularly susceptible to criminal misuse; they are not pretextual provisions that seek simply to inhibit the exercise of constitutional rights; and the restriction involved is a modest tax, not a prohibition or other regulation that could "broadly restrict arms use by the public generally." *Id.* at

---

[11] *See* Connecticut Office of Legislative Research, *Gun Permit and License Fees*, https://www.cga.ct.gov/2017/rpt/pdf/2017-R-0066.pdf.

10

698, 700. While a complete ban on suppressors would be unconstitutional, the Act's restrictions comply with the Second Amendment.

## CONCLUSION

For the foregoing reasons, this Court should grant panel rehearing and hold that (a) the National Firearms Act's regulations on suppressors burden the right to bear arms but that (b) the Act's modest burden is consistent with the principles underlying the Second Amendment.

Respectfully submitted,

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

/s/ *Kevin G. Boitmann*
KEVIN G. BOITMANN
Assistant United States Attorney
LA Bar Roll No. 26203
U.S. Attorney's Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3109
E-Mail: kevin.boitmann@usdoj.gov

11

## <u>CERTIFICATE OF SERVICE AND ECF COMPLIANCE</u>

I hereby certify that on this 23rd day of May, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. The following ECF-registered counsel of record was served by Electronic Notice of Docket Activity:

David H. Thompson, dthompson@cooperkirk.com
Richard J. Richthofen, Jr., rick@rjrlawfirm.com

I further certify the foregoing document meets the required privacy redactions; that it is an exact copy of the paper document; and the document has been scanned with the most recent version of a commercial virus scanning program and is virus-free.

/s/ *Kevin G. Boitmann*
KEVIN G. BOITMANN

12

### The Washington Post
*Democracy Dies in Darkness*

# Are firearms with a silencer 'quiet'?

March 20, 2017    More than **8 years ago**

 Analysis by <u>Glenn Kessler</u>

*"You know what protects your hearing better than a silencer? Ear plugs."*
— **Americans for a Responsible Solution, in a <u>tweet</u>, March 13**

*"When someone gets shot by a gun with a silencer, it's quiet. Witnesses might not hear. Police will be less likely to track down the shooter."*
— **Sen. Kirsten Gillibrand (D-N.Y.), in a <u>tweet</u>, March 14**

Congress is preparing to debate the so-called <u>Hearing Protection Act</u>, which would streamline the purchase of suppressors for firearms. To buy a suppressor, more popularly known as a silencer, one must meet a number of requirements that result in a nine-month approval process (including submitting fingerprints and a photograph) and a $200 tax stamp. (A silencer generally costs hundreds of dollars, and can easily top $1,000.) The legislation would make buying a suppressor as easy as buying a firearm (with an instant background check), and do away with the tax stamp and federal registration.

We obviously take no position on whether this proposed law would be good or bad, but we were curious about this pair of tweets. Americans for a Responsible Solution (ARS), in its tweet, further noted that the law "would make it easier for active shooters to inflict serious harm on our communities without being detected by trained law enforcement professionals."

**Robyn Thomas**
@RobynGLC · **Follow**

FACT: Silencers do not protect your hearing.



11:35 AM · Mar 13, 2017

❤ 18          💬 Reply          🔗 Copy link

**Read 210 replies**

What's the impact of a suppressor on firearm noise? Does it actually make the firearm quiet or is that simply something you see in the movies?

# The Facts

The Environmental Protection Agency developed the <u>noise-reduction rating</u> (NRR), which explains how much a product might reduce noise in decibels. The decibel scale is logarithmic, rather than linear, so a difference of a few decibels is important.

Of course, different ear protection has different ratings. We found that <u>the range</u> for ear plugs ranged from 22 to 33 NRR, <u>over-the-ear muffs</u> between 22 and 31 NRR and suppressors were also in 30 NRR range, although some may go higher.

(In all likelihood, the level of noise reduction is overestimated, especially for ear plugs because tests are done in a laboratory setting and people using them often do not achieve the proper fit. 3M <u>advises</u> cutting the NRR by more than half to reflect this problem, so 29 NRR would translate to 11 NRR.)

Katie Peters, a spokeswoman for ARS, supplied an article that stated: "The average suppression level, according to independent tests done on a variety of commercially available suppressors, is around 30 dB, which is around the same reduction level of typical ear protection gear often used when firing guns."

If that's the case, we're not sure why the group would say that ear plugs protect hearing "better" than suppressors." It seems the answer is that they are about the same, give or take two or three decibels. And if that's the case, ARS is especially wrong to claim that legislation to make it easier to buy such devices "does nothing to protect hearing."

Peters acknowledged that gun enthusiasts recommend that even with suppressors, other hearing protection is necessary. Hearing damage begins to occur at about 85 decibels, about the sound of a hairdryer.

This gets us to the other issue — whether a suppressor makes it "quiet," as Gillibrand tweeted, and harder for law enforcement officials to detect, as she and ARS suggested.

A 30-decibel reduction in theory means an AR-15 rifle would have a noise equivalent of 132 decibels. That is considered equivalent to a gunshot or a jackhammer. A .22-caliber pistol would be 116 decibels, which is louder than a 100-watt car stereo. In all likelihood, the noise level is actually higher.

So what are opponents of the law talking about?

"We aren't necessarily talking about being out in the middle of the woods deer hunting where it is extremely quiet. Instead, gun crimes often occur in cities and in other very noisy places," said Marc Brumer, a Gillibrand spokesman. "The shots would be heard by law enforcement or witnesses at the gun's typical decibel level, but they often cannot be heard when a silencer is added. There are many sounds in cities that are far louder than a gunshot masked by a silencer."

A nightclub, he noted, has a sound level of 155 decibels, while a subway is 102 decibels. (Actually, while sound levels as high as 155 decibels have been detected in night clubs, that's not an average and would be very damaging to a person's hearing.)

"Relative to their normal decibel level, particularly in those urban environments where gun crime often occurs, I outlined in previous email, silencers make guns impossible to hear over many common sounds and therefore 'quiet,' " Brumer said.

But gun experts say that noises are not equal. "While these items/instruments/environments may be louder or as loud as firearms, none carry with them the easily recognizable sonic pulse of a gunshot," said Bob Owens, editor of Bearing Arms, which advocates for expanded gun rights.

Peters pointed to a 2013 article in The Washington Post that said the ShotSpotter detection system may have trouble detecting shots fired from a silencer. But ShotSpotter says that information is out of date.

"In regard to gun silencers, it is more accurate to call them suppressors, as they suppress the impulsive sound of gunfire, not wholly eliminate it," said Ralph Clark, the chief executive of ShotSpotter. "We have successfully if not inadvertently detected confirmed suppressed gunfire within our existing deployments. Although we have not formally tested the theoretical impact to our system, we intend to do some targeted testing in the near future. We believe we will have various options ranging from increasing our sensor array density to developing software/firmware to address the detection of suppressed gunfire if it were to become a widespread issue."

Brumer also pointed to a video in which a firearms enthusiast exclaimed how "very quiet" a .22-caliber rifle was with a silencer.

But the firearm in the video is not a high-powered weapon; it has been supplied with <u>subsonic ammunition</u> that is even advertised as requiring no hearing protection. ("Great for backyard plinking and introducing youth to the shooting sports.") It would not be considered a semiautomatic weapon and in fact in the video the firearms enthusiast, Dan Abraham, says "now it won't cycle, so you have to cycle it on your own." That's certainly a very different situation than a standard AR-15 round, which can only to be reduced to 132 decibels with a suppressor.

Suppressors, by diffusing the noise of a weapon, may make it more difficult to locate the source of a sound, which is why they often are used by military snipers.

The Violence Policy Center, which <u>opposes the proposed law</u>, can point to only a handful of examples of silencers being used in violent crimes, including a case in Milwaukee last year in which undercover FBI agents <u>sold a silencer</u> to a man said to be planning a mass attack. "The data indicates that use of silenced firearms in crime is a rare occurrence, and is a minor problem," says <u>a 2007 study</u> cited by the Violence Policy Center. But that could also be the case because silencers are so time-consuming to obtain.

Brumer emphasized that Gillibrand was only following the lead of law enforcement officials in opposing the bill. New York <u>bans suppressors</u>, and that would continue even if the bill became law, but she has expressed concern about suppressors being illegally trafficked into the state.

# The Pinocchio Test

We can understand the irritation of gun-control advocates about legislation with a benign-sounding name such as the Hearing Protection Act. Clearly the main impact of the measure would be to loosen restrictions on the purchase of suppressors that have been in place for decades. It would be better called the Paperwork Reduction Act, especially because the use of suppressors does not mitigate the need for hearing protection.

But that title does not give opponents the liberty to stretch the facts.

It's debatable that ear plugs protect ears better than a suppressor — and meanwhile, no self-respecting gun owner would use an AR-15 rifle without ear protection, even if he or she had a suppressor. Certainly the two in combination would provide better ear protection than one type alone, especially because the NRR of earplugs in regular use is probably overstated. So ARS's tweet is rather misleading.

In the meantime, although the popular name of this accessory is a silencer, foes of the law such as Gillibrand should not use misleading terms such as "quiet" to describe the sound made by a high-powered weapon with a suppressor attached. We wavered between Two and Three Pinocchios, but finally tipped to Three. There is little that's quiet about a firearm with a silencer, unless one also thinks a jackhammer is quiet.

# Three Pinocchios

(About our rating scale)

**Send us facts to check by filling out this form**

**Keep tabs on Trump's promises with our Trump Promise Tracker**

**Sign up for The Fact Checker weekly newsletter**



# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

VOLOKH CONSPIRACY

## The Hearing Protection Act and 'silencers'

**DAVID KOPEL** | 6.19.2017 9:59 PM



A SilencerCo Osprey Micro silencer mounted on a Smith & Wesson semi-automatic pistol. (SilencerCo)

Congress is considering the "Hearing Protection Act," which would change federal regulation of gun "silencers." Here's a guide to some of the basic facts and relevant laws on the subject.

*What is a "silencer"?* Properly speaking, the devices are called "suppressors" or "moderators," because guns that use them are still very loud, as will be detailed below. A sound suppressor is based on the principle you can see in a bathtub drain. Because water swirls when it goes down the drain, the rate of water flow is less than if the water just went straight down.

The same principle can be applied to a gas. In a firearm, the bullet is propelled through the barrel and out the muzzle by expanding gas from burning gunpowder. As the gas exits the muzzle, it makes a very loud noise. If gas swirls on the way out, it exits more slowly. The slower exit reduces the noise of the gunshot.

Advertisement

AD

Thus, a suppressor is a simple canister attached to the gun muzzle. Inside the canister are baffles, which make the gas swirl, producing less sound.

The first sound moderator came to market in 1909, under the name "Maxim Silencer." The name was marketing hyperbole, like calling a flannel shirt an "Arctic coat." The inventor, Hiram Percy Maxim, also applied his noise-moderating system to automobile mufflers and other machines whose gas emissions create noise. Today, the company Maxim Silencers does not make firearms silencers, but it does produce noise reducers for many other applications.

Noise reduction made shooting more pleasant in the short run, and protected hearing in the long run. President Theodore Roosevelt put a Maxim Silencer on his 1894 Winchester lever-action rifle.

*How much is the noise reduced?* By up to 30 decibels, depending on the type of gun, ammunition and suppressor. Currently, gun control lobbies are claiming that if "silencers" are available, people will not be able to hear a mass shooting that is going on nearby. To test the claim, let's consider last week's attack on Republicans who were practicing baseball in Alexandria.

The criminal used a SKS rifle, with 7.62mm ammunition. Without a suppressor, the sound of a shot from such a gun is 165 decibels. This is more than twice as loud as a jet take-off, if you are 25 meters from the jet. With a suppressor, the SKS would be about 140db. That's equivalent to being on an active aircraft carrier deck.

The would-be assassin also had a Smith & Wesson 9mm handgun. In handguns, 9mm is an intermediate caliber - smaller and quieter than larger calibers such as .44 or .45 (inches). Without a suppressor, the S&W handgun is about 157 to 160 db. With a suppressor, that handgun would be around 127 to 130 db. That's about the same as a jackhammer. Thus, the assertions that people will not be able to hear criminal gunfire are not well supported by physics, although the assertions are consistent with how "silencers" are portrayed in movies.

(The specific decibel levels for particular guns were supplied by Jeremy Mallette, director of social media for Silencer Shop, a company in Austin.)

*Advocacy for banning silencers.* In the early 20th century, the most influential advocate for banning many firearms and accessories was William T. Hornaday, director of the Bronx Zoo. Using the resources of the Bronx Zoo and others for conservation, Hornaday helped save the American bison from extinction.

Hornaday's 1913 book, "Our Vanishing Wildlife: Its Extermination and Preservation," warned that over-hunting was wiping out American wildlife. According to Hornaday, one problem was that modern guns were too accurate. Also, hunters now had better scopes and binoculars. In Wyoming, hunters were using silencers so one shot didn't frighten away other game.

Even worse, in Hornaday's view, was who was hunting. Namely, lower-class Americans and immigrants. He urged new laws to "prohibit the use of firearms by any naturalized alien from southern Europe until after a 10-years' residence in America." Wildlife was vanishing because "the Italians are spreading, spreading, spreading. If you are without them to-day, to-morrow they will be around you. Meet them at the threshold with drastic laws, thoroughly enforced."

In the South, Hornaday argued, the problem was hunting by "poor white trash" and blacks. In an earlier time, black Americans "were too poor to own guns." But "the time came when . . . single-shot breech-loading guns went down to five dollars a piece. The negro had money now, and the merchants . . . sold him the guns, a gun for every black idler, man and boy, in all the South." Hornaday favored an Alabama proposal for an annual tax of at least $5 a year on every firearm, to prevent poor people from owning inexpensive guns.

Hornaday argued that all pump-action guns should be banned, as should all semi-automatics and all "silencers." Some of Hornaday's proposals did become law, in attenuated form. For example, states did not ban hunting by immigrant citizens, but they did enact laws against hunting or firearms possession by legal resident aliens. North Carolina enacted a statute (later repealed) that required a license for purchasing a pump action gun. (These laws are described in my article in the Harvard Journal on Legislation, Background Checks for Firearms Sales and Loans: Law, History, and Policy.)

*The National Firearms Act of 1934.* In 1934, Congress enacted the National Firearms Act, which used the tax power to set up a tax and registration system for certain arms and accessories. As enacted, the NFA applies to machine guns, short-barreled shotguns and rifles, "silencers," grenades, mortars and various other devices.

As introduced in Congress, the NFA also covered handguns, which prompted a tremendous debate. Once handguns were removed from the bill, the NFA passed with little opposition.

In the legislative history, there was no discussion of "silencers." We simply have no idea what (if anything) Congress thought it was doing about them. *See* Stephen P. Halbrook, Firearm Sound Moderators: Issues of Criminalization and the Second Amendment, 46 Cumberland Law Rev. 33 (2016).

Pursuant to the NFA, purchasing a suppressor today requires a $200 tax. Before a person takes possession of a suppressor, the suppressor must go through a months-long registration process with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

*The Gun Control Act of 1968.* As amended, the 1968 Act is the main federal law for ordinary firearms. For the GCA, suppressors are treated the same as ordinary firearms. Thus, the retail purchaser must fill out the dozens of questions in the four-page federal Form 4473, which includes questions about the purchaser's race, and whether the purchaser is Hispanic. A false answer on the 4473 is punishable by five years in federal prison. 18 U.S. Code 924(a)(1).

The Form 4473 functions as a registration system, since the dealer must retain the form. The dealer's registration forms may be examined by law enforcement officials in the course of criminal investigations or during regulatory compliance inspections. 18 U.S. Code 923(g).

Once the 4473 has been completed, the retailer contacts the FBI or a state counterpart by Internet or by telephone. The law enforcement agency conducts a background check by comparing the buyer's name to various lists of "prohibited persons." These include persons with felony convictions, domestic violence misdemeanors, illegal aliens, dishonorable discharges from the military, and so on.

Sometimes the "instant check" is completed in less than 20 minutes. Other times, the wait time to initiate the check can be hours or days. If the lawful buyer has the same name as a prohibited person, there may be delays of days or months.

To repeat: A suppressor purchaser must go through the same procedures as an ordinary firearms buyer (Gun Control Act) and the same procedures as a machine gun buyer (National Firearms Act).

This is an unusually stringent pair of systems. Most firearms accessories (e.g., scopes) have no special rules for purchase. The default rule is to have controls on the firearm, and not to bother with extra rules for accessories.

*State laws.* As long as a person complies with the NFA and the GCA, suppressor ownership is legal in almost all states. The exceptions are Hawaii, California, Illinois, New York, New Jersey, Delaware, Rhode Island and Massachusetts. In the 42 states where suppressors are legal, they are allowed for hunting in all but two (Connecticut and Vermont). (See this map from the American Suppressor Association.) The number of states that allow possession of suppressors, including for hunting, has grown in recent years, in part due to the lobbying of the NFA Freedom Alliance, a group that concentrates on items covered by the NFA.

*Why do people own suppressors?* There are three main reasons: reduction of noise pollution, hearing protection, and safety training. As for the first, hunting sometimes take place in state or national forests or other locations near where people live. During hunting season, nearby residents may be annoyed by the frequent sound of gunfire. Likewise, some people have built houses near established target ranges; when people at the range use suppressors, the ambient noise is reduced, although certainly not eliminated.

In the 1950s, many shooters did not use hearing protection. As people have become more health conscious, they have recognized that gunfire can damage the inner ear. Accordingly, use of hearing protection when shooting has become standard and is mandatory at public ranges. Earmuffs reduce the felt decibel level by about 20 to 30 decibels, depending on the model. Today, best practices are to supplement over-the-ear muffs with foam inserts into the ear. By themselves, ear plugs are usually not as effective as earmuffs, but they do provide some additional protection.

Suppressors reduce noise by about as much as earmuffs do. No one would ever suggest that a suppressor is an acceptable replacement for muffs, but suppressors are a very good supplement to reduce the sound the reaches the inner ear. Using a suppressor + earmuffs + ear plugs can reduce the perceived sound to around 100 decibels, the same as a power lawn mower.

Finally, firearms safety instructors often prefer that their students use suppressors. First of all, suppressors reduce overall noise, which makes it easier for students to hear the instructor. Second, some new shooters flinch because of the sharp noise of a gun when it is fired. A suppressor can prevent a flinch from developing and thus help students progress more quickly to proper and safe shooting form.

*How many people own suppressors?* As of November 2006, the number of suppressors in the ATF's registry was 150,364. By February 2016, the number had risen to 902,805. These numbers are not as precise as they might appear, since the ATF has acknowledged that its National Firearms Registration and Transfer Record registry (NFRTR) is riddled with errors; items that were properly registered with the ATF at some point may not appear on the current ATF registry. Regardless, there is no doubt that suppressors have become much more popular, especially with hunters, as CNN has reported.

*What is the rate of crime with suppressors?* A study of federal prosecutions for 1995-2005 , using Westlaw and Lexis, found 153 total "silencer" prosecutions. "[M]ore than 80 percent of federal silencer charges are for non-violent, victimless crimes." Paul A. Clark, Criminal Use of Firearms Silencers, 8 Western Criminology Review 44 (2007). In other words, the possessor was a prohibited person (not allowed to possess firearms, ammunition or silencers), but the possessor was not misusing the item. In only 2 percent of the cases was the firearm discharged. The author noted that most prosecutions involved improvised, home-made silencers, rather than the commercially manufactured kind that can be purchased in gun stores. The article's analysis of California cases from 2000-2005 found similar results. Thus, the misuse rate for lawfully purchased suppressors appears to be very low.

*What are the laws in other countries?* American suppressor law is anomalous, because suppressors are accessories yet are treated the same as firearms (Gun Control Act). On top of that, they are also treated like machine guns (National Firearms Act). As Halbrook's article details, in European nations such as Finland, France, Germany, Italy and Britain, among others, an individual who is licensed to own a firearm is always allowed the appropriate suppressor. Many European guns are sold with suppressors already attached. The policy is that if a person is legally authorized to possess a firearm, then it is generally preferable for that firearm to have a suppressor.

*What is the Hearing Protection Act?* In the current Congress, the Hearing Protection Act (HPA) is H.R. 367 in the House (sponsored by Rep. Jeff Duncan, R-S.C.) and S. 59 in the Senate (sponsored by Sen. Mike Crapo, R-Idaho). The HPA retains all of the Gun Control Act's provisions on suppressors. In other words, purchasing a suppressor would continue to be subject to all the rules that apply to purchasing or possessing an ordinary firearm.

The HPA removes suppressors from the National Firearms Act, which means buyers would not have to pay a $200 tax and would not have to go through a months-long federal registration process.

The HPA does not preempt the laws in the states that prohibit suppressor possession. It does say that in states where suppressors are lawful, states may not impose additional registration requirements or special taxes.

Start your day with *Reason*. Get a daily brief of the most important stories and trends every weekday morning when you subscribe to *Reason Roundup*.

Email Address    Subscribe

---

**_NEXT:_** **'In an appropriate case, we should reconsider our qualified immunity jurisprudence'**

---

**DAVID KOPEL** is research director at the Independence Institute.

**VOLOKH CONSPIRACY**

    MEDIA CONTACT & REPRINT REQUESTS

 Show Comments (0)

About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

Amazon

  

© 2025 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.



January 15, 2025

Representative Ben Cline
2443 Rayburn House Office Building
Washington, D.C.  20515

Dear Representative Cline,

The Academy of Doctors of Audiology (ADA) supports evidence-based practices in the delivery of audio-vestibular care. Hearing protection and other hearing conservation tools, resources, and programs are essential for ensuring optimal hearing throughout one's lifetime.

As such, ADA supports the Hearing Protection Act to improve access to firearm noise suppressors, which are recommended by the National Hearing Conservation Association (NHCA)[1], the Centers for Disease Control and Prevention (CDC), and the National Institute for Occupational Safety and Health (NIOSH) as a tool to prevent noise-induced hearing loss (NIHL).[2]

Millions of Americans of all ages routinely shoot firearms for sport. For example, nearly 7.5 million Americans hunt with a firearm each year, and an estimated 19 million Americans, six years of age and older, participate in firearms target shooting.[3] Firearm users are at high risk of developing NIHL.[4] Peak sound pressure levels (SPLs), from firearms, range from 130 to 175 decibels (dB).[5] According to the CDC, loud noises, above 120 dB, can cause immediate, permanent harm to hearing.[6]

"The use of conventional hearing protection tools, such as earplugs and earmuffs are fundamental for preventing noise induced hearing loss in firearm users," said Amyn Amlani, Ph.D., ADA President. "However, conventional hearing protection alone does not always offer adequate protection from noise exposure. Firearm noise suppressors can be an effective supplement to traditional hearing protection."

Depending on the environmental conditions and the technical specifications of the firearm and ammunition, firearm noise suppressors can reduce noise levels at the shooter's ear by 7-32 dB.[7] Importantly, using both conventional hearing protection and a firearm noise suppressor, concurrently, has been demonstrated to significantly reduce the risk of NIHL, compared with using either device alone.[8]

ADA is committed to advancing public policy initiatives related to hearing loss prevention and early intervention. Therefore, ADA endorses the Hearing Protection Act to provide improved access to firearm noise suppressors to support hearing conservation. Please contact us at sczuhajewski@audiologist.org for additional information.

Thank you,

Amyn Amlani, Ph.D., President                    Stephanie Czuhajewski, MPH, CAE, Executive Director

[1] https://www.hearingconservation.org/assets/NHCA%20Hearing%20Protection%20Act%20with%20Encl%2020191028.pdf
[2] https://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf
[3] https://huntingmark.com/hunting-statistics/
[4] https://pubs.aip.org/asa/jasa/article/151/3/1769/2838222/Auditory-changes-following-firearm-noise-exposure
[5] See 1
[6] https://www.cdc.gov/nceh/hearing_loss/what_noises_cause_hearing_loss.html#:~:text=Sound%20is%20measured%20in%20decibels,immediate%20harm%20to%20your%20ears.
[7] See 1
[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5634813/



XPERIENCES WITH THE

# MAXIM
# SILENCER

BY
HIRAM
PERCY MAXIM



**HIRAM PERCY MAXIM**

*Foreword:*

The **Maxim Silencer** was developed to meet my personal desire to enjoy target practice without creating a disturbance. I have always loved to shoot, but I never thoroughly enjoyed it when I knew that the noise was annoying other people. It occurred to me one day that there was no need for the noise. Why not do away with it and **shoot quietly?**

For nearly two years I sought for some way to check the powder gases from bursting into the air when the bullet left the barrel. This is what causes the objectionable report noise. I thought of every kind of a valve, vent, by-pass, expansion chamber, etc., and built some of them. None were satisfactory. It seemed quite a problem to find a hole through which the bullet could pass, but through which the powder gases could not pass.

One morning after my bath I noticed in the bath tub the miniature whirlpool that forms over the drain hole when the plug is

2

pulled and the water starts to run out. There was the familiar little hole down in the center of the whirl and it started me thinking that here was an exactly similar case to my powder gas and bullet problem. Here was water in a bath tub, the drain plug pulled out, and yet the water was able to run out but **slowly** because it was **whirling.**

Why would not the powder gases act the same way as the water, if they were whirled? The whirling would give them centrifugal action precisely as it did the water, and cause a "hole" to form in the center just as the hole formed in the water. In a flash I saw the "hole" for which I had been looking for nearly two years.

I immediately made a little "whirling tube" which would catch the powder gases as they burst from the muzzle of one of my rifles and whirl it around vigorously. In the center I provided a hole for the bullet to pass through but considerably larger than the bullet so it could not touch. The gases had no escape except through this central hole. Being central they could not possibly get out until they had **slowed down.** This of course meant that they must come out gradually and, in consequence, noiselessly. The first time I shot the rifle I was quite excited. I will never forget the sensation I experienced when I found **it was quiet.**

That was the birth of the Maxim Silencer.

The letters from sportsmen in all parts of the country, reproduced on the following pages, will give a more graphic idea of the uses and advantages of the Maxim Silencer than I could in my own words. You will find every one of these letters exceedingly interesting.

**Hiram Percy Maxim.**

3

# My Own Experience in Teaching My Son to Shoot

### By Hiram Percy Maxim

I had an interesting example of the advantage of the Silencer in target shooting in the case of my son Hamilton. He was nine years old at the time, and for a year had owned and shot remarkably well a little .22 cal. Savage rifle. One day some friends and I planned an afternoon on our 200 yard range with the U. S. Springfield service rifle. Hearing of it, the boy asked to be allowed to go along. Always willing to encourage his interest in the manly sports, I consented.

After watching the shooting for a while, he suggested that he would like to try it. At first I would not consider it, fearing the child would be hurt. He was only nine years of age and I feared to let him shoot such a powerful gun even with the Silencer. The more I thought of it, however, the less dangerous it seemed, and finally I decided to make the experiment.

The rifle was too heavy for him to hold and he had to shoot kneeling. I gave him one cartridge to begin with and after warning him to hold tight and be careful I left him to work it out himself. He understood the sights. After much preliminary squirming he finally found a position which suited him and sighting as carefully as an expert he pulled. I half expected to see him burst out crying. He did nothing of the kind, however, but quietly looked up and waited for the shot to be marked. Judge my astonishment when it was a 4.

Believing firmly it was an accident, I asked him how he felt and when he answered "all right," I gave him another cartridge. He repeated the operation only this time, it was a 5—a bull's eye. Wondering what it meant, I gave him a clip of five cartridges and stood back to watch. He got two more 5's, a 4, one miss and a 3. To complete his ten, I gave him three more cartridges with which he got a 4 and a 3. giving him 33 out of a possible 50.

4

Needless to say, the young man was heartily congratulated by all present. His target was dated, signed by himself in his own scrawling handwriting and witnessed, and afterwards photographed. Twenty years hence, when he grows up, it will be an interesting relic.

Afterward he shot several more strings with us, but being flustered by the attention he had received, did not do as well. He must have shot thirty or forty rounds altogether. When we started for home, he was asked how his shoulder felt. He said his shoulder was all right, and appeared surprised at the question. Little did he suspect what he had been saved. Without the Silencer, he would have been seriously bruised and his tender young ears would have rung for hours.

## Ten Cent Piece Covers 10 Shots

"The .22 calibre Maxim Silencer I bought some time ago for my Steven's Pope Rifle, has given entire satisfaction.

I have made 10 consecutive shots at 50 yards that could be covered by a ten-cent piece.

I would recommend this Silencer for indoor uses to all marksmen.

E. S. M., Waynesboro, Pa.



*Showing the Boy*

5

## His First Crow Shoot



*Noiseless Indoor Shooting*

"I certainly had a funny go with one of your Silencers last Sunday. J——gave me a Winchester automatic .22 calibre for Christmas, with a Silencer attached, and it sure is a beauty. This makes two Silencer outfits in the family now. T., my fat brother-in-law, was with us over Sunday and I thought it was about the proper thing to show him what a lot of fun can be had shooting crows with a Silencer. In the winter there is nothing else around here to shoot, and I have worked it out so that it is a pretty live sport.

Wel., T——said he was willing so we got into my car and ran out to the place I have which is on the line the crows take every afternoon on their way to the rookery. Every afternoon about four o'clock they begin and there is a steady flight of them for an hour or more. There must be thousands and thousands. I have a little blind fixed up in a Pasture where there are a lot of stunted cedars, and it makes a fine stand.

We got in the blind about four and I gave T—— the repeater while I took the new automatic. It was the first time I had taken the latter out. Somehow or other the crows did not appear as soon as usual, or else we were a little early for T——commenced to jolly me about bringing on my crows. He was already all right and if I would attend to my part of the contract, the ball could open.

Finally I sighted the advance guard. I got the old crow call going, much to T—'s amusement and in about a minute I saw it had been heard. The

6



*Noiseless*
*Outdoor Sport*

whole line veered and started toward us. T—— didn't catch on until they were right overhead circling and cawing like mad. Then you should have seen him  He is not much of a sport, and probably has been hunting about twice in all his life. He is fat, and likes a hammock, a good book and a black cigar more than tramping in the open.  But he has all the good old instincts just the same although they are dormant most of the time.

He had my repeater which carries some 12 or 13 cartridges, and I had told him how to load and work it. He had a little box of cartridges opened on the ground beside him, and as it was pretty cold, he had his gloves on.  When T—— caught sight of the cawing birds circling overhead hundreds of them all within easy range, he jerked his gun to his shoulder with a snap, spat out his cigar butt, and went into action with a vengeance.  He astonished me.  All the fighting blood of his noble ancestors rose up in him and went at it as though his life hung on the result.  He pumped in fresh shells and blazed away and squirmed around trying to kill the whole flock at once until he nearly upset the blind. I got to laughing so I simply had to give up.

Finally he came to the last cartridge and discovered that his magazine was empty.  Did he stop?  Well I guess not.  He dove into the box of cartridges and in a frenzy began to reload.  Picking them up one at a time wasn't fast enough so he just poured them out. Then his gloves got mixed up and he spilt a lot out on the ground.  Then off came the gloves and such a scramble you never beheld in all your life.  I had stopped shooting to watch him and the birds stopped coming or saw us, so by the time T—— was ready again there was nothing to shoot.

7

He was heartbroken. He just thirsted for blood. Turning to me he said half mad, "why didn't you shoot?" I told him I had done my best, having got three out of ten shots which wasn't so bad. "Come off," said he, looking me in the eye for a joke. When I pointed out the dead crows out in the field you should have seen good old T———'s face. *He had not heard my gun notwithstanding he was in the same blind with me.*

Well, we had several more "battles" and each time T——— almost went mad. He shot away every blooming shell he had and never hit a bird. All he seemed to want to do was to wade in and shoot as fast as he could pump the gun. I got a little better results with the automatic, probably because I was less disturbed by not having to work the "pump" of the repeater. And it takes some shooting, let me tell you to get a crow on the wing, even though he is circling overhead. For me it beats trap shooting all hollow.

But just think of it—crow shooting Sunday afternoon, with no noise, in fact, not enough for the man in the same blind to hear your gun. Without the Silencer this would be absolutely impossible. One shot, and good-bye crows."

