**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| CHRIS BROWN, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 4:25-cv-1162 |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

BACKGROUND..............................................................................................................2

   I.    The National Firearms Act...........................................................................2

   II.   The One Big Beautiful Bill Act....................................................................5

   III.  This Lawsuit...............................................................................................5

LEGAL STANDARDS......................................................................................................5

ARGUMENT...................................................................................................................7

   I.    Plaintiffs lack Article III standing to challenge several NFA regulations.............................7

   II.   The Constitution empowers Congress to adopt the challenged NFA requirements.........................................................................9

        A.    The challenged NFA requirements remain a valid exercise of Congress's taxing power.........................................................9

        B.    Congress's power under the Commerce Clause independently authorizes the challenged NFA requirements.................................13

        C.    Congress's authority under the Necessary and Proper Clause further supports the challenged NFA requirements....................27

   III.  The challenged NFA requirements comport with the Second Amendment....................28

   IV.  Any relief should be narrowly tailored to redress only plaintiffs' actual injuries................32

CONCLUSION...............................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
  968 F. Supp. 2d 38 (D.D.C. 2013)............................................................35

*Andrews v. State,*
  50 Tenn. (3 Hesik.) 165 (1871) ...............................................................30

*Berry v. 21st Circuit Ct. of St. Louis Cnty.,*
  2020 WL 6798999 (E.D. Mo. Nov. 19, 2020)..........................................34

*Bianchi v. Brown,*
  111 F.4th 438 (4th Cir. 2024) ..................................................................30

*Blodgett v. Holden,*
  275 U.S. 142 (1927) ..................................................................................6

*Brown* v. *Maryland,*
  25 U.S (12 Wheat.) 419 (1827) ..................................................................6

*Burns Prescription Pharm, Inc. v. Express Scripts, Inc.,*
  2022 WL 17718616, (E.D. Mo. Dec. 15, 2022).......................................34

*Christian Lab. Ass'n v. City of Duluth,*
  142 F.4th 1107 (8th Cir. 2025) ...............................................................7, 8

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ....................................................................................8

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................................8

*Coal. of Clergy, Laws., & Professors v. Bush,*
  310 F.3d 1153 (9th Cir. 2002)...................................................................7

*Ctr. for Individual Freedom v. Carmouche,*
  449 F.3d 655 (5th Cir. 2006).....................................................................5

*Davis v. Colerain Township,*
  51 F.4th 164 (6th Cir. 2022).................................................................8, 9

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ......................................................................2, 28, 30

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................................7

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023)) ....................................................................................32-33

*Fife v. State*,
   31 Ark. 455 (1876) .........................................................................................................30

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank.*,
   527 U.S. 627 (1999) .......................................................................................................24

*Gill v. Whitford*,
   585 U.S. 48 (2018) .........................................................................................................33

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ....................................................................................................passim

*Groome Res. Ltd. v. Parish of Jefferson*,
   234 F.3d 192 (5th Cir. 2000) ...................................................................................13, 21

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) .......................................................................................................33

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) .......................................................................................................17

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*,
   740 F. Supp. 3d 509 (N.D. Tex. 2024) ..........................................................................24

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) ...................................................................................................13, 17

*Hollis v. Lynch*,
   121 F. Supp. 3d 617 (N.D. Tex. 2015) ..........................................................................20

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .......................................................................................................35

*Hunter v. United States*,
   73 F.3d 260 (9th Cir. 1996) ...........................................................................................11

*Johnson v. United States*,
   576 U.S. 591 (2015) .......................................................................................................29

*In re SuperValu, Inc.*,
   870 F.3d 763 (8th Cir. 2017) ...........................................................................................8

*Iowa Utils. Bd. v. FCC,*
    109 F.3d 418, 425 (8th Cir. 1996)............................................................................33

*John Doe Co. v. CFPB,*
    849 F.3d 1129, 1134 (D.C. Cir. 2017).....................................................................34

*Legal Tender Cases,*
    79 U.S. (12 Wall) 457 (1870) ...................................................................................22

*Lomont v. O'Neill,*
    285 F.3d 9 (D.C. Cir. 2002).........................................................................................2

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................................7, 8

*Mader v. United States,*
    654 F.3d 794 (8th Cir. 2011).....................................................................................27

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ..................................................................................................33

*Mandina v. United States,*
    472 F.2d 1110 (8th Cir. 1973)....................................................................................20

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ............................................................................22, 28

*Minor v. United States,*
    396 U.S. 87 (1969) ....................................................................................................23

*Mkt. Synergy Grp., Inc. v. U.S. Dep't of Lab.,*
    2016 WL 6948061 (D. Kan. Nov. 28, 2016)............................................................35

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023)...................................................................................3, 30

*Mont. Shooting Sports Ass'n v. Holder,*
    2010 WL 3926029 (D. Mont. Aug. 31, 2010)..........................................................20

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ....................................................................................................6

*Murthy v. Missouri,*
    603 U.S. 43 (2024).................................................................................................8, 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ......................................................................................................29

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................................*passim*

*Nigro v. United States,*
    276 U.S. 332 (1928) ..................................................................................23

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U.S. 1 (1937) ......................................................................................13

*Owner–Operator Indep. Drivers Ass'n v. DOT,*
    831 F.3d 961 (8th Cir. 2016) ....................................................................8

*Packard Elevator v. ICC,*
    782 F.2d 112 (8th Cir. 1986) ..............................................................33, 34

*Perez v. United States,*
    402 U.S. 146 (1971) ..................................................................................17

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583, 602 (8th Cir. 2022) ............................................................36

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) ....................................................................................6

*Royal Indem. Co. v. Werner,*
    784 F. Supp. 690 (E.D. Mo. Feb. 20, 1992) ............................................5

*Safari Club Int'l v. Jewell,*
    47 F. Supp. 3d 29 (D.D.C. 2014) ............................................................35

*Second Amend. Found., Inc v. ATF,*
    702 F. Supp. 3d 513 (N.D. Tex. 2023) ................................................29, 32

*Sinking-Fund Cases,*
    99 U.S. 700 (1878) ....................................................................................6

*Smith v. Bayer Corp.,*
    564 U.S. 299, 315 (2011) ..........................................................................36

*Sonzinsky v. United States,*
    300 U.S. 506 (1937) ..................................................................................*passim*

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ..................................................................................7

*State v. Kerner,*
    107 S.E. 222 (N.C. 1921) ..........................................................................30

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ................................................................................................................7

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .........................................................................................................8, 36

*Sunshine Anthracite Coal Co. v. Adkins,*
   310 U.S. 381 (1940) ...........................................................................................................28

*Trump v. CASA,*
   606 U.S. 831 (2025) ...............................................................................................32, 33, 36

*United States v. Adams,*
   914 F.3d 602 (8th Cir. 2019) ..............................................................................................16

*United States v. Aiken,*
   974 F.2d 446 (4th Cir. 1992) .........................................................................................11, 23

*United States v. Anderson,*
   771 F.3d 1064 (8th Cir. 2014) ............................................................................................27

*United States v. Ardoin,*
   19 F.3d 177 (5th Cir. 1994) ..........................................................................................15, 22

*United States v. Beaty,*
   2023 WL 9853255 n.11 (M.D. Fla. Jan. 20, 2023) ............................................................32

*United States v. Beuckelaere,*
   91 F.3d 781 (6th Cir. 1996) ................................................................................................15

*United States v. Burns,*
   2025 WL 2076468 (S.D. Miss. July 23, 2025) ..................................................................32

*United States v. Carmel,*
   548 F.3d 571 (7th Cir. 2008) ..............................................................................................11

*United States v. Clay,*
   128 F.4th 163 (3d Cir. 2025) ..............................................................................................24

*United States v. Comstock,*
   560 U.S. 126 (2010) .....................................................................................................22, 28

*United States v. Conner,*
   2025 WL 2858030 (W.D. Tex. Sep. 19, 2025) .............................................................31, 32

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ..........................................................................................29

*United States v. Darby,*
    312 U.S. 100 (1941) ...........................................................................................15

*United States v. Dodge,*
    61 F.3d 142 (2d Cir. 1995)................................................................................12

*United States v. Doremus,*
    249 U.S. 86 (1919).....................................................................................10, 23

*United States v. Eggebrecht,*
    486 F.2d 136, 137 (8th Cir. 1973)...................................................................31

*United States v. Hale,*
    978 F.2d 1016 (8th Cir. 1992).........................................................1, 15, 23, 27

*United States v. Hall,*
    171 F.3d 1133 (8th Cir. 1999)...................................................................10, 26

*United States v. Holder,*
    2024 WL 1599916 n.7 (N.D. Ga. Jan. 19, 2024) ............................................32

*United States v. Houston,*
    103 F. App'x 346 (10th Cir. 2004) ..................................................................16

*United States v. Jennings,*
    195 F.3d 795 (5th Cir. 1999) .............................................................................3

*United States v. Jones,*
    976 F.2d 176 (4th Cir. 1992).................................................................11, 15, 22

*United States v. Kenney,*
    91 F.3d 884 (7th Cir. 1996) .............................................................................20

*United States v. Kirk,*
    105 F.3d 997 (5th Cir. 1997).............................................................................20

*United States v. Knutson,*
    113 F.3d 27 (5th Cir. 1997) .............................................................................15

*United States v. Lara,*
    541 U.S. 193 (2004) ........................................................................................22

*United States v. Letts,*
    264 F.3d 787 (8th Cir. 2001)...........................................................................15

*United States v. Lightner,*
    2024 WL 2882237 (M.D. Fla. June 7, 2024) ..................................................32

*United States v. Lopez*,
  514 U.S. 549 (1995) ........................................................................................*passim*

*United States v. Luna*,
  165 F.3d 316 (5th Cir. 1999) ................................................................................20

*United States v. Matthews*,
  438 F.2d 715 (5th Cir. 1971) ..........................................................................11-12

*United States v. McCartney*,
  357 F. App'x 73, 76 (9th Cir. 2009) ......................................................................31

*United States v. Miller*,
  307 U.S. 174 (1939) ........................................................................................2, 29

*United States v. Miller*,
  2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) ..............................................29, 32

*United States v. Morgan*,
  2024 WL 150340 (W.D. La. Jan. 12, 2024) ..........................................................32

*United States v. Morrison*,
  529 U.S. 598 (2000) ........................................................................................*passim*

*United States v. Mugan*,
  441 F.3d 622 (8th Cir. 2006) ................................................................................21

*United States v. Park*,
  938 F.3d 354 (D.C. Cir. 2019) ..................................................................22, 23, 27

*United States v. Pearson*,
  8 F.3d 631, (8th Cir. 1993) ............................................................................15, 27

*United States v. Peterson*,
  --- F.4th ---, 2025 WL 3537261 (5th Cir. Dec. 9, 2025) ......................................32

