# IN UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

CHRIS BROWN, et al.,

     *Plaintiffs*

  v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

     *Defendants.*

Case No. 4:25-cv-01162-SRC

**[PROPOSED]**

**BRIEF OF *AMICUS CURIAE* ROBERT M. MILLER, PH.D.**

**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITES...................................................................................ii

INTEREST OF AMICUS CURIAE ....................................................................1

ARGUMENT ......................................................................................................1

A.  The Supreme Court's Decisions in *Bruen* and *Heller* Are Controlling............................1

B.  Congress Has No Plenary Police Powers to Regulate Firearms for Crime Reduction. ...2

C.  NFA Firearms Are in Common Use for Lawful Purposes. ............................2

    1.  SBRs and SBSs Are in Common Use for Lawful Purposes........................2

    2.  Any Other Weapons Are in Common Use for Lawful Purposes ...............5

    3.  Silencers Are in Common Use for Lawful Purposes ................................6

    4.  Congress May Not Declare Firearms Dangerous and Unusual by Legislative Fiat...7

    5.  NFA Hearings Lack Evidence that NFA Firearms Are Dangerous and Unusual. ......7

D.  Taxing Fundamental Rights Is Unconstitutional. ............................8

E.  Registration Infringes the Right to Bear Arms.............................11

F.  Decisions in Other District and Circuit Courts Are Erroneous .....................11

CONCLUSION ..................................................................................................15

INDEX OF EXHIBITS
    Exhibit: Table of Figures

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITES

**CASES**

*A. Magnano Co. v. Hamilton*, 292 U.S. 40 (1934) ...................................................8

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, (1987) ...........................9

*Board of Education of Westside Community Schools (Dis. 66) v. Mergens*, 496 U.S. 226 (1990) ...................................................................................................9

*Cox v. New Hampshire*, 312 U.S. 569 (1941) .......................................................14

*Crandall v. Nevada*, 73 U.S. 35 (1868) ..................................................................8

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ...........................passim

*Doremus v. United States*, 249 U.S. 86 (1919) .......................................................8

*FBI v. Fikre*, 601 U.S. 234 (2024) ........................................................................10

*Follett v. McCormick*, 321 U.S. 573 (1944) ...........................................................9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...............10

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .............................................................7

*Grossjean v. American Press Co.*, 297 U.S. 233 (1936) .......................................8, 10

*Heller v. District of Columbia*, 670 F. 3d 1244 (2011) (Kavanaugh, J., dissenting) .................15

*McCray v. United States*, 195 U.S. 27 (1903) .........................................................8

*McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010) .................................15

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 576 (1983) ...................................................................................................9

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) .....................................................14

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (Gorsuch, J. concurring in part) ...........................................................................................14

*Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761 (9th Cir. 1937) ...................................................................................................................7

*National Maritime Union of America v. Herzog*, 78 F. Supp. 146 (D.D.C. 1948)(Prettyman, J. dissenting) ......................................................................................7

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (June 23, 2022) ................passim

*Robert M. Miller v. Pamela J. Bondi*, 1:22-cv-02579 (D.D.C).....................................................1

*Sonzinsky v. United States*, 300 U.S. 506 (1937) .....................................................................8, 9

*Spreckels Sugar Refining v. McClain*, 192 U.S. 397 (1904) ..........................................................8

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) .................................................................12

*United States v. Lopez*, 514 U.S. 549 (1995) .................................................................................2

*United States v. Robinson*, No. 23-12551 (11th Cir. Mar. 20, 2025).............................12, 13, 14

*United States v. Rush*, 130 F.4th 633 (7th Cir. 2025).....................................................12, 13, 14

United States v. Thompson/Ctr. Arms Co., 504 U.S. 505 (1992).........................................13, 14

## STATUTES

National Firearms Act of 1934, Pub. L. 73-474 (1934) .........................................................passim

One Big Beautiful Bill Act, Pub. L. 119–21 (2025).......................................................................9

## OTHER AUTHORITIES

Col. Robert E. Gardner, *Small Arms Makers: A Directory of Fabricators of Firearms, Edged Weapons, Crossbows and Polearms*, Crown Publishers Inc, New York: 1963............2

Firearms Commerce in the United States, Statistical Update 2024, ATF. ....................................3

https://www.nramuseum.org/the-museum/the-galleries/ancient-firearms/case-10-artcraftsmanship-in-the-old-world-iii/giovanni-beretta-(brescia,-italy)-folding-stock-snaphaunce-pistol.aspx..............................................................................................................2

https://www.nramuseum.org/the-museum/the-galleries/ancient-firearms/case-10-artcraftsmanship-in-the-old-world-iii/giovanni-beretta-(brescia,-italy)-folding-stock-snaphaunce-pistol.aspx..............................................................................................................2

https://www.rockislandauction.com/riac-blog/smith-and-wesson-revolvers-jim-supica-gun-collection#:~:text=One%20of%20the%20most%20obscure,3%20revolver. ....................3

McAulay, John D. (2004). "Col. Colt's Revolving Rifle in the Civil War." American Rifleman. National Rifle Association of America. https://www.americanrifleman.org/content/colt-s-model-1855-revolving-rifle-in-the-civil-war/ .................................................................................................................................2

National Museum of American History Behring Center; Norm Flayderman, *Flayderman's Guide to Antique American Firearms and their Values*, Gun Digest Books, Iola, 2007. 9th ed.................................................................................2

National Resource Committee, "Consumer Incomes in the United States: Their Distribution in 1935-36." U.S. Gov't Printing Office, Washington, D.C. August 1938 .......10

Philip A. Schmidt, U.S. Military Flintlock Muskets and their Bayonets: The Early Years, 1790—1815, at 75 (2006) ................................................................................2

Springfield Model 1795 Musket: America's First Production, Forgotten Weapons. Apr. 8, 2021, https://www.forgottenweapons.com/springfield-model-1795-musket-americas-first-military-production/ ......................................................................2

Stephen Gutowski. The Reload. June 2, 2023. https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/#:~:text=The%20ATF%20told%20The%20Reload,to%20seven%20million%20devices%20exist..........11

U.S. Bureau of Labor Statistics CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm. ...........................................................9

U.S. Census Bureau. *The Social and Economic Status of the Black Population.* Current Population Reports, series P-23, no. 80. Washington, D.C. U.S. Government Printing Office, 1979: 30...............................................................................................10

U.S. Springfield Model 1795 Flintlock Musket Type I, Nat'l Rifle Assoc. Museum, https://www.nramuseum.org .........................................................................2

U.S. Treasury Department. Annual Report of the Commissioner of Internal Revenue for the Fiscal Year Ended June 30, 1935. Washington, D.C.: U.S. Government Printing Office, 1935...............................................................................................10

## RULES

Factoring Criteria for Firearms with Attached "Stabilizing Braces," RIN 1140-AA55, 88 FR 6478. ....................................................................................................11

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I...............................................................................................15

U.S. Const. amend. II ........................................................................................1, 9, 15

U.S. Const. amend. XIV.........................................................................................15

### INTEREST OF AMICUS CURIAE

*Amicus curiae* Robert M. Miller is plaintiff in *Robert M. Miller v. Pamela J. Bondi*, 1:22-cv-02579 (D.D.C), a civil action challenging the constitutionality of the National Firearms Act of 1934 (NFA), Pub. L. 73-474 (1934). A decision in this case favoring Plaintiffs will be persuasive precedent in *Amicus*'s case. *Amicus* has a Ph.D. in Economics, specializing in cost-benefit analysis, public economics and microeconomics. *Amicus* has more than forty years of firearm experience. He owns twenty-four SBRs, three SBSs, and thirty-two silencers. This part Brandeis brief, part legal brief brings to the Court's attention relevant facts and points and authorities.[1]

### ARGUMENT

**A. The Supreme Court's Decisions in *Bruen* and *Heller* Are Controlling.**

It should not have to be said, but the reliance of Defendants and other courts on pre-*Heller* and *Bruen* cases defies the Supreme Court. Those cases were effectively overruled. The Second Amendment presumptively protects an individual's right to keep and bear arms for lawful purposes including self-defense. *Bruen*, 597 U.S. 1-2. "[T]o justify a firearm regulation, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id.* The Second Amendment is the product of interest balancing by the people. *Id*, citing *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("*Heller*"). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.*

---

[1] No counsel for any party authored this brief in whole or in part, nor did such counsel make a monetary contribution to fund this brief. No person other than *Amicus* made a monetary contribution intended to fund the preparation or submission of this brief. All parties consented to this brief.

1

**B. Congress Has No Plenary Police Powers to Regulate Firearms for Crime Reduction.**

Congress has no plenary police powers to reduce crime in several states. *United States v. Lopez*, 514 U.S. 549, 566 (1995). In NFA Hearings, the Government admitted that Congress had no police powers. *Hearings Before the Committee on Ways and Means*, House of Representatives, Seventy-Third Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 ("*NFA Hearings*") at 8, 102, 100, 134.

**C. NFA Firearms Are in Common Use for Lawful Purposes.**

1. SBRs and SBSs Are in Common Use for Lawful Purposes

*(a) Short-Barreled Rifles*

The Giovanni Beretta Folding Stock Snaphaunce Pistol, produced in 1683, could be concealed under a cloak.[2] Figure 2. The Springfield Model 1795 musket, produced from 1795-1814 with a 44-inch barrel, was often shortened to 10-14 inches for close quarters use.[3] Colt's New Model Revolving Rifle was produced from 1855-1863 with a barrel length as low as 15 inches.[4] Figure 3. The Springfield Model 1855 musket was produced in a pistol-carbine version with barrel lengths of 10-12 inches.[5] Figure 4. The Smith & Wesson New Model No. 3 Single Action Revolver, produced from 1870-1915 with a 6.5-inch barrel, was sometimes made with a detachable

---

[2] https://www.nramuseum.org/the-museum/the-galleries/ancient-firearms/case-10-artcraftsmanship-in-the-old-world-iii/giovanni-beretta-(brescia,-italy)-folding-stock-snaphaunce-pistol.aspx

[3] Philip A. Schmidt, U.S. Military *Flintlock Muskets and their Bayonets: The Early Years, 1790—1815*, at 75 (2006); U.S. Springfield Model 1795 Flintlock Musket Type I, Nat'l Rifle Assoc. Museum, https://www.nramuseum.org; Springfield Model 1795 Musket: America's First Production, Forgotten Weapons.com. Apr. 8, 2021, https://www.forgottenweapons.com/springfield-model-1795-musket-americas-first-military-production/.

[4] McAulay, John D. (2004). "Col. Colt's Revolving Rifle in the Civil War." American Rifleman. National Rifle Association of America. https://www.americanrifleman.org/content/colt-s-model-1855-revolving-rifle-in-the-civil-war/

[5] National Museum of American History Behring Center; Norm Flayderman, *Flayderman's Guide to Antique American Firearms and their Values*, Gun Digest Books, Iola, 2007. 9th ed.; Col. Robert E. Gardner, *Small Arms Makers: A Directory of Fabricators of Firearms, Edged Weapons, Crossbows and Polearms*, Crown Publishers Inc, New York: 1963. 185.

shoulder stock.[6] According to the ATF, there were 870,286 SBRs registered as of May 2024, likely surpassing one million by the date of this brief.[7] Rifles are known to be used in only 2.6% of homicides, and SBRs are a very small portion of those.[8] Citizens of forty-five states are permitted to own SBRs. The M-4 carbine with its 14.5 inch barrel is U.S. military standard issue. Figure 1.

*(b) Short-Barreled Shotguns*

The British Sea Service Blunderbuss produced around 1750 was a smoothbore shotgun with a 14-inch barrel. Figure 8. The Wilson Flintlock Blunderbuss with its 11-inch barrel first appeared in the 16th century. Figure 9. In the 1860s, "coach guns" with shortened barrels were used for personal protection on stagecoaches. Figure 10. There are currently at least 165,180 SBSs registered under the NFA,[9] but there are *millions* more firearms that could soon be made into SBSs by adding a shoulder stock. The Mossberg 590 Shockwave fires shotgun shells with from its 14-inch barrel. Figure 14 (bottom). It was the most popular selling "shotgun" in the U.S. in 2020.[10] The Shockwave is technically not a shotgun – it is legally a "firearm" because it is longer than 26 inches. Other similar firearms using shotgun shells include the Remington TAC-14 with a 14-inch barrel, Figure 15 (bottom) and the Remington V3 TAC-13 with a 13-inch barrel. Figure 16 (bottom). While these short-barreled firearms are not NFA regulated, they demonstrate vast popularity of short-barreled, shotgun-type weapons for home and personal defense. SBSs are permissible for civilian ownership in forty-four states and territories.

---

[6] https://www.rockislandauction.com/riac-blog/smith-and-wesson-revolvers-jim-supica-gun-collection#:~:text=One%20of%20the%20most%20obscure,3%20revolver.

[7] Firearms Commerce in the United States, Statistical Update 2024, ATF. 12.

[8] FBI Uniform Crime Report, *Crime in the United States*, 2019 (sum of states).

[9] Firearms Commerce in the United States 2024. 12.

[10] https://www.americanrifleman.org/content/mossberg-590-shockwave-top-selling-pump-shotgun-in-2020/

*(d) SBRs and SBSs Are Less Dangerous than Longer-Barreled Firearms.*

Shorter barrels on firearms substantially reduce the kinetic energy of their projectiles. Table 1 shows muzzle velocity and energy[11] for rifles of different barrel lengths.[12] A 16.5 inch rifle has 19.2% higher muzzle velocity and 42.1% more energy than a 10 inch SBR.

**Table 1: Muzzle Velocity and Energy (55 grain, 5.56mm)**

| Barrel Length | Muzzle Velocity | % Change | Cum. % | Energy (Joules) | % Change | Cum. % |
|---|---|---|---|---|---|---|
| 10 | 2,489 | | | 1,025.6 | | |
| 12 | 2,646 | 6.3% | 6.3% | 1,159.0 | 13% | 13% |
| 14 | 2,808 | 6.1% | 12.8% | 1,305.3 | 12.6% | 27.2% |
| 16.5 | 2,968 | 5.7% | 19.2% | 1,458.3 | 11.7% | 42.1% |
| 18 | 3,006 | 1.3% | 20.8% | 1,495.9 | 0.7% | 45.9% |

Table 2 shows the size of buckshot spread for the three shotguns at different distances, one with a short barrel. There is no meaningful difference in the size of the pattern.

**Table 2: 12 gauge Buckshot Spread Pattern (inches)**

| Distance (feet) | Mossberg 500 14 inch bbl | Mossberg 590A1 18 inch bbl | Remington 870 18 inch bbl |
|---|---|---|---|
| 12 | 1.0 | 1.5 | 1.0 |
| 30 | 2.5 | 2.25 | 2.0 |
| 50 | 5.5 | 5.75 | 9.0 |
| 60 | 7.0 | 7.0 | 9.0 |
| 75 | 10.5 | 9.0 | 11.5 |

The benefit of short-barreled firearms is to better maneuver through narrow hallways and doorways and to add a silencer without bearing too much length and weight. These benefits come at a cost of reduced energy and magazine capacity.[13]

---

[11] Calculated using Calculator Soup Kinetic Energy Calculator
https://www.calculatorsoup.com/calculators/physics/kinetic.php

[12] Rifleshooter.com, December 7, 2015, 223/5.56mm NATO Barrel length and velocity: 26 inches to 6 inches, https://rifleshooter.com/2015/12/223-remington-5-56mm-nato-barrel-length-and-velocity-26-inches-to-6-inches/

[13] A shotgun magazine is typically the same length of the barrel or less. Shotguns with shorter barrels generally have fewer rounds of ammunition.

*(e) SBRs and SBSs Are No More Concealable than Non-NFA Regulated Firearms.*

Figure 17 shows four *identical* firearms with the same barrel length. The SBR (bottom) is the same length as a pistol with a stabilizing brace (second from top), the latter of which is not NFA regulated. The SBR is *longer* than a pistol without a brace or stock (top), which is also not NFA regulated. According to erroneous ATF classifications, adding a vertical forward grip to a pistol (third from top) makes the pistol into an NFA regulated AOW. Figure 17 therefore proves that SBRs are *less concealable* than non-NFA regulated firearms. Figures 14, 15, and 16 show that SBSs are *less concealable* than the popular short-barrel firearms that are not NFA regulated: Mossberg Shockwave, Remington Tac-14, and Remington V3 Tac-13.

*(f) SBRs and SBSs Are Useful for Home Defense and Sporting Purposes.*

Self-defense is most acute in the home. *Heller*, 554 U.S. at 628. Short barrel rifles are particularly useful in homes with narrow hallways and doorways. *Amicus* prefers and recommends SBRs and SBSs for home defense to his customers.

SBRs and SBSs are commonly used for sporting purposes such as hunting and competitions organized by the National Rifle Association (NRA), United States Practical Shooting Association (USPSA), the International Defensive Pistol Association (IDPA), and the National Shooting Sports Foundation (NSSF). *See* Figure 19, 20.

2. Any Other Weapons Are in Common Use for Lawful Purposes

There are more than 88,149 AOWs registered under the NFA as of July 2024.[14] Firearms that would today be classified as AOWs have been in common use for lawful purposes for centuries. German guns consisting of a combination of two or more shotgun and rifle barrels (Büchsflinte, Drilling, Vierling, etc.) were manufactured in Germany in the 19th century by

---

[14] Firearms Commerce in the United States 2024. 12.

notable manufacturers such as Emil R. Martin & Son, Krieghoff, Heym, J.P. Sauer & Sohn, Ernst Kerner, and Imman Meffert. Figure 21. Marble's Game Getter, produced from 1908 to the present, has a rifle barrel over a smooth-bore shotgun barrel, with a folding stock. Figure 6. The gun was produced in barrel lengths as low as 12 and 15 inches.

Disguised firearms that are classified as AOWs include cane guns, ring guns, umbrella guns, pen guns, sleeve guns, and wallet guns, which were produced in the mid-19th to early 20th centuries. The single shot Remington Cane Gun was produced from 1858-1888. Figure 22. The Remington Percussion Cane Gun was produced from 1858-1866. Figure 23. R. Stewart of Glasgow marketed Le Petit Protector, a ring gun, around 1870. Figure 24. *Amicus* is aware of no firearm regulations in the U.S. prohibiting these AOWs until the NFA.

### 3. Silencers Are in Common Use for Lawful Purposes

Silencers are designed to reduce the report from supersonic gases exiting firearm muzzles, functioning on the same principles as an automobile muffler. Silencers also reduce recoil, muzzle rise, flash, and infrasonic compression waves. Approximately *50 million* Americans suffer from tinnitus or hearing loss.[15] A silencer is a safety device that reduces sound intensity by 20-35 decibels. Sound intensity in an unsuppressed rifle is 140–167 decibels, 154–169 decibels for pistols, and 150–162 decibels for shotguns. These are louder than a rock concert and on par with jet aircraft, jackhammers and ambulance sirens. Defendants admit suppressors have lawful and beneficial uses, which is the beginning and the end of the *Bruen* analysis. ECF 33 at 43.

Defendants falsely argue that "silencers are not typically possessed by law-abiding citizens for lawful purposes." ECF 33 at 43. In July 2024 there were more than three million registered

---

[15] https://www.hearingloss.org/wp-content/uploads/2023/09/HLAA_Hearing_Loss_Facts_and_Statistics.pdf

silencers, and that number is constrained by the NFA.[16] Silencers are legal in forty-two (42) states.

Silencers are *almost never* used in crimes; in 2017, ATF reported 44 prosecutions out of 1.3 million registered silencers (0.0034%).[17] From 1995 to 2005, there were only 153 prosecutions for crimes involving silencers, and only a tiny percentage involved violence.[18] Defendants argue that silencers frustrate law enforcement by making it harder to track down shooters. ECF 33 at 31–32. The Supreme Court rejected these means-ends arguments in *Bruen*. Defendant's facts are also not supported by competent affidavits. Shots fired from suppressed firearms can still be detected by crime surveillance systems like ShotSpotter.[19]

4.  Congress May Not Declare Firearms Dangerous and Unusual by Legislative Fiat.

Congress cannot declare that a firearm is "dangerous and unusual." The Supreme Court repeatedly emphasized that courts had an independent obligation to evaluate facts when constitutional rights are implicated. *Gonzales v. Carhart*, 550 U.S. 124 (2007). "[C]ourts must 'determine independently,' or some equivalent expression, the facts when constitutional questions of congressional power are presented." *National Maritime Union of America v. Herzog*, 78 F. Supp. 146, 184 (D.D.C. 1948) (Prettyman, J. dissenting). "Congress cannot establish its own power by a mere affirmation of fact." *Id.* at 185. "Congress has no power, by mere legislative fiat, to create a fact or to change a fact." *Nat'l Labor Relations Bd. v. Mackay Radio & Telegraph Co.*, 92 F.2d 761, 762 (9th Cir. 1937).

5.  NFA Hearings Lack Evidence that NFA Firearms Are Dangerous and Unusual.

The initial NFA draft did not regulate SBRs. Nothing in hearing testimony reveals why

---

[16] Firearms Commerce in the United States, Statistical Update 2024, ATF. 12.

[17] https://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/

[18] https://www.westerncriminology.org/documents/WCR/v08n2/clark.pdf

[19] https://www.soundthinking.com/wp-content/uploads/2019/05/FAQ-June-2019.pdf

Congress believed SBRs were dangerous. Rifles were added because a congressman believed that leaving out rifles would put his hunting constituents at risk when including them put hunters at more risk. *NFA Hearings* at 13. Attorney General Cummings made a conclusory claim that "A sawed-off shotgun is one of the most dangerous and deadly weapons." *NFA Hearings* at 6. He presented no data in support of his claim, and *Amicus's* data disproves this. The Hearings did not even mention silencers and AOWs as dangerous weapons.

**D.  Taxing Fundamental Rights Is Unconstitutional.**

The Supreme Court ruling in *Sonzinsky v. United States*, 300 U.S. 506 (1937) should be disregarded because *Heller, Bruen,* and other decisions eroded its legal foundation. *United States v. Gaudin,* 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444., cited in *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,* 585 U.S. 878, 881 (2018). *Sonzinsky* is effectively overruled by erosion for the following reasons:

(1) *Sonzinsky* preceded *Heller* and *Bruen* by more than 74 years, so the case did not employ the developing framework of the individual right to bear arms and the historical analogues necessary to overcome the presumption of lawfulness.

(2) *Sonzinsky* relied on cases of taxing butter substitutes, sugar, and drugs. *A. Magnano Co. v. Hamilton,* 292 U.S. 40 (1934); *McCray v. United States,* supra, 195 U.S. 27 (1903); *Spreckels Sugar Refining v. McClain,* 192 U.S. 397 (1904); *Doremus v. United States,* 249 U.S. 86 (1919). Undoubtedly, a court today would not likely find that those types of taxes are analogous to taxing a fundamental right.

(3) *Sonzinsky* did not consider the NFA to be a tax on fundamental rights, so it did not apply the Supreme Court's decisions in *Grossjean v. American Press Co.,* 297 U.S. 233 (1936) or *Crandall v. Nevada,* 73 U.S. 35 (1868). After *Sonzinsky,* the Supreme Court issued numerous decisions squarely asking and answering whether taxing

fundamental rights was constitutional. *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943); *Follett v. McCormick*, 321 U.S. 573, 577 (1944); *Boddie v. Connecticut*, 401 U.S. 371 (1971); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, (1987).

Thus, the three legs of *Sonzinsky's* stool are broken and *Sonzinsky* must fall.

Defendants rely on historical analogues of "several states" banning or taxing pocket pistols. ECF 33 at 30. But none of those taxes were so high that the majority of the population could no longer afford them, as with the NFA. Defendants argue that they still receive some tax revenues after the One Big Beautiful Bill Act, Pub. L. 119–21 (2025) from businesses that import, manufacture, or deal in firearms. ECF 33 at 9. This Court can clearly bifurcate its judgment of the constitutionality of the tax on the making and transfer of *each firearm* (Section 3) from the special occupational tax levied periodically on importers, manufacturers, and dealers (Section 2).

Defendants argue that registration helps the government identify the chain of possession of a firearm and the identify the maker liable for the tax. ECF 33 at 10–12. This means-end scrutiny fails under *Bruen*. Plaintiffs argue correctly that with a $0 tax the government relinquishes interest in registration to track tax payments of taxes. When the text and legislative history prove that the *purpose* of a tax is to infringe a right, the Court may strike it down. *Board of Education of Westside Community Schools (Dis. 66) v. Mergens*, 496 U.S. 226, 249 (1990). Congress openly stated it wanted regulated firearms to be too expensive for most people to own. *NFA Hearings* at 19, 91. The $200 NFA tax in 1934 was equivalent to $4,732 in today's dollars.[20] The tax was 17.2% of

---

[20] U.S. Bureau of Labor Statistics CPI Inflation Calculator,
https://www.bls.gov/data/inflation_calculator.htm.

the 1935-36 median family income – more than two months wages.[21] Black families earned 18-51% of what white families earned, making regulated guns even less accessible to them.[22]

Despite a zero tax, Plaintiffs' objections to the tax are not moot because Congress could, at any moment, increase the tax in reconciliation with only a bare majority of the House and Senate and the President's signature. The likelihood of policy reversal preserves the Plaintiffs' right to judgment on the merits of their tax opposition unless Defendants meet a stringent standard that the allegedly wrongful behavior could not reasonably be expected to recur. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167 (2000); see also *FBI v. Fikre*, 601 U.S. 234 (2024). One U.S. Senator recently proposed an amendment to *increase* the NFA tax from $200 to $4,709 – the inflation adjusted tax level. All forty-seven Senators in his party voted in favor of it.[23]

The NFA tax had the effect of infringing rights. No NFA firearms were sold in 1934 after the effective date of the NFA.[24] From 1934-35, there were only 4,686 transfers of regulated firearms.[25] Even if Congress intended to raise revenue, the NFA tax had the inevitable, unlawful effect of infringing the right to bear arms. *Grossjean,* 297 U.S. at 244–47.

Even though the adverse economic effects of the fixed $200 tax have declined since 1934 due to inflation, taxation remains a substantial deterrent to owning NFA firearms. When ATF issued a rule allowing the tax-exempt making of SBRs from braced pistols it received 255,162

---

[21] National Resource Committee, "Consumer Incomes in the United States: Their Distribution in 1935-36." U.S. Gov't Printing Office, Washington, D.C. August 1938: 4.

[22] Census Bureau. *The Social and Economic Status of the Black Population.* Current Population Reports, series P-23, no. 80. Washington, D.C. U.S. Government Printing Office, 1979: 30.

[23] 171 Cong. Rec. S4543 (daily ed. July 22, 2025) (S. Amdt. 2973 to H.R. 3944)

[24] "Machine Guns' Sale Is Halted," The Washington Post, December 25, 1934.

[25] U.S. Treasury Department. Annual Report of the Commissioner of Internal Revenue for the Fiscal Year Ended June 30, 1935. Washington, D.C.: U.S. Government Printing Office, 1935: 18.

applications.[26,27] This natural experiment shows that exemption of the $200 tax was the *but for* reason for up to a quarter million Americans to make an SBR. With the new zero dollar tax, *Amicus* estimates gun owners will register *millions* of NFA firearms in 2026. The NSSF estimated that on January 1, 2026 alone, approximately 150,000 eForms were submitted, compared to the typical daily volume of about 2,500.[28] *Amicus* estimates 370,000 forms submitted on January 2–6, 2026.[29]

**E.  Registration Infringes the Right to Bear Arms.**

When ATF offered tax-exempt making of braced pistols into SBRs, it received a quarter million applications from the three to seven million people who owned braced pistols. This natural experiment demonstrates that between 91.5% and 99.36% of braced pistol owners refused to register them even when it was free. This proves that the registration requirement is a substantial deterrent to owning SBRs. The reasons gun owners are often unwilling to register their firearms is that they reasonably fear from many historical examples that registration is a precursor to future confiscation. They credibly fear, however improbable, that being on a government "list" could lead to a S.W.A.T. team showing up at their door at 2:00 a.m. They also hesitate to register NFA firearms because of the costs and restrictions on interstate travel.

**F.  Decisions in Other District and Circuit Courts Are Erroneous**

Defendants invite this Court to adopt fallacious precedent from other courts saying that the Supreme Court's decision in *Miller v. United States*, 307 U.S. 174 (1939) carries over to all other NFA regulated firearms. ECF 33 at 41, citing, *United States v. Rush*, 130 F.4th 633, 637 (7th Cir.

---

[26] ATF Brace Rule (2023), 88 FR at 6569.

[27] Stephen Gutowski. The Reload. June 2, 2023. https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/#:~:text=The%20ATF%20told%20The%20Reload,to%20seven%20million%20devices%20exist.

[28] https://www2.nssf.org/l/127421/2026-01-02/5lv41v

[29] Based on control numbers provided by another FFL/SOT. Grok estimated that eForm 1 and 4 were 98–99% of forms submitted those days, and the remainder were for Forms 2, 3, 5, 6, 9, 10, 20.

2025) and *United States v. Robinson*, No. 23-12551, 2025 WL 870981, at *5 (11th Cir. Mar. 20, 2025) . This Court should decline the invitation.

Defendants cannot piggyback on the Supreme Court's *evidentiary* ruling in *Miller*. Respondent Miller died before oral arguments and thus failed to present facts demonstrating that SBSs had been used in World War I. The Court refused to take judicial notice that SBSs have any reasonable relationship to the preservation of a well-regulated militia. *Miller*, 307 U.S. at 174. SBSs (a.k.a. blunderbusses) have long been used in military service and civilian self-defense, most notably by the Pilgrims in the Plymouth Colony.

The government's argument turns the *Heller/Bruen* analysis on its head requiring civil plaintiffs and criminal defendants to prove that other NFA firearms are "meaningfully different" from SBSs. Instead, it is the government's burden to produce historical regulatory analogues to prove that NFA firearms are meaningfully different than Title I guns. *United States v. Robinson*, No. 23-12551, 2025 WL 870981, at *1 (11th Cir. Mar. 20, 2025), cert. denied, No. 25-5150, 2025 WL 3620471 (U.S. Dec. 15, 2025); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). The Second Amendment ***presumptively*** protects all instruments that constitute bearable arms. *Bruen*, 597 U.S. 1-2. All NFA firearms are bearable arms.

The Supreme Court's decisions in *Heller* and *Bruen* imply that courts must conduct an ***independent analysis*** for each "sort[] of weapon," based on facts presented in the specific case, to determine whether they are protected.[30] A hand waving corollary is no substitute for the *Heller/Bruen* analysis.

Exactly as in *Miller*, the Seventh Circuit declined to recognize SBRs as "arms" because there was no evidence in the record that SBRs "are commonly used by ordinary, law-abiding

---

[30] Heller, 554 U.S. at 570.

citizens for a lawful purpose like self-defense." *United States v. Rush*, 130 F.4th 633, 640 (7th Cir. 2025), cert. denied, No. 24-1259, 2025 WL 3620422 (U.S. Dec. 15, 2025). This was an *evidentiary* decision, not a decision of law. This *Brandeis* brief provides that evidence.

Seventh Circuit relied on a *non sequitur* argument by the government that historical regulations required militiamen to muster with a "good fixed musket … not less than three feet, nine inches, nor more than four feet three inches in length." *Rush* at 641. It does not follow that because militiamen were required to muster with longer-barreled firearms that they were prohibited from owning shorter-barreled firearms. Longer barreled firearms were preferred by militias for technical and military reasons. Eighteenth century firearms had a poor fit between crudely forged barrels and hand-cast lead balls, which allowed propellant gases to slip past the lead ball, reducing velocity, and diminishing range, accuracy, and terminal energy. Longer barreled firearms were also preferred to host bayonets for use as spears. Militias favored standardization for the efficiency of military logistics and training.

Seventh Circuit, violating the principle of party presentment, offered its own historical analogues of regulating firearms. *Rush* at 642. Its arguments fall flat because none of the analogues the court provided involved regulation of short-barreled weapons or AOWs. It cited laws fining those who go armed offensively; fines, taxes, and sureties on gun possession; carrying firearms in certain parts of New York City; and fines for discharging a weapon. These laws regulate certain *actions* by persons owning guns, not the ownership of certain *types* of guns.

As the Eleventh Circuit did in *Robinson*, the Seventh Circuit relied on *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992), which erroneously upheld a regulation because the firearms were likely to be used for criminal uses – an argument expressly rejected in the later *Heller/Bruen* decisions. *Rush* at 643. Seventh Circuit claims, "[t]he NFA regulates rifle

13

barrel length because a short-barreled rifle's concealability coupled with its 'heightened capability to cause damage' make the weapon more appealing to those who intend to wield the firearm for unlawful use." *Id.* Aside from inventing false facts from whole cloth, the Seventh Circuit relies on the rejected argument in *Heller/Bruen* that guns can be regulated if they are commonly used for criminal purposes. The Seventh Circuit ignored Rush's evidence that SBRs were in common use for lawful purposes well before the time of the Founding and are still in common use today. *Rush* at 644. Courts may disagree with the Supreme Court's decisions, but they are never free to defy them." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n,* 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J. concurring in part).

The Eleventh Circuit's shortcut amounts to a circular argument, "NFA regulated firearms are dangerous and unusual because the NFA regulates them." The Eleventh Circuit relied on *dicta* saying, "It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes...." citing *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992). The Supreme Court expressly rejected that analysis, holding that the dispositive inquiry *is not* whether a firearm is commonly used by criminals or particularly suited to criminal uses, such as handguns, but whether they are commonly used by citizens for lawful purposes. *Heller*, 554 U.S. at 628–29.

The Eleventh Circuit rejected Robinson's fee jurisprudence argument that Supreme Court precedent precluded taxation of fundamental rights, citing *Murdock v. Pennsylvania*, 319 U.S. 105 (1943) and *Cox v. New Hampshire,* 312 U.S. 569 (1941). The Court reasoned that because *Bruen* rejected means-end scrutiny in reviewing *firearm regulations*, that it could not apply the means-end tests in *Cox* and *Murdock* in reviewing *the tax* in the appellant's case. *Robinson* at *6. This is *non sequitur*. Courts are required to interpret *Cox, Murdock, Heller,* and *Bruen* in harmony with

14

one another, not in opposition. The First Amendment, like the Second Amendment, is the very product of interest balancing by the people. *Bruen*, 597 U.S. at 26. The Second Amendment is not a second-class right. *McDonald v. City of Chicago*, IL, 561 U.S. 742, 780 (2010). If the First Amendment prohibits taxes on free speech, then so too must the Second Amendment prohibit taxes keeping and bearing arms. Sumptuary taxes on non-firearms are not analogous to the NFA. There is no right to consume goods commonly subject to sumptuary taxes – e.g., liquor, cigarettes, marijuana, gambling, pornography – but there is a right to bear arms.

The NFA, enacted long after the Founding, the Second Amendment, and the Fourteenth Amendment, cannot stand as its own analogy. *Bruen*, 579 U.S. at 35; *Heller v. District of Columbia*, 670 F. 3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

## CONCLUSION

For the foregoing reasons and those presented by Plaintiff and other amici supporting Plaintiff, this Court should grant Plaintiff's motion for summary judgment.

*Amicus* declares under penalty of perjury that the facts presented in this brief are true and correct to the best of his understanding and experience. 28 U.S.C. § 1746

Dated: January 8, 2026

Respectfully Submitted,

Robert M. Miller, Ph.D.
4094 Majestic Lane, #278
Fairfax, VA 22033
(415) 596-2444
Robmiller44@hotmail.com

*Amicus Curiae*

15

## EXHIBIT 1

**Figure 1**



U.S. Army M4 Carbine, 14.5" barrel

**Figure 2**



Giovanni Beretta Folding Stock Pistol

**Figure 3**



Colt New Model Revolving Rifle, 15" Bbl

**Figure 4**



Springfield Model 1855, 12" Barrel

**Figure 5**



Winchester Model 1892, "Mare's Leg"

**Figure 6**



Marble's Game Getter, 1908

**Figure 7**



Sharp's Model 1859 Indian Blanket Gun

**Figure 8**



British Sea Service Blunderbuss, c. 1750

1

Exhibit 1

**Figure 9**



Wilson Blunderbuss, 11" Barrel, c. 1750

**Figure 10**

Theophilus Coach Gun, 15.9" Barrel, c. 1800-1815

**Figure 13**



AR Pistol, 10.3" Barrel (top)
AR SBR, 10.3" Barrel (bottom)

**Figure 14**



Mossberg 590 Shotgun, 18.5" Barrel (top)
Mossberg 590 SBS, 14" Barrel (middle)
Mossberg Shockwave, 14" Barrel (bottom)

**Figure 15**

Remington 870, 18.5" Barrel (top)
Remington 870 SBS, 14" Barrel (middle)
Remington TAC-14, 14" Barrel (bottom)

**Figure 16**



Remington V3 Comp. Shotgun, 22" Bbl (top)
Remington V3 TAC-13, 13" Barrel (bottom)

2                                    Exhibit 1

**Figure 17**



**Figure 18**







AR Pistol (top)
AR Pistol with Brace (second)
Any Other Weapon (third)
AR Short-Barreled Rifle (bottom)

Two-Handed Handgun Shooting
Competitive Shooter (top)
Law Enforcement (middle)
Military (bottom)

**Figure 19**



Competitive Shooter Using MP5 SBR

**Figure 20**



Competitive Shooter Using APC-9 SBR

3

Exhibit 1

**Figure 21**



Emil R. Martin & Sohne
"Drilling" Gun c. 1865-1896

**Figure 22**



Remington Single-Shot
Cane Gun, c. 1858-1888

**Figure 23**



Remington Percussion Cane Gun
1858 to 1866

**Figure 24**



R. Stewart Le Petit Protector
Ring Gun, c. 1870

**Figure 25**



Finger Stop

**Figure 26**



Hand Stop

4

**Exhibit 1**

**Figure 27**

**Figure 28**





SLR Solo 9" Ultra Lite
Handguard

Heckler and Koch MP5

**Figure 29**



TAC-SAC Accessory

5

**Exhibit 1**