**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRIS BROWN; ALLEN MAYVILLE; PRIME PROTECTION STL, LLC D/B/A PRIME PROTECTION STL TACTICAL BOUTIQUE; NATIONAL RIFLE ASSOCIATION OF AMERICA; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; and AMERICAN SUPPRESSOR ASSOCIATION, | : : : : : : : : | |
| | : | |
| *Plaintiffs*, | : | No. 4:25-cv-01162-SRC |
| | : | |
| v. | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | : : : : : : : : | |
| | : | |
| *Defendants*. | : | |

**<u>PLAINTIFFS' SUPPLEMENTAL BRIEF</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................................................1

I.      Plaintiffs' Course of Conduct is "Arguably Affected with a Constitutional Interest."........4

II.     The Common-Use Inquiry is the Product of *Heller*'s and *Bruen*'s Historical Inquiry. .......6

III.    To Determine Whether a Type of Arm is "in Common Use," a Court Should Look to Nationwide Evidence of Whether it is Numerically or Jurisdictionally Common. .............9

IV.   Plaintiffs Arguably Bear the Burden of Proving that an Item is Covered by the Plain Text of the Second Amendment. ........................................................................................12

V.    Possession of Suppressors Is Covered by the Plain Text of the Second Amendment. ......12

VI.   The NFA is Not a "Shall-Issue" Licensing Regime..........................................................18

VII.  "Shall-Issue" Licensing Regimes Are Not Presumptively Constitutional. ........................19

VIII. ATF's Application of the NFA in this Case........................................................................20

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774 (8th Cir. 2019).......................................4

*Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871)..........................................................................14

*ANJRPC v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ..............................................................16

*Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022) ..............................................................................4

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*, 974 F.3d 237 (3d. Cir. 2020)...............10

*ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022) (mem.)........................................................................10

*Bond v. United States*, 564 U.S. 211 (2011).................................................................................4, 5

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ...........................................................10, 11, 12, 13

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016) ..................................................................4

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)...................................................12

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012)..............................................4

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...........................6, 7, 8, 9, 11, 12, 13, 14, 19

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ...............................................................16, 17, 18

*Dusky v. United States*, 362 U.S. 402 (1960)...................................................................................15

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................................................14

*Friedman v. City of Highland Park*, 136 S. Ct. 447 (2015) (mem.) .................................................10

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) ...................................................12

*Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007) ...........................................5, 6

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..............................................18, 19

*Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904 (8th Cir. 2025)...................................4, 5

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)...................................16

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022)............................................................................4

*Luis v. United States*, 578 U.S. 5 (2016).................................................................................14, 15

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024).......................................12, 20

*McConnell v. FEC*, 540 U.S. 93 (2003)..........................................................................................15

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023)..............................................................................15

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336 (2020)...................................14

*New York State Rifle & Pistol Association v. Bruen*,
   597 U.S. 1 (2022)...................................................................6, 8, 9, 12, 13, 15, 18, 19, 20

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ...........................................................................................4

*Parke v. Raley*, 506 U.S. 20 (1992)................................................................................................15

*Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001)......................................4

*Saia v. People of State of N.Y.*, 334 U.S. 558 (1948) ...............................................................13, 16

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025) .......................11

*Snope v. Brown*, 145 S. Ct. 1534 (2025) (mem.) ...........................................................................11

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................................................................5

*Staples v. United States*, 511 U.S. 600 (1994) ...............................................................................11

*United States v. Arthur*, No. 7:22-cr-5-D, 2023 WL 12195529 (E.D.N.C. Jan. 17, 2023) ............17

*United States v. Arthur*, 160 F.4th 597 (4th Cir. 2025) .................................................................17

*United States v. Bridges*, 150 F.4th 517 (6th Cir. 2025) ...............................................................11

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)...................................................................17

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sep. 20, 2019).................17

*United States v. Miller*, 307 U.S. 174 (1939).................................................................14, 16, 19

*United States v. Morgan*, 150 F.4th 1339 (10th Cir. 2025) ...........................................................12

*United States v. Rahimi*, 602 U.S. 680 (2024) ...............................................................................13

*United States v. Saleem*, No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024)......................17

**Constitutions and Statutes**

U.S. Const. art. I, § 8, cl. 16 ...............................................................................................14

Act of May 8, 1792, ch. 33, 1 Stat. 271, 271, § 1 ..........................................................14

**Other Authorities**

J. Joel Alicea, Bruen *Was Right*, 174 U. Pa. L. Rev. 13 (2025)....................................................8, 9

Gov't's Suppl. Resp. to Def's. Pet. for Reh'g En Banc, *United States v. Peterson*,
    No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 .......................................................18

*Maxim 9 Instruction Manual*, SilencerCo, https://perma.cc/3VKZ-6CXN ..........................16, 17

Peter A. Patterson, *Common Use Is Not a Plain-Text Question*, Per Curiam,
    Harv. J.L. & Pub. Pol'y 1 (2025), https://perma.cc/AZS3-JKAN ..............................7, 8, 9

Plaintiffs submit this supplemental brief in response to the Court's March 24, 2026, Order, ECF No. 64, directing the parties to address the following issues.

I.      **Plaintiffs' Course of Conduct is "Arguably Affected with a Constitutional Interest."**

For standing in a preenforcement challenge, "injury in fact exists when the plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (quotation marks and citation omitted). Plaintiffs argue that the NFA provisions challenged in this case exceed Congress's powers. Plaintiffs have a "direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Although *Bond* arose in the context of a criminal defendant challenging the statute under which she was convicted, *Bond* provides no reason to differentiate between a preenforcement and post-enforcement challenge on this point. Indeed, the Court is foreclosed from holding otherwise, as the Eighth Circuit has repeatedly held that plaintiffs have standing to bring pre-enforcement challenges based on structural provisions of the Constitution. *See, e.g.*, *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 914 (8th Cir. 2025) (Supremacy Clause); *Alexis Bailly Vineyard*, 931 F.3d at 778 (dormant commerce). Other circuits have done the same.[1] What is more, prominent Supreme Court cases involving structural provisions of the Constitution have been brought in a pre-enforcement setting. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519 (2012).

---

[1] *See, e.g.*, *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022); *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012); *Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001).

Plaintiffs' injury is not a generalized grievance. Plaintiffs desire to possess, acquire, or make NFA firearms without registering them. If they engage in that conduct, there is a credible threat of criminal enforcement against them. Defendants have not disclaimed any intent to prosecute Plaintiffs under the NFA. The challenged NFA provisions therefore injure Plaintiffs "in a personal and individual way"; they do not assert a "generalized grievance" shared by the public. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 & n.7 (2016) (quotation marks and citation omitted).

To be clear, a plaintiff does not assert a generalized grievance when the action he seeks to block is his own criminal prosecution under an allegedly unconstitutional law. "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Iowa Migrant Movement for Just.*, 157 F.4th at 913 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)). This is particularly true when the regulation is alleged to be unconstitutional. Such circumstances implicate not only the constitutional infirmity alleged to invalidate the challenged law but also the constitutional prohibition on depriving a person of life, liberty, or property without due process of law. After all, "a law 'beyond the power of Congress' . . . is 'no law at all.'" *Bond*, 564 U.S. at 227–28 (Ginsburg, J., concurring) (quoting *Nigro v. United States*, 276 U.S. 332, 341 (1928)). And an individual "has a personal right not to be convicted under a constitutionally invalid law." *Id*. at 226.

A generalized grievance, by contrast, does not target the plaintiff in any particular way. The paradigmatic example is a taxpayer plaintiff seeking to challenge government spending. The interests of such a plaintiff "are, in essence, the interests of the public at large," and, as a general matter, "this type of interest is too generalized and attenuated to support Article III standing." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599–600 (2007). This principle, however, does not bar "standing to challenge the *collection* of a specific tax assessment as unconstitutional;

being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer." *Id*. at 599. The threat of prosecution under an unconstitutional law likewise causes a real and immediate injury to an individual.

## II.   The Common-Use Inquiry is the Product of *Heller*'s and *Bruen*'s Historical Inquiry.

The "in common use" test belongs at the historical phase of the inquiry. Indeed, it is the *product* of *Heller*'s application of that inquiry. Under *Bruen*, courts ask a threshold question of whether "the Second Amendment's plain text covers [the plaintiff's] conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). If it does, then "the Constitution presumptively protects that conduct," and the burden shifts to "the government" to show the challenged action "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The threshold inquiry under *Bruen* is confined to the Second Amendment's "plain" or "bare" text. *Id.* at 24, 44 n.11. This inquiry will typically be brief because the relevant "textual elements" of the Second Amendment have already been defined by *Heller*. *Id.* at 32. To be clear, *Heller* applied the same text-informed-by-history framework that was elaborated on in *Bruen*. With respect to whether handguns constituted "Arms" within the scope of the Second Amendment's plain text, *Heller* held that the normal and ordinary "18th-century meaning" of the word "Arms" was the same as "the meaning today": "weapons of offence, or armour of defence," encompassing "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Dist. of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (cleaned up). It reached that determination based contemporary dictionaries, *id.*, a comparison with other provisions of the Bill of Rights, *id.* at 582, and usage in other Founding-Era legal documents, *id.* at 581. Based on this plain-text analysis, *Heller* concluded that the "prima facie" meaning of "Arms" extends "to all instruments that constitute bearable arms." *Id.* at 582. Or as the Court later put it, the "textual

elements" of the Second Amendment "guarantee the individual right to possess and carry *weapons in case of confrontation.*" *Id.* at 592 (emphasis added).

Having established the meaning of the Second Amendment's plain text, the Court then proceeded to address historical limits on the right to keep and bear arms. *See id.* at 626–28. And it was at this phase of the analysis that the *Heller* Court announced the "in common use" test. *Heller*'s historical analysis focused on Founding-Era laws, *e.g.*, *id.* at 627, 629, 631–34, judicial decisions, *e.g.*, *id.* at 627, and legal treatises, *e.g.*, *id.* And with respect to the scope of the "Arms" protected by the Second Amendment, the Court suggested that "dangerous and unusual weapons" could be banned. *Id.* (quotation marks and citation omitted). But the Court made clear that weapons that were "in common use at the time" were "protected" and therefore could not be banned. *Id.* (quotation marks and citation omitted). This "limitation" on the textual scope of the term "Arms" was based on the Court's analysis of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" a regulatory tradition that dated to medieval England and that *Heller* traced through the commentaries of Blackstone and James Wilson and several early-American state laws. *Id.* at 582, 627 (citation omitted). But this historical tradition of firearms regulation does not allow the government to restrict "arms in common use at the time for lawful purposes like self-defense." *Id.* at 624 (quotation marks omitted). *Heller*'s "in common use" test is based on this historical tradition. It is not based on any textual analysis of the plain meaning of the word "Arms." After all, "there is nothing in the plain text of 'arms' that would allow for exclusion of certain types of firearms." Peter A. Patterson, *Common Use Is Not a Plain-Text Question*, PER CURIAM, HARV. J.L. & PUB. POL'Y 1, 2 (2025), https://perma.cc/AZS3-JKAN [hereinafter Patterson, *Common Use*].

Nonetheless, "[s]ome have contended that [*Bruen*] supports a contrary conclusion or at

7

least introduces uncertain[t]y about where the 'common use' question fits into the analysis," *id.*, based on the following passage from that decision:

> Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement. . . . It is undisputed that [the plaintiffs]—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects. Nor does any party dispute that handguns are weapons 'in common use' today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense.

*Bruen*, 597 U.S. at 31–32 (citations omitted). While this passage cites the "in common use" test and then, in the following sentence, references "the plain text of the Second Amendment," *id.* at 32, it does not shift the "in common use" test from the history phase to the text phase.

Such an interpretation would, as an initial matter, "be at odds with the fact that the common-use test is not about the semantic meaning of the Second Amendment's plain text, which *Bruen* repeatedly describes as the focus of" the threshold textual analysis. J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 26 (2025) [hereinafter Alicea, Bruen *Was Right*]. As discussed, the "in common use" test is exclusively grounded in *history*—there is no basis for it whatsoever in the ordinary meaning of the word "Arms," and *Heller* explicitly bases it on our "historical tradition." 554 U.S. at 627. That is not simply *Plaintiffs'* interpretation of *Heller*, it is *Bruen's own interpretation of Heller*. *Bruen* itself quotes *Heller*'s holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582), "a proposition that is inconsistent with presumptive textual protection only for arms in common use," Patterson, *Common Use*, at 3. And *Bruen* also clearly indicates "that the 'common use' standard is the product of *Heller*'s evaluation of 'historical tradition' and therefore is part of 'the historical understanding' that 'demark[s] the limits on the exercise of" the 'individual right to armed self-defense.'" *Id.* (quoting *Bruen*, 597 U.S. at 21, 46).

Rather than holding, or even implying, that the "common use" test is analytically located

8

in the threshold inquiry of the text-informed-by-history framework, what the above passage from *Bruen* actually did was "conclude[ ] in summary fashion that there was nothing" in the *historical* phase of the inquiry "that would have defeated the plaintiffs' claims based on who they were or the weapon they wanted to carry." Alicea, Bruen *Was Right*, at 27. Neither the scope of the "people" nor the "Arms" protected by the Second Amendment "were in dispute," *id.*, so this passage merely dispatched those issues—both as a matter of text *and* history—before turning to the real contest in the case: the conduct that those people intended to engage in with those arms. That is evident from the Court's final sentence in the relevant passage: "[w]e therefore turn to whether the plain text of the Second Amendment protects [the plaintiffs'] *proposed course of conduct*—carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32 (emphasis added).

Indeed, *Bruen* does not imply that the "in common use" test applies at the threshold "plain text" phase of the inquiry; it "*refutes* that very argument." Patterson, *Common Use*, at 2. For in this brief passage, "the Court resolved entirely the question of whether the arms at issue in the case were protected by the Second Amendment, not just presumptively protected by the plain text." *Id. Bruen* does not say that handguns are *prima facie* covered by the Second Amendment as a matter of plain text, it says, "that they are protected, *period.*" *Id*. That conclusion is only possible because *Bruen* resolved the issue "*conclusively* with respect to text and history, *i.e.*, steps one *and* two." *Id*.

III.    **To Determine Whether a Type of Arm is "in Common Use," a Court Should Look to Nationwide Evidence of Whether it is Numerically or Jurisdictionally Common.**

The inquiry of whether an arm is in common use typically starts with counting the total number of the type of arm in question. A natural reading of *Heller*'s language—distinguishing between arms "in common use" and those "that are highly unusual in society at large," 554 U.S. at 627—establishes this metric. And for some types of arms, the inquiry can end with this metric, as the sheer numerosity of an arm may establish that it cannot possibly be considered both a

dangerous *and* unusual weapon. Justice Thomas's dissent from the denial of certiorari in *Friedman v. City of Highland Park*, 577 U.S. 1039 (2015), exemplifies this approach. There, the plaintiffs had challenged a city ordinance that barred the possession of popular semiautomatic rifles such as the AR-15. Justice Thomas reasoned that the ban was "highly suspect" because "[r]oughly five million Americans own AR-style semiautomatic rifles," and "[t]he overwhelming majority" did so for lawful purposes. *Id*. at 1042 (Thomas, J., dissenting from the denial of certiorari). "Under [the Supreme Court's Second Amendment] precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id*.

Whatever the lower bound for establishing commonality based on numbers alone, it does not follow that an arm that is less widely owned is not in common use. The Second Amendment protects *all* common arms, not just the most popular. The ultimate question is whether, based on the actions of the American people, a given weapon is both dangerous and unusual. Therefore, any arm that is owned by substantial numbers of Americans and that is generally lawful for typical Americans to possess and use across the country should be considered in common use. After all, if the American People truly deemed an arm to be a dangerous and unusual weapon, it is likely that they "would . . . rush[ ] to regulate [it]" rather than allowing it to be available in the same manner as any other common arm. *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*, 974 F.3d 237, 258 (3d. Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vacated, and remanded sub nom. ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022) (mem.).

These principles are illustrated by Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016). There, the Supreme Court vacated a decision of Massachusetts's highest court sustaining that state's ban on the possession of stun guns. The Court's brief *per curiam* opinion repudiated the state court's reasoning and remanded, but Justice

10

Alito authored a concurring opinion, joined by Justice Thomas, setting out their reasoning more fully. After explaining that the relevant test in an arms ban case is whether the arms in question "are commonly possessed by law-abiding citizens for lawful purposes today," Justice Alito went on to apply that test to stun guns. *Id.* at 420 (Alito, J., concurring) (emphasis omitted). "The more relevant statistic," he stated, "is that hundreds of thousands of Tasers and stun guns have been sold to private citizens"—such that "approximately 200,000 civilians owned stun guns as of 2009"—"who it appears may lawfully possess them in 45 States." *Id.* (cleaned up). As a result, Justice Alito concluded, stun guns are "widely owned and accepted as a legitimate means of self-defense across the country" and thus cannot be banned consistent with the Second Amendment. *Id.* Justice Alito's *Caetano* concurrence therefore indicates that even if an arm is not so numerous that numbers alone establish its commonality, an arm is in common use when it is owned by a substantial number of Americans and is generally lawful across the country. *See also Snope v. Brown*, 145 S. Ct. 1534 (2025) (mem.) (Kavanaugh, J., respecting the denial of certiorari); *United States v. Bridges*, 150 F.4th 517, 548 (6th Cir. 2025) (Nalbandian, J., concurring in part and concurring in the judgment).

This approach is also supported by the Supreme Court's decisions in *Staples v. United States*, 511 U.S. 600 (1994), and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025). While neither was a Second Amendment case, in both the Court sought to distinguish common from more unusual arms, and both used similar analyses, rejecting that arms were suspect when they were "commonplace and generally available," *Staples*, 511 U.S. at 611, or "widely legal and bought by many ordinary consumers," *Smith & Wesson*, 605 U.S. at 297.

The ultimate question, under *Heller*'s binding interpretation of historical tradition, is whether the practices and customs of the American people have adjudged an arm to be unfit for ordinary use by the common person—"highly unusual in society at large," 554 U.S. at 627, and

11

not "accepted" as "legitimate," *Caetano*, 577 U.S. at 420 (Alito, J., concurring). If an arm is owned and generally available for purchase by common Americans, the Government cannot bear its burden of showing that it has been deemed to fall outside our constitutional tradition in this way.

**IV.      Plaintiffs Arguably Bear the Burden of Proving that an Item is Covered by the Plain Text of the Second Amendment.**

The Supreme Court has not answered the question of who bears the burden of proving that an item is covered by the plain text of the Second Amendment. Nevertheless, post-*Bruen*, several lower courts have determined that it is plaintiffs who bear that burden. *See, e.g.*, *United States v. Morgan*, 150 F.4th 1339, 1343 (10th Cir. 2025); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 229 (4th Cir. 2024) (en banc); *Hanson v. District of Columbia*, 120 F.4th 223, 231–34 (D.C. Cir. 2024). Plaintiffs do not contest that this conclusion is reasonable. Ordinarily, the party challenging a statute's constitutionality bears the initial burden of showing that his conduct implicates the constitutional right in question. For example, in the First Amendment context, the government assumes the burden of "justify[ing] impingements on First Amendment interests" only if the claimant first "demonstrate[s] that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Given that "*Heller* repeatedly compared the right to keep and bear arms" to "the freedom of speech in the First Amendment," *Bruen*, 597 U.S. at 24, the same burden allocation likely applies to *Bruen*'s framework.

**V.       Possession of Suppressors Is Covered by the Plain Text of the Second Amendment.**

As explained, the original meaning of the term "Arms" in the Second Amendment is "[w]eapons of offence, or armour of defence." *Heller*, 554 U.S. at 581 (quotation marks and citation omitted). This "historically fixed meaning applies to new circumstances." *Bruen*, 597 U.S. at 28. It is not limited "only [to] those arms in existence in the 18th century." *Id.* (quoting *Heller*, 554 U.S. at 582). This "general definition" therefore "covers modern instruments that facilitate

12

armed self-defense," *id.*, regardless of whether they are "thoroughly modern invention[s]," *Caetano*, 577 U.S. at 412 (quotation marks and citation omitted).

The relevant conduct for purposes of determining whether "suppressors" are protected by the plain text of the Second Amendment is the possession or acquisition of a firearm equipped with a suppressor. A suppressor has no purpose other than for use as part of a firearm, so it cannot be divorced from the firearm to which it is affixed for purposes of this inquiry. Characterizing the relevant conduct another way would be like concluding that the First Amendment does not protect a sound amplification device simply because it is external to a person's vocal cords and a person can physically speak without one. But the Supreme Court has held that the First Amendment covers sound amplification devices. *See Saia v. People of State of N.Y.*, 334 U.S. 558, 561–62 (1948). Just as the First Amendment is implicated when the government "regulat[es] decibels" of speech, *id.* at 562, the Second Amendment is implicated when the government regulates decibels of firearms.

When the Second Amendment inquiry is properly framed in this way, the NFA's regulation of suppressed firearms implicates presumptively protected conduct. The plain text of the Second Amendment covers the possession of a suppressed firearm because a firearm outfitted with a suppressor is an "arm": it is "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quotation marks and citation omitted). A homeowner confronting a late-night intruder can use a suppressed firearm to defend his family while preserving his hearing, avoiding night blindness from muzzle flash, and maintaining the ability to hear and communicate clearly during those critical moments, without the need for at-the-ear muffling. Because the challenged NFA provisions as applied to suppressors regulate "arms-bearing conduct," *United States v. Rahimi*, 602 U.S. 680, 691 (2024), those challenged provisions implicate the plain text of the Second Amendment.

Alternatively, the Second Amendment's plain text covers suppressors because they are designed to facilitate the use or affect the functionality of an arm. Regulating a firearm component or accessory designed to affect the functionality or facilitate the use of a firearm implicates the right to keep and bear arms under well-established constitutional reasoning.

Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). American courts accordingly have long recognized that the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871); *accord United States v. Miller*, 307 U.S. 174, 180 (1939); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see also N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting).

The right to keep and bear arms has had an intimate connection with items designed to facilitate the use of arms since the Founding. The Second Amendment's prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Meanwhile, Congress's power to "provide for . . . arming . . . the Militia," U.S. CONST. art. I, § 8, cl. 16, refers to the same militia that the Second Amendment contemplates. *Heller*, 554 U.S. at 596. Exercising that authority, the Second Congress passed the Militia Act of 1792, which required "able-bodied" citizens "provide" themselves with not only a "good musket or firelock" but also a "sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball." Act of May 8, 1792, ch. 33, 1 Stat. 271, 271, § 1. In other words, in providing for "arming" the militia, Congress

14

appropriately required the possession of various items other than firearms because of the way those items facilitated the use of firearms. It should follow that law-abiding citizens when exercising the right to arm themselves must also have the right to possess items designed to affect the functionality or facilitate the use of firearms. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

Just as other constitutional provisions protect myriad conduct that facilitates exercise of the right, the Second Amendment does too. The First Amendment protects spending for speech because the "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part). The Fifth Amendment due process right requires that a defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" to stand trial. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). The Sixth Amendment right to counsel protects "the right to use lawfully owned property to pay for an attorney." *Luis*, 578 U.S. at 25 (Thomas, J., concurring in the judgment). The Fifth and Sixth Amendment rights to a jury trial, to confront one's accusers, and the privilege against self-incrimination protect against unknowing or involuntary guilty pleas. *Parke v. Raley*, 506 U.S. 20, 28–29 (1992). Because the Second Amendment right "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees,'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.)), it protects the possession and use of firearm components or accessories designed to affect the functionality and facilitate the use of arms.

These principles confirm that the Second Amendment protects suppressors. The

15

overwhelming evidence is that suppressors are safe, effective, and commonly used devices that decrease the noise level of a gunshot and are recommended by numerous professional organizations for the safest use of firearms. *See* Mem. of L. in Supp. of Pls.' Mot. for Summ. J. at 32–37 (Nov. 14, 2025), ECF No. 24 ("Pls.' MSJ").

To be sure, a suppressor cannot, by itself, expel a projectile, just as a sound amplifier cannot speak on its own. *See Saia*, 334 U.S. at 561–62 (holding that the First Amendment covers sound amplifiers). Notably, *no single part* of a firearm can expel a projectile on its own. Yet the regulation of other components of firearm functionality such as an ammunition magazine, a rifle barrel, or a trigger is still a regulation of a firearm. *See, e.g.*, *ANJRPC v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (holding magazines are "arms"); *see also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967–68 (9th Cir. 2014) (holding that hollow-point ammunition is covered by the Second Amendment because of the "corresponding right to obtain the bullets necessary to use [firearms]" (quotation marks and citation omitted)); *Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition . . . ." (quotation marks and citation omitted)).

Nor is it possible to meaningfully distinguish between different components that affect firearm functionality for purposes of Second Amendment analysis. "[W]hether a firearm component is an inherent and 'necessary' part of the arm itself, or instead merely an 'optional' and unnecessary accessory to the arm, is a hopelessly indeterminable and inadministrable distinction." *Duncan v. Bonta*, 133 F.4th 852, 916 (9th Cir. 2025) (en banc) (VanDyke, J., dissenting). "[J]ust as with televisions and sewing machines, there is no such thing as a stock-part basic firearm . . . . There are many parts that constitute the arm, most of which usually can be swapped out to emphasize and improve certain functions over others." *Id.* at 919. Case in point: although suppressors are sometimes detachable, they are sometimes *integral* components of a firearm that

16

cannot be removed. *See Maxim 9 Instruction Manual*, SILENCERCO, https://perma.cc/3VKZ-6CXN. Accordingly, the keeping and bearing of "arms" necessarily includes the possession of any "*functional* component" of an "arm"; otherwise, governments could ban all manner of "arms" simply by regulating their individual components. *Duncan*, 133 F.4th at 919 (VanDyke, J., dissenting).

Out-of-circuit decisions to the contrary fail to persuade. The Tenth Circuit, in a sparsely reasoned decision that predates *Bruen*, concluded, without further explanation, that a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Similarly, the Fourth Circuit, in an unpublished decision, stated that a suppressor is a mere "firearm accessory" that "fails to serve a core purpose in the arm's function." *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024); *see also United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sep. 20, 2019); *United States v. Arthur*, No. 7:22-cr-5-D, 2023 WL 12195529, at *7–8 (E.D.N.C. Jan. 17, 2023), *aff'd on other grounds*, 160 F.4th 597 (4th Cir. 2025). But those decisions are premised on the fallacious "assumption that there is some Platonic ideal of a firearm." *Duncan*, 133 F.4th at 918 (VanDyke, J., dissenting). By that logic, a "magazine is only 'a box that, by itself, is harmless,' a grip could be characterized as just a piece of polymer, a barrel as just a steel tube, and a bullet as just a small hunk of metal." *Id.* at 917. And "that would mean a grip or a sighting system is not a protected component of a firearm because those pieces are 'optional components' not strictly necessary to make the gun fire a round." *Id.* The "Second Amendment cannot apply only to firearms containing just those parts that [the government] deems essential and necessary." *Id.* at 919.

If the Second Amendment's "protection of 'Arms' [did not] extend to their functional

17

components . . . the Second Amendment would be a shallow right—easily infringed by basic indirect regulation." *Id.* at 897 (Bumatay, J., dissenting). There is no principled basis on which to distinguish which components or accessories are protected and which are not. Because a suppressor affects firearm functionality, it is an "arm" protected under the Second Amendment.

Finally, it bears emphasis that there is no dispute between the parties that the plain text of the Second Amendment covers possession of suppressors. Pls.' MSJ at 26; *see* Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. at 28–32 (Dec. 17, 2025), ECF No. 33; *see also* Defs.' Answer to Pls.' Compl. ¶¶ 48–50 (Oct. 10, 2025), ECF No. 19; Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1–5, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [Pls.' App'x at Appx.230–34].

## VI.     The NFA is Not a "Shall-Issue" Licensing Regime.

The NFA is not a "shall-issue" licensing regime. It is instead a taxation and registration regime. There is a distinction between licensing and registration. *Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*"). "Licensing requirements" might "advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public," *id.* at 1291, or "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). But "[r]egistration requirements . . . require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can," so they "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). The NFA falls into the latter, registration category, not the former, licensing category. Consequently, treating the nondiscretionary aspect of the NFA as the key feature for purposes of

the constitutional analysis would erase the distinction between licensing and registration.

The erasure of that distinction is inconsistent with the Supreme Court's precedents, which have treated registration differently than licensing by expressing serious doubt about the constitutionality of the former. In *Miller*, the Court affirmed a prosecution for possessing an unregistered short-barreled shotgun because the Court was not presented with "any evidence tending to show" that short-barreled shotguns were protected and declined to take judicial notice that they were. 307 U.S. at 178. But "if registration could be required for all guns, [*Miller*] could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting). And in *Heller*, the Court suggested that the NFA's "restrictions on machineguns . . . might be unconstitutional" if machineguns were protected arms. 554 U.S. at 624. By contrast, footnote nine of *Bruen* suggested that licensing might be constitutionally applied to protected arms. *See* 597 U.S. at 38 n.9.

## VII.    "Shall-Issue" Licensing Regimes Are Not Presumptively Constitutional.

As an initial matter, the question of whether "shall-issue" licensing regimes are presumptively constitutional is academic here because the NFA is not a "shall-issue" licensing regime. But even putting that dispositive point to the side, "shall-issue" licensing regimes are not presumptively constitutional. The position that all shall-issue licensing regimes are presumptively constitutional has no limiting principle. All that would be required for the Government to be presumptively free to track lawful firearm ownership, complete with sensitive personal identifying information about the owner of any specific firearm, would be for the regime to deny the Government discretion to prohibit the possession of the firearm.

Furthermore, this position would upend who bears the burden of establishing

19

constitutionality under *Bruen*. If the Second Amendment covers an individual's conduct the "*government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24 (emphasis added). *Bruen*'s "Footnote Nine" did not "presumptively immunize" any licensing regime "from constitutional challenge absent special circumstances." *Maryland Shall Issue*, 116 F.4th at 240–41 (Richardson, J., dissenting). Instead, the footnote "limited the Court's holding to the particular kind of licensing regime at issue in *Bruen* while leaving open constitutional challenges to other kinds of licensing regimes." *Id.* at 241. Footnote nine "merely clarified that shall-issue licensing regimes are not necessarily unconstitutional just because may-issue regimes are." *Id.* at 242. Reading footnote nine to do anything more "would elevate implications from dicta over the mandatory text-and-history test established in *Bruen*." *Id.* at 241. Consequently, "text, history, and Supreme Court precedent establish that any regulation of protected conduct, if unjustified, infringes the Second Amendment right." *Id.* at 245. Any shall-issue licensing regime that regulates protected conduct under the Second Amendment's plain text, therefore, must be justified according to history and tradition. *Id.*

## VIII.    ATF's Application of the NFA in this Case.

To the extent the Court determines the NFA to be at least in part a shall-issue licensing regime, the Government has applied the NFA "toward abusive ends" by leveraging the Act to establish a registry of protected arms. As Plaintiffs have explained, registration of protected arms is unsupportable as a matter of the Second Amendment's text and this Nation's historical tradition. *See* Pls.' MSJ at 39–40; Pls.' Combined Reply & Opp'n at 35–37 (Jan. 21, 2026), ECF No. 56.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny the Government's motion.

Dated: March 31, 2026

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson – 450503(DC)*
Peter A. Patterson – 998668(DC)*
Nicholas A. Varone – 1739141(DC)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
nvarone@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

On March 31, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Missouri, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC