IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| STATE OF MISSOURI *ex rel.* CATHERINE L. HANAWAY, ATTORNEY GENERAL OF MISSOURI; and DAVE MARSHAK,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES; and ROBERT CEKADA, in his official capacity as DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,<br><br>Defendants. | ) | Case No. |

## COMPLAINT

For their complaint, Plaintiff the State of Missouri, appearing on relation of its Attorney General, Catherine L. Hanaway and Dave Marshak respectfully allege as follows:

## INTRODUCTION

1. In 1934, Congressed enacted a robust regulatory and registration scheme of firearms under the National Firearms Act ("NFA"). Premising the Act on Congress's taxing power, Congress imposed a $200 tax on the manufacture and transfer of particular classes of firearms. The NFA's authors left no doubt that the NFA was an exercise of the taxing power, and the Supreme Court upheld it on that basis. *See*

*Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). This has been the uncontroversial understanding of courts and commentators for nearly a century. *See, e.g.*, *Silencer Shop Found. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:25-CV-056-H, 2026 WL 2255460, at *18 (N.D. Tex. Aug. 5, 2026) ("Congress enacted the NFA under the taxing power—and the taxing power only.").

2. The NFA, however, no longer imposes any tax on the vast majority of firearms it purports to regulate. On July 4, 2025, the One Big Beautiful Bill Act zeroed the manufacture and transfer tax on nearly all NFA-regulated firearms. That means the constitutional foundation on which the NFA rested has dissolved. *See, e.g.*, *United States v. Constantine*, 296 U.S. 287, 295 (1935) (provision that does not generate revenue cannot be justified as a tax). And the NFA cannot be upheld under any other Article I power. Thus, with respect to the untaxed firearms, the NFA is now unconstitutional. *Silencer Shop*, 2026 WL 2255460, at *11–26.

3. The One Big Beautiful Bill Act left undisturbed the NFA's registration requirements and restrictions on manufacture and transfer, which for most NFA firearms now lack any accompanying exercise of Congress's taxing power. *Id.*

4. Wholly apart from the NFA's constitutional infirmity in the above respect, the NFA's restrictions also constitute an unconstitutional regulatory scheme of suppressors and short-barreled rifles under the Second Amendment.

5. Under *New York State Rifle & Pistol Association v. Bruen*, the Second Amendment presumptively protects the People's right to keep and bear all arms. 597 U.S. 1, 17 (2022). If an item qualifies as an "arm," the Second Amendment protects

to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme.

6. Firearms equipped with suppressors and short-barreled rifles are "arms" as a matter of plain text. As a matter of history, these arms are neither dangerous nor unusual. Because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

7. Plaintiffs seek an order declaring that the NFA is unconstitutional with respect to the untaxed firearms it purports to regulate and enjoining enforcement of the unconstitutional provisions. The NFA's regulatory requirements pertaining to untaxed firearms burden Plaintiffs and Missourians. Additionally, Plaintiffs seek a judgment declaring that the NFA is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles and enjoining enforcement of the unconstitutional provisions and any related regulations.

## PARTIES

### I. Plaintiffs

8. Plaintiff State of Missouri is a sovereign state of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interest in protecting its citizens, businesses, and employees. Missouri brings this suit through its Attorney General Catherine L. Hanaway. She is the chief legal officer of Missouri and has the authority to represent Missouri in civil litigation. Mo. Rev. Stat. § 27.060.

9. The State of Missouri, on relation of its Attorney General, brings this action to put an end to the unlawful and unconstitutional regulation of untaxed NFA firearms. Missouri, through its Attorney General, has the authority to bring this action because this suit alleges that Defendants have, are, and will continue unlawfully and unconstitutionally regulating untaxed NFA firearms to Missouri's and its citizens' detriment, which is conduct in which the State has an express interest under Missouri Revised Statute § 27.060.

10. Missouri, one of its agencies, and its employees possess and transfer NFA firearms and are not exempt from the reach of the challenged NFA requirements. Missouri will continue these activities, as they are necessary for Missouri to carry out its law-enforcement responsibilities.

11. Missouri also has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. "[A] State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982).

12. Missouri sues to vindicate its quasi-sovereign interest in securing its residents from the harmful effects that the unlawful and unconstitutional regulation of nontaxed NFA firearms has caused, is causing, and, if not stopped, will keep causing.

13. Plaintiff Dave Marshak is a natural person and a citizen of the United States and a citizen of Festus, Missouri. Marshak is an adult over the age of 21 who is

eligible to purchase and possess firearms under state and federal law. Marshak is a gun owner and a supporter of the Second Amendment right to keep and bear arms.

14. To that end, Marshak values his personal privacy and does not want the federal government to obtain identifying information about his personally owned firearms, including information such as his name, physical appearance and characteristics, date of birth, demographic information, fingerprints, home address, or the make, model, caliber, physical dimensions, serial number, legal classification, quantity, or physical location of his firearms.

15. However, federal law currently requires that Marshak and other Missourians provide all of this identifying information to the federal government in order for them to register and legally purchase, make, or possess short-barreled rifles, short-barreled shotguns, the NFA category "any other weapons" (collectively, "short-barreled firearms"), or silencers defined and regulated under the NFA. *See* 26 U.S.C. §§ 5845, 5841; 27 C.F.R. §§ 479.62, 479.84. Marshak and Missouri object to this onerous registration requirement, which requires the collection of personal information akin to that obtained from an individual being arrested and charged with a crime.

16. Collecting and providing this NFA registration information as a precondition to lawful ownership and possession imposes a significant regulatory burden on gun owners. For example, in order to register an NFA-regulated item, Marshak must spend time completing application forms promulgated by ATF, and then wait for ATF to issue an approval determination, enter his registration information, and authorize his possession of the NFA-regulated item. *See* ATF, OMB No. 1140-0011, Application

to Make and Register NFA Firearm (2026);[1] ATF, OMB No. 1140-0014, Application to Transfer and Register NFA Firearm (Tax-Paid) (2026).[2] Completing these ATF forms online can take the better part of an hour. Then, Marshak and other Missourians must wait days, weeks, or sometimes months for ATF to enter their registration information and issue an approval determination. *See Current Processing Times*, ATF.[3] ATF has publicly admitted "that registering firearms . . . under the NFA will impose a time burden." Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6563 (Jan. 31, 2023).

17. Moreover, Marshak and other Missourians must incur costs related to providing their fingerprint information and a photograph with each NFA registration application. Missourians have incurred these time and monetary costs in the past, having registered short-barreled rifles, short-barreled shotguns, and silencers with ATF.

18. Because of Congress's recent reduction of the NFA's excise tax rate for short-barreled firearms and silencers from $200 to $0, Marshak and other Missourians now wish to purchase and possess NFA-regulated items—specifically, short-barreled rifles, short-barreled shotguns, silencers, and other regulated weapons. They would purchase these firearms within 30 days of the effective date of the $0 tax, were they not required by law to register these items with the federal

[1] https://www.atf.gov/media/22361/download

[2] https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download

[3] https://archive.is/VnQxG

government. Marshak and other Missourians also would purchase at least one additional silencer within 30 days of the effective date of the $0 tax but for the ongoing registration requirement.

19. The NFA leaves Marshak and other Missourians with only two choices: comply with the onerous regulations or forgo possessing the firearms. The NFA's provisions "have teeth" and carry "severe consequences." *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023). If one were to so much as peacefully possess an unregistered NFA short-barreled firearm or silencer, they would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. § 5861.

20. Accordingly, Marshak and other Missourians will refrain from their planned acquisitions unless and until they can lawfully acquire short-barreled firearms and silencers without federal registration.

21. Marshak and other Missourians do not wish to wait an indeterminate period of time to acquire short-barreled firearms and silencers.

**II. Defendants**

22. Defendant Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF") is a component of the Department of Justice and is headquartered at 99 New York Avenue, Washington, D.C. 20226. ATF is delegated authority to enforce federal gun control laws, including the NFA's taxation and registration provisions. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a). ATF receives and processes NFA-related registration applications, issues approval determinations for those applications, and maintains the National Firearms Registration and Transfer

Record, the central registry of all NFA-regulated firearms "which are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a).

23. Defendant Robert Cedeka is Director of ATF and is responsible for overseeing the agency's enforcement of the NFA's taxation and registration provisions. *See* 28 C.F.R. §§ 0.130(a)(1)-(3); 28 U.S.C. § 510. He is sued in his official capacity.

24. Defendant Todd Blanche is the United States Attorney General. Attorney General Blanche oversees the Department of Justice, an executive department of the United States. 28 U.S.C. §§ 501, 503. He is vested with authority to enforce federal firearms laws, including the provisions of the NFA at issue in this case. *See* 26 U.S.C. § 7801(a)(2). He is sued in his official capacity.

25. Defendants have not disclaimed criminal enforcement of the NFA's registration requirement. Indeed, they continue to enforce the NFA nationwide. This is true even though Defendants are permanently enjoined from enforcing the NFA as to certain individuals, States, businesses and members of certain associations. *Silencer Shop Found. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 6:25-CV-056-H, 2026 WL 2255460, at *30 (N.D. Tex. Aug. 5, 2026).

26. If Plaintiffs were to make, manufacture, acquire, receive, transfer, possess, or otherwise use unregistered short-barreled firearms or silencers in violation of federal law, it is likely that Defendants would prosecute them for it.

## **JURISDICTION AND VENUE**

27. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

28. Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

29. Plaintiffs seek remedies pursuant to the Court's inherent authority and the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201, 2202, 2412.

30. Venue is proper in this Court because Defendants are officers and agencies of the United States, no real property is involved in this action, and Plaintiffs State of Missouri and Marshak reside in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

## STATUTORY FRAMEWORK

### I. The National Firearms Act

31. First enacted in 1934, the NFA established an excise tax of $200 on the transfer of certain categories of firearms within the United States.[4] *See* National Firearms Act of 1934, § 3, 48 Stat. 1236, 1237.

32. Among other items, the NFA's definition of "firearm" regulates suppressors, short-barreled rifles, short-barreled shotguns, and "any other weapon" ("AOWs"). *See* 26 U.S.C. § 5845(a).

33. Amendments to the NFA expanded this tax scheme to the making of such firearms. *See* Act of May 21, 1952, Pub. L. No. 353, § 1, 66 Stat. 87, 87; Gun Control Act of 1968, Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1228–29.

[4] All references contained herein to "National Firearms Act" or "NFA" refer to Chapter 53 of Title 26, U.S. Code (26 U.S.C. §§ 5801–5872) unless specific context indicates otherwise.

34. The $200 tax that the NFA imposed was a pretextual means test to preclude average citizens from possessing NFA firearms.

35. The NFA also created a burdensome registration scheme that a maker, transferor, or transferee must comply with to lawfully make, transfer, or receive the firearm. *See id.* §§ 5812, 5822, 5841, 5861; 27 C.F.R. §§ 479.62, 479.84. Before making or transferring a firearm, the maker or transferor must provide to the ATF extensive, intrusive, personally identifying information such as the maker or transferee's name, home address, photograph, date of birth, demographic information, and fingerprints, along with a detailed description of the firearms in question, including their quantity and physical location, to be entered into a central registry, the National Firearms Registration and Transfer Record. *See* 26 U.S.C. §§ 5812, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

36. Purportedly to ensure the collection of the NFA tax, the NFA established a central registry for recording the makings, transfers, and corresponding tax payments of firearms subject to the NFA (the National Firearms Registration and Transfer Record).

37. Failure to comply with the NFA carries severe consequences and penalties. *Mock*, 75 F.4th at 570. If anyone transfers, receives, or even possess an NFA-regulated firearm that is unregistered or untaxed according to the NFA requirements, that person could face imprisonment up to 10 years and fines up to $250,000. 26 U.S.C. § 5861 (unlawful acts); *id.* § 5871 (penalties); 18 U.S.C. § 3571(b)(3) (fines); *see also United States* v. *Springer*, 609 F.3d 885, 889 (6th Cir.

2010) (recognizing that NFA violations subject defendants to severe fines and imprisonment of up to 10 years). Organizations could also face a fine up to $500,000. 18 U.S.C. § 3571(c)(3).

38. Further, "[a]ny firearm involved in any violation" of the NFA "shall be subject to seizure and forfeiture." 26 U.S.C. § 5872(a).

39. The challenged NFA provisions apply to all covered firearms regardless of whether they traveled in interstate commerce and lack any commerce "jurisdictional hook." As a result, the challenged NFA provisions apply equally to a firearm an individual makes in that person's home and a firearm made by a national company and shipped to a customer across state lines.

40. The lack of an interstate commerce jurisdictional hook in the challenged NFA provisions makes them markedly different than other federal firearm statutes. For example, the Gun Control Act of 1968 explicitly regulates "interstate commerce." *See, e.g.*, 18 U.S.C. §§ 921(a)(2), 922(a)(l), (k), (n). And it contains specific Congressional findings about the relationship between the firearms industry and interstate commerce in that context. *Id.* § 922(q)(l).

41. Congress specifically premised the NFA on its enumerated power to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. I.

42. In 1937, the Supreme Court upheld the NFA's occupational tax and dealer-registration provisions against constitutional challenge, holding that the NFA was "only a taxing measure" and thus lawful pursuant to Congress's taxing power." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937).

## II. The One Big Beautiful Bill Act

43. On July 4, 2025, President Donald J. Trump signed into law the One Big Beautiful Bill Act, Pub. L. No. 119-21, H.R. 1, 119th Cong. (2025).

44. The Act eliminated the tax on transferring and making all NFA firearms except machineguns and destructive devices. *Id.* § 70436. The transfer and making tax on machineguns and destructive devices remains at $200. *Id.* But the transfer and making tax is now set at zero dollars for silencers, short-barreled rifles, short-barreled shotguns, and AOWs. *Id.*; *see also* 26 U.S.C. § 5811(a)(2), 5821(a)(2).

45. As a federal district court recently explained, "Congress's "decision to eliminate the transfer and making taxes for most NFA firearms has constitutional consequences. Without revenue generation, the regulatory requirements for those firearms—which were designed to support the transfer and making taxes—cannot be upheld under the taxing power." *Silencer Shop*, 2026 WL2255460, at *26. Nor can the NFA be upheld under Congress's power to regulate interstate commerce. *Id.* at *19–22. Accordingly, the NFA unconstitutionally regulates short-barreled rifles, short-barreled shotguns, suppressors, and AOWs. *Id.* at *12–26.

46. ATF nevertheless continues to enforce the NFA's regulatory requirements against Plaintiffs and other similarly situated parties.

## III. The Second Amendment

47. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This constitutional provision, at minimum, guarantees the law-abiding

citizens of this Nation the fundamental right to keep and bear arms for defense of self and family and for all other lawful pursuits.

48. In *District of Columbia v. Heller*, the Supreme Court explained that the Second Amendment protects the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. 554 U.S. 570, 592 (2008); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022); *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

49. *Bruen* explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. The government carries a heavy burden to overcome that presumption. The "government may not simply posit that the regulation promotes an important interest" but rather "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

50. The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id* at 28 (quoting *Heller*, 554 U.S. at 582). The Supreme Court has defined "arms" broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id.*

51. No one disputes that short-barreled rifles and short-barreled shotguns are "arms." So are silencers—they "facilitate armed self-defense," *Bruen*, 597 U.S. at 28, and, as the government has itself recognized, the NFA's provisions "impose a burden on using firearms that implicates the Second Amendment," Appellee's Suppl. Resp. to Appellant's Pet. for Reh'g En Banc at 5, *United States v. Peterson*, No. 24-30043, (5th Cir. May 29, 2025), Doc. 135.

52. That means the NFA's regulations of those arms are presumptively unconstitutional. And the presumption is not rebutted when a firearm is in "common use." *Bruen*, 597 U.S. at 47.

53. Short-barreled rifles, short-barreled shotguns, and silencers are all in common use. *See* ATF, Firearms Commerce in the United States, Statistical Update 2024 at 12 (May 2024)[5] (documenting that approximately 3,536,623 suppressors, 870,286 short-barreled rifles, and 165,180 short-barreled are shotguns registered in the National Firearms Registration and Transfer Record).

54. Had there been no tax or registration requirements on these firearms, use would be orders of magnitude more common. No historical tradition supports the regulation of these firearms. The NFA's regulations are unconstitutional.

55. Despite this constitutional guarantee, Congress has enacted, and Defendants enforce, an unconstitutional regulation of suppressors and short-barreled rifles.

[5] tinyurl.com/mscuvayt

### A. Suppressors are Second Amendment-protected arms.

56. A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve the experience and use of firearms. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, make firearms training safer and more effective, increase the accuracy and ease of use of firearms by reducing felt recoil and shot flinch, and improve the effectiveness of firearms for self-defense and defense of the home. Contrary to representations in movies and television, suppressors do not reduce all sound from a gunshot and are rarely used by criminals.

57. While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 36 (2016); *see also* Am. Suppressor Ass'n, *The American Suppressor Association ("ASA")* (YouTube, Nov. 26, 2014)[6] (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard." Halbrook, *supra*, at 36; *see also United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers" as "the same thing"). Indeed, suppressed firearms are still quite loud.

[6] https://bit.ly/45aP0qe

58. The NFA's regulation of suppressors implicates the Second Amendment's plain text. By regulating suppressors, the NFA effectively regulates suppressed firearms, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms.

59. The federal government has agreed that the Second Amendment protects suppressors. *See* Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. at 28–32, *Brown v. ATF*, No. 4:25-cv-01162-SRC (E.D. Mo. Dec. 17, 2025), Doc. 33; Defs.' Answer to Pls.' Compl. ¶¶ 48–50, *Brown v. ATF*, No. 4:25-cv-01162-SRC (E.D. Mo. Oct. 10, 2025), Doc. 19; Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. at 28–33, *Jensen v. ATF*, No. 2:25-cv-00223-Z (N.D. Tex. Dec. 19, 2025); Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1–5, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), Doc. 135 (hereinafter Gov't *Peterson* Br.) ("In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors.").

60. By forcing Plaintiffs and Missourians to comply with the NFA to possess suppressors, Defendants have burdened the right to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. amend. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

61. Defendants cannot demonstrate any such thing. *Heller* and *Bruen* have provided the sole historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of restricting the use of dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48. To be banned, a firearm must be "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original). And if a firearm cannot be banned, because it is not *both* dangerous *and* unusual, it can be regulated only if there is a historical tradition of doing so.

62. Suppressors are neither dangerous nor unusual. Arms that are in common use, like those equipped with suppressors, cannot be unusual. And suppressors, which increase the safety of a firearm and have been deemed necessary to the safest use of a firearm, cannot be dangerous. Moreover, there is not a historical tradition that supports the NFA's comprehensive registration scheme for protected arms.

63. Suppressors do not meet the Supreme Court's threshold for banning or regulating arms, so the NFA's registration scheme as to suppressors must be held unconstitutional.

**i. Suppressors are in common use.**

64. Suppressors have been broadly permitted and commonly used for over one hundred years. In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935A (filed Nov. 30, 1908).[7] Several years later,

[7] https://perma.cc/5TPE-PSZ7

Maxim explained that he invented the device to reduce sound disturbance that firearms can cause. Hiram Percy Maxim, Experiences With the Maxim Silencer 2–4 (1915).[8] President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012).[9]

65. The common use of suppressors has continued into the modern day. Americans own millions of suppressors, a number that continues to steadily increase. As of May 2021, Americans had registered nearly 2.7 million suppressors with the ATF. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021 ("ATF Statistical Update 2021"), at 16 (2021).[10] As of May 2024, ATF reported over 3.5 million registered suppressors. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, Firearms Commerce in the United States: Statistical Update 2024 ("AFT Statistical Update 2024"), at 12–13 (2024).[11] More recent ATF data indicates that by the end of 2024, there were approximately 4.5 million registered suppressors. *See* Nat'l Shooting Sports Found., Suppressor Owner Study 7 (2025).[12] And as of August 27, 2026, there were 6,654,209 registered suppressors. *See Current Processing Times*, ATF.[13]

---

[8] https://perma.cc/WY37-3YE2
[9] https://perma.cc/3G38-C5XQ
[10] https://perma.cc/4WAF-QGPQ
[11] https://perma.cc/DJC5-VBJZ
[12] https://perma.cc/HV5A-7APV
[13] https://archive.is/VnQxG

66. Suppressors are widely permitted throughout the United States. Forty-two states permit their citizens to possess and use suppressors. And the NFA allows individuals to make, transfer, or receive suppressors subject to its onerous, invasive registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

**ii. Suppressors have many lawful, safe, and common uses.**

67. Suppressors have many common, legal uses. Firearm suppressors are commonly used for lawful purposes and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

68. First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery, the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise, the Centers for Disease Control and Prevention, and the Academy of Doctors of Audiology have all recommended the use of suppressors for hearing protection. *See Suppressors for Hearing Preservation*, Am. Acad. Otolaryngology-Head & Neck Surgery (Nov. 18, 2024);[14] Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, Nat'l Hearing Conservation Ass'n (Mar. 16, 2017);[15] Lilia Chen & Scott E. Brueck, Nat'l Inst. for Occupational

[14] https://perma.cc/X4AK-4DZZ
[15] https://perma.cc/RB6V-V7JV

Safety & Health, Ctrs. For Disease Control & Prevention, HHE Rep. No. 2011-0069-3140, Noise and Lead Exposures at an Outdoor Firing Range – California 5 (2011);[16] Scott E. Brueck et al., Nat'l Inst. for Occupational Safety & Health, Ctrs. for Disease Control & Prevention, HHE Rep. No. 2013-0124-3208, Measurement of Exposure to Impulsive Noise at Indoor & Outdoor Firing Ranges during Tactical Training Exercises 14 (2014);[17] Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025).[18]

69. Because suppressors are one of the most effective hearing protection tools, police departments routinely purchase them to "[r]educ[e] potential hearing loss of officers and the public during shooting events." Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024).[19] As the Law Enforcement Management Institute of Texas concluded, "[t]o help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors." James B. Abbott, Tex. Off. Att'y Gen., Use of Firearm Suppressors by Law Enforcement to Prevent Hearing Loss 9 (2024).[20] Similarly, "[i]n 2017 the U.S. Marines began using suppressors on service weapons" to reduce

[16] https://perma.cc/8C62-Z42R
[17] https://perma.cc/UQF7-DH5Q
[18] https://perma.cc/758Z-95JC
[19] https://perma.cc/MD4N-8S79
[20] https://perma.cc/FF96-5Q9J

gunshot-related hearing loss. *See Military-Grade Protection*, Hearing Health Found.[21]

70. This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level] limit recommended by OSHA and NIOSH." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, at 38 (Mar.–Apr. 2011).[22] Consequently, "recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* at 40.

71. With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127 to 130 decibels. David Kopel, *The Hearing Protection Act and 'Silencers'*, Volokh Conspiracy (June 19, 2017).[23] An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are firearms with a silencer 'quiet'?*, Wash. Post (Mar. 20, 2017).[24]

72. Second, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors do not silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. *See* Maxim, *supra*, at 2–4.

---

[21] https://perma.cc/U369-7C2N
[22] https://perma.cc/QS93-AVV8
[23] https://perma.cc/C5FU-T6U8
[24] https://perma.cc/9M7S-NFYH

73. Third, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *See Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024).[25] Further, using suppressors in conjunction with earmuffs or earplugs (or in place of earmuffs or earplugs, in instances where traditional hearing protection is not commonly used, such as self-defense or hunting) increases a firearm user's ability to hear commands and warnings, which improves the safe use of firearms at ranges and elsewhere. *See* Halbrook, *supra*, at 34.

74. Fourth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. If an individual must use a firearm for self-defense, suppressors reduce recoil and shot flinch, improving the accuracy of a shot. The individual may not have earmuffs or earplugs at his or her disposal. Accordingly, a suppressor already affixed to the barrel of the firearm allows the individual to exercise self-defense or defense of the home while dramatically reducing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noises or signals, which may aid in coordinating self-defense activities or contacting law enforcement.

75. The federal government agrees that suppressors "have several benefits to persons in exercising their Second Amendment rights" and "facilitate the constitutional right to keep and bear arms," including "limit[ing] the noise caused by

[25] https://perma.cc/9H6M-A8LU

firearms," "improv[ing] accuracy and aid[ing] in target re-acquisition by reducing recoil and muzzle rise," and "aid[ing] in target shooting." Gov't *Peterson* Br. at 4–5.

76. Although not relevant to the constitutional inquiry, suppressors are almost never used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8(2) W. Crim. Rev. 44, 51 (2007). A leading study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions, and a large majority of those cases did not involve "the actual use of a silencer in a crime." *Id* at 52. Indeed, unsuppressed firearms "are far more likely to be actively employed, as well as used to injure a victim." *Id.* In 2017, ATF Associate Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." Ronald Turk, Bureau of Alcohol, Tobacco, Firearms & Explosives, Options to Reduce or Modify Firearms Regulations 6 (2017).[26]

77. The fact that suppressors are very rarely used for criminal purposes makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are louder than an ambulance siren or a rock concert. Brian J. Fligor, Better Hearing Inst., Prevention of Hearing Loss From Noise 8 (2011).[27] Accordingly, criminals who shoot suppressed weapons can still be heard easily.

---

[26] https://perma.cc/H52G-BJCT

[27] https://perma.cc/NAZ3-VL46

78. Suppressors can reduce or prevent hearing damage but do not silence criminal activity.

79. The federal government agrees that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov't *Peterson* Br. at 7.

80. The NFA's regulatory scheme as it pertains to suppressors, therefore, regulates the keeping and bearing of arms that are commonly possessed and used for lawful purposes, including hearing protection, public courtesy, firearm accuracy and training, and self-defense in the home.

**B. Short-barreled rifles are Second Amendment-protected arms.**

81. Short-barreled rifles are arms under the plain text of the Second Amendment. Their use can only be restricted, therefore, if they are both dangerous and unusual. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48; *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Short-barreled rifles are not dangerous and unusual weapons. The Constitution therefore guarantees the right of peaceable citizens to possess and use them.

82. First, nothing about a short-barreled rifle makes it any more dangerous than other protected arms. A short-barreled rifle is simply an intermediate size firearm that is more accurate, although less portable, than a handgun. A short-barreled rifle is also more portable, although generally less accurate, than a rifle with a longer barrel. Moreover, there is nothing inherently dangerous about short-barreled rifles, i.e., rifles with barrels under 16 inches in length. *See* Joseph G.S. Greenlee, *The*

*Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 Wyo. L. Rev. 111, 141 (2025).

83. Again, although irrelevant to this Court's constitutional inquiry, statistical surveys demonstrate that short-barreled rifles are rarely used by criminals. *See id.* For example, a survey conducted by the National Institute for Justice found that only seven of the 157 firearm criminals that they interviewed had used a short-barreled rifle. James D. Wright & Peter H. Rossi, Armed and Considered Dangerous 95 tbl. 4.6 (2d ed. 2008). That number is less than pistols, short-barreled shotguns, regular shotguns, and regular rifles. *Id*

84. Second, short-barreled rifles are in common use in the United States. As of May 2021, there were 532,725 short-barreled rifles registered with the ATF. *See* ATF Statistical Update 2021, at 16. As of May 2024, the ATF reported that number had increased to 870,286. *See* ATF Statistical Update 2024, at 12. As of August 26, 2026, there were 1,227,044 ATF registered short-barreled rifles. *See Current Processing Times*, ATF.[28]

85. To be sure, the Supreme Court in 1939 rejected a Second Amendment challenge to the inclusion of short-barreled *shotguns* in the NFA because there was insufficient evidence to demonstrate that those firearms were protected arms. *See United States v. Miller*, 307 U.S. 174, 178 (1939). But *Miller* does not foreclose a Second Amendment challenge to the NFA's application to short-barreled *rifles*—short-barreled rifles are distinct from short-barreled shotguns.

[28] https://archive.is/VnQxG

86. There is no constitutionally relevant difference between what the government unconstitutionally regulates as "short-barreled rifles" and other rifles that all agree are protected arms. Just like other rifles, short-barreled rifles are popular and commonly possessed for lawful purposes such as self-defense, proficiency training, hunting, competition, and collecting, and they are lawful to possess and use in the vast majority of states now and historically.

87. The NFA's regulatory scheme as it pertains to short-barreled rifles, therefore, regulates the keeping and bearing of arms that are neither dangerous nor unusual.

### C. There is no historical tradition supporting the NFA's comprehensive regulatory scheme for protected firearms.

88. Because suppressors and short-barreled rifles are not dangerous and unusual weapons, they cannot be ahistorically regulated due to the Second Amendment's protections. There is no historical tradition that would support the NFA's all-encompassing registration scheme for suppressors, short-barreled rifles, or any other protected arm.

89. Defendants bear the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id.* at 29.

90. Defendants will be unable to carry their burden because there is no historical tradition of requiring the registration of protected arms at all, much less punishing the failure to do so with hefty criminal penalties. *See* Greenlee, *supra*, at 140–47.

91. There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594.

92. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *Bruen*, 597 U.S. at 38 n.9 (citation omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors and short-barreled rifles, commercial suppressor and short-barreled rifle sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t).

93. Registration allows the federal government to track who has arms and, therefore, registration facilitates efforts the federal government to disarm the populace. *See generally* Stephen P. Halbrook, Gun Control in the Third Reich: Disarming the Jews and "Enemies of the State" (2013). It is thus unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

94. Suppressors and short-barreled rifles are neither dangerous nor unusual, and there is no historical tradition of requiring the registration of protected arms. Thus, the NFA's registration scheme as pertains to suppressors and short-barreled rifles is unconstitutional under the Second Amendment.

## CAUSES OF ACTION

### Claim 1
### Violation of the U.S. Constitution
### The NFA's Regulatory Requirements Exceed Congress's Authority

95. Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

96. The NFA's regulatory requirements pertaining to untaxed firearms, including 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5842, 5843, 5861, 5871, 5872, and 27 C.F.R. §§ 479.62, 479.84, exceed Congress's enumerated powers and are thus unconstitutional.

97. Congress enacted these requirements as an exercise of its taxing power, *see Sonzinsky*, 300 U.S. at 513–14, and no other power, *Silencer Shop*, 2026 WL 2255460, at *12–26.

98. Because of One Big Beautiful Bill § 70436, all NFA firearms—except machineguns and "destructive devices"—are now untaxed. The comprehensive registration scheme to make, transfer, receive, or possess those firearms nevertheless remains in effect.

99. The NFA's requirements injure Missouri, Marshak, and other Missourians.

100. Plaintiffs are entitled to a declaration that the NFA's requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA, and any regulations implementing them, exceed Congress's enumerated powers, both facially and as applied to Plaintiffs. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

101. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants from implementing or otherwise enforcing any part of the NFA that pertains to untaxed firearms.

**Claim 2**
**Violation of the U.S. Constitution**
**The NFA's Regulatory Requirements Violate the Second Amendment**

102. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though set forth fully herein.

103. The Second Amendment to the U.S. Constitution provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

104. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see also Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

105. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

106. By regulating suppressors and short-barreled rifles, the NFA regulates the use of bearable arms in common use for lawful purposes by Americans. Suppressors and

short-barreled rifles are neither dangerous nor unusual, and the Second Amendment protects their possession. There is no historical tradition that would justify the NFA's comprehensive registration scheme for protected arms.

107. Defendants therefore violate the Second Amendment right to keep and bear arms by forcing law-abiding Americans, including Marshak and other Missourians, under pain of felony violation, to comply with the challenged provisions of the NFA to make, transfer, receive, possess, or otherwise use suppressors and short-barreled rifles.

108. Defendants' enforcement of the NFA forces Marshak and Missourians either to comply with the unconstitutional registration scheme—thereby being burdened in exercising their rights under the Second Amendment to the U.S. Constitution—or be subjected to criminal prosecution.

109. As a direct and proximate result of the above infringement and impermissible burden on Second Amendment rights, Marshak and other Missourians have suffered—and continue to suffer—from an unlawful and irreparable deprivation of the fundamental constitutional right to keep and bear arms.

110. The NFA's regulatory requirements pertaining to untaxed firearms, including 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5842, 5843, 5861, 5871, 5872, and 27 C.F.R. §§ 479.62, 479.84, violate the Second Amendment. *See also* 18 U.S.C. §§ 922(a)(4), 922(b)(4).

111. The continued requirement for obtaining prior permission from the federal government before transferring or transporting an untaxed short-barreled rifle or

untaxed short-barreled shotgun violate the Second Amendment. Defendants currently enforce this requirement through NFA forms.

112. The NFA's unconstitutional requirements injure Missouri, Marshak, and other Missourians.

113. Plaintiffs are entitled to a declaration that these regulatory requirements violate the Second Amendment, both facially and as applied to Plaintiffs and Missourians.

114. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the NFA and related regulations that pertain to untaxed suppressors and short-barreled rifles. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

**PRAYER FOR RELIEF**

The State of Missouri, appearing on the relation of its Attorney General, and Marshak pray this Court:

A. Declare that the NFA's regulatory requirements pertaining to untaxed firearms exceed Congress's enumerated powers, both facially and as-applied.

B. Declare that any regulations promulgated, in whole or in part, under the NFA requirements are unlawful.

C. Declare that the NFA and corresponding regulatory requirements violate the Second Amendment with respect to suppressors and short-barreled rifles, both facially and as-applied.

D. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of the NFA with respect to untaxed firearms or, in the alternative, untaxed suppressors and short-barreled rifles.

E. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of all regulations promulgated to effectuate the challenged NFA requirements, including 27 C.F.R. §§ 479.62 and 479.844.

F. Award Plaintiffs their reasonable costs and attorneys' fees.

G. Award Plaintiffs any and all such other and further relief to which they are justly entitled at law and in equity.

Dated: September 8, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
Missouri Attorney General

<u>*/s/ Louis J. Capozzi III*</u>
Louis J. Capozzi III, #77756MO
*Solicitor General*
William J. Seidleck, #77794MO
*Principal Deputy Solicitor General*
Ryan Dugan, #77805MO
*Assistant Solicitor General*

Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Fax: (573) 751-0774
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Ryan.Dugan@ago.mo.gov

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that true and correct copies of this Petition shall be served in accordance with Federal Rule of Civil Procedure 4.

*/s/ Louis J. Capozzi III*