W. T. S.

# Improved His Marksmanship 25%

"Since writing you I have purchased a .22 cal. Maxim Silencer of Jos. Weigand, a sporting goods dealer of Merrill, Wis. This Silencer on my target pistol completely eliminates the noise of shooting and there is no more noise than is made by the action of the gun. It has also improved my shooting about 25 per cent., as it counteracts the tendency of the gun to jump or fly upward at each shot. I would not take $50.00 for it, if I could not get another.

I have not tried a Silencer on a high power rifle yet as I disposed of the rifle I had, but I will purchase another before next hunting season and you may be sure it will be equipped with a Silencer."

R. R. J., Irma, Wis.

# Splendid for Noisy Cats

"I want to tell you how your Silencer helps us keep house. We live in a big apartment house and there are neighboring back yards which are regular battlefields for cats. These half wild creatures nightly get into political arguments which disturb us so much we lose sleep.

My wife, who is a nervous invalid, but nevertheless gifted with a fine working imagination, suggested to me that I buy a Maxim Silencer and shoot the troublesome animals. Being something of an outdoor man and fond of hunting, the idea struck me as pretty good. I bought a Silencer for my little Remington, and put it on easily—thanks to the little coupling which came with it.

The first night after getting the thing fixed up I had a good chance to use it. We had retired and were just getting to sleep when a couple of cats started up. I immediately got up, and finally located them right down on the grass of a yard. Knowing the little .22 short cartridge would be perfectly safe fired into the grass and earth from above, I got out the little rifle and with considerable excitement got a bead on the biggest one of the cats. I pulled the trigger, there was a little click and the old cat went end over end a couple of times and then lay still. The other cat paused a moment and then withdrew in haste, and we were left in quiet.

I suppose the people who found the dead cat put it in the ash barrel for me. It is great having your game retrieved this way. Since then I have done away with just ten cats who have disturbed our sleep at night. Instead of being in trouble all the time over the noise, we now have quiet nights or the means to make them quiet if they get noisy.

Anyone understanding how to shoot safely and living in a neighborhood where cats are troublesome ought to get a little .22 cal. rifle and a Maxim Silencer without delay."

                                                          **A. L. M.**

9

## Thought it had Missed Fire

'You will be interested in a little incident I had up in Canada on a recent fishing trip.

I took along a .22 cal. rifle which I fitted with one of your Maxim Silencers. I always take this little outfit with me everywhere I go, just for the pleasure that can be extracted from shooting at a mark. One morning before breakfast at the camp, I stepped outside with one of the other members of the party to take a few shots at whatever there was around. Frequently I get a little something which goes well on the table. I had turned the gun over to my friend to try, when a large hawk appeared overhead, circling and looking for his breakfast.

Pointing to it as a fine shot and a good thing to get rid of, he up with the gun and begins shooting. The first shot he took he landed, as I could distinctly see. Evidently he was not aware that he had hit the hawk, possibly because of his astonishment at shooting a noiseless gun for the first time. He brought the gun down from his shoulder and looking at it he said, "missed fire." In the meantime the hawk's body had fallen on the far side of a tree. "Missed fire?" I replied, "how about that?" pointing to the hawk's body on the ground.

Needless to say, he was amazed. He had given no thought to the hawk, thinking the gun had missed fire. He had to shoot several times before he could believe his own eyes, that he was actually shooting a real .22 long rifle cartridge. I thought you might be interested in this little experience."

J. E.

## He Got His Deer

"I got a deer this season which I would not have got if it had not been for your Maxim Silencer. It happened like this:

I came out onto a little pond and across on the other side I saw a deer drinking. I had my .30-30 and immediately brought it up and let go. I missed, holding too high. The deer did a strange thing. It

APPX.263

jumped, hearing the bullet crack overhead, but did not seem to know which way to run to avoid the noise. As you know, bullet crack always sounds right over your head, no matter which way the bullet is traveling. There is no idea as to where the gun is.

This deer was confused. He finally backed into bushes before I could get another good chance at him. I waited to see what would happen, and in a minute or so out he came again. He looked around and came all the way out, evidently not entirely scared, but just curious. I let him have it again, and strange to say I missed the second time. I held on his shoulder and he moved just as I pulled. This time he jumped again, but did not move away, seemingly trying to study out that little "cracking" noise.

I got another shell in and this time I got down to business and landed him. The distance was not more than 100 yards, and you can imagine how much chance I would have had at that deer without the Silencer. The first loud bang of the report would have sent him scurrying never to return.

I had several other experiences with the Silencer which I think would interest you. I am convinced it is a very good thing from the humane standpoint and also for saving the game, although many people who have had no experience with it think otherwise. With a Silencer a hunter gets his first animal, usually. He has more chance to. This means there are less wounded animals which get away and die. We all know how often we find a poor creature's body, with all the signs of having crawled away wounded and left to die slowly. The loud report noise of the regular gun prevents a second or a third shot, which in many cases are necessary to kill."

W. G.

## Muskrat Hunting

"Your Silencer certainy is a great thing for muskrat hunting. I had an experience the other day which I am going to write you about.

11

At this season our river comes up and floods the banks and forces the rats out of their holes and we get them with small rifles and shotguns. A friend and I were out after them in a boat and I had my .22 rifle with one of your Silencers on it so as to keep down the noise. I saw a rat on the bank and after getting the boat as near as we dared, I fired. I failed to connect, probably because the boat was not steady. The bullet plunked into the mud back of him. Of course I expected that would be the last seen of that rat.

But this was where the Silencer came in. Instead of diving, that rat hearing only the soft plunk of the bullet in the mud back of him, turned to look at what was behind him, thinking that was where his danger was located. I caught on right away and getting in another shell I took more careful aim and got him. I would have lost him without the Silencer.

Some time I will write about a queer experience I had shooting skunks with the Silencer."

## Sparrow Shooting

"Please send me catalog showing present method of attachment of Silencer. I want one for a .28-30 Stevens barrel which is not standard either in muzzle diameter or taper. The Silencer which I have on a .44 cal. shot barrel is about the most satisfactory implement I ever possessed.

The total bag of English sparrows on my premises of about five acres, between two streets, since January 1st, is less than a dozen while on the premises of an adjacent neighbor where they have not previously been shot, I have killed about a hundred and fifty in the last month.

The consequent increase in song birds and other insect eaters is notable, and is plainly shown in condition of fruit trees and shrubbery. This shooting would be entirely out of the question in this vicinity without the Silencer.

It is especially to be noted that this muffled shooting does not in the least degree alarm the other birds.

F. W. W., Norwichtown, Conn.

12

# Miniature Trap Shooting

"I am sending you a couple of photos of our Noiseless Trap Shooting Club which I trust will interest you. We use .22 and .32 shot cartridges, in smooth bore rifles fitted with your wonderful Maxim Silencers. We also use regular Blue Rock Clay "birds" and a regular Leggett trap. The latter is mounted upon a bracket so that the "bird" is thrown nearly straight up. We stand back twenty feet from the trap.

This outfit enables us to enjoy trap shooting on the front lawn without disturbance or danger. The Silencers stop the noise and the shot cartridge is perfectly harmless beyond 200 feet. Some of us have become crack shots, and we think it great sport. Incidently it is much less expensive than regular trap shooting, and it is always convenient. We can set up the trap any time in almost any place. We propose trying .32 single shot smooth bore pistols next, with Silencers. If it works out all right we will have pistol trap shooting, something entirely new."



*Noiseless Trap Shooting*

13

# A Slender Young Lady's Experience

"I have just got back and today have been trying out that Featherweight Savage .303 rifle which you fitted with a Silencer, and must say that I am very pleased with the result. The gun makes a bit of row with the high steam cartridge, but it does what I particularly wanted: reduces the recoil. And with those cartridges which you supplied, it does away with both recoil and noise, much better than when using the auxiliary cartridge and revolver ammunition. It looks almost ridiculous to pull the trigger and see a squirrel drop with less noise than snapping a primer in an empty shot gun shell.

I am sorry that I did not have a rifle fitted with a Silencer long ago. It is the first one in this district and appears to be attracting quite a little interest among the local shots, quite a few having been patiently waiting for me to come and try it out.

I ordered a .22 cal. rifle to be fitted with a Silencer on my way up which you may have heard of by now. I will be pleased to answer any one inquiring about a Silencer around here or let them see it used should they care to come along.

I may say that the rifle will be shot mostly by a slightly built lady who is enthusiastic over the idea of being able to kill big game without having her shoulder battered to the various colors of the rainbow by her high power arm."

J. B. Flagstone, B. C.

# Bringing Ducks up to the Gun

"Here is an experience with one of your Maxim-Silencers which you will probably find hard to believe notwithstanding it is an actual fact.

I was duck shooting from a boat which I had pushed in among the reeds out of sight. A flock of ducks came in and settled in the water considerably beyond the reach of my shotgun. I had figured that one of your Silencers on a .22 cal. rifle would be a good thing

**14**

to have around when shooting ducks. I decided to try it this time, and see if I could not bring those ducks nearer in.

I picked up the .22 and shot out beyond the ducks so that the bullet would hit the water on the far side of them and far enough off to wake them up but not frighten them into the air. They immediately took notice when the bullet splashed in the water and began swimming away from the disturbance, and toward me.

After a while, I sent another bullet out and kept repeating the operation every minute or so. I found that I could steer these ducks perfectly. They could not hear the gun and of course I could bring them right up toward me. I really brought them up within easy range of the shotgun and got one with each barrel.

It seems like a fairy tale to write, but I vouch for the absolute accuracy of the above "

R. E. P.

## Killing Crippled Ducks

"I am one of those who enjoy duck shooting and one of my difficulties has been killing crippled ducks. There are always several of these in a day's shooting which are not killed, but seriously crippled. They fall into the water and if they are in range of the shotgun you have to blaze away until you kill them. Sometimes you do it and sometimes you don't. Anyway, you kick up an awful row, scare new birds from coming in and waste a lot of ammunition.

I have found that a .22 cal. rifle with a Maxim Silencer just fills the bill for killing these cripples. It allows you to get them when they are out beyond the range of the shotgun, and there is no noise to frighten away other flocks. The best cartridge to use I find to be the .22 smokeless Long Rifle. I can get a duck practically every time at 100 to 125 yards. You ought to tell duck shooters about this. Most people dislike to cripple the poor creatures and let them get away to die a lingering death."

A. B. T.

15

# Training Recruits

The following is taken from a letter received from an Army Officer:

"Enclosed you will find the record of five men in my Company who have given us a lot of trouble. Two of them are recruits and three are old men. All five are what we call "chronic flinchers." They have been the despair of their officers and comrades, being so gun shy as to be incapable of making a respectable score on the range.

Believing that Silencers would help them, I secured five and fitted them to their rifles. The scores tell the rest of the story.

You will see that the first string beat the best previous records ever made by any of these five men. You will also see that after finishing the programme with the rifles fitted with Silencers, these men were able to also beat the previous averages with regular rifle. I ascribe this to learning the knack of shooting without flinching. This knack was a sealed book to these men before they used the Silencer.

There is no doubt but what much can be gained by starting recruits in with rifles fitted with Silencers and thus teaching them the principles of proper holding and trigger pull. The greatly reduced recoil, and the annulment of report effected by the Silencer prevent forming the flinching habit. I consider these results as very important."

---

The Silencer works perfectly on the .22 Winchester automatic rifle.

---

The Silencer is not recommended on high power auto-loading rifles, nor shotguns.

---

Shot loaded cartridges up to .45 cal. work perfectly in the Silencer.

---

The Maxim Silencer will not silence a revolver nor an automatic pistol.

16



## First Use of the Maxim Silencer in Actual War •

This report was made to me by the personal representative of a Mexican officer who for the past two years has figured in active hostilities. The report gives the first authentic information regarding the use of Maxim Silencers in actual battle.

It seems that a number of Maxim Silencers were purchased in one of the border cities on the American side. They were evidently used extensively in the first revolution on Madero's side, and it seems that they are again in use at the present time. When I asked about their military value, I was informed that my Silencer's chief value was altogether different than I had predicted.

Instead of its chief value being the concealment of position, I was told that it was the favorable effect upon the soldier. The latter, when furnished with a rifle equipped with Silencer, became possessed of the idea that he could take greater chances without injury to himself, and always shot more carefully.

17

This, according to my informant, was a very valuable thing indeed   He said that it tended toward making every man a sharpshooter.   I was asked if I had expected this, and I was forced to acknowledge that I had not thought of it, although I could easily see how it could be so.

I imagine this will surprise several military experts, as it surprised me.   No one to my knowledge predicted this.

Another curious thing was the reported effect of the Silencer upon the nervous and physical organization of the soldier.   It seems that in consequence of the terrific report and recoil of many of the rifles used, that the men acquire a state of excitement, which after several hours produces serious fatigue. In this condition the average man cannot be counted upon.   It was stated that the men with the Silencers could always be counted upon at critical moments, even late in the day.   The reason given was that these men had not been subjected to terrifying noise and continual recoil pounding.

This condition was predicted by some of our United States officers after the first Maxim Silencer tests.

Another thing that came out as predicted according to the report, was the effect upon marksmanship. I asked about this particularly, and the reply was that the Silencer gives the soldier the idea that he is safer and he can be more careful in aiming, and as a natural result his marksmanship is better.   It was claimed that with the Silencer the soldier takes an interest in hitting what he aims at.   If this is so throughout the rank and file of an army, it is a matter of the greatest importance.

The prediction made by most military experts regarding improved control of the firing by officers was borne out.   The fighting in Mexico seems to be generally open order.   The men are scattered and not in solid masses.

18

It was said that officers have great d.fficulty in controlling the fire of these men because of the noise drowning out the sound of their voices. When the men having Silencers were grouped together, their control was said to be perfect. Officer's orders could always be heard no matter how rapidly they were shooting. It is interesting to note that this exactly bears out the predictions made by the U. S. School of Musketry. Confusion on the part of the enemy regarding location of firing line and the number of guns against them and also the reducing waste of ammunition were mentioned. The report was of great interest as it constitutes the first word from the actual battlefield.

**Hiram Percy Maxim.**



*The Deadliest Firearm ever Invented*

19

# Your Question is Probably Answered Here



## .22 Calibre Rifles

This is an accurate illustration of the .22 calibre Silencer and its coupling.

The coupling simply has to be driven tight onto the end of your gun barrel. Once on, the Silencer can be attached or detached at will by a single twist of the wrist. A small sleeve or cap is furnished which can be used to cover the threads on the end of the coupling when the Silencer is off, thereby giving the gun its usual appearance.

Different-sized couplings are made for different-sized gun barrels. When ordering, state **make** and **model** of your rifle, and whether barrel is **round** or **octagon**, and the proper size coupling will be furnished.

Model, 1912, 1 in. x 4¼ in., weight 5 oz., $5.00 with coupling.

This Silencer will make your gun noiseless. It will double the pleasure of your shooting and your advantage in hunting and target practice. Once you have enjoyed the experience of **shooting quietly,** you will never be satisfied with the old-fashioned noisy report.

## .25-20 and .32-20 Rifles

As with the .22 cal., these Silencers are attached by means of couplings which simply have to be driven tight onto the end of the gun barrel. Once the coupling is on, the Silencer can always be attached or detached by a single twist of the wrist. Different couplings are made to suit the various sizes of gun barrels. When ordering state **make** and **model** of your rifle, and whether barrel is **round** or **octagon**, and the proper size coupling will be furnished.

20

The dimensions and weights are as follows:

.25-20, 1 in. x 5 in., weight 7 oz., $7.00 with any size coupling.

.32-20, 1⅝ in., x 6¼ in., wt. 12 oz., $7.00 with any size coupling.

Either one of these Silencers will absolutely annul the noise made at the muzzle of the gun by the report and also take out practically all of the recoil. With ordinary ammunition, this does not give strictly noiseless shooting because the bullet from the usual cartridge has a velocity high enough to make a noise of its own in its flight through the air. By sacrificing some of the velocity, this bullet flight noise may be avoided and strictly noiseless shooting obtained. We furnish this ammunition or give you exact information regarding loading it yourself.

## .22 Savage High Power "Imp"

This Silencer is attached to the gun barrel by means of a coupling which slips onto the end of the barrel and locks back of the front sight by means of a clamp band. The Silencer can be attached or detached at will by a single twist of the wrist. Small cap covers the threads on the end of the coupling and gives a neat appearance to the barrel when the Silencer is off.

The size and weight are as follows:

Diameter 1 in., length 5¾ in., weight 7 oz. Price of Silencer only $6.00. Price of Coupling only $2.50.

This Silencer is especially good on the Savage "Imp". The gun has an extremely sharp report and the Silencer entirely does away with this. It also takes out the last bit of recoil. It doubles the pleasure of shooting the gun. It, of course, does not stop the noise made by the bullet in its flight through the air. As with other high power rifles, this bullet flight noise is always heard with regular ammunition notwithstanding the fact that the gun report is entirely eliminated by the Silencer. By sacrificing some of the bullet velocity, strictly noiseless shooting can be obtained.

## .25-35 Rifles

For Winchester, Savage, Stevens and Marlin rifles of this calibre, a Silencer and Coupling is furnished. The coupling drives tight on the end of the gun barrel after removing the front sight from the latter. A new front sight is furnished in the Coupling to take the place of the one driven out of the barrel.

The Silencer can be attached or detached at will by a single twist of the wrist. A small cap covers the threads on the end of the coupling when the Silencer is off.

APPX.274

The size and weight are as follows:

Diameter 1 in., length 5¾ in., weight 8 oz. Price of Silencer only $7.00. Price of Coupling only $2.50.

The Silencer entirely stops the noise made at the muzzle of the gun by the report and also takes out 75 per cent. of the recoil. With ordinary ammunition, strictly noiseless shooting is not obtained because the bullet from the regular cartridge has a velocity high enough to make a noise of its own in its flight through the air. By sacrificing some of the velocity, this bullet flight noise can be avoided and strictly noiseless shooting obtained. We furnish this ammunition or full information regarding loading it.

The Silencer improves marksmanship and the advantage in hunting or target practice to an extent that is difficult to believe until it has been tried. With the reduced velocity ammunition, target practice can be enjoyed anywhere without creating the least disturbance or attracting attention.

## .30 Calibre up to .45 Calibre Rifles

For Winchester, Marlin, Savage and Stevens and all other makes of repeating, or single shot rifles in any calibre between .30 and .45, Silencer and coupling is furnished with either **sight type "drive-on" coupling** or **clamp type coupling.**

The "drive-on" type coupling is used on all rifles having front sight which can be removed from gun barrel, leaving a plain round barrel.

The clamp type coupling is used on all rifles having front sight mounted upon a base built into the gun barrel.

The Silencer attaches or detaches from the coupling by a single twist of the wrist. A cap is furnished which covers the threads on the end of the coupling when the Silencer is off, giving the gun barrel a finished appearance.

The size and weight are as follows:

Diameter 1⅜ in., length 6¼ in., weight 12 oz. Price of Silencer only $7.00. Price of Coupling only $2.50.

On any one of the rifles mentioned above the Silencer absolutely annuls the noise made at the muzzle by the report,—even in the most powerful such as the Winchester, cal. 405, or the Winchester Model '95 shooting the Government '06 cartridge. This is not only accomplished, but in addition the recoil is reduced 75 per cent., and changed from a kick to a softened push.

**22**

As in the case of the other high power rifles mentioned above, noiseless shooting is not obtained with the regular cartridge because the bullet of the latter has a high enough velocity to make a noise of its own in its flight through the air. This noise is, of course, not nearly as loud as the report noise. It can only be stopped by sacrificing enough of the velocity to bring the latter down to 1100 feet per second, at which point the bullet flight noise always begins. We furnish this ammunition or full information regarding loading.

---

The Silencer vastly increases the value of any of the high power rifles on account of the greater pleasure and interest in shooting and the greater use that can be made of the gun. Small game can be shot around camp without frightening away big game which may be in the neighborhood. Target practice can be enjoyed even at home with reduced velocity ammunition without the slightest disturbance being created. Marksmanship is improved because of the stopping of the report noise and reducing the recoil which stops the tendency to flinch, almost unavoidable when shooting a high power rifle.

---

By threading the rifle barrel, any Silencer can be attached without coupling. We recommend this direct attachment wherever possible, as it saves both the weight and expense of the coupling.

---

One Silencer can be used on any number of different guns provided the calibre of the gun is not greater than the calibre of the Silencer.

---

The Silencer does not injure accuracy, but actually improves it on account of the steadying action of the Silencer on the gun barrel. The bullet is not supposed to touch the Silencer in passing through and consequently it has the same clear flight whether the Silencer is on or off.

---

The best .22 cal. ammunition to use in the .22 cal. Silencer is regular smokeless Long Rifle. The cartridges furnished by some makers loaded with Lesmok powder have bullet velocities high enough to make bullet flight noise. The regular smokeless cartridge does not.

---

The Silencer can be cleaned by letting hot water run through it. A good way is to attach it to a hot water faucet and let the water run through sowly for two or three hours.

APPX.276



# YALE UNIVERSITY LIBRARY



FROM THE COLLECTION MADE BY
CHARLES SHELDON B.A. 1890
OF BOOKS ON NATURAL HISTORY
EXPLORATION · HUNTING & FISHING

GIFT OF FRANCIS P. GARVAN
B.A. 1897



# Military-Grade Protection



Hearing loss is often preventable. Proper fitting and consistent wearing of hearing protective devices (HPDs) help prevent hearing loss and tinnitus. Noise-induced hearing loss and tinnitus (ringing in the ears) are the top two health conditions (https://www.ncbi.nlm.nih.gov/pubmed/21775950) among military veterans. In 2016, Veterans Affairs had 1,610,911 compensation receipts for tinnitus and 1,084,069 for hearing loss. Additionally, many Veterans who score normally on hearing tests have trouble understanding speech. This condition, called auditory processing disorder, is associated with blast exposure.

Military personnel commonly experience these disorders after exposure to loud noise, such as working in an airplane hangar, or exposure to high-intensity noise, such as an explosion.

Jump to:
Veterans Overview
Latest Veteran News
Military-Grade Protection
Veteran Stories

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

Accept

There is a misconception hearing protection inhibits vital communication and mission readiness. With today's increasingly sophisticated technology, soldiers do not have to choose between protecting their ears or their lives.

Below are some of Hearing Health Foundation's suggestions for hearing protective devices (HPDs) that protect without compromising safety:

## Earplugs

Traditional earplugs effectively prevent hazardous noise from entering the ear canal, but they can interfere with mission communication requirements, such as being able to hear speech or low-level combat sounds.

Level-dependent earplugs however use a filter that enables soft noises to be conveyed at full strength yet eliminate high-frequency or impulse noise. Level-dependent earplugs are easily transportable, but should be used in combination with other devices when operating aircraft or combat vehicles.

## Earmuffs

Earmuffs block sound by creating an airtight barrier around the entire ear, and are best used for intermittent exposure to noise. Earmuffs provide great protection, warmth, comfort, and durability than earplugs. Although they block softer sounds including speech, some military-grade earmuffs contain an electronic communication system to allow for clear communication.

## Noise-Attenuating Helmets

Noise-attenuating helmets protect from hearing loss, crash impact, and eye injury while increasing communication through radio communication. Technologically advanced helmets include active noise-reducing technology to monitor sound energy around the ear and cancel unwanted noise while

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

preserving verbal communication ability. A communications earplug microphone can also be worn to enhance verbal clarity.

## Suppressors

In 2017 the U.S. Marines began using suppressors on service weapons. While they don't completely drown out gunfire, they can reduce noise by more than 30 decibels. Suppressors offer tactical and medical advantages.

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

APPX.281

**TERMS (/TERMS-AND-CONDITIONS)**      **PRIVACY POLICY (/PRIVACY-POLICY)**

**CONTACT US (/CONTACT-US)**

**© 2025 Hearing Health Foundation.** All rights reserved.

Hearing Health Foundation, PO Box 1397, New York NY 10018

Phone: 212.257.6140 (TTY: 888.435.6104). Email: info@hhf.org (mailto:info@hhf.org).

HHF is a 501(c)(3) tax-exempt corporation. Our tax ID number is 13-1882107.

*HHF does not endorse products or services appearing as paid advertisements on this website.*

(http (http (http (http (http (http

(http (http

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.



*NSSF® Report*

# MODERN SPORTING RIFLE

## COMPREHENSIVE CONSUMER REPORT

Ownership, Usage and Attitudes Toward
AR- and AK-Platform Modern Sporting Rifles

**NSSF**
The Firearm Industry
Trade Association

**NSSF MSR Consumer Study – Report of Findings**

**Copyright:** ©2022 National Shooting Sports Foundation

For all client unique research, copyright is assigned to said client. All report findings contained within are the property of the client (NSSF), who is free to use this information as desired. However, it is recommended that the client contact *Sports Marketing Surveys*, prior to reproduction or transmission for clarification of findings, analysis, or recommendations.

**Disclaimer:**

While proper due care and diligence has been taken in the preparation of this document, *Sports Marketing Surveys* cannot guarantee the accuracy of the information contained and does not  accept any liability for any loss or damage caused as a result of using information or recommendations contained within this document.

Sports Marketing Surveys USA

6650 West Indiantown Road, Suite 220,

Jupiter,

Florida 33458, USA

www.sportsmarketingsurveys.com

+1 561 427 0647

c. 772 341 6711

APPX.284

NSSF MSR Consumer Study – Report of Findings

## Table of Contents

Executive Summary………………………………………………………………………………….   3

Methodology…………………………………………………………………………………………   9

1. Experience with MSRs……………………………………………………………………   10

2. Most Recently Acquired MSR…………………………………………………………   18

3. MSR Usage and Activities………………………………………………………………   39

4. MSR User Profiles…………………………………………………………………………   51

5. Clusters/Segmentation…………………………………………………………………   61

6. Sample Profile………………………………………………………………………………   71

APPX.285

## Executive Summary

### EXPERIENCE WITH MSRs

- <u>Ownership & Platform</u>: The median MSR user owns nearly 4 MSRs, with 97% of owners saying they own an AR–platform MSR. 38% own another MSR platform and 27% own an AK platform MSR.

- <u>When MSR was first owned</u>: Over 40% obtained their first MSR since 2009, with 11% obtaining their first MSR within the last 2 years.  while 20% of MSR owners obtained their first MSR prior to 1999.

- <u>Other Firearms Owned First</u>: 99% of MSR owners used or obtained another firearm before an MSR; the most popular firearm owned is a handgun, which 88% of MSR owners held before obtaining a MSR.

- <u>Introduction to MSRs</u>: One-third of MSR owners became interested through their own personal accord. About 21% first gained interest through military or their job, and another 20% through family & friends.

- <u>Range membership</u>: 52% of MSR owners are current members of a shooting range. 28% have never been a member, with the final 20% being former members.

- <u>Reasons for ownership</u>: Recreational target shooting was rated as the most important reasons for owning an MSR.  Big game hunting and professional/job-related use were rated as least important.

### MOST RECENTLY ACQUIRED MSR

- <u>When Acquired:</u> 48% of MSR owners said they obtained their most recently acquired MSR within the last two years (2021 or 2021), with 31% saying they obtained a MSR in 2021.

- <u>Platform:</u> Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

# Executive Summary

### MOST RECENTLY ACQUIRED MSR (cont.)

- New/Used MSR: 83% of MSR owners said they bought their most recent MSR by purchasing it new.

- Place of purchase: 30% of owners bought their most recent MSR from a independent (mom & pop) retail store. 22% assembled their MSR using purchases of different parts, and 19% used the internet/website.  The most popular retailers & online sites used were Palmetto State Armory, Gunbroker.com, Cabela's, and Sportsman's Warehouse.

- Price: The average price for a new MSR paid by owners was $1,071; half of MSR owners paid between $500 and $1000 for their most recently acquired MSR.

- Brand: Survey data indicates the MSR market is highly fragmented.  11% of MSR owners said Palmetto was the brand of their most recently acquired MSR.

- Caliber – 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm.

- Reasons for buying– MSR owners said reliability, accuracy, and fun were the most important reasons for purchasing their most recently acquired MSR. The least important reasons were recommendations from a retailer and MSRs owned by family/friends.

- Accessories: 86% of MSR owners have their most recently acquired MSR customized to some extent, with 70% having 1–3 accessories. 75% of those with accessories added them to their MSR within 12 months after purchase. The average spent for accessories by owners on their most recently acquired MSR is $618.

- Optics used: 61% of MSR owners have a scope equipped as a primary optics, while 55% utilize a red dot.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

**MOST RECENTLY ACQUIRED MSR (cont.)**

- <u>Scope:</u> the most common scopes used by MSR owners are the 3-9x power scope and the 1-4x power scope.

- <u>Magazine capacity</u>: Over half (52%) of MSR owners stated the magazine capacity of their MSR is 30 rounds. When asked why they chose their respective capacity, most frequent responses were related to popularity/standard and being readily available.

- <u>Stock</u>: Approximately two-thirds of MSR owners have a collapsible/folding stock on their MSR.

- <u>Receiver</u>: 81% of owners have a flat top upper receiver.

- <u>Handguard</u>: The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

- <u>Finish color</u>: 3 out of 4 owners have a black finish color on their MSR.

- <u>Barrel</u>: 67% have a threaded barrel on their MSR.

- <u>Barrel accessories</u>: Most used barrel accessories are flash hider (39% of MSR owners) and muzzle brake/compensator (37%).

- <u>Barrel length</u>: 75% have a MSR with a barrel length of 16" to 20".

- <u>Operating system</u>: The most recently acquired MSR for 59% of owners operates by direct gas impingement.

APPX.288

NSSF MSR Consumer Study – Report of Findings

## Executive Summary

**MOST RECENTLY ACQUIRED MSR (cont.)**

- <u>Storage</u>: 67% store their MSR unloaded and secured in a safe, lock box, or with a trigger lock. An additional 19% store their MSR <u>loaded</u> and secured in a safe, lock box, or with a trigger lock.

- <u>Likelihood to buy</u>: On a scale from 1 to 10, where 1 is "not at all likely" and 10 is "very likely", the average likelihood rating given by MSR owners that they'll buy a MSR in the next 12 months is 6.2, slightly more to the 'likely' end of the scale.

- <u>Accessories owned</u>: The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and a soft carrying case. The accessory MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer. About 70% of MSR owners do not own and do not plan on buying a laser designator or night vision/thermal scope in the next 12 months.

**USAGE AND ACTIVITIES**

- <u>Use:</u> 88% of MSR owners used/shot their MSR(s) in the last 12 months. The average number of times used was 14, just over once a month. Compared to the 12 months before that, 41% said their MSR use was "about the same" while 38% said it was less.

- <u>Desired usage</u>: 75% of MSR owners said they did not use their MSR as much as they would like over the past 12 months. The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

- <u>Activities</u>: The most popular activity by MSR owners is target shooting — 54% said they did target shooting at a private range, while 49% said they did target shooting at a public range.

- <u>Ammo used</u>: Roughly 70% of MSR owners used budget factory and premium factory loads in the last 12 months. The ammo breakdown for an average MSR user is made up of 42% budget factory loads, 32% premium factory loads, 17% handloads/reloads, and 9% import ammo. The average number of rounds used by MSR owners in the last 12 months is 907 rounds. In the next 12 months, MSR owners project they'll fire 984 rounds.

## Executive Summary

### USAGE AND ACTIVITIES (cont.)

•  <u>Ammo purchases</u>: The average number of ammo rounds typically purchased by MSR owners is 637.

•  <u>Ammo on hand</u>: Nearly half (45%) of MSR owners own/keep more than 1,000 rounds on hand.

•  <u>Ammo reloads</u>: 6 out of 10 MSR owners do not reload their own ammunition. Of the 40% who do, the average percentage of ammunition they reload is 53%.

•  <u>Activities - Distance</u>: The most frequent distance that MSR owners hunt/target shoot is at 100-300 yards.

•  <u>Target shooting alone vs with others</u>: 43% of MSR owners who go target shooting typically go with 1 other person. 27% go alone.

•  <u>Favorite part about owning MSR</u>: MSR owners said their favorite part about owning a MSR was: fun/enjoyment of shooting, exercising freedom/2A rights, ease of use, and reliability.

### RESPONDENT PROFILE

•  Organizations: 61% of MSR owners are members of or recently donated to the NRA, the most frequently chosen organization. 21% of MSR owners are not members of or recently donated to any firearm organizations. 12% are members or recently donated to the NSSF.

•  Military/Law-Enforcement: 38% of MSR owners are active/retired member of law enforcement or the military.

•  Age/Gender/Race: 96% of MSR owners are Male. The average age of MSR owners is 55 years old. 88% are White/Caucasian.

•  Marital status: 74% of MSR owners are married. Of these MSR owners, over half say their spouse accompanies them for target shooting. 24% say their spouse has no interest in target shooting or firearms.

## Executive Summary

**RESPONDENT PROFILE (cont.)**

- Education: 45% of MSR owners have attained at least a bachelors degree. One-quarter have attended some college, but did not graduate.

- Income: The average yearly household income for MSR owners is $110,934. More than half are in households with an annual income of greater than $85,000.

- <u>Children in Household</u>: 62% of MSR owners do not have any children living with them.

- State: The states with the most respondents were Texas (9%), California (5%), and Florida (5%).

NSSF MSR Consumer Study – Report of Findings

## Methodology

In 2020, the National Shooting Sports Foundation (NSSF) contracted Sports Marketing Surveys for an online consumer survey on modern sporting rifles (MSRs) that was last carried out in 2013. Due to the COVID pandemic and personnel changes at NSSF, this survey was not able to be administered until December 2021. The aim is to provide the NSSF and manufacturers insights on current consumer needs and uses of MSRs as well as educate those influencing public policy in the effort to preserve our constitutional rights.

The online survey covered various aspects of MSR ownership, behavior, and attitudes. The NSSF promoted the survey via a partner email distribution list.  A random drawing to win one of four $250 Mastercard prepaid gift cards was included to incentivize participation. The term "Modern Sporting Rifle" was clearly defined as AR- or AK-platform rifles such as AR-15, AR-10, AK-47, AK-74 and did not include non-rifle firearms such as AR pistols, etc. Photographs of both AR- and AK-platform MSRs were shown on the survey landing page. All responses from those under 18 years old or said they did not own at least 1 MSR were removed from the analysis.

The survey was live from December 9, 2021 to January 2, 2022.
- **Completed Surveys: 2,421**
- **Usable responses for analysis: 2,185**



NSSF MSR Consumer Study – Report of Findings

Section 1: Experience with Modern Sporting Rifles

7/14/22

11

**NSSF MSR Consumer Study – Report of Findings**

## Modern Sporting Rifle Ownership: Platforms

**MSR Platforms Owned**

% of users owning platform



| Platform | Average Number of MSRs owned (must own at least one of specified platform) |
|---|---|
| AR platform | 2.7 |
| Other platform | 2.3 |
| AK platform | 1.5 |

**Average number of MSRs owned: 3.8**
- AR – 2.6
- Other – 0.8
- AK – 0.4

Median of all MSRs owned: 3

(may own zero of one or more platform, but must at least own one MSR)

**Number of MSRs owned**



**Trend – Average Number of MSRs owned**
2010: 2.6
2013: 3.1
2021: 3.8

APPX.294

# Modern Sporting Rifle Ownership: Experience

**When did you obtain your FIRST MSR?**



| By Number of MSRs Owned | | | | |
|---|---|---|---|---|
| 1 MSR | 2 | 3 | 4 | 5+ |
| 2021 | 14% | 3% | 3% | 1% | 1% |
| 2020 | 13% | 7% | 3% | 1% | 2% |
| 2019 | 9% | 7% | 5% | 4% | 2% |
| 2018 | 9% | 7% | 5% | 5% | 2% |
| 2017 | 8% | 5% | 5% | 4% | 3% |
| 2016 | 7% | 8% | 8% | 6% | 3% |
| 2015 | 7% | 8% | 6% | 3% | 5% |
| 2014 | 5% | 7% | 3% | 4% | 3% |
| 2013 | 3% | 5% | 6% | 4% | 4% |
| 2012 | 4% | 4% | 4% | 7% | 5% |
| 2011 | 2% | 4% | 4% | 4% | 4% |
| 2010 | 2% | 4% | 7% | 4% | 6% |
| 2005 – 2009 | 8% | 13% | 15% | 15% | 19% |
| 2000 – 2004 | 3% | 4% | 7% | 9% | 11% |
| Prior to 1999 | 7% | 13% | 20% | 28% | 30% |

- 20% of MSR owners obtained their first MSR before 1999. Over 40% have owned theirs since 2009.

- 11% obtained their first MSR within the last two years.

- 26% of those who own 1 MSR obtained it in 2020 or 2021.

**NSSF MSR Consumer Study – Report of Findings**

# Modern Sporting Rifle Ownership: Experience

**Firearms Used/Owned BEFORE obtaining a MSR**



- Handguns are the most popular firearm used/owned before obtaining an MSR, with 88% of MSR owners selecting.

- Traditional rifles were also first used/owned by 82% of MSR owners.

- Younger MSR owners show less ownership of other firearm types before a MSR compared to other age groups.



**Firearms Used Before MSR - by Age**

7/14/22

14

## Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

NSSF MSR Consumer Study – Report of Findings

## Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

7/14/22

16

APPX.298

**NSSF MSR Consumer Study – Report of Findings**

## Modern Sporting Rifle Ownership: Shooting Ranges

**Do you currently have a membership at a shooting range?**



- About half of MSR owners are current members of a shooting range.

- 28% have never been a member of a shooting range.

# Modern Sporting Rifle Ownership: Reasons for Ownership

Respondents were asked to rate how important each of the following reasons are to owning an MSR. They rated each reason on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."

**Rating: How important are these reasons to owning an MSR?**





| | 1 2 3 4 5 6 7 8 9 10 | |
|---|---|---|
| Recreational target shooting | | 8.7 |
| Home/self-defense | | 8.3 |
| Collecting | | 6.3 |
| Varmint Hunting | | 5.8 |
| Competition shooting (i.e. 3. Gun) | | 5.6 |
| Big Game Hunting | | 4.9 |
| Professional use / Job-related | | 3.4 |

*Scale:*
*1=Not at all important,  10= very important*

- Recreational target shooting was rated as the most important reason for owning an MSR.

- Big game hunting and professional/job-related use were given the lowest importance ratings.

| | MSR Owned | | | | | Age | | | | Usage Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | | 3 times or less | 4 to 11 times | 12 to 23 times | 24+ times |
| Recreational target shooting | 8.4 | 8.7 | 8.8 | 8.6 | 9 | 8.4 | 8.8 | 8.9 | | 8.5 | 8.8 | 9 | 9.1 |
| Home/self-defense | 7.9 | 8.2 | 8.2 | 8.3 | 8.7 | 8.4 | 8.3 | 8.2 | | 8 | 8.3 | 8.5 | 8.7 |
| Collecting | 5.2 | 5.8 | 6.6 | 6.7 | 7.1 | 6.9 | 6.5 | 5.8 | | 5.9 | 6.2 | 6.4 | 7 |
| Varmint Hunting | 5.2 | 5.5 | 5.8 | 5.9 | 6.3 | 5.7 | 5.8 | 5.8 | | 5.2 | 5.7 | 6.2 | 7 |
| Competition shooting (i.e. 3. Gun) | 4.6 | 5.3 | 5.6 | 6 | 6.4 | 6 | 5.8 | 5.2 | | 4.9 | 5.4 | 6.3 | 7 |
| Big Game Hunting | 4.3 | 4.4 | 4.9 | 5.4 | 5.5 | 5.2 | 4.9 | 4.7 | | 4.4 | 4.9 | 5.2 | 6 |
| Professional use / Job-related | 2.8 | 3 | 3.7 | 3.5 | 3.9 | 4 | 3.4 | 3 | | 3 | 3.2 | 3.6 | 4.5 |



NSSF MSR Consumer Study – Report of Findings

Section 2: Most Recently Acquired Modern Sporting Rifle

7/14/22

19

**NSSF MSR Consumer Study – Report of Findings**

## Most Recently Acquired MSR: Platform, When Acquired

**Platform - Most Recent MSR Obtained**



**Year of Most Recently Acquired MSR**



- Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

- Nearly one-third of MSR owners said they acquired their most recent one in 2021, nearly 50% within the last two years (2021 or 2020).

APPX.302

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: How? Where?

**How did you obtain your most recently acquired MSR?**




| | |
|---|---|
| I purchased it NEW | 83% |
| I purchased it USED | 11% |
| I received it NEW as a gift | 3% |
| I received it USED as a gift | 2% |
| I inherited it | 1% |

**Place of Purchase**



| | |
|---|---|
| Independent (Mom & Pop) Retail Store | 30% |
| Purchases of different parts | 22% |
| Internet/Website | 19% |
| Other | 10% |
| Chain or Big Box Retail Store | 9% |
| Purchased as a kit | 6% |
| Gun Show | 4% |

- 83% of MSR owners acquired their most recent MSR by purchasing it new.

- For those purchasing a new or used MSR, the most common place of purchase was an independent retail store.

- Popular retailers & online sites used: Palmetto State Armory, Gunbroker.com, Cabela's,  Sportsman's Warehouse,

APPX.303

# Most Recently Acquired MSR: Place of Purchase

| | Total | Number of MSRs Owned | | | | | Age | | | Range Membership | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | Member | Non-member |
| Independent (Mom & Pop) Retail Store | 30.3% | 31.9% | 30.5% | 31.1% | 29.8% | 28.9% | 26.6% | 35.1% | 30.1% | 33.9% | 26.5% |
| Purchases of different parts | 22.2% | 12.0% | 18.8% | 24.8% | 29.3% | 28.6% | 25.4% | 25.8% | 19.0% | 21.3% | 23.2% |
| Internet/Website | 19.3% | 18.6% | 21.1% | 16.2% | 19.1% | 20.2% | 24.3% | 14.1% | 19.1% | 18.1% | 20.7% |
| Other | 9.5% | 11.4% | 11.2% | 9.6% | 8.0% | 7.3% | 6.1% | 7.8% | 11.9% | 8.9% | 10.1% |
| Chain or Big Box Retail Store | 9.2% | 16.2% | 10.1% | 7.6% | 5.3% | 5.2% | 7.9% | 8.8% | 9.9% | 7.9% | 10.5% |
| Purchased as a kit | 5.8% | 5.6% | 4.6% | 6.3% | 5.8% | 6.4% | 7.0% | 4.6% | 5.6% | 5.9% | 5.6% |
| Gun Show | 3.7% | 4.2% | 3.7% | 4.3% | 2.7% | 3.5% | 2.7% | 3.8% | 4.2% | 4.0% | 3.4% |

APPX.304

# Most Recently Acquired MSR: Price



**Price of most recently acquired NEW MSR**

| | |
|---|---|
| Under $500 | 8% |
| $500 - $1,000 | 50% |
| $1,001 - $1,500 | 24% |
| $1,501 - $2,000 | 10% |
| $2,001 - $2,500 | 4% |
| $2,501 - $3,500 | 2% |
| More than $3,500 | 1% |
| I don't know | 1% |

**Price of most recently acquired USED MSR**

| | |
|---|---|
| 13% | Under $500 |
| 49% | $500 - $1,000 |
| 18% | $1,001 - $1,500 |
| 7% | $1,501 - $2,000 |
| 5% | $2,001 - $2,500 |
| 5% | $2,501 - $3,500 |
| 1% | More than $3,500 |
| 2% | I don't know |

- Half of MSR owners paid between $500 and $1000 for their most recently purchased MSR, both those who bought a new MSR and those who bought a used MSR.

- Average price for last MSR: $1,071.

| | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Overall average** | **$1,083** | **$1,058** | **$1,071** |
| AR–platform (new) | | $1,112 | $1,057 |
| AR platform (used) | | | $992 |
| AK platform (new) | | $711 | $1,086 |
| AK platform (used) | | | $1,218 |

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Brand

**Brand of Most Recently Acquired AR**



• Survey data indicates the MSR market is highly fragmented. 11% of MSR owners said Palmetto was the brand of their most recently acquired MSR —— the highest among the options available.

Commonly mentioned brands included in "Other":
• ATI
• Battle Arms Development
• MBX
• Sharp Bros
• Tavor
• WBP

*50+ other brands were selected by less than 1 % of respondents; full list available upon request*

APPX.306

## Most Recently Acquired MSR: Caliber

**Caliber of Most Recently Acquired MSR**



*7 other calibers were selected by less than 1% of respondents*

- 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm

- Of the 5% selecting "other," the most frequently mentioned calibers included:
  - 6.5 Grendel
  - .458 SOCOM
  - .224 Valkyrie

APPX.307

## Most Recently Acquired MSR: Reasons for Buying

For the 94% of respondents that purchased their MSR new or used, they were asked to rate how important each of the following reasons are for selecting their most recently acquired MSR on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."

**Rating: Most Important Reasons for Buying Most Recently Purchased MSR**



| Reason | Rating |
|---|---|
| Reliable | 9.0 |
| Accuracy | 8.8 |
| Fun | 8.7 |
| Easy to shoot | 8.4 |
| Good ergonomics, easy access to safety, fits my body | 8.1 |
| Reputation of manufacturer | 8.1 |
| Availability of ammunition in this caliber | 8.1 |
| Availability of parts | 8.1 |
| Ability to accessorize | 7.5 |
| For home/self-defense | 7.4 |
| Aesthetically pleasing | 7.0 |
| Potential to avoid any potential future ownership ban | 7.0 |
| Low cost of ammunition | 6.8 |
| Price | 6.6 |
| Light weight | 6.6 |
| Low recoil | 6.5 |
| Ability to shoot competitively | 5.2 |
| To hunt | 5.1 |
| Taught to use a similar firearm in military / law enforcement | 3.7 |
| Recommended by retailer | 3.3 |
| My friends / family had one | 3.2 |

Scale:
1=Not at all important,  10= very important

- MSR owners rated reliability, accuracy, and fun as the most important reasons for purchasing their most recently acquired MSR.

- The least important reasons as rated by MSR owners include recommendations from a retailer and MSRs owned by family/friends.

## Most Recently Acquired MSR: Accessories

**MSR - Use of Accessories**



**When have you added accessories to your MSR?**



- 86% of have their most recently acquired MSR customized to some extent, 70% having 1–3 accessories.

- For those with accessories on their most recently acquired MSR, 75% added accessories within 12 months after purchase. Nearly a quarter added accessories at the time of purchase.

APPX.309

## Most Recently Acquired MSR: Accessories - Spend

**Spend on After-Market Customization to Most Recently Acquired MSR**



|  | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Average spent** | **$436** | **$381** | **$618** |

- Of the MSR owners who have added accessories to their most recently acquired MSR, nearly half, or 48%, have spent between $201 and $600 on after-market customization.

- The average spent for accessories by owners on their most recently acquired MSR by owners is $618.

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Optics



**Optics Used on Most Recently Acquired MSR**

- 61% of MSR owners have a scope equipped as a primary optic on their most recently acquired MSR.

- Iron sights are the most common secondary aiming device, equipped on two-thirds of respondents' MSRs.

APPX.311

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Scope



**Type of Scope on MSR**

- The most common scopes used by MSR owners are the 3–9x power scope (21%) and the 1–4x power scope (20%).

- Of the 10% who selected "Other," the most frequently mentioned scopes were:
  - 1–8x variable power scope
  - 1–10x variable power scope

7/14/22                                                                                    30

**NSSF MSR Consumer Study – Report of Findings**

## Most Recently Acquired MSR: Magazine Capacity

**Magazine Capacity on MSR**



| Capacity | Percent |
|---|---|
| 30 round capacity | 52% |
| 20 round capacity | 17% |
| 10 round capacity | 17% |
| 5 round capacity | 5% |
| 15 round capacity | 3% |
| 25 round capacity | 2% |
| 40 round capacity | 2% |
| Other | 1% |

- Half (52%) of MSR owners stated the magazine capacity of their most recently acquired MSR is 30 rounds.

- When asked why they chose their respective magazine capacity, the most frequent responses were:
  - Common/standard
  - Readily available

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Type of Stock

**Type of Stock on MSR**



- **65%**, or approximately two–thirds, of MSR owners have a collapsible/folding stock on their most recently purchased MSR.

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Type of Upper Receiver

**Type of Upper Receiver on MSR**




- 81% have a flat top upper receiver on their most recently acquired MSR.

7/14/22                                                                                    33

## Most Recently Acquired MSR: Type of Handguard

**Type of Handguard on MSR**



- The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

## Most Recently Acquired MSR: Finish Color

**Finish Color on MSR**



- 3 out of 4 MSR owners have a black finish color.

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Barrels – Type, Accessories, Length

**Type of Barrel on MSR**



| | |
|---|---|
| Threaded | 67% |
| Non-threaded | 14% |
| Pinned and welded | 9% |
| I don't know | 9% |
| Other | 1% |

**Barrel Accessories on MSR**



| | |
|---|---|
| Flash Hider | 39% |
| Muzzle Brake/Compensator | 37% |
| No Muzzle Device | 9% |
| Silencer/Suppressor | 8% |
| Thread Protector | 3% |
| I don't know | 2% |
| Other | 1% |

**Barrel Length on MSR**



| | |
|---|---|
| 16" to 20" | 75% |
| 10.5" to 14.5" | 9% |
| 14.6" to 15.9" | 7% |
| More than 20" | 5% |
| Less than 10.5" | 3% |
| I don't know | 2% |

- Two-thirds of MSR owners have a threaded barrel.

- Most common accessories: flash hider (39%), muzzle brake/compensator (37%)

- 75% have a barrel length of 16–20%

7/14/22                                                                                     36

## Most Recently Acquired MSR: Operating System, Storage



**Operating System on MSR**

| | |
|---|---|
| Direct gas impingement | 59% |
| Gas piston | 21% |
| Recoil / Blow-back operated | 11% |
| I don't know | 6% |
| Delayed toggle bolt recoil | 1% |
| Other | 1% |

- 59% of MSR owners indicated their most recently acquired MSR is operated by direct gas impingement.

- 67%, or two-thirds, of MSR owners store their MSR secured and unloaded.

**MSR Storage**

| | |
|---|---|
| 67% | Secured (e.g., in a safe, lock box, trigger lock) – unloaded |
| 19% | Secured (e.g., in a safe, lock box, trigger lock) - loaded |
| 8% | Unsecured – unloaded |
| 5% | Unsecured - loaded |

NSSF MSR Consumer Study – Report of Findings

## Most Recently Acquired MSR: Likelihood to Buy a MSR in Next 12 Months



- Average likelihood to buy an MSR in the next 12 months is a 6.2 out of 10, slightly more to the "likely" end of the scale.

- 25%, or one–fourth of respondents, said they are "very likely" to buy an MSR in the next 12 months.

## Most Recently Acquired MSR: Accessories Owned

| | Owned | Plan to buy in next 12 months | Don't own, don't plan to buy |
|---|---|---|---|
| Gun Cleaning Kit | 94% | 9% | 3% |
| Extra Magazines | 87% | 23% | 6% |
| Targets | 84% | 26% | 5% |
| Soft Carrying Case | 84% | 9% | 12% |
| Rifle Sling | 81% | 21% | 8% |
| Gun Safe | 78% | 14% | 13% |
| Rifle Scope | 76% | 23% | 14% |
| Hard Carrying Case | 69% | 12% | 25% |
| Gun Lock | 64% | 4% | 32% |
| Backup sights | 55% | 20% | 31% |
| Bipod | 55% | 21% | 34% |
| Railed Handguard | 54% | 13% | 36% |
| Spotting Scope | 52% | 19% | 31% |
| Mounted Flashlight | 46% | 27% | 36% |
| Trigger Upgrade | 45% | 26% | 39% |
| Range Finder | 43% | 25% | 37% |
| Vertical Fore-grip | 41% | 14% | 49% |
| Stock Upgrade | 37% | 17% | 49% |
| Suppressor/silencer | 19% | 37% | 53% |
| Laser Designator | 17% | 12% | 72% |
| Night Vision/Thermal | 13% | 26% | 67% |
| Other | 6% | 4% | 43% |

- The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and soft carrying case.

- The accessory that MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer.

- Roughly 70% of MSR owners do not own and do not plan to buy a laser designator or night vision/thermal scope in the next 12 months.

NSSF MSR Consumer Study – Report of Findings



Section 3: Modern Sporting Rifle Usage & Activities

7/14/22

40

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities

**Used Your MSR(s) in the last 12 months?**



**MSR Use in Last 12 Months Compared to Previous 12 Months**



**MSR Usage: Number of Times in Last 12 Months**



| | |
|---|---|
| 1 to 4 times | 33% |
| 5 to 11 times | 32% |
| 12 to 23 times | 17% |
| 24 or more times | 18% |

Avg: **14 occasions**

- 88% of MSR owners used/shot their MSR(s) in the last 12 months. Compared to the 12 months before that, 41% said their MSR use was "about the same." 38% said it was less.

- Of those who used their MSR, the average number of times respondents used it in the last 12 months is 14.

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Factors Preventing Usage

**Used MSR As Much As You Would Like in Last 12 Months?**



**Rating: How important are the following in preventing you from using your MSR as much as you'd like?**



| | |
|---|---|
| Lack of ammunition availability | 8.0 |
| Cost of ammunition | 7.8 |
| Not enough free time | 6.2 |
| Distance I must travel for a suitable place to shoot | 4.5 |
| Cost of range fees | 3.4 |
| No one to go with | 3.2 |
| Other | 3.0 |

- 3 out of 4 MSR owners said they did not use their MSR as much as they would like over the past 12 months.

- The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

*Scale:*
*1=Not at all important,  10= very important*

APPX.324

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities

**MSR Activities in Last 12 Months**



- The most popular activity by MSR owners is target shooting; 54% said they did at a private range, while 49% said they did at a public range.

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Ammunition Used - Type

**Ammo Used (% of MSR Owners Using)**



| | |
|---|---|
| Budget factory loads | 72% |
| Premium factory loads | 70% |
| Handloads/reloads | 35% |
| Import ammo | 32% |

**Ammo Profile - Average % Breakdown Per MSR Owner**



"Budget" Factory Loads/Bulk packs , 42%

Premium factory loads, 31%

Handloads/Reloads, 17%

Import Ammo, 9%

- Across all MSR owners, roughly 70% of used budget factory loads and premium factory loads in the last 12 months.

- The ammo breakdown per MSR owner shows that 42% of ammo they used in the past 12 months are factory loads/bulk packs.

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Ammunition Used - Amount

**Rounds of Ammo Fired Through MSR In Last 12 Months**



| | |
|---|---|
| None | 0% |
| 1 – 50 | 6% |
| 51 – 100 | 9% |
| 101 – 200 | 15% |
| 201 – 400 | 19% |
| 401 – 600 | 15% |
| 601 – 800 | 6% |
| 801 – 1,000 | 10% |
| 1,001 – 3,000 | 14% |
| 3,001 – 5,000 | 4% |
| 5,001 – 10,000 | 2% |
| 10,001+ | 1% |

**Rounds of Ammo Fired (Grouped)**



| 1 – 200 | 201 – 400 | 401 – 800 | More than 800 |
|---|---|---|---|
| 29.8% | 19.1% | 21.0% | 30.1% |

- The average number of rounds used by MSR owners in the last 12 months is 907.

- Approximately half of MSR owners fired between 1 and 400 shots in the last 12 months, the other half shooting more than 400 rounds.

APPX.327

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Ammunition Used – Projected Amount

**Projected Rounds of Ammo Fired Through MSR In Next 12 Months**



**Projected Rounds of Ammo Fired (Grouped)**



- The average number of rounds that MSR owners project they will fire in the next 12 months is 984.

- Over one-third of MSR owners anticipate firing more than 800 rounds of ammunition in the next 12 months.

APPX.328

# MSR Usage and Activities: Ammunition Quantity Purchased, Kept On Hand

**Quantity of MSR Ammo Typically Purchased**



**Number of MSR Rounds Owned/Kept on Hand**




- When purchasing ammunition, the average number of ammo rounds typically purchased by MSR owners is 637.

- 36% of MSR owners typically purchase between 500–1,999 rounds.

- Nearly half of MSR owners own/keep more than 1,000 rounds on hand.

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Ammunition Reloads

**Do you reload your own ammunition?**



**Percentage of Ammo Reloaded**



- 6 out of 10 MSR owners do not reload their own ammunition.

- Of the 40% who do, the average percentage of their ammunition they reload is 53%.

APPX.330

NSSF MSR Consumer Study – Report of Findings

## MSR Usage and Activities: Firearms Used



**Firearms Used - Activities**

- 95% of respondents used their MSR to rifle target shoot.

APPX.331

**NSSF MSR Consumer Study – Report of Findings**

## MSR Usage and Activities: Target Shooting/Hunting

**Typical Distance When Using MSR for Hunting/Target Shooting**



**Target Shooting - Do you generally go alone or with others?**



- The most frequent distance that MSR owners hunt/target shoot at is 100–300 yards.

- 43% generally go target shooting with one other person. 27% go alone.

## Respondent Profile: Favorite Part About Owning MSR

Respondents were asked in an open-ended question to explain their favorite part of owning an MSR. Common themes in answers include:

**FUN/ENJOYMENT OF SHOOTING**
- General enjoyment of shooting; relaxing
- Challenge of target shooting, hunting; improving
- Camaraderie with others, quality time with loved ones
- Ability to customize/building from parts

**EXERCISING FREEDOM/2A RIGHTS**
- Represents freedom and America
- Tradition and history

**EASE OF USE**
- Lightweight
- Low-recoil
- Accurate, versatile
- Instills confidence

**RELIABLE**
- Craftsmanship and engineering
- Peace of mind — excellent for home defense



NSSF MSR Consumer Study – Report of Findings

Section 4: MSR Owner Profiles

7/14/22

52

NSSF MSR Consumer Study – Report of Findings

## Profile: Single MSR Owners vs Multi-MSR Owners



Multiple–MSR owners are relatively more likely to be:

- Ages 55+

- Non-range members

- Those who used MSR 11 or less times in the last 12 months

- Not from a military/law enforcement background

- Those with an income under $65k, though there is fairly even distribution across ranges

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense purposes

- Those who plan to buy MSR accessories in the next 12 months

7/14/22

53

NSSF MSR Consumer Study – Report of Findings

## Profile: Range vs Non-Range Member



MSR owners who are shooting range members are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- Occasional users of MSRs – 4 to 11 times times in the last 12 months

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who plan to buy MSR accessories in the next 12 months

## Profile: Infrequent vs Avid MSR Users



Avid MSR owners are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- A member of a shooting range

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting and hunting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who recently bought a MSR in 2020 or 2021, plan to buy accessories or a new MSR in the next 12 months

NSSF MSR Consumer Study – Report of Findings

## Profile: Target Shooters vs Hunters



Target shooters and hunters have similar profiles. Hunters are slightly more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- A frequent or avid user of MSRs

- Those without a bachelors degree

- Users of MSR for target shooting and hunting

- Those with kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who are likely to buy a new MSR in the next 12 months

7/14/22                                                                     56

## Profile: Owners Who Haven't Used MSR In Last 12 Months



Non-MSR users are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- Not a member of a shooting range

- Those with a household income of less than $110k

- Those with no kids at home

- Owners of a MSR(s) for home defense, some hunting

- Those who plan to buy accessories for their MSR in the next 12 months

NSSF MSR Consumer Study – Report of Findings

## Profile: Premium Buyers (>$1500 spent on MSR) vs Non-Premium Buyers



Premium MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- A member of a shooting range

- Regular users of MSRs, using 4 to 11 times a year

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Recent buyers (purchased MSR in 2021 or 2020), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

APPX.340

**NSSF MSR Consumer Study – Report of Findings**

## Profile: Heavily Accessorized (4+ accessories) MSR Owners



Owners of heavily accessorized MSRs are relatively more likely to be:

- Owners of multiple MSRs
- Under 45 years old
- A member of a shooting range
- Frequent/avid users of MSRs
- Those with a household income greater than $110k
- With a bachelors degree or more
- Using MSR for target shooting, competition shooting, and hunting.
- Owners of a MSR(s) for home defense, competition shooting, hunting
- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

APPX.341

**NSSF MSR Consumer Study – Report of Findings**

## Profile: Likely MSR buyers



Likely MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- Frequent/avid users of MSRs

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

7/14/22                                                                                                   60

APPX.342

## Profile: Military/Law Enforcement vs Non-Military/Law Enforcement



MSR owners with a military/law-enforcement background are relatively more likely to be:

- Owners of multiple MSRs

- 55 years old or older

- Frequent/avid users of MSRs

- Those with a household income of $65–$110k

- Those without a bachelors degree or more

- Using MSR for competition shooting or work

- Owners of a MSR(s) for home defense or professional/job-related purpose



NSSF MSR Consumer Study – Report of Findings

Section 5: Clusters/Segmentation

7/14/22

62

**NSSF MSR Consumer Study – Report of Findings**

## Clusters Analysis/Market Segmentation Explained

A Cluster Analysis is method used in market segmentation to help marketers identify specific consumer groups based on a specific set and sub-set of demographic and specific product usage patterns. Market segmentation means dividing the market into distinct groups of individual segments or clusters with similar wants or needs and behaviors.

A market segment or cluster is a sub-set of a people, in this case, MSR owners with one or more characteristics that cause them to demand similar product and/or services based on qualities of those products — such as usage activity and demographics. A true market segment meets all of the following criteria: it is distinct from other segments (different segments have different needs), it is homogeneous within the segment (exhibits common needs), and responds similarly to market stimulus and media.

In the MSR Study, we used the following variables to establish clusters:
- Age
- Reasons for owning an MSR
- Annual Household Income
- Number of MSRs Owned
- Military/Law-Enforcement Affiliation

**NSSF MSR Consumer Study – Report of Findings**

## MSR Clusters Summary

| | 1. Law Enforcement & Competition | 2. Casual Hunter | 3. Affluent Gun Enthusiast | 4. Low-Use Home Defense | 5. Hunting Aficionado |
|---|---|---|---|---|---|
| % of owners | 18% | 17% | 23% | 21% | 21% |
| % of MSRs | 24% | 13% | 27% | 11% | 25% |
| Number of MSRs Owned | 3+ | 1 | 3+ | 1 | 3+ |
| Age | Under 45 | Under 45 | 45 to 54 | 55+ | 55+ |
| Reasons for Owning a MSR | Professional use/job-related, competition | Hunting | Competition shooting | Home defense | Hunting |
| Annual Household Income | $65 to $110k | <$65k | >$110k | <$65k | >$110k |
| Military/Law-Enforcement Affiliation | Military/L.E. | Non-Military/L.E. | Non-Military/L.E. | Slightly more Military/L.E. | Slightly more non-Military/L.E. |
| MSR usage frequency (last 12 months) | More than 24 times | 3 times or less | 12 to 23 times | 3 times or less | 4 to 11 times |
| Range Member | Slightly more likely to be a range member | Non-member | Range Member | Non-member | Non-member |
| Education | Slightly more likely to not have a bachelors | No bachelors | Bachelors+ | Both bachelors+/no bachelors | Bachelors+ |
| Introduction to MSRs | Military/job, Other | Family/friends, personal interest | Shooting Range | Media/internet, military/job | Family/friends, personal interest |
| MSR Activities In Last Year | Use MSR for work, competition shooting | Hunting, long-range shooting | Competition shooting | Not Used MSR | Hunting |
| MSR Purchase Behavior | Very likely to buy MSR in next year, premium MSR buyer (>$1500 for MSR), High-spend accessories, heavily accessorized, recent buyer | Very likely to buy MSR in next 12 months, plans on buying accessories | Premium MSR buyer (>$1500), heavily accessorized MSR, high-spend on accessories, recent buyer | Slightly less likely to plan to buy accessories in next year | Recent buyer (obtained MSR in 2020 or 2021) |
| Place of Purchase | Mom & Pop Retail Store | Gun Show | Gun show, custom built | Chain/Big-Box Retail | Bought as kit/custom-built |

APPX.346

NSSF MSR Consumer Study – Report of Findings

# MSR Clusters Summary

### Clusters: Makeup of MSR Owners & Total MSRs Owned



| | % of owners | % of MSRs |
|---|---|---|
| Law Enforcement & Competition | 18% | 24% |
| Younger Casual Hunter | 17% | 13% |
| Affluent Gun Enthusiast | 23% | 27% |
| Low-Use | 21% | 11% |
| Hunting Aficionado | 21% | 25% |

APPX.347

## How to Read Cluster Graphs

In the cluster graphs, the overall MSR sample profile is represented by a value of 0. The index is calculated by dividing the profile of the cluster (percentage of that cluster for a category) by the profile of the total MSR population. An index of 20 means the cluster is 20% more likely to exhibit that behavior or be a part of that group. For examples, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45 —this means a MSR owner in this cluster is 37% relatively more likely to be under 45 years old compared to the overall MSR user population.

We describe this as a relative measure since it does not account for the percentage of the MSR owner population. Using our previous example, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45; this does not mean MSR owners under 45 form the majority of Cluster 1, only that they're over–represented compared to the overall MSR owner population.

NSSF MSR Consumer Study – Report of Findings

## Cluster 1: Law Enforcement & Competition

*Index (All MSR Owners = 0)*



The **Law Enforcement & Competition** Cluster accounts for 18% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- Under 45 years old

- Avid users of MSR

- From a military/law enforcement background

- Those with income of $65k to $110k

- Users of MSR for work/law, competition shooting

- Those with kids at home

- Very likely to buy new MSR in next 12 months, a premium buyer of MSRS (spending more than $1500 most recently acquired MSR), high-spenders on accessories

APPX.349

# Cluster 2: Casual Hunter

*Index (All MSR Owners = 0)*



The **Casual Hunter** Cluster accounts for 17% of MSR owners. They tend to be:

- Owners of 1 MSR

- Under 45 years old

- Not members of a shooting range

- Casual users, using their MSR 3 times or less in the past 12 months

- Not from a military or law enforcement background

- Those with income less than $65k

- Those without a bachelors degree

- Users of MSRs for hunting and long-range shooting

- Those without kids at home

- Very likely to buy new MSR in next 12 months and plan to buy accessories

- Owners of MSRs for hunting and self-defense

## Cluster 3: Affluent Gun Enthusiast

*Index (All MSR Owners = 0)*



The **Affluent Gun Enthusiast** Cluster accounts for 23% of MSR owners. They tend to be:

- Owners of 3+ MSR

- 45 to 54 years old

- Members of a shooting range

- Frequent users, using their MSR 12 to 23 times in the last 12 months

- Not from a military or law enforcement background

- Those with income greater than $110k

- Those with a bachelors degree

- Users of MSRs for competition shooting

- Premium MSR Buyers (>$1500 on most recent MSR, heavily accessorized and high spender on accessories

- Owners of MSRs for competition shooting

# Cluster 4: Low-Use Self Defense

*Index (All MSR Owners = 0)*



The **Low-Use Self Defense** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 1 MSR

- 55 years old or older

- Not members of a shooting range

- Infrequent users, using their MSR 3 times or less in the last 12 months

- Slightly more likely to be from a military or law enforcement background

- Those with income less than $65k

- Those who did not use their MSR in the last 12 months

- Those with no kids at home

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for home defense

APPX.352

NSSF MSR Consumer Study – Report of Findings

# Cluster 5: Hunting Aficionado

*Index (All MSR Owners = 0)*



The **Hunting Aficionado** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- 55 years old or older

- Not members of a shooting range

- Occasional MSR users, using their MSR 4 to 11 times in the last 12 months

- Slightly more likely to not be from a military or law enforcement background

- Those with income of greater than $110k

- Those with a bachelors degree

- Those used their MSR for hunting in the last 12 months

- Recent buyers of a MSR (in 2020 or 2021)

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for hunting

NSSF MSR Consumer Study – Report of Findings



Section 6: Sample Profile

7/14/22

72

NSSF MSR Consumer Study – Report of Findings

## Respondent Profile: Organizations

**Current Membership or Recent Donation to Organizations**



- When asked what organizations they are a member of or recently donated to, the most–selected organization was the NRA (61%), chosen more than twice as much as any other organization.

- 21% of MSR owners are not members of or recently donated to any organizations listed.

- 12% are members or recently donated to the NSSF.

- Of the 19% who selected "Other" organizations, the most common mentions were:
  - Firearms Policy Coalition
  - Liberal Gun Club/Liberal Gun Owners
  - Second Amendment Foundation
  - National Skeet Shooting Foundation
  - National Sporting Clays Association

7/14/22                                                                                          73

**NSSF MSR Consumer Study – Report of Findings**

## Respondent Profile: Military/Law-Enforcement

**Active or Veteran/Retired Member of Law Enforcement/Military**



Yes 38%

No 62%

**Military/Law Enforcement Affiliation**

| Affiliation | % |
|---|---|
| Army (veteran) | 34% |
| Air Force (veteran) | 19% |
| Local Law Enforcement (veteran) | 17% |
| Navy (veteran) | 17% |
| Marines (veteran) | 13% |
| National Guard (veteran) | 11% |
| Reserves (veteran) | 9% |
| Local Law Enforcement (active) | 7% |
| Other Law Enforcement (veteran) | 6% |
| State Law Enforcement (veteran) | 6% |
| Federal Law Enforcement (veteran) | 5% |
| Army (active) | 5% |
| State Law Enforcement (active) | 3% |
| Federal Law Enforcement (active) | 3% |
| National Guard (active) | 3% |
| Other Law Enforcement (active) | 2% |
| Air Force (active) | 2% |
| Coast Guard (veteran) | 2% |
| Reserves (active) | 2% |
| Navy (active) | 2% |
| Marines (active) | 2% |
| Coast Guard (active) | 2% |
| Space Force (active) | 2% |
| Space Force (veteran) | 1% |

| Military/law-enforcement (grouped) | % of those |
|---|---|
| Veteran military | 82% |
| Veteran law enforcement | 26% |
| Active law enforcement | 11% |
| Active military | 9% |

APPX.356

**NSSF MSR Consumer Study – Report of Findings**

## Respondent Profile: Age, Gender

**Gender**



**Age**



Avg: **55 years**

**Race/Ethnicity**



| | |
|---|---|
| 88% | White / Caucasian |
| 3% | Multi-racial |
| 3% | Hispanic / Latino |
| 2% | Other |
| 2% | Asian / Pacific Islander |
| 2% | Black / African-American |
| 1% | American Indian / Alaska Native |

- 96% of respondents are Male.

- The average age of respondents is 55 years old. Only 27% are under the age of 45.

- 88% of respondents are White/Caucasian.

APPX.357

## Respondent Profile: Martial Status, Shooting Activities with Spouse



**Marital Status**

| | |
|---|---|
| Married | 74% |
| Single or Never married | 13% |
| Separated or Divorced | 9% |
| Prefer not to say | 3% |
| Widowed | 2% |

**MSR Activities with Spouse**

| | |
|---|---|
| 57% | Goes target shooting with me |
| 31% | Does not own an MSR, and has no interest in owning one |
| 24% | Has no interest in target shooting or firearms |
| 22% | Owns his/her own MSR |
| 10% | Does not own an MSR, but is interested in purchasing one |

- **74% of respondents are married.**

- **Of these MSR owners, over half (57%) say their spouse accompanies them for target shooting. Nearly a quarter, 24%, say their spouse has no interest in target shooting or firearms.**

# Respondent Profile: Education

**Highest Level of Education Completed**



- 45% of respondents have attained at least a bachelors degree (29% have bachelors, 16% post-graduate).

- One-quarter of MSR owners have attended some college but did not graduate.

# Respondent Profile: Income

**Estimated Yearly Household Income**



Avg: **$110,934**

$85k or less: 37%
More than $85k: 52%

- The average yearly household income for respondents is $110,934.

- More than half of MSR owners are in households with an annual income of greater than $85,000.

APPX.360

## Respondent Profile: State, Household Children

**Do you have any children living with you?**



**State**



- Nearly two-thirds of respondents do not have any children living with them.

- The states with the most respondents are Texas (9%), California (5%), and Florida (5%).

## Respondent Profile: State, Household Children





© 2022 National Shooting Sports Foundation, Inc. All Rights Reserved

7/22   Item #33101-21



# SUPPRESSOR OWNER STUDY

Market Size | Purchase Profile & Journey | Satisfaction | 2025

# OVERVIEW

## Introduction

Demand for suppressors has increased in recent years. Insights regarding this market have been limited. To help better understand this market, the National Shooting Sports Foundation (NSSF) contracted Southwick Associates to profile the suppressor purchaser, their purchase journey, and satisfaction with the purchase process.

## Methodology

More than 800 people age 21 and older who own at least one firearm and purchased a suppressor in the past 10 years responded to an online survey between October 10, 2024 and December 11, 2024. Respondents were identified with assistance from the following partners who fielded the survey link:

· GunBroker
· Gun Talk Media
· Outdoor Sportsman Group
· Shooting News Weekly

Market size estimates were developed using survey data and Bureau of Alcohol, Tobacco, Firearms, and Explosives statistical records on the number of National Firearms Act transfer records for silencers, obtained through  FOIA request from the NSSF.

# OVERVIEW

## Definitions

National Firearms Act (NFA) - The NFA is a federal law that regulates the manufacture, sale, and possession of certain firearms, including machine guns, short-barreled rifles and shotguns, silencers, and "any other weapon." (ATF Rules and Regulations)

National Firearm Registration and Transfer Record (NFRTR) - The NFRTR was established in 1934 and is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered). (26 U.S.C. 5841(a))

Form Definitions:

Form 1, Application to Make and Register a Firearm - Filed by an individual or entity to get approval to make and register an NFA firearm

Form 2, Notice of Firearms Manufactured or Imported - Filed by a qualified manufacturer or importer to register NFA firearms manufactured or imported. Quantity per form may be multiple.

Form 3, Application for Tax-Exempt Transfer of Firearms and Registration to Special (Occupational) Taxpayer (National Firearms Act) - Filed by a qualified federal firearms licensee to transfer to another qualified federal firearms licensee

Form 4, Application for Tax Paid Transfer and Registration of a Firearm - Filed by a qualified federal firearms licensee to transfer to an individual or other entity (non-licensee)

# KEY FINDINGS

### Key Findings Include

- 80% of survey respondents cite "suppressor" as their preferred term over "silencer".

- Suppressor sales to individuals in 2024 are estimated to be $820 million, including the cost of the required tax stamp.

- 35% of 2024 suppressor buyers were first time purchasers.

- Recreational shooting and hunting are the primary reasons for purchasing a suppressor, and suppressors are primarily purchased for rifles.

- 86% of suppressors were purchased from a local shop/independent retailer or online.

- Manufacturer websites, online reviews/articles/blogs, friends/family/coworkers, and retailers were cited as the most influential sources consulted by purchasers prior to purchasing their most recent suppressor.

- Level of sound reduction, and the ability to use the suppressor with multiple calibers were the most important features cited by suppressor purchasers.

- 51% of suppressor purchasers considered their purchase for less than six months. Those who purchased higher priced suppressors were more likely to consider their purchase for a year or more.

- Overall, 48% of suppressor purchasers found the application process to be extremely easy. Those who purchased in 2024 were significantly more likely to indicate the application process was extremely easy. Respondents age 65 and older were more likely to report the application process being not at all or not very easy.

- Application approval times decreased significantly in 2024 with 72% of 2024 suppressor purchasers indicating their application was approved in 6 months or less. 50% of 2023 purchasers reported the application approval within 6 months, while roughly 30% of those who purchased prior to 2023 reported approval within 6 months.

- The majority, 85% of suppressor purchasers are very satisfied with the most recent suppressor they purchased.



5 | nssf.org | Image courtesy of Sig Sauer

# THE SUPPRESSOR MARKET | 2024

## $820 Million
### Estimated 2024 Suppressor Market Value
(Includes $664 million estimated products sales, plus $156 million associated tax stamps)

## +265%
### 5-Year Growth in Annual Suppressor Registrations
(2020 vs. 2024 Form 4 registrations, does not include Form 1)

## 80%
### Of All Consumer Suppressors Registered Were in the Last 5 Years
(Form 1 and 4 registrations 2020-2024 vs. total Form 1 and 4 registrations in the NFRTR)

## THE SUPPRESSOR MARKET | HISTORICAL DATA

# 3.14 Million
### Total Historical Consumer Suppressors Registered at End of 2024
(Total Form 1 and Form 4 in NFRTR)

# $628 Million
### Total Historical Tax Stamp Revenue
(Generated from the 3.14 million registered suppressors)

# 4.5 Million
### Total Historical Suppressors Registered at End of 2024
(Registered to individuals, trusts, corporations, government, N/A)

# 80%
### Cite "Suppressor" as Their Preferred Term

7 | nssf.org

# RESPONDENT PROFILE

### Demographics & Characteristics

Survey respondents were 98% male, with half being 65 and older. 91% were White, followed by 3% Hispanic.



### Respondent Age

| Age | % |
|-----|---|
| 65+ yrs | 50% |
| 55-64 yrs | 28% |
| 45-54 yrs | 12% |
| 35-44 yrs | 6% |
| 25-34 yrs | 3% |
| 21-24 yrs | 1% |

### Respondent Income

| Income | % |
|--------|---|
| More than $200,000 | 14% |
| $150,000 - 200,000 | 12% |
| $100,000 - 149,999 | 21% |
| $75,000 - 99,999 | 15% |
| $50,000 - 74,999 | 14% |
| $25,000 - 49,999 | 8% |
| $10,000 - 24,999 | 2% |
| Less than $10,000 | 1% |
| Prefer Not to Say | 13% |

Figures represent those who responded to the survey and may not be representative of all suppressor purchasers.

8 | nssf.org

# RESPONDENT PROFILE

## Demographics & Characteristics (continued)

Respondents primarily live in a rural area (37%), followed by Suburban (29%), or small town (27%). Only 7% of respondents live in an urban community. More than 1/2 of the suppressor owners consider themselves to be proficient at shooting, and nearly 1/3 have military experience.



**Community Type**

Urban 7%
Suburban 29%
Rural 37%
Small Town 27%

**LE/Military Experience**

Military 32%
Law Enforcement 15%
Neither 53%

**Shooting Ability**

Proficient 57%
Expert 16%
Novice 2%
Competent 25%

Figures represent those who responded to the survey and may not be representative of all suppressor purchasers.

# MOST RECENT SUPPRESSOR PURCHASE

**Year of Most Recent Suppressor Purchase**
Roughly 40% of the respondents purchased their most recent suppressor in 2024, followed by 19% in 2023, and 12% in 2022. Overall, 54% reported their most recent purchase was their first.

## Year of Purchase



| 12% Before 2019 | 5% 2019 | 5% 2020 | 6% 2021 | 12% 2022 | 19% 2023 | 38% 2024 | |

3%
I don't know

# 35%
of purchasers in 2024 were first time buyers

## Motivation for Most Recent Suppressor Purchase

Recreational shooting and hunting are the top reasons cited for buying a suppressor, followed by home protection, and to have or collect.  Of the 7% who indicated their primary reason for purchase was other, more than half specified hearing/noise protection and 10% specified varmint shooting/animal control.  Suppressors were primarily purchased for rifles, and less than 1/4 were purchased for handguns.

### Primary Reason for Purchase



| Reason | Percent |
|---|---|
| Recreational Shooting | 39% |
| Hunting | 30% |
| Home Protection | 9% |
| Just to Have or Collect | 7% |
| Personal Protection | 5% |
| Competitive Shooting | 2% |
| Work (LE, Military, Etc.) | 1% |
| Other | 7% |

### Purchaser's Host Firearm



**37%** | Modern Sporting Rifle

**32%** | Traditional Rifle

**23%** | Handgun

11 | nssf.org

## Most Recent Suppressor Purchase & Firearms Consumer Segments

In 2020/2021 the NSSF identified five distinct segments of firearm consumers based in part on their motivation to purchase a firearm. Respondents to the suppressor study were asked about their motivations for buying the firearm that their most recently purchased suppressor was paired with. Based on the motivations for buying a firearm, Prepared for the Worst (30%), and Hunter (29%) were the top two segments for purchasing suppressors.

| Family Guardian | Skills Builder | Hunter | Urban Defender | Prepared for the Worst |
|---|---|---|---|---|
|  |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| 19% of suppressor purchasers | 18% of suppressor purchasers | 29% of suppressor purchasers | 4% of suppressor purchasers | 30% of suppressor purchasers |
| I am not looking to be an expert shooter, I just want o be able to protect myself, my family, and my home | I wanted a firearm that would help improve my shooting skills | I needed the firearm for hunting | It's for protecting myself, especially when I am away from home. | I wanted to be a skilled shooter, always ready |

## Location of Most Recent Suppressor Purchase

Local shop/independent retailer (46%) and online retailer (40%) were the top locations where consumers' most recent suppressors were purchased. Online retailers were the top purchase location cited for those who purchased their most recent suppressor in 2022, 2023, or 2024, indicating a shift in the ease and acceptance of purchasing online. Local shop/ independent retailer was the top purchase location cited by those who purchased their most recent suppressor prior to 2022. Respondents 65 and older were less likely than other age cohorts to purchase online. The distribution of purchase location was consistent among all the survey fielding partners, indicating the presence of an online marketplace in this survey's sample did not bias the results.

### Purchase Location



Online Retailer 40%

Local Shop /
Independent Retailer
46%

Outdoor Specialty 3%

Gun Show 4%

Other 7%

**86%** of suppressors were purchased from an independent retailer or online

## Price of Most Recent Suppressor Purchase

Roughly two-thirds (65%) of suppressor purchasers spent between $600 and $1,199 on their most recent suppressor, with the overall average price paid of $830. Average prices paid didn't differ much by year of most recent purchase, or the type of firearm the suppressor was purchased for.

### Price Paid

| | |
|---|---|
| $1,200 or More | 10% |
| $900 - 1,199 | 32% |
| $600 - 899 | 33% |
| $300 - 599 | 19% |
| Less than $300 | 6% |



| Average Price Paid by Purchase Location | |
|---|---|
| Local Shop / Independent Retailer | $803 |
| Online Retailer | $881 |
| Gun Show / Expo | $867 |
| Outdoor Specialty Store | $675 |

| Average Price Paid by Firearm Type | |
|---|---|
| Modern Sporting Rifle | $883 |
| Traditional Rifle | $871 |
| Handgun | $867 |

# $830
## average price paid for most recent suppressor
### (Does not include cost of tax stamp/application fee/trust, etc.)



15 | nssf.org | Image courtesy of Born and Raised Outdoors

# SUPPRESSOR PURCHASE JOURNEY

### Building Interest in Suppressors

Magazine articles, friends/coworkers, online forums, and YouTube videos were the top sources that built interest in purchasing a suppressor. Magazine articles were cited more by those age 55 and older, whereas friends or coworkers was more likely to be cited by 35–54-year-old respondents. YouTube videos and online forums were more likely to build interest among those age 35-64. The overall distribution of information sources were similar among all partners who helped field this survey, indicating limited bias was introduced by the type of media each survey partner represented.

## Sources that Built Interest



| Source | Percent |
|---|---|
| Magazine Articles | 41% |
| Friends / Coworkers | 34% |
| Online Forums | 33% |
| YouTube Videos | 30% |
| Browsing Stores | 17% |
| Expos / Gun Shows | 17% |
| Sales Promotions | 15% |
| Family Members | 10% |
| Newspaper / Magazine Ads | 9% |
| Podcasts | 9% |
| Blogs | 8% |
| Social Media | 7% |
| News Stories | 5% |
| Movies / TV Programs | 2% |
| Radio Programs | 1% |
| Video Games | 1% |

Multiple select question - responses may add to more than 100%

16 | nssf.org

## Research Conducted Prior to Suppressor Purchase

Most of the research conducted prior to purchasing a suppressor is online as would be expected in modern times. 60% of suppressor purchasers conducted research on manufacturer websites prior to purchase, followed by more than half who read online reviews, articles, and/or blogs. Less than 1/3 of the respondents conducted research by physically visiting retail stores, while 40% visited retailer websites. When asked to select the single most influential research source, manufacturer websites, online reviews/articles/blogs, friends/family/coworkers, and retailers were most cited.

### Research Conducted



| Research Source | % |
|---|---|
| Visited Manufacturer Websites | 60% |
| Read Online Reviews / Articles / Blogs | 56% |
| Watched Shooting Related Online Videos | 42% |
| Visited Retailer Websites | 40% |
| Read Magazine Reviews / Articles (not online) | 38% |
| Spoke with Friends / Family / Coworkers | 32% |
| Visited Stores | 31% |
| Perused Social Media / Online Forums | 30% |
| Visited Gun Show or Similar In-person Event | 19% |
| Tried a Friend / Family Member's Suppressor | 18% |
| Watched Shooting Related Television Shows | 14% |

Multiple select question - responses may add to more than 100%

**Most Influential Research**
- Manufacturer Websites
- Online Reviews / Articles / Blogs
- Friends / Family / Coworkers
- Retailers

17 | nssf.org

APPX.380

## Desired Suppressor Features

As would be expected, the level of sound reduction is a key feature wanted by more than 2/3 of suppressor purchasers. Respondents were able to select more than one feature. More than half also wanted the suppressor to work with multiple calibers, followed by 47% considering brand reputation in their purchase. Purchasers aged 45 to 54 were more likely than other age cohorts to want durability and ease of attaching/detaching. Respondents who spent less than $600 on their most recent suppressor were more likely to cite price as a key attribute desired in their purchase. When asked about the single most important feature, overwhelmingly respondents cited level of sound reduction and ability to use with multiple calibers. No other feature came close to these.

### Key Features Desired



| Feature | Percentage |
|---------|-----------|
| Sound Reduction Level | 67% |
| Works with Multiple Calibers | 52% |
| Brand Reputation | 47% |
| Ease of Attaching / Detaching | 46% |
| Durability | 45% |
| Price | 41% |
| Material (aluminum, stainless, etc.) | 37% |
| Weight | 37% |
| User Serviceable | 36% |
| Length / Size | 31% |
| Mount Type | 28% |
| Pressure / Cartridge Ratings | 26% |
| Warranty | 23% |
| Aesthetics / Looks | 9% |

Multiple select question - responses may add to more than 100%

**Most Important Features Cited**

- Level of sound reduction
- Ability to use with multiple calibers

## Consideration Period Prior to Suppressor Purchase

Just under 1/3 of suppressor purchasers considered their most recent purchase for less than a month, and half considered for less than 6 months. 27% percent considered purchasing for more than a year. Purchasers who spent $900 or more on their most recent suppressor were more likely to consider their purchase for a year or more. Those age 55 and older were more likely to consider their most recent suppressor purchase for 6 months to a year.

## Consideration Period

| 12% < 1 week | 20% 1-3 weeks | 19% 1-5 months | 21% 6-11 months | 17% 1-2 years | 11% 3+ years |
|---|---|---|---|---|---|



19 | nssf.org | Image courtesy of Magpul

# APPLICATION PROCESS & SATISFACTION

## Ease of Application Process

Overall, just under half of suppressor purchasers found the application process for their most recent suppressor to be very to extremely easy. Those who purchased their most recent suppressor in 2024 were significantly more likely to report the application process being very or extremely easy (64%), with 29% reporting the application process to be extremely easy, compared to an average of 16% reporting the process to be extremely easy across the other years. Those age 65 and older were more likely to report the application process being not at all or not very easy.

### Ease of Application Process



## Promotions Offered

Promotions to purchase a suppressor are not common with 3/4 of respondents reporting they did not receive any type of promotion when buying their most recent suppressor.  Seven percent received a free muzzle device, and 5% had their tax stamp paid for by the promotion. Of those who wrote in a promotion they received, the most common was a free NFA Trust, followed by a "buy one, get one free" promotion.

### Promotion Offered at Purchase



| | |
|---|---|
| No Promotion | 75% |
| Other (specify) | 12% |
| Free Muzzle Device | 7% |
| Free Tax Stamp | 5% |
| Gift Card | 1% |

Multiple select question - responses may add to more than 100%

| Most Common "Other (specify)" Responses Received | |
|---|---|
| T-shirt | 16% |
| Buy One Get One Free / Two for the Price of One | 21% |
| NFA Trust | 41% |
| Other | 22% |

## 25%
### of suppressor purchasers
### received a promotion to purchase

21 | nssf.org

## Application Approval Time

Application approval time decreased significantly in 2024, with 35% of suppressor purchasers reporting a wait time of a month or less for application approval, compared to prior years that ranged between 5-8% approval within a month. Although 17% of those who purchased their most recent suppressor in 2024 reported to be 'still waiting' for application approval, much of this could be related to the time of year it was purchased and timing of the survey. Prior to 2023, roughly 30% of applications were approved within 6 months. This increased to 50% in 2023, and 72% in 2024.



**Application Approval Time**

| Year | <4 wks | 1-6 mos | 7-11 mos | 1+ yrs | Still Waiting |
|------|--------|---------|----------|--------|---------------|
| 2019 or Earlier | 5% | 25% | 22% | 46% | 2% |
| 2020 | 8% | 22% | 35% | 35% | |
| 2021 | 7% | 17% | 30% | 43% | 3% |
| 2022 | 7% | 26% | 30% | 36% | 1% |
| 2023 | 6% | 45% | 34% | 12% | 3% |
| 2024 | 35% | 37% | 9% | 2% | 17% |

**72%** of 2024 applications were approved in 6 months or less

## Overall Application Process Satisfaction

Respondents were more satisfied than dissatisfied with the overall application process. On a scale of 1-10, the average rating was 6.5 among respondents. Nearly half of the respondents overall rated their satisfaction with the application process an 8, 9, or 10. Those who purchased their most recent suppressor in 2024 were significantly more satisfied with the overall application process, with 30% rating the application process a 10.

### Overall Application Process Satisfaction



23% Very Dissatisfied          Neutral          45% Very Satisfied

Scale 1-10 (1=Not Satisfied At All & 10=Extremely Satisfied)

 Those who purchased their most recent suppressor in 2024 were significantly more satisfied with the overall application process, with 30% rating the application process a 10.

**Approval Wait Time Satisfaction**

Overall, respondents were highly dissatisfied with the wait time for application approval, with 57% rating their satisfaction a 1-3. As previous pages have shown, wait times have improved significantly in the last couple years. Roughly 70% of those who purchased their most recent suppressor prior to 2023 consistently rated their satisfaction with the wait time a 1-3. Sixty-two percent of those who purchased their most recent suppressor in 2023 rated their wait time satisfaction a 1-3, and in 2024 those who rated their satisfaction with the wait time a 1-3 dropped to only 37%. Those who reported purchasing their most recent suppressor in 2024 were significantly more likely to rate their satisfaction with the wait time more positively with 39% giving a very satisfied rating of an 8, 9, or 10.

**Overall Approval Wait Time Satisfaction**



Scale 1-10 (1=Not Satisfied At All & 10=Extremely Satisfied)

! Overall, respondents were highly dissatisfied with the wait time for application approval

24 | nssf.org

## Satisfaction with The Suppressor Purchased

Overall, suppressor purchasers are consistently very satisfied with the most recent suppressor they have purchased, with 85% rating their product satisfaction an 8-10. This level of satisfaction is consistent across all years reported.

### Satisfaction with Purchased Suppressor



Scale 1-10 (1=Not Satisfied At All & 10=Extremely Satisfied)



25 | nssf.org | Image courtesy of Sig Sauer



Image courtesy of Sig Sauer

## Suppressor Registrations (Form 1-4) as of December 31, 2024*

| State | Form 1 | Form 2 | Form 3 | Form 4 | Total |
|-------|--------|--------|--------|--------|-------|
| AK | 321 | 166 | 3,055 | 20,651 | 24,193 |
| AL | 1,211 | 2,860 | 10,387 | 65,763 | 80,221 |
| AR | 792 | 1,978 | 7,954 | 47,542 | 58,266 |
| AZ | 1,787 | 2,922 | 21,094 | 107,559 | 133,362 |
| CA | 41 | 5,990 | 2,567 | 21 | 8,619 |
| CO | 1,353 | 1,836 | 22,763 | 92,217 | 118,169 |
| CT | 353 | 1,389 | 3,712 | 22,566 | 28,020 |
| DC | 2 | - | 15 | - | 17 |
| DE | - | - | 4 | 2 | 6 |
| FL | 3,362 | 30,493 | 39,538 | 226,064 | 299,457 |
| GA | 1,877 | 10,735 | 22,802 | 128,344 | 163,758 |
| HI | 1 | - | 8 | - | 9 |
| IA | 1,006 | 1,774 | 6,396 | 34,276 | 43,452 |
| ID | 781 | 6,184 | 10,464 | 51,577 | 69,006 |
| IL | 70 | 309 | 1,789 | 45 | 2,213 |
| IN | 1,423 | 4,366 | 11,148 | 65,726 | 82,663 |
| KS | 745 | 711 | 6,489 | 40,747 | 48,692 |
| KY | 1,066 | 7,031 | 7,319 | 42,830 | 58,246 |
| LA | 1,103 | 1,021 | 16,206 | 67,443 | 85,773 |
| MA | 12 | 10,400 | 3,530 | 20 | 13,962 |
| MD | 918 | 476 | 4,809 | 41,367 | 47,570 |
| ME | 222 | 134 | 2,389 | 12,839 | 15,584 |
| MI | 1,405 | 1,651 | 12,338 | 75,310 | 90,704 |
| MN | 915 | 3,290 | 9,052 | 49,094 | 62,351 |
| MO | 1,310 | 2,073 | 11,107 | 68,614 | 83,104 |
| MS | 630 | 830 | 6,151 | 47,277 | 54,888 |
| MT | 468 | 801 | 6,734 | 45,381 | 53,384 |
| NC | 2,049 | 1,322 | 19,452 | 114,841 | 137,664 |

Appendix | nssf.org

## Suppressor Registrations (Form 1-4) as of December 31, 2024* (continued)

| State | Form 1 | Form 2 | Form 3 | Form 4 | Total |
|-------|--------|--------|--------|--------|-------|
| ND | 317 | 1,392 | 3,093 | 30,372 | 35,174 |
| NE | 542 | 412 | 4,340 | 36,965 | 42,259 |
| NH | 356 | 22,512 | 7,126 | 26,198 | 56,192 |
| NJ | 7 | 5 | 42 | 1 | 55 |
| NM | 444 | 3,341 | 3,744 | 24,458 | 31,987 |
| NN | - | - | 1 | - | 1 |
| NV | 667 | 1,155 | 11,963 | 46,609 | 60,394 |
| NY | 57 | 130 | 1,872 | 3,337 | 5,396 |
| OH | 2,042 | 2,129 | 15,315 | 90,231 | 109,717 |
| OK | 1,030 | 808 | 10,977 | 72,997 | 85,812 |
| OR | 1,163 | 8,423 | 9,450 | 68,471 | 87,507 |
| PA | 2,120 | 5,263 | 16,397 | 111,519 | 135,299 |
| RI | 4 | - | - | - | 4 |
| SC | 972 | 6,978 | 21,645 | 53,651 | 83,246 |
| SD | 295 | 969 | 106,980 | 42,379 | 150,623 |
| TN | 1,348 | 9,356 | 21,225 | 85,724 | 117,653 |
| TX | 7,841 | 11,861 | 127,197 | 552,492 | 699,391 |
| UT | 1,031 | 8,646 | 73,437 | 66,579 | 149,693 |
| VA | 2,076 | 1,537 | 13,428 | 99,856 | 116,897 |
| VT | 110 | 24 | 950 | 5,221 | 6,305 |
| WA | 2,223 | 1,238 | 13,929 | 110,140 | 127,530 |
| WI | 1,109 | 11,350 | 8,220 | 54,287 | 74,966 |
| WV | 328 | 115 | 2,789 | 19,373 | 22,605 |
| WY | 310 | 2,788 | 3,555 | 20,965 | 27,618 |
| Grand Total | 51,615 | 201,174 | 746,947 | 3,089,941 | 4,089,677 |

*Figures represent the total number of Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) statistical records for silencers in the National Firearm Registration and Transfer Record (NFRTR). Figures were obtained through a FOIA request from the NSSF to the BATFE. States omitted may not allow the sale of silencers. Silencers in the NFRTR registered under Form 5, Form 9, Form 20, and Form 4467 are not counted in this table. Form 2 registrations may include multiple silencers per form.

Appendix | nssf.org

## Suppressor Registrations (All Forms) as of December 31, 2024**

|  | Individual | Trust | Corporation | Government | N/A | Total |
|---|---|---|---|---|---|---|
| Total | 1,584,040 | 1,258,255 | 1,255,492 | 376,088 | 28,200 | 4,502,075 |
| Percentage | 35% | 28% | 28% | 8% | 1% | 100% |

**NSSF previously reported a total of 4.8 million silencers in July 2024, but that figure was based on incomplete information received from ATF. We have confirmed with ATF that the figures reported here are accurate as of December 31, 2024.

## Consumer Suppressor Ownership Demographics (Forms 1 & 4)***

| Gender | Ethnicity | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
|  | White | Black / African American | Asian | American Indian / Alaskan Native | Hispanic / Latino | Native Hawaiian / Other Pacific Islander | Unknown | |
| Female | 200,447 | 3,408 | 7,510 | 1,377 | 665 | 344 | 592 | 214,343 |
| Male | 3,740,049 | 98,149 | 126,920 | 24,253 | 9,083 | 8,204 | 7,633 | 4,014,291 |
| Unknown | 1,521 | 43 | 53 | 7 | 5 | 4 | 3,535,523 | 3,537,156 |
| Total | 3,942,017 | 101,600 | 134,483 | 25,637 | 9,753 | 8,552 | 3,543,748 | 7,765,790 |

***Silencer registrations in the NFRTR can belong to multiple persons. For example, a trust may have multiple trustees, therefore the demographic table above is not a direct count of suppressors registered.

Appendix | nssf.org



nssf.org
(203) 426-1320
6 Corporate Drive, Suite 650
Shelton, CT 06484

SouthwickAssociates.com
(904) 277-9765
P.O. Box 6435
Fernandina Beach, FL 32034

Item# 33162-25

Cover images courtesy of Magpul

REGISTER    **MY ACCOUNT**



☰

**TRENDING TOPICS** |    IACP 2025 COVERAGE  |  WOMEN IN POLICING CA

◄ ━━━━━━━━━━━━━━━━━━━━

**TOMORROW:** The patrol officer's complete toolkit for active

**Need new gear? Start with a Police1 Buying Guide.**

How to buy police drones & unmanned aircraft systems

How to buy virtual reality training: A guide for police departments

How to buy inventory management software for police

How to buy police investigation software: A step by step guide

Weapons  ›  Firearm Accessories

# Wash. PD equips entire department with s Silencer Central

"Reducing potential hearing loss of officers and the public during major factor in our testing," said Chief Ken Roske of the Pasco P

May 15, 2024 03:53 PM



"We are very proud of the BANISH Speed K and our partnership with Federal Ammunition. I was confident that the F Washington Police Department would want to add the Speed K after they tested it," said Silencer Central CEO Brand Maddox. "It met every design point that we set out for it, and Pasco's testing proves it is a perfect silencer for law enforcement agencies."

*Silencer Central*

By Joanna Putman
Police1

PASCO, Wash. — The Pasco Police Department recently updated its eq[...]
BANISH Speed K silencers from **Silencer Central**, according to a news[...]

This acquisition follows extensive testing and evaluation by the depart[...]
suppressor's suitability for law enforcement use, according to the relea[...]

"We are very proud of the BANISH Speed K and our partnership with Fe[...]
confident that the Pasco, Washington Police Department would want t[...]
tested it," said Silencer Central CEO Brandon Maddox. "It met every des[...]
it, and Pasco's testing proves it is a perfect silencer for law enforcemer[...]

Designed in collaboration with Federal Ammunition, the BANISH Speed[...]
suppressor optimized for law enforcement applications, particularly fo[...]
rifles used in close-quarters scenarios, according to the release. The su[...]
inches in length and 2 inches in diameter, preventing the rifle from snag[...]
operations. It also significantly reduces noise exposure, registering 138[...]
ear, which is critical for protecting officers' hearing.

"Having the entire department equipped with suppressed patrol rifles was an important
consideration," said Chief Ken Roske of the Pasco Police Department. "Reducing potential hearing
loss of officers and the public during shooting events was a major factor in our testing."

The BANISH Speed K's design incorporates clipped-wall baffles and a finned blast chamber to
minimize gas blowback, according to the release. It reduces recoil, eliminates muzzle flash and
minimizes muzzle rise during rapid fire. It is constructed from 100% Inconel, a type of steel known
for its strength and heat resistance.

The suppressor has passed seven rounds of U.S. Special Operations Command testing protocols,
according to the report.

**Need new gear? Start with a Police1 Buying Guide.**

How to buy police drones & unmanned aircraft systems

How to buy virtual reality training: A guide for police departments

How to buy inventory management software for police

How to buy police investigation software: A step by step guide

H. P. MAXIM.
SILENT FIREARM.
APPLICATION FILED NOV. 30, 1908.

**958,935.**

Patented May 24, 1910.



Attest:
W. McGinn
Ella J. Kruger

Inventor:
by Hiram Percy Maxim
Redding, Greeley & Austin
Attys.

# UNITED STATES PATENT OFFICE.

### HIRAM PERCY MAXIM, OF HARTFORD, CONNECTICUT, ASSIGNOR TO MAXIM SILENT FIREARMS COMPANY, OF NEW YORK, N. Y., A CORPORATION OF NEW JERSEY.

#### SILENT FIREARM.

**958,935.**   Specification of Letters Patent.   **Patented May 24, 1910.**

Application filed November 30, 1908.   Serial No. 465,051.

*To all whom it may concern:*

Be it known that I, HIRAM PERCY MAXIM, a citizen of the United States, residing in the city of Hartford, in the State of Connecticut, have invented certain new and useful Improvements in Silent Firearms, of which the following is a specification, reference being had to the accompanying drawing, forming a part hereof.

In the continued use of silencers for firearms in which the energy of the powder gases is dissipated in rotary or whirling movement of the gases before they pass into the atmosphere, and in which a series of partitions, diaphragms or spreaders are supported by a shell or casing at the muzzle of the firearm, the rotary or whirling movement of the gases taking place in the chambers formed thereby, the partitions, diaphragms or spreaders nearest the true muzzle of the barrel of the firearm are exposed to the highest gas pressure, while those more remote from the muzzle are exposed to much less gas pressure. Lightness in the silencer can be secured by making the partitions, diaphragms or spreaders in the zone of high gas pressure of sufficient strength to withstand such pressure and by making the partitions, diaphragms or spreaders more remote from the muzzle of thinner and even of lighter material. It is found, however, that it is necessary to provide an abutment for the heavier and stronger diaphragms near the muzzle to support them against the impact of the gases and to relieve from great pressure the successive lighter diaphragms, which are liable to be crushed eventually if the resistance is through them.

One object of the present invention, therefore, is to provide such a construction of silencers of this character as shall be capable of withstanding the impact of the gases while at the same time the minimum of weight in the silencers is secured. Furthermore, in silencers of this character which are eccentric with respect to the axis of the gun barrel, it is necessary to assure accurate alinement of the openings through the successive diaphragms for the passage of the projectile.

It is, therefore, a further object of this invention to provide a construction by which such alinement of the openings through the diaphragms shall be secured without requiring great labor in the assembling of the diaphragms and casing.

The invention will be more fully explained hereinafter with reference to the accompanying drawing in which it is illustrated and in which—

Figure 1 is a view in side elevation of an ordinary sporting rifle equipped with a silencer which embodies the invention. Fig. 2 is a detail view in section and on a larger scale of the silencer shown in Fig. 1, a portion of the barrel being also represented. Fig. 3 is a face view of one of the diaphragms, showing the recesses in the circumference thereof. Fig. 4 is a transverse section of the supporting shell or casing, showing the longitudinal key.

In the embodiment of the invention shown in the drawing there is secured to the extremity of the barrel $a$ of the gun, in any suitable manner, as by screw threads, a casing $d$, which is preferably substantially circular in cross section and of greater or less length as may be required and forms a support and inclosure for the series of single silencing devices or partitions or diaphragms or spreaders $e$ by which the gases, which escape at the muzzle of the barrel $a$, are compelled to acquire, within successive cells or chambers formed by the diaphragms $e$, a rotary or whirling movement.

In the embodiment of the invention shown each single silencing device $e$ is generally circular or annular with reference to the axis of the shell or casing $a$, and is spiral or conchoidal in cross section, an opening $e'$ being formed for the passage of the projectile. In the construction shown, such opening is eccentric with respect to the axis of the shell or casing. As is now well understood, the powder gases are directed by the frusto-conical portion of each diaphragm or spreader, or single silencing device, into the annular chamber formed by the diaphragm and acquire therein a rapid rotary motion in which their energy is dissipated. The diaphragms or spreaders, as $e^2$, nearest the muzzle of the gun are naturally subjected to the highest pressure of the gases, while those more remote from the muzzle are subjected to a considerably lower pressure. Those more remote from the

958,935

muzzle of the gun may, therefore, be less capable of resisting high pressure than those nearer the muzzle and may be made of much lighter sheet steel than those near the muzzle, or may even be made of aluminum, while those nearer the muzzle are made of steel. However, should the diaphragms or spreaders nearer the muzzle rest directly against those more remote from the muzzle, so that the latter receive the pressure transmitted through the former, they would eventually be broken down. To obviate this, an abutment is formed in the shell or casing $d$ to receive the pressure of the diaphragms or spreaders in the zone of high gas pressure. Such abutment may be variously formed, but as a convenient and inexpensive, but effective construction, the shell or casing $d$, after the lighter diaphragms or spreaders $e$ have been placed therein, is formed with an inner circumferential ridge or shoulder $d'$, as by spinning, and against such abutment the heavier diaphragms or spreaders $e^2$ rest. It will be understood that the number of heavier or stronger diaphragms or spreaders employed will depend upon the character of the gun to which the silencer is applied. For a light power gun it is sufficient to provide one heavy, steel diaphragm or spreader $e^2$, as shown in Fig. 2 of the drawing, but with a gun of higher power two or more of the heavy steel diaphragms or spreaders may be required. Of course the number of the lighter diaphragms or spreaders employed will also depend upon the character of the gun to which the silencer is applied and the effect to be produced. In the construction shown in Fig. 2 space is provided within the shell or casing $d$ for more than one heavy or strong diaphragm or spreader and a spacing sleeve $d^2$ is introduced to hold the single diaphragm or spreader in place.

It will be understood that the provision of an abutment for the heavier diaphragms or spreaders is equally desirable, whether the silencer be concentric with the axis of the gun barrel or eccentric with respect thereto. In the construction shown in the drawing, however, the silencer is eccentric and it therefore becomes desirable to provide means for readily assuring the accurate alinement of the openings $e'$ in the several diaphragms or spreaders with the bore of the gun barrel. For this purpose, in the construction shown, each of the diaphragms or spreaders is provided in its circumference with a keyway, as shown at $e^3$ in Fig. 3, and the shell or casing $d$ is provided with an internal longitudinal ridge or key $d^3$, which may be conveniently formed by rolling or pressing a suitably shaped tool into the outer wall of the casing. With this construction the diaphragms or spreaders cannot be introduced into the shell or casing except in their proper relative position with the openings $e'$ in accurate alinement with the bore of the barrel $a$.

I claim as my invention:

1. A silencing device for firearms, comprising a shell or casing, a series of diaphragms or spreaders disposed in the shell or casing remote from the muzzle and forming a succession of chambers, each of the diaphragms or spreaders having an opening for the passage of the projectile, and a relatively heavy or strong diaphragm or spreader disposed in the shell or casing adjacent to the muzzle of the firearm and also having an opening for the passage of the projectile, the shell or casing having an abutment to resist the forward pressure of such heavier diaphragm or spreader, whereby the lighter diaphragms or spreaders remote from the muzzle of the firearm are relieved of the pressure of the heavier diaphragm or spreader.

2. A silencing device for firearms, comprising a supporting shell or casing, a series of diaphragms or spreaders disposed in the shell or casing remote from the muzzle and forming a succession of chambers, each of the diaphragms or spreaders having an opening for the passage of the projectile and forming an annular cell substantially conchoidal in cross section, and a heavier diaphragm or spreader disposed in the shell or casing adjacent to the muzzle of the firearm and also having an opening for the passage of the projectile and also forming an annular cell substantially conchoidal in cross section, the supporting shell or casing having an abutment to receive the pressure of such heavier diaphragm or spreader, whereby the lighter diaphragms or spreaders remote from the muzzle of the firearm are relieved of the pressure of the heavier diaphragm or spreader.

3. A silencing device for firearms, comprising a supporting shell or casing, a series of diaphragms or spreaders disposed in the shell or casing remote from the muzzle of the firearm, each of the diaphragms or spreaders forming an annular cell substantially conchoidal in cross section and having an opening for the passage of the projectile, and a heavier or stronger diaphragm or spreader disposed in the shell or casing adjacent to the muzzle of the firearm and also forming an annular cell substantially conchoidal in cross section and having an opening for the passage of the projectile, the supporting shell or casing having an interior circumferential ridge forming an abutment to receive the pressure of such heavier diaphragm or spreader, whereby the lighter diaphragms or spreaders remote from the muzzle of the firearm are relieved of the pressure of the heavier diaphragm or spreader.

958,935

4. A silencing device for firearms, comprising a supporting shell or casing and a series of diaphragms or spreaders disposed in the shell or casing and forming a succession of chambers, each of the diaphragms or spreaders having an opening eccentrically disposed for the passage of the projectile, the shell or casing having an interior ridge or key and each of the diaphragms or spreaders having a key-way to coöperate therewith.

5. A silencing device for firearms, comprising a supporting shell or casing and a series of diaphragms or spreaders disposed in the supporting shell or casing and forming a succession of chambers, each of the diaphragms or spreaders forming an annular cell substantially conchoidal in cross section and having an opening eccentrically disposed for the passage of the projectile, the shell or casing having an interior ridge or key and each of the diaphragms or spreaders having a key-way to coöperate therewith.

This specification signed and witnessed this 27th day of November, A. D., 1908.

HIRAM PERCY MAXIM.

Signed in the presence of—
JOSEPHINE H. MAXIM,
LENA E. BERKOVITCH.

(/ammo)

Paid Advertisement



Guns.com (https://www.guns.com) / News (https://www.guns.com/news)
/ Antiques & Collectibles (https://www.guns.com/news/category/antiques-and-collectibles) / Teddy Roosevelt's Suppressed 1894 Winchester

# TEDDY ROOSEVELT'S SUPPRESSED 1894 WINCHESTER

05/18/2012 10:00 PM | by Max Slowik (/news/author/max_slowik)    Share 62

A new exhibit is coming to the National Firearms Museum this June, the Theodore Roosevelt Collection. Teddy Roosevelt is famous for his love of shooting, hunting, and battle. He was an avid gun user and collector, and a great fan of Winchester lever-action rifles (https://www.guns.com/firearms/rifles/lever-action), and one of his most-used and prized Winchesters will be a part of it.

That Rifle is a Model 1894 likely chambered in .30-30, which he often called his "Little .30." Roosevelt instantly became a fan of the cartridge when it was first introduced. He was such a fan of their rifles that he tried every new model introduced, and when he felled an antelope at about 180 yards he declared the .30-30 Model 1894 as "Aces," and decided to get one for use at home in Long Island.



Chiefly purposed for varminting on and around his property, Roosevelt had it modified and suppressed with a Maxim silencer, as to be kind to his neighbors.  "The President's rifle comes with the usual Roosevelt bells and whistles—the crescent buttplate, no raised check piece, as well as a little something extra; a threaded barrel. Yes, you guessed it, Roosevelt's '94 Winchester comes with it's very own suppressor."

While .30-30 was his go-to cartridge for culling local pests, Roosevelt was exceptionally fond of another smokeless powder chambering, .405 Winchester.



"Introduced in 1904, the .405 Winchester cartridge was the most powerful round ever developed for a Winchester lever-action rifle. Roosevelt had to have not one, not two, but three 1895s in .405, and it proved very effective on almost every sort of game in Africa. The big 300 grain bullet was a hard hitter with an initial muzzle velocity of more than 2230 fps.

"In perhaps the best Presidential endorsement of any product ever, Roosevelt wrote in Scribners Magazine 'The Winchester .405 is, at least for me personally the medicine gun for lions!' He created a sensation for the gun that lasts, to this day. The .405 was discontinued in 1932. However rifles chambered in 'Teddy's caliber' continue to bring a high premium over examples that are chambered in a round still readily available. In 2000, Winchester announced the re-introduction of the Browning 1895 in .405 caliber, demonstrating that the spirit of 'Big Medicine' is stilt alive and well."

APPX.400



That being said, the Model 1894 is one of Winchester's greatest all-time successes, having made over 7 million of these rifles in various calibers, with many other companies manufacturing guns patterned on the design to this day.

We have to wonder what other guns will be a part of the Theodore Roosevelt Collection, and we look forward to next month when it is unveiled. Read more about it and the other exhibits at the National Firearms Museum.

*Photo credit Lars Dalseide/NRAblog.com..*

**READ MORE ON:**

Antiques & Collectibles (/news/category/antiques-and-collectibles)    Hunting (/news/category/hunting)

## LATEST HEADLINES


07/28/2025 05:00:00
Uberti 1873 Cattleman Stallion: Faithful .22 LR Clone of an American Icon (/news/reviews/uberti-1873-cattleman-stallion)


07/28/2025 03:36:00
B&T Importing Phoenix Drake and Redback Swiss-made Pistols (/news/2025/07/28/b-and-t-importing-phoenix-drake-and-redback-swiss-made-pistols)


07/28/2025 01:17:00
Senate Committee Keeps ATF Budget Intact, Eschews Cuts (/news/2025/07/28/senate-committee-keeps-atf-budget-intact-eschews-cuts)


07/25/2025 03:49:00
Gun Sales Up, New Tech Coming (/news/gun-sales-up)

## LATEST REVIEWS

(/news/reviews/uberti-1873-cattleman-stallion)                    (/news/reviews/czech-brno-98-22)

**Uberti 1873 Cattleman Stallion: Faithful .22 LR Clone of an American Icon**
(/news/reviews/uberti-1873-cattleman-stallion)

The .22 LR Uberti 1873 Cattleman Stallion is a faithful replica of the wheel gun that won the West, combining the timeless Colt Single Action Army look with a 10-round cylinder for all-day plinking fun.

(/news/reviews/uberti-1873-cattleman-stallion)

| READ MORE |
|---|

**Czech Br**
(/news/reviews/czech-brno-98

The Brno 98/22 is one of the sh
pass up the chance to shoot th
inventory.

(/news/reviews/czech-brno-98-22

Stay in the know. Get Guns.com offers and news!!

By signing up you agree to Guns.com's Terms and Conditions (/terms-and-conditions) and Privacy Policy (/privacy-policy).

Enter Your Email

SIGN UP

Follow Us On:
(https://rumble.com/c/Gunscom) (https://www.facebook.com/gunsdotcom) (https://www.instagram.com/gunsdotcom) (https://www.twitter.com/gun

## Need Help?

FAQ (/FAQS)                                    CONTACT US (/CONTACT)

**HOW TO BUY A GUN ONLINE(/HOW-TO-BUY-A-GUN-ONLINE)**

**CERTIFIED USED GUNS(/USED-GUNS/CERTIFIED-USED)**

**WE BUY GUNS(/WE-BUY-GUNS)**

**THE GUNS.COM PROMISE(/ABOUT-US)**

**CUSTOMER RESOURCES**

**SELLER RESOURCES**

**WHO WE ARE**

Terms and Conditions (/terms-and-conditions)    Mobile T&Cs (/terms-and-conditions/mobile)    Privacy Policy (/privacy-policy)    Site Map (/site-map)

PO Box 1131, 13800 Nicollet Blvd Burnsville, MN 55337 ©2025 Guns.com. All Rights Reserved



Home   RSO TV   Store   Blog   Info
Gear Recommendations

Login

Join RSO

By Ron Spomer

## Short Rifle Barrel Performance Advantages



Most hunters are a mite confused about the advantages and disadvantages of a short rifle barrel. You might say they are long on fear and short on information. Maybe we can fix that.

We detailed short rifle barrel ballistic performance loss in an earlier article on RSO. You can read it here. Basically it shows there is surprisingly little performance lost to a short barrel. Great. But what are the gains? Why bother with a shorter barrel? Let's investigate the advantages of short barrels.

### Short Rifle Barrel Advantages

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

Accept

APPX.403



This mountain caribou didn't know he was shot with a 140-grain Swift A-Frame thrown by a puny 7mm-08 Rem. in a "too-short" 18.5-inch barreled Kifaru Rambling Rifle. The 10-ounce Leupold 2-7x33 scope helped keep the weight down, too.

A short rifle barrel offers advantageous because it is lighter and easier to carry than a long barrel. Short barrels are faster to whip into action, too. They are stiffer and thus potentially more accurate. There's less flex, less harmonic vibration and less muzzle whip. All of this contributes to accuracy.

Additional convenience accrues when carrying a short barreled rifle in brush and woods, especially slung over your shoulder. Long barrels entangle branches when you try to aim and swing. Slung on your shoulder, a 24-inch barrel snags branches as you  duck under limbs. Knowing this, I recently chose a 20-inch barrel Mossberg Patriot Youth Super Bantam Rifle in 243 Win. for a north Idaho cougar hunt.

## Short Rifle Barrel on the Hunt

I knew we'd be climbing high, hard and at incredibly steep angles on this hunt. There's more up and down than back and forth in north Idaho. I assumed we'd also fight deep snow and plenty of brush and limbs. I wasn't disappointed.

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.



Mossberg's Patriot Youth Compact with 20-inch barrel in 243 Win. was none too short for fighting through deep snow and tangled brush during an Idaho lion hunt.

The hunt was brutal, but the statistics don't sound too impressive. We climbed about 1,400 feet and traversed about 5 miles each day, most of it zigging and zagging. Snow varied from recently melted to waist deep, the crust sometimes holding, sometimes breaking. With each step I appreciated that compact, light, short rifle barrel. If it had been shorter, more compact and lighter yet, I'd have loved it even more. Even with a 20-inch barrel, the muzzle caught a few limbs and branches. This doesn't sound like a big deal until you're bulling through waist deep snow at the end of 6 hours, 4 miles and 1,399 feet of elevation gain. At that point the little insult of a springy limb tugging at the muzzle above your shoulder comes like a slap in the face, Nature's subtle reminder of the relentless pull of gravity. It's an attitude killer.

## Stratus Support System Lends A Helping Hand

I found relief, oddly enough, in a simple little gizmo called a <u>Stratus Support System</u>. It has nothing to do with undergarments. It's a two piece gun holder consisting of a polymer clip that slides onto your belt and a matching peg that wraps around your rifle butt. You slide the peg into a notch on the belt unit and it holds your rifle, putting the weight on your hip and leg. You can watch a <u>quick video demonstration here.</u>

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.



Stratus Support System

The peg swivels 180-degrees in the notch, so the rifle can be carried muzzle up, down, forward or back. Best of all, it can be leaned left or right. When I leaned my Patriot right across my chest, I discovered it would clip under the sternum strap of my ALPS Extreme Pursuit X pack (buy here.) This combination of pack strap and Stratus butt peg/belt holder left me hands free with the Patriot's muzzle protruding just a few inches past my left shoulder. And below it. No more overhead branch snagging. And I was free to grab brush to pull myself into the rarified air of mountainous Idaho.

## Short Rifle Barrel Advantages in Mountains

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.



What do you get when you mix 350 yards, a 7mm-08, 140-gr. Swift A-Frame bullet, 18.5 inch barrel and big billy? Success. Two shots, two hits and no need for a magnum length barrel.

I've also found short barrels to be convenient in steep, rocky country where long tubes tend to jut into overhead rocks as you climb, lean forward and ease around ledges. During a mountain goat hunt with guide Bryan Martin of Canadian Mountain Outfitters in the wilds of north-central British Columbia, I employed a Kifaru Rambling Rifle in 7mm-08 Rem. with an 18.5-inch barrel. At barely more than 4 pounds with a Leupold 2-7x33 scope, it carried easily without getting hung up, even as we scaled narrow chimneys near the tops of 7,000-foot ridges. I strapped the rifle onto my pack and it barely stuck above it. Perfect for hands-free climbing without interruption. Despite that "too-short" barrel, I put two 140-grain Swift A-Frames into a big billy 350 yards away.

Not even the biggest game seems to need magnum length barrels. Drew Goodlin of Federal Premium used an extra short 16.5-inch barrel on a Ruger Hawkeye Compact chambered for the overlooked but deadly effective 338 Federal to take a moose with a couple of well placed shots at about 200 yards.

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

APPX.407



The world's largest deer had to agree a 16.5-inch barrel Ruger Hawkeye Compact in 338 Federal was more than enough gun.

You don't have to hunt the mountains to appreciate short rifle barrels. You'll find them easy to maneuver in and out of trucks, ATVs, bush planes, horse scabbards and even airports. Traveling in any conveyance with a long rifle case can be a pain. Why suffer?

Again, as this short barrel ballistics article shows, cutting six inches from a barrel might reduce bullet muzzle velocity by 300 fps, but at 300 yards that results in only one more inch of drop and one of drift. Seems a small price to pay for all the conveniences a short barrel brings.

*Author and global hunter Ron Spomer has sometimes found himself short-barreled but never short-changed.*

Additional Blogs







Jan 19, 2024

Apr 7, 2022

Mar 24, 2022

Load More.. (231)

##24-inch barrel · #18-5-inch barrel · #20-inch barrel · #243 Winchester · #338 Federal · #A-Frame · #alps · #ballistics · #barrel · #British Columbia · #Bryan Martin · #caribou · #cougar hunt · #Federal Premium · #firearm · #Flying B Ranch · #gun · #Hawkeye · #hunting · #Idaho · #Kifaru Rambling Rifle · #Leupold · #moose · #Mossberg · #mountain caribou · #mountain goat · #pack · #Patriot · #rifle barrel · #rifles · #Ruger · #shooting · #short barrel · #short rifle barrel · #Stratus Support System · #Swift · 16-5-inch barrel

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

Comments (9)

Newest First

Preview    Post Comment...

**Alex H.**  4 years ago · 0 Likes

Ron, its my first post here after following you for a while at YouTube.

I was wondering, what 7mm short rifle cartridge would be best for a 20" barrel and also supressor....

.284, 280Rem have too long cases, I guess. And the 7mm-08 might have a disadvantage here compared to the .308.

Because of the relationship between case capacity and caliber...

So.... how would a 7mm catridge be designed like with the following requirements ?? :

1. .284 Diameter bullet with 140grain
2. 2850fps muzzle velocity out of a 20" barrel.
3. All powder burned within the barrel, low muzzle pressure. (good for suppressor)
4. OAL to fit standard short action receivers.

That would be sort of my dream cartridge... And as I know you, you would love it as well ;)

Any idea?

Cheers
Alex H.

**Ron Spomer**  4 years ago · 0 Likes

Alex, COAL of 284 Win. is 2.8", same as 308 Win. and 7mm-08 Win. It and the 7mm-08 should come pretty close to 2,850 fps with a 140-gr. in a 20" bl. The 7mm SAUM should do it easily, but I can't guarantee all powder will be consumed within the barrel.

**Mark James**  8 years ago · 0 Likes

Ron,Once again I fully appreciate the thoroughness and professionalism of your writing and expose! I am a huge fan of short-barreled rifles and as you know… A big, big fan of yours! Love and appreciate your Stratus Support System as it is PERFECT for my 18.5" barelled 375 H&H Magnum! Thanks again!Pure excellence all the way around!Mark James

**Ron Spomer**  8 years ago · 0 Likes

Mark, you are too kind. But if anyone should know excellence, it's you. Your sculpture is impeccable. Anyone reading this: google Mark David James Sculptor and be impressed.

**Swift Bullets Kimber Adirondack — Ideal Hunting Rig - Ron Spomer Outdoors**  8 years ago · 0 Likes

[…] If you worry that the rifle's short barrel sacrifices too much reach, rest easy. (And read this explanation of short barrel advantages in an early RSO post.) Zeroed 3 inches high at 100 yards, the Sciroccos drop just 6.5 inches at 300 […]

**Mark Eggleston**  8 years ago · 0 Likes

RonThis was written by your fellow countryman Charlie Sisk. Since i hunt with a custom Ruger No1 full wood in 270 with a 20 inch spout I got sick of ill informed comments from various hunting buddies.[ QUOTE ] Charlie SiskFor a long time I have wondered about how barrel lengthaffected velocity. I had always been told you need a certainlength barrel for certain calibers. I have read when folkscompared one gun to another with different lengths but Ialways thought that was not an apples to apples comparision.So I did a few test myself.All these were Shilen barrels. I used the same brass throughout the whole test. All weighed to 1 grain. Bulletswere tested on the Juenke machine. Powder charges wereweighed to .1 grain. The same rest, chronograph, Reddingpress, primers all from the same lot, bullets for the samebox, same lathe, same crowning tool, same cutoff tool, andeach rifle done from start to finish on the same day.Ambient temperature was the same because I shoot from insidethe shop. I held the rifle the same way on the rest everytime. I

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

345125 342524 340756 fps from highest to lowest270 Winchester Hodgdon 435064 grains Federal GM210MWinchester brass 130 grain Sierra27 inches 3115 fps26 309325 307124 305423 303522 302721 3001114 fps from highest to lowest300 Winchester mag Federal GM215M Winchester brass 74 grainsof Reloder 22 180 grain Partition27 inches 3055 fps26 303125 302424 300323 298422 296095 fps from highest to lowest340 Weatherby Federal GM215M Winchester brass81 grains Reloder 22 Wby brass27 inches 2837 fps26 281725 280924 279123 277722 275521 2731106 fps from highest to lowestI think I will do a little more thinking before I recommenda barrel length in the future. What do you folks think ? CharlieHere is the info about the 338 Win and the 257 Roberts.338 Win magWinchester brassFederal GM215M primersReloder 19.....73 grains250 grain Partitions27 inches.....2806 fps26 inches.....2787 fps25 inches.....2761 fps24 inches.....2743 fps23 inches.....2716 fps22 inches.....2697 fps21 inches.....2676 fps20 inches.....2656 fps150 fps from 27 inches to 21 inches257 RobertsFederal GM210M primersRemington brassH-4350....45 grains120 grain Partitions27 inches.....2860 fps26 inches.....2834 fps26 inches.....2815 fps25 inches.....2815 fps24 inches.....2798 fps23 inches.....2775 fps22 inches.....2760 fps21 inches.....2739 fps20 inches.....2717 fps143 fps from 27 inches to 20 inchesI want to test this on the next 450 Marlin I build and on a222 Remington. If I get the same results with those, in mymind the test is over. I think this will be enough data tosupport the findings. Are there any folks out there who havea degree in this sort of thing ? Maybe explain how many datapoints would be needed to be able to say this would workwith the majority of calibers ? Someone with experience instatistical(spell check) quality control ?CharlieA few weeks ago I done some testing with shortening barrelswith various calibers. I just finished this test with a 300Ultra.These loads were EXTREMELY HOT !!!!!!!!!!I will not post the grains here because on the third loadingthe primer would fall out of the case . I never load thishot , only this time for the test. I used Remington brass,Federal GM215M primers, 220 grain round nose bullets. I usedthe same procedures as the last test.length.... H-4895 .....H-870.....27 .....2740 .....3107 FPS.....26 .....2709 .....3088.....25 .....2685 .....3062.....24 .....2663 .....3046.....23 .....2636 .....3018.....22 .....2612 .....2997H-4895 lost 128 fpsH-870 lost 110 fpsCharlie[/ QUOTE ]/ message

---



**Ron Spomer**   8 years ago · 0 Likes

Mark: Thanks for sending this. I remember reading this Sisk study once. I don't know about you, but I'm happy to trade about 20 fps per inch for a more convenient barrel length.

---



**Jeffrey Moyer**   9 years ago · 0 Likes

Hello Ron. You obviously understand why I like my Ruger 77 Ultralight in .257 Roberts so well. Cheers...............

---



**Joseph Smith**   9 years ago · 0 Likes

As always, Ron Spomer's blog has accurate and insightful information.I first became aware of the advantages and only minor performance loss of short barreled rifles through extensive research for the 6.5 Grendel.One loses some velocity when dropping off from the longest commercial barrel. The real-world consequence is, of course, slightly increased drop. The increase in drop rarely affects the point blank range and has no effect on ability to get the correct elevation with the abundance of electronic range finders.Not so obvious is the decreased range at which the bullet opens adequately to give the desired terminal performance. That range can be described as the feasible range. The loss of muzzle velocity can reduce the maximum feasible range by 10 per cent or so, but choosing the proper bullet will still keep the ethical range inside the feasible range.

**CHECK OUT MY LATEST VIDEO!**



**CHECK OUT MY LATEST PODCAST**



By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

**EXCLUSIVE, UNLIMITED, UNCENSORED, STRAIGHT UP RON VIDEOS.**

Sign Up For RSO TV

**JOIN THE RSO PATREON GROUP TODAY!**



‹  Bottomless Underwear                                    Fish Tacos and Chili Corn Pudding ›

## Join Our Mailing List

Sign up with your email address to receive news and updates.

Email Address                    Sign Up



If your heart leaps at the sight of a bear and your spirit soars with the flight of a goose, join me here at Ron Spomer Outdoors as we discover our roles, responsibilities, adventures, and thrills as Nature's hunters and conservationists.

© Ron Spomer | All Rights Reserved |
Terms and Conditions

**Information**

About

Contact

Questions

Join RSO

RSO TV

**Store**

Shop All

Books

Clothing

Hats

Mugs

Freedom Bells

**Blog**

All Blogs

Hunting

Guns, Ammo & Ballistics

Optics

Tools and Gear

Cooking

By using this website, you agree to our use of cookies. We use cookies to provide you with a great experience and to help our website run effectively.

# NHCA POSITION STATEMENT
## Recreational Firearm Noise
March 16, 2017

*Michael Stewart, Deanna K. Meinke, Gregory A. Flamme,*
*William J. Murphy, Donald S. Finan, James E. Lankford, and Stephen M. Tasko*

*National Hearing Conservation Association (NHCA)*
*Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise*

This document was prepared by The National Hearing Conservation Association (NHCA) Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise and approved by the NHCA Executive Council, March 16, 2017. The judgments expressed here represent the best available evidence at the time of publication and shall be considered the position of NHCA and not the individual opinions of the contributing authors or their respective institutions. The contributing authors declare no conflict of interest.

## EXECUTIVE SUMMARY

Recreational firearm use is a popular leisure-time activity in the United States today. Millions of Americans of all ages enjoy shooting sports including target practice, competitive shooting, and hunting. While participation in the shooting sports can be an enjoyable recreational pursuit, it can also put an individual at risk for noise-induced hearing loss (NIHL) and tinnitus resulting from unprotected exposure to high-intensity firearm noise. Almost all firearms generate impulse levels in excess of 140 dB peak SPL. Hearing loss may occur gradually over time due to repeated unprotected exposure to firearm noise. Hearing loss also may occur suddenly due to acoustic trauma from a single unprotected gunshot. The hearing loss is often characterized by normal or near normal hearing sensitivity in the lower frequency range with severely impaired hearing in the higher frequency range which results in difficulty hearing speech clearly.

NHCA developed this guidance document to assist hearing conservationists, audiologists, physicians and other hearing conservation professionals, in managing and mitigating the risk of NIHL associated with recreational firearm noise. Several strategies can be employed to reduce the risk of acquiring NIHL and associated tinnitus from firearm noise exposure. These include wearing hearing protection devices (HPDs), using firearms equipped with suppressors, choosing smaller caliber firearms, using subsonic ammunition, shooting in a non-reverberant environment, and avoiding shooting in groups. In addition, several commercially-available HPDs are specifically designed for the shooting sports. These include conventional passive earmuffs and earplugs, level-dependent devices that attenuate high level sound while providing audibility for lower level sound, and electronic devices that amplify low level sounds and attenuate high level hazardous sounds.

The key to preventing NIHL and tinnitus secondary to excessive firearm noise exposure is to educate firearm users about the auditory hazard associated with firearm noise and provide them with strategies to protect their hearing. Educational programs may be offered through hunter safety courses, hunting clubs, or during training. A special firearm noise topic section should be included in occupational educational training for individuals who use firearms as part of their jobs. Finally, clinical audiologists should educate their patients who use firearms regarding the hazards and ways to prevent hearing loss. Several educational tools are available on the National Hearing Conservation Association website including a hearing loss simulator, a tinnitus simulator, posters and slides of inner ear structures damaged by firearm noise, a hearing protection brochure, a hunting and hearing video and links to other educational resources. Firearm NIHL is almost completely preventable if necessary precautions are taken.

# NHCA POSITION STATEMENT
## RECREATIONAL FIREARM NOISE

*Michael Stewart, Deanna K. Meinke, Gregory A. Flamme,*
*William J. Murphy, Donald S. Finan, James E. Lankford, and Stephen M. Tasko*

*National Hearing Conservation Association (NHCA)*
*Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise*

This document was prepared by The National Hearing Conservation Association (NHCA) Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise and approved by the NHCA Executive Council, March 16, 2017. The judgments expressed here represent the best available evidence at the time of publication and shall be considered the position of NHCA and not the individual opinions of the contributing authors or their respective institutions. The contributing authors declare no conflict of interest.

## Abstract

Recreational firearm use is a popular leisure-time activity in the United States enjoyed by millions of individuals across all age groups. Recreational firearms produce impulse noise levels that exceed 140 decibels peak sound pressure levels (dB peak SPL). Unprotected ear exposure to this high-level impulse noise can cause immediate and irreversible damage to delicate inner ear structures of both the shooter and bystanders in close proximity. This damage includes noise-induced hearing loss (NIHL) and tinnitus. The potential increased risk of NIHL and tinnitus associated with recreational firearms noise may not be evident to recreational shooters, or nearby bystanders such as instructors and spectators. NHCA developed this guidance document to assist hearing conservationists, audiologists, physicians and other hearing conservation professionals, in managing and mitigating the risk of NIHL associated with recreational firearm noise.

## Recreational Firearm Prevalence in the United States

Recreational firearm use by civilians is prevalent in the United States. Americans own an estimated 270-310 million firearms (Jütersonke *et al*., 2007; Krouse, 2012), more than any other country in the world. Data collected by the U.S. Fish and Wildlife Service (2011) revealed that approximately 15.7 million individuals over the age of 16 years used several types of firearms (rifles, shotguns, pistols, muzzle loaders) for hunting purposes while approximately 7.1 million people participated in target shooting in preparation for hunting. According to the National Shooting Sports Foundation (2009), over 30 million Americans are actively involved in the shooting sports. Several states allow children 10 years of age and younger to use firearms for hunting when accompanied by an adult family member (National Shooting Sports Foundation, 2010).

## Recreational Firearm Noise Sound Pressure Levels

Although firearms are used by millions of U.S. citizens for recreational activities related to the shooting sports, these individuals may not be aware that exposure to high-level firearm noise can be hazardous to their hearing. This need for awareness also extends to those that are exposed as nearby bystanders, e.g. instructors, spectators. Almost all firearms generate peak impulse noise levels that exceed the 140 decibel peak sound pressure level (dB peak SPL) exposure limit mandated by the Occupational Safety and Health Administration (OSHA. 1983) and the A-weighted 140 decibel (dBA) limit recommended by the National Institute for Occupational Safety and Health (NIOSH, 1998) for adults in occupational settings. The World

2

Health Organization (WHO, 1997) recommends a 120 dB peak SPL maximum exposure limit for children. Several studies involving the measurement of firearm noise have found levels between 160 and 170 dB peak SPL for big bore rifles, pistols, and shotguns (Murphy and Tubbs, 2007; Flamme *et al*., 2009; Schulz, Murphy, Flamme 2013; and Meinke *et al.*, 2014). Additionally, Meinke *et al.,* (2013) found that some models of starter pistols can generate impulse levels exceeding 160 dB peak SPL at the shooters' ears. Many large bore firearms that generate peak noise levels above 160 dB peak SPL at the shooters' ear, closest to the muzzle, result in maximum permissible exposures (MPEs) of less than one shot when applying an A-weighted 8-hour equivalent energy level, $L_{Aeq8}$, and a limit of 85 dBA (Meinke *et al.,* 2014). Flamme *et al.,* (2011) employed three different damage risk criteria (DRC) and also calculated MPEs of one or less for a variety of large bore rifles and shotguns at the bystander position (1 meter behind the shooter). In addition, some air rifles have been found to exceed the 120 dB peak SPL limit for children (Lankford *et al*., 2016). Despite the recognition that firearms, including air rifles, can produce hazardous sound levels that can permanently damage the auditory system, 38% of target shooters and 95% of hunters reported never wearing hearing protection while shooting when asked about the previous year (Nondahl *et al.*, 2000).

**Recreational Firearm Noise-induced Hearing Loss and Tinnitus**

High-level impulse noise generated by recreational firearms is one of the leading causes of NIHL in the U.S. today. Several studies have found recreational firearm use can lead to NIHL (Prosser *et al*., 1988; Dancer *et al*., 1991; Kryter, 1991; Cox and Ford, 1995; Stewart *et al*., 2001; Stewart *et al*., 2002). Nondahl *et al*., (2000) reported that the risk of having a significant high-frequency hearing loss increased by 7% for every 5 years the study participants had hunted. The audiometric configuration of firearm NIHL is characterized by normal or near normal hearing sensitivity in the lower frequencies with a precipitous drop in the higher frequencies. Affected individuals often deny their hearing loss because they can easily hear the higher intensity, low-frequency vowel sounds in speech, but often do not hear the lower intensity, high-frequency consonants which are important for clarity of speech. The result is that they perceive others are mumbling when speaking. High-frequency hearing loss also makes it difficult to localize sound and to understand speech, especially in the presence of competing background noise, such as encountered when riding in a car or dining in a restaurant. The hearing loss worsens with continued unprotected exposure to firearm noise and ultimately impacts the speech frequency hearing range. Analysis of the 2011-2012 National Health and Nutrition Examination Survey (NHANES) data by Hoffman *et al.,* (2016) found the prevalence of high-frequency (3000-6000 Hz) hearing loss to be 50%, 95% Confidence Interval (CI 40-59) among firearm users who reported having fired at least 1000 rounds in their lifetimes, 32% (95% CI 27-38) among firearm users reporting having fired fewer than 1000 rounds, and 26% (95% CI 24-29) among people who reported never having used firearms. The prevalence of speech-frequency (500-4000 Hz) hearing loss was also higher among people reporting having fired at least 1000 rounds (26% versus 11%), and these same individuals had higher odds of hearing impairment even after adjusting for age, gender, ethnicity, educational level, cardiovascular risk factors, and other noise exposures (Odds Ratio: 1.8; 95% CI 1.1-3.0).

The left ear of right-handed shooters often exhibits more hearing loss because it is slightly closer to and receives a direct exposure from the muzzle of a rifle or shotgun while the right ear is partially protected by the head shadow effect (Rasmussen *et al*., 2009). The opposite is true for a left-handed rifle shooter. An asymmetrical hearing loss is less evident among people only firing handguns or pistols. The hearing loss from firearm impulse noise is greater in those who work in noisy environments when compared to those who do not (Stewart, Konkle, and Simpson, 2001). In addition to NIHL, firearm noise exposure can also lead to tinnitus (Smith *et al*., 2000; Olsen-Widen and Erlandsson, 2004; Stewart *et al*., 2009; Stewart *et al*., 2014). In fact, tinnitus is one of the early warning signs of NIHL (Griest *et al*., 1998).

3

## Recreational Firearm NIHL and Tinnitus Prevention Strategies

### Hearing Protection Devices (HPDs)

Fortunately, NIHL and tinnitus caused by firearm noise exposure are largely preventable with the use of appropriately fitted hearing protection devices (HPDs). HPDs may be earplugs or earmuffs. Murphy *et al*., (2012) measured the amount of sound attenuation or protection (impulse peak insertion loss) using an acoustic mannequin, fit with conventional HPDs (insert earplugs and earmuffs), and found impulse peak insertion loss values greater than 35 dB for 170 dB peak SPL firearm noise. The protected levels were less than the OSHA dB peak SPL and NIOSH 140 dBA exposure limit. Murphy and Tubbs (2007) also found peak impulse reduction values of approximately 30 dB using an acoustic mannequin with correctly fit earmuffs or earplugs. Moreover, they found insert earplugs used in combination with circumaural earmuffs ("double protection") provided approximately 50 dB of peak reduction, an effect greater than either earplugs or earmuffs alone. A subsequent study (Murphy *et al.,* 2015) also reported more than 50 dB of impulse peak insertion loss when double protection was employed.

Appropriate use of HPDs can be effective in preventing NIHL caused by exposure to high-level impulses generated by firearms. However, HPDs must be worn properly and consistently by the recreational firearm user to achieve any benefits. Recent studies investigating the shooting habits of adult recreational firearm users noted that they do not consistently wear HPDs while hunting. Stewart *et al.,* (2011) found over 70% of shooters reported never using HPDs while hunting and only 50% reported consistent use of HPDs during target practice. Stewart *et al*., (2009) also found only 40% of adult waterfowl hunters reported using HPDs consistently while target shooting and only 20% consistently wore HPDs while hunting ducks and geese. This particular population of recreational firearm users is at increased risk of NIHL because they often hunt in groups, in enclosed hunting blinds, and use large bore, semi-automatic weapons capable of rapid firing. Stewart *et al*., (2014) surveyed youth shooters 10-17 years of age and found results similar to adult recreational firearm users; 56% reported consistent use of HPDs while target practicing and only 16% while hunting. The majority of individuals in these studies were unaware of advancements in hearing protector design that overcome some of the conventional barriers toward wearing hearing protection in this population.

Because hearing protectors reduce the awareness of important environmental sounds, such as the approach of game, many recreational firearm users are reluctant to wear HPDs while hunting. However, several commercially available HPDs are specifically designed for the shooting sports that largely circumvent this problem. Electronic HPDs can provide mild amplification of ambient sound in quiet to allow the hunter to hear, but attenuate intense firearm impulse noise (and other high-intensity sound) by employing electronic peak clipping and passive attenuation when sound levels exceed a high-intensity threshold (Murphy *et al.,* 2015; Murphy and Tubbs 2007). Electronic devices are available in a variety of styles including circumaural headphones, insert earplugs, custom in-the-ear devices, and behind-the-ear devices. Passive (non-electronic) level-dependent (also called non-linear) HPDs are less expensive than the electronic devices and allow softer sounds to be heard while attenuating high-level sound such as firearm noise via specially designed physical apertures and filters. These level-dependent HPDs provide increasing attenuation with increased sound level (Murphy *et al*., 2012; Murphy *et al.,* 2016b; Fackler *et al.,* 2017). These technologies allow hunters to monitor their auditory environment and allow target shooters to hear conversation and instructions at the firing range while providing hearing protection when guns are fired.

The noise reduction rating (NRR) listed on the packaging or in the manufacturer's specifications provides the consumer guidance when selecting hearing protection for shooting sports. For continuous or constant noise, the NRR informs the consumer about the potential performance of the protector when properly worn. For impulse noise, the attenuation will be similar to the NRR rating, but can be higher (Murphy *et al*., 2012; Murphy *et al*., 2015; Fackler *et al*., 2017). Some HPDs are designed with filters that provide increased attenuation with higher peak impulse levels. The attenuation for these types of filtered HPDs will not exceed

4

that for the same protector with the filter completely closed or blocked. Earmuffs tend to exhibit increased attenuation with increasing impulse level. An adequate seal in the ear (for earplugs) or over the ear (for earmuffs) is essential for optimal hearing protection and the wearer should evaluate both comfort and seal when choosing an HPD. Dual hearing protection (earplugs plus earmuffs) will provide the greatest protection. Electronic devices may also be worn in combination with passive HPDs providing the best audibility for soft sounds and greatest degree of hearing protection.

### Firearm Noise Suppressors

Another device that may reduce the risk of acquiring NIHL is the firearm suppressor, which is commonly, and inaccurately, known as a silencer. Discharging a firearm produces a high-level acoustic impulse generated by the sudden release of gases that propel the projectile out of the barrel of the gun. A suppressor affixed to the end of the barrel can reduce the noise from the pressure of the escaping gases by coupling a chamber with a large volume to the muzzle of the firearm. In addition, a series of baffles within the chamber act as a muffler to further reduce the impulse noise level. Suppressors cannot reduce the noise caused by the supersonic flight of the projectile breaking the sound barrier once it leaves the barrel of the firearm. However, subsonic ammunition can be used to avoid this from occurring, thus reducing the overall SPL. Using subsonic ammunition in conjunction with a suppressor can collectively reduce firearm noise over either approach alone.

Recently, two studies have examined the effectiveness of firearm suppressors in reducing firearm noise. Lobarinas *et al.,* (2016) measured firearm noise using a variety of AR-15 firearms with different calibers (5.56 mm and 7.62 mm), types of ammunition (sub and supersonic), suppressors, and barrel lengths. The authors found suppressors reduced peak sound pressure levels from 7 to 32 dB relative to various unsuppressed conditions at three microphone locations (right and left ear and at 1 meter left of muzzle). However, several measurement conditions using suppressors still yielded levels above 140 dB peak SPL, especially for guns firing supersonic ammunition and guns with shorter barrels. Murphy *et al.,* (2016a) measured suppressed and unsuppressed firearm noise with two different rifles (.223 and .308 caliber) using subsonic and supersonic ammunition at three different microphone locations (shooter's right ear, left ear, and at the instructor's position 1 meter behind the shooter). Impulse levels for the subsonic ammunition ranged from 100 to 132 dB peak SPL in the suppressed conditions across microphone locations. The levels were 127 to 149 dB peak SPL for the unsuppressed conditions. Impulse levels for the supersonic ammunition ranged from 120 to 137 dB peak SPL in the suppressed conditions compared to 148 to 161 dB peak SPL for the unsuppressed conditions. The sound levels of firearm noise for supersonic ammunition can be reduced by approximately 30 dB with the use of suppressors. Coupling suppressors with subsonic ammunition can reduce levels further, compared to unsuppressed, supersonic ammunition conditions. Other suppressors not evaluated in the above studies and future technologically advanced suppressors may not provide the same reduction of firearm noise.

It is important to note that the use of a suppressor does not eliminate the risk of NIHL; it only reduces the risk by reducing the intensity of the sound emission.  There currently are no standardized protocols to measure the degree of attenuation (noise reduction) firearm noise suppressors provide. This means that manufacturers cannot guarantee that noise suppressors make a firearm safe to use without the wearing of hearing protection; that is, manufacturers cannot guarantee that use of noise suppressors alone will prevent hearing loss.

To properly protect their hearing, consumers must regard attenuation data published by firearm noise suppressor manufacturers with caution, and wear hearing protection whenever shooting firearms, including when employing a noise suppressor device.

### Choice of Caliber of Rifle, Pistol or Gauge of Shotgun

Most hunting rifles, pistols and shotguns produce dangerously high levels of impulse noise. Magnum calibers increase noise levels significantly. Using smaller caliber firearms for target practice can lower the risk of NIHL. Hunters must balance their choice of caliber with other factors, but a smaller caliber with an adequate effective range might be a smart decision. Consistent use of appropriate hearing protection must be stressed. The use of double hearing protection is especially important when shooting large bore firearms.

### Muzzle Brakes (Ports)

Muzzle brakes (ports) can reduce recoil but generally at the cost of increased noise hazards. The associated opening in the barrel/port allow for the escaping gases to be ejected closer to the ear and also radiates more sound energy back toward the shooter. Consequently, muzzle brakes often increase the peak sound pressure levels measured at the ears of the shooter. This condition is exacerbated when using short barrels.

### Shooting Environment

Almost any firearm can be hazardous to hearing, especially if it is capable of rapid fire or is fired in a reverberant environment, such as a hunting blind. Firing indoors in a room without sound treatment versus firing in open outdoor areas also increases the risk. Shooting in a reverberant environment will result in longer impulse durations and may contribute to higher sound pressure levels which can increase risk of hearing loss. When shooting in a small enclosed hunting blind, it is important to make sure the gun barrel is outside of the blind before firing. Sound treatments on the walls of indoor firing ranges can also reduce the risk of hearing loss.

### Number of Shots Fired

The more shots fired, the higher the risk for NIHL. Each shot fired potentially contributes to the hearing loss. For example, waterfowl hunters who shoot hundreds of shots each season may be at greater risk of hearing loss than large game hunters who only fire their rifle a few times a season. Target shooting may present the opportunity for firing a large number of rounds, and hearing protection is essential during these sessions. HPDs can also improve accuracy by reducing flinching due to the lower noise level reaching the shooter's ears.

### Hunting and Shooting in Groups

Waterfowl and upland bird hunters are high-risk shooting populations because they often hunt in groups, may fire multiple shots in a single hunt, and almost exclusively use rapid-fire, large-bore firearms. In this case, shooters are not only exposed to the high level impulse noise from their own firearms, but also to the impulses from nearby shooters. Increasing the distance between shooters and making sure both shooters and bystanders are wearing hearing protection are important to reducing exposure levels.

### Handgun Use

Any caliber of handgun generates hazardous levels of impulse noise because the muzzle of a short barrel is closer to the ears than for a long gun. Big-bore pistols (for example, the .357, .44 caliber magnum and .50 caliber), can expose the shooter to impulse levels greater than 170 dB peak SPL. It is important to wear double hearing protection when firing big-bore handguns to prevent NIHL. It is also worth noting that shooting over a surface such as a table or bench versus standing over open ground will also increase the peak SPL reaching the ear (Meinke *et al.,* 2014).

*Educational Information for Firearm Users*

| TIPS FOR SHOOTERS TO REDUCE RISKS FOR HEARING LOSS |
|---|
| Keep hearing protection devices on hand and use them correctly. |
| Use earplugs and earmuffs together (double protection) when using large-caliber guns or when many shots will be fired. |
| Consider smaller calibers or gauges during target practice. |
| Choose a single-shot or bolt-action over a semi-automatic weapon to help reduce the numbers of shots and increase the quiet time between shots. |
| Avoid shooting in large groups, especially at indoor or enclosed firing ranges, and if you do be especially aware of those who may be shooting near you so you can have your ears protected when their guns discharge. |
| Select a firing range with noise control treatments on the walls and ceilings. |
| Choose firearms with longer barrels and no ports or muzzle brakes. |
| Consider using low-recoil (low-noise) ammunition. |
| Consider the use of a firearm suppressor for use in combination with HPDs, where suppressor use is legally permitted. |
| When hunting in a blind, make sure the muzzle is outside the blind before pulling the trigger. |
| Use well-fitted, nonlinear or electronic ear protection designed for hunting/shooting. |

## Hearing Healthcare

Hearing loss prevention programs for recreational firearm shooters should include annual audiometric testing and hearing protector fit testing to monitor hearing levels and make sure the hearing protection devices are providing adequate protection. Any reduction in hearing sensitivity or sudden onset of tinnitus (especially immediately after shooting) necessitates a hearing test, a re-evaluation of shooting habits and hearing protection device fitting. Other health issues (diseases) can cause hearing loss, so recreational shooters should never assume their hearing loss is solely from firearms. Shooters should be advised to see an audiologist whenever a hearing loss is suspected. There are practical rehabilitation approaches options available to shooters with hearing loss.

## Hearing Aids

Audiologists are skilled in fitting hearing aids and also offer treatment and counseling for bothersome tinnitus. Hearing aids can help compensate for the loss of hearing but are unable to restore natural healthy hearing. Fitting amplification to individuals with precipitous hearing loss can be challenging especially when high frequency audiometric thresholds are severely impaired as in the case of NIHL. Recent availability of frequency shifting capability in advanced technology hearing aids that move sounds from areas of severely degraded hearing to areas of better residual hearing may offer some promise in remediation of this type of hearing loss. Sophisticated digital programing and other features can provide individualized tailoring of the hearing aid to the fit the person's needs and lifestyle. Sound therapy and counseling are also available to help individuals with tinnitus better manage their symptoms.

## Resources

Several educational tools, effective in motivating firearm users to protect themselves from firearm noise, are available on the National Hearing Conservation Association website. These include:

| NHCA EDUCATIONAL TOOLS |
| --- |
| NIOSH hearing loss simulator. |
| A tinnitus simulator. |
| Posters and slides of inner-ear structures damaged by excessive firearm noise. |
| A brochure on hearing protection devices for shooting sports. |
| A hunting and hearing video. |
| Links to other educational resources. |

## Conclusion

Noise-induced hearing loss from high level firearm noise can be prevented by employing effective strategies aimed at reducing the sound level produced by the firearm and protecting the ears of the recreational shooter and bystanders.

## References

Cox H. & Ford GR. 1995. Hearing loss associated with weapons noise exposure-when to investigate an asymmetrical loss. *J Laryngol Otol*, 109(4), 291–295.

Dancer A., Grateau P., Cabanis A., Vaillant T. & Lafont D. 1991. Delayed temporary threshold shift induced by impulse noise (weapon noise) in men. *Int J Audiol*, 30(6), 345-356.

Fackler C.J., Berger E.H., Murphy W.J. & Stergar M.E. 2017. Spectral analysis of hearing protector impulsive insertion loss, *Int J Audiol*, 56, S13-S21, DOI: 10.1080/14992027.2016.1257869.

Flamme G.A., Stewart M., Meinke D., Lankford J. & Rasmussen P. 2011. Auditory risk to unprotected bystanders exposed to firearm noise. *J Am Acad Audiol*, *22*, 93–103.

Flamme G.A., Wong A., Liebe K. & Lynd J. 2009. Estimates of the auditory risk from outdoor impulse noise II: Civilian firearms. *Noise Health*, *11*, 231–242.

Griest, S.E., & Bishop, P.M. 1998. Tinnitus as an early indicator of permanent hearing loss: A 15 year longitudinal study of noise exposed workers. *AAOHN Journal, 46*(7), 325-329.

Hoffman, H.J., Dobie, R.A., Losonczy, K.J., Themann, C.L., Flamme, G.A. (2016). Declining prevalence of hearing loss in U.S. adults aged 20 to 69 years. *JAMA-Otolaryn*, Early Online, Retrieved December 15, 2016. doi:10.1001/jamaoto.2016.3527

Jütersonke O., Krause K. & Muggah R. 2007. Guns and the city: Urban landscapes of armed violence in small arms survey. Graduate Institute of International Studies. Geneva, Switzerland: Cambridge University Press, pp. 47.

Krouse, W.J. 2012. Gun Control Legislation. Congressional Research Service Report for Congress RL32842. Available at https://fas.org/sgp/crs/misc/RL32842.pdf. Retrieved on November 5, 2016.

Kryter, K.D. 1991. Hearing loss from gun and railroad noise-relations with ISO standard 1999. *J Acoust Soc Am*, 90(6), 3180–3195.

Lankford, J.E., Meinke, D.K., Flamme, G.A., Finan, D.S., Stewart, M., Tasko, S., Murphy, W.J. (2016). Auditory risk of air rifles. *Int J Aud*, 55(sup1), S51–S58.

8

Lobarinas E., Scott, R., Spankovich C. & Le Prell, C. G. 2016. Differential effects of suppressors on hazardous sound pressure levels generated by AR-15 rifles: Considerations for recreational shooters, law enforcement, and the military. *Int J Audiol*, *55*(1).

Meinke, D.K., Murphy, W.J., Finan, D.S., Lankford, J.E., Flamme, G.A., Stewart, M., Soendergaard, J., & Jerome, T.W. 2014. Auditory risk estimates for youth target shooting. *Int J Audiol*, 53(S1), S16-S25.

Meinke D.K., Finan D.S., Soendergaard J., Flamme G.A., Murphy W.J., Lankford, J.E., & Stewart, M. 2013. Impulse noise generated by starter pistols. *Int J Audiol*, 52(S1), S9–S19.

Murphy W. J. & Tubbs R. L. 2007. Assessment of noise exposure for indoor and outdoor firing ranges. *J Occup Env Hyg*, 4(9), 688-697.

Murphy W.J., Fackler C.J., Berger E.H., Shaw P.B. & Stergar M. 2015. Measurement of impulse peak insertion loss from two acoustic test fixtures and four hearing protector conditions with an acoustic shock tube. *Noise and Health*, 1-10.

Murphy W.J., Flamme G.A., Zechmann E.L., Dektas C., Meinke D.K., et al, 2012. Noise exposure profiles for small-caliber firearms from 1.5 to 6 meters. Lay-language paper for the 164th meeting of the Acoustical Society of America, Kansas City, MO.

Murphy W.J., Stewart M., Flamme G.A., Tasko S.M., Lankford J.E., Meinke D.K., & Finan D.S. 2016a. The reduction of gunshot noise and auditory risk through the use of firearm suppressors. 171st meeting of Acoustical Society of America, Salt Lake City UT.

Murphy W.J., Graydon P.S., Strobel M. & Freeland K.L. 2016b. Impulse peak insertion loss for hearing protection devices with an acoustic shock tube. National Hearing Conservation Association, San Diego, CA.

National Shooting Sports Foundation. 2009. 2009 NSGA shooting sports participation. NSSF Research Department. Newtown, CT.

National Shooting Sports Foundation. 2010. Families Afield: An Initiative for the Future of Hunting. Retrieved from www.familiesafield.org/pdf/familiesafield_report.pdf

NIOSH. 1998. Criteria for a recommended standard: Occupational noise exposure. (NIOSH Publication No. 98-126). U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.

Nondahl D.M., Cruickshanks K.J., Wiley T.L., Klein B.E. & Tweed T.S. 2000. Recreational firearm use and hearing loss. *Arch Fam Med*, 9, 352-357.

Olsen-Widen S.E. & Erlandsson S.I. 2004. Self-reported tinnitus and noise sensitivity among adolescents in Sweden. *Noise Health*, 7, 29-40.

Prosser S., Tartari M.C. & Arslan E. 1988. Hearing loss in sports hunters exposed to occupational noise. *Br J Audiol*, *22,* 85-91.

Rasmussen P., Flamme G., Stewart M., Meinke D. & Lankford J. 2009. Measuring recreational firearm noise. *Sound and Vibration*. 14-18.

Schulz T.Y., Murphy W.J., Flamme G.A., 2013. New Research Shows Firearms Users How to Keep Their Hearing Safe. *Soldier Modernisation*, 11(Summer/Autumn), 1-3.

Smith P.A., Davis A., Ferguson M. & Lutman M.E. 2000. The prevalence and type of social noise exposure in young adults in England. *Noise Health*, 2, 41-56.

Stewart M., Borer S. & Lehman M.E. 2009. Shooting habits of waterfowl hunters. *Noise Health*, 11, 8-13.

9

Stewart M., Foley L., Lehman M.E. & Gerlach A. 2011. Shooting habits of recreational firearm users. *Audiology Today*, 23, 38-52.

Stewart M., Konkle D.F. & Simpson T.H. 2001. The effect of recreational gunfire noise on hearing in workers exposed to occupational noise. *Ear Nose Throat J*, 80, 32-40.

Stewart M., Meinke D.K, Snyders J.K. & Howerton K. 2014. Shooting habits of youth recreational firearm users. *Int J Audiol*, 53, S26–S34.

Stewart M., Pankiw R., Lehman M.E. & Simpson T.H. 2002. Hearing loss and hearing handicap in users of recreational firearms. *J Am Acad Audiol*, 13, 160-168.

U.S. Department of the Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce & U.S. Census Bureau. 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.

U.S. Occupational Safety and Health Administration. 1983. Occupational noise exposure; hearing conservation amendment; final rule (29 CFR 1910.95). *Fed Regist*, 48(46), 9738–9785.

WHO. 1997. Strategies for prevention of deafness and hearing impairment. Prevention of noise-induced hearing loss. Geneva: World Health Organization.

10



# RISKS
## FACED BY
## RECREATIONAL
## FIREARM USERS

BY MICHAEL STEWART, LAUREN FOLEY, MARK LEHMAN, AND ANDREA GERLACH

The level of impulse noise generated by almost all firearms exceeds the 140 dB peak SPL limit recommended by OSHA and NIOSH. Studies of the shooting habits of recreational firearm users indicate that many of these shooters are at risk to acquire NIHL. The present study provides information about the shooting habits of recreational firearm users that will help audiologists provide better hearing conservation services to this population.

The civilian use of firearms for hunting and other sport activities is widespread in the United States today. According to the Small Arms Survey, Geneva (2007), the number of firearms owned by Americans is estimated to be 270 million, more than any other country in the world. According to the U.S. Department of the Interior Fish and Wildlife Service (2006), over 12.5 million Americans use firearms for hunting purposes. The National Shooting Sports Foundation (2009) reports over 30 million U.S. citizens are actively involved in the shooting sports (hunting, target shooting, etc.). In many communities, especially those in rural areas, the tradition of recreational firearm use passes from older generations to younger generations within the family structure. Several states have hunting laws that allow children as young as 10 years of age (17 of those states have virtually no age requirement) to share a limited hunting experience

APPX.422





**A: Age**

- 31–50 Years — 36%
- 51–70 Years — 34%
- 18–30 Years — 28%
- 71+ Years — 2%



**B: Occupation**

- White Collar — 35%
- Blue Collar — 38%
- Self-Employed — 3%
- Retired — 12%
- Unemployed — 2%
- Student — 5%
- No Response — 5%



**C: Occupational Loud Noise Exposure**

- Yes — 53%
- No — 41%
- No Response — 6%

**FIGURE 1.** Demographic data of subjects: age (A), occupation (B), and occupational loud noise exposure (C).

when mentored by an adult family member (National Shooting Sports Foundation, 2010).

Although recreational firearm activities can provide individuals and families with leisure-time opportunities, participation in those activities can also be hazardous to hearing. The level of impulse noise generated by almost all firearms exceeds the 140 dB peak SPL limit recommended by the Occupational Health and Safety Administration (OSHA) and the National Institute of Safety and Health (NIOSH) (Coles et al, 1967; Odess, 1972; Ylikoski, 1989; Ylikoski and Ylikoski, 1994; Kardous et al, 2003; Murphy and Tubbs, 2007; Flamme et al, 2009). Exposure to impulse noise levels in excess of 140 dB SPL can lead to noise-induced hearing loss (NIHL) (Patterson and Hamernick, 1992; Chan et al, 2001). Increasing the duration of firearm noise by shooting in an enclosed, reverberant environment increases auditory risk (CHABA, 1968; Weissler and Kobal, 1974; Smoorenburg, 2003).

Because of the widespread use of firearms for recreational pursuits and the dangerously high peak SPLs generated by most firearms, it is not surprising that recreational firearm noise exposure is one of the leading causes of NIHL in America today (Clark, 1991). Several studies have found recreational firearm use can result in high frequency NIHL (Prosser et al, 1988; Dancer et al, 1991; Kryter, 1991; Cox and Ford, 1995; Stewart et al, 2001; Stewart et al, 2002). Nondahl et al (2000) estimated an increase of seven percent incidence of high frequency hearing loss for every five years of hunting activity. Audiometric configurations of NIHL caused by firearm noise exposure are often characterized by normal or near normal hearing in the lower frequencies, with a precipitous drop-off in the higher frequencies for both ears. Individuals with this type of hearing loss often minimize the communication difficulties and may not always receive adequate benefit from hearing aids.

An important factor in the incidence rate of NIHL secondary to firearm noise exposure may be the shooting habits of many recreational firearm users. Wagner et al (2006) surveyed 297 recreational firearm users and found more than 80 percent of the subjects reported never using hearing protective devices (HPDs) while engaging in hunting activities. Only 39 percent of the subjects reported consistently using HPDs during target practice. The majority of subjects in the Wagner et al study were males. However, Nakayama et al (2008) found a similar trend of sporadic HPD use in a survey of 153 female shooters. A study by Stewart et al (2009) found waterfowl hunters reported inconsistent use of HPDs during both hunting (only five percent reported 100 percent use) and

Risks Faced by Recreational Firearm Users

target practice (only 40 percent reported 100 percent use) while many hunters reported being exposed to over 100 unprotected shots in a single hunting season. Approximately 90 percent of the waterfowl hunters reported using the 12 gauge shotgun (which is one of the loudest shotguns available), and over half of subjects in this study reported routinely shooting in a reverberant environment (hunting blind) when hunting waterfowl. Collectively, these studies of the shooting habits of recreational firearm users indicate many of these shooters are at risk to acquire NIHL.

The purpose of the present study was to collect more information about the shooting habits of recreational firearm users including their use of conventional HPDs, their use and knowledge of commercially available HPDs designed specifically for the shooting sports, the types of commonly used firearms, use of enclosed hunting blinds, the estimated number of unprotected exposures, and their self-assessed auditory status. This information is necessary to increase understanding about how and under what conditions firearms are being used in recreational shooting activities so that better hearing conservation services can be provided to this population.

## Methods

### Subjects

The subjects in this study were 573 recreational firearm users and were solicited while they shopped at a central Michigan sporting goods store during the first week of deer season (November 2009).

### Materials

A 25-item survey was used to collect information from participants regarding demographic information and their recreational firearm use (see Appendix A). Five items requested demographic information, including age, sex, county of residence, occupation, and exposure to occupational noise; five items requested information regarding use of HPDs during target practice and while hunting; ten questions focused on shooting habits during target practice and while hunting; and five items inquired about self-perceived hearing ability, hearing aid use, and tinnitus.

### Procedures

A proposal of this project was submitted and approved by the institutional review board of Central Michigan University. It was concluded no risk would exist to participants of this project.



# See For Yourself

**CapTel® Captioned Telephone**

CapTel® captioned telephone shows word-for-word captions of everything a caller says helping people to understand every word – even if they have difficulty hearing it.

> Powerful amplification up to 35dB
> Easy-to-read display with contrast control
> Review captions during or after a call
> Enables patient to hear what they can and read what they need to

**Call today 1.800.233.9130** (V/TTY)



926 Colorado Avenue
Santa Monica, CA 90401-2717
email: sales@weitbrecht.com
**1.800.233.9130 (V/TTY)**

WCI
WEITBRECHT
COMMUNICATIONS, INC.

 Find us on Facebook

Risks Faced by Recreational Firearm Users



A: Small Game Firearms



B: Large Game Firearms

FIGURE 2. Firearms typically used by subjects in this study to hunt small game (A, N = 533) and large game (B, N = 549) as a function of reported usage.



FIGURE 3. Number of subjects who reported hunting large game from a blind (N = 561).

A display was set up in the lobby of the central Michigan sporting goods store, and customers were invited to complete the survey to assist in data collection for the project. The survey took approximately 10 minutes to complete, and subjects were given a pair of hearing protection devices for participating. Data analysis was completed using Microsoft Excel, and descriptive statistics were derived from the raw data.

## Results

### Demographics
Of the 573 participants—90 percent were male and 10 percent female. Participants ranged in age from 18 to 82 years with a mean age of 42.6 years. See FIGURE 1 for additional data regarding age, occupation, and loud noise exposure.

### Shooting Habits
Shooting habits of participants were assessed through multiple questions on the survey, including years of firearm use, types of firearms used (size of bore and type of action), hunting environments, and estimated shots taken both during target practice and hunting.

The majority of recreational firearm users in this study (62 percent) reported shooting firearms for more than 21 years. Approximately 17 percent reported shooting 10 years or less, while 21 percent reported shooting for 11 to 20 years. The average age of subjects in this study, in addition to the average number of years of reported recreational firearm use, would likely increase the risk of acquiring an NIHL for many of these subjects.

The firearms most commonly used for large and small game hunting by these subjects are shown in FIGURE 2. A majority (70 percent) of small game hunters reported that their guns were equipped with either semiautomatic (36 percent) or pump (34 percent) actions, which allow several shots to be fired in a short period of time. The most commonly used actions reported by the large game hunters were either a bolt (54 percent) or semiautomatic (17 percent). Both of these actions allow the hunter to fire several shots in a short period of time. Thus, both large and small game hunters reported using large-bore guns that are loud and can be fired in a rapid manner. Both the 30.06 rifle and 12 gauge shotgun are capable of generating peak impulses over 160 dB SPL (Flamme et al, 2009). Noise levels of this intensity may physically damage the inner ear resulting in temporary or permanent hearing loss (Ylikoski et al, 1987; Patterson and Hamernick, 1992; Chan et al, 2001).

Another important variable in the analysis of risk for NIHL is acoustic environment in which shots are fired.

APPX.426





Solutions for better hearing    audifon.com

# audifon's highlights at AudiologyNOW! 2011

Visit us at
AudiologyNOW!
Booth 1038

**WORLD PREMIERE!**



### via M – the digital way of CROS/BiCROS
Experience audifon's new digital and completely wireless CROS/BiCROS system with easy click control synchronisation feature.

**NEW VERSIONS!**



### elia – design meets technology
Modern and contemporary in design, elia is now available in a variety of styles including RITE, BTE, ITE and super-power custom aids with up to 70 dB gain.

**NEW FAMILY!**



### prado – easy listening
audifon's new prado family convinces with an outstanding price-performance-ratio and is available from Power BTE as well as RITE to Power ITE.

APPX.427

www.audifon.com

Peak SPL and duration values can be significantly higher if the shots are fired in a small enclosure like a hunting blind. Higher peaks and longer durations of firearm noise impulses increase auditory risk (CHABA, 1968; Weissler and Kobal, 1974; Smoorenburg, 2003). FIGURE 3 shows the majority (70 percent) of respondents reportedly hunt large game from an enclosed blind at least part of the time. The use of an enclosed blind, especially in cold weather climates during later hunting seasons, is a common hunting practice that serves to protect the hunter



**FIGURE 4.** Number of shots fired during target practice and during hunting (N = 572).



**FIGURE 5.** Types of HPDs used during target practice and hunting (N = 425).

APPX.428

from the elements while concealing him or her from approaching game.

Probably the most important aspect of shooting habits, as they relate to NIHL, is the total number of shots taken during various shooting activities in a year's time. Increasing the number of exposures, especially if unprotected, logically serves to increase the risk of hearing loss. The comparison of the number of shots reportedly taken during target practice and during small and large game hunting in the past year can be seen in FIGURE 4.

## Hearing Protection Devices

A major goal of this study was to assess the use of HPDs by recreational firearm users during firearm use. Several questions on the survey focused on this issue, including the percentage of time HPDs were worn and which types were worn during target practice versus hunting. Over 70 percent of the subjects reported never wearing HPDs during hunting activities, and only 54 percent reported consistent use of HPDs during target practice. These results are consistent with those of prior studies (Wagner et al, 2006; Stewart et al, 2009) and suggest many recreational firearm users are putting themselves at risk for NIHL, especially while hunting with large-bore (loud) firearms. FIGURE 5 shows that the most common types of HPDs used by subjects for both target practice and hunting were nonelectronic plugs or muffs. Approximately 15 percent of the subjects reported using electronic hearing protective devices (EHPDs) when hunting. This is a significant increase in EHPD use, compared to a previous study by Wagner et al in 2006, and indicates hunters are becoming more aware of this type of protective device. Although over 50 percent of the subjects reported that they were aware of the nonlinear (military) type of HPDs, few reported utilizing these devices during target practice or hunting.

Large numbers of shots and lack of HPD use increase auditory risk. FIGURE 6 shows the reported number of shots taken by subjects in the past year without HPDs as a function of firearm type. The types of firearms were categorized as small, medium, and large rifles, small and large pistols, and shotguns. Rifles categorized as small included the .17 and .22 caliber rimfire guns. Rifles categorized as medium included .22–250, .223, .243, .25–06, and .257 caliber. Rifles categorized as large included .30 caliber and larger. Any pistol larger than a .22 caliber was classified as large. Shotguns were placed in the same category regardless of gauge. Most subjects reported being exposed to either 1–10 or 11–50 unprotected shots in the past year across firearm types. However, many



integrity™ V500

Non-Sedated ABR, OAEs
Non-Invasive ECochG

**Fully Automated ASSR**
for quick and objective
hearing threshold estimation

*New from* vivosonic

Threshold search

Estimated audiogram

**Aurix™**
Newborn Hearing Screening System

**Practical Advantages**
over popular systems
on the market today

• Superior response detection of ABR
• Better handling of myogenic artifact
• Less susceptible to interference
• Consistent performance and results
• Reduces rescreens and rescheduling
• Automated, easy to use
• Portable, wireless convenience
• Dedicated 24/7 customer support

## See it. Try it. Believe it.

Contact us for a free demonstration!
Tel: 1.416.231.9997
E-mail: sales@vivosonic.com

vivosonic
www.vivosonic.com

individuals reported much higher numbers of unprotected shots for various firearm types. For example, over 15, 18, and 10 percent reported being exposed to over 200 unprotected shots in the past year from large pistols, medium rifles, and shotguns, respectively. Individuals exposed to a high number of unprotected shots in a year's time from firearms capable of generating high impulse noise levels may be at considerable risk for NIHL.

### Subjective Hearing Status

Self-perceived hearing ability was assessed for both right and left ears. Subjects were asked to categorize their right and left ear hearing ability as being excellent, very good, good, fair, or poor. Although over 75 percent of the subjects assessed right and left hearing ability to be good to excellent, approximately 20 percent reported right and left hearing to be either fair or poor. In the personal clinical experience of the authors, it has been observed that most patients presenting with a hearing loss underestimate the severity of their hearing loss when asked to make a self-assessment.

In addition to self-assessment of their hearing ability, subjects were asked if they experience temporary or constant tinnitus, or if they noticed an increase in tinnitus, a major symptom of sensorineural hearing loss (Axelsson and Barrenas, 1992; Eggermont and Roberts, 2004; Moller, 2007; Bauer and Brozoski, 2008; Dawes and Welch, 2010; Mazurek et al, 2010), following firearm use. Twenty-two percent of the subjects reported constant tinnitus (81 percent bilateral, 11 percent left ear only, eight percent right ear only) while approximately 44 percent reported temporary tinnitus or an increase in constant tinnitus after shooting a firearm in the past year. The reported incidence of constant tinnitus by firearm users in this study is significantly higher than the national average of 10–15 percent (Henry et al, 2005; American Speech-Language-Hearing Association [ASHA]) and suggests many of these individuals may have NIHL secondary to firearm noise exposure. Individuals reporting temporary tinnitus after shooting a firearm may have been exposed to SPLs high enough to cause NIHL.

### Discussion

Results of this study reveal that the shooting habits and inconsistent use of HPDs reported by many recreational firearm users may put them at risk of acquiring an NIHL. The majority of subjects reported using firearms for over 20 years. The most frequently used firearms reported by



**FIGURE 6.** Number of shots fired without HPDs as a function of firearm type (N = 436).

APPX.430

shooters in this study for hunting small and large game were the 12 gauge shotgun and 30.06 rifle, respectively. Most shooters reported using either the semiautomatic or pump actions for small game hunting, while the most common action for large game was a bolt. The most com-

Although an overwhelming majority (88 percent) of recreational firearm users in this study acknowledged that firearm noise can cause hearing loss, many reported a large number of unprotected firearm noise exposures within the past year. This finding suggests that recre-

---

# Approximately 20 percent of the subjects reported right and left hearing to be either fair or poor.

---

monly used firearms for both small and large game are not only loud (over 160 dB peak SPL) but are equipped with actions that allow up to five shots to be fired in a few seconds. Also, small game hunters often hunt in groups, which could serve to increase the number of exposures to high-level firearm noise during a single hunting excursion. The majority of large game hunters in this study reported frequently, if not always, hunting from an enclosure (hunting blind), which can increase peak SPL and duration of the impulse noise generated by their firearms via reverberation and lead to an increase in auditory risk.

Many subjects reported inconsistent use of HPDs, especially during hunting activities. Over 70 percent of the hunters reported never using HPDs while hunting, while only slightly more than one-half reported consistent use of HPDs during target practice. Ironically, using HPDs during target practice would not only protect hearing but also has the potential side benefit of increasing accuracy by reducing physical flinching by the shooter caused by anticipation of hearing the loud shot. Over half of the shooters reported they were aware of non-electronic, level-dependent (i.e., military style) HPDs specifically designed for the shooting sports, yet fewer than five percent reported using them during hunting activities. Approximately 12 percent of the shooters did report using electronic HPDs when hunting. Overall, the finding that approximately 17 percent of the hunters in this study used either active or level-dependent HPDs for hunting purposes is encouraging and indicates a significant increase in both awareness and use of these devices compared to previous studies (Wagner et al, 2006; Stewart et al, 2009). Both of these devices are especially applicable for hunting game since they allow hearing of softer environmental and animal sounds while protecting hearing from loud firearm noise.

ational firearm users in this study may be recklessly putting themselves at risk for NIHL. Audiologists and other hearing health professionals should be aware of this behavior and effectively counsel recreational firearm



## UF | UNIVERSITY of FLORIDA
*The Foundation for The Gator Nation*

Join the 1507 audiologists who have earned their **Doctor of Audiology** degree from the University of Florida.

*Earning the Au.D. made me more knowledgable, confident, and skillful in rendering audiology services to my clients and increased patient/client satisfaction. Thanks to the University of Florida. I would recommend your Au.D. program to prospective students.*

*Smita Hiremath, Au.D.*
*2005 Graduate*

Come visit us at **AudiologyNOW! 2011** (booth #1946).
**www.audiology.ufl.edu**
**(866) 479-4737**

users about the importance of protecting their hearing during target practice and especially while hunting.

The reported incidence of subjective hearing problems and tinnitus by recreational firearm users in this study should be of concern to audiologists and hearing conservationists, as approximately 20 percent of the subjects rated their hearing to be only fair or poor, 22 percent reported constant tinnitus, and 44 percent reported tinnitus or an increase in their constant tinnitus after firing a gun in the past year. Many of these subjects may be hearing aid candidates (although only four percent reported wearing hearing aids), and the incidence of constant tinnitus is significantly higher than the estimated rate in the general adult population of 10–15 percent (Henry et al, 2005; ASHA). The percentage of subjects with tinnitus who reported their tinnitus as being severely annoying (nine percent) is similar to findings by Axelsson and Barrenas (1992). These subjects may be considered candidates for a tinnitus therapy program.

Results of this study support the need for hearing conservation educational programs for recreational firearm users. A major focus of the educational training should stress the hazardous effects of firearm noise on hearing so shooters fully understand the auditory consequences of excessive exposure. Appropriate selection and proper use of HPDs should be a major component of any educational program. Students enrolled in these programs should be advised on the effectiveness of various types of HPDs and when double protection (muff and plug) may be needed to attenuate firearm noise to nonhazardous levels. They also need to be knowledgeable about and able to select appropriate active (electronic) and level-dependent HPDs that are specially designed for the shooting sports. Demonstrations of simulated hearing loss (NIOSH, 2004) and simulated tinnitus (Martin, 2009) should also be used to allow the students to actually hear the consequences of excessive firearm noise exposure. Students should also receive a basic hearing test by a qualified hearing health professional to identify possible hearing loss and establish a baseline audiogram. The educational programs could be offered through hunter safety courses, hunting clubs, or during shooting instructions. A special firearm noise section in industrial hearing conservation program educational programs could be included for workers who use firearms. Finally, clinical audiologists should educate their patients who use firearms with regard to the hazards and types of hearing protection to prevent NIHL. ☻

*Michael Stewart, PhD, is a professor of audiology, Lauren Foley, BS, is an AuD student, and Mark Lehman, PhD, is a professor of speech-language pathology in the Department of Communication Disorders at Central Michigan University. Andrea Gerlach, AuD, is the territory manager at Phonak Hearing Systems, Dallas, TX.*

## References

American Speech-Language-Hearing Association (ASHA). *Tinnitus.* www.asha.org/public/hearing/disorders/tinnitus.htm. Accessed January 25, 2011.

Axelsson A, Barrenas ML. (1992) Tinnitus in noise-induced hearing loss. In: Dancer AL, Henderson D, Salvi RJ, Hamnernik RP, eds. *Noise-Induced Hearing Loss.* St. Louis, MO: Mosby-Year Book, 269–276.

Bauer CA, Brozoski TJ. (2008) Tinnitus assessment and treatment: integrating clinical experience with the basic science of tinnitus. *Semin Hear* 29(4):371–385.

Chan PC, Ho KH, Kan KK, Stuhmiller JH, Mayorga MA. (2001) Evaluation of impulse noise criteria using human volunteer data. *J Acoust Soc Am* 110(4):1967–1975.

Clark WW. (1991) Noise exposure from leisure activities: a review. *J Acoust Soc Am* 90(1):175–181.

Coles RRA, Garinther GR, Rice CG, Hodge DC. (1967) Criteria for assessing hearing damage risk from impulse-noise exposure, Technical Memorandum:13–67. Human Engineering Laboratories, Aberdeen Proving Ground, Maryland.

Committee on Hearing, Bioacoustics, and Biomechanics (CHABA). (1968) *Proposed Damage-Risk Criterion for Impulse Noise (Gunfire),* Report of Working Group 57, National Academy of Sciences, National Research Council, Washington, DC.



## Also of Interest

*Facts About Noise-Induced Hearing Loss*

Log in to www.audiology.org and search key words "fact sheets NIHL."

APPX.432

Cox H, Ford GR. (1995) Hearing loss associated with weapons noise exposure—when to investigate an asymmetrical loss. *J Laryngol Otol* 109(4):291–295.

Dancer A, Grateau P, Cabanis A, Vaillant T, Lafont D. (1991) Delayed temporary threshold shift induced by impulse noise (weapon noise) in men. *Int J Audiol* 30(6):345–356.

Dawes PJ, Welch D. (2010) Childhood hearing and its relationship with tinnitus at thirty-two years of age. *Ann Otol Rhinol Laryngol* 119(10):672–676.

Eggermont JJ, Roberts LE. (2004) The neuroscience of tinnitus. Abstract. *Trends Neurosci* 27(11):676–682.

Flamme GA, Wong A, Liebe K, Lynd J. (2009) Estimates of the auditory risk from outdoor impulse noise II: civilian firearms. *Noise Health* 11(45):231–242.

Henry JA, Dennis KC, Schechter MA. (2005) General review of tinnitus: prevalence, mechanisms, effects, and management. *J Speech Lang Hear Res* 48(5):1204–1235.

Kardous CA, Willson RD, Hayden CS, Szlapa P, Murphy WJ, Reeves ER. (2003) Noise exposure assessment and abatement strategies at an indoor firing range. *Appl Occup Environ Hyg* 18(8):629–636.

Kryter KD. (1991) Hearing loss from gun and railroad noise-relations with ISO standard 1999. *J Acoust Soc Am* 90(6):3180–3195.

Martin B. (2009) Tinnitus Simulator. MP3 audio file. http://nhca.affiniscape.com/displaycommon.cfm?an=1&subarticlenbr=11.

Mazurek B, Olze H, Haupt H, Szczepek AJ. (2010) The more the worse: the grade of noise-induced hearing loss associates with the severity of tinnitus. *Int J Environ Res Public Health* 7(8):3071–3079.

Moller AR. (2007) Tinnitus: presence and future. *Prog Brain Res* 166:3–16.

Murphy WJ, Tubbs RL. (2007) Assessment of noise exposure for indoor firing ranges. *J Occup Environ Hyg* 4(9):3180–3195.

Nakayama JR, Stewart M, Lehman ME. (2008) Demographic risk patterns and shooting behaviors of female recreational firearm users. Abstract. *NHCA Spectrum* 25(1):29.

National Institute of Safety and Health (NIOSH). (2010) Hearing Loss Simulator (Version 3.01215). Software. www.cdc.gov/niosh/mining/products/product47.htm.

National Shooting Sports Foundation. (2009) *2009 NSGA shooting sports participation*. NSSF Research Department. Newtown, CT.

National Shooting Sports Foundation. (2010) *Families Afield: An Initiative for the Future of Hunting*. www.familiesafield.org/pdf/familiesafield_report.pdf.

Nondahl DM, Cruickshanks KJ, Wiley TL, Klein R, Klein BE, Tweed TS. (2000) Recreational firearm use and hearing loss. *Arch Fam Med* 9(4):352–357.

Odess JS. (1972) Acoustic trauma of sportsman hunter due to gun firing. *Laryngoscope* 82(11):1971–1989.



Versatile, High Performance
**AUDIOMETRIC ROOMS**
**The CL Series** feature Eckel's unique cam-lock panel design, ensuring the necessary sound isolation for reliable audiological measurements • eight models • excellent visibility • easy access • comfortable to use • simple to install • in-place lighting and jack panel.
**ECKEL INDUSTRIES**
Morrisburg, ON K0C 1X0 – eckel@eckel.ca
Cambridge, MA 02138 – eckel@eckelusa.com
AudiologyNOW! 2011 – Booth #2775

Patterson JH, Hamernik RP. (1992) An experimental basis for the estimation of auditory system hazard following exposure to impulse noise. In: Dancer A, Henderson D, Salvi RJ, Hamernik RP, eds. *Noise-Induced Hearing Loss*. Philadelphia: B.C. Decker, 336–348.

Prosser S, Tartari MC, Arslan E. (1988) Hearing loss in sports hunters exposed to occupational noise. *Br J Audiol* 22(2):85–91.

Small Arms Survey. (2007) *Small Arms Survey 2007: Guns and the City*. Geneva, Switzerland: Cambridge University Press.

Smoorenburg G. (2003) *Risk of Hearing Loss from Exposure to Impulse Sounds*. Report No. RTO-TR-017. Brussels, Belgium: North Atlantic Treaty Organization (NATO).

Stewart M, Borer S, Lehman ME. (2009) Shooting habits of waterfowl hunters. *Noise and Health* 11(42):8–13.

Stewart M, Konkle DF, Simpson TH. (2001) The effect of recreational gunfire noise on hearing in workers exposed to occupational noise. *Ear Nose Throat J* 80(1):32–40.

Stewart M, Pankiw R, Lehman ME, Simpson TH. (2002) Hearing loss and hearing handicap in users of recreational firearms. *J Am Acad Audiol* 13(3):160–168.

U.S. Department of the Interior Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. (2006) *2006 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*. www.census.gov/prod/2008pubs/fhw06-nat.pdf.

Wagner A, Stewart M, Lehman ME. (2006) Risk patterns and shooting habits of recreational firearm users. In: Abstracts of the National Hearing Conservation Association Annual Conference 2006, Tampa, Florida. *NHCA Spectrum* 23(Suppl. 1):28.

Weissler PG, Kobal MT. (1974) Noise of police firearms. *J Acoust Soc Am* 56(5):1515–1522.

Ylikoski J. (1989) Acute acoustic trauma in Finnish conscripts. *Scand Audiol* 18(3):161–165.

Ylikoski J, Pekkarinen J, Starck J. (1987) The efficiency of earmuffs against impulse noise from firearms. *Scand Audiol* 16(2):85–88.

Ylikoski M, Ylikoski J. (1994) Hearing loss and handicap of professional soldiers exposed to gunfire noise. *Scand J Work Environ Health* 20(2):93–100.

# Appendix A
## Shooter Survey
### Department of Communication Disorders
### Central Michigan University

Age: _____ County of Residence: _____ Sex:   M ☐   F ☐
Occupation: _____ Do you work in loud noise?   Yes ☐   No ☐

**1.** Do you feel that noise from shooting a gun may cause hearing loss?
☐ Yes   ☐ No

**2.** Do you shoot:
☐ Right-handed   ☐ Left-handed

**3.** How many years have you been shooting guns?
_____ years

**4.** Which type of gun do you use the most for small game hunting?
Caliber/gauge _____
☐ Auto   ☐ Single/double barrel   ☐ Bolt   ☐ Pump
☐ Lever

APPX.434

**5.** Which type of gun do you use the most for large game hunting?
Caliber/gauge _____
☐ Auto   ☐ Single/double barrel   ☐ Bolt   ☐ Pump
☐ Lever

**6.** How many shots do you typically fire per year during target practice?
☐ 1–10   ☐ 11–50   ☐ 51–100   ☐ 101–150   ☐ 151–200
☐ 201+

**7.** What percentage of time do you use ear protection during target practice?
☐ 100%   ☐ 75%   ☐ 50%   ☐ 25%   ☐ 0%

**8.** Are you aware of the non-electronic type of hearing protection device used by the military to reduce loud sounds while allowing softer sounds to be heard?
☐ Yes   ☐ No

**9.** If you use ear protection during target practice, which type do you use?
☐ Plugs   ☐ Muffs   ☐ Plug/muff combo
☐ Electronic device   ☐ Military device

**10.** How many shots do you typically fire per year while hunting small game?
☐ 1–10   ☐ 11–50   ☐ 51–100   ☐ 101–150   ☐ 151–200
☐ 201+

**11.** How many shots do you typically fire per year while hunting large game?
☐ 1–10   ☐ 11–50   ☐ 51–100   ☐ 101–150   ☐ 151–200
☐ 201+

**12.** What percentage of time do you use ear protection while hunting?
☐ 100%   ☐ 75%   ☐ 50%   ☐ 25%   ☐ 0%

**13.** If you used ear protection while hunting, which type did you use?
☐ Plugs   ☐ Muffs   ☐ Plug/muff combo
☐ Electronic device   ☐ Military device

**14.** When hunting large game, what percentage of time do you shoot from an enclosed blind?
☐ 100%   ☐ 75%   ☐ 50%   ☐ 25%   ☐ 0%

**15.** How would you rate your hearing ability?

| Right Ear | Left Ear |
|---|---|
| ☐ Excellent | ☐ Excellent |
| ☐ Very good | ☐ Very good |
| ☐ Good | ☐ Good |
| ☐ Fair | ☐ Fair |
| ☐ Poor | ☐ Poor |

**16.** Do you wear hearing aids?
☐ Yes   ☐ No

If yes, which ear?
☐ Right   ☐ Left   ☐ Both

**17.** Do you notice constant or almost constant ringing in your ears?
☐ Yes   ☐ No

If yes, which ear?
☐ Right   ☐ Left   ☐ Both

**E.A.R. SOUND CHECKER™**
**Personal Sound Level Meter**

**Announcing new E.A.R. Sound Checker™** Protects hearing by easily checking surrounding decibel levels.

Just point the E.A.R. Sound Checker™ toward a sound source, press the button and three LED Lights indicate if sound levels are safe or dangerous, helping the user determine whether hearing protection should be worn.

Uses include shooting, music, dance clubs, military, law enforcement, industrial, sporting events, etc.

**Every hearing professional dealing with hearing loss should have one!**

**To order:**
**www.earinc.com**
**or call 800-525-2690.**

**EAR** inc
SPECIALIZED HEARING SYSTEMS

800-525-2690 ▪ www.earinc.com ▪ www.EARsoundchecker.com

**18.** If you experience ringing in your ears, at which level of annoyance do you find it:
☐ Severely  ☐ Moderately  ☐ Mildly

**19.** Do you ever notice ringing or an increase of ringing in your ears after shooting?
☐ Yes  ☐ No

  If yes, how many times in the past year?
  _____ times

**20.** List all guns you've shot in the past year *without* wearing hearing protection. List the bore size and whether the gun is a rifle, shotgun, carbine, or pistol. Check the number of shots that you take per year with each gun.

Gun #1: _____
Number of shots per year without protection:
☐ 1–10  ☐ 11–50  ☐ 51–100  ☐ 101–150  ☐ 151–200
☐ 201+

Gun #2: _____
Number of shots per year without protection:
☐ 1–10  ☐ 11–50  ☐ 51–100  ☐ 101–150  ☐ 151–200
☐ 201+

Gun #3: _____
Number of shots per year without protection:
☐ 1–10  ☐ 11–50  ☐ 51–100  ☐ 101–150  ☐ 151–200
☐ 201+



**You can have confidence in the OAE capabilities and reliability of the Echoport**

NOW WITH INDUSTRY LEADING PROTECTION
3 year Warranty

The #1 choice for clinical OAE testing, the **ILO292 DP Echoport** provides all the OAE tests you need:

Full screen analysis for **TEOAE**, **DPOAE**, **Contralateral Suppression**, **Spontaneous OAEs**, optimized **DP Growth** and **Binaural Stimulation**.

It also helps to know that you can safely rely on the most trouble-free system in the industry.

**No breakdowns ... No worries!**

# Otodynamics



Booth 2655


Otodynamics

www.otodynamics.com   1 800 659 7776

APPX.436

No External Use or Transfer (Including AI-Based Technologies): The materials and content on this website are provided for personal, non-commercial transitory viewing only. You are prohibited from copying or transferring any materials or content accessed through this website into applications, software, bots, or websites which may allow third parties to retain or use the content, including but not limited to those using artificial intelligence-based technologies or infrastructure. Please see the Terms of Use for more information.

Search 🔍    🔒 **Login**    **Join Us**

 **AMERICAN ACADEMY OF OTOLARYNGOLOGY–HEAD AND NECK SURGERY®**

← **ALL RESOURCES**

# Suppressors for Hearing Preservation

NOVEMBER 18, 2024

  

Sound suppressors are mechanical devices attached to the barrel of a firearm designed to reduce harmful impulse noise of firearms at its source. CDC research has shown that "The only potentially effective noise control method to reduce [shooters'] noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel."[1]  Suppressors reduce muzzle blast noise by up to 30 dB.[2] Their benefit is additive when used with ear-level hearing protection devices such as circumaural muffs or ear plugs.[3] The American Academy of Otolaryngology-Head and Neck Surgery endorses the use of firearm suppressors as an effective method of reducing the risk of hearing loss, especially when used in conjunction with conventional hearing protective measures.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. No cookies are used for advertisement purposes nor shared with third parties. By clicking "Accept", you consent to the use of ALL the cookies.

Cookie settings     Accept

Chen L, Brueck SE. Noise and Lead Exposures at an Outdoor Firing Range —



California.*Health Hazard Evaluation Report* HETA 2011-0069-3140:5:5.

2. Branch M,"Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use", *Otolaryngology-Head and Neck Surgery*, 144(6): 950-953.

3. Heiman D, et al., ibid; Le Prell CG. Sound level suppressors for firearm noise reduction: Implications for hearing conservation. *Hearing Review*. 2017;24(12):26-30

**Important Disclaimer Notice (Updated 7/31/14)**

Position statements are approved by the American Academy of Otolaryngology–Head and Neck Surgery or Foundation (AAO-HNS/F) Boards of Directors and are typically generated from AAO-HNS/F committees. Once approved by the Academy or Foundation Board of Directors, they become official position statements and are added to the existing position statement library. In no sense do they represent a standard of care. The applicability of position statements, as guidance for a procedure, must be determined by the responsible physician in light of all the circumstances presented by the individual patient. Adherence to these clinical position statements will not ensure successful treatment in every situation. As with all AAO-HNS/F guidance, this position statement should not be deemed inclusive of all proper treatment decisions or methods of care, nor exclusive of other treatment decisions or methods of care reasonably directed to obtaining the same results. Position statements are not intended to and should not be treated as legal, medical, or business advice.

## Related Content

### Position Statement: Botulinum Toxin Treatment

**POSITION STATEMENT**

I. Treatment of Spasmodic Dysphonia (Laryngeal Dystonia)The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS") considers Botulinum toxin a...

## Eustachian Tube Balloon Dilation in the Pediatric Population

**POSITION STATEMENT**

The American Academy of Otolaryngology-Head and Neck Surgery considers Eustachian Tube Balloon Dilatation (ETBD) as appropriate treatment for pediatric...

## Position Statement: Vestibular Rehabilitation

**POSITION STATEMENT**

Vestibular rehabilitation, or Balance Retraining Therapy, is a scientifically based and clinically valid therapeutic modality for the treatment of...



**AAO-HNS Foundation**

**ENT Careers**

**Industry Programs**

**Newsroom**

**OTO Store**

**Calendar**

**Contact Us**

1650 Diagonal Rd
Alexandria VA 22314

1-703-836-4444

© COPYRIGHT 2025 AMERICAN ACADEMY OF OTOLARYNGOLOGY — HEAD AND NECK SURGERY

PRIVACY POLICY

TERMS OF USE

ACCESSIBILITY POLICY

CIGNA TRANSPARENCY IN COVERAGE MRF

BUILT BY
SOCIAL DRIVER

# Federal Firearms Regulations
**_____**

## Options to Reduce or Modify Firearms Regulations



# White Paper
### (Not for public distribution)

### Ronald Turk
### Associate Deputy Director (Chief Operating Officer)
### Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

### 20 Jan 2017

*"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."*

Second Amendment to the United States Constitution

## Executive Summary:

ATF is the only Federal law enforcement agency with a primary mission that directly involves an Amendment to the United States Constitution.  Thus, our actions and policies are appropriately subjected to intense review and scrutiny.  This paper serves to provide the new Administration and the Bureau multiple options to consider and discuss regarding firearms regulations specific to ATF.  These general thoughts provide potential ways to reduce or modify regulations, or suggest changes that promote commerce and defend the Second Amendment without significant negative impact on ATF's mission to fight violent firearms crime and regulate the firearms industry.  This white paper is intended to provide ideas and provoke conversation; it is not guidance or policy of any kind.

ATF's enforcement and regulatory efforts are focused on reducing violence and increasing public safety.  Positive steps to further reduce gun violence through enforcement or regulation are extremely important but are not the focus of this paper.

## Points for Discussion:

1. **New Federal Firearms Licensees (FFL) Dealing Exclusively at Gun Shows (or internet):**
   For over two years representatives within the firearms licensing community have asked for clarification and/or a decision from ATF regarding new FFL applicants requesting to conduct business solely at gun shows.  ATF has delayed a decision or guidance due to several concerns including what it means to be "engaged in the business" of selling firearms, and ATF's ability to have access to a dealer's records where they may not have routine business hours.  ATF has already recognized FFL activities via the internet without a classic "storefront" and is considering whether to include gun show only activities in a similar manner.  The marketplace has changed significantly in recent years, and ATF's guidance to FFLs on these issues has not kept pace with developments in commerce.  Classic "brick and mortar" storefronts with an on-hand inventory and set "front-door" business hours often no longer apply in today's modern marketplace.  A question remains as to whether ATF should consider simply changing past policy or initiate a lengthy regulation rule change process.  There is ample room for immediate action on this issue.  ATF can simply issue new guidance immediately and adjust past

2

policy to allow for a business to obtain a license with the primary intention of selling firearms with the transfer occurring at a location other than the business's physical premises (whether at guns shows, over the internet, or elsewhere).  This practice has in fact already been taking place, and ATF has provided guidance to FFLs allowing such activity with regards to internet only sales.  Provided the business is established at a location in full compliance with state and local laws/ordinances and the business is reasonably inspectable by ATF at an established business location, limited or no actual sales out the business's front door should not be an issue.

If a formal regulation rule change is needed for long-term clarification, ATF can start that process while immediately issuing a policy change to the above practice which would have no negative impact to public safety.  In fact, it would encourage more sales and business through a licensee, including background checks on sales at gun show events, and likely increase public safety.  Several national gun show promoters prefer to have licensees at their shows, which also somewhat reduces the so-called "gun show loophole" concerns some have expressed about such venues.

ATF recently issued guidance regarding what it means to be "engaged in the business" and indicated that:

> *"A person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted. For example, a person can be engaged in the business of dealing in firearms even if the person only conducts firearm transactions at gun shows or through the internet."*

Thus, by establishing that persons can be required to obtain a license to sell only at gun shows, ATF must provide reasonable means for businesses to obtain a license.  ATF can provide guidance to the public for gun show-only dealers similar that which was posted for internet-only firearms dealers.  There is no apparent downside to such a proposal, and in fact public safety is enhanced.

2. **Armor Piercing Ammunition:** ATF has regulatory authority to classify what is and is not armor piercing (AP) ammunition.  Several major ammunition manufacturing companies have had requests pending for years to produce AP ammunition (AP ammo or ammo) which is not intended for use in a handgun and potentially lawful under Federal law.  In 2014, ATF proposed a framework that would have provided a transparent and fair review process for these applications, and would have resulted in the approval of many of the long-pending requests.  The framework, however, also would have withdrawn the 5.56 "green tip" AP ammo exemption that has existed since 1986.  The withdrawal of the exemption created controversy that ultimately stalled all AP ammo classification decisions.  Since that time, ATF has been asked to hold off on any AP ammo

determinations.  Continued inaction on these requests poses significant litigation and reputational risks to ATF.  ATF can readily mitigate these risks by using the criteria established in the framework to process and approve many of the applications, while leaving the 5.56 "green tip" AP ammunition exemption intact.  Moving forward with approval of these applications is consistent with the statutory goal of protecting the public and law enforcement because, consistent with the statutory exemption, the projectiles involved are not associated with criminal use, but instead are clearly designed and intended for hunting and sporting purposes (the projectiles/calibers at issue will generally penetrate body armor regardless of whether AP-classified metals are used in the manufacturing process).  If decisional restrictions were removed, ATF could readily apply drafted standards for reviewing AP ammo requests while leaving the 5.56 "green tip" AP ammo exemption intact.  Many of the industries' pending requests could be decided in a timely manner, meeting both statutory requirements and safety concerns within the law.

3. **Re-importation of Certain Department of Defense Surplus Firearms from Foreign Countries:**  The State Department and ATF have worked over the past several years with the Administration on requests for the importation of U.S. origin military firearms, ammunition, and parts that were once sent overseas to support allies.  There are surplus rifles, pistols, ammunition, and other importable U.S. origin Curio and Relic (C&R) defense articles (including M1 Garand and Carbine rifles) and pistols (M1911) overseas awaiting importation authority.  There is no clear public safety reason why taxpayer-funded US-origin C&R defense articles should be denied re-importation to the American public, while many non-U.S.- origin C&R items are approved.  Additionally, these items do not represent any discernable public safety concern, as demand lies with collectors of vintage military firearms.  Importation and sale through licensed dealers would effectively regulate the lawful transfer of these firearms through a licensee and a background check.  Joint effort from the Administration, State Department, and ATF could easily reverse past decisions and allow for the safe and legal importation and sale of these historical and collectible items.  Many M1 Garand rifles have been approved for importation in the past, setting precedence for this to occur.  The more recent denials were in part due to perceived potential that they may be used in crimes, for which there is little, if any, evidence for such a concern.

4. **Title 18, United States Code (U.S.C.), Section 922(o):**  Current law precludes FFLs who are registered Special Occupational Taxpayers (FFL/SOT) from transferring machineguns manufactured post-1986 unless they are for export or for law enforcement/government use; and there is no provision for the transfer from one FFL/SOT to another.  This is somewhat detrimental to FFL/SOTs operating within the small, but useful, Department of Defense-supported industry and theatrical armorer community.  One option, if supported by the Department of Justice (DOJ), would be to re-institute ATF's ability to

4

provide variances to licensees, as ATF has done in the past, that would adequately provide form transfers within defense industry FFLs and avoid a requirement to change the statute. Use of variances in a consistent and fair process within the limited DoD-supported FFL/SOT community would be viewed favorably by the industry and have no impact on public safety.

5. **Firearm Arm or Stabilizing Brace:** Manufacturers have produced an arm brace or stabilizing brace which is designed to strap a handgun to a forearm to allow a disabled shooter to fire the firearm. ATF determined that the brace was not a stock, and therefore its attachment to a handgun did not constitute the making of a short-barreled rifle or "any other firearm" under the National Firearms Act (NFA). (NFA classification subjects the product to a tax and registration requirement.) In the determination letter, however, ATF indicated that if the brace was held to the shoulder and used as a stock, such use would constitute a "redesign" that would result in classification of the brace/handgun combination as an NFA firearm (i.e., the "use" would be a "redesign" and making of a short-barreled rifle). ATF has not made another NFA determination where a shooter's use alone was deemed be a "redesign" of the product/firearm resulting in an NFA classification. This ruling has caused confusion and concern among firearm manufacturers, dealers, and consumers about the extent to which unintended use of a product may be a basis for NFA classification. To mitigate this confusion and concern, ATF could amend the determination letter to remove the language indicating that simple use of a product for a purpose other than intended by the manufacturer – without additional proof or redesign – may result in re-classification as an NFA weapon. While many at ATF are concerned about manufacturing processes continuing to push the boundaries between a Gun Control Act (GCA) and an NFA firearm, ATF has a relatively consistent history of what crosses the line between GCA and NFA firearms with which to draw from, and still maintains the ability to exercise good judgement with future requests based upon the firearm's individual characteristics.

6. **Reissue a New Sporting Purpose Study:** Since the sunset of the Assault Weapons ban in 2004, the use of AR-15s, AK-style, and similar rifles now commonly referred to as "modern sporting rifles" has increased exponentially in sport shooting. These firearm types are now standard for hunting activities. ATF could re-examine its almost 20-year-old study to bring it up to date with the sport shooting landscape of today, which is vastly different than what it was years ago. Action shooting sports and organizations such as 3 Gun and the United States Practical Shooting Association (USPSA) have also drastically expanded in recent years. Restriction on imports serves questionable public safety interests, as these rifles are already generally legally available for manufacture and ownership in the United States. Low cost foreign made firearms are also still imported and converted into "non-sporting" configurations. These restrictions have placed many limitations on importers, while at the same time imposing a heavy

5

workload on ATF's Firearms and Ammunition Technology Division.  ATF's Imports Branch also possesses a list of firearms approved for import but has not made this list public. Lists such as this can be made available to the public so that the importing community does not have to guess as to what the standard for importation is. Many concerns from the firearms industry could be re-examined through the publication of a new Sporting Purpose Study along with an updated Imports Branch Guide.

7. **Creation of a Database of Agency Rulings:**  ATF lacks a consistent internal database to maintain and readily access private letters and ruling.  The public also has no direct access to public rulings in a manageable format.  The inability to access these rulings can create inconsistent agency interpretations of agency guidance.  ATF can create a retrievable database for internal use that includes access by the public for open rulings.

8. **Silencers:**  Current Federal law requires ATF to regulate silencers under the NFA.  This requires a Federal tax payment of $200 for transfers, ATF approval, and entry of the silencer into a national NFA database.  In the past several years, opinions about silencers have changed across the United States.  Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.  At present, 42 states generally allow silencers to be used for sporting purposes.  The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country.  This surge in demand has caused ATF to have a significant backlog on silencer applications.  ATF's processing time is now approximately 8 months.  ATF has devoted substantial resources in attempts to reduce processing times, spending over $1 million annually in overtime and temporary duty expenses, and dedicating over 33 additional full-time and contract positions since 2011 to support NFA processing.  Despite these efforts, NFA processing times are widely viewed by applicants and the industry as far too long, resulting in numerous complaints to Congress.  Since silencers account for the vast majority of NFA applications, the most direct way to reduce processing times is to reduce the number of silencer applications.  In light of the expanding demand and acceptance of silencers, however, that volume is unlikely to diminish unless they are removed from the NFA.  While DOJ and ATF have historically not supported removal of items from the NFA, the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the NFA is archaic and historical reluctance to removing them from the NFA should be reevaluated.  ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the NFA.  On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions.  Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings.  Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not

6

be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the GCA.

If such a change were to be considered, a revision in the definition of a silencer would be important.  The current definition of a silencer extends to "any combination of [silencer] parts," as well as "any part intended only for use in" a silencer.  Compared to the definition of a firearm, which specifies the frame or receiver is the key regulated part, any individual silencer part is generally regulated just as if it were a completed silencer.  Revising the definition could eliminate many of the current issues encountered by silencer manufacturers and their parts suppliers.  Specifically, clarifying when a part or combination of parts meets a minimum threshold requiring serialization would be useful.

9. **Firearms Industry Proposals to Allow for Interstate Sale of Firearms at Gun Shows:**  18 U.S.C. 923(j) and supporting regulations prohibit FFLs from conducting firearms sales outside the state in which they are licensed and reside.  Many FFLs would like to be able to travel to other states to venues like a gun show and conduct business.  ATF currently allows an FFL to travel to another state, display firearms for sale and take orders, but not to transfer firearms on-site (this must take place back at the FFL's business location in their home state, and only to a resident of their home state).  Similarly, FFLs can transfer firearms out of state to another licensee under an "advance consignment" before the gun show to the out-of-state licensee in a somewhat convoluted process where the traveling/transferring FFL is no longer making the sale.  ATF and DOJ have historically opposed removal of the statutory restriction on direct interstate firearm sales by FFLs.  Further discussion would be beneficial.  A change that could allow FFLs to operate at out-of-state gun shows (where also allowed by individual state laws) would have no detrimental effect on public safety and still provide ATF a means to trace firearms.  It would also be viewed favorably by the broader firearms community.  Since an FFL has a license, maintains records, and conducts background checks for sales, provided they are in compliance with State and local laws, there is no apparent harm or risk to public safety in allowing them to do so, but not for the current statute and interpretation requiring in-state only sales.  Sales would be documented and traceable, and a background check would be completed.

10. **Destructive Devices**: The current definitions for destructive devices under both the NFA (26 U.S.C., 5845(f)) and the GCA (18 U.S.C., 921(a)(4)), and applicable controls, do not differentiate between destructive device launchers and destructive device munitions. Applicable regulatory and statutory controls under the GCA and NFA are focused on multi-use objects, such as typical long guns or machine guns, not single-use, expendable munitions which are also subject to the Safe Explosives Act.  The customer base for destructive device munitions is very limited—the U.S. DoD, foreign governments as

7

approved by the Directorate of Defense Trade Controls (DDTC) under current export policy, and small numbers of other destructive device launcher and/or munitions manufacturers for use in research, testing, or assistance in United States Government /foreign contract fulfillment.  In addition, the cost of munitions production runs, safety, and contract fulfillment requirements such as applicable DoD marking requirements necessitate, at a minimum, different standards for marking munitions than are possible for launchers.  This includes marking by lot numbers and having multiple dispositions against a single lot number.  There are several different ways to revise applicable controls to help solve these issues, as being currently discussed by ATF and destructive device munitions industry members.  ATF should continue to discuss these issues with leadership and the industry to explore changes that would be useful to the defense munitions industry and have discernable impact on public safety or ATF's ability to regulate them.

11. **Demand Letter 2 (DL 2):**  An ATF regulation currently provides that all FFLs that have had 10 or more guns with a time-to-crime of 3 years or less traced to them in the previous year must provide ATF with copies of limited information from used firearms they acquired in that previous year.  This equates to limited "used" or "gray market" gun information (no purchaser information is directly stored by ATF, only gun information) that can be used to expand the success rate of traces for secondary market firearms.  This information can be useful to further crime gun trace capabilities by creating a pointer to allow for a more current firearms trace to a secondary purchaser.  ATF originally set the threshold for DL2 reporting at 25 firearms, but later reduced that number to 10 firearms.  ATF is currently re-examining the program and anticipates a change to the number (somewhere in the vicinity of 15 or more) based on trend and data analysis.  Some have argued that DL 2 creates a burden on firearms dealers to provide ATF information on used firearms that may become, but are not necessarily, crime guns.  An increase in the firearms requirement above 10 would likely have a positive impact on the firearms industry and still meet program objectives.  ATF should continue to examine data to determine where the appropriate number of firearms lies to best manage this program.

12. **Demand Letter 3 (DL 3):**  Via regulation ATF currently requires FFLs in several southwest border states to record and submit multiple sales records for certain semi-automatic rifles capable of shooting with a detached magazine (although not defined as such by law or regulation, this applies to the sale of more than one rifle commonly referred to as "modern sporting rifles," sold to the same person at the same time).  This requirement came into effect several years ago in an attempt to curb the flow of rifles from commerce to the criminal element via illegal firearms trafficking into Mexico and South America.  There are examples where this regulation has proven effective and may provide a deterrent effect.  Over the past 5 years, ATF has over 40,000 multiple sales

reports involving over 90,000 rifles; opened over 300 investigations, and recommended approximately 374 defendants for prosecution. DL 3 places some burden on the firearms industry via reporting requirements. The elimination of DL 3 could have a detrimental effect on ATF's criminal enforcement mission based on the numbers of investigations and defendants seen to date, but can be further discussed regarding utility and impact.

13. **Pending ATF Regulation Regarding FFL Records Retention (20 years):** ATF has a regulation pending at DOJ to increase the requirements for FFLs to retain records indefinitely. The current standard is 20 years, and records older than 20 years can be destroyed. The intent of the change from 20 years to indefinite retention is to provide access to records for firearms traces over longer periods of time. However, many argue that crime guns are not frequently recovered with times to crimes from purchases over 20 years old. Also, older firearms possessed by criminals frequently transfer hands several times and a trace will often not lead to the criminal after so much time has passed. ATF has averaged approximately 1,200 failed traces a year over the past 5 years due to records destruction, accounting for less than one half of one percent of traces conducted nationally each year. While such an extension is arguably a viable law enforcement intelligence tool, much of the firearms industry is opposed to such a change and a closer review of this proposal could be beneficial.

14. **Expanding Permissive Use of NICS Checks by FFL Holders:** Standard pre-employment background checks frequently do not reveal that a person is firearms-disabled. Other than requiring potential new-hires to purchase a firearm, licensees, in particular large retailers, are frequently unable to determine that an employee cannot be involved in firearms operations. Retailers would appreciate the ability to run a NICS check on current employees or potential new hires to ascertain whether they can legally fulfill their job requirements. A key aspect of this proposal is that it would be entirely elective; if the Federal Bureau of Investigation (FBI), ATF and others all concurred with this slight expansion of the use of NICS, there would be no mandate that licensees perform a NICS check on all employees. Keeping the expansion of the system limited to elective employee checks will prevent any significant increase in cost to the FBI or ATF (in terms of running background checks or expanding regulatory enforcement), while it will enable FFLs to increase their compliance with existing regulations and help ensure firearms-disabled personnel do not have easy access to firearms. Businesses could also be required to certify that permissive NICS checks were only used on impacted employees or face sanctions for misuse of the system.

15. **Need for an ATF Confirmed Director:** Since moving from the Department of Treasury to the DOJ in 2003, ATF has had only one Senate-confirmed Director. The agency needs a presidentially nominated, Senate-confirmed Director who has the support and backing

9

of the Administration to lead ATF.  This will enable the agency to be fully in sync with leadership, and maximize the agency's potential regarding priorities, budgets, and support.

16. **Old Regulations Under Review for Possible Removal or Amendment:**  Below is a list of the firearms and explosives regulations that are currently under review.  They are likely no longer applicable (or portions of which are no longer applicable), and may be removed as part of a final rule to remove expired regulations. [1]

    a.  478.40 – Assault Weapons ban
    b.  478.40a – prohibition language for assault weapons
    c.  478.57(b) and (c) – assault weapons and large capacity magazines
    d.  478.92 (portions) – AP ammo and large capacity magazines
    e.  478.116 (portions) – importing large capacity magazines
    f.  478.119 – importing large capacity magazines and feeding devices (belts, drums, strips…)
    g.  478.132 – records keeping for large capacity feeding devices sold to law enforcement
    h.  478.153 – request for large capacity magazines and feeding devices for manufacturer testing
    i.  478.171 (portions) – exporting AP ammo and semi auto assault weapons
    j.  479.32(a) and (c) – reduced importer/manufacturer tax rate 1988; short taxable year standards
    k.  555.11 (portions) – obsolete dates; commerce in explosives
    l.  555.27 (portions) - obsolete dates; explosives background checks
    m.  555.33 (portions) - obsolete dates; licensees and permittees general explosives
    n.  555.41 (portions) - obsolete dates; licenses and permits general explosives
    o.  555.45 (portions) - obsolete dates;  licenses and permits general explosives
    p.  555.49 (portions) - obsolete dates; issuance of licenses and permits
    q.  555.51 (portions) - obsolete dates; duration of licenses and permits
    r.  555.57 (portions) - obsolete dates; change of control, RP's and employees
    s.  555.102 (portions) - obsolete dates; authorized operations by permittees
    t.  555.103 (portions) - obsolete dates; transactions between licensees and permittees
    u.  555.105 (portions) - obsolete dates; distribution to non licensees and non permittees
    v.  555.125 (portions) - obsolete dates; records maintained by permittees
    w.  555.126 (portions) - obsolete dates; transaction records
    x.  555.142 (portions) - obsolete dates; relief from disabilities
    y.  555.201 (portions) - obsolete dates; storage
    z.  555.224 (portions) - obsolete dates; table of distances

---

[1] This list was produced by ATF's Enforcement Programs and Services Directorate

## Conclusions:

There are many regulatory changes or modifications that can be made by or through ATF that would have an immediate, positive impact on commerce and industry without significantly hindering ATFs mission or adversely affecting public safety.  There are also areas where adjustments to policy or processes could improve ATF operations.  Alleviating some of these concerns would continue to support ATF's relationships across the firearms and sporting industry, and allow ATF to further focus precious personnel and resources on the mission to combat gun violence.

In addition to these points of discussion, it is vital for ATF to find resources to refresh aging technology and systems that support law enforcement and the firearms industry.  Functionality at ATF's Martinsburg facility and other areas has been severely hampered by outdated technology and systems that negatively impact ATF's ability to provide services and information.

***Note:***   *The opinions expressed within this white paper are not those of the ATF; they are merely the ideas and opinions of this writer.  They are provided for internal use within ATF and DOJ and not intended to be public.  They are also general thoughts that cannot be taken as exacting language regarding policy or quotable specifics.  Additional specific details can be provided to further these general discussions.*

*The men and women of ATF are overwhelmingly a fantastic group of hard working civil servants who look to reduce violent crime and ensure public safety.  The focus on combating gun violence is key.  Fairly regulating the firearms and explosives industries is also important.  As the firearms conversations take place over the next few months and years, this paper is offered to provide informal insight on potential productive ways to limit regulation and continue to protect our Second Amendment freedoms, while focusing on ATF's mission to protect our nation.*

X _____
  Ronald Turk

11

1
Shares

## Why SBRs Are Becoming Popular for Home Defense

04 **FEBRUARY** 2025

 

Short Barrel Rifles (SBRs) are quickly becoming a top choice for home defense due to their unique advantages over traditional rifles. One of the primary reasons for their rise in popularity is their compact size. SBRs offer the stopping power of a full-sized rifle but are much easier to maneuver in tight spaces, making them ideal for home defense situations. Their shorter barrel allows for faster handling around corners and in confined areas, which is crucial when protecting your home.

Another reason SBRs are becoming increasingly popular is the availability of rifle accessories in Las Vegas, Nevada. With the growing demand for SBRs, firearm owners can now find a wide variety of accessories tailored to these firearms, enhancing both comfort and performance. Upgrades like collapsible stocks, foregrips, and red dot sights are some of the popular choices that make these firearms even more versatile for home defense.

For those interested in SBRs, it's important to understand the process of acquiring class 3 firearms in Nevada. These firearms require a special tax stamp from the ATF, and their ownership is subject to strict regulations. However, the benefits they offer in terms of maneuverability and control often outweigh the complexity of the process for home defense enthusiasts.

When considering a firearm for home defense, it's essential to also focus on ammunition in Nevada. For SBRs, the right ammo ensures maximum stopping power while minimizing over-penetration. Using the proper ammunition allows for both accuracy and safety, which is a top priority when defending your home.

Finally, investing in the right firearm gear is essential for maximizing the performance and reliability of your SBR. Quality gear like tactical slings, holsters, and protective gear can make all the difference in a high-stress defense situation. Interested in SBRs for home defense? Contact **SUMMERLIN ARMORYM** for expert guidance on firearms, rifle accessories, and more.

This entry was posted in **Short Barrel Rifles** and tagged **Defense Firearm**, **Rifle Tips**, **Tactical Gear Protection**. Bookmark the **permalink**.

### RELATED POSTS:

No Related Posts Found



                        

(702) 485-5016
8840 W. RUSSELL ROAD, SUITE 235
LAS VEGAS, NV 89148

Business Hours:

Monday - Saturday 10AM to 5PM
Sunday Closed



ARMED AND CONSIDERED DANGEROUS

New Second Edition

JAMES D. WRIGHT
PETER H. ROSSI

with a new introduction by
James D. Wright and
Nicholas E. Libby

# ARMED AND CONSIDERED DANGEROUS

## New Second Edition

## JAMES D. WRIGHT
## PETER H. ROSSI

with a new introduction by
**James D. Wright and
Nicholas E. Libby**





**AldineTransaction**
*A Division of Transaction Publishers*
New Brunswick (U.S.A.) and London (U.K.)

New material this edition © 2008 by Transaction Publishers, New Brunswick, New Jersey. Originally published in 1986 by Aldine de Gruyter.

Preface to the Expanded Edition © 1994 by James D. Wright.
Copyright © 1986 by James D. Wright and Peter H. Rossi.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without prior permission in writing from the publisher. All inquiries should be addressed to AldineTransaction, A Division of Transaction Publishers, Rutgers—The State University, 35 Berrue Circle, Piscataway, New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 2007046172
ISBN: 978-0-202-36242-7
Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Wright, James D.
    Armed and considered dangerous / James D. Wright and Peter H. Rossi; with a new introduction by James D. Wright and Nicholas E. Libby. — New 2nd ed.
        p. cm.
    A reissue of the 1994 ed., with a new introduction.
    Includes bibliographical references and index.
    ISBN 978-0-202-36242-7
        1. Gun control--United States. 2. Firearms and crime--United States.
    I. Rossi, Peter H. (Peter Henry), 1921-2006. II. Title.

HV7436.W75 2008
363.4'50973--dc22

                                                        2007046172

**TABLE 4.5.** How Guns Are Used in Crimes, Depending on
Whether or Not They Were Fired: Conviction
Offenses (in Percentages)[a]

| "How did you use the weapon?" | Was gun fired? | |
|---|---|---|
| | No | Yes |
| To scare victim | 89 | 45 |
| (N) = | (218) | (184) |
| To injure victim | 9 | 26 |
| (N) = | (218) | (184) |
| To kill victim | 3 | 36 |
| (N) = | (217) | (182) |
| To get away | 26 | 28 |
| (N) = | (218) | (184) |
| To protect myself | 31 | 48 |
| (N) = | (217) | (184) |

[a]Table is based on those who were armed with a gun at the
conviction offense and who used the gun to commit the offense.

armed with a gun during the conviction offense and who used their weapon
in some way to commit the offense, the men who actually fired the weapon
were much more likely to be doing time on aggravated assault charges than
those who did not fire (32 versus 13%); and likewise for homicide (40 ver-
sus 3%) and manslaughter (10 versus 1%). In contrast, the men who did
not fire were more likely to be in on a robbery charge (66 versus 37% of
those who did fire). Interestingly, being in on a weapon's charge was slightly
more common among those who did not fire (25%) than among those who
did (18%).

## PATTERNS OF WEAPONS USE: OTHER OFFENSES

We have already indicated that the conviction crime is, for most of these
men, only the most recent in a fairly long series of criminal activities. Not
all of the hard-core gun criminals in our sample were, in fact, armed dur-
ing the conviction offense; indeed, one in five of the two Predator groups
was not carrying a weapon at the time he was last arrested (one among
many reasons, incidentally, why the conviction offense per se is a rather
misleading indicator of the true nature of a person's criminal career).

Many of the questions asked about the conviction offense were also asked
about the more general use of weapons in committing crime; results from
these "more general" questions are analyzed in the present section. This
discussion adds some useful details to the portrait of criminal weapons in-
volvement and also provides an opportunity to replicate and refine some
of the patterns that have already emerged. Data are shown in Table 4.6.

These results are based on the series of questions following the initial

**TABLE 4.6.** Weapons Use in Crimes Other Than the Conviction Offense (in Percentages)

| | Gun criminals ($N=871$) | Armed— not with a gun— criminals ($N=177$) |
|---|---|---|
| 1. What kinds of gun(s) have you *ever* *used* to commit crimes? | | |
| Handgun | 90 | — |
| Sawed-off shotgun | 27 | — |
| Regular shotgun | 16 | — |
| Sawed-off rifle | 7 | — |
| Regular rifle | 10 | — |
| Zipgun (homemade) | 3 | — |
| All other | 4 | — |
| 2. What kind of weapons have you *ever* *used* to commit crimes? | | |
| Pocket knife | — | 34 |
| Switchblade | — | 13 |
| Buck knife | — | 38 |
| Hunting knife | — | 24 |
| Club | — | 34 |
| All other | — | 56 |
| 3. About how often were you armed . . . when you committed your crimes? | | |
| Only once | 26 | 38 |
| A few times | 34 | 33 |
| Many times | 14 | 6 |
| Most of the time | 16 | 11 |
| All of the time | 10 | 11 |
| $(N)=$ | (819) | (141) |
| 4. What kind of [weapon] have you used *most frequently* in committing crimes? | | |
| Handgun | 85 | — |
| Sawed-off shotgun | 9 | — |
| Regular shotgun | 3 | — |
| All other guns | 3 | — |
| Pocket knife | — | 23 |
| Buck knife | — | 24 |
| Club | — | 14 |
| All other non-gun | — | 40 |
| $(N)=$ | (797) | (118) |
| 5. When you committed crimes, did you have just a gun or did you usually carry other weapons as well? | | |
| Just a gun | 56 | — |
| Other weapons | 44 | — |
| $(N)=$ | (794) | — |
| What other kinds of weapons did you usually carry? | | |
| Pocket knife | 37 | — |
| Switchblade | 24 | — |

(*continued*)