*United States v. Rahimi*,
  602 U.S. 680 (2024) ........................................................................................*passim*

*United States v. Rene E.*,
  583 F.3d 8 (1st Cir. 2009) ....................................................................................20

*United States v. Robinson*,
  2025 WL 870981 (11th Cir. Mar. 20, 2025) ....................................................29, 32

*United States v. Rose*,
  522 F.3d 710 (6th Cir. 2008) ................................................................................20

*United States v. Ross,*
    458 F.2d 1144 (5th Cir. 1972)................................................................................11

*United States v. Royce,*
    2023 WL 2163677 (D.N.D. Feb. 22, 2023)....................................................29, 31

*United States v. Rush,*
    130 F.4th 633 (7th Cir. 2025) ...................................................................29, 30, 32

*United States v. Rybar,*
    103 F.3d 273 (3d Cir. 1996) ..................................................................................20

*United States v. Saleem,*
    659 F. Supp. 3d 683 (W.D.N.C. 2023) .................................................................31

*United States v. Salerno,*
    481 U.S. 739 (1987) .....................................................................6, 13, 16, 17

*United States v. Serrano,*
    651 F. Supp. 3d 1192 (S.D. Cal. 2023)..................................................................32

*United States v. Shepherd,*
    2024 Wl 71724 (S.D. Miss. Jan. 5, 2024)..............................................................32

*United States v. Stepp-Zafft,*
    733 F. App'x 327 (8th Cir. 2018)..............................................................11, 29, 31

*United States v. Stewart,*
    451 F.3d 1071 (9th Cir. 2006).........................................................................19, 20

*United States v. Taylor,*
    223 F. Supp. 3d 912 (E.D. Mo. 2016)..........................................................26-27, 27

*United States v. Taylor,*
    803 F.3d 931 (8th Cir. 2015)..................................................................................26

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) .......................................................................................3, 30

*United States v. Veasley,*
    98 F.4th 906 (8th Cir. 2024)...................................................................................16

*United States v. Vill. Ctr.,*
    452 F.3d 949 (8th Cir. 2006)..................................................................................11

*United States v. Villalobos,*
    2023 WL 3044770 (D. Idaho Apr. 21, 2023).........................................................32

*United States v. Wilson,*
    440 F.2d 1068 (6th Cir. 1971)................................................................................................15

*United Stats v. Wilks,*
    58 F.3d 1518 (10th Cir. 1995)..............................................................................................15

*V Real Est. Grp., Inc. v. U.S. Citizenship & Immigr. Servs.,*
    2014 WL 5243369 (D. Nev. Oct. 15, 2014).........................................................................35

*Wash. St. Grange v. Wash. St. Republican Party,*
    552 U.S. 442 (2008)................................................................................................................6

*Wickard v. Filburn,*
    317 U.S. 111 (1942).............................................................................................................17

*Wilson* v. *State,*
    33 Ark. 557 (1878)...............................................................................................................30

*Woods v. Cloyd W. Miller Co.,*
    333 U.S. 138 (1948).............................................................................................................23

*Young Am.'s Found. v. Kaler,*
    14 F.4th 879 (8th Cir. 2021)..................................................................................................8

## Statutes

18 U.S.C. § 921.................................................................................................................................3

18 U.S.C. § 922...............................................................................................................................15

26 U.S.C. § 5801..................................................................................................................4, 5, 9, 14

26 U.S.C. § 5802......................................................................................................................14, 24

26 U.S.C. § 5811.........................................................................................................................4, 5

26 U.S.C. § 5812........................................................................................................................4, 24

26 U.S.C. § 5821........................................................................................................................5, 14

26 U.S.C. § 5822.....................................................................................................................4, 8, 14

26 U.S.C. § 5841.....................................................................................................................4, 8, 14

26 U.S.C. § 5842.....................................................................................................................4, 8, 14

26 U.S.C. § 5843........................................................................................................................4, 24

26 U.S.C. § 5845.....................................................................................................................3, 4, 24

26 U.S.C. § 5861 ...........................................................................................................*passim*

26 U.S.C. § 5871 ...........................................................................................................5

One Big Beautiful Bill Act,
    Pub. L. 119-21, 139 Stat. 72 (2025) ...................................................................5

## Constitution

U.S. Const. art. I, § 8, cl. 1 ........................................................................................28

U.S. Const. art. I, § 8, cl. 3 ...................................................................................13, 28

U.S. Const. art. I, § 8, cl. 18 ......................................................................................28

U.S. Const. art. I, § 8, cl. 1 ........................................................................................28

## Legislative Materials

H.R. Rep. No. 73-1780 (1934) .........................................................................3, 10, 23, 24

H.R. Rep. No. 83-1337 (1954) ...............................................................................3, 30

*National Firearms Act: Hearings on H.R. 9066 before the House Comm. On Ways and Means,*
    73d Cong., 2d Sess. (1934) ...................................................................2, 23, 24

S. Rep. No. 73-1444 (1934) ...........................................................................3, 10, 23, 24

S. Rep. No. 90-1097 (1968) .......................................................................................19

S. Rep. No. 90-1501 (1968) .......................................................................................31

## Administrative & Executive Materials

27 C.F.R. § 479.62 ......................................................................................................8

## Other Authorities

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*,
    50 J. Legis. 223 (2024)......................................................................................30

## INTRODUCTION

For nearly a century, the National Firearms Act ("NFA") has regulated—through taxation, registration and approval requirements, and other means—certain classes of weapons that Congress deemed particularly dangerous. To be clear at the outset, the question in this case is not whether the NFA reflects good policy—a reasonable question that the government has no occasion to address in this brief. The only questions in this case are whether Congress has exceeded its enumerated powers or violated a fundamental right in making the policy choice to enact the NFA. It did not.

It has long been settled that the NFA fits squarely within Congress's constitutional authority. *Sonzinsky v. United States*, 300 U.S. 506 (1937) (taxing power); *United States v. Hale*, 978 F.2d 1016 (8th Cir. 1992) (Commerce Clause). Despite this, plaintiffs contend that the NFA's constitutional basis evaporated following the recent enactment of the One Big Beautiful Bill Act ("OBBB"). The OBBB zeroed out the NFA's taxes on the making and transfer of four classes of regulated weapons (*i.e.*, short-barreled rifles and shotguns, silencers, and the "any other weapons" class of firearms (or "AOWs")), but preserved all the NFA's other provisions, including its tax on businesses that manufacture or deal in regulated firearms and all of its regulatory requirements. Plaintiffs now ask this Court to go further by dismantling the NFA's remaining regulations on those weapons—regulations that Congress specifically retained—because, in plaintiffs' view, they are no longer supported by an enumerated power. But the Court should reject that invitation for three independent reasons. *First*, as a threshold matter, plaintiffs lack standing to challenge several of these NFA regulations. *Second*, on the merits, the NFA regulations that plaintiffs challenge continue to support the collection and enforcement of a tax that the OBBB left intact—that is, the NFA's tax on businesses that manufacture, distribute, or deal in regulated firearms. *And third*, Congress's powers under the Commerce Clause and Necessary and Proper Clause independently authorize the NFA's regulatory requirements. The NFA regulates, at its core, manufacturers, distributors, dealers, and purchasers as they participate in an

interstate firearms market and the firearms that flow through that market, and enforces its regulations through criminal prohibitions that are tied to economic activities and, in some cases, expressly to interstate commerce. *See* 26 U.S.C. § 5861. That is the heartland of the Commerce Clause. *United States v. Lopez*, 514 U.S. 549, 558 (1995). But even the intrastate activities that are subject to the NFA are within Congress's power to regulate, as they are part of an economic class of activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

As for plaintiffs' facial Second Amendment challenge, the Supreme Court made clear in *United States v. Miller*, 307 U.S. 174 (1939), and *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment does not guarantee the right to possess short-barreled shotguns, a holding that applies equally to short-barreled rifles. And even aside from *Miller* and *Heller*, the NFA's modest regulations on short-barreled rifles and suppressors are consistent with this Nation's historical tradition of regulating uniquely dangerous weapons that, notwithstanding their lawful and beneficial uses, are particularly susceptible to criminal misuse.

For these reasons, the Court should grant summary judgment in defendants' favor.

## BACKGROUND

## I.     The National Firearms Act

The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, was Congress's first major attempt at regulating firearms in the United States, a legislative effort animated by the emergence of armed crime as a major national problem. *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002). By the 1930s, armed crime had become a "serious national emergency," with criminal enterprises "organized … upon a Nation-wide basis" and armed criminals "pass[ing] rapidly from State to State." *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 4–5 (1934), Ex. 1. With the NFA, Congress sought to design a "remedy" to the "growing frequency of crimes of violence in which people are killed or injured by the use of dangerous

weapons." H.R. Rep. No. 73-1780, at 1 (1934), Ex. 2; S. Rep. No. 73-1444, at 1 (1934), Ex. 3.

Seeking to curtail armed crime, the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals." H.R. Rep. No. 83-1337, at A395 (1954); *see also United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes."); *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (the NFA's regulation of short-barreled shotguns targets weapons "valued for their ability to be easily concealed and to unleash devastating damage at short range"); *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (the NFA regulates weapons that are "primarily weapons of war" (citation omitted)). To that end, the NFA defines six categories of "firearms" that are subject to regulation, *see* 26 U.S.C. § 5845(a)(1)–(8):

- *Machineguns.* "[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," including "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* § 5845(a)(6), (b).

- *Short-barreled shotguns.* "[A] shotgun having a barrel or barrels of less than 18 inches in length" or "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." *Id.* § 5845(a)(1), (2); *see also id.* § 5845(d) (further defining "shotgun").

- *Short-barreled rifles.* "[A] rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *see also id.* § 5845(c) (further defining "rifle").

- *Suppressors.* "[A]ny device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." *Id.* § 5845(a)(7); 18 U.S.C. § 921(a)(25).

- *Destructive devices.* "(1) [A]ny explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be

readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(a)(8), (f).

- *"Any other weapon."* "[A]ny weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire." *Id.* § 5845(a)(5), (e).

To stem the criminal misuse of these weapons, Congress imposed various requirements on their importation, manufacture, transfer, and possession, including:

- *Businesses.* Any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General, *id.* § 5802, pay a special occupational tax, *id.* § 5801, and keep records regarding the manufacture, transfer, and importation of such weapons, *id.* § 5843.

- *Manufacturing & making.* A manufacturer—*i.e.*, one "who is engaged in the business of manufacturing firearms," *id.* § 5845(m)—that is registered with the Attorney General and pays the special occupational tax must register and report to the Attorney General the NFA firearms that it has manufactured. *Id.* § 5841(b), (c). By contrast, a "maker" of an NFA firearm—*i.e.*, one who produces an NFA firearm but is *not* engaged in the business of manufacturing those firearms, *id.* §§ 5822, 5845(i)—must first submit a written application to the Attorney General, pay any applicable making tax, *id.* § 5821, and obtain the Attorney General's approval before making the firearm. *id.* § 5822. Each NFA firearm must bear a serial number and other requisite identifiers. *Id.* § 5842. The person who makes, manufactures, or imports an NFA firearm must register the weapon in the National Firearms Registration and Transfer Record ("NFRTR"). *Id.* § 5841(b).

- *Transfer & registration.* Before a person may transfer an NFA firearm, he or she must submit a written application with the Attorney General, *id.* § 5812, pay any applicable transfer tax, *id.* § 5811, and obtain the Attorney General's approval to transfer the weapon, *id.* § 5812; *see also id.* § 5841(c). The transferor also must register the weapon to the transferee, who may take possession of the weapon once the transfer is approved and the firearm is appropriately registered. *Id.* § 5841(b). A person possessing an NFA firearm must retain proof of its registration. *Id.* § 5841(e).

To enforce these requirements, Congress made it unlawful to import, manufacture, transfer,

receive, possess, or transport an NFA firearm in violation of the Act's provisions, *id.* § 5861, and permitted the imposition of criminal penalties for any such violation, *id.* § 5871.

## II.    The One Big Beautiful Bill Act

On July 4, 2025, President Trump signed into law the One Big Beautiful Bill Act ("OBBB"), Pub. L. 119-21, 139 Stat. 72 (2025). The OBBB, among other things, amended 26 U.S.C. §§ 5811 and 5821 to zero out the NFA's making and transfer taxes on short-barreled rifles and shotguns, suppressors, and the "any other weapons" class of firearms (hereafter "AOWs'). *See* OBBB § 70436; *see also* 26 U.S.C. §§ 5811(a) (setting the transfer tax at "$0"), 5821(a) (same for the making tax). Congress did not change the NFA's $200 making or transfer tax on machineguns and destructive devices, *see* 26 U.S.C. §§ 5811(a)(1), 5821(a)(1), the special occupational tax on importers, manufacturers, and dealers in NFA firearms, *see id.* § 5801(a), or any other NFA requirement.

## III.    This Lawsuit

The following month, a coalition of four firearms advocacy groups, two individuals, and a firearm dealer filed this lawsuit, claiming that various NFA requirements on short-barreled rifles and shotguns, suppressors, and AOWs exceed Congress's constitutional authority and that the NFA's regulation of short-barreled rifles and suppressors violates the Second Amendment. *See* Compl., ECF No. 1. Plaintiffs then moved for summary judgment. *See* Pls.' Mot. for Summ. J., ECF No. 22; Mem. of L. in Supp. of Pls.' Mot. for Summ. J. ("Mot."), ECF No. 24.

## LEGAL STANDARDS

Where, as here, the parties dispute no material facts and agree that the only issues before the court are pure questions of law, summary judgment under Federal Rule of Civil Procedure 56(a) is the proper mechanism for resolving the case. *Royal Indem. Co. v. Werner*, 784 F. Supp. 690, 691 (E.D. Mo. Feb. 20, 1992); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("[A] facial challenge to the constitutionality of a statute presents a pure question of law ….").

Plaintiffs *facially* challenge the constitutionality of certain NFA requirements. To succeed, plaintiffs must overcome the "presumption of constitutionality" that attaches to every Act of Congress. *United States v. Morrison*, 529 U.S. 598, 607 (2000). Judging the constitutionality of an Act of Congress is "the gravest and most delicate duty that this Court is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.). In performing that duty, this Court must accord "great weight" to Congress's judgment that a statute is constitutional. *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (citation omitted). "Every possible presumption is [thus] in favor of the validity of a statute," *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878), and "the whole burthen of proof lies on him who denies its constitutionality," *Brown v. Maryland*, 12 Wheat. 419, 436 (1827) (Marshall, C.J.).

Moreover, facial challenges are "the most difficult challenge to mount successfully," *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (cleaned up), and for "a host of good reasons," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement"; they "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways," *id.* (cleaned up); and they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 450–51 (2008) (cleaned up). Therefore, to succeed on either of their facial challenges, plaintiffs must "establish that no set of circumstances exists under which" the challenged NFA requirements "would be valid," *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))—"*i.e.*, that the law is unconstitutional in all of its applications," *Wash. St. Grange*, 552 U.S. at 449. That any specific requirement "might operate unconstitutionally under some conceivable set of circumstances" would be "insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745. Rather, in analyzing plaintiffs' claims, this Court should

"consider the circumstances in which" the challenged NFA requirements are "most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where [a requirement] might raise constitutional concerns" *Rahimi*, 602 U.S. at 701.

## ARGUMENT

**I.    Plaintiffs lack Article III standing to challenge several NFA regulations.**

In seeking to upend the NFA's requirements on the manufacture, transfer, and possession of short-barreled rifles and shotguns, suppressors, and AOWS, plaintiffs overlook the issue of Article III standing, citing no evidence that several of the challenged requirements are causing them ongoing or certainly impending harm—a burden they bear on summary judgment. Absent any such evidence, plaintiffs lack standing to challenge these specific requirements.

Article III limits federal courts' jurisdiction to resolving actual "Cases" and "Controversies," not any dispute that happens to arise between two parties. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). For there to be a case or controversy, a plaintiff must have standing to sue. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). If standing is absent, a court cannot proceed at all to the merits of the dispute. *Christian Lab. Ass'n v. City of Duluth*, 142 F.4th 1107, 1111 (8th Cir. 2025) ("No standing, no decision on the merits."); *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1164 (9th Cir. 2002) ("[W]here litigants lack standing," any ruling on the merits "is, by very definition, for a court to act ultra vires." (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998))).

To establish standing, a plaintiff must (i) have suffered or be likely to suffer an injury in fact (ii) that is fairly traceable to the defendant's challenged conduct and (iii) that a favorable ruling would redress. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact must be both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); *accord All. for Hippocratic Med.*, 602 U.S. at 381 (an injury in fact must be "real and not abstract," "actual or imminent, not speculative," and "personal," not "generalized").

And where, as here, the relief sought is prospective, the injury must be ongoing or "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The "mere possibility" of future injury does not suffice. *In re SuperValu, Inc.*, 870 F.3d 763, 771 (8th Cir. 2017) (emphasis added); *accord City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). More still, plaintiffs must demonstrate standing "for each claim that they press" and "for each form of relief they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). That means that if "a plaintiff has been injured by one part of the law, the plaintiff cannot invoke that injury to challenge other parts of the law that have done nothing to" it. *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022).

At summary judgment, standing "cannot be inferred argumentatively" but "must affirmatively appear in the record." *Owner–Operator Indep. Drivers Ass'n v. DOT*, 831 F.3d 961, 966 (8th Cir. 2016) (citation omitted). A plaintiff therefore cannot rest upon "mere allegations" but instead must put forth "specific facts" by "affidavit or other evidence" that demonstrate each element of standing. *Lujan*, 504 U.S. at 561 (citation omitted). Vague or conclusory assertions of harm will not suffice. *Christian Labor Ass'n*, 142 F.4th at 1114. Nor will speculation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Applying those principles here, plaintiffs have fallen well short of establishing Article III standing to challenge several NFA regulations—namely, (i) the NFA's requirements and prohibitions insofar as they apply to AOWs, and (ii) the NFA's requirements on the manufacture or making of short-barreled rifles, short-barreled shotguns, or suppressors, and their related prohibitions, *see, e.g.*, 26 U.S.C. § 5822; *id.* § 5841(b), (c); *id.* § 5842(a); *id.* § 5861(c), (f); *see also, e.g.*, 27 C.F.R. § 479.62. Indeed, plaintiffs do not even argue, much less submit any evidence, that these challenged regulations are injuring them or will soon do so, leaving any suggestion that they are suffering harm because of these regulations completely unsubstantiated. *See, e.g., Young Am.'s Found. v. Kaler*, 14 F.4th 879, 888–890 (8th Cir. 2021) (finding no standing where there was "no evidence in the record" that the challenged policy impacted plaintiffs); *Owner–Operator Independent Drivers Ass'n*, 831 F.3d at 967–68

8

(finding no standing where plaintiffs "cited no evidence" that the challenged guidance caused them any injury). Plaintiffs' motion for summary judgment is thus unsupported by any evidence upon which the Court could base a finding that any plaintiff has Article III standing to challenge the NFA's requirements and prohibitions insofar as they apply to AOWs or the manufacture or making of short-barreled rifles, short-barreled shotguns, or suppressors. Defendants are thus entitled to summary judgment insofar as plaintiffs' claims challenge those regulations. *See Murthy*, 603 U.S. at 61; *Davis*, 51 F.4th at 171 (if "a plaintiff has been injured by one part of the law, the plaintiff cannot invoke that injury to challenge other parts of the law that have done nothing to" it).

## II.    The Constitution empowers Congress to adopt the challenged NFA requirements.

### A.    The challenged NFA requirements remain a valid exercise of Congress's taxing power.

Plaintiffs claim that Congress's taxing power can no longer serve as the constitutional source of the NFA's requirements on manufacturing, transferring, or possessing short-barreled rifles and shotguns, suppressors, and AOWs, because those firearms are now "untaxed" after the OBBB's enactment and therefore produce no revenue. *See* Mot. at 14–16. But that claim suffers from an obvious flaw: Contrary to what plaintiffs contend, business in these firearms is not "untaxed." While the OBBB zeroed out the NFA's making and transfer taxes on short-barreled rifles and shotguns, suppressors, and AOWs, the NFA still imposes a tax—namely, the special occupational tax—on businesses that import, manufacture, or deal in these firearms. *See* 26 U.S.C. § 5801. These firearms thus *do* produce federal tax revenue, *contra* Mot. at 16, and the challenged NFA's requirements support the collection of that revenue. That's a valid exercise of Congress's taxing power.

It's long been settled that the NFA's requirements aid in the assessment, collection, and enforcement of the Act's taxes and are thus justified under Congress's taxing power. Shortly after the NFA's enactment, in *Sonzinsky v. United States*, 300 U.S. 506 (1937), the Supreme Court rejected a constitutional challenge to the NFA's special occupational tax on firearm dealers, holding that

Congress had the power to impose the tax even if it was intended to "restrict or suppress the thing taxed"—*i.e.*, the manufacture and transfer of NFA firearms. *Id.* at 513–14. With the NFA imposing a tax, the Court further held that the Act's "registration provisions" for those who do business in NFA firearms (now codified at 26 U.S.C. § 5802) were likewise an exercise of Congress's taxing power because they "are obviously supportable as in aid of a revenue purpose," *id.* at 513.

Sonzinsky was consistent with earlier decisions—also instructive here—upholding similar regulatory requirements that were part of a taxing scheme, like the Supreme Court's decision in *United States v. Doremus*, 249 U.S. 86 (1919). There, the Court upheld under Congress's taxing power the taxation-and-regulation scheme of the Harrison Anti–Narcotics Control Act of 1914, *id.* at 93–95, which Congress used as a template for designing the NFA. *See* H.R. Rep. No. 73-1780, at 2, Ex. 2; S. Rep. No. 73-1444, at 2, Ex. 3 ("[T]his bill follows the plan of the Harrison Anti-Narcotic Act …."). Regarding the Act's regulations—*e.g.*, allowing sales of certain drugs only by registered dealers and only to patients who had valid prescriptions—the Court explained that they served a revenue-raising purpose because they kept "the traffic" in the regulated drugs "aboveboard and subject to inspection by those authorized to collect the revenue," and "diminish[ed] the opportunity of unauthorized persons to obtain the drugs and sell them clandestinely without paying the tax imposed by" the Act. *Doremus*, 249 U.S. at 94.

Since *Sonzinsky* and *Doremus*, the Eighth Circuit has consistently upheld the NFA's requirements under Congress's taxing power. For example, in *United States v. Hall*, 171 F.3d 1133 (8th Cir. 1999), the Eighth Circuit rejected a challenge to 26 U.S.C. § 5861(d), which prohibits possession of an unregistered weapon. The court explained that § 5861(d) and the registration requirement it enforces "help[] the government to learn the chain of possession of a firearm and thus to identify the maker liable for the tax," and "encourage the makers of firearms to register them and to pay the relevant tax" so that prospective purchasers can lawfully possess them. *Id.* at 1142 (cleaned up). The

Eighth Circuit has followed similar reasoning in rejecting other challenges to the NFA's requirements and prohibitions. *See, e.g.*, *United States v. Stepp-Zafft*, 733 F. App'x 327, 330 (8th Cir. 2018); *United States v. Vill. Ctr.*, 452 F.3d 949, 950 (8th Cir. 2006) (upholding 26 U.S.C. § 5861(c) on the same grounds).

Other courts have described the revenue-raising purposes of the NFA's requirements similarly. In *Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996), for example, the Ninth Circuit addressed whether the NFA's requirements were still justified under the taxing power "even if the government no longer taxes possession" because of a separate federal statute that generally banned possession of post-1986 machineguns. *Id.* at 262. The court held that they were, given that "[t]he manufacture of machine guns continues to be taxed, and knowing the chain of possession of a firearm would help the government determine who made it; thus, requiring registration for possession still facilitates taxation." *Id.* Similar reasoning is mirrored in other cases, wherein courts have found that the NFA's requirements and prohibitions on the end purchaser or possessor allow the government to determine who was further up the chain of possession—and thus who owed taxes—and thereby incentivize manufacturers, distributors, and dealers of NFA firearms to pay their applicable tax. *See, e.g.*, *United States v. Aiken*, 974 F.2d 446, 448 (4th Cir. 1992) ("By not allowing transferees to register the guns, and thus prohibiting lawful acceptance of unregistered guns, Congress has made the guns contraband. For this reason, if makers do not register the weapons originally, they face the possibility of being unable to sell the guns to anyone. This fact makes it more likely that makers will pay the tax in the first place." (citation omitted)); *United States v. Jones*, 976 F.2d 176, 183–84 (4th Cir. 1992) ("[C]learly, knowing the chain of possession and transfer assists in determining who made the firearm and hence is 'supportable as in aid of a revenue purpose.'" (citation omitted)); *United States v. Carmel*, 548 F.3d 571 (7th Cir. 2008) (adopting *Jones* reasoning); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) (prohibiting receipt or possession of an unregistered firearm "ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax"); *United States*

*v. Matthews*, 438 F.2d 715, 716–17 (5th Cir. 1971) (explaining that the NFA's registration requirement serves a revenue-raising purpose even when it regulates activities that do not give rise to a "concurrent tax"); *United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995) ("The registration of the transfer of firearms when there is no tax immediately due assists the government in the collection of taxes by creating a record to track the firearms from one party to another ….").

The challenged NFA requirements continue to serve these same revenue-raising purposes. As ATF explains, the agency reviews every application to make or transfer an NFA firearm to ensure, among many things, that any qualified manufacturer, distributor, or dealer that is associated with the relevant firearm has paid their special occupational tax. *See* Decl. of Stephen Albro ("Albro Decl.") ¶¶ 27–28, Ex. 4. Additionally, these requirements provide ATF with necessary information to determine whether an individual should be licensed and paying the special occupational tax—for example, if the individual is repetitively making certain NFA firearms or is consistently transferring a meaningful number of firearms. *See id.* In that way, the NFA's registration and approval requirements "aid in preventing the circumvention of the NFA," including its requirement that those who are engaged in the business of NFA firearms pay the special occupational tax. *Id.* And, for reasons courts have repeatedly explained, *see supra* 10–12, the NFA's prohibitions support the special occupational tax's enforcement by making it unlawful to circumvent these requirements, *see* 26 U.S.C. § 5861, including making it unlawful to engage in the business of NFA firearms without registering or paying the special occupational tax, *id.* § 5861(a), to make or transfer a firearm in violation of the NFA's requirements or to receive or possess such a violative firearm, *id.* § 5861(b)–(i), or to make a false entry on an application or record, *id.* § 5861(l). Therefore, because the challenged NFA requirements and prohibitions aid in the collection and enforcement of the NFA's special occupational tax, they are

justified under Congress's taxing power.[1]

**B.    Congress's power under the Commerce Clause independently authorizes the challenged NFA requirements.**

Apart from the taxing power, Congress has the authority to enact the challenged NFA requirements under the Commerce Clause. Plaintiffs' arguments to the contrary rest on a cramped view of Congress's authority that cannot be squared with binding precedent, and a view of the NFA that denies the reality that the Act directly regulates interstate commerce in firearms.

The Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This constitutional provision endows Congress with "broad authority." *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (lead opinion). "[T]he power to regulate commerce is the power to enact all appropriate legislation for its protection and advancement; to adopt measures to promote its growth and insure its safety; [and] to foster, protect, control and restrain." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–37 (1937). With that power, Congress may regulate the "channels of interstate commerce," the "instrumentalities of interstate commerce" and the "persons or things in interstate commerce," and "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). A court's task in reviewing whether an Act of Congress is a valid exercise of this authority is a "modest one," *Gonzales v. Raich*, 545 U.S. 1, 22 (2005), requiring only that it determine whether "Congress acted rationally in adopting a particular regulatory scheme," *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981); *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 203 (5th Cir. 2000) ("In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test…").

Measured by these principles, the challenged NFA requirements and prohibitions fit

---

[1] That there may be "some conceivable set of circumstances" where an NFA firearm has been made and possessed by a person who is not subject to the special occupational tax is immaterial in resolving plaintiffs' facial challenge. *See Salerno*, 481 U.S. at 745; *Rahimi*, 602 U.S. at 701.

comfortably within Congress's power under the Commerce Clause.

Start with the fact that, in most applications, the challenged NFA requirements and prohibitions directly regulate manufacturers, distributors, dealers, and purchasers (*i.e.*, "the persons") as they participate in an interstate firearms market and the firearms (*i.e.*, "the things") that flow through that market. *See Lopez*, 514 U.S. at 558. A large majority of the short-barreled rifles and shotguns, suppressors, and AOWs produced in the United States are produced by federally licensed manufacturers, *see* Albro Decl. ¶ 29, Ex. 4, and then distributed and sold interstate as commodities by federally licensed distributors and dealers, *id.* ¶¶ 30–32, Ex.4 (of the NFA firearms transferred in 2025, nearly 2 million (or 91%) were transferred interstate). The NFA regulates every step of that interstate commercial process: *first*, by requiring that the federally licensed manufacturer, distributor, and dealer register with the Attorney General and pay the NFA's special occupational tax, 26 U.S.C. §§ 5801–02; *second*, by requiring that the manufacturer report the manufactured firearm to the Attorney General and register it, *id.* § 5841(b), (c), and comply with certain requirements governing the firearm's manufacture, *id.* § 5842; *third*, by requiring that the manufacturer apply and receive approval to transfer the firearm to the federally licensed distributor and to register the firearm to the distributor, *id.* §§ 5821, 5822, 5841(b); *fourth*, by requiring that the distributor apply and receive approval to transfer the firearm to the federally licensed dealer and to register the firearm to the dealer, *id.* §§ 5821, 5822, 5841(b); *fifth*, by requiring that the dealer apply and receive approval to transfer the firearm to the end purchaser and to register the firearm to the purchaser, *id.* §§ 5821, 5822, 5841(b); and *sixth*, by requiring that the purchaser maintain proof that the firearm has been registered since its manufacture, *id.* § 5841(e).

And to enforce these requirements, the NFA prohibits participants in this interstate firearms market from violating any NFA requirement. *See id.* § 5861(a)–(*l*). Indeed, the NFA's enforcement regime contains explicit references to activities in foreign or interstate commerce. For example, the NFA makes it unlawful "to transport, deliver, or receive any firearm *in interstate commerce* which has not

14

been registered." *Id.* § 5861(j) (emphasis added); *see also id.* § 5861(k) (making it unlawful "to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844"). Additionally, the Gun Control Act makes it unlawful for non-licensed persons "to transport *in interstate or foreign commerce*" a subset of NFA firearms, including short-barreled rifles and shotguns, without the Attorney General's authorization. *See* 18 U.S.C. § 922(a)(4). Therefore, in many cases, the NFA's requirements will be enforced through criminal prohibitions that expressly regulate activities in interstate commerce, separately from any regulation of intrastate activities, *see infra*.

In these ways, the NFA regulates the "ingredients of interstate commerce itself." *See Raich*, 545 U.S. at 34 (Scalia, J., concurring in the judgment); *see also United States v. Darby*, 312 U.S. 100, 113 (1941) ("[T]he shipment of manufactured goods interstate *is* [interstate] commerce and the prohibition of such shipment by Congress is indubitably a regulation of [that] commerce." (emphasis added)). Indeed, that is how courts have understood the regulation of the manufacture, distribution, and possession of firearms that flow through interstate commerce. *See, e.g., United Stats v. Wilks*, 58 F.3d 1518, 1521 (10th Cir. 1995) ("The interstate flow" of firearms "*is* interstate commerce." (citation omitted)); *United States v. Knutson*, 113 F.3d 27, 29–30 (5th Cir. 1997) (the GCA's regulation of machinegun transfers and possession targets, in most cases, activities  that are part of "interstate commercial transactions" and "an item bound up with interstate attributes" (citation omitted)); *United States v. Beuckelaere*, 91 F.3d 781, 785 (6th Cir. 1996) (firearms "are 'things in interstate commerce' which flow across state lines for profit by business entities"); *United States v. Letts*, 264 F.3d 787, 789–90 (8th Cir. 2001) (similar). Courts have thus had no trouble finding that the NFA's regulation of these activities is within Congress's authority to regulate interstate commerce. *See, e.g., United States v. Hale*, 978 F.2d 1016, 1018 (8th Cir. 1992); *United States v. Pearson*, 8 F.3d 631, 633 (8th Cir. 1993); *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994) ("[N]o one could seriously contend" that the NFA cannot "be upheld under Congress's power to regulate interstate commerce."); *Jones*, 976 F.2d at 184

("[T]here can be no serious contention that [the NFA's] application in this case to two machine guns which were transported between two states for sale exceeds Congress' power to regulate interstate commerce."); *United States v. Wilson*, 440 F.2d 1068 (6th Cir. 1971); *United States v. Houston*, 103 F. App'x 346, 349–50 (10th Cir. 2004).

The fact that the challenged NFA requirements directly regulate, in most instances, the persons and things in interstate commerce, *see Lopez*, 514 U.S. at 558, should be the end of plaintiffs' facial challenge. *See Salerno*, 481 U.S. at 745 (there must be "no set of circumstances" in which a facially challenged law "would be valid"). Still, plaintiffs contend that the NFA's requirements on the making, transfer, and possession of short-barreled rifles and shotguns, suppressors, and AOWs are beyond Congress's authority insofar as they regulate intrastate activities. *See* Mot. at 19–20. But even if that were true, it would do nothing to advance plaintiffs' *facial* challenge to those NFA requirements. *See, e.g.*, Compl., Count I (claiming that the NFA's requirements regarding short-barreled rifles and shotguns, suppressors, and AOWs categorically exceed Congress's enumerated powers and seeking declaratory relief to that effect); Mot. at 43–44 (requesting "a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable").[2] As the Supreme Court explained in *Rahimi*, in analyzing a facial constitutional challenge to a federal statute, a court should "consider the circumstances in which" the statute is "most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where" the statute "might raise constitutional concerns." 602 U.S. at 701; *see also Salerno*, 481 U.S. at 745 (there is no "'overbreadth' doctrine" outside the First

---

[2] As is apparent from plaintiffs' arguments and the relief they request, plaintiffs are not asserting an as-applied challenge to any of the NFA's requirements. *See United States v. Veasley*, 98 F.4th 906, 909–10 (8th Cir. 2024) ("An as-applied challenge" "focus[es] only on" the plaintiff: "is applying" the challenged law "to *his* conduct" unconstitutional?); *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019) ("The as-applied challenger does not contend that a law is unconstitutional as written but that its application to a *particular* person under *particular* circumstances deprived *that person* of a constitutional right." (cleaned up with emphasis added)).

Amendment). So even if plaintiffs were correct that a subset of NFA-regulated activities were beyond Congress's reach under the Commerce Clause, that would not call into doubt the *facial* validity of the NFA requirements that plaintiffs seek to topple.

At any rate, Congress *does*, under existing precedent, have the power to regulate the intrastate manufacture, making, distribution, sale, transfer, and possession of NFA firearms. In addition to the "persons" and "things" in interstate commerce, the Commerce Clause authorizes Congress "to regulate activities that substantially affect interstate commerce." *Raich*, 545 U.S. at 16–17. That includes the power "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. "When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the *entire* class," including activities that are intrastate or non-commercial. *Id.* (citation omitted and emphasis added). Applying that principle, the Supreme Court has held that Congress may regulate activities like the growing and consumption of marijuana, *see id.* at 15–33; mining, *see Hodel*, 452 U.S. at 275–283; loan sharking, *see Perez v. United States*, 402 U.S. 146, 150–157 (1971); the operation of hotels, *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 253–262 (1964); and the growing and consumption of homegrown wheat, *see Wickard v. Filburn*, 317 U.S. 111, 119–129 (1942).

*Raich* is particularly instructive here. In that case, the Supreme Court rejected a Commerce Clause challenge to the Controlled Substances Act's ("CSA") prohibition on homegrown, home-consumed marijuana, holding that Congress had the power to regulate those activities as part of the CSA's broader regulation of an economic class of activities—namely, marijuana manufacturing, distribution, and possession. As the Court explained, Congress could rationally believe "that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA," given "the likelihood that" the demand for marijuana "in the interstate market" would "draw [homegrown] marijuana into that market," thus "frustrat[ing] the federal interest" in "control[ling] the

supply and demand" of that regulated commodity. *Raich*, 545 U.S. at 19–22. That the CSA "ensnare[d]" plaintiffs' "purely intrastate activity" was immaterial, as the Court found no basis for "excis[ing] individual components" of a broader regulatory scheme that Congress itself did not excise. *See id.* at 22, 28–29; *see also id.* at 17 ("[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." (cleaned up)).

Those same principles amply support the NFA requirements challenged here. The NFA regulates a class of activities that are "quintessentially economic": the manufacture, distribution, sale, and possession of weapons that, in Congress's judgment, are particularly susceptible to criminal misuse. *See id.* at 25 ("'Economics' refers to 'the production, distribution, and consumption of commodities.'" (citation omitted)). As explained, *see supra* 14, these regulated activities occur most often as part of an interstate market in NFA firearms. To think that failing to regulate the *intrastate* manufacture, distribution, sale, and possession of these same weapons "would leave a gaping hole" in the NFA by creating an unregulated sub-market in unregistered NFA firearms is more than simply rationale, it's "visible to the naked eye." *See Raich*, 545 U.S. at 22, 28–29 (quoting *Lopez*, 514 U.S. at 563). Indeed, regulating "the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* at 26. Given that many NFA firearm owners wish to avoid the NFA's registration requirement,[3] "[o]ne need not have a degree in economics to understand" that a sub-market of unregistered, untraced NFA firearms

---

[3] *See, e.g.*, Decl. of Prime Protection STL, LLC ("Prime Protection Decl.") ¶ 24, ECF No. 23-3 (stating that "[p]rospective and repeat customers have declined to purchase NFA firearms" because of the NFA's registration requirement and that it would sell more NFA firearms if there were no registration requirement); Decl. of Chris Brown ¶¶ 3–6, 10–11, ECF No. 23-1 (stating that he would acquire a short-barreled rifle if not for the NFA's registration requirement, and stating that several "would-be buyers declined" to purchase a suppressor from him because of that requirement); Decl. of Allen Mayville ¶¶ 3–6, 9–10, ECF No. 23-2 (stating that he would acquire a suppressor if not for the NFA's registration requirement).

would substantially affect the "supply and demand in the national market" for those weapons and increase the risk of their diversion into illicit channels, *see id.* at 19, 28; *see also id.* at 40 (Scalia, J., concurring in the judgment) ("fungible commodities" are "never more than an instant from the interstate market"); *United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) ("Homemade guns, even those with a unique design, can enter the interstate market and affect supply and demand.")— the very concern that the NFA was designed to address, *see supra* 2–3; *see also* S. Rep. No. 90-1097, at 255 (1968) ("The [NFA] … has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use …."). Because failure to regulate intrastate manufacturing, distribution, sale, and possession of NFA firearms would thus clearly "undercut" the NFA's regulation of the interstate market in those weapons, it was (at the very least) rational for Congress not to exempt those intrastate activities from the NFA's broader regulatory scheme. *See Raich*, 545 U.S. at 18.

Applying similar reasoning, courts have consistently upheld federal firearms laws against Commerce Clause challenges. In *Knutson*, for example, the Fifth Circuit upheld a federal statute that generally prohibits the transfer or possession of post-1986 machineguns. 113 F.3d at 29–31. Though the court observed that, like the NFA, "much of the conduct covered by § 922(o) fits comfortably" within Congress's authority to regulate "an item bound up with interstate attributes," it held that it also is "obvious 'to the naked eye' that the transfer and possession of machineguns," "including those that might conceivably be characterized as exclusively intrastate or noncommercial," "has a substantial effect on interstate commerce." *Id.* at 29–30. The Court reasoned that the extensive legislative history of federal firearms regulations, beginning with the NFA, showed that Congress could rationally conclude that the regulation of intrastate machinegun transfers and possession is "necessary to address the serious problems associated with interstate trafficking" in those firearms (*e.g.*, violent crime) and thus is squarely within Congress's power under the Commerce Clause. *Id.* at 30–31. Other courts have reached similar conclusions regarding federal firearms laws, including the NFA. *See, e.g., Mandina v.*

*United States*, 472 F.2d 1110, 1113–14 (8th Cir. 1973) ("[I]t is apparent that one of the most logical means by which to prevent interstate use of firearms and ammunition for illegal purposes is to control their source," including "dealers who deal exclusively in intrastate commerce."); *United States v. Kenney*, 91 F.3d 884, 890–91 (7th Cir. 1996) ("Permitting unregulated intrastate possessions and transfers of machine guns … indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns."); *United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996) (sustaining firearms law "because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns"); *Stewart*, 451 F.3d at 1074–78 ("[L]ike the marijuana possession ban in the CSA, … Congress could have rationally concluded that homemade machineguns would affect the national market."); *United States v. Luna*, 165 F.3d 316, 321–22 (5th Cir. 1999); *United States v. Rose*, 522 F.3d 710, 717–719 (6th Cir. 2008); *United States v. Rene E.*, 583 F.3d 8, 16–18 (1st Cir. 2009); *Hollis v. Lynch*, 121 F. Supp. 3d 617, 639–41 (N.D. Tex. 2015); *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, at *14–22 (D. Mont. Aug. 31, 2010), *aff'd* 727 F.3d 975 (9th Cir. 2013); *see also United States v. Kirk*, 105 F.3d 997, 998 (5th Cir. 1997) (Parker, J.); *id.* at 998–1005 (Higginbotham, J.).

The NFA thus bears no resemblance to the laws that the Supreme Court has held exceed Congress's authority under the Commerce Clause—namely, those in *Lopez* and *Morrison*. *Contra* Mot. at 21–22. Unlike the NFA, the laws in *Lopez* and *Morrison* had no connection to commerce. In *Lopez*, the Supreme Court observed that the challenged law "ha[d] nothing to do with 'commerce' or any sort of economic enterprise." 514 U.S. at 561. And in *Morrison*, the Court reasoned that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613. While the Court would have needed "to pile inference upon inference" to connect those laws with commerce, *Lopez*, 514 U.S. at 567, no such series of inferences is necessary with the NFA, which directly regulates the manufacturing, distribution, sale, and purchase of a commodity. *See supra* 14–16.

20

Moreover, unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such a case, and *Morrison* did not even discuss the possibility that it was." *Raich*, 545 U.S. at 39 (Scalia, J., concurring in the judgment) (citation omitted); *see also Lopez*, 514 U.S. at 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity ...."). Given that the NFA regulates activities that are "quintessentially economic" (*i.e.*, "production, distribution, and consumption of commodities"), *see Raich*, 545 U.S. at 25–26 (citation omitted), this case "presents a very different situation than cases," like *Lopez* and *Morrison*, that "challenge non-economic and non-commercial regulatory acts," *Groome Res.*, 234 F.3d at 211; *accord United States v. Mugan*, 441 F.3d 622, 629–30 (8th Cir. 2006).

Nor is this case like *NFIB*, where the Court considered the constitutionality of the Affordable Care Act's ("ACA") individual mandate, which required "that individuals purchase health care." *NFIB*, 567 U.S. at 548. In declining to uphold that statutory provision under the Commerce Clause, the Court emphasized that the individual mandate "primarily affects healthy, often young adults who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature." *Id.* at 556 (lead opinion); *see also id.* at 652–53 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power ...."). The Court's primary concern with that scheme was that Congress was seeking to compel economic activity by regulating inactivity. *Id.* at 552 (lead opinion). That concern is absent here. The NFA's possession requirements apply, in most cases, to individuals that have purchased an NFA firearm from a firearm dealer. *See supra* 14; *see also, e.g.*, Prime Protection Decl. ¶ 6. The NFA's possession requirements thus do not target a class of individuals whose "defining feature" is their "commercial inactivity," *see NFIB*, 567 U.S. at 556, nor does it compel any sort of

commercial activity, *see id.* at 552. It merely imposes modest requirements, in most cases, on those individuals that have voluntarily engaged in commercial activity to purchase a commodity that has flowed through interstate commerce. And the NFA enforces those requirements through criminal prohibitions that expressly regulate economic activity. *See, e.g.,* 26 U.S.C. § 5861(b)–(d), (h), (i) (making it unlawful to "*receive or possess*" a firearm made, transferred, or otherwise in violation of the NFA's requirements (emphasis added)); *id.* § 5861(e)–(f) (making it unlawful to "*make*" or "*transfer*" a firearm in violation of the NFA's requirements (emphasis added)). Those requirements and prohibitions fall within the heartland of existing Commerce Clause precedent. *See supra* 14–16.

Plaintiffs' remaining arguments are unpersuasive.

*First*, neither *Sonzinsky* nor *Haynes* stand for the proposition that the NFA is *solely* an exercise of Congress's taxing power, as plaintiffs suggest repeatedly throughout their brief. *See* Mot. at 1, 14, 16, 17, 22, 23. In fact, the Eighth Circuit has already twice rejected that view, *see Hale*, 978 F.2d at 1018; *Pearson*, 8 F.3d at 633, and other courts have too, *see, e.g., Ardoin*, 19 F.3d at 180 ("[A]lthough the NFA was originally upheld under Congress's taxing power, no one could seriously contend" that the Act "could not also be upheld under Congress's power to regulate interstate commerce."); *Jones*, 976 F.2d at 184; *supra* 15–16 (citing cases). Those cases reflect the well-established principle that Congress may legislate under "more than one enumerated power," as it did with the NFA. *United States v. Park*, 938 F.3d 354, 363 (D.C. Cir. 2019); *accord Morrison*, 529 U.S. at 607 ("Every law enacted by Congress must be based on one *or more* of its powers enumerated in the Constitution." (emphasis added)); *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 534 (1870) (Congress is permitted to "group together any number of [constitutional powers] and infer from them all that the power claimed has been conferred"). And it often does. *See, e.g., McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819) (several of Congress's powers supported creation of a national bank); *United States v. Lara*, 541 U.S. 193, 200–01 (2004) (Congress's power to legislate with respect to Indian tribes derives from both the Indian

Commerce Clause and the power to implement treaties); *United States v. Comstock*, 560 U.S. 126, 136 (2010) (several of Congress's powers support the enactment of federal criminal laws). Therefore, the fact that courts have upheld an Act of Congress under one enumerated power does not preclude a court from later upholding the statute under another power. Indeed, that's exactly what the Supreme Court did with the Harrison Anti-Narcotics Control Act of 1914—which Congress used as a template for designing the NFA, *see* H.R. Rep. No. 73-1780, at 2, Ex. 2; S. Rep. No. 73-1444, at 2, Ex. 3 ("[T]his bill follows the plan of the Harrison Anti-Narcotic Act and adopts the constitutional principle supporting that act…."); *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 6 (1934), Ex. 1 ("[W]e have followed the Harrison Anti-Narcotic-Act in language so as to get the benefit of any possible interpretation that the courts may have made of that act.")—initially upholding the statute under Congress's taxing power, *United States v. Doremus*, 249 U.S. 86 (1919); *Nigro v. United States*, 276 U.S. 332 (1928), and later upholding it as a valid exercise of Congress's authority under the Commerce Clause, *Minor v. United States*, 396 U.S. 87, 98 n.13 (1969); *see also United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992) (explaining that *Minor* upheld the Harrison Anti-Narcotics Control Act under the Commerce Clause).

Nor did Congress need to expressly state in the NFA that it was exercising its authority under the Commerce Clause for the Court to uphold it on those grounds. Indeed, the courts that have upheld the NFA under the Commerce Clause have not required such an expression. *See, e.g.*, *Hale*, 978 F.2d at 1018; *supra* 15–16 (citing cases). That's because the constitutionality of an Act of Congress "does not depend on recitals of the power which it undertakes to exercise." *NFIB*, 567 U.S. at 570 (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)); *accord Park*, 938 F.3d at 363 ("A court must be able to discern a basis for Congress's exercise of an enumerated power, but that does not mean that a 'law must be struck down because Congress' … failed to identify the source of its power." (quoting *NFIB*, 567 U.S. at 569–70)); *United States v. Clay*, 128 F.4th 163, 183 (3d Cir. 2025). So long as Congress

23

"had the power" to act, "[t]hat is sufficient to sustain" the action. *NFIB*, 567 U.S. at 570.

*Second*, plaintiffs' argument that Congress "disclaimed" exercising its authority under the Commerce Clause in enacting the NFA, *see* Mot. at 17–18, is belied by the historical record. Indeed, both the House and Senate reports for the 1934 bill state explicitly that Congress was relying on both its powers to tax and to regulate interstate and foreign commerce. *See* H.R. Rep. No. 73-1780, at 2, Ex. 2; S. Rep. No. 73-1444, at 2, Ex. 3 ("[T]his bill … provid[es] for the taxation of firearms and … also employs the interstate and foreign commerce power to regulate interstate shipment of firearms and to prohibit and regulate the shipment of firearms into the United States."); *see also, e.g.*, *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess. at 6, 19, 23 (1934), Ex. 1 ("Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate commerce."). And the NFA's text and operation confirm that understanding. *See NFIB*, 567 U.S. at 544 ("[T]he best evidence of Congress's intent is the statutory text."). As explained, *see supra* 14, the statutory text plainly indicates that Congress sought to regulate commercial actors and commodities that are often part of interstate commerce. *See, e.g.*, 26 U.S.C. §§ 5802, 5843 (requiring "each importer, manufacturer, and dealer in firearms" to register with the Attorney General and keep records of "the importation, manufacture, making, receipt, and sale, or other disposition, of firearms"); *id.* §§ 5812, 5845(j) (requiring the Attorney General's approval to "transfer" a firearm, which includes "selling" and "leasing"). This case is thus nothing like *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), *contra* Mot. at 17, where the Supreme Court refused to consider "the Just Compensation Clause as a basis for the Patent Remedy Act" because there was "no suggestion in the language of the statute itself, or in the House or Senate Reports of the bill which became the statute, that Congress had in mind the Just Compensation Clause." *Fla. Prepaid*, 527 U.S. at 642 n.7.

*Third*, the Supreme Court's Commerce Clause jurisprudence does not support plaintiffs'

argument that Congress can reach intrastate activities only pursuant to a regulatory scheme that is sufficiently "comprehensive." Relying on *Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509 (N.D. Tex. 2024), plaintiffs derive this supposed requirement from language in *Raich*, where the Supreme Court described the CSA as a "comprehensive statutory scheme." *Id.* at 509, 532–33 (quoting *Raich*, 545 U.S. at 3). But the Court's use of the term "comprehensive" to describe the CSA served only to distinguish that statute from the "brief, single-subject" regulation of intrastate, noncommercial activity that the Court struck down in *Lopez. See Raich*, 545 U.S. at 23–24. Nowhere did the Court suggest that it was imposing a "comprehensiveness requirement" on Congress, as plaintiffs contend, *see* Mot. at 23; indeed, it used different language elsewhere to make the same point. *See, e.g., Raich*, 545 U.S. at 24–25 (the CSA's regulation of marijuana was "merely one of many 'essential parts of a *larger* regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated'" (cleaned up with emphasis added) (quoting *Lopez*, 514 U.S. at 561)); *id.* at 17 ("When a *general* regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." (emphasis added) (quoting *Lopez* 514 U.S. at 558)); *see also id.* at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a *more general* regulation of interstate commerce." (emphasis added)). There is thus no suggestion in *Raich* or *Lopez* that courts should be engaging in a standardless assessment of whether an Act of Congress is "comprehensive" enough to justify reaching intrastate activity under the Commerce Clause, as plaintiffs encourage this Court to do. Indeed, if the contrary were true, one would expect courts to have developed standards for assessing the comprehensiveness of a federal statute in the last 20 years since *Raich*. But plaintiffs cite no such caselaw, save a single,

unpersuasive district court decision.[4] In any event, as explained, *supra* 18–19, the NFA is a comprehensive scheme for regulating the uniquely dangerous weapons that it covers, and Congress had a rational basis to think that exempting intrastate activities from the NFA's regulations would severely disrupt the effectiveness of that overall scheme.

*Fourth*, plaintiffs' reliance on *United States v. Hall*, 171 F.3d 1133 (8th Cir. 1999), is misplaced for several reasons. As an initial matter, in *Hall*, the Eighth Circuit addressed an *as-applied* challenge to a criminal defendant's conviction under 26 U.S.C. § 5861(d) for possessing an unregistered silencer, agreeing that the particular conviction exceeded the bounds of the Commerce Clause. *Id.* at 1138–40. But as explained, *supra* 16–17, plaintiffs bring a *facial* challenge to a panoply of NFA requirements, and thus cannot succeed by pointing to individual scenarios that allegedly "raise constitutional concerns." *See Rahimi*, 602 U.S. at 701. At any rate, *Hall*'s reasoning is irreconcilable with the Supreme Court's subsequent decision in *Raich*, as its holding is premised on (i) § 5861(d)'s lack of a jurisdictional element limiting its reach to interstate commerce, (ii) the fact that the criminal defendant's conduct was unrelated to a commercial transaction, and (iii) that Congress made no findings that intrastate possession of suppressors substantially affects interstate commerce. *Hall*, 171 F.3d at 1138–40. But all three of those factors were present in *Raich*, which *upheld* a statute under the Commerce Clause even though the statute had no jurisdictional element, applied to the plaintiffs' non-commercial, intrastate activity, and was supported by no congressional findings about how regulated intrastate activities substantially affect interstate commerce. *See* 545 U.S. at 20–21, 32–33. A decision of the Eighth Circuit is not controlling when, like *Hall*, it "is cast into doubt by an intervening Supreme Court decision." *United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015) (citation omitted); *accord United States v. Taylor*,

---

[4] Moreover, such a rule would perversely disincentivize Congress from enacting measured regulations under the Commerce Clause, and would instead incentivize it to regulate as broadly as possible so as not to be susceptible to constitutional attack.

223 F. Supp. 3d 912, 920–21 (E.D. Mo. 2016). Moreover, *Hall* also conflicts with the Eighth Circuit's earlier decisions in *Hale* and *Pearson*—which plaintiffs fail to cite—both of which held that 26 U.S.C. § 5861(d) is a valid exercise of Congress's power under the Commerce Clause. *See Hale*, 978 F.2d at 1018; *Pearson*, 8 F.3d at 633. "[W]hen faced with conflicting panel opinions," a district court must follow "the earliest opinion … as it should have controlled the subsequent panels that created the conflict." *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) (cleaned up); *accord, e.g.*, *Taylor*, 223 F. Sup. 3d at 920.

*Fifth*, plaintiffs suggest that the lack of a "jurisdictional element" limiting the reach of a federal statute indicates that it is not an exercise of Commerce Clause authority. *See* Mot. at 22. But as *Morrison* explains, "a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce," 529 U.S. at 611–12, but the absence of one does not indicate the opposite. *See, e.g.*, *Raich*, 545 U.S. at 23–29 (upholding under the Commerce Clause a statute with no jurisdictional element); *United States v. Anderson*, 771 F.3d 1064, 1068–70 (8th Cir. 2014) (same).

*And finally*, plaintiffs suggest that the lack of findings in the NFA regarding the effects of intrastate activities on interstate commerce cuts against the Act's constitutionality. *See* Mot. at 21. But Congress need not "make particularized findings in order to legislate" pursuant to the Commerce Clause, and the absence of such findings do not undermine the constitutionality of a federal statute. *Raich*, 545 U.S. at 20–21; *accord Morrison*, 529 U.S. at 612; *Park*, 938 F.3d at 363.

*    *    *

In sum, the challenged NFA's requirements are a valid exercise of Congress's power under the Commerce Clause, even insofar as they regulate intrastate activity.

## C. Congress's authority under the Necessary and Proper Clause further supports the challenged NFA requirements.

Buttressing Congress's power to tax and regulate interstate commerce, the Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and proper for

carrying into Execution" the federal government's powers. U.S. Const. art. I, § 8, cl. 18. That constitutional provision "grants Congress broad authority to enact federal legislation." *Comstock*, 560 U.S. at 133. While the federal government is one of enumerated powers, "'a government, entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *Id.* (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 408). "Accordingly, the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Id.* at 133–34 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413, 418). It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

The challenged NFA requirements and prohibitions help effectuate multiple enumerated powers. They assist in collecting and enforcing the NFA's special occupational tax, *supra* 9–13, thus effectuating Congress's power to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1. They also help counter the proliferation of unregistered NFA firearms and illicit traffic in those firearms, *supra* 2–3, 12, 16–17, thus effectuating Congress's power to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3. And for reasons already explained, *supra* 9–13, 14–16, 18–19, these requirements and prohibitions are both necessary for implementing these enumerated powers and fall within the bounds of what is constitutionally proper. *Sonzinsky*, 300 U.S. at 513; *Raich*, 545 U.S. at 19–29; *id.* at 33–42 (Scalia, J., concurring in the judgment) (regulation of intrastate activities was necessary and proper to effectuate Congress's regulation of interstate commerce.); *see also Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 393 (1940) ("Congress may impose penalties in aid of the exercise of any of its enumerated powers.").

## III.    The challenged NFA requirements comport with the Second Amendment.

Plaintiffs also claim that the NFA's requirements on the making, transfer, and possession of

short-barreled rifles and suppressors violate the Second Amendment on their face. *See* Mot. at 24–25. That facial challenge fails for at least two reasons.

*First*, the Supreme Court's decisions in *United States v. Miller*, 307 U.S. 174 (1939), and *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008), foreclose plaintiffs' Second Amendment claim insofar as it pertains to short-barreled rifles. In *Miller*, the Supreme Court upheld the NFA's regulation of short-barreled shotguns, holding that the Second Amendment does not guarantee the right to possess such weapons. 307 U.S. at 178. The Supreme Court did not disturb *Miller*'s holding in *Heller*, explaining that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," and that this limitation is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 625, 627; *Johnson* v. *United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (short-barreled shotguns "are not typically possessed for lawful purposes"). That principle applies equally to short-barreled rifles, which plaintiffs do not contend are materially distinguishable from the short-barreled shotguns addressed in *Miller* and *Heller*, nor have courts found any such distinction. *See United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025) (finding no constitutional distinction between these types of firearms), *cert denied.,* 2025 WL 3620422 (U.S. Dec. 15, 2025); *accord, e.g.*, *United States v. Robinson*, 2025 WL 870981, at *5 (11th Cir. Mar. 20, 2025); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018); *United States v. Cox*, 906 F.3d 1170, 1185–86 (10th Cir. 2018); *United States v. Royce*, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023); *Second Amend. Found., Inc. v. ATF*, 702 F. Supp. 3d 513, 536–37 (N.D. Tex. 2023); *United States v. Miller*, 2023 WL 6300581, at *1–3 (N.D. Tex. Sept. 27, 2023).

*Second*, the NFA's regulation of short-barreled rifles and suppressors is "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). As the Supreme Court has consistently observed, American legislatures have long "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47 (citation omitted);

*Rahimi*, 602 U.S. at 691; *Heller*, 554 U.S. at 627. Laws dating back to the Founding Era targeted, through outright bans or lesser regulation, particularly dangerous weapons that were uniquely susceptible to criminal misuse. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293–328 (2024). Similarly, many states have long regulated the size of firearms. *See id.* at 288–289, 324 (collecting examples of states banning or taxing pocket pistols).[5] The NFA fits within that historical tradition by targeting particularly dangerous weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, though its requirements are much more modest than the categorical bans of the past. *See Rush*, 130 F.4th at 643 ("These historic laws" regulating uniquely dangerous weapons "mirror the NFA in their purpose."). That alone demonstrates that the NFA comports with the Second Amendment.

Although plaintiffs dispute whether short-barreled rifles and suppressors are uniquely dangerous, *see* Mot. at 32–39, they cite no authority adopting their view, while on the other side of the ledger, Congress and the courts have overwhelmingly acknowledged that these weapons possess characteristics that make them uniquely susceptible to criminal misuse. As the Supreme Court has explained, the NFA's "regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes." *Thompson/Ctr. Arms*, 504 U.S. at 517. Indeed, short-barreled rifles "are more easily concealable than long-barreled rifles but have more destructive power than traditional handguns," giving them the "ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection" and "making them particularly desirable to" criminals. *Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024) (citation omitted), *cert denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025); *accord, e.g., Mock*, 75 F.4th at 596 (Higginson, J., dissenting) ("[S]hort-barreled rifles are uniquely

---

[5] *See also, e.g., State* v. *Kerner*, 107 S.E. 222, 225 (N.C. 1921) (describing such "reasonable regulation[s]" that applied to "pistols of small size which are not borne as arms but which are easily and ordinarily carried concealed"); *Andrews* v. *State*, 50 Tenn. (3 Hesik.) 165, 186–187 (1871); *Fife* v. *State*, 31 Ark. 455, 461 (1876); *Wilson* v. *State*, 33 Ark. 557, 559 (1878).

dangerous because they combine the power of shoulder-mounted rifles with the concealability of handguns." (cleaned up)); *Royce*, 2023 WL 2163677, at *3 ("Short-barrel rifles … are dangerous and unusual weapons that are easily concealable …." (cleaned up)); *United States v. Conner*, 2025 WL 2858030, at *4–5 (W.D. Tex. Sept. 19, 2025) ("[S]hort-barreled rifles … are subject to the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (cleaned up)); S. Rep. No. 90–1501, at 28 (1968) ("[S]hort-barreled rifles are primarily weapons of war …."); *cf. United States v. Eggebrecht*, 486 F.2d 136, 137 (8th Cir. 1973) (finding unpersuasive "the assertion that a sawed-off rifle 'become[s] just another handgun'").[6]

Courts have drawn similar conclusions about suppressors. *See, e.g.*, *Stepp-Zafft*, 733 F. App'x at 329 ("[C]ourts after *Heller* have" held "that silencers are not typically possessed by law-abiding citizens for lawful purposes." (collecting cases)); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers … are not typically possessed by law-abiding citizens for lawful purposes" and "are dangerous and unusual.") (cleaned up)); *United States v. Saleem*, 659 F. Supp. 3d 683, 698 (W.D.N.C. 2023) ("[S]ilencers are modern and lethal weapons that are likely to be used for criminal purposes" and are "dangerous and unusual weapons." (cleaned up)). While suppressors undoubtedly have lawful and beneficial uses, given their function, they are uniquely susceptible to criminal misuse because they make it harder for law enforcement to identify or detect the source and direction of gunfire. *See, e.g.*, Phil McCausland, *Virginia Beach shooter killed 12 using silencer and high-capacity magazine. Now, lawmakers might look at both.*, NBC News (June 4, 2019), https://perma.cc/BQ97-WVHC (quoting an executive director of the Advanced Law Enforcement Rapid Response Training at Texas State University's observation that suppressors can "impact law enforcement officers when there's a shooting because it's harder to track down the shooter"); Lisa Marie Pane, *Did a 'silencer' make a difference in the Virginia*

---

[6] Plaintiffs are thus wrong that "Congress did not even view short-barreled rifles as particularly dangerous." *See* Mot. at 38.

*Beach carnage?*, The Salt Lake Tribune (June 1, 2019), https://perma.cc/CJ42-BQF9 (quoting a former ATF officer's observation that "a suppressor will distort the sound in such a way that it would not immediately be recognizable as gunfire").

Courts have routinely rejected Second Amendment challenges to the NFA's requirements given their comparability to traditional firearms regulations.[7] *See, e.g.*, *Conner*, 2025 WL 2858030, at *5 (short-barreled rifles); *United States v. Lightner*, 2024 WL 2882237, at *3 (M.D. Fla. June 7, 2024) (suppressors); *United States v. Holder*, 2024 WL 1599916, at *7 n.7 (N.D. Ga. Jan. 19, 2024) (short-barreled rifles); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211–13 (S.D. Cal. 2023) (suppressors); *United States v. Villalobos*, 2023 WL 3044770, at *13 (D. Idaho Apr. 21, 2023) (suppressors); *United States v. Beaty*, 2023 WL 9853255, at *8 n.11 (M.D. Fla. Jan. 20, 2023) (suppressors); *see also Rush*, 130 F.4th at 641–45 (finding that the NFA's regulation of short-barreled rifles is "likely" consistent with the Nation's traditional of firearms regulation after an extensive historical analysis, but resolving the case on threshold grounds). Plaintiffs cite no case in which a court has reached a contrary conclusion, and this Court should not be the first.

## IV.    Any relief should be narrowly tailored to redress only plaintiffs' actual injuries.

Even if plaintiffs succeed on their claims, any remedy should be no broader than necessary to provide plaintiffs with complete relief, consistent with the constitutional and equitable limitations on this Court's remedial authority. *See Trump v. CASA, Inc.*, 606 U.S. 831, 853–54 (2025) ("Complete relief … is the maximum a court can provide."); *see also See Feds for Med. Freedom v. Biden*, 63 F.4th 366,

---

[7] But most courts reject Second Amendment challenges to the NFA on threshold grounds, like the one asserted above, *see supra* 29, and thus never conduct a historical analysis. *See, e.g.*, *United States v. Peterson*, --- F.4th ---, 2025 WL 3537261 (5th Cir. Dec. 9, 2025); *Robinson*, 2025 WL 870981, at *5; *Second Amend. Found.*, 702 F. Supp. 3d at 536–37; *Miller*, 2023 WL 6300581, at *1–3; *United States v. Burns*, 2025 WL 2076468, at *5–6 (S.D. Miss. July 23, 2025); *United States v. Shepherd*, 2024 WL 71724, at **4–6 (S.D. Miss. Jan. 5, 2024); *United States v. Morgan*, 2024 WL 150340, at *5–6 (W.D. La. Jan. 12, 2024), *aff'd* 147 F.4th 522 (5th Cir. 2025).

389 (5th Cir. 2023) ("[At the merits stage], the plaintiffs will have to *prove* that whatever [relief] they request is broad enough to protect against their proven injuries and no broader."), *judgment vacated on other grounds*, 144 S. Ct. 480 (2023). Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any "remedy must be tailored to redress" plaintiffs' "particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018). Traditional principles of equity reinforce that constitutional limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999), instructing that a remedy "be no more burdensome" to defendants "than necessary to provide complete relief" to plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *accord CASA*, 606 U.S. at 852.

Plaintiffs propose an injunction that would enjoin the enforcement of numerous NFA regulations on the manufacture, transfer, and possession of short-barreled rifles and shotguns, suppressors, and AOWS, and that would cover (i) themselves; (ii) Prime Protection's customers; (iii) the associational plaintiffs' members; and (iv) those members' customers. *See* Mot. at 43. But they have not justified such unnecessarily broad relief.

*First*, as explained above, *see supra* 8–9, the record is devoid of evidence that any plaintiff will suffer imminent, irreparable harm because of the NFA's requirements or prohibitions insofar as they apply to AOWs or the manufacturing or making of short-barreled rifles, short-barreled shotguns, or suppressors. *See Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."); *accord Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986) (irreparable harm "must be actual and not theoretical" to support the issuance of an injunction). Moreover, neither Brown nor Mayville have presented any evidence that the NFA's regulation of short-barreled shotguns will cause them any irreparable harm, and likewise, none of the associational plaintiffs have presented such evidence for their individual or commercial members.

There is thus no basis for enjoining the enforcement of the NFA's requirements or prohibitions against a plaintiff who has shown no likelihood of suffering irreparable harm on their account. *See Packard*, 782 F.2d at 115 (a plaintiff must "substantiate" any claim of irreparable harm with "proof").

*Second*, Prime Protection's "lost sales" theory of irreparable harm, *see* Prime Protection Decl. ¶ 6, cannot justify extending injunctive relief to its customers. As an initial matter, Prime Protection rests this theory on nothing more than the conclusory assertion that it "loses potential customers and business revenue because of the NFA's registration requirements." *Id.* But conclusory assertions of irreparable harm cannot suffice. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (a plaintiff cannot show imminent, irreparable harm with "unsubstantiated and conclusory assertions"); *accord, e.g.*, *Burns Prescription Pharm, Inc. v. Express Scripts, Inc.*, 2022 WL 17718616, at *2 (E.D. Mo. Dec. 15, 2022); *Berry v. 21st Circuit Ct. of St. Louis Cty.*, 2020 WL 6798999, at *3 (E.D Mo. Nov. 19, 2020). Indeed, the boilerplate assertions in Prime Protection's declaration warrant skepticism, as they appear to be lifted from a declaration submitted by another firearms dealer in a separate challenge to the NFA. *See Jensen v. ATF*, No. 2:25-cv-223 (N.D. Tex.), ECF No. 19 at 17.[8]

At any rate, Prime Protection's theory boils down to the belief that, if this Court enjoins enforcement of the NFA's registration requirements against any potential customers, then it would

---

[8] *Compare* Decl. of Hot Shots Custom LLC ¶ 6, *Jensen v. ATF*, No. 2:25-cv-223 (N.D. Tex.), ECF No. 19 at 17 ("Hot Shots Custom has lost sales because of the NFA's registration requirements, including sales to residents of Texas. Prospective and repeat customers have declined to purchase NFA firearms because the NFA requires them to submit personally identifying information to the federal government and go through the intrusive, time-consuming registration process. These sales to prospective and repeat customers would have occurred but for the NFA's registration scheme. Consequently, Hot Shots Custom loses potential customers and business revenue because of the NFA's registration requirements...."), *with* Prime Protection Decl. ¶ 6 ("Prime Protection has lost sales because of the NFA's registration requirements, including sales to residents of Missouri. Prospective and repeat customers have declined to purchase NFA firearms because the NFA requires them to submit personally identifying information to the federal government and go through the intrusive, time-consuming registration process. These sales to prospective and repeat customers would have occurred but for the NFA's registration scheme. Consequently, Prime Protection loses potential customers and business revenue because of the NFA's registration requirements....").

sell more short-barreled rifles and shotguns and suppressors. But "[s]peculation about how third parties" will behave in the marketplace "is insufficient to demonstrate irreparable harm." *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Lab.*, 2016 WL 6948061, at *30 (D. Kan. Nov. 28, 2016); *accord Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 78–79 (D.D.C. 2013) (rejecting claim of irreparable harm based on assertions about what plaintiffs "truly 'expect' [will] happen in the marketplace; what their customers are 'likely' to demand; and what 'could' happen to their businesses"). And even if Prime Protection could substantiate this speculation, any potential harm to its business absent injunctive relief would result from the independent choices of consumers, as nothing in the NFA prevents prospective customers from purchasing any of Prime Protection's products. Courts routinely reject claims of irreparable harm that depend on an indirect theory of causation about how a challenged law will impact a plaintiff's economic or other interests. *See, e.g.*, *Mkt. Synergy Grp., Inc.*, 2016 WL 6948061, at *30; *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36–37 (D.D.C. 2014) (holding that the plaintiff could not establish irreparable harm to economic interests because any revenue losses resulted from third parties' independent decisions, and not directly from the challenged law); *Am. Meat Inst.*, 968 F. Supp. 2d at 80–81 ("[Alleged harms] based on independent market variables such as how the supplier's customers and/or retail consumers might react" to a challenged law and concerns that plaintiffs "will ultimately lose future business because others may … react in a manner that may ultimately affect their companies negatively" are "indirect harm[s]" that are "neither certain nor immediate."); *V Real Est. Grp., Inc. v. U.S. Citizenship & Immigr. Servs.*, 2014 WL 5243369, at *3 (D. Nev. Oct. 15, 2014) (explaining that harms resulting from "independent decision of . . . third-parties to withhold their investments . . . do[] not constitute irreparable injury for the purposes of a preliminary injunction").

*Third*, plaintiffs cite no case—and defendants are aware of none—permitting an organization to seek and obtain relief on behalf of its members' customers. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) ("Even in the absence of injury to itself, an association may," under

certain circumstances, "have standing solely as the representative of its *members*." (emphasis added)).

*And finally*, if the Court is inclined to grant relief, it should limit any injunction only to the named plaintiffs, and members of the advocacy groups that the groups have chosen to identify and who have standing to challenge the NFA's regulations. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022) (holding that a membership organization cannot sue and obtain relief "on behalf of unnamed members"). The Court cannot directly grant a universal injunction. *CASA*, 606 U.S. at 856. Nor can it indirectly do so by extending relief to nonparties who are represented by a party, other than through class certification under Rule 23 or properly established associational standing. Plaintiffs have not sought or obtained class certification, and they have submitted declarations identifying a limited number of members—all named plaintiffs—for standing purposes. *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] properly conducted class action … can come about in federal courts in just one way—through the procedure set out in Rule 23."); *see also Summers*, 555 U.S. at 497–500 ("[T]he Court has required plaintiffs claiming organizational standing to identify members who have suffered the requisite harm."). Plaintiffs cannot end-run all three of those limits—*CASA*, Rule 23, and associational standing requirements—by obtaining an injunction barring the government from enforcing an injunction against individuals whose membership is unknown to the government. *See Religious Sisters of Mercy*, 55 F.4th at 602 (holding that an organization "lack[ed] associational standing to sue on behalf of unnamed members" where, "[o]ther than the three named plaintiffs who [were] members," the organization had "otherwise failed to identify members who have suffered the requisite harm").

Limiting a remedy to the members the advocacy groups have identified for standing purposes appropriately leaves the breadth of the remedy the groups can receive in their own hands. Nothing prevents them from naming as many of their members as they wish so that each member can benefit from any relief the Court orders. Likewise, nothing prevents the advocacy groups from seeking to

litigate this case as a class action. But what the Court cannot do is enjoin the government from enforcing the NFA against members of the advocacy groups when the government does not know who those members are because the groups have not identified them. Therefore, should any injunction issue in this case, the Court should make clear that the injunction runs only to the members that the advocacy groups chose to identify to the government for purposes of standing.

## CONCLUSION

The Court should grant summary judgment in defendants' favor on all of plaintiffs' claims.

Dated: December 17, 2025          Respectfully submitted,

                                  BRETT A. SHUMATE
                                  Assistant Attorney General
                                  Civil Division

                                  ANDREW I. WARDEN
                                  Assistant Branch Director

                                  /s/ Jody D. Lowenstein
                                  JODY D. LOWENSTEIN
                                  Mont. Bar No. 55816869
                                  Trial Attorney
                                  U.S. Department of Justice
                                  Civil Division, Federal Programs Branch
                                  1100 L Street NW
                                  Washington, DC 20005
                                  Phone: (202) 598-9280
                                  Email: jody.d.lowenstein@usdoj.gov

                                  *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On December 17, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Missouri, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice